No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

V.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al*.,
*Defendants-Appellants.*

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

# OPENING BRIEF OF PLAINTIFF-APPELLANT


ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*


October 2, 2026

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1
Jurisdictional statement ........................................................................ 3
Statement of the issues .......................................................................... 3
Background ............................................................................................ 4
A. The Defense Production Act and related regulations ..... 4
B. Pipelines CA-324 and 325 ............................................ 8
1. The Refugio Oil Spill and Consent Decree .......... 8
2. Disputes over restarting after Sable's purchase ... 9
C. Sable's DPA request and the Wright Order ................. 12
D. Procedural history ....................................................... 14
Summary of argument ......................................................................... 16
Argument ............................................................................................. 20
I. The Wright Order is unlawful ................................................ 20
A. The Wright Order does not fall within the plain terms of the DPA's allocation or prioritization powers ........................................................................ 21
1. The allocation power is for apportioning materials, facilities, and services among competing recipients or uses, not compelling new production ................................................ 21
2. A lawful prioritization order merely designates contracts for preferential treatment... 29
B. Even if the Wright Order validly invoked the DPA's allocation or prioritization authority, it did not lawfully authorize Sable to ignore state regulations and property rights ..................................................... 32

## TABLE OF CONTENTS
## (continued)

Page


1. A valid DPA order does not provide businesses with carte blanche to defy state health and safety regulations .............................. 32

2. The DPA does not override California's right to exclude Sable from state-owned land............. 40

C. The Wright Order is arbitrary and capricious and otherwise not in accordance with law........................... 44

1. The Wright Order was ill-explained, pretextual, and oblivious to important state regulatory and property interests ........................ 44

2. The Order also violates federal regulations governing allocation orders ................................ 52

II. The district court had no other basis to deny a preliminary injunction.......................................................................... 54

A. The Wright Order is reviewable, and California has standing ........................................................................ 54

B. The remaining equitable factors strongly support injunctive relief............................................................ 57

Conclusion ................................................................................................ 61

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott Lab'ys v. Gardner*
387 U.S. 136 (1967) .......... 54

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*
594 U.S. 758 (2021) (per curiam) .......... 41, 43, 51

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*
916 F.3d 749 (9th Cir. 2019) (en banc) .......... 57

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) .......... 59

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*
870 F.3d 1140 (9th Cir. 2017) .......... 38

*Ass'n of Irritated Residents v. EPA*
686 F.3d 668 (9th Cir. 2012) .......... 25

*Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Rsrv. v. Enbridge Energy Co.*
184 F.4th 874 (7th Cir. 2026) .......... 59

*Biden v. Nebraska*
600 U.S. 477 (2023) .......... 29, 37

*Botany Worsted Mills v. United States*
278 U.S. 282 (1929) .......... 24

*Bowen v. Am. Hosp. Ass'n*
476 U.S. 610 (1986) .......... 51

*Bus. Roundtable v. Sec. Exch. Comm'n*
647 F.3d 1144 (D.C. Cir. 2011) .......... 46

*California v. Mullin*
183 F.4th 42 (1st Cir. 2026) .......... 55

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Cedar Point Nursery v. Hassid*
594 U.S. 139 (2021)....................................................................41, 59

*Chamber of Com. of U.S. v. Whiting*
563 U.S. 582 (2011)..........................................................................38

*Cipollone v. Liggett Grp., Inc.*
505 U.S. 504 (1992)..........................................................................33

*Cmty. Hosp. of Monterey Peninsula v. Thompson*
323 F.3d 782 (9th Cir. 2003) ...........................................................52

*Connecticut Nat. Bank v. Germain*
503 U.S. 249 (1992)..........................................................................23

*Cook Cnty. v. Wolf*
962 F.3d 208 (7th Cir. 2020) ...........................................................51

*Creech v. Tewalt*
94 F.4th 859 (9th Cir. 2024) ............................................................20

*Crowe & Dunlevy, P.C. v. Stidham*
640 F.3d 1140 (10th Cir. 2011) ........................................................59

*Dep't of Com. v. New York*
588 U.S. 752 (2019)...........................................................19, 47, 48, 49, 50

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020)..............................................................................51

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*
532 F.2d 957 (5th Cir. 1976) ...........................................................30

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ...........................................................57

*Franklin v. Massachusetts*
505 U.S. 788 (1992)..........................................................................55

## TABLE OF AUTHORITIES
## (continued)

Page

*Fulcrum Fin. Partners v. Meridian Leasing Corp.*
230 F.3d 1004 (7th Cir. 2000) .......... 22

*Glenn v. Tyson Foods, Inc.*
40 F.4th 230 (5th Cir. 2022) .......... 40

*Gregory v. Ashcroft*
501 U.S. 452 (1991) .......... 37, 43

*Harrington v. Purdue Pharma L.P.*
603 U.S. 204 (2024) .......... 39

*Helgeson v. Bureau of Indian Affs.*
153 F.3d 1000 (9th Cir. 1998) .......... 54

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) .......... 30, 31, 34, 35, 36, 37

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*
471 U.S. 707 (1985) .......... 40

*Huron Portland Cement Co. v. City of Detroit*
362 U.S. 440 (1960) .......... 40

*I.N.S. v. Cardoza-Fonseca*
480 U.S. 421 (1987) .......... 26

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*
959 F.3d 1201 (9th Cir. 2020) .......... 38, 40

*Johnson v. Tyson Foods, Inc.*
580 F. Supp. 3d 382 (N.D. Tex. 2022) .......... 39

*Judulang v. Holder*
565 U.S. 42 (2011) .......... 46

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Kentucky v. Env't Prot. Agency*
123 F.4th 447 (6th Cir. 2024) .......... 51

*Kentucky v. United States ex rel. Hagel*
759 F.3d 588 (6th Cir. 2014) .......... 59

*Kohl v. United States*
91 U.S. 367 (1875) .......... 42

*Learning Res. Inc. v. Trump*
607 U.S. 229 (2026) .......... 24, 29, 60

*Montana Med. Ass'n v. Knudsen*
119 F.4th 618 (9th Cir. 2024) .......... 40

*Murphy Co. v. Biden*
65 F.4th 1122 (9th Cir. 2023) .......... 55

*Murphy v. Nat'l Collegiate Athletic Ass'n*
584 U.S. 453 (2018) .......... 44

*Nat. Res. Def. Council v. U.S. Forest Serv.*
421 F.3d 797 (9th Cir. 2005) .......... 53

*Nebraska v. Su*
121 F.4th 1 (9th Cir. 2024) .......... 55

*Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*
167 F.4th 320 (5th Cir. 2026) .......... 44, 52

*Ohio River Valley Env't Coal., Inc. v. Kempthorne*
473 F.3d 94 (4th Cir. 2006) .......... 51

*Ohio v. Env't Prot. Agency*
603 U.S. 279 (2024) .......... 44, 46, 50

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*
636 F.3d 1150 (9th Cir. 2011) .......... 59

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*PennEast Pipeline Co. v. New Jersey*
594 U.S. 482 (2021)....................................................................42

*Pennhurst State Sch. & Hosp. v. Halderman*
451 U.S. 1 (1981)........................................................................24

*Ross v. Blake*
578 U.S. 632 (2016)....................................................................21

*Russello v. United States*
464 U.S. 16 (1983)......................................................................55

*Silkwood v. Kerr-McGee Corp.*
464 U.S. 238 (1984)....................................................................40

*Tennessee v. Dep't of Educ.*
104 F.4th 577 (6th Cir. 2024) .....................................................57

*Trump v. Cook*
146 S. Ct. 2234 (2026)................................................................55

*Trump v. Illinois*
146 S. Ct. 432 (2025)..................................................................60

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*
590 U.S. 604 (2020)....................................................41, 43, 51

*United States v. 50 Acres of Land*
469 U.S. 24 (1984)......................................................................43

*United States v. Robel*
389 U.S. 258 (1967)....................................................................60

*United States v. Vertac Chemical Corp.*
46 F.3d 803 (8th Cir. 1995) ...................................................35, 36

*Va. Uranium, Inc. v. Warren*
587 U.S. 761 (2019)..............................................................38, 40

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*W. Union Tel. Co. v. Pa. R.R. Co.*
195 U.S. 540 (1904)....................42

*Washington v. Trump*
145 F.4th 1013 (9th Cir. 2025)....................60

*Washington v. U.S. Dep't of State*
996 F.3d 552 (9th Cir. 2021)....................28

*West Virginia v. EPA*
597 U.S. 697 (2022)....................29

*WildEarth Guardians v. U.S. Dep't of Agric.*
795 F.3d 1148 (9th Cir. 2015)....................56

*Woods v. Cloyd W. Miller Co.*
333 U.S. 138 (1948)....................53

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952)....................42, 43, 56, 60

**STATUTES AND REGULATIONS**

5 U.S.C.
§ 706(2)(A)....................44, 52

28 U.S.C.
§ 1292(a)(1)....................3
§ 1331....................3

## TABLE OF AUTHORITIES
## (continued)

Page

50 U.S.C.
§ 4502(a)(2) ........................................ 38
§ 4502(a)(3) ........................................ 22, 38
§§ 4511-4518 ........................................ 5
§ 4511(a) ........................................ 21
§ 4511(a)(1) ........................................ 6, 29, 30
§ 4511(a)(2) ........................................ 6, 21
§ 4511(b) ........................................ 7
§ 4511(c) ........................................ 6, 7, 21
§§ 4531-4535 ........................................ 6, 23
§ 4531(a)(1) ........................................ 24
§ 4532(a) ........................................ 24
§ 4533 ........................................ 24
§ 4557 ........................................ 33, 54
§ 4558 ........................................ 37
§ 4565(e)(1) ........................................ 54

10 C.F.R.
§ 217.50 ........................................ 7, 25
§ 217.51(f) ........................................ 7
§ 217.52 ........................................ 7, 52, 53
§ 217.53 ........................................ 26
§ 217.54(b) ........................................ 7, 52, 53
§ 217.54(d) ........................................ 7, 52
§ 217.54(e) ........................................ 7

Pub. L. No. 81-774, 64 Stat. 798 (1950) ........................................ 5, 23, 42

Pub. L. No. 83-95, 67 Stat. 129 (1953) ........................................ 5

**OTHER AUTHORITIES**

96 Cong. Rec. 11510 (1950) ........................................ 25

76 Fed. Reg. 33615-01 (June 9, 2011) ........................................ 30

**TABLE OF AUTHORITIES**
**(continued)**

**Page**


2015-1502 Emergency Special Permit Conditions, Regulations.gov (Dec. 23, 2025), https://tinyurl.com/2hsyhf4j ................. 13

*Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13,199 (Mar. 13, 2026) ................................................................................. 12

Admin. Of Donald J. Trump, Memorandum on Allocating Certain Scarce or Threatened Health and Medical Resources to Domestic Use (Apr. 3, 2020), https://tinyurl.com/srnz8f52 ................... 22

*Allocate*, Webster's Int'l Dictionary (2d ed. 1950) ........................................ 22

*Apportion*, Webster's Int'l Dictionary (2d ed. 1950) ...................................... 22

Br. of United States, *Hercules, Inc. v. United States*, 516 U.S. 417 (1996) (No. 94-818), 1995 WL 495540 ...................................... 35, 37

Barron, *Memorandum for Attorneys of the Office: Best Practices for OLC Legal Advice & Written Opinions* (July 16, 2010), https://tinyurl.com/mps3zc9n ...................................................... 49

Broadwater et al., *Blocking Windmills? Banning Press? Building an Arch? Trump Cites National Security*, N.Y. Times (Sept. 22, 2026), https://tinyurl.com/3h9z73st ..................................................... 28

Else, Cong. Rsch. Serv., RS20587, Defense Production Act: Purpose and Scope (2009) ....................................................... 4, 31

Env't Health Hazard Assessment, *Refugio Beach Oil Spill Incident Fisheries Closure Chemical Testing Results Summary* (July 2015), https://tinyurl.com/22n29w37 ................................. 8

Exec. Order No. 14391, 91 Fed. Reg. 13,199 (Mar. 13, 2026) ....................... 12

## TABLE OF AUTHORITIES
## (continued)

**Page**


Fact Sheet: President Donald J. Trump Reinvigorates the Nuclear Industrial Base, The White House (May 23, 2025), https://tinyurl.com/mr4cc7f5 .......................................................27

Fed. R. App. P. 4(a)(1)(B) .......................................................3

H.R. Rep. No. 81-2759 (1950).......................................................4, 5

*Hearings Before the Comm. on Banking and Currency on S. 3936*, 81st Cong. (1950) .......................................................31

Lieff Cabraser Heimann & Bernstein, *Plains All American Santa Barbara Oil Spill* (May 2022), https://tinyurl.com/2n3r2624 ......................9

Neenan, Cong. Rsch. Serv. R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress (2023).......................................................5, 22

Off. of Env't Health Hazard Assessment, *Refugio Beach Oil Spill Incident Fisheries Closure Chemical Testing Results Summary* (July 2015), https://tinyurl.com/22n29w37 .................................8

*Preference*, Webster's Int'l Dictionary (2d ed. 1950) ....................................30

*Priority*, Webster's Int'l Dictionary (2d ed. 1950) .........................................30

*Refugio oil spill cleanup costs near $100 million*, Pac. Coast Bus. Times (June 27, 2015), https://tinyurl.com/w9m9zrrm.............................30

S. Rep. No. 81-2250 (1950).......................................................23

*Sable Offshore Corp. Investor Presentation*, U.S. Sec. and Exch. Comm'n, https://tinyurl.com/yc4k6hsm (last visited Sept. 30, 2026) .......................................................9

*Second Amendment to Senior Secured Term Loan Agreement*, U.S. Sec. and Exch. Comm'n, https://tinyurl.com/bdev8su2 (last visited Sept. 30, 2026) .......................................................10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Secretary of Defense, Memorandum: Ensuring Access to Reproductive Health Care (Oct. 20, 2022), https://tinyurl.com/yh5uyyye ........................................................ 27

*Senior Secured Term Loan Agreement*, U.S. Sec. and Exch. Comm'n, https://tinyurl.com/3cbv3tfc (last visited Sept. 30, 2026) ........................................................................................ 10

Stevenson et al., *White House Official's Move to Oil Company She Aided Raises Ethics Questions*, Politico (Aug. 21, 2026), https://tinyurl.com/3x4dru9w ........................................................ 49

Webster's Third Int'l Dictionary (1993)........................................................ 22

## INTRODUCTION

This case concerns a breathtaking assertion of executive power. In Section 101 of the Defense Production Act (DPA), Congress authorized the President and his designees to issue orders requiring companies to "allocat[e]" materials and facilities in certain ways and "prioritiz[e]" some contracts over others. But the Secretary of Energy invoked this authority to do something quite different. A private oil company was tired of working its way through regulatory procedures and easement negotiations, which were required under state law and a federal consent decree. The company's pipelines, which travel across state-owned land, had been shut down after a prior rupture and catastrophic oil spill, and required state approval to restart. At the company's behest, Secretary Wright issued an order (the "Wright Order") that purports, in one stroke, to wipe away the State's regulatory powers—and the State's power to control its own property—by "commanding" the all-too-willing company to disregard state law and property rights for as long as the federal government desires. Secretary Wright did so shortly after the Department of Justice's Office of Legal Counsel issued an opinion—also at the company's behest—stating that unilateral executive directives such as the Wright Order would automatically preempt state laws.

This is not what the DPA was designed to do and not what it allows. Congress empowered the Executive to provide for defense production needs by

ordering private actors to "prioritiz[e]" one contract over another, and to "allocat[e]" the distribution of materials, facilities, or services among various recipients or competing uses—for example, by directing steel producers to send material to military contractors even if that means failing to fulfill existing private contracts. The DPA did not provide authority to require private businesses to bring new products to market using facilities that would otherwise be inactive. Nor did it empower the Executive to nullify an entire state legal regime with the stroke of a cabinet secretary's pen. And it certainly did not authorize private companies and executive-branch officials to collude to take state-owned property.

Defendants' arguments to the contrary represent a vast expansion of executive power, subject to dangerous abuses. State laws that protect vital interests such as worker health, property rights, public safety, and the environment could be cast aside for politically favored industries to increase their rate of return. The Executive Branch could compel unwilling homeowners or retailers to "prioritize" their rooftops for solar power or require farms to "allocate" their acreage to wind turbines. And sovereign States would have their regulatory power diminished, and could even have their property commandeered, for whatever industrial or energy policy a given administration wishes to pursue—so long as it utters "national defense" as its justification.

The district court should have enjoined the Wright Order to prevent these extraordinary abuses and ensure proper adherence to the rule of law. The Order is not just contrary to the DPA's text, structure, and history; it is in fundamental tension with our system of federalism and the ordinary allocation of governmental power over private property. The Order is also arbitrary and capricious because Secretary Wright offered only internally inconsistent, ill-explained justifications for the measure and disregarded the far-reaching harms that the Order inflicts on the State. The denial of a preliminary injunction should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. The preliminary injunction was denied on August 19, 2026, 1-ER-2, and the notice of appeal was timely filed on August 21, 6-ER-1215; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the Wright Order qualifies as a "prioritization" or "allocation" order under the DPA.

2. Whether a DPA order can lawfully preempt all state regulatory requirements and override state property rights.

3. Whether the Wright Order was arbitrary and capricious, and otherwise not in accordance with law under the Administrative Procedure Act.

## BACKGROUND

This case involves two onshore oil pipelines that were closed after a catastrophic spill. As the pipelines' owner was working with state regulators to obtain approvals needed to restart, and negotiating with a state agency for an easement covering the portion of the pipelines that runs through state-owned land, the owner also pursued a parallel track: lobbying the federal government to override necessary state approvals and property rights. In March of this year, the Secretary of Energy obliged. He issued an order under Title I of the DPA, directing the pipelines' owner to "immediately commence" transporting oil through the inactive pipelines, even though the State had not provided regulatory approvals or an easement. 5-ER-780.

### A. The Defense Production Act and Related Regulations

1. Congress enacted the DPA in response to the outbreak of the Korean War. H.R. Rep. No. 81-2759, at 1 (1950). After World War II, "[b]oth the armed services and the defense industry supporting the nation's war effort had demobilized," and the government had "cut back military expenditures significantly." Else, Cong. Rsch. Serv., RS20587, Defense Production Act: Purpose and Scope 1 (2009). After the Korean War began, President Truman informed Congress that "the United States must increase its military strength and preparedness," urging action "to insure that the increased national-defense needs

will be met and that our economic strength which is at the base of our security is not impaired, but continues to grow." H.R. Rep. No. 81-2759, at 1-2.

The DPA initially contained seven titles. *See* Pub. L. No. 81-774, 64 Stat. 798, 798-815 (1950). But Congress allowed four to lapse in 1953—including Title II, which had allowed the President to requisition property for the national defense. *Compare id.* at 799-800, with Pub. L. No. 83-95, 67 Stat. 129, 129-131 (1953); *see* Neenan, Cong. Rsch. Serv. R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress 2 (2023). Under the now-expired requisition authority, the President was required to determine that the need for expropriating property was "immediate and impending and . . . will not admit of delay or resort to any other source of supply." 64 Stat. at 799-800. The President was also required to "promptly determine the amount of the compensation to be paid for any property or the use thereof." *Id.* at 800.

Of the three titles that remain in effect, two are pertinent here. Title I ("Priorities and Allocations") authorizes the President to compel prioritization of certain contracts and allocation of scarce materials to serve the national defense and energy production. 50 U.S.C. §§ 4511-4518. And Title III ("Expansion of Productive Capacity and Supply") allows the President to expand productive capacity and supply for defense needs by offering financial incentives, such as loan

guarantees to private businesses to fund the production of materials that are essential to the national defense. *Id.* §§ 4531-4535.

2. The dispute here arises under Title I. Section 101(a) contains two clauses. Under the first, the President may "require that performance under contracts or orders . . . which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). "[F]or the purpose of assuring such priority," the President may "require acceptance and performance of such contracts or orders in preference to other contracts or orders." *Id.* Under the second clause, the President may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." *Id.* § 4511(a)(2).

Section 101(c) tracks Section 101(a) in authorizing "the allocation of, or the priority performance under contracts or orders . . . relating to[] materials, equipment, and services in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c). That power, however, "may not be used" unless the President finds, first, that the materials are "scarce, critical, and essential" to "maintain[ing] or expand[ing] exploration, production, refining, transportation," "conserv[ing] energy supplies," or "construct[ing] or maintain[ing] energy facilities," *id.*

§§ 4511(c)(2)(A)(i)-(iii), and second, that these purposes "cannot reasonably be accomplished without exercising" Section 101(c), *id.* § 4511(c)(2)(B).

Under Section 101(b), the "powers granted in [Section 101] shall not be used to control the general distribution of any material in the civilian market" unless the "material is a scarce and critical material essential to the national defense" and defense-related needs "cannot otherwise be met without creating a significant dislocation" of normal civilian-market distribution and "appreciable hardship." 50 U.S.C. § 4511(b).

3. The Department of Energy has issued implementing regulations governing orders under Section 101(a) and (c). Allocation orders must "be distributed equitably among the suppliers of the materials, services, or facilities being allocated and not require any person to relinquish a disproportionate share of the civilian market." 10 C.F.R. § 217.50. An allocation order must also contain specific start and end dates, *id.* §§ 217.51(f), 217.54(b), a statement affirming it is an allocation order certified for national defense use, *id.* § 217.54(d), and a current copy of the Energy Priorities and Allocations System regulation, *id.* § 217.54(e). And if an allocation action is "used to control the general distribution of a material in the civilian market," the issuing agency must submit their findings "for the President's approval" before exercising the allocation power. *Id.* § 217.52.

### B. Pipelines CA-324 and 325

The Santa Ynez Unit is a set of three offshore oil platforms located in federal waters off the coast of Santa Barbara, California. 5-ER-778. Offshore pipelines carry crude oil from the Santa Ynez Unit to an onshore processing facility in Las Flores Canyon, California. 5-ER-779. The onshore pipelines at issue here, CA-324 and 325, connect the Las Flores Canyon facility to a distribution station in Kern County. *Id.*; 2-ER-143 (depicting map of pipelines). Several miles of that journey pass through Gaviota State Park, which is owned by the California Department of Parks and Recreation. 6-ER-1092-1094.

#### 1. The Refugio Oil Spill and Consent Decree

In May 2015, CA-324 ruptured due to external corrosion. 2-ER-143; 5-ER-888. That rupture caused the Refugio Oil Spill, in which over 120,000 gallons of heavy crude oil flowed into the coastal environment near Refugio State Beach. 5-ER-921. The spill degraded marine and coastal habitats, and caused widespread damage to marine mammals, fish, and birds. 5-ER-920-925. California waters had to be closed to commercial and recreational fishing.[1] Beaches were also closed. 5-ER-925. Cleanup operations and restoration cost approximately $96 million.[2] And

---

[1] Off. of Env't Health Hazard Assessment, *Refugio Beach Oil Spill Incident Fisheries Closure Chemical Testing Results Summary* (July 2015), https://tinyurl.com/22n29w37.

[2] *Refugio oil spill cleanup costs near $100 million*, Pac. Coast Bus. Times (June 27, 2015), https://tinyurl.com/w9m9zrrm.

the pipeline's owner at the time, Plains All American Pipeline L.P. (Plains), paid $230 million in damages to property owners and fishers impacted by the spill.[3]

In 2020, after years of litigation over civil penalties and remediation costs, Plains entered into a court-issued consent decree with state and federal agencies. 5-ER-783-884 (the Consent Decree). The Consent Decree recognized that any restart plan would require the approval of California's Office of the State Fire Marshal (OSFM), which regulates hazardous liquid pipeline safety under California Government Code Section 51011. 5-ER-862, 878-884.

### 2. Disputes over restarting after Sable's purchase

With the pipelines still inactive, they were sold to ExxonMobil, and in February 2024, they were sold again to Sable Offshore Corporation. 5-ER-779, 937-944. The purchase also included the three offshore oil platforms comprising the Santa Ynez Unit, as well as the Las Flores Canyon processing facility and the offshore pipelines from the Santa Ynez Unit to Las Flores Canyon. *Sable Offshore Corp. Investor Presentation*, U.S. Sec. and Exch. Comm'n, https://tinyurl.com/yc4k6hsm (last visited Sept. 30, 2026). The purchase price was $625 million—financed by a loan from ExxonMobil to Sable. *Id.* At the time the Wright Order issued, Sable was required to repay this loan by March 31, 2027 to

[3] Lieff Cabraser Heimann & Bernstein, *Plains All American Santa Barbara Oil Spill* (May 2022), https://tinyurl.com/2n3r2624.

avoid default.[4] Sable agreed to be bound by the Consent Decree, including the requirement for OSFM approval before restarting the pipelines. 5-ER-937-944.

In September 2025, Sable submitted a restart plan to OSFM. OSFM declined approval, advising Sable that it had failed to meet repair conditions in the Consent Decree that require permanent repair of anomalies with a 40% or greater pipeline wall loss. 5-ER-1003-1004. Those repair conditions are more stringent than the default federal and state anti-corrosion standards, which regulators deemed insufficient in light of the prior rupture. 1-ER-20; 5-ER-888.

Since 2024, Sable has also attempted to negotiate an easement allowing it to transport oil across state-owned property in Gaviota State Park and access that property to perform pipeline maintenance. 6-ER-1088-1089, 1160-1165. In 1987, State Parks had granted an easement to Sable's predecessor, but it expired in 2016. 6-ER-1087-1088, 1096-1139. Since then, the State has annually provided limited, one-year permits allowing the pipelines' owner to enter state lands for purposes of maintenance. 6-ER-1088-1089; 1143-1158. The last of those permits expired on July 26, 2026. 6-ER-1151-1153. There has been no permit or easement allowing *transportation of oil* across state lands since 2016.

---

[4] *Senior Secured Term Loan Agreement* §§ 2.03 and 7.01(a), U.S. Sec. and Exch. Comm'n, https://tinyurl.com/3cbv3tfc (last visited Sept. 30, 2026); *Second Amendment to Senior Secured Term Loan Agreement* § 1(b), U.S. Sec. and Exch. Comm'n, https://tinyurl.com/bdev8su2 (last visited Sept. 30, 2026).

When Sable began maintenance-related construction work in 2024, the California Coastal Commission informed Sable that the pipelines are located in the coastal zone, meaning that Sable's construction activities require a coastal development permit under the Coastal Act. Rather than obtaining a permit, Sable sued the Commission in Santa Barbara Superior Court in February 2025, and the Commission cross-complained for injunctive relief. *Sable Offshore Corp. et al. v. Cal. Coastal Comm'n*, No. 25CV00974 (Santa Barbara Super. Ct. Feb. 18, 2025). The court granted a preliminary injunction barring Sable from further development contrary to the Coastal Act. *See Sable Offshore Corp. v. Cal. Coastal Comm'n*, 2026 WL 1745438 (Cal. Ct. App. June 17, 2026) (affirming the injunction). The court's final judgment affirmed the Commission's cease-and-desist order.

With the clock ticking on Sable's window to repay the loan from Exxon, *supra* pp. 9-10, Sable decided to pursue a separate track for approval. In November 2025, it petitioned the federal pipeline regulator—PHMSA—to displace OSFM and assume exclusive regulatory jurisdiction over the pipelines. 5-ER-1006-1008. In December 2025, PHMSA issued such an order, declaring that it had exclusive federal jurisdiction over Lines CA-324 and 325 as *inter*state pipelines. *Id.* Petitions for review of that order and related orders are pending in this Court.[5]

[5] *See California v. Pipeline & Hazardous Materials Safety Admin.*, No. 26-508 (*PHMSA I*) (filed Jan. 26, 2026), *consolidated with Env't Def. Ctr. v. Pipeline*
(continued…)

### C. Sable's DPA Request and the Wright Order

In December 2025, Sable requested that the U.S. Department of Energy use the DPA to override California's regulatory requirements and property interests and authorize Sable to restart the pipelines. *See* 5-ER-1023-1024. In March 2026, the Office of Legal Counsel (OLC) responded by issuing a legal opinion taking the novel view that a DPA order issued to Sable by the President or his delegee "would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure." 5-ER-1021 (50 Op. O.L.C. __, (Mar. 3, 2026)). Ten days later, the President added the Secretary of Energy to the list of executive officers authorized to issue orders under Section 101(c). *Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13,199 (Mar. 13, 2026). That same day, Secretary Wright issued an order pursuant to Sections 101(a) and (c) of the DPA, entitled *Pipeline Capacity Prioritization and Allocation Order.* 5-ER-778-780.

The Wright Order directs Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons" from the Santa Ynez Unit through the Santa Ynez Pipeline System, which includes Lines CA-324 and 325.

---

*& Hazardous Materials Safety Admin.*, No. 25-8059 (filed Dec. 24, 2025); *California v. Pipeline & Hazardous Materials Safety Admin.*, No. 26-4629 (*PHMSA II*) (July 20, 2026), *consolidated with Env't Def. Ctr. v. Pipeline & Hazardous Materials Safety Admin.*, No. 26-6190 (filed Sept. 23, 2026).

5-ER-780. It also orders Sable to "immediately commence performance under contracts or orders for services . . . for hydrocarbon transportation capacity" from the "point of production" in the Santa Ynez Unit to Pentland, California. *Id.* It directs "[a]ny person contracting for or ordering . . . hydrocarbon transportation services from Sable from the point of production" to "prefer and utilize" capacity in the pipeline system "in preference to" transportation by other means, including any "alternative pipeline." *Id.* The Wright Order does not include an end date. Instead, it orders Sable to maintain compliance "until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." *Id.* Although the Wright Order itself does not refer to preemption of state regulations or property rights, when read in conjunction with OLC's opinion, it was plainly intended to override those state laws.

And that is exactly how Sable understood it. The day after the Wright Order issued, Sable started pumping oil through Lines CA-324 and 325. 5-ER-1053. At the time, Sable had no state or federal permit for that transport.[6] The restart also

[6] *See* 5-ER-1003-1004 (OSFM letter denying Sable's restart plan). Sable had received an Emergency Special Permit from PHMSA, but that permit expired before Sable restarted the pipelines. *See* 2015-1502 Emergency Special Permit Conditions, Regulations.gov (Dec. 23, 2025), https://tinyurl.com/2hsyhf4j (permit expired February 21, 2026).

violated the Consent Decree. And Sable still had no easement from the State for the portion of the journey through Gaviota State Park.

### D. Procedural History

On March 31, 2026, California filed suit, alleging that the Wright Order is contrary to law and arbitrary and capricious in violation of the APA. The State moved for a preliminary injunction blocking application of the Wright Order. 5-ER-767-769; 6-ER-1056-1085. At the time, the only document that defendants had made publicly available was the Wright Order itself, which did not include the findings necessary for a Section 101(a) order and merely recited the findings required by Section 101(c) without providing any supportive reasoning. 5-ER-778-780. It was not until defendants filed their opposition to the preliminary-injunction motion that they produced additional memoranda that purported to include and explain those required findings. 4-ER-606-607, 618-644.

The district court denied the motion for preliminary injunction as part of an omnibus order that also decided motions in other cases involving the pipelines. 1-ER-2-46. Without addressing irreparable harm or the balance of the equities, the court held that California is unlikely to succeed on the merits because "the DPA Order . . . is an allocation order, generally authorized by the plain language of Section 101." 1-ER-31. And in the court's view, an order that falls within the scope of the DPA's "allocation" authority preempts *all* state regulatory

requirements and property interests that do not "align" with the "federal executive['s] . . . actions." 1-ER-35. Here, that meant that the court saw no room for state regulations or property law to apply if they raised any hindrance to Sable's ability to immediately pump oil through the pipelines. 1-ER-35-38. The court further held that the Order satisfies the APA's arbitrary-and-capricious standard—which it called a "low bar"—and that "the agency made all necessary findings" under DPA implementing regulations. 1-ER-32-33.

With respect to other Sable-related cases, the district court granted in part the State's motion to enforce the Consent Decree in *United States v. Plains* (Case No. 2:20-cv-02415), determining that Sable violated the Decree by restarting "without justification." 1-ER-28. As a result, the court imposed a $1.449 million penalty against Sable. 1-ER-29. But the court also modified the Consent Decree prospectively by allowing Sable to continue operations and replacing OSFM with PHMSA as the pipelines' regulator. 1-ER-22-23. The district court also denied the State's motion to dismiss in *Sable Offshore Corporation v. Quintero* (Case No. 2:26-cv-02739), a case brought by Sable to bar California's Department of Parks and Recreation from bringing any action that would prevent Sable from complying with the Wright Order, including a trespass action. 1-ER-7. The court reiterated its view that the Wright Order "does, as a matter of law, preempt enforcement of any state law that conflicts with Sable's ability to operate the Onshore Pipeline,"

including trespass laws. 1-ER-41. The court thus issued a declaratory judgment that the DPA, "through Secretary Wright's allocation order, bars California's Department of Parks and Recreation from bringing legal action to prevent Sable from complying with the DPA order by operating the Onshore Pipeline." *Id.*

After the State filed its notice of appeal of the order denying its motion for preliminary injunction, defendants filed a motion to dismiss, which is fully briefed and awaiting decision. 6-ER-1230.

## SUMMARY OF ARGUMENT

The district court committed numerous legal errors in holding that California does not have a likelihood of success on the merits. The first was a fundamental misunderstanding of what counts as an "allocation" or "prioritization" order under Section 101 of the DPA. As the statute's text makes clear, "allocation" orders *apportion* facilities, materials, or services *among* various users or uses. "Prioritization" orders require a company to *prioritize* the fulfillment of one contract *over another*. Neither type of order allows executive officials to require a company to start pumping oil through pipelines that would otherwise remain inactive. The DPA's structure and history confirm what the plain text shows: Congress foresaw that executive officials might need to encourage the production of materials not currently being supplied. But rather than giving the Executive the

power to *mandate* such production, Congress provided a more limited tool in the form of loans and other financial *incentives*.

Defendants' contrary view would not only defy that considered congressional judgment; it would carry far-reaching consequences that Congress could not have reasonably intended. In defendants' view, the Wright Order is an "allocation" order because it "allocates" oil "to market." But on that theory, the Executive would have virtually unbounded authority to dictate production decisions and other commercial activities on a range of politically divisive and economically significant matters, so long as it claimed to do so in the name of national defense. For example, executive officials could order shuttered power plants to reopen, despite unresolved safety concerns; require nuclear waste to be stored in certain facilities despite fervent local opposition; direct that unsafe AI models be released to the public; or force homes and businesses to dedicate portions of their property to mining activities or energy production. If Congress had intended these remarkable consequences, it would have spoken far more clearly.

But even if the words "allocate" or "prioritize" could be stretched to cover the Wright Order, it would still be unlawful because nothing in the DPA authorized Secretary Wright to preempt *all* state regulations and property rights. Prior to the Order's issuance, Sable had not yet obtained state regulatory approval to restart because it was not in compliance with the State's restart conditions, which were

designed to prevent rupture-threatening pipeline corrosion. In that respect, Sable was in the same position as a business hoping to open a factory that has not passed fire-hazard inspections because its fire-alarm or sprinkler systems are not yet functional. Nothing in the DPA's text or history suggests that Congress authorized executive-branch officials to order that factory to open, no matter the safety risks to workers and the public. The result should be no different here.

Nor did Congress provide any basis to allow Secretary Wright to override the State's core property interests. Sable does not currently have an easement or any other form of permission to transport oil across state-owned land. And the Supreme Court has made clear that Congress must speak clearly to authorize executive agencies to invade, transfer, or otherwise interfere with property rights—especially when the relevant property belongs to a sovereign State. The DPA includes no such clear statement. Although the original version of the DPA empowered the Executive to requisition property, Congress allowed that portion of the statute to expire. And it has not been reenacted.

An alternative ground for enjoining the Wright Order is that it is arbitrary and capricious under the APA. Secretary Wright's principal justification for the Order was that it would address the risk of fuel shortages at California-based military installations. But Sable's pipelines transport crude oil, not refined transportation fuels. And the Wright Order does nothing to address the capacity of refineries that

supply fuel to California's market. Nor does it do anything to ensure military access to oil or fuel. It simply directs Sable to supply oil to all purchasers, civilian or military. The amount of oil supplied by Sable through the relevant pipelines is also miniscule in relation to California's total energy needs.

These deficiencies in the Secretary's reasoning are alone sufficient to render the Order invalid under the APA. But there is more: Agencies have an obligation to provide courts and the public with the genuine rationale for their actions. Here, much as in *Department of Commerce v. New York*, 588 U.S. 752 (2019), the serious mismatch between the Order's scope and proffered justification, as well as the series of events that led up to its issuance, strongly suggest that the Secretary's rationale was pretextual. The Secretary also disregarded the State's weighty regulatory interests and the impact of the Order on state property rights. And in multiple respects, he failed to comply with the Department of Energy's own implementing regulations.

No other barrier to an injunction exists. Although the district court did not address defendants' arguments that the Order is unreviewable, those contentions are meritless. The State has a cause of action under the APA and on ultra vires grounds. And the State's standing is obvious, in light of the Order's evisceration of California's regulatory interests and property rights. For much the same reason, the State has shown irreparable harm and that the public interest and balance of the

equities support a preliminary injunction. As this Court and the Supreme Court have made clear many times, the Executive cannot insulate unlawful actions from judicial scrutiny and relief merely by uttering the words "national security."

## ARGUMENT

This court reviews the denial of a preliminary injunction for abuse of discretion. *Creech v. Tewalt*, 94 F.4th 859, 862 (9th Cir. 2024). "'The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law.'" *Id.* That is the case here.

### I. THE WRIGHT ORDER IS UNLAWFUL

The Wright Order directed Sable to "immediately commence" pumping oil through Lines CA 324 and 325 for the first time in over a decade. 5-ER-780. Nothing in the DPA authorizes such an order. Indeed, throughout this litigation, defendants have not pointed to a single prior example in which the DPA has been invoked this way, ordering a business to begin operating a closed facility in order to commence production of a product that the business is not currently supplying. And even if the Wright Order qualified as a permissible form of "allocation" or "prioritization" under the DPA, Secretary Wright still had no authority to direct Sable to commence operations in violation of all state regulations and property rights. The district court's contrary view would give executive-branch officials

never-before-seen permission to disrupt business operations, run roughshod over property rights, and resolve questions of political and economic importance—all without the involvement of Congress.

### A. The Wright Order Does Not Fall Within the Plain Terms of the DPA's Allocation or Prioritization Powers

In issuing the Order, Secretary Wright relied exclusively on Section 101 of the DPA, which is entitled "Priority in contracts and orders." That provision authorizes only two types of directives: those which "allocate materials, services, and facilities," and those which "require that performance" under certain "contracts or orders" take "priority over performance under any other contract or order." 50 U.S.C. § 4511(a); *see also id.* § 4511(c). The Wright Order is neither.

#### 1. The allocation power is for apportioning materials, facilities, and services among competing recipients or uses, not compelling new production

a. The district court determined that the Wright Order "is an allocation order, generally authorized by the plain language of Section 101." 1-ER-31. But the opinion contained no analysis of the statute's language. "[T]hat failure makes a difference, because the statute speaks in unambiguous terms opposite to what [the district court] said." *Ross v. Blake*, 578 U.S. 632, 638 (2016).

Section 101(a)(2) authorizes the President or his delegees "to allocate materials, services, and facilities" for national-defense purposes. 50 U.S.C. § 4511(a)(2). "Allocate" means "to distribute or assign," "allot," or "apportion"—

in other words, "to divide and assign in just proportion," or "to divide and distribute proportionally." *Allocate* and *Apportion*, Webster's Int'l Dictionary (2d ed. 1950); *see also, e.g.*, *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1009 (7th Cir. 2000) (defining "allocate" as "'the act of apportioning,'" and "apportion" as "'to divide and assign in proportion' or 'to divide and distribute proportionately'" (quoting Webster's Third New Int'l Dictionary (1993))).

Section 101(a)'s authority to "allocate materials, services, and facilities" thus allows executive officials to determine how a resource should be divided or distributed *among* multiple competing uses or parties. And in the past, it has been used in exactly that way—for instance, to allocate personal protective equipment to domestic users rather than foreign ones during the COVID pandemic, or to allocate civilian aircraft to military airlifts rather than commercial activities during a crisis.[7] The allocation authority, in other words, reflects Congress' judgment that defense preparedness may sometimes require "the *diversion* of certain materials and facilities *from ordinary use* to national defense purposes." 50 U.S.C. § 4502(a)(3)(D) (emphasis added).

---

[7] *See* Admin. Of Donald J. Trump, Memorandum on Allocating Certain Scarce or Threatened Health and Medical Resources to Domestic Use (Apr. 3, 2020), https://tinyurl.com/srnz8f52; Neenan, *supra*, at 9.

The Wright Order does something quite different. It does not require that oil produced by Sable be directed to one set of purchasers or purposes rather than others. Nor does it require that pipeline capacity be used to transport Sable's oil rather than something else. Instead, it requires Sable to produce new oil and begin using an inactive pipeline. That is not within the "allocation" authority under the DPA's plain language. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (courts must "presume that a legislature says in a statute what it means and means in a statute what it says there").

b. The structure and history of the DPA reinforce Section 101's plain meaning. The DPA provides an explicit—and quite different—way to promote new or expanded production of critical resources: the financial incentives in Title III. *See* 50 U.S.C. §§ 4531-4535; *see also* 64 Stat. at 800 (Title III, entitled "Expansion of Productive Capacity and Supply"); *supra* pp. 5-6. Title III was adopted precisely because legislators realized that "[t]he process of gearing our economy to meet prospective requirements for defense and essential civilian use cannot be confined merely to the distribution of scarce supplies so as to minimize the inevitable strains and dislocations." S. Rep. No. 81-2250, at 16 (1950). "An important element of the total program" would therefore be "to accelerate the increase of available supplies of essential materials and products," with "Title III"—not Title I—"devoted to this objective." *Id.*

The key difference is that Title III imposes strict legal and practical limits on executive authority: it requires the use of voluntary *incentives*, rather than legal commands or mandates. Where Congress enacts provisions "intended to encourage" certain activities through voluntary action, courts presume that Congress does not intend for the federal government to "mandate" those same activities. *E.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 20 (1981). More generally, courts presume that "[w]hen a statute limits a thing to be done in a particular mode," Congress does not intend to authorize "any other mode." *E.g.*, *Botany Worsted Mills v. United States*, 278 U.S. 282, 289 (1929). The Supreme Court recently applied that principle in *Learning Resources Inc. v. Trump*, 607 U.S. 229 (2026). As the Court recognized, Congress had "conditioned exercise of the tariff power on demanding procedural prerequisites." *Id.* at 244 (plurality opinion); *see id.* at 308-309 (Kagan, J., concurring in part and concurring in the judgment). The Court thus rejected the President's attempt to impose tariffs under a statute that did not include those demanding procedures.

Similar logic applies here: if Secretary Wright wishes to increase oil production, Title III gives him ample authority to do so through loans and loan guarantees, 50 U.S.C. §§ 4531(a)(1), 4532(a); pre-committing to government purchases, *id*. § 4533(a)(1)(A); subsidizing production, *id.* at § 4533(c)(2); and procuring and installing equipment that will expand private facilities' capacity, *id*.

§ 4533(e)(1). But the Secretary cannot circumvent the limits on his authority under those Title III provisions by misusing Title I to accomplish the same result.

Legislative history provides additional support for California's plain-meaning interpretation. *See, e.g.*, *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 681 (9th Cir. 2012) (invoking legislative history to reinforce plain meaning). During debates on the DPA, members of Congress described the allocation authority as the ability to "take [a commodity] away from somebody who has a demand for it and give it to somebody who is going to turn it into war materiels," to require "everyone who uses critical materials . . . to give something up," and to limit "the quantities of given types of nonessential civilian end products which are produced." 96 Cong. Rec. 11510, 11515, 11526 (1950) (statements of Reps. Herter, Brown, and Addonizio). That is not what Secretary Wright did here: rather than apportioning oil among competing uses, he ordered Sable to extract and transport oil that otherwise would have not been used at all.

In the 70-plus years since the DPA's enactment, the Department of Energy's regulations have never indicated that it interprets the term "allocation" to provide the sweeping authority claimed by defendants here. Instead, the regulations repeatedly use formulations that contemplate orders apportioning materials, facilities, or services among competing users or uses. For example, one provision directs that allocation orders "not require any person to relinquish a

disproportionate share of the civilian market" by apportioning materials, facilities, or services for military needs. 10 C.F.R. § 217.50. Another provision enumerates various types of allocation orders—including orders to "reserve materials, services, or facilities capacity"; orders to "stop or reduce production of an item, prohibit the use of selected materials, services or facilities, or divert the use of materials, services, or facilities from one purpose to another"; and orders "specif[ying] the maximum quantity of a material, service, or facility authorized for a specific use." *Id.* § 217.53. No mention is made of anything resembling the Wright Order.

c. Below, defendants asserted that the Wright Order qualified as an allocation order because it "allocate[d]" oil from the Santa Ynez Unit—an offshore oil field—"to market." 4-ER-588. But that view would read the concepts of distribution and apportionment out of the definition of "allocation," contravening "the strong presumption that Congress expresses its intent through the language it chooses." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987). And the consequences of defendants' view would be truly extraordinary, allowing the federal government to interfere with our market economy in unprecedented, unbounded ways, with far-reaching political and economic implications.

Imagine, for example, how easy it would be under defendants' interpretation—with one stroke of a pen—to override political opposition, not only at the state and local levels, but in Congress. The Executive could "allocate"

nuclear power to market by ordering a shuttered plant to restart operations, bypassing safety or environmental requirements set by Congress or state law. It could sidestep one of the longest running political debates in modern American history by ordering that nuclear waste storage facilities be opened—for instance, at Yucca Mountain, Nevada, or elsewhere. It could attempt to order manufacturers of products prohibited under state law—such as mifepristone in Louisiana or assault weapons in California—to disregard state limitations and bring their products to market in those States. It could order artificial intelligence companies to release certain AI models on the market—despite significant safety risks recognized by those companies—as part of federal efforts to purportedly compete with Chinese developers. It could force a shuttered manufacturing plant to reopen, even if the owner believes operations are no longer economical, on the ground that American economic strength requires a robust domestic manufacturing sector. It could "allocate" subterranean coal to market by forcing family farms to allow strip-mining of their fields. Or it could "allocate" land to renewable energy production by ordering property owners to allow third parties to construct wind turbines or solar panels on their property.

It is not hard to conceive of "national security" or "national defense"-related arguments that executive officials could invoke to support these measures.[8] The current federal administration has not been shy about invoking "national security" to justify its favored projects. *See, e.g.*, Broadwater et al., *Blocking Windmills? Banning Press? Building an Arch? Trump Cites National Security*, N.Y. Times (Sept. 22, 2026), https://tinyurl.com/3h9z73st. Future administrations would no doubt be tempted to do the same, for different projects.

And the hypotheticals discussed above are just the beginning. Defendants' interpretation is not logically limited to orders that *compel* production or other commercial activities. Under defendants' understanding of the word "allocate," the federal government could also *prohibit* production. *See* 4-ER-589 (contending that the DPA grants "broad discretion" to "allocate" "productive activity" in any manner "necessary or appropriate to promote the national defense"). For example, it could prohibit production of fuel-efficient vehicles on the ground that national security requires demand for gas-powered vehicles to stimulate investment in fossil fuels. Or it could bar production of trucks and SUVs that require more gasoline

---

[8] *See, e.g.*, Fact Sheet: President Donald J. Trump Reinvigorates the Nuclear Industrial Base, The White House (May 23, 2025), https://tinyurl.com/mr4cc7f5 (making national security argument in favor of expanded nuclear power generation); Secretary of Defense, Memorandum: Ensuring Access to Reproductive Health Care (Oct. 20, 2022), https://tinyurl.com/yh5uyyye (providing military readiness justification for access to abortion services).

than compact vehicles, on the ground that national security requires reduced reliance on fossil fuels.

Congress would have spoken far more clearly had it intended to convey this power. "Congress 'does not hide . . . elephants in mouseholes.'" *Washington v. U.S. Dep't of State*, 996 F.3d 552, 562 (9th Cir. 2021). And where the Executive Branch claims a "newfound power," representing a "transformative expansion in its regulatory authority" on a question of "economic and political significance," *West Virginia v. EPA*, 597 U.S. 697, 724, 729-730 (2022) (internal quotation marks and brackets omitted), "clear congressional authorization" is required, *id.* at 732; *see also Biden v. Nebraska*, 600 U.S. 477, 502-503 (2023); *Learning Res.*, 607 U.S. at 246-247 (plurality opinion). No clear authorization exists here. The text, structure, and history of the DPA all show that Congress intended only to grant authority to apportion resources among recipients or uses when necessary for the national defense, *supra* pp. 21-26—not to mandate or prohibit any productive activity that could conceivably have some national-security justification.

### 2. A lawful prioritization order merely designates contracts for preferential treatment

The Wright Order likewise cannot be justified as a prioritization order. Section 101(a)(1) authorizes the President or his delegee to "require that performance under contracts or orders . . . which he deems necessary or appropriate to promote the national defense shall take priority over performance

under any other contract or order," and "for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders." 50 U.S.C. § 4511(a)(1). The prioritization authority thus "authorize[s] the President to dictate that preference be given to government contracts which are necessary to promote the national defense." *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994); *see also* 76 Fed. Reg. 33615-01 (June 9, 2011) ("Under the priorities component, certain contracts . . . are required to be given priority over other contracts to facilitate expedited delivery in promotion of the U.S. national defense."). This authority is the "vehicle by which military orders gain[] precedence over civilian production." *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981 (5th Cir. 1976).

Section 101(a)(1)'s plain text—including the twice-repeated word "priority" and the phrase "in *preference* to other contracts or orders"—makes clear that it confers power to determine the sequence in which competing contracts or orders should be fulfilled. 50 U.S.C. § 4511(a)(1) (emphasis added). Inherent in the plain meaning of "priority" is the concept of relative position: in order for one contract to be prioritized, another must necessarily be deprioritized. "Priority" means "precedence: superiority in rank, position, privilege, or the like." *E.g.*, *Priority*, Webster's Int'l Dictionary (2d ed. 1950). And "preference" means "the setting of one thing before or above another." *E.g.*, *Preference*, Webster's Int'l Dictionary

(2d ed. 1950). The prioritization power therefore allows the Executive to order that "a contractor . . . re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract," even at the expense of existing private contracts. *Hercules*, 24 F.3d at 204; *see*, *e.g.*, Else, *supra*, at 2 (describing DPA's use to require Chrysler to prioritize contracts for development of tanks).

That plain-text meaning is exactly how the Congress that enacted the DPA understood things. In Senate testimony, for instance, the Chairman of the National Security Resources Board characterized the prioritization authority as "giv[ing] the President authority to obtain the green light for security procurement as against normal peacetime procurements." *Hearings Before the Comm. on Banking and Currency on S. 3936*, 81st Cong. 11 (1950). And a staff analysis for the Senate Committee on Banking and Currency stated that the prioritization authority "provide[s] for preferential treatment to contracts and subcontracts necessary or appropriate to promote the national defense." *Id.* at 271.

The Wright Order does nothing similar. It does not direct Sable to prioritize oil contracts over other contracts Sable may want to fulfill, nor does it prioritize sales to certain purchasers over others. Instead, it requires Sable to produce and transport oil when it otherwise would have fulfilled *no contracts at all*. That is an "order"—but it has nothing to do with prioritization.

### B. Even if the Wright Order Validly Invoked the DPA's Allocation or Prioritization Authority, It Did Not Lawfully Authorize Sable to Ignore State Regulations and Property Rights

Although the Wright Order's commands are addressed to Sable, its real purpose and effect are not to *compel* Sable to do anything. Instead, Sable is using the Order to do what it has long wanted: to bypass regulatory conditions that state law requires, and to use state property without an easement. *Supra* pp. 10-13. But nothing in the DPA authorizes the federal government to exempt businesses from regulations that protect health, safety, and the environment; nor does the DPA authorize companies to disregard state property interests. In holding otherwise, the district court badly misunderstood the principles governing preemption and property rights in the DPA context.

#### 1. A valid DPA order does not provide businesses with carte blanche to defy state health and safety regulations

As the district court recognized, *see* 1-ER-5-6, state regulations preclude Sable from restarting operations. Among other things, Sable has not yet obtained the requisite coastal development permit or made a satisfactory showing to OSFM that it has sufficiently repaired its pipelines to prevent rupture-threatening corrosion. *Supra* pp. 10-11. The district court nonetheless held that Sable can bypass these state requirements for two reasons: it effectively construed Section 707 of the DPA as an expansive express-preemption provision that displaces *all* state regulations, *see* 1-ER-35-36; and the court thought that state regulatory

requirements "would neuter the force of the [DPA] and compromise its policy goals," 1-ER-35. The district court erred in both respects. Neither its opinion—nor OLC's preemption analysis, which the district court echoed, *see* 5-ER-1021-1042—identifies any valid basis for overriding all state regulations.[9]

a. Section 707 states that "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid." 50 U.S.C. § 4557. By its plain terms, Section 707 forbids only "damages or penalties" for activities undertaken in reliance on a DPA order that is subsequently "declared . . . invalid." For example, a manufacturer is immunized from damages for breach of contract if it fails to meet a commercial buyer's delivery date because it received a prioritization order to send materials elsewhere.

But nothing in Section 707 purports to exempt businesses subject to DPA orders from all state regulatory requirements, including requirements enforced—as here—through requests for prospective injunctive relief, as opposed to retrospective "damages or penalties." Any additional preemptive effect of the

[9] As discussed above, *supra* p. 13, the Wright Order itself does not discuss the preemption of state law, but it was issued in conjunction with the OLC opinion, which makes clear the Order was intended to preempt all state regulations.

DPA arises—if at all—only as a matter of implied-preemption principles. *See infra* pp. 38-40; *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.").

Section 707 is also limited to actions "resulting directly or indirectly from compliance with [a DPA order]." Liability for failing to comply with state health, safety, and environmental regulations would not "result[]" from compliance with a DPA order. It would instead result from a business's failure to ensure safe, state-law compliant conditions of operation. For example, if the President ordered a medical supply company to deliver personal protective equipment to hospitals during a pandemic "as quickly as possible," that company would not be exempt from meeting safety standards in the production of that equipment, or paying its factory workers the state minimum wage, or directing its delivery drivers not to exceed the local speed limit. Nothing in the DPA requires or authorizes a business to disregard background, generally applicable state regulations when "allocating" or "prioritizing" materials, facilities, and contracts pursuant to a DPA order.

The two principal federal appellate authorities on Section 707 support this understanding. In *Hercules Inc. v. United States*, 24 F.3d 188 (Fed. Cir. 1994), the Federal Circuit held that Section 707 did not immunize a company from state tort liability for harms caused by "Agent Orange" manufactured for the federal

government pursuant to a DPA order. Although the court recognized that "[t]he government used the authority provided in Section 101 of the DPA" to require the company "to enter into contracts to produce Agent Orange for the Vietnam War effort," *id.* at 202, the court held that Section 707 served the limited function of immunizing contractors "from liability resulting from compliance with" Section 101, *id.* at 204. For example, Section 707 would immunize "a DPA contractor" from breach-of-contract liability in "a suit by a non-government customer in the event that the DPA contractor is forced to breach another contract to fulfill the government's requirements." *Id.* at 203. But nothing in Section 101 authorized or required the company to manufacture products "inherently unsafe to users" in contravention of state tort standards. *Id.*

Similarly, in *United States v. Vertac Chemical Corp.*, 46 F.3d 803 (8th Cir. 1995), the Eighth Circuit considered a company's request for immunity under Section 707 for noncompliance with environmental regulations—specifically, for polluting land during the time when a DPA order required it to sell a factory's chemicals to the government. *Id.* at 806, 812. "[A]gree[ing]" with the Federal Circuit's reasoning in *Hercules,* the Eighth Circuit held that Section 707 did not apply because nothing in Section 101 authorized the company to violate environmental regulations. *Id*. at 812. As the federal government itself recognized in *Vertac*, it would be "absurd" to "allow[] a government contractor to violate the

laws with impunity, so long as it was performing" activities under a DPA order. *Id.*; *see also* Br. of United States, *Hercules, Inc. v. United States*, 516 U.S. 417 (1996) (No. 94-818), 1995 WL 495540, at *36 (arguing that Section 707 does not "displac[e] the normal rules that would otherwise govern responsibility for the proper design and manufacture" of materials subject to DPA orders).

Here, the district court observed that *Hercules* and *Vertac* stand for the principle that Section 707 immunity "is limited to 'liability arising as a consequence of' re-prioritization or allocation," and that the lack of immunity merely reflected that "the tortious chemical product" in each case was a consequence of "defective chemical design" rather than "re-prioritization or allocation." 1-ER-36-37. But the same reasoning shows why the Wright Order cannot lawfully exempt Sable from state health, safety, and environmental regulations. Any liability that Sable might incur for failing to comply with permit requirements in the coastal zone or failing to adopt the safety conditions required by OSFM—conditions that OSFM has deemed necessary to ensure that the pipelines do not rupture and spill oil—would arise from Sable's refusal to take those precautions, not "re-prioritization or allocation" under the DPA. If Section 707 were construed otherwise, it would yield the absurd consequence of effectively licensing a company to violate all manner of state regulations, exposing workers and the public to grave health and safety risks. And when harm to others resulted,

the company would be immunized even if (like Sable here) it was not the unwilling recipient of a DPA order, but had actively sought that order with the very goal of bypassing the state-required protections at issue.

If "Congress had intended" that extraordinary result, "it would have said so in clear and unequivocal terms." *Hercules*, 24 F.3d at 204. Any such construction of the DPA would significantly "alter the 'usual constitutional balance between the States and the Federal Government,'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), and grant executive officials "virtually unlimited power" on questions of indisputable political and economic significance, *Biden*, 600 U.S. at 502. "While it is not inconceivable that Congress might enact such broad protection in some circumstances, it is extremely unlikely that it would do so in an ambiguous manner and without extensive consideration and debate." Br. of United States, *Hercules*, 516 U.S. 417, 1995 WL 495540, at *36.[10]

---

[10] Another provision in the DPA shows that Congress knows how to expressly displace state regulatory authority when it wishes to do so: it provides a "defense for any person to any civil or criminal action" brought under the antitrust laws of the federal government or "any State" with respect to certain actions taken under DPA orders. 50 U.S.C. § 4558(j)(1). The district court dismissed this provision as an exception to a savings provision in Section 4558(a), under which "no provision of this chapter shall be deemed to convey" an immunity from antitrust liability. 1-ER-37. But the more fundamental point is that both antitrust-related provisions show that preemption was on Congress' mind, and that it chose to enact only specific, narrow provisions—not the sweeping displacement of *all* state regulations that defendants claim.

b. The district court was likewise wrong in holding that enforcement of state regulations "would neuter the force of the [DPA] and compromise its policy goals." 1-ER-35. Although the district court did not say so, it appeared to be invoking the doctrine of "obstacle preemption," an implied-preemption doctrine that applies "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017). Because "[t]he preemption of state laws represents 'a serious intrusion into state sovereignty,'" *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019), "'a high threshold must be met' before a court will conclude that a federal law has impliedly preempted a state law," *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020); *see also Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion).

Here, Congress was quite clear about the DPA's objectives in the Act's plain text. In an exhaustive section entitled "Declaration of Policy," Congress carefully enumerated the statute's purposes, which include "ensur[ing] the vitality of the domestic industrial base," "development of domestic productive capacity," and "diversion of certain materials and facilities from ordinary use to national defense purposes, when national defense needs cannot otherwise be satisfied in a timely fashion." 50 U.S.C. § 4502(a)(2), (a)(3)(C)-(D). Nowhere in that provision—or

anywhere else in the DPA's text or history—did Congress so much as hint that it sought to achieve those goals by broadly allowing businesses to ignore generally applicable state laws that protect the public health, safety, and environment. *Cf. Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 220 (2024) ("'[n]o statute pursues a single policy at all costs," and the "question" is "*how far* Congress has gone in pursuing one policy or another").

Nor would it have made sense for Congress to take that extreme view: the DPA's objective of ensuring adequate industrial capacity can be accomplished without displacing all state laws. The way to reconcile Congress' goals with state regulatory authority is to presume that Congress intended compliance with the DPA to be undertaken *safely*—in conformance with state regulations designed to protect workers and the public. Here, for example, on the assumption that the DPA authorized Secretary Wright to direct Sable to restart the pumping of oil through inactive pipelines, *but see supra* pp. 21-31, Sable could comply with that order *and* state regulatory requirements by securing permits for construction work in the sensitive coastal zone and completing the necessary work on its pipelines to guard against rupture-threatening corrosion before restarting, *supra* pp. 10-11.[11]

[11] The district court invoked *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022), which it characterized as holding that a "DPA allocation order requiring meat facilities to remain open during the COVID-19 pandemic preempted all conflicting state-law standards." 1-ER-37. But *Johnson* reveals (continued…)

Consistent with that commonsense logic, courts have repeatedly refused to displace state health, safety, and environmental regulations on implied-preemption grounds where, as here, they can be reconciled with federal requirements. *See, e.g.*, *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715 (1985) (discussing "the presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause"); *see also Va. Uranium*, 587 U.S. at 772-773; *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 445-447 (1960); *Montana Med. Ass'n v. Knudsen*, 119 F.4th 618, 629 (9th Cir. 2024)*; In re Volkswagen*, 959 F.3d at 1206.

### 2. The DPA does not override California's right to exclude Sable from state-owned land

The district court also held that the Wright Order exempts Sable from state trespass laws—and thus overrides California's interest in controlling its own real property. *See* 1-ER-37, 41. That question is relevant because the pipelines travel through state-owned property. *Supra* p. 8. Because Sable has not had an easement or any other right to transport oil across state-owned land since 2016, or even to

---

nothing about what the DPA authorizes or requires. As the Fifth Circuit explained in a related case, the government had not actually issued any "DPA order to Tyson or any other meatpacking company." *Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 234 (5th Cir. 2022). Although a DPA order to that effect was "under consideration," it "never" became necessary. *Id.* at 233-234.

enter the land to conduct maintenance operations on the surface since July 2026, Sable is currently trespassing. Nothing in the DPA authorizes the subject of a DPA order to violate someone else's (let alone a sovereign State's) "right to exclude"—"'one of the most treasured' rights of property ownership." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).

Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020)). That is exactly what the federal government seeks to do here: profoundly alter the balance of power over property rights by allowing executive-branch officials to empower private companies, like Sable, to access and use another's property without owner consent. Under defendants' interpretation, for example, a family's backyard could be invaded to build an access road, a cemetery festooned with windmills to power a nearby factory, a private school's or church's grounds taken over by undesired solar panels, or a family farm razed for strip mining.

The DPA does not authorize those actions—certainly not with "exceedingly clear language." *Ala. Ass'n of Realtors*, 594 U.S. at 764. Indeed, Section 101 makes no mention of third parties' property rights. That stands in marked contrast

to other statutes that allow the federal government to expropriate, take, or otherwise interfere with private property. Where Congress intends to provide such authority, it does so by "express terms or by necessary implication," *W. Union Tel. Co. v. Pa. R.R. Co.*, 195 U.S. 540, 569 (1904)—and typically with a procedure allowing affected property owners to seek just compensation. *See, e.g.*, *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 498-499 (2021); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 615-619 (1952) (Frankfurter, J., concurring) (collecting examples); *Kohl v. United States*, 91 U.S. 367, 374 (1875). The fact that Congress provided no mechanism for property owners to seek compensation gives rise to a strong inference that it did not intend for DPA orders under Section 101 to interfere with property rights in ways that could generate takings liability. *See, e.g.*, *Youngstown*, 343 U.S. at 598 (Frankfurter, J., concurring) ("Congress . . . has not left to implication that just compensation be paid: it has usually legislated in detail regarding enforcement of this . . . requirement.").

The DPA originally *did* provide explicit authorization to expropriate property and pay just compensation. Former Title II specifically allowed the President to requisition "real property," § 201(b), or the "use thereof," § 201(a), and established a procedure for the prompt payment of compensation, § 201(a). 64 Stat. at 799-800. But Congress allowed Title II to expire in 1953, and has never reinstated the requisition power. *Supra* p. 5. The Supreme Court has long been reluctant to

allow executive officials to "reimpose[]" programs that "Congress [does] not renew." *E.g.*, *Ala. Ass'n of Realtors*, 594 U.S. at 760, 762. In *Alabama Association of Realtors*, for example, the Court rejected the CDC's attempt to impose the same type of eviction moratorium that Congress had previously authorized and then allowed to expire. And in *Youngstown*, the Court refused to allow the President to seize private steel mills. "[T]his extraordinary authority" had previously been accorded by Congress—but was "repealed after a short period." 343 U.S. at 598 (Frankfurter, J., concurring).

The Court should be especially hesitant to conclude that Congress intended the DPA to allow for interference with *state* property rights. As the Supreme Court has recognized, authorizing executive officials to "gain power over" state-owned property, *Cowpasture River Pres. Ass'n*, 590 U.S. at 621 n.6, "has striking implications for federalism," *id.* at 621. Although Congress may take state-owned property interests for public use if it complies with the Fifth Amendment, *see United States v. 50 Acres of Land*, 469 U.S. 24, 31 (1984), due respect for state sovereignty under the Tenth Amendment and our Constitution's structure requires Congress to be "unmistakably clear" when altering the federal-state balance, *Gregory*, 501 U.S. at 460. Otherwise, there is a danger that Congress could shirk "political accountability" for its actions by commandeering state-owned property for federal ends—much as there is a risk of "blurr[ing]" the lines of political

accountability when Congress commandeers state personnel. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473-474 (2018). Because nothing in the DPA provided clear authorization for Secretary Wright to order Sable to commence operations without obtaining an easement authorizing its use of state-owned property, the Wright Order is unlawful and should be enjoined.

### C. The Wright Order Is Arbitrary and Capricious and Otherwise Not in Accordance with Law

California is also likely to succeed on its claim that the Wright Order is arbitrary and capricious and otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024). "'[A]n agency's failure to follow its own regulations may [also] be challenged under the APA.'" *Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*, 167 F.4th 320, 327 (5th Cir. 2026). Courts "will not hesitate to overturn agency action . . . if the agency fails to comply with its own regulations." *Id.* at 327-328 (internal quotation marks omitted).

#### 1. The Wright Order was ill-explained, pretextual, and oblivious to important state regulatory and property interests

a. The arbitrary-and-capricious standard requires the agency to "offer[] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ohio*, 603 U.S. at 292. The Wright Order

did not do so. The Order itself provided very little explanation for the Secretary's action. It merely asserted that the Order was designed to "address the shortages" and "resulting vulnerabilities" identified by the President in his January 2025 Executive Order declaring a national energy emergency. 5-ER-779. In additional memoranda that defendants produced and attached to their district-court opposition, *supra* p. 14, the Secretary stated that California's "concentration of defense-related activities and personnel require sufficient fuel access to enable military ships and planes to operate at home and abroad." 4-ER-622. Further, they suggested that "California['s] and, by extension, the U.S. military['s]" "dependen[ce] on foreign imports" to meet fuel needs was a vulnerability heightened by Iran "attack[ing] tankers in the Strait of Hormuz." 4-ER-622-623.

Ensuring fuel for military operations is important, to be sure. But neither the Order itself nor the subsequently produced memoranda explain how that goal is meaningfully advanced by ordering these pipelines to restart. There are glaring gaps in the reasoning.

To begin with, while the Secretary repeatedly explained that California's military installations would benefit from increased access to *fuel*, these pipelines transport *crude* oil—not the refined transportation fuels that the military or ordinary consumers use. 4-ER-610, 622, 626. The Order does not distinguish between fuel shortages caused by a lack of crude oil and those caused by refining

capacity limitations—a notable shortcoming since the memorandum elsewhere states that California's "[i]n-state refining capacity has . . . been in steep decline" and "California refineries face several critical limitations" including "infrastructure" and "facility designs." 4-ER-626. The failure to explain how crude supplies, rather than refining bottlenecks, are responsible for defendants' concerns is precisely the kind of mismatch between "'the facts found and the choice made,'" *Ohio*, 603 U.S. at 292, that "the APA's 'arbitrary and capricious' standard is designed to thwart," *Judulang v. Holder*, 565 U.S. 42, 59 (2011).

Additionally, the Order provides no reason to believe that any of the product to pass through these pipelines would actually reach military users. Although issued under the DPA, the Order does not require Sable to prioritize military contracts over commercial ones, or to allocate its oil in ways destined for military use. 5-ER-780; *see Bus. Roundtable v. Sec. Exch. Comm'n*, 647 F.3d 1144, 1153-54 (D.C. Cir. 2011) (invalidating agency action that was "internally inconsistent and therefore arbitrary"). Nor is there any indication that Sable has any military contracts. And the Order's effect on the overall availability of crude or refined products in California will be miniscule. As defendants' own declarant has explained, California's fuel needs require the equivalent of 1.4 million barrels of oil per day. 4-ER-608. The Order "is currently facilitating the production and delivery of approximately 30,000 [barrels of oil equivalents per day]," which could

eventually rise (at most) to twice that. 4-ER-610. The Order may make tremendous economic difference to Sable—which faced the imminent default of its over $600 million loan from ExxonMobil if it could not restart production. *Supra* pp. 9-10. But as a method to meet California's oil needs—military or otherwise—the order does very little.

b. The serious mismatch between the Order's scope and purported goals—as well as the events leading up to its issuance—strongly suggest that the Secretary's stated reasoning "was pretextual." *Dep't of Com. v. New York*, 588 U.S. 752, 784 (2019); *see id.* at 785. That, too, would support setting the Order aside, as a basic "requirement of administrative law" is that "agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785. And here, as in *Department of Commerce*, "the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Id.* at 784.

*Department of Commerce* concerned a challenge to the Commerce Secretary's decision to add a citizenship question to the census. The Court determined that the stated goal of enforcing the Voting Rights Act was pretextual, noting "[s]everal points, considered together," that "reveal[ed] a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com.*, 588 U.S. at 783. The "record show[ed] that the Secretary began

taking steps to reinstate a citizenship question" long before any "hint" of the stated VRA enforcement rationale had emerged. *Id*. at 783. The Department of Justice had also issued an unusual, results-oriented letter in requesting citizenship data for VRA-enforcement purposes. *Id.* at 784. The letter went "beyond a simple entreaty for better citizenship data—what one might expect of a typical request from another agency—to a specific request that Commerce collect the data by means of reinstating a citizenship question on the census." *Id.*

Similar considerations show that the Secretary's stated national security rationale for the Wright Order was contrived. Well before current military hostilities with Iran began in late February 2026, Sable and federal authorities were already collaborating on plans to evade the Consent Decree, override California's regulatory authority, and resume pipeline operation without undertaking full safety measures or waiting for an easement to use the State's land. In December 2025, PHMSA redesignated Lines CA-324 and 325 as interstate at Sable's urging. 5-ER-1006-1008; *see supra* p. 11. That same month, Sable wrote to DOE requesting it to invoke the DPA. 5-ER-1023. OLC also issued a highly unusual opinion: it relied heavily on assertions in Sable's letter to the Department of Energy requesting use of the DPA, *see id.* n.2, and it focused narrowly on Sable's needs,

not broader options for increasing energy supplies, *see* 5-ER-1034-1042.[12] Secretary Wright then issued a DPA order limited to Sable's two pipelines.

That is not the kind of action "one might expect," *Dep't of Com.*, 588 U.S. at 784, if the goal was to address widespread energy insecurity. The Secretary has not exercised Title III's financial incentives, which Congress designed to expand the production and supply of materials essential to national defense—even though those incentives would presumably reduce whatever bottlenecks might exist at the crucial refinery stage. *Supra* pp. 45-46. Secretary Wright even directed Sable *not* to pursue alternative means of transporting its crude oil, such as "truck, vessel, or alternative pipeline[s]." 5-ER-780; *see* 4-ER-634. And public reporting has revealed that a senior White House staffer centrally involved in the decision to issue the DPA order has since left government service to become the head of Sable's policy arm. Stevenson et al., *White House Official's Move to Oil Company She Aided Raises Ethics Questions*, Politico (Aug. 21, 2026), https://tinyurl.com/3x4dru9w. Only by "'exhibit[ing] a naiveté from which

[12] *See generally* Barron, *Memorandum for Attorneys of the Office: Best Practices for OLC Legal Advice & Written Opinions* 1 (July 16, 2010), https://tinyurl.com/mps3zc9n (describing OLC's longstanding tradition of issuing opinions "on questions of law that are centrally important to the functioning of the Federal Government").

ordinary citizens are free'" could a court "ignore" the "disconnect between the decision made and the explanation given." *Dep't of Com*., 588 U.S. at 785.

c. Defendants also disregarded "'an important aspect of the problem'" before them. *Ohio*, 603 U.S. at 294. They did not consider the effect on the State's significant regulatory and property interests. The State's regulatory interests were obvious. The federal government was itself a signatory to the court-ordered Consent Decree that had confirmed California's role as the pipelines' principal regulator. *Supra* p. 9. The pipeline's rupture had also caused catastrophic harm to California's coast—closing beaches and fishing, harming the environment, and requiring expensive remediation. *Supra* pp. 8-9. Yet the Order contains no evaluation of the strength of the State's regulatory interests, or an explanation of how those interests could be outweighed by the pipelines' miniscule contribution (*supra* pp. 46-47) to overall energy needs. While DOE issued a memorandum "propos[ing]" that it "will condition its orders on requiring Sable to comply with Federal pipeline safety and other Federal environmental, health, and safety regulations," 4-ER-627, that condition does not actually appear in the Wright Order, 5-ER-778-780. And there is no consideration anywhere of how those federal requirements compare to the state ones—a particularly glaring omission given the Consent Decree's requirement to employ heightened anti-corrosion standards in place of default ones that were deemed inadequate, *supra* p. 10; *see,*

*e.g.*, *Ohio River Valley Env't Coal., Inc. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (holding action arbitrary and capricious due to inadequate analysis of whether new provision "render[ed] the amended state program more, less, or equally effective compared to the federal requirements").

The significance of the State's property interests was also clear: As the Secretary himself acknowledged, Sable had not been "'grant[ed] a long-term easement through a state park.'" 5-ER-779. Yet the Secretary failed to discuss or evaluate the effect of the Order on state property rights—let alone offer an explanation as to why the purported benefits of allowing Sable to immediately restart operations counterbalanced the harms to California's property interests. That is not a lawful way for the federal government to approach an order with such "striking implications for federalism." *Cowpasture River Pres. Ass'n*, 590 U.S. at 621; *see Alabama Ass'n of Realtors*, 594 U.S. at 764. Indeed, courts have not hesitated to invalidate agency actions on arbitrary-and-capricious grounds where they fail to adequately evaluate harms to States or "significant[] change[s] [to] the federal-state balance." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643-645 (1986) (plurality op.); *see, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31 (2020); *Kentucky v. Env't Prot. Agency*, 123 F.4th 447, 471 (6th Cir. 2024); *Cook Cnty. v. Wolf*, 962 F.3d 208, 231 (7th Cir. 2020).

### 2. The Order also violates federal regulations governing allocation orders

Because federal regulations have "the force of law," *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 799 (9th Cir. 2003), agencies fail to act in "accordance with law," as required under the APA, when they fail to follow their own regulations, 5 U.S.C. § 706(2)(A); *see, e.g.*, *Neumann's Pharmacy*, 167 F.4th at 328 n.22 (collecting cases). The Wright Order violates multiple regulations. It does not include the calendar start and end dates required by 10 C.F.R. Section 217.54(b). Nor does it include the required affirmation that it is an allocation order certified for national defense. *Id.* § 217.54(d). And because the federal government is using the Wright Order to "control the general distribution of a material in the civilian market," defendants were required to submit their findings "for the President's approval" before issuing the Order, *id.* § 217.52 — which they did not do. 4-ER-595.

The district court was not justified in excusing these violations. The court stated "it is hard to imagine" that specifying an end date "would be possible," given "the uncertain duration of the energy emergency." 1-ER-34. But the regulation contains no "uncertainty" exception, and requiring end dates serves important purposes by placing all parties on notice of the order's duration. While an end date may be extended by a subsequent order, the existence of the end date helps guard against orders continuing in effect past their justifying events. Without

that check in place, there is a great danger that a so-called "emergency" will become the new normal and last indefinitely. *Cf. Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 146-147 (1948) (Jackson, J., concurring). And Section 217.52(b)'s requirement of presidential approval ensures that the President himself receives public scrutiny for the consequences of a designation, rather than only lower-ranking functionaries.

For similar reasons, the district court erred in concluding that any failure by defendants to comply with its regulations "was likely harmless error." 1-ER-34 n.16. The harmless error doctrine "'may be employed only when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of the decision reached,'" and the agency that committed the error bears the burden of demonstrating harmlessness. *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 807 (9th Cir. 2005). Defendants cannot meet that burden here. If defendants had complied with Section 217.52, they would have used a markedly different procedure to issue the Wright Order, because their findings would have required the President's review and approval. And by ignoring Section 217.54(b), defendants bypassed making and announcing a decision as to when the Wright Order should end. That deprives California and the public at large of any notice as to when the State may resume the enforcement of state law and once again enforce its property rights.

## II. THE DISTRICT COURT HAD NO OTHER BASIS TO DENY A PRELIMINARY INJUNCTION

### A. The Wright Order Is Reviewable, and California Has Standing

The district court did not rule on defendants' arguments that California's challenges are unreviewable, and that California lacks standing. *See, e.g.*, 1-ER-32; 4-ER-601. But those arguments lack merit.

1. The DPA's text makes plain that DPA orders are subject to judicial review. Section 707 confers immunity for acts that result from "compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation or order shall thereafter be *declared by judicial* or other competent authority to be invalid." 50 U.S.C. § 4557 (emphasis added). Congress would have had no reason to include such a provision if courts could not declare DPA "order[s]" "invalid."

There is also a "'strong presumption that Congress intends judicial review of administrative action,'" *Helgeson v. Bureau of Indian Affs.*, 153 F.3d 1000, 1003 (9th Cir. 1998), and that presumption can be overcome "only upon a showing of 'clear and convincing evidence' of contrary legislative intent," *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967). Section 101 does not contain any language suggesting that Congress intended for prioritization and allocation orders to be immune from review. That is a marked contrast from other provisions in the DPA, which do preclude judicial review. *See*, *e.g.*, 50 U.S.C. § 4565(e)(1); *see also*

*Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it another,'" "'it is generally presumed that Congress acts intentionally'").

Below, defendants contended that because Secretary Wright acted as the President's delegee, the Wright Order is unreviewable under *Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992)—which held that the President himself is not an "agency" for purposes of the APA. But nothing in the APA's text exempts agency actions from review merely because they were taken under delegated presidential authority. As this Court has explained, "[t]he APA applies to any 'final agency action,'" and "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential action." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also California v. Mullin*, 183 F.4th 42, 51 (1st Cir. 2026) ("'[A]gency action that carries out a presidential directive is ordinarily subject to APA review.'").

2. Even if the APA did not apply, the Wright Order would be subject to review as ultra vires action. "[P]laintiffs may sue 'in equity' without a congressionally-provided cause of action 'to prevent an injurious act by a public officer.'" *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026). Accordingly, courts may review claims that executive officials have acted "beyond delegated statutory authority." *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023). A classic

example is *Youngstown*, which granted relief on claims that the President's seizure of steel mills was ultra vires because it was "not authorized by an act of Congress or by any constitutional provisions." 343 U.S. at 583. The Wright Order is ultra vires for similar reasons: It exceeds the prioritization and allocation powers granted by the DPA. *Supra* pp. 21-31. And the President lacks any inherent constitutional authority to compel businesses to produce oil or other materials in contravention of state regulatory requirements and property interests. *Cf. Youngstown*, 343 U.S. at 587-588.

3. Finally, defendants were wrong to assert below that California lacks standing. Defendants argued that, independent of the Wright Order, California's regulatory jurisdiction had been displaced by PHMSA's assertion of jurisdiction. But PHMSA's assertion of jurisdiction does not purport to override California's property rights in the state-owned parkland that Sable's oil must traverse. That purported abrogation of the State's rights is traceable to the Wright Order alone: PHMSA's assertion of jurisdiction did not cause the pipelines to restart; oil did not begin flowing until the day after the Wright Order issued, three months later. *Supra* p. 13. In any event, "the mere existence of multiple causes of an injury does not defeat redressability." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015). To the extent defendants claim that their actions are

justified by both the DPA order and PHMSA's orders, that simply shows that California has standing to challenge *both*.

### B. The Remaining Equitable Factors Strongly Support Injunctive Relief

Although the district court did not reach the questions of irreparable harm, the public interest, and the balance of equities, *see Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc), they all weigh in favor of a preliminary injunction.

1. Defendants argue, and the district court agreed, that the Wright Order's preemption of California law is so broad as to prevent the State from exercising any regulatory powers over the pipelines. 1-ER-41 (Wright Order "preempt[s] the enforcement of *any* state law that conflicts with Sable's ability to operate the Onshore Pipeline" (emphasis added)); *see* 1-ER-36. That displacement of the State's authority itself qualifies as irreparable harm, since "'[i]nvasions of state sovereignty . . . cannot be economically quantified, and thus cannot be monetarily redressed, and as such constitute irreparable harm.'" *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024); *see E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("Intangible injuries may also qualify as irreparable harm, because such injuries generally lack an adequate legal remedy.").

The preemption of state regulatory authority also causes concrete risks. It prevents the State from monitoring the safety and structural integrity of pipelines

whose prior failure resulted in catastrophic damage, and which had not yet received state clearance to reopen because of the lack of adequate corrosion testing and preventative measures. *Supra* p. 10. Those safety concerns are not negligible: for example, the State recently learned that Sable informed Santa Barbara County officials that it had detected anomalies requiring several days of repairs at several locations along CA-324. And California will be unable to require inspections to ensure enforcement of state-law requirements for the safe transport of oil—for example, the requirement that Sable remediate all anomalies with a "depth of 40% [plus margin of error] or greater [pipeline] wall loss, within one year of discovery." 5-ER-864-865. And because Sable has not obtained proper coastal development permits, California is unable to ensure that the company's construction activities do not damage the surrounding coastal environment in the process of addressing any anomalies on the pipelines. *Supra* p. 11.

Should the pipeline fail again, moreover, the harms would be calamitous. The prior 2015 rupture spilled over 120,000 gallons of heavy crude oil into California's coast, closing beaches and commercial fishing, and inflicting widespread damage to marine and coastal habitats as well as mammals, fish, and birds. *Supra* pp. 8-9. There were hundreds of millions of dollars in economic damage. 2-ER-255. And if another spill occurs now, the Order's very existence will lead to Sable claiming immunity from damages under Section 707. *See supra* p. 33. California and its

residents are thus forced to shoulder the risk of any failure without later recourse. *See, e.g.*, *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (risk of harm that could not later be monetarily remedied due to immunity "constitutes irreparable injury"); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599-600 (6th Cir. 2014) (similar).

Beyond those harms to California's sovereign, regulatory, and pocketbook interests, the Order also irreparably harms the State in its capacity as a property owner by forcing the State to devote its property to the federal government's preferred use. "The right to exclude is 'one of the most treasured' rights of property ownership," *Cedar Point*, 594 U.S. at 149, and "the loss of an interest in real property constitutes an irreparable injury," *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011); *see also Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Rsrv. v. Enbridge Energy Co.*, 184 F.4th 874, 898-899 (7th Cir. 2026) (treating invasion of property rights for pipeline access as per se irreparable harm).

2. The public interest and balance of equities weigh heavily in favor of injunctive relief. Sable and the federal government cannot suffer harm from ending an unlawful practice. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). And the public has a strong "interest [in ensuring] 'that the laws enacted by their representatives are not imperiled by executive fiat.'"

*Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025). Although the federal government has asserted that an injunction would harm our national security, *see* 4-ER-601, it has not provided any plausible rationale, let alone actual evidence, that would support those claims, *supra* pp. 48-49. In any event, the "concept of 'national defense' cannot be deemed an end in itself," *United States v. Robel*, 389 U.S. 258, 264 (1967), especially where—as here—the Executive attempts to "enlarge [its] mastery over the internal affairs of the country" by invoking purported national-security or foreign-affairs concerns, *Youngstown,* 343 U.S. at 642 (Jackson, J., concurring). The judiciary has not hesitated to invalidate and enjoin such attempts when they exceed legal bounds. *See, e.g.*, *id.*; *Learning Res.*, 607 U.S. at 247-248; *Trump v. Illinois*, 146 S. Ct. 432, 434 (2025). It should not hesitate to do so again here.

## CONCLUSION

The denial of a preliminary injunction should be reversed.

Dated: October 2, 2026

Respectfully submitted,

*s/ Jane Reilley*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*
JANE REILLEY
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY L. AMSTER
*Associate Deputy Solicitor General*

## STATEMENT OF RELATED CASES

One related case is pending before this Court: *Sable Offshore Corp., et al. v. Quintero*, No. 26-5643.

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5409

I am the attorney or self-represented party.

**This brief contains** 13,909 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ________.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jane Reilley **Date** October 2, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*