No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al*.,
*Defendants-Appellants.*

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

# PLAINTIFF-APPELLANT'S EXCERPTS OF RECORD
# INDEX VOLUME

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

# INDEX



| Document | File Date | D.Ct. Dkt. No. | ER No. |
|---|---|---|---|
| **VOLUME 1 OF 6** | | | |
| Order Denying Motion for Preliminary Injunction and Stay *(Order Granting Motion to Modify the Consent Decree in U.S. v. Plains, Granting in Part Motion to Enforce the Consent Decree, and Addressing Pending Motions in Related Pipeline Actions)* | 08/19/2026 | 82 | 2-46 |
| **VOLUME 2 OF 6** | | | |
| Interventor-Defendants Notice of Joinder and Brief in Support of Defendants' Motion to Dismiss | 08/21/2026 | 86 | 48-55 |
| Defendants' Notice of Motion and Motion to Dismiss Plaintiff's Amended Complaint | 08/21/2026 | 85 | 56-88 |
| Plaintiff's Reply in Support for Motion for Leave to File Supplemental Brief in Support of Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants | 08/17/2026 | 81 | 89-95 |
| Defendant-Interventors' Response to Plaintiff's Motion for Leave to File Supplemental Brief | 08/10/2026 | 80 | 96-102 |
| Defendants' Opposition to Plaintiff's Motion for Leave to File Supplemental Brief in Support of Plaintiff's Motion for a Preliminary Injunction | 08/10/2026 | 79 | 103-111 |

| Document | File Date | D.Ct. Dkt. No. | ER No. |
|---|---|---|---|
| Plaintiff's Notice of Motion and Motion for Leave to File Supplemental Brief in Support of Plaintiff's Motion for Preliminary Injunction and Stay against all Defendants | 07/30/2026 | 77 | 112-119 |
| Declaration of Kavita Lesser *(Plaintiff's Motion for Leave to File Supplemental Brief)* | 07/30/2026 | 77-1 | 120-121 |
| Proposed Order RE Plaintiff's Motion for Leave to File Supplemental Brief in Support of Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants | 07/30/2026 | 77-2 | 122-123 |
| Plaintiff's Proposed Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction and Stay Against All Defendants | 07/30/2026 | 77-3 | 124-129 |
| First Amended Complaint | 07/20/2026 | 72 | 130-172 |
| Plaintiff's Joint Reply to Defendants' and Interventors' Joint Post-Hearing Brief filed Pursuant to Instruction at June 8, 2026 Hearing | 06/25/2026 | 65 | 173-185 |
| Joint Post-Hearing Reply Brief from the United States of America, Sable Offshore Corp. and Pacific Pipeline Co., and Plains All American Pipeline, L.P. and Plains Pipeline, L.P. | 06/25/2026 | 64 | 186-202 |

| Document | File Date | D.Ct. Dkt. No. | ER No. |
|---|---|---|---|
| Joint Post-Hearing Brief from the United States of America, Sable Offshore Corp. and Pacific Pipeline Co., and Plains All American Pipeline, L.P. and Plains Pipeline, L.P. | 06/18/2026 | 63 | 203-225 |
| Plaintiff's Joint Supplemental Brief Filed Pursuant to Instruction at June 8, 2026 Hearing | 06/18/2026 | 62 | 226-248 |
| Reporter Second Amended Transcript of June 8, 2026 Hearing | 06/16/2026 | 58 | 249-344 |
| **VOLUME 3 OF 6** | | | |
| Plaintiff's Reply to Intervenors Sable Offshore Corp. and Pacific Pipeline Company's Opposition to Plaintiff's Motion for Preliminary Injunction and Stay | 05/27/2026 | 32 | 346-362 |
| Plaintiff's Objections to Evidence Submitted in Support of Intervenors' Opposition to Motion for Preliminary Injunction and Stay | 05/27/2026 | 32-1 | 363-383 |
| Plaintiff's Responses to Intervenors' Objections to Evidence Submitted in Support of Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants | 05/27/2026 | 32-2 | 384-398 |
| Plaintiff's Reply to Opposition to Motion for Preliminary Injunction and Stay Against All Defendants | 05/18/2026 | 27 | 399-418 |
| Sable Offshore Corp. and Pacific Pipeline Company's Notice of Motion, Motion to Intervene, and Supporting Memorandum | 05/11/2026 | 24 | 419-439 |

| Document | File Date | D.Ct. Dkt. No. | ER No. |
|---|---|---|---|
| Declaration of J. Caldwell Flores *(Sable Offshore Corp. and Pacific Pipeline Company's Motion to Intervene)* | 05/11/2026 | 24-1 | 440-458 |
| Declaration of Jessica Stebbins Bina *(Sable Offshore Corp. and Pacific Pipeline Company's Motion to Intervene)* | 05/11/2026 | 24-2 | 459-460 |
| Proposed Order Granting Sable Offshore Corp. and Pacific Pipeline Company's Motion to Intervene | 05/11/2026 | 24-3 | 461-462 |
| Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company's Proposed Opposition to California's Motion for Preliminary Injunction and Stay | 05/11/2026 | 24-4 | 463-494 |
| Declaration of Steve Rusch *(Sable Offshore Corp. and Pacific Pipeline Company's Opposition re: Plaintiff's Motion for Preliminary Injunction and Stay)* | 05/11/2026 | 24-6 | 495-556 |
| Proposed Order Denying Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants | 05/11/2026 | 24-7 | 557-558 |
| Evidentiary Objections to Evidence Submitted in Support of Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants | 05/11/2026 | 24-5 | 559-568 |
| **VOLUME 4 OF 6** | | | |
| Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction and Stay | 05/11/2026 | 23 | 570-603 |

| Document | File Date | D.Ct. Dkt. No. | ER No. |
|---|---|---|---|
| Declaration of Ashley Nunes *(Defendants' Opposition re: Motion for Preliminary Injunction and Stay)* | 05/11/2026 | 23-1 | 604-644 |
| Declaration of Dustin B. Hubbard *(Defendants' Opposition re: Motion for Preliminary Injunction and Stay)* | 05/11/2026 | 23-2 | 645-765 |
| **VOLUME 5 OF 6** | | | |
| Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Stay Against All Defendants | 05/01/2026 | 16 | 767-769 |
| Request for Judicial Notice in Support of Plaintiff's Motion for Preliminary Injunction Against All Defendants | 05/01/2026 | 16-1 | 770-1054 |
| **VOLUME 6 OF 6** | | | |
| Plaintiff's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction and Stay Against All Defendants | 05/01/2026 | 16-2 | 1056-1085 |
| Declaration of Dena Bellman *(Motion for Preliminary Injunction and Stay)* | 05/01/2026 | 16-3 | 1086-1165 |
| Declaration of Julie Vance *(Motion for Preliminary Injunction and Stay)* | 05/01/2026 | 16-4 | 1166-1170 |
| Declaration of Rohit Sharma *(Motion for Preliminary Injunction and Stay)* | 05/01/2026 | 16-5 | 1171-1175 |
| Proposed Order Granting Plaintiff's Motion for Preliminary Injunction and Stay | 05/01/2026 | 16-6 | 1176-1178 |
| Complaint for Declaratory and Injunctive and Other Relief | 03/31/2026 | 1 | 1179-1214 |

| Document | File Date | D.Ct. Dkt. No. | ER No. |
|---|---|---|---|
| Plaintiff's Notice of Preliminary Injunction Appeal | 08/20/2026 | 83 | 1215-1216 |
| Civil District Court Docket Sheet, *California v. Wright et al.;* No. 2:26-cv-03396-SVW-SSC (C.D. Cal.), as of September 29, 2026 | - | - | 1217-1230 |

No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al*.,
*Defendants-Appellants.*

**On Appeal from the United States District Court for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

# EXCERPTS OF RECORD – VOLUME 1 OF 6

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

| | |
|---|---|
| Present: The Honorable | STEPHEN V. WILSON, U.S. DISTRICT JUDGE |

| | |
|---|---|
| Daniel Tamayo | N/A |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| N/A | N/A |

**Proceedings:** ORDER GRANTING MOTION TO MODIFY THE CONSENT DECREE IN US V. PLAINS [49], GRANTING IN PART MOTION TO ENFORCE THE CONSENT DECREE [55], AND ADDRESSING PENDING MOTIONS IN RELATED PIPELINE ACTIONS: (1) DENYING A MOTION FOR PRELIMINARY INJUNCTION IN CALIFORNIA V. WRIGHT [16], (2) DENYING A MOTION TO DISMISS IN SABLE V. QUINTERO [27], AND (3) GRANTING A MOTION TO REMAND IN BIOLOGICAL DIVERSITY V. CALIFORNIA [46].

## I. Introduction

These related cases all consider issues relevant to the legality and consequences of actions by Defendants Sable Offshore Corporation and its subsidiary Pacific Pipeline Company (collectively, "Sable") to restart the flow of oil through two previously discontinued pipelines. Restart of those pipelines had been committed to the supervision of this Court under the terms of a consent decree, entered as the

:

Initials of Preparer DTA

final judgment of the Court on October 14, 2020. *US. v. Plains*, ECF No. 33.[1] Now before the Court are dueling motions to either terminate, modify, or enforce that consent decree. *U.S. v. Plains,* ECF Nos. 49, 55. For the following reasons, the Court modifies the consent decree and denies in part the motion to enforce it. The Court also considers and denies a preliminary injunction in *Wright* and a motion to dismiss in *Quintero*. Finally, the Court remands *Biodiversity* to state court.

## II. Relevant Background

### A. The Oil Spill and Consent Decree

On May 19, 2015, in Santa Barabara County, a corroded onshore oil pipeline, then-called Line 901 (now, "CA-324") ruptured, spilling over 120,000 gallons of crude oil onto Refugio State Beach and into the Pacific Ocean, causing substantial ecological damage. This resulting lawsuit, *United States of America et al. v. Plains All American Pipeline L.P. et al.*, 2:20-cv-02415-SVW-SSC ("*U.S. v. Plains*"), was brought against Defendants Plains All American Pipeline L.P. and Plains Pipeline L.P. (collectively, "Plains"), who, at the time, controlled Line CA-324 and the continuous Line 903 (now, "CA-325") (collectively, "the Onshore Pipeline").[2]

[1] This order cites materials from multiple dockets in several related cases. *See Engrahm v. Cnty. of Colusa,* 2005 WL 8179754, at *3 (E.D. Cal.) ("A court may judicially notice pleadings, files and records in related cases pending in its own court, as well as in different courts.") (citing Federal Rule of Evidence 201*; Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980)). The Court identifies which docket was the source of a cited filing by preceding the citation with a shortened form of the case: *US v. Plains*, 2:20-cv-02415-SVW-SSC; *Parks & Rec*, 2:26-cv-02946-SVW-SSC; *Wright*, 2:26-cv-03396-SVW-SSC; *Quintero*, 2:26-cv-02739-SVW-SSC; or *Biodiversity*, 2:26-cv-05242-SVW-SSC.

[2] CA-324 is a 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California. CA-325 is a 30-inch diameter crude-oil pipeline, that continues from the Gaviota Pump Station approximately 129 miles to the Emidio Pump Station in Kern County.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

In *U.S. v. Plains*, Plaintiffs United States of America, the State of California, and several California agencies—including the Department of Parks and Recreation and the Office of the State Fire Marshal—sued Defendant Plains to enforce federal pipeline safety laws and punish violations of the federal Clean Water Act and Oil Spill Prevention and Response Act, along with violations of state laws controlling water pollution and pipeline safety under California's Government, Water, and Fish and Game Codes. Complaint, ECF No. 1. *U.S. v. Plains* culminated in a consent decree, signed by the parties and additional federal agencies, including the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). "Consent Decree," ECF No. 6-1. Pursuant to the Consent Decree, Plains was required to pay millions of dollars in civil penalties and natural resource damages. Also, and relevant to this case, Plains was required by injunction to commit to certain management plans and reporting requirements and forbidden from restarting operation of either CA-324 or CA-325 without first applying for and receiving 'State Waivers' from California's Department of Forestry and Fire Protection's Office of the State Fire Marshal ("OSFM") and then submitting and receiving OSFM's approval for its 'Restart Plans.' Consent Decree, Appx. B, D. In other words, the federal government and PHMSA, the federal agency, agreed to be bound by this Court's order that approval of the California state regulator was required before the Onshore Pipeline might be returned to operation.

However, on or about March 14, 2026, the Onshore Pipeline, which had now been acquired by Sable, restarted—without the approval required by the Consent Decree. As a result, California is now challenging Sable's decision to restart the Onshore Pipeline, both as a violation of the Consent Decree and on other grounds, discussed *infra*. Thus, after several years of dormancy, *U.S. v. Plains* is now at the center of an orbit of related cases presently before the Court, and a fundamental issue for this Court to resolve is whether changed circumstances require modifying the Consent Decree or enforcing it.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

**B. Change in Ownership and Restart of the Pipeline**

The relevant changed circumstances began in February 2024, when Sable first acquired the Onshore Pipeline and signed a contract (the "Assumption Agreement"), agreeing to be bound by the Consent Decree. Assumption Agreement, ECF No. 55-1 Ex. E ¶ 1.[3] Accordingly, Sable continued to operate under the Consent Decree to prepare to re-operationalize the Onshore Pipeline. This process involved requesting State Waivers from OSFM in April 2024 and working with OSFM to conduct testing and repairs necessary to bring the Onshore Pipeline back online. *See* Declaration of B. Lance Yearwood ("Lance Decl."), ECF No. 61-2 ¶¶ 5-9. On December 17, 2024, OSFM granted to Sable the necessary State Waivers required by the Consent Decree, though the Restart Plan remained pending. ECF No. 55-1, Exhibits. I, J. On February 11, 2025, after an opportunity for public comment, PHMSA notified OSFM that it had no objections to the State Waivers. *Biodiversity*, ECF No. 23 Exs. D, E.

However, on April 15, 2025, public interest groups brought suit in state court against California, contending that the State Waivers issued to Sable were improper and seeking to prevent or delay restart of the pipeline without more rigorous environmental protections, opportunities for public process, and a better developed administrative record. *See Center for Biological Diversity et al v. California Department of Forestry and Fire Protection et al.*, 2:26-cv-05242-SVW-SSC ("*Biodiversity*"). On July 29, 2025, the Santa Barbara judge presiding over *Biodiversity* entered a preliminary injunction, prohibiting Sable from restarting the Onshore Pipeline. Nevertheless, Sable continued to endeavor to re-operationalize the Onshore Pipeline pursuant to the Consent Decree, submitting a restart plan to OSFM for approval on September 11, 2025. However, on October 22, 2025, OSFM informed Sable by letter that restart was

[3] The Assumption Agreement was made pursuant to the requirements of the Consent Decree, which dictated, "In the event Defendants sell or transfer ownership of or operating responsibility for [the Onshore Pipeline], Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired." Consent Decree ¶ 88.

:

Initials of Preparer DTA

forbidden under the law because Sable had not satisfied one of the conditions of the State Waiver—repairing all identified anomalies in the walls of the pipeline where prior testing revealed wall loss that was 40% or greater.[4] Declaration of Rod M. Seeley, *US v. Plains*, ECF No. 49 Ex. B, Ex. 3.

At this point, Sable petitioned the executive branch of the United States government for relief, which came in two primary forms. *First*, PHMSA conducted inspections and determined that the Onshore Pipeline was part of an "interstate" pipeline facility subject to PHMSA's exclusive jurisdiction. Declaration of J. Caldwell Flores ("Flores Decl."), *Parks & Rec*, ECF No. 28 ¶¶ 28-29. Second, on March 13, 2026, empowered by Executive Order 14156—which declared a 'National Energy Emergency,' and encouraged domestic energy production, particularly on the west coast—under delegated authority of the Defense Production Act, United States Energy Secretary Chris Wright issued the Pipeline Capacity Prioritization and Allocation Order (the "DPA Order"), which, expressly ordered Sable to restart the Onshore Pipeline. *Declaring a National Energy Emergency*, 90 FR 8433; DPA Order, *Parks & Rec,* ECF No. 23-2, Ex. 3. After the issuance of the DPA Order, Sable promptly restarted the Onshore Pipeline.

### C. Legal Challenges and Disputes Since Restart

Before cataloging the various pending motions in the related cases challenging Sable's recent restart of the Onshore Pipeline, the Court must briefly note one additional factor, beyond the Consent Decree, on which California bases some of its challenges. Namely, a four-mile portion of CA-325 is buried

[4] This dispute is narrower than it first appears. Sable contends that it *did* repair every section of the Pipeline where the measured wall loss was 40% or greater, and OSFM does not contest the point. *See* Lance Decl. ¶ 14. Rather, OSFM maintained that Sable was *also* required to fix any section of the Pipeline where there *could have been* 40% or greater wall loss, taking into account the margin of error intrinsic in the "tool tolerance" of the prior testing. *See* ECF No. 49 Ex. B, Ex. 4. Sable, for its part, argued that the requirement to repair anomalies within the "tool tolerance" margin of error applied only *after restart* as part of its ongoing maintenance obligations, once Sable had the opportunity to conduct new in-line inspections with new tools. *Id*.

:

Initials of Preparer DTA

below the ground in Gaviota State Park (the "Park"), in the southern part of Santa Barbara County, so the oil is presently passing below land under California's ownership and control. Declaration of Dena Bellman, ("Bellman Decl."), *Parks & Rec*, ECF No. 23-4 ¶ 2; Flores Decl. ¶ 7; Cal. Pub. Res. Code § 5001(b). Historically, this portion of the Onshore Pipeline operated with California's permission, pursuant to a 30-year easement, granted by California and the Department of Parks and Recreation (the "Parks Department") to Sable's predecessor-in-interest in August 1987. *Parks & Rec*, ECF No. 23-4 ¶ 5, Ex. B. However, the easement expired on July 17, 2016, during the period when the Onshore Pipeline was decommissioned, after the rupture of CA-324, pursuant to the Consent Decree. *Id.* Since acquiring the Onshore Pipeline, Sable continued to access the inactive pipeline below the Park, but its permissive access has been limited by annual Right of Entry Permits, which allowed Sable "access to and maintenance of [the pipeline]" but specified that "[a]ctivities related to any new or future projects, including restarting [the pipeline] or constructing a new pipeline" were not permitted. "ROE," *Parks & Rec*, ECF No. 23-4, Ex. E. Meanwhile, Defendant unsuccessfully attempted to negotiate with California for a new easement.

Relevant to this complicating factor of an expired easement, the first relevant legal challenge that came before the Court on this issue was filed by Sable on March 13, 2026, the same day the DPA Order issued. In this case, *Sable Offshore Corp. et al v. Armando Quintero* ("*Quintero*"), No. 2:26-cv-02739-SVW-SSC, Sable seeks a declaratory judgment against the Director of the California Parks Department that: (1) federal law bars California from conditioning easement access on Sable's compliance with a regulatory regime, and (2) the DPA order preempts any action brought under state law that would prevent Sable from compliance, including a trespass action. *Quintero*, ECF No. 1.[5] Three days later, on March 17, 2026, the California Parks Department filed a suit alleging continuing trespass against Sable for transporting oil through the pipeline below the Park. That case, *California Department of Parks and*

[5] A motion to dismiss this case, filed by Defendant Armando Quintero in his capacity as the Director of the Parks Department, was filed on May 26, 2026, and was taken under submission by the Court. *Quintero*, ECF Nos. 27, 32.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
|---|---|---|---|
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

*Recreation v. Sable Offshore Corp. et al.* ("*Parks & Rec*"), No. 2:26-cv-02946-SVW-SSC, was removed to this Court on March 19, 2026, under federal officer jurisdiction, because Sable had restarted the pipeline under the direct supervision and control of the federal government. *Parks & Rec*, ECF No. 1.

Meanwhile, California brought two additional legal challenges against Sable. The first was an ex parte application for an emergency order enforcing the original Consent Decree in *US v. Plains* on March 16, 2026.[6] *US v. Plains*, ECF No. 43. The second was an independent suit, filed on March 30, 2026, against the United States Department of Energy and Secretary Chris Wright. In that case, *State Of California v. Chris Wright, et al.* ("*Wright*"), No. 2:26-cv-03396-SVW-SSC, California requests that the Court declare the DPA Order to be unlawful and prevent Sable from using the DPA Order to authorize continued operation of the pipeline. *Wright*, ECF No. 1. A motion to dismiss *Wright* has recently become moot in light of California's First Amended Complaint. *Wright*, ECF No. 72. However, a preliminary injunction motion remains pending before the Court, whereby California requests that the DPA Order be stayed while the Court considers its lawfulness. *Wright*, ECF No. 16.

Finally, the public interest Plaintiffs in *Biodiversity* also challenged Sable's restart of the pipeline as being in knowing defiance of the preliminary injunction, described, *supra* II(B), wherein the Santa Barbara court barred Sable from restarting the pipeline without notice and approval. On March 16, 2026, shortly after restarting the pipeline, Sable filed a motion to dissolve the injunction it was violating.[7] However, on April 17, 2026, the state court denied Sable's motion. *Biodiversity*, ECF No. 1, Ex. E. On

[6] The Court denied this application on the grounds that it failed to make the showings requisite for *ex parte* relief, so California refiled the request as a regularly noticed motion on April 13, 2026. *US v. Plains*, ECF No. 55. Between these filings, Plaintiff United States of America moved to modify or terminate the Consent Decree. *US v. Plains,* ECF No. 49.

[7] It may be noted that Sable had already sought to dissolve the injunction after PHMSA's findings that the pipeline was part of an interstate facility, but the state court rejected Sable's motion and kept the injunction in place.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

May 14, 2026, eight days before a hearing to enforce the injunction in which it faced a potential finding of contempt, Sable, along with nonparty United States removed the case before this Court and filed a motion requesting that this Court dissolve the state court's injunction. Defendant California filed a motion to remand. ECF No. 46.

In all, pending before the Court are: (1) dueling motions to enforce or modify the consent decree in *US v. Plains,* (2) a motion for preliminary injunction in *Wright*, (3) a motion to dismiss in *Quintero*, and (4) dueling motions to either remand or dissolve the injunction in *Biodiversity*.

## III. Discussion

### A. The Consent Decree in *US v. Plains*

#### i. The Consent Decree is Enforceable Against Sable

As a preliminary matter, notwithstanding the arguments put forward by the United States, it is clear from the record that Sable *is* bound by the Consent Decree as a matter of law. To reach this conclusion, the Court looks to the plain language of the Consent Decree and the Assumption Agreement. *See United States v. Asarco Inc.*, 430 F.3d 972, 980-81 (9th Cir. 2005) ("A consent decree, like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree."). Section XVIII of the Consent Decree, entitled "TRANSFER AND ACQUISITION OF ASSETS" anticipates our present circumstance, where CA-324 and CA-325 have been purchased by non-party Sable and are no longer under the ownership and control of Plains. That section provides that Plains must notify OSFM of the transfer and provide a copy of the Consent Decree to the "transferee" Sable and that, "Plains will obtain from [Sable] an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the [the Onshore Pipeline], unless [Plains has]

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

already completed the required action or unless OSFM agrees to relieve [Sable] of the obligations of any otherwise applicable provision." Consent Decree ¶¶ 88-89.

As provided, when the pipeline transferred ownership, Sable signed a contract and notified OSFM that "Pursuant to Paragraphs 88-89 of the Consent Decree, [Sable] hereby agrees to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to [the Onshore Pipeline]" as of February 14, 2024. Assumption Agreement ¶ 1. Pursuant to the Consent Decree, Sable has therefore contracted to be bound by law to comply with the Consent Decree. The Consent Decree is therefore applicable to and enforceable against Sable. *See* Consent Decree ¶ 4 ("the obligations of this Consent Decree apply to and are binding upon the Parties and any…entities or persons otherwise bound by law to comply with this Consent Decree.").

Sable and the United States respond that consent decrees are generally not enforceable against nonparties. *See US v. Plains*, ECF No. 61 at 11. However, the cases they cite for this proposition are inapposite because none limits the enforceability of a consent decree on a nonparty business that is a successor in interest to a party bound by consent decree and has voluntarily and contractually agreed to be bound by the decree *See Sierra Club*, 868 F.3d 1062 (9th Cir. 2017); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313 (9th Cir.1998); *Keith v. Volpe*, 118 F.3d 1386 (9th Cir. 1997); *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 523 (1986). In fact, the case that arguably stands most strongly for a consent decree's inapplicability to a nonparty emphasizes as its underlying policy that the nonparty *had not* voluntarily assumed the obligations of the consent decree. *See Ass'n for Ret'd Citizens of Conn., Inc. v. Thorne*, 30 F.3d 367 (2d Cir. 1994) (holding that "where the judgment is based solely on a consent decree, it generally cannot be enforced against third parties" but emphasizing that the reason for the rule is that "the terms of the consent decree were voluntarily assumed rather than legally imposed," and highlighting that the object of enforcement was "a party that did not bargain for it or agree to it").

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
|---|---|---|---|
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Here, Sable took over ownership of the assets governed by the Consent Decree (the Onshore Pipeline) and agreed contractually to be bound by the terms of the Consent Decree in its operation. The Consent Decree had anticipated exactly such a circumstance and purports to be binding on a successor such as Sable. Moreover, Sable is the exclusive operator of the pipeline and has stepped into exactly the role that Plains had played with respect to the pipeline at the time the Consent Decree was issued. Given this new context, adequate relief in the form of continued regulation and supervision under the Consent Decree is not available to Plaintiffs through enforcement against Plains alone. Nor is there any indication that imposing successor liability on Sable would have any significant impact on third party rights. Considering all these facts, the Consent Decree is enforceable against voluntarily-bound-nonparty Sable. *See Bates v. Pac. Mar. Ass'n,* 744 F.2d 705 (9th Cir. 1984) (holding that a consent decree could be enforced against a nonparty successor business when: (1) the imposition of liability was consistent with the legitimate expectations of the parties, (2) the successor was on notice of its obligations under the consent decree when it became a successor, (3) adequate relief from the predecessor was unavailable, and (4) third party interests were not significantly affected).

ii. <u>Declining to Terminate the Consent Decree</u>

The United States argues that the Consent Decree should be terminated because the requirements for termination have been satisfied. *See US v. Plains,* ECF No. 49. However, this conclusion is belied by the plain language of the Consent Decree. *See United States v. Asarco Inc.,* 430 F.3d 972, 980-81 (9th Cir. 2005) (for the purpose of terminating or modifying a consent decree, courts apply standard contract interpretation principles). In pertinent part, the Consent Decree outlines a potential avenue for termination: "After Defendants have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination." Consent Decree ¶ 100.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Sable and the United States argue toward an ambiguity in this construction and urge the Court to interpret the provision to mean that termination requirements have been met provided only that Defendants have remained in compliance with the requirements of the Consent Decree for five years and three months. However, there is no ambiguity that allows this Court to consider the proposed interpretation to be reasonable. What the provision in dispute actually does is allow Defendants to request termination after five years and three months, provided Defendants have *entirely* complied with the requirements of the Consent Decree.[8] In other words, Defendants must *both* comply with the Consent Decree for five years and three months *and also* have *satisfied* each requirement of the Consent Decree to the full extent it may be satisfied.

Beyond the plain language, the Court's interpretation is based on two factors. *First*, the proposed interpretation offends the presumption against surplusage. The first element of the termination requirement, that Defendants 'operate under' the Consent decree for five years and three months, employs language that assumes compliance with the decree's terms and ongoing obligations. Therefore, the second half of the conjunctive phrase (that Defendants comply with the Consent Decree) would be redundant if it referred only to ongoing compliance during the five-year period. Avoiding redundancy requires interpreting the 'complied with requirements' element to add an additional condition—here, *complete* satisfaction of any of the Consent Decree's completable requirements. *Second*, in context, the same sentence that sets this standard for requesting termination goes on to clarify that Defendants' Request for Termination must state "that Defendants have ***satisfied*** [the Consent Decree's] requirements, together with supporting documentation." *Id.* (emphasis added). It is clear from the plain language of the phrase in context that termination of the Consent Decree requires documented *satisfaction* of its requirements, not mere *compliance* with its provisions during a particular period.

[8] The Court interprets the use of 'complied' as a simple past participle to imply a completed action.

:

Initials of Preparer DTA

Here, the record shows some requirements of the Consent Decree have *not* been satisfied by Defendants because, under the chosen path for restart, the Consent Decree required restart plan approval by OSFM, which Defendants never obtained. Therefore, wholesale termination of the Consent Decree would not be proper at this time.

iii. Modifying the Consent Decree

The Court also may not modify the Consent Decree under the terms of the decree itself because the Parties have not all consented to the change. *See* Consent Decree ¶ 98 ("The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties"). However, the Court has the intrinsic, equitable power to modify the terms of a consent decree in certain situations. *See Keith v. Volpe*, 784 F.2d 1457, 1461 (9th Cir. 1986) ("even in the absence of express authorization in the decree or request from the parties, the power to modify in appropriate circumstances is inherent in the equity jurisdiction of the court.") (citation omitted). Specifically, under Federal Rule of Civil Procedure 60, a court may modify a consent decree upon a showing that "a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). The burden here is on the party seeking modification. *Id.* Here, the United States, Plains, and Sable have made such a showing.

The Court identifies two changed circumstances that, together, are significant enough to warrant modification of the Consent Decree: (1) the change in ownership of the pipeline and (2) the national energy emergency and resulting DPA Order.[9] As discussed, *supra,* and in prior orders, the initial purpose of the

[9] The parties requesting modification also identify as a changed circumstance PHMSA's finding that the Onshore Pipeline is part of an 'interstate' pipeline facility. In light of the Court's analysis, it is not necessary to resolve this issue.

:

Initials of Preparer DTA

Case: 26-5409, 10/02/2026, DktEntry: 18.1, Page 21 of 1218



Consent Decree was, in large part, for the Court to supervise the disbursement of various penalties and damages owed by Defendant Plains, the culpable Party, who had owned and operated the Onshore Pipeline at the time of the spill and resulting suit. Now, Plains contends it has paid its penalties and operated in unfailing compliance under the Consent Decree, having generally satisfied its requirements. To be sure, Plains has ongoing obligations under the Consent Decree, at least in that Plains remains limited from modifying its Integrity and Control Room Management Plans. *See* Consent Decree ¶¶ 21-24. Plains also does continue to operate one pipeline, specifically addressed in the Consent Decree ("Line 2000"). However, no party has argued to the Court that any of these Consent Decree requirements have any continued relevance today.

The only active requirements in dispute under the Consent Decree are those related to CA-324 and CA-325, the Onshore Pipeline at issue in these related cases and, notably, the pipeline that ruptured in 2015 (CA-324). That pipeline is now owned and operated entirely by Sable, who is bound only by the provisions of the Consent Decree that apply to the segments of pipeline it acquired. Plains, in its reduced relevance under the decree, requests that the decree be 'terminated' as to Plains. *US v. Plains,* ECF No. 52. As discussed, *supra* III(A)(ii), with some of its requirements still unsatisfied, the Consent Decree is not ripe for termination on its own terms. *But*, the fact that those unsatisfied requirements have all been assigned to Sable, rather than Plains, is a sufficient change that justifies modifying the Consent Decree to relieve Plains of its continuing obligations for the pendency of the Consent Decree's term. Here, where Plaintiff United States supports thus 'terminating' the Consent Decree as to Plains, and California has offered no argument in objection, the Court finds such a modification to be appropriate. The Consent Decree is hereby modified to relieve Plains of all ongoing and future obligations during its term. The operative portions of the Consent Decree—those relevant to the Onshore Pipeline acquired by Sable—remain binding on Sable alone.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

The second significant changed circumstance, the national energy emergency, declared by Executive Order 14156 on January 20, 2026, is relevant because it provides strong evidence of a new federal interest in the operation of the pipeline. The order declaring the emergency outlined as a matter of federal policy that due to threats from hostile states and other foreign actors, "[t]he integrity and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate and pressing priority for the protection of the United States' national and economic security... most pronounced in our Nation's Northeast and West Coast." Then, following the executive order, and an associated delegation of Presidential authority to Secretary Wright, the Department of Energy issued the DPA Order, alongside relevant findings and determinations. DPA Order; *Wright*, ECF No. 23-1, Attachment 2. In the DPA Order, while directly ordering Sable to restart the Onshore Pipeline, Secretary Wright made the notable findings that both domestically produced oil and pipeline services in the relevant area were scarce, critical, and essential to national interests. *Id.* at 3-4. In support of these findings, counsel for the United States argued, "the Secretary determined that there are emergency vulnerabilities on the west coast that jeopardize our national security, namely the fact that California imports over 60 percent of its oil from foreign nations, which leaves our most populous state and the 32 military bases there highly vulnerable to disruptions in the global supply chain" *Wright*, Hearing Transcript, ECF No. 58 at 9:6-11.

Developing national security interests and a coordinated federal effort to harness regional energy resources constitute changed circumstances sufficient to justify modifying a consent decree to shift regulatory authority from the state to the federal level. Such a transfer helps avoid conflicts involving state courts and agencies and limits the ability of state agencies to unilaterally frustrate abiding federal interests. The present case is illustrative. Here, in the DPA Order, the Executive Branch of the federal government attempted to channel the power of the Defense Production Act to order an allocation by Sable, relating to a designated critical resource. However, under the terms of the Consent Decree, Sable's ability to restart the pipeline was still conditioned on the approval of a state agency. The result is presently before the Court and in state courts as well—a litany of cases, where state and federal agencies clamor for authority, and

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

state agencies cite the Consent Decree to assert a *de facto* veto over a federal mandate. When, as here, a directive based on a clear and present national security interest is in the balance, such discord risks dangerous delay. Therefore, the Consent Decree is hereby modified to transfer supervising regulatory authority over the Onshore Pipeline to PHMSA, streamlining the regulatory regime by consolidating it under federal authority, at least during this period of national emergency.

Before concluding, the Court briefly addresses an argument asserted by California on this issue: that the national energy emergency and DPA Order cannot constitute changed circumstances because they represent unilateral actions of the executive. California argues that the federal government may not cite its own unilateral actions as changed circumstances to justify modifying a consent decree.

It is true that in certain situations, the federal government may not cite its own unilateral actions as changed circumstances to avoid compliance with a consent decree. *See Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020). In *Flores*, for example, the United States had been a defendant in class action suit brought by minors in immigration custody. The lower court in *Flores* considered whether its consent decree, which limited the government's ability to detain minors, should be terminated, and the United States tried to argue that a recent, relevant rule, issued by the Departments of Homeland Security and Health and Human Services, constituted a change in law that supported modification. *Id.* at 730. In its analysis, the *Flores* court expressly "reject[ed] the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with the consent decree." *Id.* at 741 (citing *Nehmer v. U.S. Dep't of Veterans Aff.*, 494 F.3d 846, 860 (9th Cir. 2007)). This language *seems* facially applicable to the instant analysis in that it would bar the federal government from citing the national energy emergency or the DPA order, both arguably unilateral executive actions, to justify modifying the decree. However, *Flores* addresses a fundamentally different situation and is not controlling here.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

*Flores*, like *Nehmar*, which it cites, is a case about preventing the federal government from *excusing compliance*—avoiding obligations imposed on it by a consent decree. In *Nehmer*, these were payments to veterans owed by Veterans Affairs for service-related diseases; in *Flores*, it was a strict regime of self-regulation to safeguard against the government's inhumane detention of children. The case before the Court, however, is fundamentally different. Here, the federal government is not a Defendant but a Plaintiff, who, unlike the government in *Flores*, is trying to take on *more* regulatory authority, rather than avoid it. The fact that Sable's arguments align with the federal government's does not change the outcome.

iv. Tailoring the Terms of the Modified Consent Decree

Notwithstanding the Court's holding that the Consent Decree must be modified in equity, the Court is careful not to order modification beyond that which is necessary to respond to the changed circumstances. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. at 383 ("If the moving party [establishes changed circumstances], the court should consider whether the proposed modification is suitably tailored to the changed circumstance."). Furthermore, "the court in making modifications should consider the original expectations of the parties." *Keith v. Volpe*, 784 F.2d at 1462.

As discussed, *supra* III(A)(iii), as requested by Plains, Sable, and the United States, the Court is hereby modifying the Consent Decree to: (1) relieve Plains of its ongoing and future obligations, and (2) substitute PHSMA for California's OSFM as the primary regulatory agency responsible for overseeing Sable's compliance with the Consent Decree in its operation of the CA-324 and CA-325 pipelines. To ensure proper tailoring of Consent Decree modifications to the changed circumstances, the Court briefly considers whether the effects of these modifications are in keeping with the original expectations of the parties to ensure that unwarranted collateral effects of the proposed modifications are mitigated.

:

Initials of Preparer DTA

The intended effect of the *first* modification is to eliminate Plains' ongoing obligations under the Consent Decree. This is in keeping with the original expectations of the parties. The impetus for the Consent Decree was the need to remediate the damage from the 2015 spill and ensure adequate oversight over the continued operation of the Onshore Pipeline to avoid comparable disasters in the future. Notably, at the time of execution, the Consent Decree contemplated a situation in which Plains paid its penalties, complied with its ongoing requirements, abandoned the pipeline, and achieved termination of the Consent Decree after five years and three months. *See* Consent Decree ¶ 100. Here, Plains has transferred CA-324 (the segment that ruptured) alongside CA-325 to Sable and otherwise complied with the Consent Decree for longer than five years and three months.

From Plain's perspective, the anticipated termination condition has therefore essentially been met. Although wholesale termination of the Consent Decree is improper because Sable has now voluntarily bound itself to the Consent Decree's authority over its continued operation of the Onshore Pipeline, Plains' relationship with the Onshore Pipeline is now functionally the same as if it had abandoned them, [10] and all parties have agreed to (or at least not opposed) relieving Plains from its Consent Decree obligations. Meanwhile, the original expectations of the parties—that the original damage would be remediated and the Onshore Pipeline would be subject to continued oversight under the Consent Decree—are honored even after modification because Plains has paid its penalties, and every condition in the Consent Decree governing *future* operation of the Onshore Pipeline remains intact and enforceable against Sable.

The intended effect of the *second* modification is to reduce the regulatory authority of California's agencies over the operation of the pipeline, so as to concentrate regulatory authority in the federal

[10] The Court notes that Plains does continue to operate Line 2000, which is also a subject of the Consent Decree. However, Plains' operation of Line 2000, which never ruptured, is not challenged by any party. No party argues that the Consent Decree's ongoing regulation of Plains in relation to this additional pipeline is still necessary.

government. As discussed, this effect is necessary to respond to an increased federal interest in the pipeline's efficient operation based on national security considerations and to foreclose an avenue by which state agencies may cite the federal Consent Decree to effect a *de facto* veto of federal directives, such as the DPA Order. However, there are two possible collateral effects that the Court must mitigate, because they are not justified by the established changed circumstances and would likely frustrate the original expectations of the parties. The first of these possible collateral effects is that Sable's ongoing operational obligations may be substantively reduced. The second is that California's interest in supervising operation of the Onshore Pipeline may be undermined. Below, the Court addresses each effect and analyzes what, if any, tailoring of the modification is appropriate.

*a. Avoiding Reduction of Substantive Requirements*

As discussed *supra* III(A)(iii), significant changed circumstances have justified a modification to change the identity of the supervising agency, thereby transferring regulatory *authority*. However, no party has persuasively argued before this Court that changed circumstances, such as the repairs already performed by Sable to restore the pipeline to an operational state, yet justify a modification of the *substance* of the safety regulations governing Sable's continuing operation of the pipeline.

In this vein, while there is evidence that the original expectations of the parties anticipated a role for PHMSA in regulating the Onshore Pipeline, there is no comparable evidence that the original expectations of the parties included eliminating substantive regulations while the Consent Decree was in effect. To illustrate, PHMSA already has a long history of regulating the Onshore Pipeline. For decades before the 2015 spill, while the pipeline was still functioning as an interstate pipeline under Federal Energy Regulatory Commission ("FERC") tariffs, PHMSA was the sole regulator. Then, after the spill, it was PHMSA that acted as lead investigator, issuing the Corrective Action Order and Failure Investigation Report, which were instrumental to determining the cause of the spill and structuring the Consent Decree's

remedies. *See* Consent Decree, Appx. D (explicitly incorporating the remaining requirements of PHMSA's Corrective Action Order into the Consent Decree). Moreover, the Consent Decree established a central role for PHMSA, particularly in supervising the large-scale injunctive relief for Plains' management and operation of its nationwide pipeline system. *See* Consent Decree ¶¶ 22-23. PHMSA's role was also plainly expected to include regulatory authority, even final authority, over restart conditions and safety requirements because the Consent Decree made restart of the Onshore Pipeline contingent on State Waivers from OSFM, while the Pipeline Safety Act mandates that such waivers must be submitted to PHMSA, who may stay or block them. Consent Decree, Appx. B ¶ 1(A-B); 49 U.S.C. § 60118(d). Conversely, the evidence does not show that the Consent Decree parties expected that ongoing operation requirements for the Onshore Pipeline would be eliminated during the term of the Consent Decree.

Rather, the record is unambiguous that the parties to the Consent Decree intended to impose rigorous, ongoing regulatory standards for operation of the Onshore Pipeline after restart, especially to address and neutralize the corrosion risks caused by the limited effectiveness of cathodic protection for both segments of the Onshore Pipeline. *See* Consent Decree, Appx. B ¶ 1(A-B). Some of these standards or requirements were expressly limited by time or gave the pipeline operator opportunity to terminate them during the term of the decree. *See* Consent Decree, Appx. B ¶ 4(A)(2)(a) (requiring biannual in line inspections during the first two years of the Consent Decree); Consent Decree, Appx. D ¶ 1(d, h) (allowing for the removal of pressure restrictions upon written request from the pipeline operator after sufficient engineering analysis). However, the absence of such time limits or termination mechanisms on several other ongoing requirements clearly indicates an expectation that they persist for the term of the decree.[11]

[11] The Consent Decree also explicitly intended many of these continuing requirements to apply to a transferee like Sable. *See e.g.,* Consent Decree ¶ 88 (applying Appendix B, paragraph 4 to transferees); *see also* Consent Decree, Appx. 4 (listing ongoing requirements for operating pipelines).

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

For example, because the Consent Decree does not contain a specific expiration or termination date for the State Waivers, the Consent Decree clearly anticipated that substantive regulatory standards for the continued operation of the Onshore Pipeline would be determined by the California state regulator throughout the life of the decree. PHMSA had already been granted other significant roles under the decree, but the parties intentionally assigned California's OSFM the role of both *developing* these regulatory standards and *enforcing* them. Though the Court must modify the Consent Decree to shift the *enforcement* role to PHMSA, it is neither within the original expectations of the parties nor justified by changed circumstances that the substantive standards *developed* by California regulators should be modified or eliminated. Transferring regulatory authority for enforcement without tailoring the modification to preserve the substance of the State Waivers' requirements would therefore exceed the Court's equitable authority.

The Court therefore considers tailoring the modification to preserve these substantive requirements. Now that the pipeline has been successfully restarted, any pre-restart requirements are moot. However, the tailoring considered by the Court is to incorporate every post-restart regulatory requirement dictated by the State Waivers as substantive requirements of the Consent Decree, enforceable against Sable for the duration of its term. There is little conflict between the mandates of the state and federal regulators that might complicate this method of tailoring. There are two primary pieces of evidence to support this conclusion. First, OSFM already submitted the State Waivers to PHMSA for approval, and PHMSA approved them without objection. Second, when PHMSA unilaterally declared regulatory authority over the pipeline and issued an Emergency Special Permit for Sable, PHMSA essentially copied the post-restart conditions and standards from the State Waivers *verbatim*. *Compare* State Waivers, *US v. Plains*, ECF No. 55-1, Exs. I, J *with* Emergency Special Permit, ECF No. 49-2, Ex. 7.

As far as the Court can discern, the only substantive post-restart requirement in the State Waiver that was approved by PHMSA but nonetheless does not appear in the Emergency Special Permit is that

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Sable must comply with the standards set by the California Elder Pipeline Safety Act. State Waivers ¶ 5. The Court therefore considers whether this method of tailoring—incorporating substantive requirements of California state law into the Consent Decree—is in keeping with the original expectations of the parties. In light of the record, the Court finds that it is. Prior to the spill, PHMSA was the sole regulator of the Onshore Pipeline, which was designated as interstate and governed by federal law. The Consent Decree could have maintained this *status quo*, but instead the parties opted to reclassify the pipeline and explicitly subject it to California state law. *See* Consent Decree ¶ 84. This conscious decision to apply California state law is strong evidence of the parties' intent. Moreover, a letter from PHMSA to OSFM in 2016, immortalizing part of this "understanding" between the parties explicitly outlines the expectation that the pipeline would be subjected to California state pipeline laws. *See* 55-1, Ex. H (explaining how OSFM would be responsible for including the Onshore Pipeline in its Annual Inspection and Leak Prevention Programs pursuant to Senate Bill 295 and Assembly Bill 864 as well as other state regulations, both "existing and future").[12] Again, this is supported by the text of the decree itself. Consent Decree, Appx. B ¶ 8 ("Nothing in this [Consent Decree] shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated."). Therefore, given the original expectations of the parties, tailoring the Consent Decree to incorporate the substantive standards for pipeline operation from California's Elder Pipeline Safety Act alongside the rest of the State Waivers' post-restart requirements is warranted given the modification.

The Court closes this section by reiterating its conclusion: it is hereby tailoring the Consent Decree modification by which it replaces OSFM with PHMSA as the regulator of the pipeline. This tailoring consists of incorporating the substantive, post-restart requirements from the State Waivers into the

[12] The Court further notes that one manifest expectation of the parties is that the Onshore Pipeline operator would also be subject to future state regulations. For this reason, if future state legislation introduces substantive requirements for pipeline operation, the Court will entertain motions by California to further modify the decree to incorporate them as well.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Consent Decree itself. Moreover, it includes incorporating all the substantive standards for pipeline maintenance and operation that *would be* applicable to Sable under California's Elder Pipeline Safety Act. The Court here clarifies that it is not mandating compliance with California law and regulations as enforced by California agencies but rather *incorporating* the substantive requirements of those laws and regulations among the other terms of the Consent Decree to be enforced by PHMSA. These now-incorporated substantive standards will therefore still apply, and PHMSA will be responsible for enforcing them, regardless of whether the pipeline is determined to be "intrastate" or "interstate" for the purposes of the Pipeline Safety Act, an issue not decided by the Court here.

In the view of this Court, though the solution that a federal agency functionally enforces standards set by a state legislature is unusual, it is necessary tailoring to consider both major public interest factors here—protecting energy security and the ecology of California's coast—while honoring the original expectations of the parties about what substantive rules would apply to the owner of the pipeline.

*b. Honoring California's Supervisory Interest*

The Court also briefly addresses the possible concern that California's interest in protecting the ecology of its coastline will be frustrated by its inability to supervise Sable's compliance with the Consent Decree. It is true that California's environmental interests are relevant to the purposes of the Consent Decree. Furthermore, it is also true that as an unavoidable effect of this modification—in order to accomplish its purpose—California loses authority over the pipeline, such as its ability to order the shutdown of the pipeline at any time or otherwise directly regulate Sable.

However, as discussed, *supra* III(A)(iv)(a), it is not beyond the original expectations of the parties that PHMSA would exercise some regulatory authority, even final authority in some instances, over the Onshore Pipeline. Moreover, California's interests are not entirely frustrated by this modification.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Although much of Sable's reporting will now be directed to PHMSA, rather than OSFM, as Plaintiffs in the case, California and its agencies will still receive the biannual reports from Sable describing the status of its compliance with the Consent Decree as to the Onshore Pipeline. *See* Consent Decree ¶ 57. If California identifies noncompliance, it can vindicate its interest before this Court through a motion to enforce the Consent Decree. As such, California is not left without recourse. The Court therefore finds that equity requires no further tailoring.

v. Enforcing the Consent Decree

California has brought its own motion to enforce the Consent Decree. *US v. Plains*, ECF No. 55. "A district court retains jurisdiction to enforce its judgments, including consent decrees." *Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992) (citation omitted). Moreover, as the Court analyzed, *supra* III(A)(i), all portions of the Consent Decree, including Appendices B and D, which relate to the Onshore Pipeline, are enforceable against Sable. Moreover, Appendix D of the Consent Decree contains the unambiguous requirement that neither CA-324 nor CA-325 may be restarted without authorization from OSFM after approval of a Restart Plan. Consent Decree, Appx. D ¶ 1(a-b; e-f); *See also Hooks*, 972 F.2d at 1014 ("consent decrees are construed as contracts for purposes of enforcement") (citation omitted). Sable does not dispute the fact that OSFM did *not* provide authorization or approve the Restart Plan, but rather told Sable that restart was expressly forbidden because of Sable's perceived noncompliance with the State Waivers. Sable also does not dispute the fact that Sable nonetheless *did* restart both segments of the Onshore Pipeline. By the plain language of the decree, based on undisputed facts, the Court finds that Sable violated the Consent Decree by restarting the Onshore Pipeline without authorization and Restart Plan approval from OSFM.

Sable argues, however, that it was justified in ignoring the explicit requirements of the Consent Decree because Sable "substantially complied" with the decree by meeting the safety requirements and

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

completing all necessary repairs required by the Consent Decree and the State Waivers. *US v. Plains*, ECF No. 61 at 25. According to Sable, OSFM's failure to approve the Restart Plan based on Sable's perceived noncompliance with the State Waivers was due to OSFM's misinterpretation of its own State Waivers. *Id.* Sable maintains that by complying with Sable's own interpretation of the State Waivers, it substantially complied with the Consent Decree's requirements, notwithstanding the failure to obtain authorization. This argument is implicitly founded on Sable's interpretation that authorization from OSFM was merely a technicality (not required for substantial compliance), while the relevant material term of the Consent Decree merely required Sable to follow whatever substantive requirements appeared in the State Waivers.

However, despite Sable's proposed interpretation, authorization from OSFM is an explicit pre-restart requirement in the Consent Decree. Moreover, considering the original expectations of the parties to grant California's OSFM regulatory authority to prevent restart of the pipeline, discussed at length *supra*, there is no evidence before the Court that the term is immaterial. If Sable believed that OSFM was acting outside the discretion granted to it by the decree when it interpreted its own State Waivers to prevent restart, the proper course of action for Sable would have been to petition this Court to clarify its order. Sable could have argued before the Court that by substantially complying with the State Waivers, it should be excused from the requirement for authorization and Restart Plan approval. Sable, however, was not within its rights to unilaterally relieve itself of its explicit obligations under the decree based on its own interpretation of what in the decree was immaterial. *See Nehmer v. U.S. Dep't of Veterans Aff.*, 494 F.3d 846, 860 (9th Cir. 2007) ("the district court… is the principal and proper arbiter with the responsibility to interpret the decree and oversee the litigation. Although a party may *ask* the district court to issue an order clarifying, enforcing, or modifying a decree and *suggest* a favored interpretation, a party—whether a private or public entity—cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval."). Sable's 'substantial compliance' argument, therefore, does not excuse its violation.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Sable similarly argues that changed legal circumstances, such as PHMSA's interstate classification and the DPA Order, justified any non-compliance. The Court has acknowledged the significance of the changed legal circumstances, particularly the DPA Order. In fact, as the Court held *supra* III(A)(iii), the DPA Order *did* represent changed legal circumstances that supported modifying the decree. However, again, the required course of action for Sable was to request modification *before* violating the Consent Decree. *See Hook*, 972 F.2d at 1017 ("Even if the law underlying the consent decree no longer appears to support the decree, a party cannot disobey the decree without bringing a Rule (60)(b) motion to modify or vacate the decree."). It is for the Court, not Sable, to determine whether changed legal circumstances justified modification. Changed legal circumstances do not justify Sable's unauthorized violation of the Consent Decree, even if Sable's interpretation was correct that modification of the decree was warranted.

Sable also argues that the same changed circumstances justified its non-compliance because they qualified as "force majeure" events. Under the terms of the Consent Decree:

> "Force Majeure" … is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized."
>
> Consent Decree ¶ 44.

The Court, however, is unpersuaded that the actions by PHMSA and the Secretary of Energy qualify as 'force majeure' events under this definition. Sable did not petition this Court to modify its

:

Initials of Preparer DTA

obligations so as to avoid a violation. Nor, of course, did Sable bring legal challenges against the executive actions (as California did) so that Sable might avoid conflicting directives that made compliance more complex. Therefore, the Court finds that based on undisputed facts, Sable did not use its best efforts to fulfill its obligation to delay restart of the pipeline until it had been authorized by OSFM. The 'force majeure' provision therefore can provide no defense for Sable's instant violation.

Finally, Sable argues that 50 U.S.C § 4557 ("Section 707" of the Defense Production Act) exculpates Sable for noncompliance with the Consent Decree. Section 707 reads, in the pertinent provision entitled, *Liability for compliance with invalid regulations*:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to [the Defense Production Act], notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid.
>
> 50 U.S.C. § 4557

According to Sable's interpretation, this immunity from "damages or penalties" extends to penalties issued for noncompliance with the Consent Decree. In other words, Sable understands the statute to mean that the Defense Production Act allows the executive, through unilateral action, to immunize a private party from compliance with an order of a federal court. It does not.

While the Court agrees with Sable that Section 707 provides immunity from common law claims besides breach of contract, *see infra* III(B)(ii), there is no reasonable interpretation by which the provision can be interpreted to provide immunization to liability for violation of a federal court order. If the Secretary of Energy, exercising unilateral executive authority, were able to directly interfere with a federal court's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

discretion to enforce its own orders, it would implicate major questions about separation of powers. That is not to say that Congress *could not* delegate such authority, but such an extraordinary delegation would need to be clear and express. *See, e.g., West Virginia v. E.P.A.*, 597 U.S. 697 (2022). This backwater provision of the DPA, cited by Sable, is fundamentally insufficient.

In all, Sable has violated the express provisions of the Consent Decree, without justification. It is therefore appropriate that the Consent Decree be enforced against Sable. However, the injunction proposed by California is not the proper remedy here. For one, as of this Order, the Consent Decree has been modified to replace OSFM as the regulatory authority with PHMSA, and the pre-restart requirements of the State Waivers are no longer applicable. Nor, too, are OSFM's approval of a Restart Plan or authorization. PHMSA, the current regulator, has authorized Sable to restart the pipeline. Therefore, Sable is no longer in violation of the Consent Decree, and proactive, injunctive relief is inappropriate. Rather, the appropriate penalty for Sable's violations is dictated by the Consent Decree.

The portion of the Consent Decree's section on "Stipulated Penalties" that applies directly to the operation of the Onshore Pipeline and is therefore binding on Sable, provides, in pertinent part: "Unless excused under Section XII (Force Majeure), the stipulated penalties… [f]or operation of [CA-324 without authorization from OSFM] and... for operation of [CA-325 without authorization from OSFM] shall accrue as follows: $2,000 penalty per Day 1st to 30th Day; $4,000 penalty per Day 31st to 60th Day; $5,500 penalty per Day 61st Day and beyond. Consent Decree ¶ 29(a, d, y) (cleaned up). The Court therefore finds it appropriate to follow the Consent Decree's anticipated remedy. Sable has been continuously violating both its obligations for CA-324 and for CA-325 between restart and this Court's modification of the Consent Decree—a period the Court calculates to be 159 days. Applying the stipulated formula, Sable is therefore liable for $724,500 per violation, for a total of $1.449 million.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

For the above reasons, the Court grants in part California's motion to enforce the Consent Decree. However, the Court declines to impose an injunction but rather orders Sable to pay the appropriate penalty of $1.449 million to Plaintiff California.

**B. The Preliminary Injunction in *Wright***

In *Wright*, California requests that the Court declare the DPA Order unlawful and prevent Sable from using the DPA Order to authorize continued operation of the pipeline. Given the present posture of the case—with California have recently filed a First Amended Complaint ("FAC") on July 20, 2026—a ruling on the merits is premature. FAC, *Wright*, ECF No. 72. However, the Court here rules on the pending motion for preliminary injunction, filed by California on May 1, 2026. *Wright*, ECF No. 16.[13]

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

[13] The Court notes that Plaintiff California's amended complaint has added an additional, *ultra vires*, cause of action and has filed a motion to file a corresponding supplemental brief to update its request for an injunction. *Wright*, ECF No. 77. The Court has reviewed and considered California's proposed supplemental brief before issuing the instant Order.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

Importantly, a "preliminary injunction is an extraordinary and drastic remedy, [and] one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Indeed, the moving party bears the burden of meeting all prongs of the *Winter* test. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011) ("To warrant a preliminary injunction [the plaintiff] must demonstrate that it meets all four of the elements of the preliminary injunction test established in *Winter*[.]"). The decision of whether to grant or deny a preliminary injunction is a matter of the district court's equitable discretion. *See Winter*, 555 U.S. at 32.

Here, California's FAC alleges five causes of action, all facially challenging the DPA Order: (1) violations of the Administrative Procedure Act ("APA") § 706(2)(A-C) for violations of law; (2) violation of the APA for arbitrary and capricious agency action; (3) violation of the United States Constitution's separation of powers; (4) violation of the Constitution's Tenth Amendment; and (5) *Ultra Vires* conduct in excess of statutory authority. FAC ¶¶ 126-181. The Court categorically addresses Plaintiff's challenges to the DPA Order to determine Plaintiff's likelihood of success on the merits. Finding that Plaintiff has not demonstrated even a serious question as to the merits, the Court denies the preliminary injunction without reaching the remaining *Winter* factors.

Under Section 101 of the Defense Production Act, the President is authorized "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). Furthermore, "the President may, by rule or order, require the allocation of … materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings… that (A) [they are] scarce, critical, and essential… and (B) maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority." 50 U.S.C § 5411(c). However, the President may not "control the general distribution of any material in the civilian market" without first making the findings:

:

Initials of Preparer DTA

"(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." 50 U.S.C. § 5411(b).

Here, the President issued an executive order, citing national security concerns (including the disruptive efforts of hostile state actors), declaring a national energy emergency, and ordering that "[t]o protect the collective national and economic security of the United States, agencies shall identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States." *Executive Order 14156*, 90 FR 8433 § 3(b). The Executive Order defined 'transportation' as "the physical movement of energy, including through, but not limited to, pipelines." *Id.* § 8(c). After an additional executive order delegating the President's authority under the DPA to Secretary Wright, Wright then issued the DPA Order, citing the President's declarations, findings, and national security concerns. The DPA Order noted that "[a]ccording to Sable, the State of California is impeding it from resuming transportation" and found that ordering Sable to operationalize the pipeline was "necessary or appropriate to promote the national defense and to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation[,] and maintenance or expansion of exploration, production, refining, transportation cannot reasonably be accomplished without exercising the [DPA authority]. DPA Order at 2-3. The DPA Order therefore is an allocation order, generally authorized by the plain language of Section 101.[14]

[14] Moreover, it is well aligned with serving the underlying policy of the DPA, which includes the need "to respond to actions taken outside of the United States that could result in reduced supplies of strategic and critical materials, including energy, necessary for national defense and the general economic well-being of the United States." 50 U.S.C. § 4502 (a)(2)(D).

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

On the same day the DPA Order allocated offshore oil to be transferred through the Onshore Pipeline, the Department of Energy issued corresponding Findings and Determinations that described in greater detail the reasoning behind the DPA Order. *Wright*, ECF No. 23-1, Attachment 2. These findings included, among several lines of reasoning, "California's unrivaled concentration of defense-related activities," noting that "a 65% reduction in California's in-state oil production since 2001 has left California and, by extension, the U.S. military, dependent on foreign imports." According to the findings, this state of affairs, in the geopolitical context "weakens the United States' position in international markets and endangers our national security." *Id.* at 5. These findings satisfy the requirements of Section 101, and the allocation order is facially valid.

i. Review Under the APA

Although Sable and the United States take the position that the DPA Order is not reviewable under the APA, the Court does not decide the question because even *assuming* reviewability, the DPA Order survives California's challenges under the APA—that the order is arbitrary and capricious and in violation of Department of Energy regulations.[15]

The "arbitrary and capricious" standard sets a low bar for reviewing agency actions that is easily met. In *Motor Vehicle Manufacturers v. State Farm*, the case often cited for the standard, the Supreme Court held that "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). The Court reasoned that "[t]he scope of review under the 'arbitrary and capricious' standard is

[15] In the following subsection, the Court addresses further challenges to the DPA's Order's lawfulness and Constitutionality, brought under the APA and as an *ultra vires* action. These challenges also fail, irrespective of reviewability.

:

Initials of Preparer DTA

narrow and a court is not to substitute its judgment for that of the agency." *Id.* at 43. However, this standard still requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The *State Farm* Court also offered examples of APA violations, stating that "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Here, Secretary Wright relied on a clear directive from the President on matters related to national security and foreign affairs—the type of determinations generally delegated to the executive. The resulting findings were also informed by a memorandum from the Office of Policy, Hydrocarbons, and Geothermal Energy, which further outlined the security interests implicated for California's energy security and the United States' national security. *Wright*, ECF No. 23-1, Attachment 3. Secretary Wright's findings and determinations were demonstrably plausible and reasonable in light of the President's order and the evidence before the agency, including the aforementioned memorandum. Together, these orders and findings reveal a thoroughly rational explanation for the DPA Order that is more than sufficient to satisfy arbitrary and capricious review.

To ensure compliance with applicable regulations, the Court has looked generally to the regulatory scheme outlined in 10 C.F.R. parts 216 and 217 and found that the agency made all necessary findings. The Court also looks particularly to 10 C.F.R. § 217.54, which requires that an allocation order such as the DPA order must include five elements: (1) A detailed description of the required allocation action(s); (2) Specific start and end calendar dates for each required allocation action; (3) The written signature on a manually placed order, or the digital signature or name on an electronically placed order, of the Secretary

:

Initials of Preparer DTA

of Energy; (4) A statement that reads in substance: "This is an allocation order certified for national defense use. [Insert the legal name of the person receiving the order] is required to comply with this order, in accordance with the provisions of the Energy Priorities and Allocations System regulation (10 CFR part 217), which is part of the Federal Priorities and Allocations System"; and (5) A current copy of the Energy Priorities and Allocations System regulation (10 CFR part 217). 10 C.F.R. § 217.54.

The DPA Order substantively complies with these regulations. For example, the signed DPA Order directs Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons from the [offshore oil field] through the [Onshore Pipeline] …"—a detailed description of the required action. And, though the order does not list calendar dates, it does dictate that "Sable is ordered to comply … immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." Given the uncertain duration of the energy emergency, it is hard to imagine more specificity would be possible. Finally, the DPA Order substantively makes clear that it is an allocation order for national defense, requiring that Sable comply, and the Energy Priorities and Allocations System regulations, 10 C.F.R. § 217, are incorporated by reference in the Secretary's findings.[16]

ii. Lawfulness and Constitutionality of the DPA Order's Preemptive Force

California's central challenge to the DPA Order, under both its APA and *ultra vires* causes of action, is that the DPA Order's preemptive effect over state law is beyond the intended scope of the DPA and unconstitutional. Most essentially, California contends that because the DPA Order knowingly ordered Sable to violate state law and a state court injunction, it is attempting to exert *ultra vires*

[16] Furthermore, any failure to comply with additional regulations was likely harmless error. 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.").

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

preemptive authority Congress never intended to bestow in the DPA, and by ordering continuing trespass on state land, it is unconstitutionally commandeering California's government or requisitioning its land.

California's theory of unlawfulness can be generally distilled to the argument that, although the Constitution's Supremacy Clause establishes federal law as preemptive over state law, when Congress passed the DPA, it never intended to empower the President to broadly preempt state law when acting under it. Therefore, when the executive attempts to use the DPA to preempt state law, it does so without congressional authority, and its orders therefore cannot carry the force of federal law. The Court, however, disagrees with California's reading of the DPA.

The Defense Production Act is a significant statutory grant of authority to the executive, giving the President substantial discretionary power to compel private industry, allocate resources, and incentivize domestic production for national defense. Essential to the underlying policy of the DPA is the directive for the President "to ensure the vitality of the domestic industrial base," including through the "restoration of domestic critical infrastructure operations under emergency conditions" and responses to "actions taken outside of the United States that could result in reduced supplies of strategic and critical materials, including energy, necessary for national defense and the general economic well-being of the United States." 50 U.S.C. § 4502(a)(2)(C-D). If this authority were subject to *de facto* vetoes by state governments through the enforcement of conflicting state or local laws, or the federal executive were limited in its actions under the DPA by a need to proactively align all of its actions with existing state and local regulatory regimes, it would neuter the force of the act and compromise its policy goals.

Section 707 of the DPA supports the Court's interpretation. That section states: "No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation or order shall thereafter be declared by judicial or other competent authority to be invalid."

:

Initials of Preparer DTA

50 U.S.C. § 4557. The plain language of this provision confirms that California cannot assert common law claims that would prevent Sable from complying with the DPA Order. Nothing in the provision distinguishes between the type of claim for damages or otherwise limits immunity to breach of contract claims. Instead, the provision provides broad immunity "for damages or penalties *for any act or failure to act resulting directly or indirectly from compliance with*" a DPA order. *Id.* (emphasis added).

The Court's interpretation is not undermined by *Hercules Inc. v. United States,* 24 F.3d 188 (Fed. Cir. 1994) or *United States v. Vertac Chem. Corp.*, 46 F.3d 803 (8th Cir. 1995). In *Hercules*, the Federal Circuit addressed tort claims stemming from a company's manufacturing of Agent Orange pursuant to a order for contract prioritization under the DPA. The Federal Circuit explained that the DPA provides immunity only for "liability arising as a consequence of such re-prioritization." *Hercules*, 24 F.3d at 204. The court noted that "the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance," and that "the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA." *Id.* "[W]hile the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users." *Id.* at 203. In *Vertac*, the Eighth Circuit agreed. *See* 46 F.3d at 204

Thus, *Hercules* and *Vertac* stand for the premise that Section 707 immunity is limited to "liability arising as a consequence of" re-prioritization or allocation. *Hercules*, 24 F.3d at 204. Only *in context* do those cases stand for the premise that immunity does not apply in tort or other areas of law outside breach of contract.[17] A tortious chemical product is not a consequence of re-prioritization or allocation; it is a

[17] At one point, *Hercules* does state that immunity under Section 707 "extends *only* to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization." 24 F.3d at 204 (emphasis added). The Court does not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

consequence of dangerous and defective chemical design. By contrast, even assuming California has a viable trespass claim, that trespass *would* be a direct consequence of the DPA Order at issue here. Accordingly, the Court's interpretation is consistent with *Hercules* and *Vertac*.[18]

Nor is the Court persuaded by California's invocation of 50 U.S.C § 4558(j) to reflect that the legislature did not intend to grant general preemptive authority to the executive. Section 4558(j) outlines certain conditions under which a person may cite a voluntary agreement with the President under the DPA as a defense to inadvertent violations of antitrust law. California argues that by including a section that provided for preemption in the particular case of antitrust, it implies that the grant of preemptive power is case-by-case and not general. However, California does not read Section 4558(j) in context. The purpose of Section 4558, generally, is to explicate that the DPA's preemptive grant of immunity does *not* extend to antitrust, with subsection (j) outlining the narrow *exception*. *See* 50 U.S.C. § 4558(a) ("Except as specifically provided in subsection (j) of this section, no provision of this chapter shall be deemed to convey to any person any immunity from civil or criminal liability, or to create defenses to actions, under the antitrust laws."). Section 4558, therefore, stands for exactly the *opposite* proposition as that asserted

believe this broad reference is intended to mean that immunity will never extend to tort liability under any circumstances. Indeed, when describing the tort liability to which Section 707 does not apply, *Hercules* is more narrow, stating that the statute "does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe." *Id.* And *Hercules* repeatedly emphasizes that immunity extends to the consequences of complying with a DPA order and the risks of such compliance. However, to the extent *Hercules* does hold that Section 707 never applies to tort liability under any circumstances, that holding is inconsistent with the text of the statute, and the Court disagrees with it.

[18] The Court's interpretation is also consistent with *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022), *aff'd*, No. 22-10171, 2023 WL 2645553 (5th Cir. Mar. 27, 2023) (holding that a DPA allocation order requiring meat facilities to remain open during the COVID-19 pandemic preempted all conflicting state-law standards).

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

by California—the fact that the DPA specifically provides that antitrust laws are *not* preempted strongly implies that the DPA's preemptive authority *is* otherwise generalized.

Turning to the Constitutional challenges, the Court considers whether the DPA Order, in its demand that Sable violate state law and trespass on state land, violates the Constitution's separation of powers or the anti-commandeering doctrine of the Tenth Amendment. On the separation of powers question, the Court finds instructive the iconic concurrence of Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634-655 (1952). In *Youngstown*, Jackson outlined three categories of Presidential action. Of those, the category of cases wherein the President acts with express or implied authority from Congress, is that in which the President's power is at its maximum and least likely to offend separation of powers. Our case falls into that category. Here, the DPA provides explicit authority that the President may compel private parties to allocate critical resources in the interest of national security interests. As discussed, via Section 707, It also implicitly provides authority to preempt state law. Furthermore, in this case, Congressional intent is even more clear because the preempted state laws and rulings would seek to regulate the operation of an oil pipeline, a field which has been completely occupied by the federal government through the Pipeline Safety Act—whereby pipeline regulation is within the sole authority of the executive, and states require explicit permission from the federal government to regulate in the field. In context, the fact that the preempted state laws relate to the operation of a pipeline makes it even less plausible that Congress would want state laws to functionally overrule a directive under the DPA.

Finally, the Court briefly addresses California's argument that preempting state trespass action and immunizing restart of the pipeline without an easement under Gaviota State Park is essentially dedicating state property to federal aims in violation of the Tenth Amendment. However, the case cited for this proposition, *New York v. United States*, 505 U.S. 144 (1992), is inapposite. The Court in *New York* held that the Tenth Amendment was violated by a statute that required state governments to take title and

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

possession of radioactive waste. *Id.* at 174-176. Here, the DPA Order does not require California to take title or possession of anything. It certainly does not commandeer the California government to become an instrument of federal regulatory purposes. California has not directed the Court to a case that would by analogy indicate that allowing the operationalization of an existing pipeline, which has sat underground on state land for decades, unconstitutionally commandeers that state's government. This challenge is therefore easily disposed.

### C. The Motion to Dismiss in *Quintero*

In *Quintero*, Sable seeks declaratory judgment that: (1) the fact that California's Parks Department is a party to the Consent Decree bars it from attempting to regulate, direct, oversee, or interfere with Sable's operation of the Onshore Pipeline, and (2) the Defense Production Act also bars the agency from bringing legal action to prevent Sable from complying with the DPA Order. *Quintero*, ECF No. 1 at 14-15. In its motion to dismiss, Defendant argues that it may bring a valid trespass claim to enjoin operation of the Onshore Pipeline because Plaintiff is currently transporting oil below the Park without a valid easement, and Defendant also generally reiterates its interpretation of the DPA's preemptive authority and constitutional limitations, discussed in depth, *supra* III(A)(v); III(B)(ii).

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. See Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

cause of action will not do." *Id.*; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). Thus, "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

The Court organizes its analysis of the instant motion in three parts: (1) the Consent Decree's limitations on a California agency's ability to bring state law claims, (2) the preemptive power of the Pipeline Safety Act, and (3) the preemptive power of the DPA Order.

Of course, this Order significantly modifies the Consent Decree in several ways: eliminating Plains, replacing OSFM with PHMSA, and incorporating the substantive requirements of the State Waivers, so argument on the issue is somewhat outdated. However, regardless of the specific terms, Plaintiff fails to state a claim, even assuming the factual veracity of its pleadings, that the Consent Decree substantively limits the ability to generally assert state law against Sable. The Consent Decree, which is incorporated by reference in the complaint, merely sets a floor, rather than a ceiling, to limit Sable's ability to restart and operate the pipeline. In other words, satisfaction of the Consent Decree's restrictions is a necessary but *not* a sufficient condition for Sable to operate the Onshore Pipeline. Nowhere in the Consent Decree does the decree purport to prevent the enforcement of other state laws against Sable, even if those enforcement actions might interfere with the pipeline's operation. Again, the Consent Decree is designed to limit Sable's ability to operate the pipeline, not provide Sable any sort of immunity. It is of course true that California's Parks Department, as a party to the Consent Decree, must comply with its terms.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

However, Sable's contention that the agency is otherwise estopped from any legal action that may impact pipeline operations fails as a matter of law, and the first requested judicial declaration must be dismissed.

As to the question of whether the Pipeline Safety Act preempts California's denial of an easement for CA-325 and decision to bring the associated trespass action, the claim must survive a motion to dismiss. In the Ninth Circuit, a state is preempted from pretextually leveraging its role as a property owner in relation to a pipeline operator to impose safety regulations on a pipeline that are preempted by the Pipeline Safety Act. *See Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 881 (9th Cir. 2006). Here, Plaintiff plausibly alleges facts that might imply that the Parks Department denied the easement for the purpose of imposing regulation. *Quintero*, ECF No. 1 ¶¶ 38-42. Moreover, the Court has not yet seen evidence sufficient to establish as a matter of law whether the Pipeline Safety Act preempts state regulation over the Pipeline. Therefore, taking the pleaded facts as true, the claim survives.

Finally, as the Court has now discussed, the DPA Order *does*, as a matter of law, preempt the enforcement of any state law that conflicts with Sable's ability to operate the Onshore Pipeline, including the trespass claim. Therefore, going beyond the present posture and relying only on facts not reasonably disputed, the Court finds that not only does the DPA preemption argument survive the instant motion, but it also justifies issuing the second requested declaratory judgment as a matter of law. Accordingly, the Court hereby makes the following judicial declaration: the Defense Production Act, through Secretary Wright's allocation order, bars California's Department of Parks and Recreation from bringing legal action to prevent Sable from complying with the DPA Order by operating the Onshore Pipeline.[19]

Moreover, having provided Plaintiff Sable with the requested relief, the case is properly closed.

---

[19] The Court notes that this declaration is dispositive in the *Parks & Rec* trespass action and therefore will look favorably on a motion for summary judgment in that case.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

**D. The Remand in *Biodiversity***

The state court's preliminary injunction in *Biodiversity*, forbidding Sable from restarting the pipeline segments before obtaining permits and giving notice to all parties was issued on July 29, 2025. *Biodiversity*, ECF No. 1-4. On March 16, 2026, two days after restarting the pipeline, Sable filed a motion in state court to dissolve that injunction. Plaintiffs filed an opposition motion to enforce the preliminary injunction that same day. On April 17, 2026, state court denied Sable's motion to dissolve the preliminary injunction. *Biodiversity*, ECF No. 1-5. Sable and nonparty United States filed a notice of removal in this court on May 14, 2026, under federal officer jurisdiction, just over a week before Sable faced possibly being held in contempt by the Santa Barbara court for violating its injunction. *Biodiversity*, ECF No. 1. Now that *Biodiversity* has been removed, Sable has filed a motion for this Court to dissolve the injunction. ECF No. 43. Plaintiffs have filed a motion to remand to the state court. ECF No. 46. In the following analysis, the Court finds that though jurisdiction exists in this Court, the case must be remanded because removal was untimely.

The federal officer removal statute allows defendants to remove a "civil action ... that is against or directed to ... [t]he United States or any agency thereof or any officer (or any person acting under that officer) ... in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). To invoke federal officer jurisdiction, a private defendant must show that: (1) "it is a person within the meaning of the statute"; (2) "it can assert a colorable federal defense"; and (3) "there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 755 (9th Cir. 2022) (citation omitted). "To demonstrate a causal nexus, the private person must show: (1) that the person was 'acting under' a federal officer in performing some 'act under color of federal office,' and (2) that such action is causally connected with the plaintiff's claims against it." *Id.* (citing *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–50 (9th Cir. 2017)). To determine whether a party was "acting under" a

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

federal officer, courts consider many factors, but it basically requires something akin to an agency relationship. *See id.* at 756-57.

Here, California functionally conceded that federal officer jurisdiction exists over Sable when it chose not to challenge removal of *Parks & Rec.* Sable, when removing that case, explained that it had restarted and was operating the pipeline under the direct supervision and control of the federal government, thus demonstrating the agency-type relationship required. Moreover, after conducting its analysis, the Court finds that federal officer jurisdiction exists over non-party United States as well. The case challenges Sable's actions under the direction and supervision of the United States, so the case can plainly be said to be "directed to" the United States.

However, notwithstanding the existence of removal jurisdiction, the Court must remand the case because removal was not timely. 28 U.S.C. § 1446 proscribes the procedure for removal, including a 30-day time restriction from receipt of the initial pleading. Furthermore, if at the time of the initial pleading, the case is not removable, under § 1446(b)(3), the 30-day clock begins to run when it "may first be ascertained that the case is one which is or has become removable." Therefore, the Court must determine when Sable or the United States was first informed that the requirements for federal officer jurisdiction had been met. The Court conducts this analysis liberally in favor of Sable and the United States. *See Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006) (unlike § 1446 removals, § 1442 removals are liberally construed in favor of removal).

In its March 16, 2026, motion to dissolve the state court injunction, Sable argued that obeying both the DPA Order and the preliminary injunction was impossible,[20] thus offering the preemptive power of

[20] "It is well established that federal courts may take judicial notice of related state court orders and proceedings." *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 56 F. Supp. 3d 1121, 1136 (C.D. Cal. 2014).

:

Initials of Preparer DTA

the DPA Order as a colorable federal defense to enforcement of the injunction. Then, on March 19, Sable informed this Court that it was "acting under" a federal officer, within the meaning of the federal officer statute, when it restarted the Pipeline. *Parks & Rec*, Notice of Removal, ECF No. 1. Therefore, by March 19, federal officer jurisdiction was unequivocally clear and certain and not only ascertainable but actually *ascertained* by Sable. Thirty days after that date, on April 18, 2026, at the latest, the 30-day window therefore expired. The May 14, 2026 removal was thus untimely, and remand is required.

The United States offers the novel counterargument that, as a removing nonparty, it is immune to the 30-day removal deadline. This is not true. The basis of the United States' contention is the plain language of § 1446, which seems to apply on its terms only to removing "Defendants." According to the United States, this provides a legal loophole that allows the United States to remove cases directed toward it (but in which it is not a defendant) *at any time*. It is true that under the plain language of 28 U.S.C. § 1442, the United States may remove a case even as a nonparty. However, the 30-day window still applies.

To interpret removal statutes, courts consider the plain language and legislative history. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 351-54 (1999). Here, under § 1442, the fact that a federal officer can remove even a case that is "directed to" that officer rather than merely those filed "against" the officer is the product of a 2011 amendment. *See Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1250 (9th Cir. 2017). Meanwhile, when § 1446 was drafted in 1948 and 1949, non-defendants were not able to remove cases at all. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 351-52. (1999). Therefore, when § 1446 talks about defendants, it is reasonably interpreted to mean 'person or entity removing the case,' because that is the complete class of removing parties it described at the time. Reading ambiguity into the statute would be

:

Initials of Preparer DTA

anachronistic and also produce the counterintuitive results that the United States would be significantly more limited in removing cases where it was a defendant than those in which it was not.[21]

The United States's argument therefore fails, and the case must be remanded. However, the Court notes that, pursuant to this Order and the doctrine of collateral estoppel, due to the preemptive authority of the DPA Order, a state court may not impose or enforce state laws that might burden Sable from complying with the DPA Order. Also, to the extent that the state court case relates to now-modified portions of the Consent Decree, those issues are now moot.

## IV. Conclusion

For the foregoing reasons, and in the manner described, *supra*: the motion to modify the consent decree in *US v. Plains* is GRANTED; the motion to enforce the Consent Decree in *US v. Plains* is GRANTED IN PART; the motion for preliminary injunction in *Wright* is DENIED; the motion to dismiss in *Quintero* is DENIED. Judgment in Quintero is DECLARED, and the case is closed; and the motion for remand in *Biodiversity* is GRANTED. Accordingly, the Court hereby: (1) MODIFIES the Consent Decree in *US v. Plains* to terminate the ongoing requirements for *Plains*, substitute PHMSA for OSFM, and incorporate by reference the requirements of the State Waivers, including the substance of some California state law; (2) ENFORCES the Consent Decree by imposing on Sable a penalty of $1.449 million; (3) DECLARES that the Defense Production Act, through Secretary Wright's allocation order, bars California's Department of Parks and Recreation from bringing legal action to prevent Sable from

[21] The Court notes that legislative intent in the drafting of § 1442 also weighs in favor of this interpretation. The 1940 edition 28 U.S.C. § 72, on which the modern federal officer jurisdiction statute is based, actually *did* allow federal officer defendants to remove "any time before trial." The clear decision to omit this freedom in the modern version of the law and instead apply § 1446's time limit indicates an express interest in time-limiting jurisdiction in federal officer cases.

:

Initials of Preparer DTA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC; 2:26-cv-02739-SVW-SSC; 2:26-cv-05242-SVW-SSC | Date | August 19, 2026 |
| Title | *United States of America et al v. Plains All American Pipeline L.P. et al.; State Of California v. Chris Wright, et al.; Sable Offshore Corp. et al v. Armando Quintero; Center For Biological Diversity et al v. California Department of Forestry and Fire Protection et al.* | | |

complying with the DPA Order by operating the Onshore Pipeline; and (4) REMANDS *Biodiversity* to Santa Barbara Superior Court.

**IT IS SO ORDERED.**

:

Initials of Preparer DTA

No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al.*,
*Defendants-Appellants.*

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

# EXCERPTS OF RECORD – VOLUME 2 OF 6

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

BABST CALLAND CLEMENTS & ZOMNIR, P.C.
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500

HOLLAND & KNIGHT LLP
Zachary James Watson (Bar No. 348019)
*zachary.watson@hklaw.com*
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
Telephone: +1 949.517.1451

*Attorneys for Defendant-Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

*[Additional counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY,<br><br>Intervenor-Defendants. | Case No. 2:26-cv-03396-SVW-SSCx<br><br>**INTERVENOR-DEFENDANTS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF JOINDER AND BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date: September 28, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A<br>Judge: Hon. Stephen V. Wilson |

**NOTICE OF JOINDER**

Intervenor-Defendants Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") hereby join in the Motion to Dismiss, ECF 85, brought by Defendants Chris Wright, in his official capacity as Secretary of the U.S. Department of Energy, and the U.S. Department of Energy (collectively, the "United States").

**BRIEF IN SUPPORT OF MOTION TO DISMISS**

The State of California asks this Court to decide sweeping questions about the meaning and validity of the Defense Production Act, 50 U.S.C. § 4501 *et seq.* ("DPA"), under the guise of challenging Secretary Wright's order requiring Sable to restart oil transportation. *See* ECF 16-1 at 9–12 (the "DPA Order"). But just two days ago, this Court determined that California "has not demonstrated even a serious question as to the merits" because "[t]he DPA Order . . . is an allocation order, generally authorized by the plain language of Section 101" and "facially valid." ECF 82 at Page ID 2236–-38. As explained below, this Court need not reach a final merits decision on the scope of the DPA's statutory authorization or the nature of Secretary Wright's delegated authority. Instead, the Court should dismiss California's complaint for lack of reviewability and failure to state a claim.

California's two claims under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"), (Counts I and II) must be dismissed because the DPA Order is not reviewable under the APA. California's two constitutional claims (Counts III and IV) fail to state a claim: neither the separation-of-powers theory in Count III nor the anti-commandeering theory in Count IV alleges any cognizable violations. California's ultra vires claim (Count V) likewise fails to state a claim because California has not pleaded that the United States violated a specific statutory prohibition that it is entitled to enforce. And, finally, California has not shown that

it is within the DPA's zone of interests such that it has a cause of action for any of its claims.

**1. Counts I and II are unreviewable under the APA**. California must rely on the APA for judicial review because the DPA itself provides no private right of action. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 808 n.7 (9th Cir. 2006). But the APA extends only to "agency action." 5 U.S.C. §§ 702, 704. The President is not an "agency" under the APA and therefore out of respect for the separation of powers is not subject to review. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–-01 (1992); *Dalton v. Specter*, 511 U.S. 462, 469–70 (1994).

When a cabinet official exercises delegated presidential power, the action qualifies as presidential action exempt from APA review. *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1190–91 (9th Cir. 1975) (holding that where authority is vested in the President and formally delegated to a cabinet secretary, "the Secretary's actions are those of the President"—regardless of the President's involvement in any particular decision—and "therefore by the terms of the APA the approval of the regulation at issue here is not reviewable"). Other courts agree. *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100–02 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018); *NRDC v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111–13 (D.D.C. 2009). Secretary Wright acted here under presidential authority formally delegated by the President. *See* Exec. Order No. 14,391, 91 Fed. Reg. 13,199 (Mar. 13, 2026). Secretary Wright's action is accordingly unreviewable under the APA given that the statute provides no meaningful standard against which the court can evaluate the exercise of authority.[1] *See* 5 U.S.C. § 701(a)(2); 50 U.S.C.

---

[1] Even if this Court could exercise review, California's claims would fail on the merits because the DPA Order is a facially valid allocation order, supported by rational explanations for its issuance and promulgated in compliance with applicable regulations, and carrying general preemptive authority. *See* ECF 82 at Page ID 2238-44.

§§ 4511, 4554(a); *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1174 (9th Cir. 2018). Counts I and II must be dismissed.

**2. Count III fails to state a separation-of-powers claim**. California's separation-of-powers theory also fails. To start, this Court has already determined that the DPA Order rests on firm constitutional footing because it is based on express statutory authority to "compel private parties to allocate critical resources in the interest of national security interests" and implied statutory authority to preempt state law. ECF 82 at Page ID 2241–42. And it rejected California's preemption-based theory when it concluded that the DPA has broad preemptive power, because allowing states and localities to retain "*de facto* vetoes . . . would neuter the force of the act and compromise its policy goals." ECF 82 at Page ID 2241, 2244. Regardless, California's claims that Secretary Wright "exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 462, 473. The Supreme Court has recognized a "well established" "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other." *Id.* at 474. The Constitution would be implicated only if Secretary Wright relied on it as an independent source of authority or the DPA were itself unconstitutional—claims that California does not make here. *Id.* at 473, 473 n.5. "[I]f every claim alleging that the President exceeded his statutory authority were considered a constitutional claim," that would twist the APA's nonreviewability of presidential actions "beyond recognition." *Dalton*, 511 U.S. at 474. California's theory is thus a statutory dispute reviewable only through the APA framework, and because APA review is unavailable, Count III should be dismissed.

**3. Count IV fails to state an anti-commandeering claim.** California's Tenth Amendment claim contends that the DPA Order compels the State to devote its property to Sable's operations. *See* ECF 72 at ¶ 170. The anti-commandeering

doctrine, however, bars only federal directives *aimed at states themselves*—not at private actors. *See Murphy v. NCAA*, 584 U.S. 453, 470 (2018). Here, the DPA Order obligates Sable, a private company, not California. As this Court has already recognized, this dooms California's anti-commandeering claim because the DPA Order "does not require California to take title or possession of anything [and] . . . certainly does not commandeer the California government to become an instrument of federal regulatory purposes.[2] ECF 82 at Page ID 22–45. Because the DPA Order is directed at a private party, the anti-commandeering doctrine has no application and Count IV should be dismissed.

**4. Count V fails to state an ultra vires claim.** California's ultra vires claims likewise fails. This Court has already rejected the premise of California's ultra vires claim, ECF 82 at Page ID 2240-44—and rightly so, because the DPA Order is an allocation order authorized under DPA § 101 and with preemptive effect authorized under DPA § 707. Count V must be dismissed for that reason alone.

But California fails even to state a claim on which relief may be granted. "Because ultra vires review could become an easy end-run around the limitations of . . . judicial-review statutes," the Supreme Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)].'" *Nuclear Regul. Comm'n v. Tex.*, 605 U.S. 665, 681 (2025) (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). The *Kyne* exception "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.* at 666

[2] Any tension between the DPA Order and state law would present a preemption question, not a commandeering one. *See Murphy*, 584 U.S. at 470–71, 477–79; *New York v. Dep't of Just.*, 343 F. Supp. 3d 213, 232 (S.D.N.Y. 2018). Federal action that displaces state regulatory authority does not violate the Tenth Amendment so long as it rests on valid constitutional grounds. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981); *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013). And as this Court held, Section 707 of the DPA preempts state laws that would impose "'liability arising as a consequence' of re-prioritization or allocation." ECF 82 at Page ID 2242.

(quoting *Ry. Clerks v. Ass'n for Benefit of Non-Cont. Emps.*, 380 U.S. 650, 660 (1965)) (emphasis in original). Additionally, "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (citing *Kyne*, 358 U.S. at 190). An ultra vires cause of action will not lie "simply because an agency has arguably reached a conclusion which does not comport with the law." *Nuclear Regul. Comm'n*, 605 U.S. at 681.

Here, California fails to state an ultra vires claim because it focuses entirely on whether the DPA Order preempts or supersedes other laws and not whether the DPA Order was lawfully issued—the only thing at issue in an ultra vires claim. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (noting the distinction between the lawfulness of agency action and its preemptive effect). And just as dispositively, California fails to identify a specific prohibition under the DPA that is violated by the DPA Order—let alone that any such prohibition confers rights upon California. *See Nuclear Regul. Comm'n*, 605 U.S. at 681. Without these allegations, California fails to state an ultra vires claim and Count V must be dismissed without the Court ever needing to reach the merits.

**5. Counts I – V also fail because California is not within the DPA's zone of interests.** "[A] statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). California thus must show that it is within the zone of interests of the DPA not only for its APA claims, but also for its constitutional and ultra vires claims, because the equitable powers of the federal courts to hear those claims are themselves conferred by statute.[3] *Grupo Mexicano de*

---

[3] The Ninth Circuit rejected a zone-of-interests test for constitutional and ultra vires claims in *Sierra Club v. Trump*, 929 F.3d 670, 700–01 (9th Cir. 2019) (*Sierra Club*

*Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982) (applying zone-of-interests test to establishment clause claim); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (same for dormant commerce clause). California cannot meet that requirement here because its asserted interests in enforcement of its environmental laws and sovereign property interests are outside the zone of interests of the DPA, which this Court has held is "to compel private industry, allocate resources, and incentivize domestic production for national defense." ECF 82 at Page ID 2241. California thus does not have a cause of action for its statutory, constitutional, or equitable claims and Counts I – V must be dismissed for this reason, as well.

* * *

Because California's claims "fail[] as a matter of law, granting leave to amend would be futile." *Oei v. N. Star Cap. Acquisitions, LLC*, 486 F. Supp. 2d 1089, 1104 (C.D. Cal. 2006). The United States' motion to dismiss thus should be granted with prejudice.

**Dated**: August 21, 2026

Respectfully submitted,

By: /s/ *Nicholas McDaniel*

BABST CALLAND CLEMENTS & ZOMNIR, P.C.
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*

---

*I*), and *Sierra Club v. Trump*, 963 F.3d 874, 893 (9th Cir. 2020) (*Sierra Club III*). But *Sierra Club I* was impliedly disapproved of by the Supreme Court in *Trump v. Sierra Club*, 588 U.S. 930 (2019) (*Sierra Club II*), which stayed the injunction at issue in that case in part because "the Government . . . made a sufficient showing . . . that the plaintiffs have no cause of action . . . ." And *Sierra Club III* then was vacated by the Supreme Court in *Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (*Sierra Club IV*), in light of changed circumstances due to a new presidential administration. To the extent that this Court considers either *Sierra Club I* or *Sierra Club III* to be binding precedent, Sable reserves the right to argue that they were wrongly decided. Sable further reserves the right to argue that *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023), was wrongly decided to the extent that it held that an ultra vires cause of action lies to challenge actions by the President.

505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
Zachary James Watson (Bar No. 348019)
*zachary.watson@hklaw.com*
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
Telephone: +1 949.517.1451
James W. Noe (*pro hac vice*)
*jim.noe@hklaw.com*
800 17th St., NW, Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525
Ashley Akers (*pro hac vice*)
*ashley.akers@hklaw.com*
1650 Tysons Boulevard, Suite 1700
Tysons, VA 22102
Telephone: +1 703.720.8583

*Attorneys for Defendant-Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
IAN M. SWENSON
Email: Ian.Swenson@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY,<br><br>Intervenor-Defendants | Case No. 2:26-cv-03396-SVW-SSC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**<br><br>Hearing Date: September 28, 2026<br>Time: 1:30 pm<br>Judge: Honorable Stephen V. Wilson |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on September 28, 2026, at 1:30 pm, in Courtroom 10A of the U.S. District Court for the Central District of California, Western Division, located at 350 West 1st Street, Suite 4311, Los Angeles, CA 90012, Defendants Chris Wright, in his official capacity as Secretary of Energy, and the U.S. Department of Energy, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), will and hereby do respectfully move the Court for an order dismissing Plaintiff California's Amended Complaint, ECF 72, for the reasons set forth in Defendants' attached memorandum of points and authorities.

Pursuant to Local Rule 7-3, counsel for Defendants has conferred with counsel for Plaintiff and Intervenor-Defendants regarding this motion. Plaintiff will oppose the motion to dismiss and Intervenor-Defendants will likely submit their own filing in support of the motion. The Court has already entered a briefing schedule for the motion. *See* ECF 78.

DATED: August 21, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General

*/s/ Ian M. Swenson*
Ian M. Swenson
Email: Ian.Swenson@usdoj.gov
Counsel (CA Bar No. 344260)
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
IAN M. SWENSON
Email: Ian.Swenson@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants,

and

SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY,

Intervenor-Defendants

Case No. 2:26-cv-03396-SVW-SSC

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Hearing Date: September 28, 2026
Time: 1:30 pm
Judge: Honorable Stephen V. Wilson

# TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The Defense Production Act ..... 2

II. The Defense Production Act Order ..... 4

III. California's Amended Complaint ..... 4

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

I. California's Administrative Procedure Act Claims are Unreviewable Because They Challenge Presidential Action (Counts I and II). ..... 6

II. Even if the Defense Production Act Order were Agency Action, California's Arbitrary-and-Capricious Claim Is Unreviewable Because it Challenges Determinations Committed to Agency Discretion (Count II). ..... 9

III. Even Assuming Reviewability, the Court Should Again Reject California's Challenges under the APA ..... 12

IV. California Fails to State a Claim that the Defense Production Act Order Violates the Separation of Powers (Count III). ..... 13

A. The Defense Production Act Order does not usurp Article III judicial power. ..... 13

B. The Defense Production Act Order does not usurp legislative power. ..... 14

V. California Fails to State a Claim that the Defense Production Act Order Violates the Tenth Amendment (Count IV). ..... 17

VI. The Claim that Defendants Have Acted *Ultra Vires* by Issuing the Defense Production Act Order (Count V) Should Be

Dismissed for Lack of Jurisdiction and Failure to State a Claim. ........................................................................................ 19

CONCLUSION ........................................................................................ 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 698 F.3d 171 (4th Cir. 2012) .......... 7

*Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 801 F. Supp. 2d 383 (D. Md. 2011) .......... 7, 8, 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 5

*Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650 (1965) .......... 19

*Boire v. Greyhound Corp.*, 376 U.S. 473 (1964) .......... 19

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684 (4th Cir. 2019) .......... 11

*Chairez v. Mayorkas*, 168 F.4th 1227 (9th Cir. 2026) .......... 6

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) .......... 16

*Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880 (D.C. Cir. 2021) .......... 11

*Cohen v. Apple Inc.*, 46 F.4th 1012 (9th Cir. 2022) .......... 16

*Dakota Cent. Tel. Co. v. S. Dakota ex rel. Payne*, 250 U.S. 163 (1919) .......... 10

*Dalton v. Specter*, 511 U.S. 462 (1994) .......... 6, 14, 15, 18

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........ 8, 10, 11

*Detroit International Bridge Company v. Government of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016) ........ 7, 8

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*,
532 F.2d 957 (5th Cir. 1976) ........ 2

*El-Shifa Pharm. Indus. Co. v. United States*,
402 F. Supp. 2d 267 (D.D.C. 2005) ........ 6, 9

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ........ 16

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 6, 7

*Garcia v. San Antonio Metro. Transit Auth.*,
469 U.S. 528 (1985) ........ 17

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ........ 15, 19, 20

*Gros Ventre Tribe v. United States*,
469 F.3d 801 (9th Cir. 2006) ........ 6

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........ 9

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981) ........ 17

*I.C.C. v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987) ........ 11

*Jensen v. Nat'l Marine Fisheries Serv.*,
512 F.2d 1189 (9th Cir. 1975) ........ 6, 7

*Kingman Reef Atoll Invs., LLC v. United States*,
541 F.3d 1189 (9th Cir. 2008) ........ 5

*Knick v. Township of Scott, Pa.*,
588 U.S. 180 (2019) ........ 18

*Larson v. Domestic & Foreign Com. Corp.*,
337 U.S. 682 (1949) ........ 19, 20

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........ 9, 10, 11

*Mendez-Gutierrez v. Ashcroft*,
340 F.3d 865 (9th Cir. 2003) ........ 12

*MetroPCS Cal., LLC v. Picker*,
970 F.3d 1106 (9th Cir. 2020) ........ 16

*Murphy Co. v. Biden*,
65 F.4th 1122 (9th Cir. 2023) ........ 19

*Murphy v. NCAA*,
584 U.S. 453 (2018) ........ 18, 19

*Nat. Res. Def. Council (NRDC) v. U.S. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) ........ 7, 8

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ........ 8, 12, 15

*New York v. United States*,
505 U.S. 144 (1992) ........ 17, 18

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ........ 2, 19, 20

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ........ 14

*San Francisco Herring Ass'n v. Dep't of Interior*,
946 F.3d 564 (9th Cir. 2019) ........ 5

*San Luis Unit Food Producers v. United States*,
709 F.3d 798 (9th Cir. 2013) ........ 5

*Sierra Club v. Jackson*,
648 F.3d 848 (D.C. Cir. 2011) ........ 12

*Sisseton–Wahpeton Oyate v. U.S. Dep't of State*,
659 F. Supp. 2d 1071 (D.S.D. 2009) ........ 8

*Tobar v. United States*,
639 F.3d 1191 (9th Cir. 2011) ........ 5

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ........ 5

*Trump v. Hawaii*,
585 U.S. 667 (2018) ....................10

*United States v. Comstock*,
560 U.S. 126 (2010) ....................17

*United States v. Hatch*,
722 F.3d 1193 (10th Cir. 2013) ....................17

*Waterkeeper All. v. EPA*,
140 F.4th 1193 (9th Cir. 2025) ....................5

*Webster v. Doe*,
486 U.S. 592 (1988) .................... 9, 10, 12

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ....................10

**Statutes**

49 U.S.C. § 60104(c) ....................13

5 U.S.C. § 701(a)(2) ....................9

5 U.S.C. §§ 702 ....................6

50 U.S.C. § 4502(a)(1) ....................2

50 U.S.C. § 4511(a) ....................4, 10

50 U.S.C. § 4511(c)(1) ....................4

50 U.S.C. §§ 4502(a)(5) ....................11

50 U.S.C. §§ 4511 ....................8

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ....................5

Federal Rule of Civil Procedure 12(b)(6) ....................5

**Other Authorities**

*Adjusting Certain Delegations Under the Defense Production Act*,
Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026) ....................3, 4

*National Defense Resources Preparedness*,
Exec. Order No. 13603, 77 Fed. Reg. 16651 (Mar. 16, 2012) ....................3

*Presidential Administration*,
114 Harv. L. Rev. 2245 (2001) ....................................................................8

## INTRODUCTION

Pursuant to a delegation of authority that Congress vested in the President, the Secretary of Energy determined that the immediate flow of oil through the Santa Ynez Pipeline System (the "Pipeline") is necessary to meet core national-security needs stemming from West Coast energy shortages and supply-chain risks. The Secretary therefore issued an order (the "Order") under the Defense Production Act (the "DPA") directing Sable Offshore Corp. and Pacific Pipeline Company ("Sable") to immediately resume the transport of oil through the Pipeline. Because the DPA Order involved (1) the exercise of presidential authority (2) based on a national-security determination, it is unreviewable under the Administrative Procedure Act ("APA"). The Court should accordingly dismiss Counts I and II of California's Amended Complaint, ECF 72. In all events, Counts I and II of the Amended Complaint fail as a matter of law for the reasons the Court explained in its Order Denying California' Motion for a Preliminary Injunction. ECF 82 at 31-37.

California's constitutional claims fare no better. The State alleges that the DPA Order encroaches on judicial power by interfering with a federal consent decree—and on legislative power by exceeding the President's statutory authority under the DPA—in violation of the separation of powers. Neither allegation states a constitutional claim; indeed, the latter is really a *statutory* claim in disguise for which California lacks a cause of action outside the APA. If California's theory were right, then every Executive Branch action that allegedly exceeds statutory authority would give rise to an independent constitutional claim. The Supreme Court has rejected such artful attempts to bypass statutory limits on review. As for its Tenth Amendment claim, none of California's allegations even implicate the Tenth Amendment. If anything, California is alleging a taking of property without compensation, but the State has not brought a takings claim under the Fifth Amendment. Nor could it bring one in this Court—such claims belong in the Court of Federal Claims, where the remedy (if any) would be compensation, not an

injunction. As with California's APA claims, Counts III and IV of the Amended Complaint fail as a matter of law for the reasons explained in the Court's Order Denying California' Motion for a Preliminary Injunction. ECF 82 at 37-38. For these reasons, the Court should dismiss Counts III and IV for failure to state a claim.

Count V is California's "Hail Mary" *ultra vires* claim, which "in court as in football . . . rarely succeeds" and which fails here. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (quotation marks omitted). California improperly alleges an *ultra vires* claim to obtain jurisdiction over its otherwise unreviewable contrary-to-law APA claim. And in all events, California fails to identify a specific statutory prohibition Defendants violated in issuing the DPA Order and fails to show how issuing the DPA Order exceeded the Defendants' delegated authority under the DPA. As the Court has already held in denying California's Motion for a Preliminary Injunction, the DPA Order is a valid use of the DPA and California's *ultra vires* claim fails as a matter of law. *See* ECF 82 at 33-38. The Court should dismiss Count V.

## BACKGROUND

### I. The Defense Production Act

The DPA grants the President—and any department head to which he delegates authority—"a sweeping delegation of power" to ensure that domestic industry supports the national defense. *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976). Congress enacted the DPA because "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States." 50 U.S.C. § 4502(a)(1); *see also id.* § 4502(a)(3) (finding that "the development of domestic productive capacity" is necessary "to provide for the national security" of the United States and "national defense preparedness"). Consistent with this prophylactic focus, the DPA grants the President "an array of

authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4) .

As relevant here, the President may require entities to prioritize the performance of certain contracts and to allocate materials, services, and facilities as he shall "deem necessary or appropriate" to "promote the national defense." *Id.* § 4511(a). Separately, the President may use these prioritization and allocation powers to "maximize domestic energy supplies," upon making certain findings. *Id.* § 4511(c)(1) .

This latter authority under section 4511(c)—which does not require an independent national-security determination, unlike section 4511(a)—reflects the DPA's broader recognition of the link between the domestic energy supply and the national defense. For example, the DPA makes clear that "national defense preparedness" depends on "the availability of domestic energy supplies for national defense needs." *Id.* § 4502(a)(5) . It also defines "national defense" broadly to include "energy production or construction." *Id.* § 4552(14) . And it specifically designates energy as a "strategic and critical material." *Id.* § 4516. The DPA thus affirms that energy security *is* national security.

Over time, the President has delegated these DPA authorities to executive department and agency heads, who can then step into the President's shoes and exercise his DPA authority themselves. In 2012, the President delegated to the Secretary of Energy authority under section 4511(a) "with respect to all forms of energy," as well as the authority to make certain findings under section 4511(c). *National Defense Resources Preparedness*, Exec. Order No. 13603, §§ 201(a)(2), 203, 77 Fed. Reg. 16651 (Mar. 16, 2012). More recently, on the same day as the DPA Order, the President delegated all authority under section 4511(c) to the Secretary of Energy. *See Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, § 2, 91 Fed. Reg. 13199 (Mar. 13, 2026).

## II. The Defense Production Act Order

Exercising these delegated authorities, the Secretary of Energy determined in March 2026 that West Coast energy shortages and supply-chain risks—including heavy dependence on imports from foreign adversaries—threaten our national defense. *See* ECF 23-1 at 10-11 (DPA Order). Meanwhile, the Santa Ynez Unit—one of the largest offshore oilfields in the United States and a "critical energy resource on the West Coast"—sits in federal waters off the coast of California. *Id.* The Pipeline can provide reliable transportation for oil from the Unit to onshore refineries in California. *Id.* at 11. The Secretary therefore issued the DPA Order, which directs Sable to immediately prioritize and allocate transportation services for hydrocarbons from the Unit through the Pipeline, and to start performing under contracts for such transportation.

In issuing the DPA Order, the Secretary invoked the President's authority under both section 4511(a) and section 4511(c). For the former, the Secretary determined that the DPA Order is "necessary or appropriate to promote the national defense." *Id.* at 12; *see* 50 U.S.C. § 4511(a). For the latter, he determined that the DPA Order is necessary to "maximize domestic energy supplies," after making the required findings that those supplies of "materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation" and that "maintenance or expansion of exploration, production, refining, [or] transportation . . . cannot reasonably be accomplished without exercising th[is] authority." ECF 23-1 at 12 (DPA Order); *see* 50 U.S.C. § 4511(c)(1)-(2).

## III. California's Amended Complaint

About two weeks after the Secretary issued the DPA Order, California filed this suit seeking declaratory and injunctive relief, as well as vacatur under the APA. California's Complaint asserted two APA claims (Counts I-II) and two constitutional claims (Counts III-IV). Count I alleged that the DPA Order is contrary to law under

the APA because it exceeds the President's statutory authority under the DPA and violates Department of Energy regulations. ECF 1 ¶¶ 116-29. Count II alleged that the DPA Order is arbitrary and capricious under the APA because the Secretary failed to make valid national-defense and energy-production determinations. *Id.* ¶¶ 130-38. Count III alleged that the DPA Order usurps judicial and legislative power in violation of the Constitution's separation of powers. *Id.* ¶¶ 139-50. Finally, Count IV alleged that the DPA Order violates the Tenth Amendment. *Id.* ¶¶ 151-59.

After the United States moved to dismiss California's Complaint, ECF 66, California responded by amending its Complaint, ECF 69, 72. The Amended Complaint adds Count V, which alleges Defendants have acted *ultra vires* by issuing the DPA Order in excess of the President's statutory authority under the DPA. ECF 72 ¶¶ 176-81.

**LEGAL STANDARD**

When a defendant moves to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) (cleaned up). "The waiver of sovereign immunity is a prerequisite to federal-court jurisdiction." *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the court accepts as true the factual allegations in a complaint, it does not defer to a complaint's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Ninth Circuit has treated some of the APA's review provisions as jurisdictional. *See San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801 (9th Cir. 2013); *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564,

571 (9th Cir. 2019). That approach has been called into question, *see Waterkeeper All. v. EPA*, 140 F.4th 1193, 1206 n.6 (9th Cir. 2025), and other circuits have disagreed, *see, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 183-85 (D.C. Cir. 2006). For the avoidance of doubt, the Federal Government moves to dismiss California's APA claims (Counts I and II) under both Rule 12(b)(1) and Rule 12(b)(6). It moves to dismiss California's constitutional claims (Counts III and IV) under Rule 12(b)(6). Defendants move to dismiss California's *ultra vires* claim under both Rule 12(b)(1) and Rule 12(b)(6).

## ARGUMENT

### I. California's Administrative Procedure Act Claims are Unreviewable Because They Challenge Presidential Action (Counts I and II).

Because the DPA does not create a private right of action, California's only statutory path to judicial review is the APA. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 808 n.7 (9th Cir. 2006). The APA waives sovereign immunity for, and structures judicial review around, "agency action." 5 U.S.C. §§ 702, 704; *Chairez v. Mayorkas*, 168 F.4th 1227, 1231 (9th Cir. 2026). Because the President is not an "agency," the APA's waiver and review provisions do not apply to presidential action. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Dalton v. Specter*, 511 U.S. 462, 469-70 (1994); *El-Shifa Pharm. Indus. Co. v. United States*, 402 F. Supp. 2d 267, 273 (D.D.C. 2005) (holding that the APA's waiver of sovereign immunity does not apply to presidential action).

The Secretary of Energy issued the DPA Order under a delegation of authority that Congress vested in the President. The question here is whether it matters that a *delegee*, rather than the President *personally*, exercised discretionary authority vested in the President by law. The answer is no.

Under Ninth Circuit precedent, when an agency head exercises the President's delegated authority, the action is presidential action for purposes of APA review. *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1190-91 (9th Cir. 1975). In

*Jensen*, a treaty gave the President authority to approve fishing regulations issued by a commission; the President delegated the authority to the Secretary of State; and the Secretary approved a regulation. *Id.* In rejecting an APA challenge to the Secretary's approval, the Ninth Circuit held that "[f]or the purposes of this appeal the Secretary's actions are those of the President, and therefore by the terms of the APA the approval of the regulation at issue here is not reviewable." *Id.* at 1191.

So too here. The DPA gives the President authority to issue orders; the President delegated that authority to the Secretary of Energy; and the Secretary issued the DPA Order. Under *Jensen*, the DPA Order is thus presidential action and "by the terms of the APA . . . is not reviewable." *Id.*; *Franklin*, 505 U.S. at 800-01 (holding that the terms of the APA do not permit review of presidential action).

Other courts have held that the bar on APA review of presidential action extends to agency action taken pursuant to a delegation of presidential authority. For example, the court in *Detroit International Bridge Company v. Government of Canada* held that the Secretary of State's exercise of delegated presidential authority to approve a permit for an international bridge was "presidential in nature"—and thus "unreviewable under the APA"—because it "involved the exercise of discretionary authority committed to the President" by the International Bridge Act of 1972. 189 F. Supp. 3d 85, 100-02 (D.D.C. 2016), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).

In so holding, the court correctly reasoned that "the determinative consideration is not whether the actions were actually taken by the President personally, but whether separation of powers concerns articulated in *Franklin* and *Dalton* apply." *Id.* at 103 (cleaned up). And such concerns, the court explained, "exist whenever the President's discretion is at stake," especially in "sensitive" and "complex" areas like "foreign affairs." *Id.*; *see also Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 801 F. Supp. 2d 383, 404 (D. Md. 2011) ("[A]ctions taken pursuant to delegated presidential authority . . . will not be held

subject to review under the APA."), *aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012); *Nat. Res. Def. Council (NRDC) v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111-13 (D.D.C. 2009) ("an act need not be carried out by the President personally to constitute presidential action exempt from judicial review under the APA" because an agency "stands in the President's shoes" when it exercises "the President's inherent discretionary power"); *Sisseton–Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) ("The President is free to delegate some of his powers to the heads of executive departments … and those delegation actions that are carried out create a presumption of being as those of the President.").

The DPA Order is likewise "unreviewable presidential action because it involved an exercise of discretionary authority committed to the President by law" in the DPA. *Detroit Int'l Bridge*, 189 F. Supp. 3d at 102; *see* 50 U.S.C. §§ 4511, 4554(a). What is more, the "separation of powers concerns" undergirding the court's holding in *Detroit International Bridge* are even weightier here because the case arises in the "sensitive" and "complex" area of national security. 189 F. Supp. 3d at 103; *Ancient Coin*, 801 F. Supp. 2d at 403; *NRDC*, 658 F. Supp. 2d at 111; *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (noting that "courts traditionally have been reluctant to intrude" into "national security affairs").

None of this is to say that agency action becomes unreviewable whenever it is directed by the President. Although APA review is unavailable for "actions involving discretionary authority delegated by Congress to the *President*," review is available for "actions involving authority delegated by Congress to an *agency*" but "directed by the President." *Detroit Int'l Bridge*, 189 F. Supp. 3d at 104 (quoting Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001)) (emphasis added). That explains why courts review agency actions that simply implement executive orders. *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). But when, as here, the President formally delegates *his* statutory or constitutional

authority to an agency head, and the agency head then acts solely under *that* authority, there is presidential action beyond the scope of the APA. Accordingly, the Court should dismiss Counts I and II of the Complaint under Rule 12(b)(1). *See El-Shifa*, 402 F. Supp. 2d at 273 (no waiver of sovereign immunity under the APA and thus no subject matter jurisdiction for challenges to presidential action). Alternatively, the Court should dismiss under Rule 12(b)(6).

## II. Even if the Defense Production Act Order were Agency Action, California's Arbitrary-and-Capricious Claim Is Unreviewable Because it Challenges Determinations Committed to Agency Discretion (Count II).

Even if the Court were to conclude that the DPA Order constituted agency action, APA review would still be unavailable for Count II because the APA limits judicial review "to situations in which … the agency action is not committed to agency discretion by law." *Webster v. Doe*, 486 U.S. 592, 599 (1988); 5 U.S.C. § 701(a)(2). Agency action is committed to agency discretion if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Review is also unavailable for "certain categories" of actions "traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191-93 (1993).

Here, the DPA Order rested on two distinct grounds: the Secretary's national-defense determination under section 4511(a) and his energy-production determination under section 4511(c). Both determinations are committed to his discretion and thus unreviewable under the APA. But even if the Court were to find that the latter determination under section 4511(c) were reviewable, the Court should still dismiss Count II because the unreviewable national-security determination under section 4511(a) is independently sufficient to sustain the DPA Order.

***Section 4511(a) national-defense determination.*** Count II challenges the Secretary's determination that the DPA Order is necessary to promote the national defense. ECF 72 ¶¶ 143-55. But that determination is committed to the Secretary's

discretion and thus unreviewable under the APA, as confirmed by the DPA's text and the judiciary's traditional reluctance to review national-security determinations.

Starting with the statutory text, the operative provisions "exude[] deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). Section 4511(a) grants the President broad discretion by authorizing him to require priority performance of certain contracts "which he deems necessary or appropriate to promote the national defense" and to allocate materials, services, or facilities "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a). This sweeping language neither restricts the President's discretion nor provides any substantive standard for reviewing national-defense determinations. Indeed, the text allows the President to exercise his prioritization and allocation authorities as he "*deems* necessary" to promote the national defense, "not simply when" doing so "*is* necessary." *Webster*, 486 U.S. at 600. The Supreme Court in *Webster* held similar language to "exude[] deference" and "foreclose the application of any meaningful judicial standard of review." *Id.* (statute authorized CIA Director to terminate employees when he "shall *deem* such termination necessary or advisable in the interests of the United States").

The national-defense determination underlying the DPA Order is also the kind of action "traditionally regarded as committed to agency discretion." *Lincoln*, 508 U.S. at 192. As the Supreme Court has observed, "courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Egan*, 484 U.S. at 530. "Judicial inquiry into the national-security realm raises concerns for the separation of powers" because "[n]ational-security policy is the prerogative of the Congress and President." *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). "[W]hen it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked." *Trump*, 585 U.S. at 704 (cleaned up); *see also Dakota Cent. Tel. Co. v. S.*

*Dakota ex rel. Payne*, 250 U.S. 163, 181, 184 (1919) (President's exercise of discretion under statute granting him authority to act "whenever he shall deem it necessary for the national security or defense" was "beyond the reach of judicial power").

For these reasons, the APA's general presumption of reviewability "runs aground" when, as here, "it encounters concerns of national security." *Egan*, 484 U.S. at 527. As in *Webster*, the APA thus "precludes judicial review" of the Secretary's determination that the DPA Order is "in the interests of national security, an area of executive action in which courts have long been hesitant to intrude." *Lincoln*, 508 U.S. at 192 (cleaned up).

***Section 4511(c) energy-production determination.*** Because the Secretary's national-security determination under section 4511(a) is unreviewable—and because section 4511(a) authority is independently sufficient to sustain the DPA Order—the Court need not reach California's arbitrary-and-capricious challenge to the Secretary's use of section 4511(c) authority to maximize domestic energy supplies. *See I.C.C. v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) (rejecting view "that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable"); *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 701 n.13 (4th Cir. 2019) (same); *Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880, 884-86 (D.C. Cir. 2021) (agency action that rested on two distinct grounds—statutory interpretation and prosecutorial discretion—was unreviewable even though the interpretation was independently reviewable).

But even if the Court reaches the question, the Secretary made the required findings under section 4511(c). *See* ECF 23-1 at 12 (DPA Order). And insofar as California seeks to probe the reasoning behind those findings, section 4511(c)—though nominally about maximizing domestic energy supplies—is no less concerned with national security than section 4511(a), given the DPA's explicit and repeated

recognition of the link between the domestic energy supply and our national security. *See, e.g.*, 50 U.S.C. §§ 4502(a)(5) (declaring that "in order to ensure national defense preparedness, it is necessary and appropriate to assure the availability of domestic energy supplies for national defense needs"), 4516 (designating energy as a "strategic and critical material"), 4552(14) (defining "national defense" to include "energy production"); *see also Webster*, 486 U.S. at 600 (considering the "overall structure" of the statute to determine reviewability). The Secretary's invocation of that provision is thus unreviewable for all the reasons given above.

* * *

Accordingly, the Court should dismiss Count II under Rule 12(b)(1) and, in the alternative, under Rule 12(b)(6). *Contrast Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003) (noting that "this court lacks jurisdiction to review agency actions that are 'committed to agency discretion by law'"), *with Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) (holding that "a complaint seeking review of agency action committed to agency discretion by law has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6)" (cleaned up)).

**III. Even Assuming Reviewability, the Court Should Again Reject California's Challenges under the APA**

In its Order Denying California's Motion for a Preliminary Injunction, the Court held that "even *assuming* reviewability, the DPA Order survives California's challenges under the APA." ECF 82 at 31. The Court held there is "a thoroughly rational explanation for the DPA Order that is more than sufficient to satisfy arbitrary and capricious review." *Id.* at 32. The Court held the DPA Order is not contrary to DOE regulations. *Id.* at 33. And the Court held the DPA Order is a lawful application of the DPA. *Id.* 33-37. Consistent with its prior ruling, the Court should dismiss Counts I and II under Rule 12(b)(6).

**IV. California Fails to State a Claim that the Defense Production Act Order Violates the Separation of Powers (Count III).**

California's Complaint fails to state a claim that the DPA Order violates the separation of powers. *See* ECF 72 ¶¶ 156-66. The Complaint makes two allegations. First, it alleges that the DPA Order "usurp[s] the judiciary's authority to modify or reverse judicial judgments" by "ordering Sable to restart [the Pipeline] in direct contravention of the Consent Decree." *Id.* ¶ 162. Second, it alleges that the DPA Order "overrid[es] Congress's considered judgments by attempting to broadly preempt state law, when the text of the DPA does not empower Defendants to do so," and by "attempt[ing] to substitute the President's policy priorities for the will of Congress in enacting the DPA." *Id.* ¶¶ 163-64. Each allegation fails.

**A. The Defense Production Act Order does not usurp Article III judicial power.**

California's allegation that the DPA Order usurps Article III judicial power is based solely on its assumption that the DPA Order violates the Consent Decree in *United States v. Plains All American Pipeline, L.P.*, No. 20-cv-02415 (C.D. Cal.). That assumption is incorrect for at least three reasons.

First, no provision of the Consent Decree limits the President's use of the authority Congress gave him in the DPA. In other words, when the United States signed the Consent Decree, it did not (and could not) agree to forfeit its ability to make full use of the DPA to promote national security by responding to vulnerabilities in the domestic energy supply. California makes no allegation to the contrary.

Second, the DPA Order does not conflict with the Consent Decree because, when the DPA Order was issued in March 2026, the Office of the State Fire Marshal's ("OSFM") authority under the Consent Decree had already been displaced based on the federal Pipeline and Hazardous Materials Safety Administration's ("PHMSA") December 2025 recognition that the Pipeline is interstate. *See* ECF 72

¶ 52 (admitting that PHMSA's recognition displaced OSFM's authority under the Consent Decree); 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.").

Third, even if there were a conflict between the DPA Order and the Consent Decree, the Decree would yield to the DPA Order, not the other way around. That is because consent decrees are creatures of equity and "must … be modified if … one or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And the DPA Order now makes it "impermissible under federal law" for Sable *not* to operate the Pipeline *immediately*. *Id.* As Court has recognized, the DPA Order *requires* that the Consent Decree be modified, ECF 82 at 12-16, which necessarily means that it does not *violate* the Consent Decree.

**B. The Defense Production Act Order does not usurp legislative power.**

California's allegation that the DPA Order usurps legislative power is likewise based on a single assertion: that the Order exceeds the authority granted by the DPA to preempt state law. *See* ECF 72 ¶¶ 163-64. But a claim that an Executive Branch official exceeded his statutory authority cannot be recast as an independent constitutional claim. *See Dalton*, 511 U.S. at 472-74. Even putting that fatal flaw aside, California's claim fails because preemption is not properly presented here, and Congress need not expressly authorize preemption in any event.

**1. California lacks a cause of action to bring its freestanding separation-of-powers claim that the DPA Order usurps legislative power.**

Paragraphs 163 and 164 of the Amended Complaint allege that the DPA Order violates the separation of powers by exceeding the authority granted by the DPA. Under the Supreme Court's decision in *Dalton*, this purported "constitutional" separation-of-powers claim is really a *statutory* claim that falls outside any non-APA

cause of action to enjoin alleged unconstitutional conduct. 511 U.S. at 474.

In *Dalton*, the Supreme Court rejected the notion that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. "[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the exception recognized in *Franklin*" for judicial review of constitutional claims. *Id.* at 437-74. Were it otherwise, "plaintiffs would . . . be able to avoid statutory limits on review"—such as the limits imposed by the APA, *see supra* at 5-11—"by reframing any alleged statutory violation by the President as a constitutional one." *Glob. Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025); *Dalton*, 511 U.S. at 474 ("[I]f every claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* would be broadened beyond recognition").

Here, as in *Dalton*, California dresses up a statutory claim in constitutional garb. It is "alleging that the President," through the Secretary, "exceeded his statutory authority" under the DPA by preempting state law without congressional authorization. *Dalton*, 511 U.S. at 473; ECF 72 ¶¶ 163-64. Indeed, California makes exactly the same allegation in Count I, its statutory claim. *See* ECF 72 ¶¶ 140-41 ("Even if the Wright Order otherwise complied with the DPA, it would not have the sweeping preemptive scope that Defendants claim," so "Defendants lack legal authority under the DPA . . . in enacting the Wright Order, and . . . acted contrary to law and in violation of the APA."). Since California alleges that the DPA Order violates the separation powers *because*, and *only because*, it is not authorized by the DPA, its claim is "statutory" in nature and reviewable only under the APA. *Dalton*, 511 U.S. at 474. California thus lacks a constitutional cause of action for this argument.

**2. In any event, California's separation-of-powers claim fails on the merits.**

Even if California had a cause of action, its allegation—that the DPA Order usurps legislative power "by attempting to broadly preempt state law, when the text of the DPA does not empower [it] to do so"—fails on the merits for three reasons. ECF 72 ¶ 163.

First, this allegation is misplaced because the DPA Order says nothing about preemption; it simply imposes certain obligations on Sable. If a conflict arises between the DPA Order and the application of a specific state law, then the Court may need to consider preemption in an as-applied context. Preemption cannot be decided on the face of the DPA Order because preemption is a context-specific inquiry. *See MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1124-26 (9th Cir. 2020).

Second, the DPA Order's preemptive effect is distinct from its legality. *See Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022) (treating preemption and statutory authorization as separate questions). So even if California were right (it is not) that congressional authorization for preemption is required and was not provided in the DPA, that would simply mean that the DPA Order lacks preemptive effect. The DPA Order would still be valid, just like a federal statute without preemptive effect is still a valid statute.

Third, even if preemption were relevant, California is wrong that "the text of the DPA" needed to "empower" the Executive Branch to issue orders with preemptive effect. ECF 72 ¶ 163. Executive Branch orders and regulations have the full "force and effect of law" and have long "been held to pre-empt state law under the" same rules that apply to federal statutes. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes."). Critically, the preemptive effect of such orders and regulations "does not depend on express congressional authorization to displace state law." *De la Cuesta*, 458 U.S.

at 154. Or said another way, "Congress need not expressly delegate preemptive authority to [an agency] for its regulations to preempt state law." *Cohen*, 46 F.4th at 1028. So California's "narrow focus" on whether the DPA itself authorizes preemption is "misdirected." *De la Cuesta*, 458 U.S. at 154. The question is simply whether a particular state law "conflicts with" the DPA Order or "frustrates [its] purposes," which would be satisfied if, for example, it is "impossible to comply with both state and federal requirements." *Cohen*, 46 F.4th at 1028.

Finally, the Court has already held that the DPA Order does not violate the separation of powers. ECF 82 at 37. The Court should again hold that the DPA Order does not violate the separation of powers and dismiss Count III.

For all these reasons, even if California had a cause of action, it still fails to state a claim that the DPA Order usurps legislative power by preempting state law.

**V. California Fails to State a Claim that the Defense Production Act Order Violates the Tenth Amendment (Count IV).**

California fails to state a claim under the Tenth Amendment. *See* ECF 72 ¶¶ 167-75. The Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Tenth Amendment is "essentially a tautology," reserving to the states those rights and powers that have not been granted to the United States. *New York v. United States*, 505 U.S. 144, 156-57 (1992). When Congress acts within the bounds of its constitutional power, the Tenth Amendment is not implicated. *Id.*; *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985) ("the Constitution does not carve out express elements of state sovereignty that Congress may not employ its delegated powers to displace").

For this reason, the Supreme Court "long ago rejected the suggestion" that the Federal Government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority ... in a manner that displaces the States'

exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). In short, if the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see also United States v. Comstock*, 560 U.S. 126, 144 (2010) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." (quoting *New York*, 505 U.S. at 156)). Here, the Secretary acted pursuant to a valid federal statute—indeed, California does not challenge the DPA's constitutionality.

Nor does the DPA Order independently violate the Constitution in a manner that implicates the Tenth Amendment. California makes two allegations. First, it alleges that the DPA Order infringes on the State's power to "own, manage, and dispose of its property" because the Pipeline runs underneath a small portion of a state park. ECF 72 ¶¶ 170-71. But even if the DPA Order affected California's property rights (it does not), the DPA Order would not be unconstitutional. The Complaint, at most, appears to be alleging a taking, but California has not pled a Fifth Amendment takings claim, which would fail anyway because taking property is not unconstitutional—only failing to provide just compensation—and claims for compensation must be brought in the Court of Federal Claims. *See Knick v. Township of Scott, Pa.*, 588 U.S. 180, 189-90, 205 (2019).[1] No other constitutional doctrine fits California's allegation.

California's second allegation is equally misplaced. It alleges that the DPA Order unconstitutionally "commandeer[s] state property for federal ends in violation of the Tenth Amendment." ECF 72 ¶ 172. But the anticommandeering doctrine does not apply here. That doctrine prohibits the Federal Government from "issu[ing]

---

[1] California also alleges that there is "no authority under the DPA to infringe upon or preempt California's sovereign power to own, manage, and dispose of its property." ECF 72 ¶ 171. But this is just another improper attempt to repackage a statutory claim as a constitutional one. *See Dalton*, 511 U.S. at 472-74.

orders *directly* to the States." *Murphy v. NCAA*, 584 U.S. 453, 470 (2018) (emphasis added). It reflects the basic principle that the "Constitution . . . confers upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. Or put differently, "[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 178. The DPA Order does not conscript California into doing anything. Rather, it imposes an obligation directly on *Sable*, not California. True, this may affect California "indirectly," but indirect effects do not trigger the anticommandeering doctrine. *Murphy*, 584 U.S. at 470-71.

Finally, the Court has already "easily disposed" of California's anti-commandeering challenge in its Order Denying California's Motion for a Preliminary Injunction. ECF 82 at 38. The Court should again apply the reasoning from that prior order and dismiss Count IV.

California has thus failed to state a claim under the Tenth Amendment.

### VI. The Claim that Defendants Have Acted *Ultra Vires* by Issuing the Defense Production Act Order (Count V) Should Be Dismissed for Lack of Jurisdiction and Failure to State a Claim.

An *ultra vires* "claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (quotation marks omitted). That is because *ultra vires* review is "narrow" and subject to "painstakingly delineated procedural boundaries." *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964). Such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)). Additionally, "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Glob. Health*, 153 F.4th at 20. "The Supreme Court has emphasized that

dismissal for lack of jurisdiction is warranted if the alleged claim of statutory excess is made 'solely for the purpose of obtaining jurisdiction.'" *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690 n.10 (1949)).

*First*, the Court should dismiss California's *ultra vires claim* because it "is made 'solely for the purpose of obtaining jurisdiction.'" *Id.* (quoting *Larson*, 337 U.S. at 690 n.10). After the United States moved to dismiss Count I of California's Complaint for lack of subject matter jurisdiction, California responded by amending its Complaint to add an *ultra vires* claim based on the same argument that the DPA Order was issued in excess of Defendants' authority under the DPA. *See* ECF 69; ECF 72 ¶¶ 176-81. That new claim was the principal substantive amendment to California's Complaint. *See* ECF 72. California added no new allegations about the DPA Order or about its effects on California. *See id.* The only purpose of the new claim is to circumvent the APA's limits on reviewability, *see supra* §§ II, and to obtain jurisdiction over California's statutory challenges to the DPA Order. Under *Murphy*, the Court should dismiss Count V for lack of jurisdiction.

*Second*, the DPA Order is not "contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quotation marks omitted). Nor would any "prohibition" in the DPA "confer rights upon" California, which is not subject to the DPA Order. *Glob. Health*, 153 F.4th at 20. Indeed, California points to no specific prohibition the DPA Order even allegedly contravenes. *See* ECF 72 ¶¶ 176-81. California's *ultra vires* claim fails on that basis alone and should be dismissed under Rule 12(b)(6).

*Third*, the DPA Order is not "entirely in excess of [the Secretary of Energy's] delegated powers," *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quotation marks omitted). The Court has already held the DPA Order is a lawful exercise of the DPA. ECF 82 at 33-38. And the Court has already rejected California's *ultra vires* claim. *Id.* at 31 n.2, 33-38. The Court should dismiss Count V for the reasons articulated

in the Court's Order Denying California's Motion for a Preliminary Injunction.

## CONCLUSION

California's APA claims (Counts I and II) are unreviewable and fail to state a claim, its constitutional claims (Counts III and IV) fail to state a claim, and its *ultra vires* claim is unreviewable and fails to state a claim (Count V). The Court should grant Defendants' Motion to Dismiss.

DATED: August 21, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General

*/s/ Ian M. Swenson*
Ian M. Swenson
Email: Ian.Swenson@usdoj.gov
Counsel (CA Bar No. 344260)
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Federal Defendants, certifies that this brief contains 21 pages, which:

_X_ complies with the Court's New Case Order, ECF 18 at 2, setting a 25-page limit.

DATED: August 21, 2026

*/s/ Ian M. Swenson*

Ian M. Swenson

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
IAN M. SWENSON
Email: Ian.Swenson@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants,

and

SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY,

Intervenor-Defendants

Case No. 2:26-cv-03396-SVW-SSC

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Hearing: September 28, 2026
Time: 1:30 pm
Judge: Hon. Stephen V. Wilson

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion to Dismiss Plaintiff's Amended Complaint, the Memorandum of Points and Authorities in Support of the Motion, and all other papers filed related to the Motion, Defendants' Motion to Dismiss is GRANTED. It is hereby ORDERED that the Amended Complaint is DISMISSED.

IT IS SO ORDERED.

DATED: ______________________, 2026

_________________________________

Honorable Stephen V. Wilson
United States District Judge

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff*,

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants*,

and

**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,**

*Intervenor-Defendants*.

No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

Date: September 14, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

## INTRODUCTION

Plaintiff State of California (California) submits this Reply in support of its Motion for Leave to file a Supplemental Brief in Support of its Preliminary Injunction Motion.

Contrary to the assertions of Defendants and Defendant-Intervenors, California has demonstrated good cause for the Court to exercise its discretion to allow California to file its supplemental brief addressing the merits of its new ultra vires cause of action. As California explained in its moving papers, on June 29, 2026, after the conclusion of briefing and oral argument on California's motion for preliminary injunction, Defendants and Defendant-Intervenors filed motions to dismiss challenging, in relevant part, California's Administrative Procedure Act (APA) claims as unreviewable. California maintains that the APA claims are reviewable. However, pursuant to Federal Rule of Civil Procedure 15, California has also timely filed a First Amended Complaint to add a separate and independent ultra vires cause of action, which provides this court with a separate and independent avenue to review the Wright Order. California's proposed supplemental brief will allow the Court to consider this ultra vires claim while deciding the pending motion for preliminary injunction, thereby avoiding the need for an entirely new motion for injunctive relief and conserving the resources of the Court and the parties.

California is also likely to succeed on the merits of its ultra vires claim, which is distinct and independent from its claims under the APA. California alleges that by invoking the Wright Order to authorize Sable to disregard state and federal laws and violate two court orders, Defendants took actions "that extend beyond delegated statutory authority – *i.e., ultra vires* actions" which are reviewable. *Murphy Co. v. Biden*, 65 F.4th 1122, 1129 (9th Cir. 2023). At its crux, California's ultra vires claim against Defendants implicates preemption as well as constitutional

separation of powers and Tenth Amendment principles. Because Defendants and Defendant-Intervenors cannot point to a statute that expressly precludes this Court's review of orders issued under the Defense Production Act (DPA), the relevant standard is whether Defendants' conduct is authorized by law. *Id*. at 1129-1131. It is not; therefore, California's claim that Defendants acted ultra vires is likely to succeed.

## ARGUMENT

### I. California has Good Cause to File its Supplemental Preliminary Injunction Brief

The relevant inquiry here is not whether California could have included an ultra vires claim in its original pleading, but whether supplemental briefing on a pending preliminary injunction motion is appropriate after plaintiff has filed an amended complaint—as of right—that adds a new claim. Faced with a similar procedural posture, the court in *Berg v. County of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL 4691154 (C.D. Cal. May 28, 2021) said, "yes." As in *Berg*, the arguments raised in California's pending motion for preliminary injunction remain valid because they still pertain to the claims raised in the First Amended Complaint, except that they do not address the merits of California's new ultra vires claim because that claim had not yet been presented. Rather than file a new motion for preliminary injunction to add an argument on California's likelihood of success on the merits of the newly added claim, "and thereby 'exalt form over substance,'" California has proposed a short supplemental brief limited to the new cause of action and has given Defendants and Defendant-Intervenors an opportunity to respond to that proposed brief. *Berg*, 2021 WL 4691154, at *1 n.2. California's supplemental brief would ensure that the Court's consideration of the pending preliminary injunction motion is complete, while conserving the resources of the Court and the parties by obviating the need for an entirely new and duplicative round of preliminary injunction briefing. The Court should exercise its discretion in

granting leave for California to file its supplemental brief. *See S.E.C. v. Seaboard Corp*., 677 F.2d 1301, 1314 (9th Cir. 1982) (acceptance of supplemental briefs is within the Court's "sound discretion").

And while Defendants suggest otherwise, California moved expeditiously for leave to file a supplemental brief. On July 20, 2026, California timely filed its First Amended Complaint under Federal Rule of Civil Procedure 15, and on July 22, 2026, California scheduled the required meet and confer conference with Defendants and Defendant-Intervenors to discuss the motion for leave. Pursuant to Local Rule 7-3—which requires a moving party to wait at least seven days after the meet and confer conference to file its motion—the earliest date that California could file the motion for leave was July 30, 2026. Thus, California sought leave of court within ten days, not three months as Defendants contend.

Granting California leave to file its supplemental brief will allow the Court to fully consider California's likelihood of success on the merits of its claims when deciding the pending motion for preliminary injunction. Accordingly, California has good cause to file its proposed supplemental preliminary injunction brief regarding the new cause of action added in the First Amended Complaint.

## II. CALIFORNIA IS LIKELY TO SUCCEED ON THE MERITS OF ITS ULTRA VIRES CLAIM

California's ultra vires claim is not, as Defendants and Defendant-Intervenors argue, a repeat of its APA claim. In both its original Complaint and First Amended Complaint, California asserts that the Wright Order is not a valid order under Title I of the DPA and thus violates the APA, because the DPA authorizes federal prioritization of orders and contracts, not the restart of a dormant pipeline with no applicable contracts or orders to prioritize. But separate and apart from these issues, the DPA also does not authorize the issuance of an order that defies (either expressly or impliedly) state and federal laws, judicial orders, and violates constitutional separation of powers and Tenth Amendment principles. Because

Defendants have used the Wright Order to allow Sable to ignore state and federal law and violate two court orders barring restart of the pipeline, their actions are ultra vires. Although California maintains that the Wright Order is both violative of the APA and ultra vires action, these two claims are distinct from each other.

Relying primarily on *NRC v. Texas*, 605 U.S. 665 (2025), Defendants and Defendant-Intervenors further contend that California's ultra vires claim is "meritless." ECF 80 at 3-4; *see also* ECF 79 at 6-7. But *NRC* merely reaffirmed the high bar to relief on a non-constitutional ultra vires claim where a statute—there, the Hobbs Act—expressly precluded review. *See* 605 U.S. at 681-683. Because California's claims against Defendants implicate *constitutional* concerns, and no statute expressly precludes review, the relevant standard remains the one established in *Murphy Co.*, 65 F.4th at 1129-1131 (9th Cir. 2023)[1]: whether the challenged conduct is authorized by law. Accordingly, Defendants remain subject to a claim for acting ultra vires when they acted beyond the confines of the DPA. *See Murphy Co.,* 65 F.4th at 1131 ("plaintiffs advancing *ultra vires* claims must plead 'plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority'" (citation omitted)). As explained in California's proposed supplemental brief, nothing in the DPA authorizes

[1] Defendant-Intervenors further assert that California cannot seek ultra vires review because California is not within the DPA's "zone of interests." ECF 80 at 5. The Court need not reach this issue because *Murphy* is controlling and does not impose that requirement. Further, the Ninth Circuit is "skeptical that there could be a zone of interests requirement for a claim alleging that official action was taken in the absence of all authority," like that which is asserted here. *Sierra Club v. Trump*, 929 F.3d 670, 700–01 (9th Cir. 2019); *accord Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (holding where a plaintiff challenges official action as ultra vires, the zone-of-interests test does not apply). As the Supreme Court has explained in other contexts, "the separation of powers is designed to preserve the liberty of all the people"; "[s]o whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021) (citations omitted).

Defendants to use an order issued under the DPA in this unprecedented manner. *See* ECF 77-3 at 3. California's claim that Defendants acted ultra vires therefore is likely to succeed.

## CONCLUSION

California respectfully requests that the Court grant it leave to file the supplemental brief in support of its pending motion for preliminary injunction and stay.

Dated: August 17, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 5 pages in length, which complies with the page limit set by the Court's New Case Order, ECF 18 at 2.

Dated: August 17, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
Zachary James Watson (Bar No. 348019)
*zachary.watson@hklaw.com*
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
Telephone: +1 949.517.1451

*Attorneys for Defendant-Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA,<br>Plaintiff,<br>v.<br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br>Defendants,<br>and<br>SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY,<br>Intervenor-Defendants. | Case No. 2:26-cv-03396-SVW-SSCx<br>**DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF**<br>Date:<br>Time:<br>Courtroom: 10A<br>Judge: Hon. Stephen V. Wilson |

Defendant-Intervenors, Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable"), submit this Response to Plaintiff's Motion for Leave to File Supplemental Brief in Support of Plaintiff's Motion for Preliminary Injunction and Stay Against all Defendants (the "Motion for Leave") (ECF 77).

**ARGUMENT**

On May 1, 2026, nearly seven weeks after the March 13 DPA Order, California moved for a preliminary injunction under the APA—relief that requires a plaintiff to prove an "immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Defendants opposed, arguing in significant part that the DPA Order was not reviewable under the APA. Yet after a full briefing cycle on the preliminary injunction, a multi-hour hearing before this Court, and several post-hearing briefs—throughout which time California repeatedly insisted that the APA provided its cause of action—California notified this Court on July 13 that it did not intend to defend the complaint on which it had moved for a preliminary injunction. And on July 21, the last possible day under the Federal Rules, California amended its complaint to add a new, non-APA cause of action.

As explained by Sable and the United States in their oppositions, California's pending motion for preliminary injunction should be denied based on lack of harm alone. California's delay in bringing its new ultra vires cause of action is yet further evidence that there is no "immediate threatened injury." Because of the clear lack of harm, supplemental briefing on California's new claim is neither necessary nor appropriate.

But if the Court decides to consider California's supplemental brief, Sable provides its response here for the sake of judicial economy. The Court should reject California's new ultra vires theory as divorced from the elements of that cause of action and contrary to the plain language of the Defense Production Act, 50 U.S.C. § 4501 *et seq.*

*First*, the Court should deny the Motion for Leave because additional briefing is unnecessary. California is not seeking to respond to arguments first raised by Sable or the United States in reply or present the Court with new facts or legal authority previously unavailable to it. Rather, California is seeking to augment a preliminary injunction motion based on a newly asserted cause of action for ultra vires conduct in its First Amended Complaint—a cause of action that could have been asserted in its initial pleading. California's two cited cases do not support its attempt to litigate its motion for preliminary injunction in this piecemeal fashion. The court in *Dana v. Tewalt*, Case No. 1:18-cv-002898-DCN, 2020 WL 1545786 (D. Idaho Apr. 1, 2020), merely requested supplemental briefing on how an amended complaint affected a pending motion for preliminary injunction—which it then denied as moot after dismissing the defendants to whom it was directed. And the court in *Berg v. County of Los Angeles*, Case No. CV 20-7870 DMG (Pdx), 2021 WL 4691154 (C.D. Cal. May 28, 2021), declined to hold that an amended complaint mooted a pending motion for preliminary injunction when the amended complaint simply clarified existing claims that the defendants had addressed in prior briefing. Neither case approved of a plaintiff submitting new theories for injunctive relief after briefing and argument. Because permitting California to do so here would upset the orderly briefing and argument of the already-pending preliminary injunction motion—and because California's lack of harm dooms the motion regardless—the Court should exercise its discretion to deny the Motion for Leave. *See SEC v. Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982) ("[A]cceptance or rejection of argumentative briefs, memoranda, and other supplementary material is within the sound discretion of the court.").

*Second,* if the Court nonetheless considers California's proposed supplemental brief, it should reject California's new arguments as meritless and irrelevant to the pending motion for preliminary injunction. "Because ultra vires

review could become an easy end-run around the limitations of . . . judicial-review statutes," the Supreme Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries of [*Leedom v. Kyne*, 358 U.S. 184 (1958)].'" *Nuclear Regul. Comm'n v. Tex.*, 605 U.S. 665, 681 (2025) (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)).[1] "The *Kyne* exception is a narrow one, and it does not apply simply because an agency has arguably reached a conclusion which does not comport with the law." *Id.* (internal quotations omitted). "Rather, it applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.* (quoting *Ry. Clerks v. Ass'n for Benefit of Non-Cont. Emps.*, 380 U.S. 650, 660 (1965)) (emphasis in original). Additionally, "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) (citing *Kyne*, 358 U.S. at 190). "Given all that, a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n*, 605 U.S. at 681-82 (internal quotations omitted).

California cannot show for purposes of its pending motion for preliminary injunction that it is likely to succeed on the merits of its ultra vires cause of action. As a threshold matter, California's ultra vires cause of action fails because it does not identify a specific statutory prohibition that Secretary Wright violated when he issued the DPA Order. And even if such a prohibition existed (it does not), California is not empowered to enforce it. *See Global Health Council*, 153 F.4th at 18-20 (explaining the relevant statute precluded private parties from seeking judicial

---

[1] Sable reserves the right to argue that *Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023), was wrongly decided when it held that an ultra vires cause of action lies to challenge actions by the President. As the D.C. Circuit recently noted, "the Supreme Court has signaled that the Ninth Circuit" in *Murphy Co.* rests on faulty reasoning in the very cases that *Murphy Co.* cites. *See Glob. Health Council v. Trump*, 153 F.4th 1, 17 n.15 (D.C. Cir. 2025).

review to enforce the statute's provisions). To the contrary, the text, structure, and purpose of the DPA indicate that its zone of interests extends *only* to those persons or entities that are directed by the government to act under § 101—or perhaps those that have contracts that are deprioritized as a result.

California also fails to identify any conduct by Secretary Wright outside the scope of his statutory authority. California alleges that "Defendants have acted contrary to law and outside the authority granted to them under the DPA" . . . "[b]y using the [DPA] Order to broadly authorize Sable to disregard state and federal law, as well as orders issued by the state and federal courts." (ECF 72 at ¶ 179). But whether the DPA Order preempts or supersedes other laws is distinct from the question presented by California's ultra vires cause of action, which is whether the DPA Order was lawfully issued. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (noting the distinction between the lawfulness of agency action and its preemptive effect). The same fallacy affects California's argument in its supplemental brief that the DPA Order does not "authorize[] . . . limitless preemption of state laws," "flout[ing] judicial orders in violation of separation of powers principles," or "requir[ing] that California dedicate state-owned property to Sable's restart of the pipelines." (ECF 77-3 at PageID 2180).

California's only theory that might potentially be characterized as an ultra vires claim is that the DPA Order "is not a valid prioritization or allocation order under the DPA." (ECF 77-3 at PageID 2180). But an ultra vires cause of action will not lie "simply because an agency has arguably reached a conclusion which does not comport with the law." *Nuclear Regul. Comm'n*, 605 U.S. at 681. And as the United States explained in its opposition to California's preliminary injunction motion, the DPA Order fits squarely within the statutory text. (*See* ECF 23 at PageID 1158-1162). California is thus unlikely to prevail on the merits of its newly asserted ultra vires cause of action.

**CONCLUSION**

California's Motion for Leave is neither necessary (as its motion for preliminary injunction can be denied for lack of irreparable harm alone) nor appropriate (as it seeks to present a new theory for relief well after briefing and argument have concluded). The ultra vires cause of action that California seeks leave to present is also without merit. A plaintiff asserting this cause of action must thread the eye of a needle: not only must it demonstrate that the defendant acted contrary to a *specific statutory prohibition*, it must also demonstrate that it is a party upon whom the statutory prohibition confers rights. California has not (and cannot) show a likelihood of success on the merits of this threshold test. But even if the Court overlooked this gating issue, California is no more able to show a likelihood of success on its claim that Secretary Wright acted outside the authority delegated to him by the President under the DPA. All but one of California's theories challenge the alleged *consequences* of the DPA Order rather than the lawfulness of the DPA Order itself. And the only theory that might be said to challenge the DPA Order's statutory foundation rests on a misunderstanding of the powers that Congress conferred upon the President under the DPA. The Court thus should deny the Motion to Leave and the Motion for Preliminary Injunction and Stay that it seeks to augment.

Dated: August 10, 2026

Respectfully submitted,

By: /s/ *Nicholas McDaniel*

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
Zachary James Watson (Bar No. 348019)
*zachary.watson@hklaw.com*
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
Telephone: +1 949.517.1451
James W. Noe (*pro hac vice*)
*jim.noe@hklaw.com*
800 17th St., NW, Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525
Ashley Akers (*pro hac vice*)
*ashley.akers@hklaw.com*
1650 Tysons Boulevard, Suite 1700
Tysons, VA 22102
Telephone: +1 703.720.8583

*Attorneys for Defendant-Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General
IAN M. SWENSON
Email: Ian.Swenson@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants,<br><br>and<br><br>SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY,<br><br>Intervenor-Defendants | Case No. 2:26-cv-03396-SVW-SSC<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hearing Date: September 14, 2026<br>Time: 1:30 pm<br>Judge: Honorable Stephen V. Wilson |

## INTRODUCTION

California seeks to file a supplemental brief in support of its Motion for Preliminary Injunction. California's motion for leave should be denied because it has failed to demonstrate that good cause exists to grant the motion. The passing of three months since the filing of California's Motion for a Preliminary Injunction is reason enough to deny the motion for leave. In addition, California has failed to show why it could not have pleaded and briefed an *ultra vires* claim when it filed its original Motion for a Preliminary Injunction. The Court should not allow California to revise its Motion for a Preliminary Injunction Motion after the fact because California was required to demonstrate all the elements for preliminary injunctive relief when it filed its motion. In any event, the Court should deny California the opportunity to submit additional briefing now because the supplemental briefing would have no impact on the Court's resolution of the preliminary injunction motion. California still cannot demonstrate irreparable harm, and the addition of the *ultra vires* claim has no impact on its statutory claims, which continue to be meritless. Therefore, the motion for leave to file a supplemental brief should be denied.

## BACKGROUND

On March 31, 2026, the State of California filed suit challenging the Secretary of Energy's determination under the Defense Production Act that the reactivation of the Santa Ynez Pipeline System was necessary to meet core national security needs stemming from West Coast energy shortages and supply-chain risks. *See* Compl. ¶¶ 5-6, ECF 1. Specifically, California challenged Secretary of Energy Chris Wright's order that the Pipeline be restarted ("Wright Order"). *Id.* ¶ 3. On May 1, 2026, California filed a Motion for a Preliminary Injunction, ECF 16. The motion was fully briefed, and the Court held a hearing on the motion on June 8, 2026. *See* ECF 50. The Court ordered supplemental briefing on certain issues, and the parties filed those supplemental briefs on June 18 and June 25, 2026. *See* ECF 62-65.

On June 29, 2026, Defendants filed their Notice of Motion and Motion to Dismiss Plaintiffs' Complaint, ECF 66. On July 13, 2026, Plaintiffs informed the Court that they would file an amended complaint instead of filing a response to the Motion to Dismiss. *See* Pl.'s Resp. to Defs.' and Int.-Defs.' Mot. to Dismiss; Notice of Election to File Am. Compl. Pursuant to Rule 15(a)(1)(B), ECF 69. On July 20, 2026, Plaintiffs filed their First Amended Complaint for Declaratory and Injunctive Relief, ECF 72. The primary change in the First Amended Complaint is the addition of a Fifth Claim for Relief alleging that Defendants acted *ultra vires* in issuing the Wright Order. *Id.* ¶¶ 176-81. California has now filed a Motion for Leave to File Supplemental Brief in Support of Plaintiff's Motion for a Preliminary Injunction and Stay Against All Defendants ("Pl.'s Mot.") and Memorandum of Points and Authorities ("Pl.'s Mem."), ECF 77.

**LEGAL STANDARD**

A court may allow the filing of a supplemental brief only "upon a showing of good cause." *Taylor v. Borders*, No. CV 18-02488 TJH, 2021 WL 9721279, at *1 (C.D. Cal. Nov. 4, 2021). *See also Altheide v. Dzuerda*, No. 2:24-cv-01526-CDS-EJY, 2026 WL 977710, at *2 (D. Nev. Apr. 9, 2026) (requiring a showing of good cause for the filing of a supplemental preliminary injunction brief). To determine whether good cause exists, a court may consider whether the arguments in the supplemental brief could have been raised in the initial brief. *See Borders*, 2021 WL 9721279, at *1 (denying motion for supplemental briefing where the plaintiffs "failed to explain why they were unable to include citations to [relevant case law] along with related arguments" in their initial brief). A court may also consider the time that has elapsed between the filing of the original motion and the proposed supplemental brief. *See Alverado v. W. Range Ass'n*, No. 3:22-cv-00249-MMD-CLB, 2024 WL 915659, at *7 (D. Nev. Mar. 4, 2024).

## ARGUMENT

### I. California Has Not Demonstrated Good Cause to Allow the Filing of Its Supplemental Preliminary Injunction Brief.

California has offered no valid grounds for permitting it to file a supplemental preliminary injunction brief. As an initial matter, California cites no rule that would allow it to file such a brief. In its motion, California cites Federal Rule of Civil Procedure 15(d) and Civil Local Rules 15-1 – 15-3. Pl.'s Mot. at 1. Rule 15 is inapposite here because it applies to pleadings, not supplemental briefs. *See Borders*, 2021 WL 9721279, at *1 (denying leave to file a supplemental brief and noting, "[m]otions and oppositions to motions are not pleadings). Plaintiffs also cite Civil Local Rules 6-1 (Notice and Service of Motion), 7-3 (Conference of Counsel Prior to Filing Motions), and 7-8 (Presence of Declarants). Pl.'s Mot. at 1. But those rules also have no bearing on whether a plaintiff may file a supplemental brief in support of a motion for a preliminary injunction. Therefore, California has not even demonstrated that such a motion is allowed under the rules.

California's reliance on the Court's general authority to manage its docket and allow supplemental briefs when appropriate fares no better. Delay in moving for supplemental briefing undermines any claim for good cause. *See Alverado*, 2024 WL 915659, at *7 (denying a motion for leave to file a supplemental brief after a four-month delay). California filed its Motion for a Preliminary Injunction over three months ago and has offered no good cause for that delay or for filing a supplemental brief.

Permitting a supplemental brief at this late stage would also contravene the principle that a party seeking injunctive relief must demonstrate all the requirements for such relief when it files its motion. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). One of those elements is "a likelihood of [movants] prevailing on their case in chief." *Tri-Valley Cares v. U.S. Dept. of Energy*, No. C 08-01372 SBA, 2008 WL 2951396, at *5 (D. Nev. July 28, 2008) (citation omitted).

Therefore, "plaintiffs may not supplement their Amended Motion for a preliminary injunction with a claim they did not raise [in] their Complaint, because logically speaking, they could not prevail on its merits at trial." *Id.* California's *ultra vires* claim was not even pleaded at the time they filed their Motion for a Preliminary Injunction, so California's arguments regarding that claim should not be considered in the Court's resolution of the motion.

In all events, California has failed to show why it could not have, with reasonable diligence, pleaded and argued an *ultra vires* claim when it originally filed its preliminary injunction motion. As California's proposed supplemental brief acknowledges, California's *ultra vires* claim is premised on the same statutory arguments California made in its "prior briefing" in support of its APA claims. ECF 77-3 at 3 (citing ECF 16-7; ECF 27). California has already presented those arguments to the Court in five briefs and at a hearing on the Preliminary Injunction Motion. ECF 16, 27, 32, 62, 65. The Court need not delay its resolution of the preliminary injunction motion to accommodate California's new vehicle for its same arguments.[1]

Finally, allowing California "to engage in piecemeal litigation of the [preliminary injunction] motion would contravene the very purpose" of a preliminary injunction motion. *Taylor v. Viacom Inc.*, No. CV173247DMGAFMX, 2018 WL 4959821, at *5 (C.D. Cal. June 5, 2018). A preliminary injunction is an emergency stop-gap measure meant to "preserve the relative positions of the parties"

[1] *Berg v. County of Los Angeles*, No. CV 20-7879 DMG (PDx), 2021 WL 4691154 (C.D. Cal. May 28, 2021), does not support California's argument that leave should be granted to file a supplemental brief. In that case, after the denial of a temporary restraining order, the plaintiffs filed a supplemental brief, which the court construed as a motion for a preliminary injunction. *Id.* at *1. There is nothing in the opinion to suggest that the filing of the supplemental brief was opposed. Instead, the issue the court addressed was whether the filing of an amended complaint a week later had mooted the preliminary injunction motion. *Id.* at 16 n.2.

and the Courts' remedial options until merits proceedings with proper procedural and evidentiary guardrails—in this case, cross-motions for summary judgment based on the agency's administrative record —"can be held." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). By attempting to provide another cause of action, California makes clear that it is using its Preliminary Injunction Motion as an improper "mechanism for accelerated resolution of the merits" without the "the procedural guardrails of summary judgment," including the opportunity to review the complete administrative record and "inferences in favor of the nonmoving party." Samuel L. Bray, The Purpose of the Preliminary Injunction, 78 *Vanderbilt Law Review* 809, 840 (2025). The Court should reject California's attempts to bolster its deficient motion.

**II. California's Proposed Supplemental Brief Would Not Change the Fact that It Cannot Demonstrate Irreparable Harm.**

Because the Court can and should deny California's Motion for a Preliminary Injunction and Stay due to California's lack of irreparable harm, there is no good cause for supplemental briefing in support of California's Preliminary Injunction Motion. Indeed, California concedes that addressing the *ultra vires* claim in supplemental briefing would "not change the Court's analysis of California's likelihood of irreparable harm and equitable factors as to Counts I-IV." Pl.'s Mem. at 2-3.

"[A] showing of irreparable injury is an absolute prerequisite" to a preliminary injunction. *Ahlman v. Barnes*, No. 20-55568, 2020 WL 3547960, at *2 (9th Cir. June 17, 2020). This Court has already rejected all but one of California's theories of harm: the alleged "inability to carry out its laws" due to the DPA Order. *Wright/Plains* June 8, 2026 Tr. ("Tr.") at 28:8–10. But in support of its Preliminary Injunction Motion, California still has not identified what law the Order prevents it from enforcing. California previously speculated that, if various conditions are met, the California Geologic Energy Management Division and the Department of Fish

and Wildlife may be unable to carry out certain duties at some hypothetical future time. *See* ECF 23 at 24. At the June 8 hearing, California also alluded to "safety requirements on pipelines" that the DPA Order allegedly displaces. Tr. at 74:23–75:6. But the Pipeline Safety Act—not the DPA Order—displaced California's authority to regulate pipeline safety when PHMSA determined in December 2025 that the Pipeline is interstate (an action that the Ninth Circuit declined to stay). *See* 49 U.S.C. § 60104(c); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006). Enjoining the Order would not remedy California's asserted harm. On that basis alone, the Court can and should deny California's Motion for a Preliminary Injunction and Stay.

This Court rejected another attempt by California to shut down the Pipeline solely because California had "manifestly failed to demonstrate that it will suffer irreparable harm in the absence of preliminary injunctive relief." Order Denying Pl.'s Mot. for a Prelim. Inj., *Cal. Dept. of Parks & Rec. v. Sable Offshore Corp.*, No. 26-cv-02946, at *5 (C.D. Cal. May 28, 2026), ECF 60. Because the Court can and should do the same here, supplemental briefing on California's likelihood of success on the merits is not warranted.

## III. California's *Ultra Vires* Claim Merely Rehashes Its Statutory Claims, Which Fail on Their Merits.

California's new *ultra vires* claim also makes no difference to California's likelihood of success on the merits. As California's proposed supplemental brief acknowledges, California's *ultra vires* claim is premised on the same statutory arguments California made in its "prior briefing" in support of its APA claims. ECF 77-3 at 3 (citing ECF16-7; ECF 27). But unlike review under the APA, *ultra vires* claims are rarely permitted and only apply "when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emps. v. Ass'n for Benefit of*

Case: 26-5490, 10/02/2026, DktEntry: 19.1, (117 of 1218)

*Non-contract Emps.*, 380 U.S. 650, 660 (1965)). California points to no "specific prohibition" the Order even allegedly contravenes. *See* ECF 72 ¶¶ 176-81; ECF 77-3. And as the United States has repeatedly explained in opposing California's Motion for a Preliminary Injunction, the Order is a valid use of the DPA. ECF 23 at 9-19; ECF 63 at 4-7; ECF 64 at 3-7. For those and other reasons, California's *ultra vires* claim lacks merit, does not "control the outcome of the litigation," and is not "particularly persuasive or helpful." *Altheide*, 2026 WL 977710, at *2. Because the briefing of the additional of the *ultra vires* claim would not change the resolution of the pending Motion for a Preliminary Injunction, the motion for leave to file a supplemental brief should be denied.

**CONCLUSION**

For the foregoing reasons, California's motion for leave to file a supplemental brief in support of its Motion for a Preliminary Injunction should be denied.

DATED: August 10, 2026 Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General

*/s/ Ian M. Swenson*
Ian M. Swenson
Email: Ian.Swenson@usdoj.gov
Counsel (CA Bar No. 344260)
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 532-5139

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Federal Defendants, certifies that this brief contains 7 pages, which:

_X_ complies with the Court's New Case Order, ECF 18 at 2, setting a 25-page limit for opposition briefs.

DATED: August 10, 2026

/s/ *Ian M. Swenson*
Ian M. Swenson

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff*,

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants*,

and

**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY**,

*Intervenor-Defendants*.

No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: September 14, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff State of California (California), pursuant to Federal Rule of Civil Procedure 15(d), and Civil Local Rules 6-1, 7-3 through 7-8, and 15-1 through 15-3, moves this Court to grant California leave to file a supplemental brief in support of California's pending Motion for Preliminary Injunction and Stay (PI Motion), ECF 16. After the conclusion of briefing and oral argument on Plaintiff's PI Motion, California filed a timely First Amended Complaint (FAC), ECF 72. In addition to alleging additional facts relevant to California's original claims, the FAC adds an ultra vires cause of action (Count V). California's proposed supplemental brief is limited to a discussion of why California is also likely to succeed on the merits of its new ultra vires cause of action—an argument that could not have been presented in California's original PI Motion, before that claim was added. A copy of California's 3-page proposed supplemental brief is attached hereto.

The Parties believe that this Motion is suitable for resolution on the papers. If the Court prefers a hearing on the Motion, California has noticed this motion for hearing on September 14, 2026, at 1:30 p.m., or as soon thereafter, before the Honorable Stephen V. Wilson in Courtroom 10A of the U.S. District Court for the Central District of California, Western Division, located at 350 West 1st Street, Suite 4311, Los Angeles, CA 90012.

California has fulfilled its meet-and-confer responsibility for this Motion, pursuant to Local Rule 7-3, as detailed in the accompanying Declaration of Kavita Lesser. Both Defendants and Intervenor-Defendants will oppose this Motion. If the Court were to allow California to file the supplemental brief and correspondingly allow Defendants and Intervenor-Defendants to file an opposition to California's supplemental brief, the parties agree that Defendants and Intervenor-Defendants will file oppositions by August 10, 2026, and California will file a reply by August 17, 2026. California further requests that Defendants' and Intervenor-Defendants'

opposition be limited to not more than five pages, collectively, and that the Court then also allow California to file a reply of not more than five pages to Defendants' and Intervenor-Defendants' opposition.

Dated: July 30, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

/s Kavita Lesser
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff State of California (California) respectfully moves this Court to grant it leave to file a short supplemental brief in support of California's pending Motion for Preliminary Injunction and Stay (PI Motion), ECF 16. The proposed supplemental brief would only discuss why the new ultra vires cause of action (Count V) added in California's First Amended Complaint (FAC) further supports California's argument in its PI Motion that it is likely to succeed on the merits of its claims. The proposed supplemental brief is attached hereto as Exhibit 1. The parties believe that this Motion can be resolved on the papers without a hearing.

The supplemental brief explains that this Court can preliminarily enjoin the Wright Order on the grounds that California is likely to succeed on the Administrative Procedure Act (APA) and constitutional causes of action, discussed in the earlier briefing on the PI Motion, or the new ultra vires cause of action, or both. Because the addition of the ultra vires claim in the FAC adds another issue to be decided in the Court's analysis of California's likelihood of success on the merits, the Court would benefit from the parties' briefing on that new claim. The Court should therefore grant this Motion and allow California to file its proposed supplemental brief.

## LEGAL STANDARDS

A federal district court "possesses the inherent power to control its own docket and calendar." *Mediterranean Enterprises, Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1465 (9th Cir.1983), citing *Landis v. North American Co.,* 299 U.S. 248, 254–55 (1936). "[A]cceptance or rejection of argumentative briefs, memoranda, and other supplementary material is within the sound discretion of the court." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982). This discretion stems from the court's authority to supervise the litigation, including where helpful to clarify how an "amended complaint relate[s] to [a pending] motion for preliminary

injunction." *Dana v. Tewalt*, No. 1:18-CV-00298-DCN, 2020 WL 1545786, at *3, 25 n.3 (D. Idaho Apr. 1, 2020); *cf. Berg v. Cnty. of Los Angeles*, No. CV 20-7870 DMG (PDX), 2021 WL 4691154, at *1, 16 n.2 (C.D. Cal. May 28, 2021) (allowing briefing on a pending motion for preliminary injunction after plaintiff filed an amended complaint, because the pending motion and amended complaint sought the "'same character'" of relief, and thus there was "'a sufficient nexus between the claims raised in [the pending] motion . . . and the claims set forth in the underlying complaint itself'" (quoting *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015))).

**DISCUSSION**

In an initial round of briefing, California filed the PI Motion and replies to oppositions filed by Defendants and by Intervenor-Defendants (ECF 23 & 24-4, respective oppositions; ECF 27 & 32, respective replies). The Court then heard oral argument on the PI Motion, along with oral argument on pending motions in the related case *United States v. Plains All-American Pipeline*, No. 2:20-cv-02415-SVW-SSCx. Following oral argument, the Court ordered supplemental briefing on the arguments in the related cases. ECF 50, Hr'g Tr. 86:15-93:11. That post-hearing supplemental briefing was completed on June 25, 2026. The Court has not yet ruled on the PI Motion.

On July 20, 2026, California filed its FAC pursuant to Federal Rule of Civil Procedure 15(a)(1). ECF 72. California's FAC seeks the same relief as the original Complaint (*see Berg* at *16 n.2), but as relevant here, the FAC adds a claim raising an ultra vires cause of action (Count V).[1] California submits that the FAC does not change the Court's analysis of California's likelihood of irreparable harm and

[1] The FAC also adds new factual allegations regarding state laws displaced by the Wright Order (FAC ¶ 106), Title I of the DPA (FAC ¶¶ 22-24), the scope of Secretary Wright's statutory authority under the DPA (FAC ¶¶ 25-26, 68-71), DOE's regulations promulgated under the DPA (FAC ¶¶ 26-29), and the findings made by DOE related to the Wright Order (FAC ¶¶ 86, 89-90).

equitable factors as to Counts I-IV, which weigh in favor of immediate relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* ECF 16-2 at 18-21; ECF 27 at 10-11; ECF 32 at 7-11; ECF 62 at 12-14; ECF 65 at 1-3. However, supplemental briefing on the new ultra vires cause of action (Count V)—which provides this Court an alternative cause of action on which to invalidate the Wright Order—is appropriate.

Defendants have challenged California's APA claims as unreviewable and unlikely to succeed on the merits. *See* ECF 23 at 7-9. California's Reply explains why those arguments are incorrect (*see* ECF 27, 2-5; *see also California v. Mullin*, No. 26-1699, 2026 WL 2137667, at *5 (1st Cir. July 24, 2026) (rejecting same argument by federal government, and finding that "'agency action that carries out a presidential directive is ordinarily subject to APA review'") (quoting *Agatha v. Trump*, 151 F.4th 9, 11 (1st Cir. 2025))). The new ultra vires cause of action bolsters California's likelihood of success on the merits by providing this Court with a separate and independent cause of action under which the Wright Order should be enjoined. Without this supplemental briefing on the new cause of action, the Court's consideration of the PI Motion may be incomplete. Thus, California has good cause to file the attached proposed supplemental brief in support of the PI Motion, which contains 3 pages of briefing limited to the new cause of action pleaded in the FAC.

Additionally, allowing California to file this short and targeted supplemental brief would not prejudice Defendants or Intervenor-Defendants. This court has yet to rule on the pending PI Motion, and the Court could allow Defendants and Intervenor-Defendants to respond to the supplemental brief through briefing or the hearing on this Motion. If the Court were to allow Defendants and Intervenor-Defendants to file an opposition to California's supplemental brief, California requests that the Court limit Defendants and Intervenor-Defendants to briefing of not more than 5 pages, collectively, and that the Court allow California to file a

reply of not more than 5 pages to Defendants' and Intervenor-Defendants' opposition, as detailed in the attached Proposed Order.

Thus, the Court should grant this Motion and grant leave to California to file the attached proposed supplemental brief in support of the PI Motion.

**CONCLUSION**

California respectfully requests that the Court grant it leave to file the supplemental brief in support of its pending motion for preliminary injunction and stay.

Dated: July 30, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 4 pages in length, which complies with the page limit set by the Court's New Case Order, ECF 18 at 2.

Dated: July 30, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants,*<br>and<br>**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,**<br>*Intervenor-Defendants.* | No. 2:26-cv-3396-SVW-SSCx<br>**DECLARATION OF KAVITA LESSER IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Date: September 14, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

**DECLARATION OF KAVITA LESSER**

I, Kavita Lesser declare as follows:

1. I am an attorney admitted to practice before this Court. I am a Deputy Attorney General in the California Office of the Attorney General, and counsel of record for Plaintiff State of California (California). I make this declaration based on my personal knowledge, and, if called as a witness, I could and would testify competently thereto.

2. Pursuant to Local Rule 7-3, on July 22, 2026, my co-counsel and I conferred with counsel for Defendants and Intervenor-Defendants regarding California's motion for leave to file a supplemental brief in support of its pending motion for preliminary injunction. We discussed that California's proposed supplemental brief would be short and limited to why California is likely to succeed on the merits of its new cause of action added in California's First Amended Complaint.

3. Defendants and Intervenor-Defendants indicated that they would oppose the motion.

4. All parties agreed that the motion can be resolved on the papers without a hearing.

5. To accommodate the schedule of opposing counsel, California has noticed this motion for hearing on September 14, 2026, at 1:30 p.m. Given this accommodation, the parties agree that if the Court allows California to file the supplemental brief, Defendants and Intervenor-Defendants will file oppositions by August 10, 2026, and California will file a reply by August 17, 2026.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on July 30, 2026, in Los Angeles, California.

<u>*/s/ Kavita Lesser*</u>
Kavita Lesser

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants,*<br>and<br>**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,**<br>*Intervenor-Defendants.* | No. 2:26-cv-3396-SVW-SSCx<br>**[PROPOSED] ORDER RE PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

# [PROPOSED] ORDER

Upon consideration of Plaintiff State of California's Motion for Leave to File Supplemental Brief in support of Plaintiff's Motion for Preliminary Injunction, Plaintiff's Motion for Leave is **GRANTED.**

**IT IS HEREBY ORDER THAT:**

1. Plaintiff's Proposed Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction and Stay Against All Defendants is filed as of today.
2. Defendants Secretary of Energy Chris Wright and the U.S. Department of Energy and Interventor-Defendants Sable Offshore Corp. and Pacific Pipeline Company shall file and serve their opposition by August 10, 2026.
3. Defendants' and Intervenor-Defendants' opposition shall be limited to not more than five pages, collectively.
4. Plaintiff's reply brief shall be filed and served by August 17, 2026.
5. Plaintiff's reply shall be limited to not more than five pages.

**IT IS SO ORDERED.**

DATED:_________, 2026

______________________________

Honorable Stephen V. Wilson
United States District Judge

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants*,

and

**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,**

*Intervenor-Defendants.*

No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S PROPOSED SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S PENDING MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

## INTRODUCTION

California submits this supplemental brief to address the impact of its First Amended Complaint (FAC) (ECF 72) on its pending motion for preliminary injunction (ECF 16). The FAC adds an ultra vires cause of action and alleges that Defendants exceeded their statutory and constitutional authority in issuing the Wright Order. ECF 72, ¶¶ 176-181. As a result, there are now two separate claims under which this Court can review and should invalidate the Wright Order: the Administrative Procedure Act (APA) cause of action and the ultra vires cause of action. The State has a strong likelihood of success on the merits of its ultra vires claim because the Wright Order exceeds the Defense Production Act's (DPA) grant of authority and is unconstitutional. *See* ECF 16-2 at 8-18; ECF 27 at 5-10. The Court may therefore preliminarily enjoin the Wright Order as a likely ultra vires action, regardless of whether the APA applies.

## PROCEDURAL BACKGROUND

On March 31, 2026, California filed this case against the United States Department of Energy (DOE) and Secretary Chris Wright (collectively Defendants) challenging the Wright Order. *See Pipeline Capacity Prioritization and Allocation Order*, (the Wright Order), ECF 23-1 at 1-4. California's initial complaint alleged the Wright Order is contrary to law (Count I) and arbitrary and capricious (Count II), in violation of the APA, 5 U.S.C. § 706. ECF 1 at ¶¶ 116-138. It also asserted claims that the Wright Order violates the constitutional separation of powers doctrine (Count III) and the Tenth Amendment (Count IV). *Id*. at ¶¶ 139-159. California moved for a preliminary injunction on May 1, 2026 (ECF 16), and the Court heard argument on the motion on June 8, 2026. The parties then filed supplemental briefing at the Court's request. The Court has not yet ruled on the motion. On July 20, 2026, California filed the FAC as a matter of course under

Federal Rule of Civil Procedure 15(a)(1). ECF 72. As relevant here, the FAC adds a claim raising an ultra vires cause of action (Count V).[1]

## ARGUMENT

The new claim in the FAC further supports California's likelihood of success on the merits. As set forth in the State's prior preliminary injunction briefing, California has a strong likelihood of success on the merits that the Wright Order violates the APA and is unconstitutional. ECF 16 at 8-17; 32 at 2-7; 62 at 9-10, 65 at 3-7. The FAC adds an ultra vires cause of action, which provides this Court with a separate and independent avenue to hold that the Wright Order is invalid.

"[A]ctions by subordinate Executive Branch officials that extend beyond delegated statutory authority—i.e., ultra vires actions—are reviewable," especially where they "implicate constitutional concerns." *Murphy Co. v. Biden*, 65 F.4th 1122, 1129, 1131 (9th Cir. 2023); *see also Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (ability to bring an ultra vires action to "enjoin unconstitutional actions by state and federal officers . . . reflects a long history of judicial review of illegal executive action"). Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Consistent with this principle, the Supreme Court has allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

By invoking the Wright Order to broadly authorize Sable to disregard state and federal law and violate two court orders, Defendants have acted contrary to law and outside the authority granted to them under the DPA. *See Murphy*, 65 F.4th at

[1] The FAC also adds new factual allegations regarding state laws displaced by the Wright Order (FAC ¶ 106), Title I of the DPA (FAC ¶¶ 22-24), the scope of Secretary Wright's statutory authority under the DPA (FAC ¶¶ 25-26, 68-71), DOE's regulations promulgated under the DPA (FAC ¶¶ 26-29), and the findings made by DOE related to the Wright Order (FAC ¶¶ 86, 89-90).

1130. As explained in the State's prior briefing, the Wright Order is not a valid prioritization or allocation order under the DPA. *See* ECF 16-2 at 8-12; ECF 27 at 5-8. And nothing in the DPA authorizes the sort of limitless preemption of state laws pertaining to safety, environmental protection, and property rights that the defendants assert the Wright Order authorizes. *See* ECF 16-2 at 12-15; ECF 27 at 8-10. Nor can the DPA be reasonably construed to authorize the Executive Branch to flout judicial orders in violation of separation of powers principles, or to require that California dedicate state-owned property to Sable's restart of the pipelines in violation of the anti-commandeering doctrine. *Id.*

For these reasons, Defendants have acted in excess of their delegated powers under the DPA. California therefore has a strong likelihood of success on the merits of its claim that the Wright Order is invalid as ultra vires, and a preliminary injunction should be issued for that additional reason.

**CONCLUSION**

The Court should grant California's motion to stay and preliminarily enjoin the Wright Order.

Dated: July 30, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY M. BROWN
Supervising Deputy Attorney General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

/s/Kavita Lesser
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 3 pages in length, which complies with the page limit set by the Court's New Case Order, ECF 18 at 2.

Dated: July 30, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov

*Attorneys for Plaintiff State of California*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

and

**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,**

*Intervenor-Defendants.*

Case No. 2:26-cv-3396-SVW-SSCx

**FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF; ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF (L.R. 83-11)**

**(Defense Production Act, 50 U.S.C. § 4501 et seq.; Administrative Procedure Act, 5 U.S.C. §§ 701-706; Violation of U.S. Constitution Separation of Powers and 10th Amendment; *Ultra Vires* – Conduct in Excess of Statutory Authority; Declaratory Relief)**

## INTRODUCTION

1. In a breathtaking power grab, the federal Executive Branch has asserted that, with the stroke of a Cabinet Secretary's pen on an order under the Defense Production Act, the federal government may preempt and supersede all state laws governing hazardous oil pipelines, California's sovereign property rights, and any order of a state or federal court, in an effort to extract as much petroleum as it can from the coastal waters off of California. This stunning usurpation of California's police powers, and the powers of the state and federal courts, should be struck down swiftly and certainly.

2. Onshore oil pipelines that run along the Santa Barbara, California, coast and inland to Kern County, California, were shut down in 2015 following a catastrophic rupture that spilled over 120,000 gallons of oil onto Refugio State Beach and into the ocean. In recent years, the pipeline operator has made repairs to the pipeline and sought to restart the pipelines, which fall within the jurisdiction of at least eight state agencies with regulatory authority over the pipelines and related facilities, or whose property the pipelines cross. The subset of those agencies that must grant affirmative approval for the pipelines to restart have been carefully examining the pipeline operator's requests, consistent with the specific safety and legal requirements under their respective statutes. Some approvals have been granted conditionally, while some remain under review pending the pipeline operator's submission of additional information or completion of legally required steps.

3. The pipeline operator was unhappy with the speed of those approvals, however—not because they were taking longer than other similarly complex and environmentally sensitive reviews, but because the pipeline operator was severely undercapitalized and desperate to begin generating revenue. Accordingly, the pipeline operator asked Defendant United States Secretary of Energy Chris Wright to order it to restart the pipelines under the Defense Production Act (DPA).

Secretary Wright issued that order on March 13, 2026. *See* Secretarial Order entitled *Pipeline Capacity Prioritization and Allocation Order* (the Wright Order). ECF 23-1 pp. 1-4. The pipeline operator then relied on the Wright Order, and a contemporaneous opinion from the U.S. Department of Justice's Office of Legal Counsel, to argue that any state laws or existing court orders standing in the way of restart could be ignored and set aside. The very next day, on March 14, 2026, the pipeline operator restarted pumping oil through the pipelines despite an outstanding preliminary injunction in state court, despite not having necessary permits from either the state or the federal government for pipeline operation, despite still not having approval from several state agencies, and despite not having a current or valid easement to keep or utilize the segment of its pipeline crossing California state property.

4. By way of this action, the State of California seeks declaratory relief and permanent injunctive relief under the United States Constitution and the Administrative Procedure Act (APA) and vacatur under the APA with respect to the Wright Order.

5. The Wright Order directs the pipeline operator to immediately "prioritize and allocate" transportation of hydrocarbon services, i.e., crude oil, produced at three offshore platforms in the Outer Continental Shelf known as the Santa Ynez Unit. The crude oil extracted from the Santa Ynez Unit is transported through an undersea pipeline (the Offshore Pipeline), which Offshore Pipelines are partly on lands leased from the California State Lands Commission, into a production facility onshore where it is treated and separated into distinct petroleum products, and then enters a different intrastate onshore pipeline system and travels, including in part through Gaviota State Park, approximately 120 miles to an inland distribution station (Lines CA-324/325 or Pipelines). The Wright Order also directs the Pipeline operator to "immediately commence performance" under contracts for oil production and transportation from the Santa Ynez Unit through the Offshore

Pipeline, processing facility, and Lines CA-324/325, and to prioritize contracts regarding such oil over other contracts the company may have.

6. Defendant Secretary Wright claims that his order is authorized by the DPA. Defendants assert that Title I of the DPA "authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense" with respect to energy production. Defendants cite the *Declaring a National Energy Emergency* Executive Order (Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025)) (EO 14156) and generally claim that greenlighting the oil production and transportation from the Santa Ynez Unit through the Offshore Pipeline, processing facility, and Lines CA-324/325 is "necessary and appropriate to promote the national defense," and "maximize[s] domestic energy supplies" where those supplies are "scarce."

7. A legal opinion issued by the U.S. Department of Justice's Office of Legal Counsel 10 days before the Wright Order opined that an order signed by a Cabinet Secretary under the DPA fully preempts contrary state law, as well as existing contrary federal and state court orders. As a result, the Wright Order purports to authorize activity that is illegal or unauthorized under both state law, and federal law, and barred by existing court orders, by directing and compelling that lawless action from a privately owned oil company desperate for a shortcut to restarting its oil production from the Outer Continental Shelf through Lines CA-324/325 that have been shut down since the disastrous 2015 oil spill. Nothing in the DPA authorizes this usurpation of a State's sovereign property rights and police powers or the authority of the courts to enforce their own orders, and the federal Executive Branch's self-serving legal opinion to the contrary lacks merit.

8. The facts do not justify this overreach either. Restarting the flow of oil through Lines CA-324/325 does not fix any of these purported problems. Defendants' national defense and national energy emergency justifications are

patently unreasoned. To the contrary, the offshore platforms have a maximum expected gross oil rate of roughly 50,000 barrels per day, contributing a fraction of a percent to the domestic energy market. Although international conflict has driven up oil prices globally by reducing oil exports from the Middle East, there is no actual *shortage* of crude oil in the United States; the incremental oil production the Wright Order directs would thus neither address a shortage (because there is none) nor lower the cost of crude oil in the United States (because this miniscule incremental production would not have an impact on the global price of oil). And even if there were any marginal benefit to the "national defense," it would be vastly outweighed by the environmental and safety risks, as well as the unlawful and unconstitutional displacement of the State's police powers and the intrusion upon the State's sovereign property rights.

9. Indeed, without this Court's intervention, the Wright Order would permit the federal government to order and authorize the restart of unpermitted and noncompliant infrastructure for oil and gas production and transportation in the State of California. Defendants improperly use the DPA to authorize sweeping preemption of state and federal regulatory frameworks governing oil and gas production and transportation, coastal management, environmental protections, property interests, and more. Such broad preemption is patently unauthorized by the DPA, and the Wright Order amounts to an unprecedented and historic grant of power to an oil corporation. If allowed to stand, the Wright Order would displace California's broad and comprehensive state environmental, pipeline safety, coastal management, sovereign property rights, and common law frameworks. Unlawfully bypassing any and all state requirements is an affront to the sovereignty of California and its right to manage its property and exercise its police powers within its own borders.

10. Not only does the Wright Order seek to preempt California law, but it also seeks to authorize the pipeline operator to directly violate at least two separate

court orders—one from a state superior court and one from another federal court—requiring the operator to meet certain conditions before it can restart operating the Pipelines. This violation of the Constitutional separation of powers between the Executive and Judicial branches is yet another attempt by the current federal administration to undermine the rule of law and to eviscerate a co-equal branch of the federal government.

11. To prevent these harms to Plaintiff, this Court should declare that the Wright Order is unlawful under the APA and violates the United States Constitution. For these and other reasons discussed below, the Wright Order should be declared unlawful and vacated.

**JURISDICTION AND VENUE**

12. This action arises under the United States Constitution, the APA (5 U.S.C. § 701 *et seq.*); the DPA (50 U.S.C. § 4501 *et. seq.*); and federal regulations implementing the DPA. This Court has subject matter jurisdiction pursuant to title 28 of United States Code, sections 1331 and 2201, subdivision (a). Jurisdiction is also proper under the judicial review provisions of the APA (5 U.S.C. § 702).

13. Venue is proper in this judicial district under title 28 of the United States Code, section 1391, subdivision (e), because this is a civil action in which Defendants are agencies of the United States or officers of such an agency; the California Attorney General and the State of California have offices at 300 South Spring Street, Los Angeles, California, and therefore reside in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**PARTIES**

**Plaintiff**

14. Plaintiff the State of California is a sovereign State of the United States. Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to

protect California's rights and interests and the resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11. The State of California administers its laws through various Executive Branch agencies and independent commissions of the State, including the Department of Forestry and Fire Protection's Office of the State Fire Marshal (OSFM), the Department of Conservation's Geologic Energy Management Division (CalGEM), the California Coastal Commission, the State Lands Commission, the California Department of Parks and Recreation (State Parks), the State and Regional Water Resources Control Boards, the Department of Fish and Wildlife and that department's Office of Spill Prevention and Response.

**Defendants**

15. Defendant Chris Wright is the Secretary of the United States Department of Energy, and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. § 7131.

16. Defendant United States Department of Energy (DOE) is a cabinet agency within the Executive Branch of the United States government. 42 U.S.C. § 7131.

## ALLEGATIONS

### I. Congress Enacted the DPA To Respond to Legitimate Needs for Goods and Services in Times of Emergency.

17. Congress enacted the DPA, 50 U.S.C. § 4501 *et seq.*, to provide the President, and Executive Branch officials by delegation, with authority to shape military preparedness and provide necessary industrial supplies for the national defense.

18. The DPA authorizes the Executive to employ three tools to carry out its purpose. Title I of the DPA provides for the "allocation and prioritization" of government contracts for strategic and critical goods. Title III allows the Executive to utilize financial incentives to expand capacity. Title VII authorizes the Executive

to enter into voluntary agreements with private industry. (Other titles of the DPA have since expired and are no longer in effect.)[1]

19. The cornerstone provision of the DPA is Title I (hereinafter referred to as "Section 101"), "Priorities and Allocations."[2] Section 101 authorizes the President to require industry to prioritize and give preference to federal contracts or orders over other contracts or orders.[3] Additionally, the President may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."[4]

20. The DPA defines "national defense" as "programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity," as well as "emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act and critical infrastructure protection and restoration."[5]

21. Historically, the DPA has primarily been invoked for military contracts for goods and services and to react to a global crisis, such as the COVID-19 pandemic. The Executive has used the DPA to direct industry to prioritize the fulfillment of government contracts for specific goods it deemed critical and strategic, such as meat production[6] and medical supplies in response to COVID-19, and for the Department of Defense to "allocate" civilian aircraft for potential use by the government during a national defense emergency.[7]

---

[1] 50 U.S.C. § 4501 *et seq.*
[2] *See* 50 U.S.C. § 4511, or Section 101 of the DPA.
[3] 50 U.S.C. § 4511(a)(1).
[4] 50 U.S.C. § 4511(a)(2).
[5] 50 U.S.C. § 4552(14).
[6] *See* Exec. Order No. 13917, 85 Fed. Reg. 26,313 (Apr. 28, 2020).
[7] The allocation authority supports the Civil Reserve Air Fleet program, which was created initially in 1951, and is now managed by the U.S. Department of Transportation. Alexandra G. Neenan, *The Defense Production Act of 1950:*
(continued…)

22. The Executive's authority under the DPA is limited by the text of the statute.

23. The DPA requires that orders issued under Section 101(a) adhere to Section 101(b), which governs the "use[]" of all "powers granted in [Section 101]."[8] Accordingly, Section 101(a) cannot be used to "control the general distribution of any material in the civilian market unless the President," or his delegee, "finds (1) that such material is a scarce and critical material essential to the national defense, and (2) the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship."[9]

24. Section 101(c) of the DPA confers a distinct grant of authority specifically directed at contracts and allocation orders for energy production. It provides that "[n]otwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders . . . relating to[] materials, equipment, and services in order to maximize domestic energy supplies," and the President must find that such an order would not conflict with another order already established under Section 101(a).[10] Critically, this authority is limited and may not be invoked to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that such materials, services, and facilities are scarce, critical, and essential to maintain or expand energy exploration, production, refining, or transportation; to conserve energy supplies; or to construct or maintain energy facilities; and that these

*History, Authorities, and Considerations for Congress* (Oct. 6, 2023), available at https://www.congress.gov/crs-product/R43767.

[8] 50 U.S.C. § 4511(b).

[9] 50 U.S.C. § 4511(b).

[10] 50 U.S.C. § 4511(c)(1) & (3).

objectives "cannot reasonably be accomplished without exercising" this authority.[11] These are required threshold findings of fact, not merely discretionary recitals.

25. The DPA authorizes the President to delegate any of his authority granted under Section 101 to a federal agency. "The head of each Federal agency to which the President has delegated authority . . . shall [] issue, and annually review and update whenever appropriate, final rules, in accordance with [the APA's requirements for rule making (5 U.S.C. § 553)], that establish standards and procedures by which the priorities and allocations authority under this section is used to promote the national defense, under both emergency and nonemergency conditions."[12] The agency head must also, "as appropriate and to the extent practicable, consult with the heads of other Federal agencies to develop a consistent and unified Federal priorities and allocations system."[13]

26. The Secretary of Energy has priorities and allocations authority under Section 101(a), but previously only had authority under Section 101(c) to make the "critical and essential" findings under Section 101(c)(2)(A).[14] The Secretary later received full authority under Section 101(c).[15] DOE first promulgated regulations in 1978 for its exercise of authority under the DPA. DOE has since amended those regulations several times. DOE currently has promulgated regulations containing procedures for its allocation and priorities authority under Section 101(a) and authority to make the "critical and essential" findings under Section 101(c)(2)(A).[16] DOE has yet to issue final rules, in conformance with Section 101(d)(1) of the

[11] 50 U.S.C. § 4511(c)(2).

[12] 50 U.S.C. § 4511(d)(1).

[13] 50 U.S.C. § 4511 (d)(2).

[14] Exec. Order No. 13,603 §§ 201(a)(2), 203, 803(a), 77 Fed. Reg. 16651 (Mar. 16, 2012) (EO 13603); *see, e.g.*, Exec. Order No. 12,919 §§ 201(a)(2) & 203, 59 Fed. Reg. 29525 (June 7, 1994).

[15] Exec. Order No. 14,391 § 2, 91 Fed. Reg. 13199 (Mar. 13, 2026) (EO 14391).

[16] *See* 10 C.F.R. §§ 216.1, 217.1.

DPA, that establish standards and procedures for the DOE's use of the full authority under Section 101(c).

27. DOE's regulations pertaining to Section 101(a) describe various types of orders that the Secretary may issue under the DPA, including "allocation" orders and "rated" orders.[17] The regulations impose specific requirements on the content for each type of order. Allocation orders are defined as "official action[s] to control the distribution of materials, services, or facilities."[18] They must include "a detailed description of each required allocation action," "the specific start and end calendar dates for each required allocation action," a statement that it is an allocation order certified for national defense use, and a current copy of the regulations.[19] If an allocation order seeks to "control the general distribution of a material in the civilian market," the Secretary must also make the findings under Section 101(b) of the DPA.

28. Rated orders are defined as a "prime contract, a subcontract, or a purchase order in support of an approved program issued in accordance with the provisions of this part."[20] A rated order must assign one of three priority levels: "DX" rated orders are prioritized over "DO" rated orders, which are prioritized over "unrated" orders.[21] Additionally, rated orders must include a program identification symbol denoting which currently approved program the order supports, the required delivery date for the order, and a statement that it is a rated order certified for national defense use.[22] The words "immediately" or "as soon as possible" are insufficient to satisfy the regulation's requirement of a required delivery date.[23]

29. DOE's regulations relating to Section 101(c) of the DPA require DOE to use certain procedures and criteria when considering and making findings under

[17] 10 C.F.R. § 217.20.
[18] 10 C.F.R. § 217.20.
[19] 10 C.F.R. § 217.54.
[20] 10 C.F.R. § 217.20.
[21] 10 C.F.R. § 217.31(a).
[22] 10 C.F.R. §§ 217.31(b), 217.32.
[23] 10 C.F.R. § 217.32(b).

Section 101(c)(2)(A)—essentially, findings whether energy programs or projects "maximize domestic energy supplies and whether or not supplies of materials and equipment, services, or facilities are critical and essential."[24] In order to make the "maximize domestic energy supplies" and "critical and essential" findings, DOE must consider numerous factors related to a proposed energy project—including: (1) the quantity of energy involved, (2) the benefits of timely energy program furtherance or project completion, (3) socioeconomic impact, (4) the need for the end product for which the materials are allegedly required, (5) established national energy policies, (6) the availability and utility of substitute materials, and (7) the impact of the nonavailability of the specific materials on the furtherance or timely completion of the approved energy program or project—prior to the issuance of an order under Section 101(c).[25] Under these regulations, if DOE determines that the project meets the criteria under Section 101(c)(2)(A), DOE must communicate that determination and finding to the Department of Commerce (DOC), which determines whether the relevant supplies are scarce and whether "maintenance or furtherance of exploration, production, refining, transportation, or conservation of energy supplies or the construction or maintenance of energy facilities cannot be reasonably accomplished without exercising the authority specified in DPA section 101(c)."[26] If DOC makes those two findings, it will inform DOE, which must in turn notify the project that it may "use priority ratings under the Defense Priorities and Allocations System."[27]

30. The DPA contains no provision indicating that it displaces judicial power or state power preserved by the Constitution or Congress in other statutes, coastal management, environmental protections, property interests, and more.

[24] 10 C.F.R. §§ 216.1(b), 216.4(a).
[25] 10 C.F.R. § 216.4.
[26] 10 C.F.R. § 216.1(c).
[27] 10 C.F.R. § 216.1(c).

31. Finally, the DPA contains a sunset provision that requires Congress to periodically reauthorize it to retain effect. Notably, in 2009, Congress did not reauthorize the provision that allowed the President to use the DPA to requisition private property.

## II. Faulty Maintenance of Line CA-324 Resulted in One of the Largest Oil Spills in California History and Extensive Damage to the State, and Authorizing Its Unlawful Restart by an Irresponsible Company Is a Dangerous Usurpation of California's Sovereign Property and Police Powers.

32. Defendants purport to use the Wright Order to direct a pipeline operator, Sable Offshore Corporation Sable), to restart production and transportation of oil and gas through pipelines that were shut down since a devastating oil spill in 2015. By way of background, the Wright Order pertains to several processes and pieces of infrastructure. Crude oil and other hazardous liquids are produced at three offshore drilling platforms off the Santa Barbara Coast (the Santa Ynez Unit) and transported by undersea pipelines—including through pipelines on lands leased from the California State Lands Commission—to a processing facility immediately onshore, called the Las Flores Canyon Processing Facility. There, the liquids and natural gas are separated and treated, and the processed oil product is then placed into different pipelines, Lines CA-324/325, that span more than 120 miles—including a portion of which is currently trespassing through Gaviota State Park—from the Santa Barbara County coast inland to Kern County, California, for storage and ultimately distribution. The Santa Ynez Unit, the Las Flores Canyon Processing Facility, the Offshore Pipelines and Lines CA-324/325 first came online between 1970 and the mid-1990s.




33. On May 19, 2015, Line CA-324 (then known as Line 901) ruptured, releasing over 120,000 gallons of heavy crude oil into the environment along the Santa Barbara coast at Refugio State Beach, which came to be known as the Refugio Oil Spill. The spill coated seven miles of shoreline with crude oil and tar balls and damaged beaches more than 100 miles down the coast.

34. Investigations determined that Lines CA-324/325's system designed to prevent corrosion used a defective design that could not be remediated. The investigation report determined that the cause of the rupture was external corrosion of the pipeline wall at the point of failure.

35. The Refugio Oil Spill caused widespread damage to California's natural resources, lands, and livelihoods. The spill oiled the Pacific Ocean and the coastal zone from Refugio Beach to as far south as Manhattan Beach in Los Angeles County.

36. The spill adversely impacted natural resources under the trusteeship of the State of California, including marine mammals and fish, kelp and eelgrass, and it degraded marine and coastal habitats. It harmed migratory marine mammals and birds that spend a portion of their lifecycle within the waters of the Channel Islands National Marine Sanctuary. The California Department of Fish and Wildlife had to close commercial and recreational fishing. The spill also impeded shoreline and offshore recreation and boating at Channel Islands National Park and marred and closed Santa Barbara's beaches to public use and enjoyment.

37. Lines CA-324/325 were taken out of operation after the spill, and state and federal regulators, as mentioned, investigated the failure. Around that time, in 2016, the Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that Lines CA-324/325 were *intra*state pipelines, and that the State of California had authority to regulate and impose safety standards pursuant to the Pipeline Safety Act.[28] Regulatory authority over Lines CA-324/325 was then transferred from PHMSA to the California Department of Forestry and Fire Protection, Office of the State Fire Marshal (OSFM).

38. On May 12, 2020, the United States, California state regulatory agencies, and the University of California filed a civil action against then-owner and operator, Plains All American Pipeline Company (Plains), for causing the Refugio Oil Spill. *United States et al. v. Plains All American Pipeline*, Case No. 2:20-cv-02415 (March 13, 2020) (*United States v. Plains*).

39. State and federal agencies engaged in efforts that culminated in an agreed-upon Consent Decree, filed in 2020 in the Central District of California, which required that the operator pay over $60 million in damages and penalties, and which prescribed terms for any future restart of the Pipelines. The Court (Hon.

[28] *See* 49 U.S.C. § 60105.

Philip S. Gutierrez) signed the Consent Decree on October 14, 2020, which is a judgment binding all parties.

40. Plains was also found guilty of a felony and eight misdemeanors for failing to properly maintain these Pipelines.

41. The United States and California designated OSFM as the agency that is responsible for oversight of the Lines CA-324/325, consistent with PHMSA's confirmation of OSFM jurisdiction in 2016.

42. The Consent Decree requires that, prior to restarting Line 901 (now Line CA-324), Plains shall apply for a State Waiver (i.e., state approval to use anti-corrosion measures that differ from the federally required technology, cathodic protection) from OSFM. The Consent Decree also assigned OSFM the power to approve a restart plan and provided procedures for its modification and termination, as well as for the Court's retention of jurisdiction to enforce compliance with its terms. In its acquisition of Lines CA-324/325, Sable agreed to be bound by the Consent Decree.

43. For more than ten years, Lines CA-324/325 remained idle until March 14, 2026, when Sable restarted Lines CA-324/325 based on the Wright Order.

44. Since Sable acquired the Pipelines in 2024, it has consistently demonstrated that it is willing to cut corners and disregard legal compliance in its crusade to return to production to dig itself out of a financial hole.

45. In February 2024, Sable acquired the Santa Ynez Unit, Las Flores Canyon Processing Facility, and Lines CA-324/325 from ExxonMobil for a total of $625 million dollars, financed almost entirely by a $622 million loan from ExxonMobil.

46. Sable was and remains undercapitalized. As a condition of the acquisition, if Sable did not restart production by January 1, 2026, ExxonMobil had the right of reversion. The maturity date was extended to March 31, 2027, but with

a higher interest rate, pursuant to the Second Amendment to Senior Secured Term Loan Agreement.

47. Sable's precarious financial position dictated that it prioritize restarting the Pipelines quickly, above all else. Shortly after the acquisition, Sable began its venture to restart oil production at the Santa Ynez Unit, transport crude oil through Lines CA-324/325, and sell the oil commercially. In order to do so Sable ultimately opted to attempt to repair and augment the Pipelines instead of replacing them. Sable's crews began working on Lines CA-324/325 despite not having received several requisite permits or approvals.

48. By Plaintiff's knowledge and information, there are several active lawsuits to date related to the pipeline work and potential restart. Since early 2025, several state and local entities have issued administrative notices of violation and brought enforcement actions, and actions seeking other forms of relief, against Sable, alleging the company failed to comply with certain requirements of the state framework in performing pipeline maintenance and potential restart, including obtaining applicable property rights.[29] Sable, including its wholly-owned

---

[29] *See Sable Offshore Corp. et al. v. Cal. Coastal Comm'n*, Case No. 25CV00974 (Santa Barbara Super. Ct., Feb. 18, 2025) (Coastal Commission cross complained against Sable to enforce administrative orders, including fines for unpermitted repair work in the coastal zone); *People of the State of California v. Sable Offshore Corp.,* Case No. 25-000333 (Santa Barbara Super. Ct., Sep. 16, 2025) (Santa Barbara County District Attorney brought criminal charges alleging intentional violations of the California Water Code and Fish and Game Code related to the unpermitted repair work); *People of the State of California ex rel. Central Coast Reg'l Water Quality Control Bd. v. Sable Offshore Corp*., Case No. 25CV06285 (Santa Barbara Super. Ct., Oct. 3, 2025) (alleging violations of the California Water Code involving failure to comply with an investigative order; failure to report waste discharges; and discharge of waste into "waters of the state" without permits); *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp. et al.*, Case No. 26CV01759 (Santa Barbara Super. Ct., Mar. 17, 2026) (State Parks alleged trespass by Sable relating to use of the pipeline, including to transport oil through Gaviota State Park without a valid property interest) (removed Mar. 19,

(continued…)

subsidiaries, sued California regulators and local authorities for, *inter alia*, attempting to implement State law and taking enforcement action regarding Sable's legal violations.[30] Nonprofits have sued challenging OSFM's issuance of State Waivers for alternative anti-corrosion technology for Lines CA-324/325.[31] Sable removed this case to federal court, and the removal and remand motions are fully briefed and under submission of this Court.

49. Importantly, the Santa Barbara County Superior Court issued a preliminary injunction on July 29, 2025, which enjoined Sable from restarting the Pipelines until 10 court days following the filing and service of notice by or on behalf of Sable that Sable has received all necessary approvals and permits for restarting the Pipelines, and that Sable intends to commence such restart. As of the date of this Complaint, that preliminary injunction remains in place—which Sable is now in violation of—despite Sable twice attempting to dissolve it. Nonprofits have also sued the United States Bureau of Oceanic Energy Management and

---

2026 into federal district court as *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp. et al*., Case No. 2:26-cv-02946 (C.D. Cal.)).

[30] *See Sable Offshore Corp. et al. v. Cal. Coastal Comm'n,* Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025) (challenging the Coastal Commission's jurisdiction to enforce an administrative penalty); *Pac. Pipeline Co. v. State of California*, Case No. 1:26-cv-01486 (E.D. Cal, Sep. 29, 2025); *Sable Offshore Corp. v. Quintero,* Case No. 2:26-cv-02739 (C.D. Cal., March 13, 2026) (seeking declaratory relief related to issue of obtaining easement within Gaviota State Parks); *Sable Offshore Corp. v. Cal. Dep't of Conservation, Geologic Energy Mgmt. Div. et al.,* Case No. 26WM000036 (Sacramento Super. Ct., February 17, 2026) (challenging CalGEM's bond requirement for production facilities under Public Resources Code section 3205.8 and applicability of SB 1137).

[31] *Env't Def. Center et al. v. Cal. Dep't of Forestry and Fire Prot., Office of the State Fire Marshal et al.,* Case No. 25CV02247 (Santa Barbara Super. Ct, Apr. 15, 2025) and *Ctr for Biological Diversity et al. v. California Dep't of Forestry and Fire Prot., Office of the State Fire Marshal et al*., Case No. 25CV02244 (Santa Barbara Super. Ct, Apr. 15, 2025).

Bureau of Safety and Environmental Enforcement regarding federal leases for the Santa Ynez Unit.[32]

50. On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. On October 22, 2025, OSFM informed Sable that the State Waivers required Sable to, before any restart, repair metal loss anomalies detected during in-line inspections and declined to approve the restart plan at that time.

51. Rather than coming into compliance with the State Waiver requirements, on November 26, 2025, Sable instead petitioned PHMSA to reverse its position that the Pipelines are subject to State jurisdiction—which position was memorialized in the Consent Decree—and step in and unilaterally assume jurisdiction over the Pipelines. Sable's letter to PHMSA "notif[ied]" the agency of *Sable's* determination that the Pipelines were interstate— a determination that PHMSA must make, and one counter to PHMSA's longstanding determination —and asked that PHMSA assume exclusive authority over the Pipelines by redesignating them as interstate under the Pipeline Safety Act (49 U.S.C. § 60100 *et seq*.).

52. On December 17, 2025, PHMSA adopted Sable's determination. The agency, in violation of the Consent Decree, issued an order redesignating the Pipelines as *inter*state, purporting to strip OSFM of its authority to regulate the *intra*state Pipelines, and declaring the Pipelines under PHMSA's "exclusive regulatory authority" (Federalization Order).

53. On December 22, 2025, PHMSA issued a one-page letter approving Sable's Restart Plan for the Pipelines.

54. On December 23, 2025, PHMSA issued an Emergency Special Permit to Sable, waiving compliance with certain requirements related to remediation of corrosion in the pipeline wall. PHMSA also stated that the granting of the

---

[32] *Ctr for Biological Diversity et al. v. Doug Burgum et al.,* Case No. 2:25-cv-02840, (C.D. Cal, Apr. 2, 2025); *Ctr for Biological Diversity et al. v. Debra Haaland et al*., Case No. 2:24-cv-05459 (C.D. Cal, June 27, 2024).

Emergency Special Permit was necessary to address the energy emergency declared in EO 14156.

55. On January 23, 2026, California filed a petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's Federalization Order, PHMSA's approval of the restart plan, and the emergency special permit.[33]

56. On February 26, 2026, Sable announced that it was abandoning its State Waivers, which are required by the Consent Decree before the Pipelines could be restarted, citing PHMSA's Federalization Order as the basis.

57. Sable's restart of the Pipelines, absent the requisite permits and compliance with state and federal law, is an affront not only to California's police powers, but also the proper and safe regulation of the Pipelines and is alarming given the history of the Pipelines. Furthermore, Sable's loan indebtedness and pressure to restart before its assets revert to ExxonMobil, give the company an incentive to prioritize its own financial solvency over the safety and compliance of its project. Sable's desire to circumvent the law is not only borne out by its actions, but plainly evidenced by two letters requesting that federal regulators, first PHMSA and now DOE, help the company restart in circumvention of California's laws and rights and at least two court orders. Defendants' unprecedented act of government assistance to a single struggling oil company endangers the health and safety of California's residents and the environment.

## III. The Wright Order Was Issued at Sable's Request To Restart the Pipelines by Bypassing State and Federal Law, Including Two Judicial Orders.

58. On December 12, 2025, Sable sent a letter to DOE requesting that it act under the DPA to authorize and order the restart of the Pipelines.[34]

---

[33] *State of California v. PHMSA et al*., No. 25-508, consolidated with *Env't Defense Center v. PHMSA*, No. 25-8059 (9th Cir.).

[34] 50 Op. O.L.C __ (March 3, 2026) Slip Op. at 3, citing to a Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, (continued…)

59. On March 3, 2026, the U.S. Department of Justice's Office of Legal Counsel issued an opinion entitled *Preemptive Effect of Defense Production Act Order on State Law* (OLC Opinion). 50 Op. O.L.C. __ (Mar. 3, 2026). At DOE's request, the OLC Opinion addressed whether an order issued under the DPA to Sable by the President or his delegee "would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure."[35] The OLC Opinion concluded that an "order issued under [the DPA] could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree . . . including those vesting authority over resumption of transportation [of oil through the Pipelines] with [OSFM]."[36]

60. Shortly thereafter, on March 13, 2026, President Trump issued EO 14391, titled *Adjusting Certain Delegations Under the Defense Production Act*.[37] EO 14391 amended previous EO 13603, which delegated certain authorities of the President under the DPA to specified Executive department and agency heads, by adding the Secretary of Energy.

61. That same day, the Wright Order was issued pursuant to Section 101.[38] Specifically, the Wright Order directs Sable to:

> . . . [I]mmediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities at Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.
>
> . . . [I]mmediately commence performance under current contracts or orders for services, including contracts or order hereinafter entered into or sought, for

---

Partner, Holland & Knight LLP, Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act at 1 (Dec. 12, 2025).

[35] *Id.* at 1.

[36] *Id.* at 22.

[37] EO 14391, *supra*, at n. 15.

[38] 50 U.S.C. § 4511; The Order was issued pursuant to the delegation of authority conferred on the Secretary by amended EO 13603.

> hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal;
>
> . . . .
>
> . . . [C]omply with this order immediately and to maintain that compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.[39]

62. The Wright Order restates Sable's claims that "the State of California is impeding it from resuming transportation of Santa Ynez Unit production through the SYPS" and that:

> California agencies have deployed an array of state measures—including [California Senate Bill No. 237 (2025), setting stricter conditions on restart of pipelines that have been idle, inactive or out of service for five years or more], the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[40]

63. On March 14, 2026, one day after the Wright Order was issued, Sable restarted the Pipelines, in direct violation of the Consent Decree - which it is bound by - the preliminary injunction in the Santa Barbara County Superior Court, and all state and federal laws governing the restart. The restart also constitutes an intentional trespass across state owned property through Gaviota State Park.

64. Sable immediately issued a press release and announced it "immediately complied" with the DPA Order and restarted pumping through the CA Lines 324/325 "*at the direction of the United States Secretary of Energy, Chris Wright*."[41]

---

[39] Wright Order, ECF 23-1 at 3.

[40] *Id*. at 2.

[41] Sable Offshore Corp., *Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026* (Mar. 16, 2026), available at https://sableoffshore.com/news/news-

(continued…)

65. The DOE issued a press release and several statements confirming that Secretary Wright issued an order under the DPA directing Sable to immediately "restore the Santa Ynez Unit and Pipeline."

66. On March 17, 2026, Sable sent a letter to the U.S. Department of Justice and the California Department of Justice, also stating it had "complied with Order" and restarted the Pipelines, and that it was no longer going to abide by the Consent Decree.[42]

**IV. Secretary Wright Orders the Immediate Restart of the Pipelines in Direct Contravention of the DPA and Its Regulations.**

67. Secretary Wright issued the Wright Order pursuant to the DPA's Title I prioritization and allocation authority under Sections 101(a) and (c) that permits orders that compel the performance of government contracts with industry necessary to promote the national defense.

68. To the best of California's knowledge and belief, Sable is not part of a "program for military and energy production," nor is it supplying oil to a military program.

69. Although the Wright Order purports to proceed under Sections 101(a) and (c) of the DPA, it exceeds the Secretary's authority under each.

70. Under those provisions, the federal government may order a private actor to "prioritiz[e]" certain contracts over others and to honor a particular "allocat[ion]" of material and services among competing needs.

71. The Wright Order is interpreted by Defendants to do something quite different. It does not, for example, prioritize the production of oil over other activities Sable may want to pursue, nor does it prioritize sales of oil to some

---

details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx (emphasis added).

[42] Letter from Anthony C. Duenner, Executive Vice President, General Counsel and Secretary, Sable Offshore Corp., March 17, 2026.

purchasers over others. Rather, as interpreted and applied by the federal government, it directs and authorizes Sable to operate its Pipelines without regard to contrary law or court orders.

72. Notably, the DPA's Title I regulations establish a "Department of Energy Priorities and Allocations Program" specifically for regulating the prioritization and allocation of government contracts with industry.[43]

73. These Title I contracts are called "requirements contract," "basic ordering agreement," "prime vendor contract," or "similar procurement document . . . ."[44]

74. The DPA regulations assign levels of priority to contracts based on a rating system that rates a contract as "DO" or "DX" or "unrated."[45] DX rated orders are prioritized over DO orders, and DO orders are prioritized over unrated orders. The Wright Order lacks any priority rating information.

75. Any contracting decisions made under this system must be made with a "strong preference" for small businesses, especially those in economically depressed areas.[46] Sable is not a small business.

76. Notably, the DPA's Title I regulations require that these prioritization contracts include a specific delivery date. The Wright Order does not include a delivery date. The word "immediately," as used in the Wright Order to authorize the restart, does not constitute a delivery date as required.[47]

77. However, the Wright Order does not say, and no public information indicates, that Sable holds a Title I government contract or that Sable is required to sell its crude to the government in a Title 1 contract. The Wright Order also fails to state where, or to whom, Sable will sell the crude oil it produces.

---

[43] 10 C.F.R. § 217.3.
[44] 10 C.F.R. § 217.32.
[45] 10 C.F.R. § 217.31.
[46] 10 C.F.R. § 216.
[47] 10 C.F.R. § 217.32.

78. The Wright Order also does not meet the regulatory requirements of an allocation order because it continues in perpetuity, without a start and end date, fails to include a detailed description of the required allocation actions, and does not comply with other details required by title 10 of the Code of Federal Regulations, section 217.54.

79. It is simply inexplicable and unlawful for the Secretary to utilize the DPA's Title I authority to direct the wholesale and "immediate" restart of the Pipelines in the absence of any required Title I contracts, orders, or allocations.

80. The Secretary's use of the DPA's Title I authority to order the immediate restart of the Pipelines out of the context of ordering the performance of a government contract or allocation order is incongruent with the statute and regulations that support the DPA's Title I power and amounts to an unprecedented abuse of power by the Secretary, and the order is contrary to law and arbitrary and capricious.

81. Even if Sable had applied for or obtained a Title I government contract to supply its oil to the government, the Wright Order is still invalid because it fails to meet the threshold findings requirements of Title I.

82. The DPA only authorizes the Secretary to require priority performance of contracts or allocation orders to maximize domestic energy supplies pursuant to Section 101(c) if two key findings are made.

83. First, he must find that the covered "materials, services, and facilities are *scarce, critical, and essential*—(i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities" (emphasis added).

84. Second, he must determine that the "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities *cannot reasonably be*

*accomplished* without exercising the authority specified in paragraph (1) of this subsection"[48] (emphasis added).

85. The law governing agency actions requires that these findings must be more than mere declarations, but rather, supported by sound reasoning that supports the choice made.

86. The Wright Order contains no information in the order itself, nor does it cite to any documents that contain these required findings. However, on May 11, 2026, Defendants submitted documents attached to their Opposition (ECF 23) to Plaintiff's Motion for Preliminary Injunction and Stay that to California's knowledge, were not previously available to the public and were not cited or attached to the Wright Order. Defendants have not filed these documents in any of the related cases pending before this Court. These documents are dated March 13, 2026, the same date as the Wright Order, and purport to address findings required by Sections 101 (a) through (c), but they fall short.[49]

87. For example, there is no information provided that describes the cost of extraction on the environment or community. Nor is there an identification of other energy sources or a comparison to other possible energy sources that might provide more energy independence with fewer impacts, such as a renewable energy source. The Secretary failed to adequately explain why the DOE chose to favor Sable's oil project above all others.

88. The Order also fails to discuss the impact of another oil spill on California's economy.

89. The impacts of the 2015 oil spill—which caused hundreds of millions of dollars of damage to California's natural resources and economy—coupled with the ongoing safety issues, are another vital piece of the problems surrounding Sable's restart that were ignored in the Wright Order. Indeed, the Wright Order and the

---

[48] 50 U.S.C. § 4511(c).
[49] See ECF 23-1, pp. 1190-1216 (Attachs. 2 and 3).

associated findings documents that Defendants produced post hoc make no mention of the 2015 oil spill and its severe, adverse impacts on California.

90. The Wright Order also does not attempt to articulate why the Pipelines, in particular, are critical to the national defense. The Wright Order also does not allege that Sable is part of a national energy program or a national defense program. Nor does it state in the Order or the findings how much of Sable's oil would actually reach military end users. There is also no evidence of a fuel readiness gap provided by a credible military source that shows military fuel needs cannot be met without Sable's oil, as they have been for the last decade that the Pipelines have been shut down.

91. The United States already produces significantly more oil and gas than it uses. It is the world's largest exporter of liquified natural gas and exports millions of barrels a day of crude oil. It has been a net energy exporter since 2019, when President Trump declared the nation energy independent.[50]

92. The Wright Order fails to provide a rational basis that connects how ordering Sable to "require acceptance and prioritize performance" of "contracts" or "allocations" would promote the national defense.

93. Defendants fail to rationally explain why the restart of Sable's pipeline must be "immediate" and circumvent state and federal law, as well as existing court orders. Defendants failed to explain which specific state and federal laws were keeping Sable from restarting the pipeline, why those laws were doing so, why

---

[50] U.S. Energy Information Admin., In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023 (Apr. 1, 2024), available at https://www.eia.gov/todayinenergy/detail.php?id=61683. U.S. Energy Information Admin., U.S. Exports of Crude Oil (Jan. 31, 2025), available athttps://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a. U.S. Energy Information Admin., U.S. Energy Facts Explained (July 15, 2024), available at https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php.

displacing those laws was necessary for Sable to restart the pipeline to promote the national defense, and address the impacts of doing so. And by failing to address the 2015 oil spill and the failure of Sable's pipeline that caused it, Defendants have turned a blind eye to the whole reason the court orders were entered at all.

**V. The Wright Order Impermissibly Tries To Displace a Robust, Coordinated Apparatus of State Law and Attempts To Usurp State Agency Jurisdiction.**

94. In the three-page Wright Order, Secretary Wright gave Sable a convenient escape from compliance with state pipeline regulation and environmental, and land use laws that it, in multiple instances to date, has failed to comply with. This attempts to make inapplicable the comprehensive state regulatory framework governing the restart. Secretary Wright's use of the DPA to broadly authorize preemption of state law in the Wright Order is contrived, in direct conflict with the statute, and without lawful and reasoned explanation.

95. The California regulatory framework governing the restart vests authority in eight different state agency regulators, who play crucial and interrelated roles in regulating the Pipelines restart. The state scheme is critical for California's safety.

96. A variety of state laws apply to the restart. First, two California state laws and regulations govern pipeline safety and oil spill response.

97. The Elder California Pipeline Safety Act of 1981, Cal. Gov't Code § 51010 *et seq.*, applies to public safety, risk reduction, and spill prevention of hazardous liquid pipelines within California. OSFM implements the law. California Senate Bill 237, which took effect January 1, 2026, amended the Elder California Pipeline Safety Act to require spike hydrostatic testing for any oil pipeline that has been idle, inactive, or out of service for five years or more.

98. The Lempert-Keene-Seastrand Act of 1990, Cal. Gov't Code § 8574.1 *et seq.*, applies to oil spill prevention, preparedness and response. The Office of Spill Prevention and Response, within the California Department of Fish and Wildlife, implements the law.

99. Second, California state laws and regulations govern the restart's impacts to water quality.

100. The Porter-Cologne Water Quality Control Act of 1969, Cal. Wat. Code, § 13000 *et seq.*, applies to the discharge of waste, stormwater, and land disturbances that could occur during pipeline repair or construction. The California State and Regional Water Quality Control Boards implement the law.

101. Third, California state laws and regulations govern the restart's impacts to wildlife and habitats.

102. The California Endangered Species Act of 1984, Cal. Fish & Game Code, § 2050 *et seq.*, applies to the management and protection of listed species. And section 1602 of the California Fish and Game Code requires a lake or streambed alteration permit if the pipeline's onshore activities may substantially adversely impact fish and wildlife. The California Department of Fish and Wildlife implements these laws.

103. Fourth, California state laws and regulations govern activity and development in the coastal zone. The California Coastal Act of 1976, Cal. Pub. Res. Code § 30000 *et seq.*, regulates development in the "coastal zone."[51]

104. California Senate Bill 237 amended the California Coastal Act clarifying that the repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more and is located in the coastal zone, such as the Pipelines, requires a new coastal development permit governed by the requirements of California Public Resources Code section 30262. Cal. Pub. Res. Code § 30262(b)(2). The California Coastal Commission implements these laws.

105. Fifth, California state laws and regulations apply to certain oil and gas production facilities, including the Las Flores Canyon Processing Facility.

[51] Cal. Pub. Res. Code § 30103.

106. Sections 3106, 3224 and 3270 of the California Public Resources Code ensure that operators carry out oil and gas production, operation, and decommissioning of "production" facilities in a manner that prevents damage to the health and safety of California's citizens, or damage to the environment and natural resources. CalGEM implements these laws.

107. Furthermore, the Pipelines cross state land and are subject to state property law. The State's lands are administered and managed by several state agencies.

108. The California State Lands Commission issues and manages leases for existing oil and gas operations in State waters. The California State Lands Commission currently holds two of Sable's undersea pipelines leases, one for oil and one for natural gas, that together connect the Santa Ynez Unit offshore platforms to the Santa Ynez Pipeline System and onshore Las Flores Canyon Facilities and Onshore Pipelines.

109. State Parks may grant easements for oil or gas pipelines on property that it owns.[52] Because the onshore Pipelines cross approximately four miles of Gaviota State Park, which is owned by State Parks, Sable must obtain an easement from State Parks to run its oil across state land.

110. Sable does not currently have any easement rights or other property rights that allow it to transport oil through Gaviota State Park.

111. In 1987, State Parks granted an easement to Sable's predecessor-in-interest, Celeron Pipeline Company of California, to transport hydrocarbon substances through the segment of Line CA-325 (then Line 903) that crossed Gaviota State Park. This easement was for a term of 30 years. It began on July 28, 1986, and expired on July 27, 2016.

112. Since 2016, State Parks has issued annual Right of Entry (ROE) permits to Sable's predecessors-in-interest or companies affiliated with Sable that have

[52] Cal. Pub. Res. Code § 5012.

allowed them to access Gaviota State Park in order to perform maintenance on the then-dormant Line CA-325.

113. The ROE permits are not easements. Sable does not currently have any easement rights or other property rights that would allow it to transport oil through Gaviota State Park. The ROEs are necessary because Sable does not have an easement that would otherwise allow it to access the Park.

114. To the extent the Wright Order directs Sable to trespass on state land by operating without an easement, the Order infringes on state property rights and is unconstitutional.

115. In the days following Sable's March 14, 2026 restart announcement, State Parks, the State Lands Commission and the California Coastal Commission issued letters to Sable seeking confirmation from that company that it would adhere to state law obligations. State Parks received no responses to its letter.

116. Through these state agencies, the State of California carefully exercises its police powers to protect the public health and welfare as required by the Legislature of the State of California through its duly enacted laws. The DPA does not authorize the Secretary to issue an order that preempts California's laws.

## VI. Defendants Impermissibly Wield Executive Power To Abrogate Federal Law and Judicial Orders.

117. The Wright Order, if allowed to stand, purports to subvert a vast array of long-standing federal laws, a federal judicial Consent Decree, and at least one state preliminary injunction that put conditions on any restart of the Pipelines. The DPA contains no provision that allows it to direct Sable to circumvent federal law, the Consent Decree that arose from the devastating Refugio Oil Spill and pipeline safety problems from the Pipelines, or the state court's preliminary injunction. While actions to enforce the Consent Decree and preliminary injunction are pending in the courts that issued those orders—and thus the State does not ask this Court to enforce those orders itself against nonparty Sable—the Wright Order's

suggestion that it could upend those judicial orders is infirm and should be invalidated.

118. In addition to California's regulatory framework governing the safe and secure production of oil from Sable's Pipelines, there are several federal statutes that are not preempted by the DPA, such as the Pipeline Safety Act, the Submerged Lands Act, and the Coastal Zone Management Act.

119. Furthermore, the Consent Decree and preliminary injunction are judicial orders that Sable must comply with, and the Wright Order cannot modify or abridge them.

120. Sable has not met the conditions for restart. The DPA does not authorize the Secretary to use a Title I DPA Order to sidestep Judicial Orders and require Sable to restart "immediately" in violation of the Consent Decree and preliminary injunction.

**VII. Defendants' Actions Harm California.**

121. Without this Court's intervention, the Defendants' unlawful use of the Wright Order voids state laws and infringes on state property rights, resulting in harms to California.

122. Defendants' interpretation and use of the Wright Order is an affront to, and usurpation of, the traditional police powers delegated to the states, in that it seeks to override any and all California laws that stand in the way of the restart of the Pipelines. The Wright Order also tramples over California's property rights to the extent it purports to allow Sable to operate Line CA-325 through a state park without an easement—or the safety and environmental conditions the Department of Parks and Recreation previously imposed under a now-expired easement—and to operate the Offshore Pipeline through leases from the California State Lands Commission without abiding by lease terms, including those mandating compliance with all other state laws.

123. Without cathodic protection or the safe alternative required by the State Waivers, there is also increased risk of oil spills in the Pipelines.

124. Spills resulting from restarting the Pipelines under a handcuffed state regulatory framework would have serious environmental impacts across multiple categories, including water quality safety, coastal protection, and species protection.

125. Given the devastating impact of the Refugio Oil Spill and Sable's numerous pipeline safety violations, Sable's unlawful restart poses significant risks to California's economy, natural resources, and communities' health, safety, and welfare.

## CAUSES OF ACTION

### COUNT I

### Violations of Administrative Procedure Act, § 706(2)(A)-(C) Contrary to Law, In Excess of Statutory Authority

126. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

127. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

128. The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

129. An agency may not take any action that exceeds the scope of its statutory authority or violates federal law.

130. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . an abuse of discretion, or otherwise not accordance with law, [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) – (C).

131. Agency action is not in accordance with the law if the agency fails to interpret and implement the statutory language consistent with the statute's text, structure, and purpose. Defendants may only exercise authority conferred by statute. Agency action is also not in accordance with law if agency action is inconsistent with applicable federal regulations.

132. Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not amount to deference—rather, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109) (2015) (Scalia, J., concurring in judgment)).

133. The Wright Order is a final agency action that is reviewable under the APA. 5 U.S.C. § 551.

134. The President's involvement with the Wright Order began and ended with EO 14391, delegating Section 101(c) authority to the Secretary of Energy. The President neither issued nor directed DOE to issue the Wright Order. Secretary Wright exercised independent discretion to issue the Wright Order.

135. Defendants have no authority under the DPA to immunize Sable from compliance with state and federal laws and Court Orders, including the Consent Decree and preliminary injunction. There is no express nor implied authority in the DPA to preempt all relevant state and federal laws governing the restart. If allowed to stand, this illegal assertion of authority to displace a broad regulatory framework

could have wide-ranging applications and extend beyond judicially enforceable limits.

136. In addition, to the extent the Wright Order purports to preempt Plaintiff's right to own, manage, and dispose of its own land in Gaviota State Park, Defendants have no authority for such preemption absent a clear congressional judgment. *See, e.g.*, *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993). Defendants unlawfully claim power beyond what Congress intended when it enacted the DPA.

137. The Wright Order is not valid because it is contrary to the requirements for contract prioritizations and allocation orders codified in the statute and regulations, which specifically apply to government contracts and government contractors, conditions that are not applicable here.

138. The Wright Order is contrary to Title I's required specificity in description of contract prioritizations and allocations. The Wright Order lacks specificity as to any Title I contracts, orders, or allocations that Sable must enter into. The Wright Order fails to state where, or to whom, Sable will sell its crude from the Pipelines.

139. The Wright Order does not meet the regulatory requirements of an allocation order because it continues in perpetuity, without a start and end date, fails to include a detailed description of the required allocation actions, and does not comply with other details required by title 10 of the Code of Federal Regulations, section 217.

140. Even if the Wright Order otherwise complied with the DPA, it would not have the sweeping preemptive scope that Defendants claim. Nothing in the DPA purports to preempt all state laws and regulations that affect or apply to contracts governed by the DPA.

141. Pursuant to title 5 of the United States Code, section 706, and title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that Defendants lack legal authority under the DPA and its implementing regulations in issuing the Wright Order, and, in so doing, acted contrary to law and in violation of the APA.

142. Plaintiff is also entitled to vacatur of the Wright Order pursuant to title 5 of the United States Code, section 706.

**COUNT II**

**Violation of Administrative Procedure Act 5 U.S.C. § 706(2)(A) Arbitrary and Capricious**

143. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

144. Defendants are included as "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Wright Order is agency action subject to review under the APA.

145. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

146. Agency action is arbitrary and capricious if the agency fails to consider important factors, considers issues that Congress did not intend for it to consider, or fails to articulate a reasoned explanation for the action.

147. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

148. An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs*., 463 U.S. at 43).

149. An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. at 785. Agency action taken on pretextual grounds violates the APA's requirements of reasoned agency-decision-making.

150. The Wright Order and its supporting documents, including the findings required under Section 101(a), (b) and (c), fail to provide a rational basis explaining how ordering Sable to "require acceptance and prioritize performance" of "contracts" or "allocations" would promote the national defense or maximize domestic energy supplies.

151. The Defendants provide no reasoned basis and fail to explain why and how the restart of oil production and transportation from the Santa Ynez Unit through the Offshore and Lines CA-324/325 is necessary to "promote the national defense" as defined in the DPA. Accordingly, Defendants' national defense determination is arbitrary and capricious.

152. The Defendants failed to consider important aspects of the problem, including but not limited to the past failure of Sable's pipeline that caused the 2015 oil spill and the resulting impacts on California, the fact that immediately restarting transportation of crude oil through the Pipelines would violate state and federal law and Court Orders, and the significant risk that restarting the pipeline poses to California's economy, natural resources, and communities' health, safety, and welfare, thereby rendering the order arbitrary and capricious.

153. Further, the Wright Order contains no reasoning as to the impact it would have, if allowed to stand, on California's state regulatory framework.

154. Pursuant to title 5 of the United States Code, section 706, and title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that the Wright Order violates the APA because it is arbitrary and capricious.

155. Plaintiff is also entitled to vacatur of the Wright Order pursuant to title 5 of the United States Code, section 706.

**COUNT III**

**Violation of the U.S. Constitution**
**Separation of Powers**

156. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

157. Article III, Section 1 of the United States Constitution vests the judicial Power of the United States in federal courts. U.S. Const., art. III, § 1.

158. It is the constitutional role of the judiciary to control, by Article III judges, the interpretation, declaration, and application of federal law. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co*., 458 U.S. 50, 76-81 (1982).

159. The Constitution identifies specific roles for the Executive in the lawmaking process, via the Recommendation Clause and the Presentment Clause, which creates the President's veto power; outside these roles, the Executive Branch has no authority to change the law to suit the President's policy. U.S. Const., art. II, § 3; *id*. § 7, cl. 2; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

160. Congress cannot vest review of Article III court decisions in Executive Branch officials, and, by extension, the legislative and Executive Branches cannot unilaterally override judicial determinations. Separation of powers principles protect judicial independence by ensuring that once a court renders a decision, it cannot be subject to Executive revision or nullification. Congress also possesses the

power to legislate. Article I, Section 1 of the U.S. Constitution states "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const., art. I, § 1.

161. The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

162. With the Wright Order, Defendants attempt to usurp the judiciary's authority to modify or reverse judicial judgments in direct violation of the separation of powers. The Executive Branch's attempt to overrule the careful judgements of the Judicial branch by ordering Sable to restart is in direct contravention of the Consent Decree and the preliminary injunction, both judicial orders. Because the Consent Decree is an exercise of this court's Article III power, only an Article III court can modify or retract it.

163. Defendants violated constitutional separation of powers constraints because, through the Wright Order, Defendants claim to have overridden Congress's considered judgments by attempting to broadly preempt state law, when the text of the DPA does not empower Defendants to do so.

164. Further, Defendants impermissibly attempt to substitute the President's policy priorities for the will of Congress in enacting the DPA.

165. Plaintiff is aggrieved persons suffering a legal wrong or adversely affected by Defendants' conduct under title 5 of the United States Code, section 702.

166. Pursuant to title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that the Wright Order violates the constitutional principles of separation of powers doctrine and impermissibly arrogates to the Executive Branch power that is reserved to the Judicial branch.

## COUNT IV

### Violation of the Tenth Amendment to the U.S. Constitution Sovereign Interests

167. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

168. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const., amend. X.

169. Each state as a sovereign has reserved power to own, manage, and dispose of its property, including state parkland.

170. To the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Order infringes upon California's sovereign power to own, manage, and dispose of its property.

171. Defendants have no authority under the DPA to infringe upon or preempt California's sovereign power to own, manage, and dispose of its property. A state's power to own, manage, and dispose of its property is not subject to preemption absent a clear congressional judgment. *See, e.g., Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993); *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017).

172. And the federal government has no constitutional power to commandeer state property for federal ends in violation of the Tenth Amendment, including by compelling the state to give a private company free use of that property in potential violation of the State's own constitutional prohibition on gifting public funds or things of value to private parties (Cal. Const., art. XVI, § 6).

173. If Congress intends to override a state's right to own, manage, and dispose of its own property, it must speak clearly as to such intention, which it has not done in the DPA.

174. Plaintiff is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under title 5 of the United States Code, section 702.

175. Pursuant to title 28 of the United States Code, section 2201, Plaintiff is entitled to a declaration that, to the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Wright Order violates the Tenth Amendment to the U.S. Constitution.

**COUNT V**

***Ultra Vires* – Conduct in Excess of Statutory Authority**

176. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

177. Neither the President nor an agency can take any action that exceeds their constitutional or statutory authority.

178. Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

179. By using the Wright Order to broadly authorize Sable to disregard state and federal law, as well as orders issued by the state and federal courts, Defendants have acted contrary to law and outside the authority granted to them under the DPA. *See Murphy Company v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023).

180. Because Defendants have acted in excess of their delegated powers under the DPA, Plaintiff is entitled to a declaration under title 28 of the United States Code, section 2201, that Defendants' actions are ultra vires and that Defendants' use of the Wright Order to broadly preempt California law is not authorized under the DPA.

181. Plaintiff is also entitled to an injunction prohibiting Defendants, and all those acting in concert with Defendants, from enforcing or relying on the Wright Order in a manner that violates California law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

1. Issue a judicial declaration that the Wright Order is unconstitutional and/or unlawful because it violates the APA and the U.S. Constitution;
2. Issue a judicial declaration that Defendants' actions are ultra vires;
3. Vacate the Wright Order pursuant to title 5 of the United States Code, section 706;
4. Enjoin Defendants from invoking the Wright Order to authorize or compel operation of Lines CA-324/325, and from allowing anyone operating as Defendants' agents or working in concert with them to rely on or invoke the Wright Order to operate the Santa Ynez Unit and the Pipelines without having received necessary state-law approvals and without satisfying the terms of court orders;
5. Grant other such relief as this Court may deem proper.

Dated: July 20, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN, JR.
Supervising Deputy Attorney General
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
Deputy Attorney General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFFS' JOINT REPLY TO DEFENDANTS' AND INTERVENORS' JOINT POST-HEARING BRIEF FILED PURSUANT TO INSTRUCTION AT JUNE 8, 2026 HEARING**

Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

## INTRODUCTION

In their post-hearing brief, as in their earlier briefing, the U.S. and Sable advance a theory of the Defense Production Act (DPA) that exceeds the bounds of the Act, departs from decades of precedent, and shifts the balance of power between the state and federal governments as well as between the executive and judicial branches. California urges the Court to reject this theory by granting the requested preliminary injunction and enforcing its Consent Decree.

## ARGUMENT

### I. THE PRELIMINARY INJUNCTION IN *WRIGHT* SHOULD BE GRANTED.

#### A. Without the Injunction, California Will Continue To Suffer Irreparable Harm as a Result of the Wright Order.

The U.S. and Sable admit that the Wright Order displaces California's sovereign authority. *Wright* ECF 23 at 14-15; ECF 24-4 at 18-19.[1] This displacement of state law constitutes irreparable harm, and the U.S. and Sable do not cite any authority that suggests otherwise. The U.S. and Sable also repeat their argument that California's harm is speculative because "California [] has not identified what law the Order prevents [California] from enforcing." *Wright* ECF 63 at 2. But they have already identified that the Wright Order effectively prevents California from enforcing Senate Bill 237, which updated the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act of 1990, the Elder California Pipeline Safety Act of 1981, and the California Coastal Act of 1976, among other laws; waivers from the California Office of State Fire Marshal (OSFM); California Department of Parks and Recreation's (State Parks) rights and obligations as a landowner of Gaviota State Park; and requirements of the Consent Decree.[2] *See*

[1] Because this brief is filed in two cases, we refer to record documents by case short name (*Wright* or *Plains*) followed by ECF number and pincite.

[2] The U.S. and Sable's recognition that the Wright Order displaces state law also undermines their repeated claim that the Pipeline and Hazardous Materials Safety Administration's (PHMSA) 2025 determination that Lines CA-324/325 are

(continued…)

*Wright* ECF 23-1, Attach. 1 at 2; *see also id.*, Attach. 2 at 10, & Attach. 3 at 12 n.53. And California has also identified specific examples of state law that the Wright Order seeks to displace, including additional provisions of the Elder California Pipeline Safety Act and the Coastal Act. *See Wright* ECF 62 at 12-13.

The State's basis for irreparable harm in *Wright* is distinct from that in *State Parks*; thus, the Court's decision in *State Parks* does not preclude preliminary injunctive relief here. *See id.* at 13 (identifying in *Wright*, among other things, sovereign constitutional injury by the federal government, which is distinct from the injury caused by Sable in *State Parks*). Lastly, the U.S. and Sable repeat Sable's claim that federal preemption itself does not constitute irreparable harm. *See Wright* ECF 24 at 18; ECF 63 at 3 n.3. However, the case they cite did not find irreparable harm from federal preemption, because the federal government there acted within the scope of its express statutory authority. *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1287 (11th Cir. 2021). Here, in contrast, the Wright Order exceeds the Department of Energy's (DOE) authority under the DPA (*see infra* I.C.3.), and thus its preemption of state law irreparably harms California.

**B. Equitable Factors Weigh in Favor of the Preliminary Injunction.**

U.S. and Sable's sole argument on the "public interest and equities" is that "no governmental interest is more compelling than the security of the Nation." *Wright* ECF 63 at 2-3. But the Executive's assertion of a national security interest cannot be a blank check to act in violation of a statute and the constitution. *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) (citation omitted) ("National-security concerns must not become a talisman used to ward off inconvenient claims."). This Court may defer to DOE's representation of national security interest while avoiding

---

interstate, and not the Wright Order, displaced California's authority to regulate the pipelines' safety. *Wright* ECF 63 at 2. Regardless, the effect of the federal Pipeline Safety Act is separate from that of the Wright Order and does not impact California's ability to seek an injunction against the Wright Order.

using deference to create a judicial exemption from Congressional laws. *See Nat. Res. Def. Council v. Winter*, 527 F. Supp. 2d 1216, 1237 (C.D. Cal. 2008) ("Deference therefore does not mean a court must abjure judicial review whenever a party raises the specter of national security."). The U.S. and Sable "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). And there "is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### C. California Is Likely To Succeed on the Merits.

#### 1. The Wright Order Is a Reviewable Agency Action.

U.S. and Sable argue that the Wright Order is unreviewable because it was issued following a presidential delegation (*see Wright* ECF 63 at 4), but agency actions taken pursuant to presidential delegations of authority are reviewable. *See, e.g.*, *Protect Our Communities Fdn. v. Chu*, 2014 WL 1289444 at *6 (S.D. Cal. Mar. 27, 2014) (DOE's issuance of transmission facilities permits pursuant to delegated presidential authority was a reviewable agency action); *Indigenous Env't Network v. U.S. Dep't of State*, 2017 WL 5632435 at *4 (D. Mont. Nov. 22, 2017) (State Department's issuance of a pipeline permit pursuant to delegated presidential authority was reviewable agency action). U.S. and Sable's reliance on *Jensen v. National Marine Fisheries Services*, 512 F.2d 1189 (9th Cir. 1975), is unavailing. *See Wright* ECF 63 at 4. The relevant "agency" in *Jensen* was a commission created under a binational treaty. *See* 512 F.2d at 1191 (reasoning that "presidential action in the field of foreign affairs" presents non-justiciable political questions). DOE, in contrast, is subject to the standard rules of administrative procedure and the Wright Order has solely domestic economic implications. An agency cannot avoid judicial review simply by invoking its consideration of "foreign policy" or "security"

factors. *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (citation omitted) ("it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance").

**2. The Wright Order Is Not Valid.**

The Wright Order is not a valid prioritization and allocations order under the DPA. *See* 50 U.S.C. § 4511(a), (c). The pipelines were shut down so there were no contracts to "prioritize" under Section 101(a). Section 101(a) makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts necessary to promote the national defense." *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), aff'd on other grounds, 516 U.S. 417 (1996). In contrast to the Wright Order, past DPA prioritization orders required companies to prioritize supply orders to ensure that federal contracts addressing an emergency or national defense were fulfilled first. *Id*. Past energy uses of the DPA include: prioritizing natural gas supply contracts to California utilities; funding domestic manufacture of solar, batteries, and heat pumps; and funding the domestic manufacture of critical minerals—all via Title I allocations and priorities for producing energy companies with contracts guaranteeing domestic supply, or funding though Title III loans.[3] When a company is not operating and has *no* contracts to shuffle and prioritize, the use of the DPA's prioritization and allocations authority order is nonsensical. The U.S. and Sable can cite to no other prior DPA order or legal authority that supports this novel use of the DPA. Moreover, none of these prior DPA orders involved broad preemption of state law or violation of court orders.

Nor is the Wright Order a valid allocation order. The U.S. and Sable claim the Wright Order orders the allocation of oil from an offshore oil field to meet national

---

[3] 87 Fed. Reg. 19775 (April 6, 2022); *The California Energy Crisis and Use of the Defense Production Act, Hearing Before the S. Com. on Banking, Hous., & Urb. Affs.*, 107th Cong. 215 at 62-63 (2001) (PG&E DPA Order); 90 Fed. Reg. 13673, (March 20, 2025).

security needs. *Wright* ECF 63 at 6. This mischaracterizes the Wright Order and the DPA. The U.S. is using the Wright Order to *begin* new production from a dormant pipeline—not to allocate or "*diver[t]* … materials and facilities from ordinary use to national defense purposes." 50 U.S.C. § 4502(a)(3)(D) (emphasis added). The DOE's use of the Wright Order unlawfully expands the DPA's allocation power by compelling the start of energy production.

The U.S. and Sable's reliance on *Johnson v. Tyson Foods Inc*., 580 F. Supp. 3d 382, 388-89 (N.D. Tex. 2022), is misplaced because *Johnson* does not address what constitutes a valid allocation order under the DPA. *See Wright* ECF 63 at 6. Indeed, there was no DPA Order at all in *Johnson:* Instead, the President issued Executive Order 13917 during Covid-19 and made a determination under DPA Section 101(b) that it was important for existing meat suppliers to "*continue* operating and fulfilling orders to ensure a *continued* supply of protein for Americans" during a global health epidemic. 85 Fed. Reg. 26313 (May 1, 2020) (emphasis added). Similarly, the DPA was previously used to ensure the *continued* supply of natural gas contracts to avoid a supply disruption in California. *See* PG&E DPA Order. The Wright Order, however, does not continue the status quo; it upends it by compelling new energy production.

**3. The DPA Does Not Authorize the Broad Preemption Claimed Here.**

The U.S. maintains that the Order "direct[s]" Sable to "immediately operate the pipeline" and "preempts any California law that conflicts with [that] directive[]." *Wright* ECF 23 at 15. Thus, contrary to the U.S. and Sable's assertions otherwise, whether the DPA authorizes broad preemption of state laws is directly at issue. *See Cohen v. Apple Inc*., 46 F.4th 1012, 1027-29 (9th Cir. 2022) ("for a federal law to have preemptive force, it must fall within the scope of the [federal

agency's] delegated authority, . . . it must be "statutorily authorized") (citations and internal quotation marks omitted).[4]

U.S. and Sable's claim of preemptive authority fails. Their interpretation rests entirely on conflict preemption principles, asserting that following state law would "'frustrate [Congress's] purposes" making it "'impossible to comply with both state and federal requirements[.]'" *Wright* ECF 63 at 8. But the purpose of Section 101(a) is to require contractors to prioritize defense consumption over non-defense consumption, notwithstanding existing private contracts. *Wright* ECF 16-2 at 8-9, 13-15. California's enforcement of state laws here does not interfere with the goal of prioritizing some contracts over others. Further, construing the DPA to give the Executive Branch broad preemptive power constitutes a major change in state-federal relations without a clear statement of intent from Congress. *See Bond v. United States*, 572 U.S. 844, 858 (2014). The DPA contains no such statement, and such a conclusion requires adopting a novel interpretation of the DPA, contrary to two federal circuits. *Hercules*, 24 F.3d at 204; *Vertac*, 46 F.3d at 812.

Finally, the U.S. interprets the DPA in a manner that runs afoul of separation of powers principles and the anti-commandeering doctrine. *Wright* ECF 63 at 11-12. Its interpretation of the Wright Order as automatically displacing this Court's Consent Decree (as opposed to first seeking modification) encroaches on the Judicial Branch's power. It is for this Court to say if its judicial order need not be followed. *See generally Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995). Likewise, the U.S. interprets the Wright Order to require that California essentially dedicate state-owned property to Sable's immediate restart of the pipelines. The Wright Order thereby commandeers state government in the same way as if the federal government made California the owner of Sable's undesirable

[4] U.S. and Sable claim that California is inconsistently arguing that the Wright Order cannot preempt California law under the DPA while stating that its actual terms do not support the preemptive effect that U.S. and Sable claim. But those views are entirely consistent.

assets without California's consent. *Cf. New York v. United States*, 505 U.S. 144, 176 (1992) (invalidating federal statute that offered States choice between accepting nuclear waste and regulating according to federal instructions).

**4. The Wright Order Fails To Comply with DOE Regulations.**

The U.S. asks the Court to excuse its failure to provide an end date by deeming it harmless error. *Wright* ECF 63 at 7. But the requirement that allocation orders include a specific "calendar end date" limits the federal government's power and protects those whose rights are adversely affected by the order. 10 C.F.R. § 217.54. This is consistent with prior DPA energy orders, such as an order under Section 101 securing the continuous supply of natural gas from January 19, 2001, to January 24, 2001. *See* PG&E DPA Order. Yet even this limited order was such an extraordinary use of the DPA that Congress conducted a hearing to review the executive's potential misuse of the DPA's authority to address an energy crisis. PG&E DPA Order at 1-2. Here, the U.S. asserts that the DPA allows for broad preemption of state law for an unlimited time in direct contravention of DOE's regulations. This is not "harmless error."

## II. THE CONSENT DECREE SHOULD BE ENFORCED.

### A. The Consent Decree Binds the U.S. and Sable.

Sable is bound by the Consent Decree because it knowingly entered privity with Plains pursuant to the Court Order. Based on the principles established in *Golden State Bottling Co., v. NLRB*, 414 U.S. 168, 176 (1973), Sable must comply with the Consent Decree's injunction under FRCP 65 and Paragraph 4 of the Consent Decree. *Plains* ECF 6-1 at ¶ 4 ("the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree"). A consent decree is enforceable against a "bona fide purchaser" with knowledge of the obligations, thereby being in privity for purposes of Rule 65(d). *Golden State Bottling Co.*, 414 U.S. at 180. Sable acquired Lines CA-324/325 to

achieve the same purpose, using the same equipment, and with full knowledge of the Consent Decree's requirements as set out in the Assumption Agreement.

The safety provisions of the Consent Decree are enforceable against Sable even as a non-party under Rules 65(d) and 71. Enforcement against nonparties "is the whole point of the successorship doctrine." *See Bates v. Pacific Maritime Ass'n*, 744 F.2d 705, 709. By entering into the assumption agreement required by the Consent Decree, Sable assured it would comply. *Plains* ECF 55-1, RJ N Exh. E. The U.S. and Sable wrongly contend that paragraph 88 of the Consent Decree limits the scope of Sable's obligations. Paragraph 4 expressly binds Sable as an "Assign" or a "Person Otherwise Bound By Law" to the Consent Decree's obligations. Paragraphs 88 through 91 set forth the obligations specifically applicable to the pipelines. *Plains* ECF 6-1 at 49-50. Paragraph 4 addresses *who* is bound, and Paragraph 88 addresses *what* obligations bind a buyer of Lines CA-324/325. These provisions run with the pipeline and rule out Sable's argument that enforcement is not available against an entity that "simply purchased assets." *Plains* ECF 78 at 10; ECF 6-1 at 49:8-24.[5]

**B. Sable Cannot Claim Substantial Compliance.**

Sable defied two agency orders by restarting Lines CA-324/325 in violation of the provisions of both the State Waiver and Federal Special Permit which the U.S. and Sable concede include "all forward-looking Consent Decree safety provisions." *Plains* ECF 61 at 29. Sable refused to complete remediation requirements imposed by the OSFM and ignored jurisdictional provisions that afford California final approval and implementation of the Restart Plan.[6]

---

[5] Termination of the Consent Decree may only occur once both temporal and compliance conditions are satisfied, not one of the other. *Plains* ECF 62 at 4; ECF 6-1 at 55, ¶ 100. Sable does not comply.

[6] The U.S. and Sable assert that California's motion to enforce the Consent Decree fails if the Court determines that California lacks the irreparable harm necessary for a new preliminary injunction. *Wright* ECF 63 at 2. But the immediacy requirement for preliminary relief is inapplicable here because there is no future trial date after which the court would revisit the question of relief.

Sable seeks to cut corners of the Consent Decree by alleging "substantial compliance." But Consent Decree Appendices B and D specifically itemize what Sable must do—notably to obtain approval from OSFM prior to restart. It does not allow for "substantial compliance." Even if it did, Sable has not substantially complied. Substantial compliance is limited to "unintentional and so minor or trivial" deviations that do not impact the object of the contract. *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964). Importantly, Sable has not obtained OSFM's approval to restart Lines CA 324/325, and the U.S.'s statements otherwise are false. *Plains* ECF 45-1 at 4-5. Sable's failures are neither minor nor trivial. Sable has not "complied with *each of the decree's terms* for a substantial period before terminating the decree." *Rouser v. White*, 825 F.3d 1076, 1082 (9th Cir. 2016) (*emphasis added*). No authority supports the position that a party may rely on Federal approval to avoid the explicit terms of the Consent Decree requiring state approval. *Flores v. Bondi*, 803 F. Supp. 3d 1018, 1031-32 (C.D. Cal. 2025). There is no reason to deviate from the specific directives of the Court's order.

### C. The U.S. and Sable Fail to Justify Modifying the Consent Decree.

The U.S. and Sable assert that the DPA order and PHMSA's assumption of jurisdiction are changed circumstances requiring modification of the Consent Decree.[7] Thus, to satisfy their burden to identify changed factual circumstances, they rely on the Executive's own orders—a position foreclosed by Ninth Circuit precedent. *Flores v. Rosen* 984 F.3d 720, 741 (9th Cir. 2020); *Nehmer v. VA* 494 F.3d 846, 860 (9th Cir. 2007). In addition, their reliance on the Wright Order is foreclosed given that order's numerous shortcomings and its lack of any legal preemptive effect. *Plains* ECF 77 at 4.

---

[7] Given evidence that PHMSA did not consider the rationale it offers in its Answering Brief, the Ninth Circuit in *California v. PHMSA* may remand to the agency without reaching the *intra*state versus *inter*state question. Case No. 26-508, ECF 93.1 at 20-22.

U.S. and Sable's reliance on PHMSA's position is similarly flawed.[8] The PSA defines interstate and intrastate pipelines. 49 U.S.C. § 60101(a)(8)(B), (10). It does not delegate, to PHMSA or to any other agency, any discretion to make that determination. *Id.*; *see Wyeth v. Levine*, 555 U.S. 555, 576 & n.9 (2009) (comparing absence of delegation in that case with examples of statutes with delegations to grant and waive preemption). The relevant "pipeline facility" are Lines CA-324/325, which are intrastate pipelines because they run from Las Flores Canyon, California, to Pentland, California, and, under the PSA, intrastate status is determined by the *location* of the pipeline. 49 U.S.C. § 60101(a)(8)(B), (10); *Southern Pacific Pipe Lines Inc. v. U.S. Dep't of Transp.*, 796 F.2d 539, 542 (D.C. Cir. 1986). PHMSA's rationale for *inter*state status, stated in its December 17, 2025 Federalization Order, is Sable's unified ownership and operation, which argues that the onshore pipelines, Lines CA-324/325, the processing facility at Las Flores Canyon, and the undersea pipeline are one pipeline facility. This approximates the argument made by Southern Pacific, which the D.C. Circuit rejected. *Id*. The U.S. and Sable do not mention *Southern Pacific*—in any of the four briefs in *Plains*, two briefs at the Ninth Circuit in *California v. PHMSA*, or their joint supplemental brief—let alone explain why this Court should not follow it.[9]

## CONCLUSION

The Court should: (1) preliminarily enjoin DOE from enforcing the Wright Order, (2) grant California's motion to enforce the Consent Decree, and (3) deny the U.S.'s motion to modify or terminate the Consent Decree.

---

[8] The U.S. and PHMSA incorrectly state that the Ninth Circuit "declined to stay" PHMSA's order asserting jurisdiction over CA-324/325. *Plains* ECF 78 at 2. The Ninth Circuit issued an order denying a stay of two subsequent orders, challenged by environmental nonprofits in a related case and the petitioners did not seek a stay of the December 17, 2025 Federalization Order.

[9] The U.S. and Sable now suggest that pipelines CA-324/325 were *intra*state when inactive but became *inter*state when reactivated. *Plains* ECF 71 at 48; ECF 78 at 12:3-6. But there is no basis in the text of the PSA to treat a pipeline as *intra*state when turned off but *inter*state when turned on.

Dated: June 25, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY M. BROWN
Supervising Deputy Attorney General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*

KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 10 pages in length, which complies with the page limit set by the Court.

Dated: June 25, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*/s/ Kavita Lesser*
KAVITA LESSER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
JUSTIN D. HEMINGER
RILEY W. WALTERS (DC Bar No. 90008638)
Email: Riley.Walters@usdoj.gov
Counsel
STEFAN J. BACHMAN (DC Bar No. 90008649)
Email: Stefan.Bachman@usdoj.gov
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 598-9566

*Attorneys for the United States of America*

*[Additional Counsel for Sable and Plains Listed Below]*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA, et al.,

Plaintiff,

v.

PLAINS ALL AMERICAN PIPELINE, L.P. *et al.,*

Defendants.

Case Nos. 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC

**JOINT POST-HEARING REPLY BRIEF FROM THE UNITED STATES OF AMERICA, SABLE OFFSHORE CORP. AND PACIFIC PIPELINE CO., AND PLAINS ALL AMERICAN PIPELINE, L.P. AND PLAINS PIPELINE, L.P.**

Judge: Honorable Stephen V. Wilson

STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
800 17th Street N.W., Suite 110
Washington, D.C. 20006
Telephone: +1 202.469.5525

*Attorneys for Sable Offshore Corp. and Pacific Pipeline Company*

DANIEL B. LEVIN (State Bar No. 226044)
daniel.levin@mto.com
COLIN A. DEVINE (State Bar No. 315801)
colin.devine@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426

*Attorneys for Plains All American Pipeline L.P. and Plains Pipeline L.P.*

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. The Court Should Deny California's Motion for a Preliminary Injunction and Stay in *Wright*. ..... 2

A. California has failed to show that it is likely to suffer imminent irreparable harm absent preliminary relief. ..... 2

B. California has failed to show that it is likely to succeed on the merits. ..... 3

II. The Court Should Terminate or Modify the Consent Decree and Deny California's Motion to Enforce in *Plains*. ..... 7

A. The Court should terminate the Consent Decree. ..... 7

B. Sable did not "defy" the Consent Decree. ..... 7

C. Alternatively, the Court should modify the Consent Decree. ..... 8

D. Regardless, California's Motion to Enforce should be denied. ..... 10

CONCLUSION ..... 10

## TABLE OF AUTHORITIES

**Cases**

*Am. Semiconductor, Inc. v. Cal. Assignments LLC*, 2013 WL 5937968 (N.D. Cal. Oct. 30, 2013) ....10
*Cohen v. Apple Inc.*, 46 F.4th 1012 (9th Cir. 2022) ....6
*Cruz v. Bondi*, 146 F.4th 730 (9th Cir. 2025) ....8
*Ctr. for Biological Diversity v. Burgum*, 2025 WL 821660 (D. Mont. Feb. 21, 2025) ....10
*Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016) ....4
*FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542 (2025) ....5
*Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) ....5, 9
*Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021) ....3
*Harmon v. San Diego Cnty.*, 477 F. Supp. 1084 (S.D. Cal. 1979) ....10
*Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189 (9th Cir. 1975) ....4
*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022) ....5, 6
*Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115 (9th Cir. 2009) ....7
*McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146 (2025) ....9
*MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106 (9th Cir. 2020) ....7
*Murphy v. NCAA*, 584 U.S. 453 (2018) ....6
*Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) ....6
*New York v. United States*, 505 U.S. 144 (1992) ....5
*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) ....8

*Sierra Club v. North Dakota*,
868 F.3d 1062 (9th Cir. 2017) ....................10
*Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*,
558 U.S. 67 (2009)....................9
*United States v. Asarco Inc.*,
430 F.3d 972 (9th Cir. 2005) ....................7, 9
*Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Tr. Co.*,
379 U.S. 411 (1965)....................9

**Statutes**

5 U.S.C. § 706....................5
49 U.S.C. § 60104(c) ....................8, 9
49 U.S.C. § 60119(a)(1)....................9
50 U.S.C. § 4511(a) ....................4
50 U.S.C. § 4552(16) ....................4
50 U.S.C. § 4557....................6

**Rules**

FRCP 60(b) ....................8, 10

## INTRODUCTION

According to California, the Court must wade into thorny issues like the hypothetical preemption of state laws or jurisdictional questions already being addressed in other cases. In fact, resolution of these motions is straightforward:

**<u>California's Motion for a Preliminary Injunction and Stay in *Wright*</u>**

- California's motion should be summarily denied for lack of irreparable harm—as this Court and the Ninth Circuit have now found three times.
- If the Court examines the merits, the DPA Order is not reviewable under the APA. Even if it were, it is valid and lawful.
    - The DPA Order's preemptive effect is not at issue and can be examined as applied in other cases.
    - If the Court reaches the scope of preemption, the DPA Order preempts conflicting state law under standard preemption principles.

**<u>United States' Motion to Terminate or Modify the Consent Decree in *Plains*</u>**

- The Consent Decree should be terminated because, by its plain language, Plains has met the requirement by complying for five years and three months.
    - Even if Sable's conduct were relevant, the Consent Decree should still be terminated because Sable has substantially complied.
- If the Court does not terminate the Consent Decree in its entirety, it should modify it to substitute PHMSA as regulator and terminate as to Plains.
- To grant the United States' motion, the Court need not (and cannot) decide the legality of (1) the DPA Order or (2) PHMSA's recognition of jurisdiction.

**<u>California's Motion to Enforce the Consent Decree in *Plains*</u>**

- The Court need not reach this motion if it terminates or modifies the Consent Decree because either action will eliminate California's enforcement role.
- Additionally, the motion should be denied for these independent reasons:
    1. Consent decrees are not enforceable against third parties like Sable; Sable is not a legal successor; and the Assumption Agreement created private

contractual rights and obligations, not judicial rights and obligations.

2. There are changed circumstances: PHMSA regulates now, not California.
3. The DPA Order makes it impossible for Sable to comply with both federal and state directives. The Consent Decree must yield to the DPA Order.
4. Sable has substantially complied with California's view of the Decree's requirements by conducting repairs and operating the Pipeline safely.
5. The Consent Decree's own dispute resolution terms, not contempt motions, govern compliance disputes.

- To deny California's motion, the Court need not (and cannot) decide the legality of (1) the DPA Order or (2) PHMSA's recognition of jurisdiction; by contrast, granting the motion would effectively invalidate both federal actions.

## ARGUMENT

### I. The Court Should Deny California's Motion for a Preliminary Injunction and Stay in *Wright*.

#### A. <u>California has failed to show that it is likely to suffer imminent irreparable harm absent preliminary relief.</u>

In its post-hearing brief, California hangs its hat on two theories of irreparable harm: the alleged "inability to enforce its laws" and the "risk of harm to public health and safety and the environment." *Wright* ECF 62 at 18–19 & n.8. Both theories fail, and the Court can deny California's Motion on that basis alone. *See State Parks* ECF 60 ("*State Parks* Order") at 7.[1]

California's own actions refute its first theory. Unlike in the cases it cites, no state law has been enjoined here—much less *improperly* enjoined—as demonstrated by California's ongoing enforcement efforts. Indeed, the State is arguing in those

---

[1] Insofar as California alleges a violation of its "constitutional rights" apart from its alleged inability to enforce its laws, California neither has "constitutional rights" nor identifies what constitutional rights have been violated.

actions that the DPA Order leaves state law perfectly intact—the opposite of what it argues here on irreparable harm. *See, e.g.*, *State Parks* ECF 23; *Plains* ECF 55; Letter re Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings, https://perma.cc/HMH4-2MCV (June 9, 2026). Under California's theory, it would not suffer irreparable harm until a court *holds* that the DPA Order preempts a particular state law. But critically, even then, any such future holding would not cause irreparable harm because preemption is not an invasion of state sovereignty—it is a consequence of federal supremacy. U.S. Const. art. VI, cl. 2; *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1292 (11th Cir. 2021).

California's eleventh-hour attempt to identify laws whose enforcement the DPA Order "stands to inhibit" changes nothing. *Wright* ECF 62 at 18. For one, California forfeited reliance on these laws. *See generally Wright* ECF 16-2 (no mention of the Elder California Pipeline Safety Act, Senate Bill 237, or the California Coastal Act); *Wright* ECF 27 (same); *Wright* ECF 32 (same). For another, California's bare claim that the DPA Order "stands to inhibit" these laws—without explaining *what* the laws do or *how* the DPA Order affects them—is just as speculative as the State's prior hypothetical preemption scenarios. *See Wright* ECF 63 at 8. In fact, when the Secretary of Energy issued the DPA Order, the federal Pipeline Safety Act had already displaced California's authority to regulate pipeline safety under the Elder California Pipeline Safety Act. *Id*.

As for its second theory, California has introduced no evidence that the Pipeline is likely to cause harm during this litigation—it simply speculates, just like it did in the *State Parks* case. *See State Parks* Order at 6. The United States, by contrast, introduced unrebutted evidence that the Pipeline is safe. *See Wright* ECF 23 at 30–31 (citing Hubbard Decl., ECF 23-2).

**B. <u>California has failed to show that it is likely to succeed on the merits.</u>**

California is unlikely to succeed on the merits because (1) its arguments are unreviewable under the APA, and (2) the Order complies with the DPA, Department

of Energy regulations, and the Constitution. Preemption is not at issue in this case, but California's arguments fail anyway.

***Reviewability.*** When, as here, the President delegates *his* statutory or constitutional authority to an agency head, and the agency head then acts solely under *that* authority, there is presidential action unreviewable under the APA. *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100–02 (D.D.C. 2016); *contra Wright* ECF 62 at 14 (attacking strawman that agency action is unreviewable if it is "linked to a presidential proclamation"). California's post-hearing brief ignores *Jensen* and assumes that "presidential involvement" is necessary for there to be presidential action. *Wright* ECF 62 at 14. But that is not the law. *See Jensen*, 512 F.2d at 1191 (noting that the Secretary of State approved the regulation without presidential involvement); *Detroit Int'l Bridge*, 189 F. Supp. 3d at 100 (noting that the State Department issued the permit without presidential involvement).

***DPA.*** The Order is a valid prioritization and allocation, and each authority alone is sufficient to sustain the Order. First, on prioritization, text and history make clear that the President's authority is not limited to prioritizing existing contracts or orders. *See* 50 U.S.C. § 4511(a)(1) (granting authority to "require *acceptance* and performance" (emphasis added)); Presidential Memorandum on Order Under Defense Production Act Regarding General Motors Company (Mar. 27, 2020), https://perma.cc/N5AK-ECE2 (ordering *General Motors* to accept, perform, and prioritize new contracts for *ventilator* production).

Second, on allocation, the Order simply directs Sable to *transport* oil through the Pipeline to the West Coast, not to—as California claims—begin *production* by extracting crude oil from the ocean floor (Sable can do that independent of the Order). *Wright* ECF 23-1 at 12. Besides, California has not responded to the point that the President can compel production by allocating "services," which includes "production." 50 U.S.C. §§ 4511(a)(2), 4552(16)(A); *Wright* ECF 23 at 20. Finally,

California's suggestion that allocation orders cannot require action that violates state law confuses statutory authorization with preemption. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022) (holding that an allocation order that directed conduct in violation of state law preempted that law).

***Department of Energy Regulations.*** The DPA Order complies with all relevant regulations. *See Wright* ECF 23 at 25–27; *Wright* ECF 63 at 13. California is wrong that the Federal Government is asking the Court to "excuse the lack of an end date because the Secretary could issue a new order." *Wright* ECF 62 at 15. The Court need not "excuse" anything because the Order complies with the end-date requirement and all other regulations. *See Wright* ECF 63 at 13. Even if the Court disagreed, any error would be harmless because it "had no bearing on the … substance of the decision" to issue *this* DPA Order. *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025) (cleaned up); 5 U.S.C. § 706.

***Constitutional Avoidance.*** Constitutional avoidance does not require California's atextual reading of the DPA. California's reliance on *New York v. United States* for its anticommandeering argument is misplaced because there, unlike here, the Federal Government imposed a direct obligation on states. 505 U.S. 144, 176 (1992) (reasoning that Congress "held out the threat, should the States not regulate according to one federal instruction, of simply forcing the States to submit to another federal instruction"). And its reliance on *Flores v. Rosen* for its separation-of-powers argument fails because there, unlike here, the Executive Branch violated a specific obligation imposed on it as a *defendant* to a consent decree. 984 F.3d 720, 726–27, 741 (9th Cir. 2020). Even then, the court did not hold that the Executive Branch had acted *unconstitutionally*. *Id.* at 741.

***Preemption.*** At issue in *Wright* is whether the DPA Order is facially lawful. California still has not cited a *single* case holding that a federal action was unlawful simply because it lacked preemptive effect. Instead, the State just reasserts the same preemption points it raises in all its cases. The United States and Sable have

explained at length—and without rebuttal—why those points fail. *See, e.g.*, *Wright* ECF 23 at 22–23; *Wright* ECF 63 at 13–15; *State Parks* ECF 38 at 12–16; Tr. at 7:23–9:15, 22:12–24:22, 78:14–80:7. In sum, California's preemption arguments are internally inconsistent, irrelevant, incorrect, and improper.

They are internally inconsistent because California argues here and elsewhere that the DPA Order *lacks* preemptive effect, while also arguing that the Order is unlawful *because* it preempts without congressional authorization. California's claim that the United States' position here is inconsistent with its prior position on the scope of the DPA's immunity provision (50 U.S.C. § 4557) is false—the United States has never argued that a state can prohibit the specific conduct commanded by a DPA order. Such action is preempted based on the Supremacy Clause, with or without the immunity provision. *See Murphy v. NCAA*, 584 U.S. 453, 471 (2018).

California's preemption arguments are also irrelevant because whether the DPA Order is "statutorily authorized," and whether it preempts state law, are distinct questions. *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022). Even if California were right about preemption (it is not), that would simply knock out preemption as a defense to state-law claims; the DPA Order would still be valid, just like a federal statute without preemptive effect is still a valid statute.

In any event, California's arguments are incorrect because "Congress need not expressly delegate preemptive authority to the [Executive Branch] for its regulations to preempt state law." *Id.* Nor does "the inclusion of … an express preemption clause within a statutory scheme … foreclose the application of ordinary implied preemption principles." *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 731 (9th Cir. 2016). And California misunderstands conflict preemption. *See Cohen*, 46 F.4th at 1028; *Johnson*, 580 F. Supp. 3d at 388–89.

Finally, California's request that the Court decide preemption in the abstract—based on a hypothetical application of a state law plucked from the California Code—is an improper request for an advisory opinion. Because the DPA

Case: 26-5409, 10/02/2026, DktEntry: 19.1, Page 204 of 1218

Order will preempt some state laws (*e.g.*, ones that prevent the immediate operation of the Pipeline) but not others (*e.g.*, generally applicable labor laws that lack such impact), its preemptive effect must be considered in a concrete factual setting involving the application of a specific state law to the Pipeline's operation. *See MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1124–26 (9th Cir. 2020).

## II. The Court Should Terminate or Modify the Consent Decree and Deny California's Motion to Enforce in *Plains*.

### A. The Court should terminate the Consent Decree.

***The entire Decree is ripe for termination.*** The Court should terminate the Consent Decree by the terms "within its four corners." *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). The Decree provides for termination after "Defendants"—defined as two Plains entities—have complied for five years and three months. *CD* ECF 6-1 ¶¶ 7, 100–02. Plains timely requested termination, California does not allege that Plains violated the Decree, and the United States has confirmed that Plains satisfies the termination standard. *CD* ECF 49-2 ¶¶ 72–74.

Even if Sable's conduct were relevant, PHMSA agrees that Sable has substantially complied, *see* Tr. 57:21–22. And California points to no safety reason to stop Pipeline operation. Under these facts, the fundamental purpose of the Consent Decree has been accomplished. *See Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120–23 (9th Cir. 2009).

***At a minimum, the Court should terminate Plains***. California's supplemental brief does not raise any issues regarding Plains. No party disputes that Plains is entitled to termination under the Consent Decree's terms. The Court should order that Plains' ongoing obligations to comply with the Consent Decree are terminated.

### B. Sable did not "defy" the Consent Decree.

California relies on inaccurate, inflammatory rhetoric regarding Sable's actions. When the Pipeline—historically regulated by PHMSA—was regulated by OSFM, Sable obtained State Waivers. *See CD* ECF 43-1 Exs. I, J. After PHMSA

determined it had jurisdiction, Sable obtained federal equivalents. *See CD* ECF 53-1 ¶ 21. Sable has performed all safety work required by the Consent Decree. *See* Tr. 57:21–22. The sole area of disagreement between PHMSA and OSFM is whether certain additional repairs—if needed—could be completed pre- or post-restart. PHMSA concluded that the Consent Decree authorizes post-restart repairs and that the Pipeline segments can be safely operated, and thus approved the Pipeline Restart Plan in December 2025. *CD* ECF 53-1 ¶ 20. Still, Sable did not resume flow through the segments until March 14, 2026, after it was ordered to by the DPA Order. *Wright* ECF 16-1 at 9–12. Sable could not comply with both California's directives and the United States' mandates. Thus, Sable timely invoked the Consent Decree's force majeure and dispute resolution provisions. *See CD* Dkt. No. 61-1 ¶ 25.

### C. <u>Alternatively, the Court should modify the Consent Decree.</u>

***Change in jurisdiction***. Contrary to California's assertions, Sable's intention to operate the Pipeline segments as part of an interstate system and PHMSA's reclassification of the segments based on that intention are the sort of factual and legal changes that warrant modifying the Consent Decree under Rule 60(b)(5).

*First*, leaving the Consent Decree unmodified would require what the Pipeline Safety Act prohibits: state regulation of an interstate pipeline. 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."); Tr. 73:2–4. Because "one or more of the obligations placed upon the parties has become impermissible under federal law," the Court *must* modify the Consent Decree. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992).

California's arguments against PHMSA's underlying legal positions do not change that conclusion. Absent clear evidence to the contrary, the Court should presume that PHMSA "properly discharged [its] official duties" when it reclassified the Pipeline segments as interstate. *Cruz v. Bondi*, 146 F.4th 730, 739 (9th Cir. 2025). California cites no facts to overcome that presumption—seeking instead to

collaterally attack PHMSA's positions here while litigating the same issues in the Ninth Circuit. It may not do so.[2] 49 U.S.C. § 60119(a)(1); *see Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Tr. Co.*, 379 U.S. 411, 421–22 (1965).

*Second*, California's argument that the Consent Decree contemplated restart, *see CD* ECF 62 at 6, asks the wrong question, and in doing so, focuses on the wrong event. The changed factual circumstance warranting modification is not the restart, it is the Pipeline's *interstate operation*. And that clearly is *not* something the Consent Decree anticipated. By giving OSFM authority over a potential restart, the Decree plainly contemplated that those operations would be *intra*state. *See Asarco*, 430 F.3d at 976 (directing courts to examine consent decree text to determine if a change was anticipated). PHMSA could not, through the Decree, have waived or altered its statutory grant of exclusive jurisdiction over interstate pipelines. *See Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen*, 558 U.S. 67, 71 (2009).

*Third*, California relies on inapposite authority in arguing that the United States unilaterally created the changes warranting modification. *See CD* ECF 62 at 15–16. Unlike in *Flores*, 984 F.3d 720, this case does not concern the discretionary adoption of new rulemaking affecting the Consent Decree; the Pipeline Safety Act long predates the Consent Decree and *requires* PHMSA to regulate interstate pipelines. *See* 49 U.S.C. § 60104(c). And it was external factual changes—Sable's acquisition of the entire Pipeline and intention to operate it in interstate commerce—that animated PHMSA's reclassification.

***The DPA Order.*** The Secretary's DPA Order establishes independent grounds to modify the Consent Decree. *CD* ECF 49 at 25. California's preemption arguments

---

[2] California's reliance on *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025), is misplaced because this is not a proceeding to enforce the PHMSA decision against California. More, while California styles its filing as a "Motion to Enforce," it really seeks to attack the *validity* of PHMSA's determination and the DPA Order. That is not what *McLaughlin* permits.

do not alter that Sable *must* comply with the DPA Order, making compliance with OSFM's contradictory orders under the Consent Decree legally impermissible and factually impossible.

***FRCP 60(b)(6).*** PHMSA's reclassification of the segments and the DPA Order also present extraordinary shifts in the factual and legal landscape underlying the Consent Decree that warrant modification under Rule 60(b)(6). *See Ctr. for Biological Diversity v. Burgum*, 2025 WL 821660, at *2 (D. Mont. Feb. 21, 2025).

**D. Regardless, California's Motion to Enforce should be denied.**

Even if the Court did not terminate or modify the Consent Decree, California has not shown that Sable is subject to "enforcement" as a nonparty. *See Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017); *Am. Semiconductor, Inc. v. Cal. Assignments LLC*, 2013 WL 5937968 at *4, *7 (N.D. Cal. Oct. 30, 2013). Enforcement against a nonparty raises serious due process concerns. *See Harmon v. San Diego Cnty.*, 477 F. Supp. 1084, 1091 (S.D. Cal. 1979).

California also fails to demonstrate that any noncompliance merits "enforcement" through a preliminary injunction. California's request bypasses the Decree's own procedures for alleged noncompliance, *see CD* ECF 6-1 ¶¶ 26–29, 44–49, and makes no attempt to satisfy the preliminary injunction standard—such as by showing irreparable harm, which this Court has twice recognized is lacking. *See, e.g.*, *State Parks* ECF 60 at 5, 7.

Regardless, California and PHMSA agree that Sable has complied with the Consent Decree, other than the very narrow dispute about the timing of an additional round of possible repairs. *See* Tr. 57:21–22; *CD* ECF 53 at 8. PHMSA is actively and effectively regulating the Pipeline, and—critically—*California does not even attempt to show that Sable's operation of the Pipeline is unsafe*.

**CONCLUSION**

The Court should deny California's Motions and grant the United States' Motion to Terminate or Modify the Consent Decree.

DATED: June 25, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
JUSTIN D. HEMINGER
RILEY W. WALTERS
Counsel

*/s/ Stefan J. Bachman*[3]
Stefan J. Bachman (DC Bar No. 90008649)
Email: Stefan.Bachman@usdoj.gov
Senior Attorney
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW Washington, D.C. 20530
Phone: (202) 598-9566

*Attorneys for the United States of America*

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525

[3] Filer attests that all other signatories listed concur in the filing's contents and have authorized the filing.

*/s/ Nicholas McDaniel*
NICHOLAS McDANIEL

*Attorneys for Sable Offshore Corp. and Pacific Pipeline Company*

DANIEL B. LEVIN (State Bar No. 226044)
daniel.levin@mto.com
COLIN A. DEVINE (State Bar No. 315801)
colin.devine@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426

*/s/ Colin A. Devine*
COLIN A. DEVINE

*Attorneys for Defendants Plains All American Pipeline L.P. and Plains Pipeline L.P.*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this brief is 10 pages in length, which complies with the page limit set by the Court.

DATED: June 25, 2026

/s/ *Stefan J. Bachman*
Stefan J. Bachman

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
ROBERT N. STANDER
JUSTIN D. HEMINGER
BRADLEY CRAIGMYLE
Deputy Assistant Attorneys General
RILEY W. WALTERS
Email: Riley.Walters@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
STEFAN J. BACHMAN (DC Bar No. 90008649)
Email: Stefan.Bachman@usdoj.gov
Senior Attorney
U.S. Department of Justice
Environmental Enforcement Section
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 598-9566

*Attorneys for the United States of America*

*[Additional Counsel for Sable and Plains Listed Below]*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA, et al.

Plaintiffs,

v.

PLAINS ALL AMERICAN PIPELINE, L.P. *et al.*,

Defendants.

Case Nos. 2:20-cv-02415-SVW-SSC; 2:26-cv-03396-SVW-SSC

**JOINT POST-HEARING BRIEF FROM THE UNITED STATES OF AMERICA, SABLE OFFSHORE CORP. AND PACIFIC PIPELINE CO., AND PLAINS ALL AMERICAN PIPELINE, L.P. AND PLAINS PIPELINE, L.P.**

Judge: Honorable Stephen V. Wilson

STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
800 17th Street N.W., Suite 110
Washington, D.C. 20006
Telephone: +1 202.469.5525

*Attorneys for Sable Offshore Corp. and Pacific Pipeline Company*

DANIEL B. LEVIN (State Bar No. 226044)
daniel.levin@mto.com
COLIN A. DEVINE (State Bar No. 315801)
colin.devine@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426

*Attorneys for Plains All American Pipeline L.P. and Plains Pipeline L.P.*

# TABLE OF CONTENTS

I. THE *WRIGHT* PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED. .... 2

A. California has failed to show that it is likely to suffer imminent irreparable harm absent preliminary relief. .... 2

B. California's requested relief is against the public interest. .... 3

C. California has failed to show that it is likely to succeed on the merits. .... 4

II. THE CONSENT DECREE SHOULD BE TERMINATED OR MODIFIED. .... 9

A. The Consent Decree should be terminated. .... 9

B. At a minimum, the Consent Decree should be modified to respond to changed circumstances. .... 11

C. California's Motion to Enforce should be denied. .... 12

D. Plains' Statement. .... 15

CONCLUSION .... 15

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez*,
585 U.S. 579 (2018) ........ 3
*Ahlman v. Barnes*,
No. 20-55568, 2020 WL 3547960 (9th Cir. June 17, 2020) ........ 2
*Am. Semiconductor, Inc. v. Cal. Assignments LLC*,
No. 12-cv-06138, 2013 WL 5937968 (N.D. Cal. Oct. 30, 2013)........ 10, 13
*Arizona v. United States*,
567 U.S. 387 (2012) ........ 8
*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co.*,
626 F. Supp. 3d 1030 (W.D. Wis. 2022)........ 4
*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ........ 8
*City of New York v. FCC*,
486 U.S. 57 (1988) ........ 8
*Clark v. Martinez*,
543 U.S. 371 (2005) ........ 5
*Coal. for Econ. Equity v. Wilson*,
122 F.3d 718 (9th Cir. 1997) ........ 3
*Cohen v. Apple Inc.*,
46 F.4th 1012 (9th Cir. 20224)........ 8, 9
*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) ........ 13, 14
*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp. 3d 85 (D.D.C. 2016)........ 4
*E. Air Lines, Inc. v. McDonnell Douglas Corp.*,
532 F.2d 957 (5th Cir. 1976) ........ 6
*FDA v. Wages & White Lion Investments., LLC*,
604 U.S. 542 (2025) ........ 7
*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ........ 8
*Flores v. Rosen*,
984 F.3d 720 (9th Cir. 2020) ........ 7
*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ........ 3
*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 4
*Golden State Bottling Co. v. NLRB*,
414 U.S. 168 (1973) ........ 10

*Haig v. Agee*,
453 U.S. 280 (1981) ....... 4
*Headwaters Inc. v. U.S. Forest Serv.*,
399 F.3d 1047 ....... 13
*Hercules Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) ....... 9
*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
10 F.3d 693 (9th Cir. 1993) ....... 13
*Int'l Techs. Consultants, Inc. v. Pilkington PLC*,
137 F.3d 1382 (9th Cir. 1998) ....... 9, 14
*Jensen v. Nat'l Marine Fisheries Serv.*,
512 F.2d 1189 (9th Cir. 1975) ....... 4
*Johnson v. Tyson Foods, Inc.*,
580 F. Supp. 3d 382 (N.D. Tex. 2022) ....... 6, 9
*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) ....... 3
*Keith v. Volpe*,
784 F.2d 1457 ....... 12
*Lab./Cmty. Strategy Ctr. v. L.os A.ngeles Cnty. Metro. Transp. Auth.*,
564 F.3d 1115 (9th Cir. 2009) ....... 10
*Local No. 93, Int'l Ass'noc. of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986) ....... 10, 13
*MetroPCS Cal., LLC v. Picker*,
970 F.3d 1106 (9th Cir. 2020) ....... 3, 9
*Murphy v. Nat'l Collegiate Athletic,*
*Ass'n*, 584 U.S. 453 (2018) ....... 6
*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ....... 5
*Nelson v. Stewart*,
422 F.3d 463 (7th Cir. 2005) ....... 8
*Olympic Pipe Line Co. v. City of Seattle*,
437 F.3d 872 (9th Cir. 2006) ....... 2, 12
*Reed v. Tyson Foods, Inc.*,
No. 21-cv-01155, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021) ....... 9
*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ....... 7, 11
*Sierra Club v. North Dakota*,
868 F.3d 1062 (9th Cir. 2017) ....... 13
*Tennessee v. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024) ....... 3

*Thompson v. Enomoto*,
915 F.2d 1383 (9th Cir. 1990) .......... 13
*United States v. Asarco Inc.*,
430 F.3d 972 (9th Cir. 2005) .......... 9
*United States v. ITT Rayonier, Inc.*,
627 F.2d 996 (9th Cir. 1980) .......... 13
*United States v. Vertac Chem. Corp.*,
46 F.3d 803 (8th Cir. 1995) .......... 9
*Winter v. Nat.ural Res.ources Def.ense Council, Inc.*,
555 U.S. 7 (2008) .......... 4

**Statutes**

5 U.S.C. § 706 .......... 7
33 U.S.C. § 1319 .......... 13
49 U.S.C. § 60101(a) .......... 11
49 U.S.C. § 60104 .......... 12
49 U.S.C. § 60104(c) .......... 2
50 U.S.C. § 4502(a)(5) .......... 6
50 U.S.C. § 4511(a) .......... 5, 6
50 U.S.C. § 4511(a)(2) .......... 6
50 U.S.C. § 4511(c) .......... 5
50 U.S.C. § 4516 .......... 6
50 U.S.C. § 4552(14) .......... 6
50 U.S.C. § 4557 .......... 9

**Regulations**

49 C.F.R. § 195, Appendix A (2026) .......... 11
8 C.F.R. § 241.14 (2002) .......... 5

**Other Authorities**

*Adjusting Certain Delegations Under the Defense Production Act*,
Exec. Order No. 14391 .......... 5
*National Defense Resources Preparedness*,
Exec. Order. No. 13603 .......... 5

Before the Court are three motions across two cases: (1) California's Motion for a Preliminary Injunction and Stay against a Defense Production Act ("DPA") order (the "DPA Order") directing Sable Offshore Corp. ("Sable") to immediately resume transporting oil through the Santa Ynez Pipeline System ("the Pipeline"); (2) the United States' Motion to Terminate or Modify a 2020 Consent Decree entered by the United States and California, as co-plaintiffs, and Plains All American Pipeline, L.P. and Plains Pipeline, L.P. (collectively, "Plains"), as defendants; and (3) California's Motion to Enforce the same Consent Decree. The simplest way to resolve these Motions is also the legally correct one.[1]

First, in *California v. Wright*, the Court should *deny* California's Motion for a Preliminary Injunction and Stay against the DPA Order because the State has failed to show that it is likely to suffer irreparable harm absent preliminary relief, but even if the Court reaches the other *Winter* factors, none support preliminary relief. The Secretary of Energy lawfully issued the Order to protect national security by securing a reliable source of domestic oil production in California.

Second, in *United States v. Plains*, the Court should *terminate* the Consent Decree because the negotiated standard for termination has been met. Alternatively, the Court should *modify* the Consent Decree to account for changed factual and legal circumstances—principally, the now-interstate operation of the Pipeline and the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA")'s recognition of that fact and assertion of jurisdiction under the Pipeline Safety Act. Separately, the effects of the DPA Order require modification of the Decree. And the Court should deny California's Motion to Enforce the Consent Decree, which seeks the extreme relief of shutting down the Pipeline with no evidentiary support.

[1] References to the docket in *California v. Wright*, No. 26-cv-03396 (C.D. Cal.), are marked "*Wright* Dkt. No." References to the docket in *United States v. Plains All American Pipeline, L.P.*, No. 20-cv-02415 (C.D. Cal.), are marked "*CD* Dkt. No."

## ARGUMENT

### I. The *Wright* Preliminary Injunction Motion Should Be Denied.

#### A. California has failed to show that it is likely to suffer imminent irreparable harm absent preliminary relief.

"[A] showing of irreparable injury is an absolute prerequisite" to a preliminary injunction. *Ahlman v. Barnes*, No. 20-55568, 2020 WL 3547960, at *2 (9th Cir. June 17, 2020). And as this Court held in rejecting another attempt by California to shut down the Pipeline, California "has manifestly failed to demonstrate that it will suffer irreparable harm in the absence of preliminary injunctive relief." *State Parks* Dkt. No. 60 ("*State Parks* Order") at 5.[2] On that basis alone, the Court can and should deny California's Motion for a Preliminary Injunction and Stay. *Id.* at 7.

This Court has already rejected all but one of California's theories of harm: the alleged "inability to carry out its laws" due to the DPA Order. *Wright/Plains* June 8, 2026 Tr. ("Tr.") at 28:8–10. But California still has not identified what law the Order prevents it from enforcing. It previously speculated that, if various conditions are met, the California Geologic Energy Management Division and the Department of Fish and Wildlife *may* be unable to carry out certain duties at some hypothetical future time. *See Wright* Dkt. No. 23 at 24. At the June 8 hearing, California also alluded to "safety requirements on pipelines" that the DPA Order allegedly displaces. Tr. at 74:23–75:6. But the Pipeline Safety Act—*not* the DPA Order—displaced California's authority to regulate pipeline safety when PHMSA determined in December 2025 that the Pipeline is interstate (an action that the Ninth Circuit declined to stay). *See* 49 U.S.C. § 60104(c); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006). Enjoining the Order would thus not remedy California's asserted harm.

---

[2] References to the docket in *California Department of Parks & Recreation v. Sable Offshore Corp.*, No. 26-cv-02946 (C.D. Cal.), are marked "*State Parks* Dkt. No."

California's claim that it cannot enforce its laws also rings hollow when, in other cases, California argues that the DPA Order does *not* displace state law and that Sable must comply with state requirements—the exact opposite of what the State asserts here to show irreparable harm. *See, e.g.*, *State Parks* Dkt. No. 30 at 5–6 (arguing the Order does not preempt state law); *Wright* Dkt. No. 16-2 at 19–21 (same); *see* Tr. at 71:2–25 (same). California cannot have it both ways.

That California is actively seeking to enforce state law elsewhere also distinguishes the cases it cites. Those cases involved direct judicial injunctions against enforcement of state law or similar direct displacement of state authority. *Abbott v. Perez*, 585 U.S. 579, 602 & n.17 (2018); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *Kansas v. United States*, 249 F.3d 1213, 1223 (10th Cir. 2001); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024). By contrast, the DPA Order operates directly upon Sable, not California, and its effect on state law cannot be determined in the abstract but must be examined factually in individual challenges—exactly the sort of challenges California has filed elsewhere. *See MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1124–26 (9th Cir. 2020).

In sum, California's own actions betray its lack of irreparable harm, a "deficiency" that "alone is fatal to [its] claim of entitlement to preliminary injunctive relief." *State Parks* Order at 7. So the Court need not reach the other *Winter* factors.[3]

**B. California's requested relief is against the public interest.**

The public interest and equities cut strongly against an injunction. The Secretary issued the DPA Order based on his determination that the Pipeline is "a

[3] By contrast, to rule for California on irreparable harm, the Court would have to first reach the merits because a state does not suffer "irreparable injury" merely because "federal law preempts conflicting state law[.]" *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1292 (11th Cir. 2021). Under California's own theory, displacement of state law could only cause irreparable harm if the Federal Government were acting *outside* the scope of its authority. *Wright* Dkt. 32 at 7-8.

critical energy resource" necessary to alleviate "adversarial dependence" and "energy vulnerabilities on the West Coast." *Wright* Dkt. No. 16-1 at ECF header page 10; *see also* Tr. 37:24–38:2 ("[T]he argument is . . . the vulnerability to dependence on importing oil and the presence of an extraordinary number of military bases in California."); Tr. at 25:4–26:25; *Wright* Dkt. No. 23 at 24–25 & Dkt. No. 24-4 at 20–21 (effect on Sable and its employees). "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (citation omitted). Where "an immediate shutdown of the pipeline would have significant public and foreign policy implications[,]" an injunction should not issue. *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co.*, 626 F. Supp. 3d 1030, 1037, 1055 (W.D. Wis. 2022); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (public interest tipped "strongly in favor" of the government where President determined that the challenged activity was "essential to national security" (internal citation omitted)).

**C. California has failed to show that it is likely to succeed on the merits.**

**1.** California is not likely to succeed on the merits for four reasons. *First*, California's arguments are not reviewable under the APA because the Secretary exercised delegated presidential authority when he issued the DPA Order. *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975); *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100–02 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *opinion amended and superseded on denial of reh'g*, 883 F.3d 895 (D.C. Cir. 2018). California cites no case to the contrary. It instead cites three inapposite cases that did *not* involve the exercise of delegated *presidential* authority. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 4–5, 14–15 (9th Cir. 2024) (APA review of agency rule, issued under agency's own authority, that implemented a policy directive in an executive order).

Because APA review is unavailable, California is unlikely to succeed on *any* of the arguments made in its motion. Though California pleads two constitutional claims, it has not moved for relief under the Constitution, relying instead on constitutional avoidance. But that is a canon of *statutory* construction. *See Wright* Dkt. No. 27 at 9–10 & Dkt. No. 16-2 at 14–15. As the Supreme Court has said, the canon "is not a method of adjudicating constitutional questions by other means"—it is about "*avoid[ing]* the decision of constitutional questions." *Clark v. Martinez*, 543 U.S. 371, 381 (2005), *superseded by a regulation on other grounds*, 8 C.F.R. § 241.14 (2002). "[W]hen a litigant invokes the canon of avoidance," then, "he seeks to vindicate his own *statutory* rights[,]" not his constitutional rights. *Id.* at 382. Thus, California's constitutional arguments are really statutory arguments about the meaning of the DPA, subject to review only under the APA.

*Second*, the DPA Order is a valid exercise of the broad authority granted by the DPA. The Secretary of Energy, exercising authority delegated to him by the President,[4] issued the DPA Order to address energy vulnerabilities on the West Coast that jeopardize our national security. Those vulnerabilities stem from the fact that California is a "fuel island" with low in-state production and no inbound pipelines from other states. *Wright* Dkt. No. 23 at 4. California thus imports over 60% of its oil from foreign nations, which leaves our country's most populous state and the 32 military bases there highly vulnerable to disruptions in the global supply chain. *Id.*

Congress enacted the DPA to solve precisely this type of problem. The statute explicitly recognizes that energy security is national security. *See, e.g.*, 50 U.S.C. §§ 4502(a)(5) ("national defense preparedness" depends on "the availability of domestic energy supplies"), 4552(14) ("national defense" includes "energy

[4] *See Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026) (delegating certain authorities under 50 U.S.C. § 4511(c) to the Secretary of Energy); *National Defense Resources Preparedness*, Exec. Order. No. 13603, 77 Fed. Reg. 16651 (Mar. 16, 2012) (delegating authority under 50 U.S.C. § 4511(a) to the Secretary of Energy).

production"), 4516 (designating energy as a "strategic and critical material"). It therefore grants the President broad authority to ensure that our domestic energy supply supports the national defense. *See, e.g.*, *id.* § 4511(a), (c).

The DPA Order is a straightforward exercise of that authority. For example, the Order allocates oil stranded in an offshore oil field to where the oil is needed on the West Coast. *Id.* § 4511(a)(2), (c). And by directing Sable to transport the oil through the Pipeline, the Order directs the "manner" and "conditions" of the allocation, as authorized by the DPA. *Id.* § 4511(a)(2). In this way, the Order is analogous to the Secretary of Agriculture's use of DPA allocation authority in 2020 to order meat and poultry plants to resume operations. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022), *aff'd*, No. 22-10171, 2023 WL 2645553 (5th Cir. Mar. 27, 2023).[5]

*Third*, California cannot escape the DPA's plain text by invoking the anticommandeering doctrine, as that doctrine prohibits the Federal Government from "issu[ing] orders *directly* to the States[,]" *Murphy v. NCAA*, 584 U.S. 453, 470 (2018) (emphasis added), while the DPA Order imposes an obligation directly on Sable, not California. California cites no case to support its separation-of-powers argument related to the Consent Decree, which is also wrong on the merits. No provision of the Consent Decree prohibits the President from using the authority Congress gave him in the DPA. The DPA Order does not conflict with the Consent Decree because OSFM's authority was already displaced by PHMSA's determination that the Pipeline is interstate; and even if there were a conflict, the Consent Decree would yield to the DPA Order under Supreme Court precedent, not the other way around. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388

---

[5] California rejects this precedent because the Secretary of Agriculture issued a letter rather than a formal order, but DPA orders may be issued through "informal means of persuasion" and "jawboning" just as much as through formal, coercive commands. *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 980, 992–94 (5th Cir. 1976). The formality of the DPA Order here, if anything, puts it on even stronger footing.

(1992). This is not an instance in which the Executive Branch violated *specific terms* imposed on it as a *defendant* to a consent decree, which would not be a *constitutional* violation in any event. *Cf. Flores v. Rosen*, 984 F.3d 720, 729 (9th Cir. 2020). In short, the Federal Government is not encroaching on judicial power; California is trying to use the Consent Decree to encroach on Executive and Legislative power.

*Finally*, the DPA Order complies with all relevant Department of Energy regulations, which ensure that parties subject to DPA orders understand their obligations. The DPA Order has both a start date and an end date. By directing Sable to act "immediately," the Order's start date is the date it was signed—March 13, 2026—and the end date is "such time as the conditions necessitating the issuance of this order abate." *Wright* Dkt. No. 16-1 at ECF header 11–12. Even if California were right that the regulations required the Secretary to list an arbitrary calendar date despite the impossibility of knowing exactly when the energy-supply problems would be resolved, California has not shown that including such a date would have changed the Secretary's decision to issue the DPA Order. Thus, any error would be harmless. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 930 (2025). Indeed, because neither the DPA nor the regulations impose any durational limit on allocation orders, the Secretary could repeatedly amend any arbitrary calendar date.

**2.** Those are the live merits issues. California's attempt to insert another issue—whether the DPA Order preempts state law—is misplaced. For starters, California repeatedly contradicts itself on whether the Order has preemptive effect. *See above* Section I.A.

Contradiction aside, everything California says about preemption on the merits is a diversion. At issue here is whether the DPA Order is "within the scope of the [Secretary's] delegated authority," which is a *different* question from whether the DPA Order preempts state law. *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022) (citation omitted) (treating the validity of a regulation and its preemptive

effect as separate questions). If the DPA Order is "statutorily authorized," then it "will pre-empt any state or local law that conflicts with [it] or frustrates [its] purposes." *City of New York v. FCC*, 486 U.S. 57, 64 (1988). Conversely, if a state or local law does not conflict with the DPA Order under traditional principles of conflict preemption, then the DPA Order would not preempt that law—but the Order would still be legally valid. In short, preemption is a *consequence* of valid federal action, not a *condition* for it. *See Nelson v. Stewart*, 422 F.3d 463, 466 (7th Cir. 2005). And California has failed to cite a *single case* holding that an order or regulation was invalid simply because it lacked preemptive effect.

In any event, California misstates the legal standard for when Executive Branch action preempts state law. Orders and regulations have the full "force and effect of law" and have long "been held to pre-empt state law under the" same rules that apply to federal statutes. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295–96 (1979); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Contrary to California's position, preemption "does not depend on express congressional authorization to displace state law[.]" *De la Cuesta*, 458 U.S. at 154; *City of New York*, 486 U.S. at 64 (same). Or said another way, "Congress need not expressly delegate preemptive authority to [an agency] for its regulations to preempt state law." *Cohen*, 46 F.4th at 1028. So California's "narrow focus" on whether the DPA authorizes preemption is "misdirected." *De la Cuesta*, 458 U.S. at 154.[6] The question is whether a particular state law "conflicts with" the DPA Order or "frustrates [its] purposes," such as by making it "impossible to comply with both state and federal requirements[.]" *Cohen*, 46 F.4th at 1028 (citations omitted). That "requires a largely

[6] California is also wrong to read the DPA's express preemption language as somehow foreclosing conflict preemption in other contexts because an "'express preemption provisio[n] does *not* bar the ordinary working of conflict preemption principles' or impose a 'special burden' that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (alteration in original) (citation omitted).

factual inquiry." *MetroPCS*, 970 F.3d at 1126. The Court should not issue an advisory opinion on whether the Order can preempt state law generally.

Finally, California relies on two cases that interpreted the scope of the DPA's immunity provision. 50 U.S.C. § 4557; *Hercules Inc. v. United States*, 24 F.3d 188 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996); *United States v. Vertac Chem. Corp.*, 46 F.3d 803 (8th Cir. 1995). Neither case speaks to the DPA Order's validity or to conflict preemption. *See* Tr. at 22:17–24:22. No matter the scope of the immunity provision, basic principles of preemption prevent state law from thwarting the *specific conduct* commanded by a DPA order. Neither *Hercules* nor *Vertac* addressed that question, and the only cases that have support preemption. *See Johnson*, 580 F. Supp. 3d at 388–89; *Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021).

## II. The Consent Decree Should Be Terminated Or Modified.

### A. The Consent Decree should be terminated.

Wholly independent of the DPA Order or PHMSA's jurisdiction over the Pipeline, the Court should terminate the Consent Decree. As California acknowledges, the Court must interpret the Consent Decree "within its four corners," *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005), and it may not impose obligations beyond those agreed to by the parties. *Int'l Techs. Consultants, Inc. v. Pilkington PLC*, 137 F.3d 1382, 1387 (9th Cir. 1998). Here, the Consent Decree contains a provision, Paragraph 100, that expressly governs termination, *CD* Dkt. No. 6-1 ¶¶ 100–02. Under Paragraph 100's plain terms, the Consent Decree should be terminated after (1) five years and three months have elapsed, and (2) "Defendants" have "complied with the requirements." *Id.* ¶ 100. "Defendants" are defined as two Plains entities, Plains All American Pipeline, L.P. and Plains Pipeline, L.P. *Id.* ¶ 7. California does not dispute that the time period has elapsed, and "California does not allege Plains has violated the Consent Decree." *CD* Dkt. No. 62 at 9. By the Decree's agreed-upon terms, termination is appropriate.

Sable is not a party to the Consent Decree, and its conduct is thus irrelevant to the termination analysis. Though "successors" to Plains are judicially bound under Paragraph 4 of the Consent Decree, only entities that are the continuing business enterprise of the previous party are legal successors. *See Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 180 (1973). Entities that simply purchase assets are not successors. *Am. Semiconductor, Inc. v. Cal. Assignments LLC*, No. 12-cv-06138, 2013 WL 5937968, at *7 (N.D. Cal. Oct. 30, 2013). Sable is not a legal successor to Plains; rather, Sable purchased the pipeline assets through a transaction with an Exxon subsidiary, after that subsidiary purchased the assets from Plains. And the Assumption Agreement does not change this conclusion. It is an agreement between Exxon and Sable, whereby Sable *contractually* agreed to follow certain Consent Decree provisions. The Assumption Agreement created *contractual* rights and duties between Sable and Exxon, but it did not subject Sable to this Court's jurisdiction or create *judicial* rights and obligations. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 523, 525 (1986).

Even if the Court goes beyond the plain language of Paragraph 100 and concludes that Sable's conduct is relevant to the termination inquiry, the Court should still terminate the Consent Decree for two reasons. *First*, courts should terminate consent decrees when there has been substantial compliance and the purposes of the consent decree have been met, which is the case here. *See Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.,* 564 F.3d 1115, 1120–21 (9th Cir. 2009). Indeed, California and PHMSA *agree* that Sable has complied with the Consent Decree, except for a single insignificant dispute about the timing of an additional round of potential repairs—beyond the over 200 repairs that Sable has already performed. *See* Tr. 57:21–22; *CD* Dkt. No. 43 at 8. Those additional repairs (if even needed) will be done, just not on California's preferred timeline, and California has identified no safety concerns that would justify completing them sooner. *Second*, PHMSA is now the appropriate regulator, as explained below, and

it has already approved a restart plan and issued an emergency special permit for the Pipeline segments and is separately considering Sable's application for a non-emergency special permit. The Court should recognize these changed circumstances and terminate the Consent Decree.

**B. At a minimum, the Consent Decree should be modified to respond to changed circumstances.**

If this Court declines to terminate the Consent Decree, it should modify the Decree to reflect changed factual and legal conditions. The Supreme Court has recognized three circumstances that may warrant consent decree modification: (1) "when changed factual conditions make compliance with the decree substantially more onerous[,]" (2) "when a decree proves to be unworkable because of unforeseen obstacles," or (3) "when enforcement of the decree without modification would be detrimental to the public interest[.]" *Rufo*, 502 U.S. at 384-85. A court *must* also modify a consent decree if, because of a change in federal law, compliance with its terms becomes "impermissible." *Id.* at 388. All the *Rufo* factors favor modification.

The factual circumstances have markedly shifted since the Court entered the Consent Decree. The Pipeline has changed in ownership, operation, and intent. While previously a nonoperational and separately owned system, it is now a single, integrated interstate pipeline. Under the Pipeline Safety Act, a pipeline is interstate if it moves oil between a place outside a state (here, federal waters in the Outer Continental Shelf) and a place in a state (here, Pentland Station in California). *See* 49 U.S.C. § 60101(a)(8)(B)(i); 49 C.F.R. pt. 195, Appendix A (2026). That the segments subject to the Consent Decree are now part of an interstate pipeline facility renders unworkable the Decree's provision that OSFM supervise restart. PHMSA advised OSFM of the change in jurisdictional status in December 2025 and has been supervising the Pipeline's restart since March 2026. There is simply no role left for OSFM to play. Separately, the Decree's conflict with DPA Order further justifies modification. Sable cannot comply with both the DPA Order directing Sable to

operate the pipeline and California's interpretation of the Consent Decree, which would enable OSFM to oversee compliance.

The legal situation has also changed. Entered in 2020 when the Pipeline segments were inoperative and classified as intrastate, the Consent Decree lists OSFM as the segments' regulator. Now, PHMSA is the regulator of the entire Pipeline. As California conceded at oral argument, "if PHMSA's determination is correct and the Pipeline Safety Act applies then California is preempted from regulating the pipeline." Tr. 73:2–4; *see* 49 U.S.C. § 60104; *Olympic Pipe Line*, 437 F.3d at 878–80. California seeks to use the Consent Decree to exercise authority barred by federal statute, and leaving the Decree unmodified would permit what federal law forbids: California's regulation of an interstate pipeline. At the very least, the Court should update the Decree, as set forth in the United States' proposed order (*CD* Dkt. No. 49-5), to substitute the current regulator, PHMSA, for OSFM and make other modest revisions reflecting the changed factual and legal circumstances. *See Keith v. Volpe*, 784 F.2d 1457, 1462 (9th Cir. 1986).

The public interest supports modifying the Consent Decree for the same reasons it supports denying California's Motion for a Preliminary Injunction in *Wright*. *See above* at I.B. And the public is best served by a single regulatory agency overseeing pipeline safety to ensure programmatic continuity—precisely what the parties sought to implement in the Decree by granting OSFM oversight over the then-intrastate Pipeline. If the Decree is not modified, Sable will remain subject to directly contradictory instructions from OSFM and PHMSA, harming the public's interest in safe and clear regulation of the Pipeline.

**C. California's Motion to Enforce should be denied.**

California's Motion to Enforce, *CD* Dkt. No. 55, fails several times over. To prevail, California must first show that Sable, as a nonparty, is subject to a motion to enforce. *See Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017). But Sable is not a party to the Consent Decree, and while it contractually assumed

certain obligations, it is not judicially bound. *See Local No. 93*, 478 U.S. at 523. In general, consent decrees are not enforceable against nonparties. *See Sierra Club*, 868 F.3d at 1067. Sable purchased the Pipeline from ExxonMobil, not Plains, and contractually agreed to follow certain safety provisions of the Consent Decree. *CD* Dkt. No. 61-1 ¶¶ 9-10; *see CD* Dkt. No. 49-2 ¶¶ 3, 5. But Sable never agreed to be substituted as a party or to be bound by the dozens of provisions not applicable to the segments. "There is no Ninth Circuit case law holding that nonparties . . . are bound by [an] injunction themselves for contempt purposes, when the nonparty purchases assets from an enjoined party." *Am. Semiconductor*, 2013 WL 5937968, at *7. Nor is Sable in privity with Plains because there is no "substantial identity" between the two parties. *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980), *superseded by a statute on other grounds*, 33 U.S.C. § 1319. And "parallel legal interests alone, identical or otherwise, are not sufficient to establish privity[.]" *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054 (9th Cir. 2005).

Even if Sable were a party, California must show "(1) that [Sable] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The State cannot make that showing, because Sable has substantially complied, as PHMSA has recognized. *CD* Dkt. No. 49-2 at ¶¶ 17–66.

Even if this Court were to find Sable not in substantial compliance, the Ninth Circuit has repeatedly held that changed circumstances excuse noncompliance. In *Thompson v. Enomoto*, 915 F.2d 1383 (9th Cir. 1990), a prison reform litigation case, the Ninth Circuit held that petitioner inmates' motion for contempt should be denied, and the consent decree should be modified, because it was impossible for prison officials to comply with the decree. *Id.* at 1385–86, 1391; *see also Coleman v. Newsom*, 131 F.4th 948, 960 (9th Cir. 2025) ("If the record establishes that there in fact is a present inability to comply with an order, the civil contempt inquiry is at

an end." (citation modified)). Here, changes to the ownership and operation of the Pipeline have altered the factual basis for the Consent Decree. *See above* Section II.B. PHMSA's resumption of jurisdiction and the DPA Order have likewise altered the Decree's legal background, making it impossible for Sable to comply with both the DPA Order and California's view of the Consent Decree. *Id.*

The Consent Decree recognizes that intervening events may "prevent[] the performance of an[] obligation under this Consent Decree." *CD* Dkt. No. 6-1 ¶¶ 44–48. Notably, the Decree sets out a nonjudicial process for resolving the issue, one that is the "*exclusive mechanism* to resolve disputes arising under or with respect to this Consent Decree." *Id.* ¶ 49 (emphasis added). And the parties negotiated agreed-upon stipulated penalty amounts as the remedy for any finding of noncompliance. *Id.* ¶¶ 26–29. Contrary to California's suggestions that Sable and the United States should have immediately come to this Court for emergency modification, Sable followed the agreed-upon procedures and invoked the force majeure clause within four days of resuming oil flow through the pipeline. *CD* Dkt. No. 61-1 ¶ 25. California's motion should be denied for ignoring this nonjudicial process.

Finally, there is no basis for "enforcing" the Consent Decree against the United States—California's co-plaintiff, not a defendant—and California has not identified any affirmative requirement in the Decree that the United States has not met. Neither PHMSA's exercise of jurisdiction nor the DPA Order violates any term of the Decree. *See Int'l Techs. Consultants*, 137 F.3d at 1387 ("A consent decree in a private action imposes no more on the party to be bound than that party agreed to."). And the United States timely moved to modify the Consent Decree on March 30, 2026, within three months of PHMSA's jurisdictional decision and within three weeks of the DPA Order.

Regardless of the merits of its motion, California's proposed relief—essentially a preliminary injunction—is inappropriate because California has made no attempt to meet the preliminary injunction standard, *see above* Section I.A. And

as this Court has already twice recognized, there is no risk of irreparable injury.

**D. Plains' Statement**

Plains should be terminated from the Consent Decree in whatever order the Court issues. Certain of the Consent Decree's requirements apply to the two former Plains pipelines now owned by Sable, but other ongoing Consent Decree requirements apply to Plains' wider operations, covering over 9,000 miles of pipelines. There is no dispute that Plains has met the Consent Decree's termination requirements. *See CD* Dkt. No. 6-1 ¶¶ 100–02. Neither the United States nor California contests otherwise. The final step is for the Court to order termination as to Plains. Regardless of how the Court rules on the application of the Consent Decree to Sable, or whether it modifies the Consent Decree, Plains requests that any order include the following language from the United States' proposed order: "*Defendants Plains All American Pipeline, L.P. and Plains Pipeline, L.P. are terminated as parties to the Consent Decree, and their obligations to comply with the Consent Decree are terminated*." *CD* Dkt. No. 49-5 at 2.

**CONCLUSION**

The Court should deny California's Motion for Preliminary Injunction and Stay, *Wright* Dkt. No. 16, and Motion to Enforce Consent Decree, *CD* Dkt. No. 55. And the Court should grant the United States' Motion to Terminate or Modify Consent Decree, *CD* Dkt. No. 49.

DATED: June 18, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General
RILEY W. WALTERS
Counsel

*/s/ Stefan J. Bachman*[7]
Stefan J. Bachman
Email: Stefan.Bachman@usdoj.gov
Senior Attorney (DC Bar No. 90008649)
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Enforcement Section
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 598-9566

*Attorneys for the United States of America*

BABST CALLAND
Nicholas McDaniel (*pro hac vice*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

HOLLAND & KNIGHT LLP
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525

*/s/ Nicholas McDaniel*
NICHOLAS McDANIEL

[7] Filer attests that all other signatories listed concur in the filing's contents and have authorized the filing.

*Attorneys for Sable Offshore Corp. and Pacific Pipeline Company*

DANIEL B. LEVIN (State Bar No. 226044)
daniel.levin@mto.com
COLIN A. DEVINE (State Bar No. 315801)
colin.devine@mto.com
MUNGER TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426

*/s/ Colin A. Devine*
COLIN A. DEVINE

*Attorneys for Plains All American Pipeline L.P. and Plains Pipeline L.P.*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this brief is 15 pages in length, which complies with the page limit set by the Court.

*/s/ Stefan J. Bachman*
Stefan J. Bachman
Email: Stefan.Bachman@usdoj.gov
Senior Attorney (DC Bar No. 90008649)
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Enforcement Section
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 598-9566

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff*,

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants*.

No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFFS' JOINT SUPPLEMENTAL BRIEF FILED PURSUANT TO INSTRUCTION AT JUNE 8, 2026 HEARING**

Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

## TABLE OF CONTENTS

**Page**

Introduction ... 1

Argument ... 2

I. The Court Should Grant California's Motion To Enforce the Consent Decree and Deny the U.S. Motion To Modify or Terminate. ... 2

A. The Court Should Not Permit the U.S. and Sable To Defy, Modify, or Dissolve the Consent Decree. ... 2

B. Modification of the Consent Decree Is Not Justified by Any Preemptive Effect of the Wright Order. ... 4

C. Modification of the Consent Decree Is Not Justified by PHMSA's Unlawful Federalization Order. ... 5

II. The Court Should Grant California's Request for a Preliminary Injunction and Stay the Wright Order. ... 7

A. The Wright Order Is Subject to Judicial Review. ... 8

B. California Is Likely To Succeed on the Merits That the Wright Order Is Unlawful. ... 9

1. The Wright Order Exceeds the DPA's Grant of Authority and Violates DOE's Own Regulatory Requirements. ... 9

2. DOE and Sable Have Placed the Wright Order's Preemptive Effect at Issue, and DOE's Attempts To Preempt Are Barred by the Statute and the Constitution. ... 10

C. The Injunction Is Needed To Prevent Irreparable Harm to California. ... 12

D. Equitable Factors Weigh in Favor of a Preliminary Injunction. ... 14

E. The Court Should Grant Preliminary Relief Against the Wright Order Regardless of Relief in Related Cases. ... 14

Conclusion ... 15

## TABLE OF AUTHORITIES

Page

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018) ....... 12

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) ....... 13, 14

*Biden v. Nebraska*
600 U.S. 477 (2023) ....... 4

*Bond v. United States*
572 U.S. 844 (2014) ....... 5

*Ctr. for Biological Diversity v. Cal. Dep't of Forestry & Fire Prot.*
Case No. 25CV02244 (Santa Barbara Sup. Ct.) ....... 13

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ....... 8

*Exxon Corp. v. U.S. Sec'y of Transp.*
978 F. Supp. 946 (E.D. Wash. 1997) ....... 7

*Flores v. Rosen*
984 F.3d 720 (9th Cir. 2020) ....... 6, 11, 15

*Franklin v. Mass.*
505 U.S. 788 (1992) ....... 8

*Helgeson v. Bureau of Indian Affs., Dep't of Interior*
153 F.3d 1000 (9th Cir. 1998) ....... 8

*Hercules, Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ....... 4, 5, 11
516 U.S. 417, 1995 WL 495540 (No. 94 818) ....... 5

*Hook v. State of Ariz., Dep't of Corr.*
972 F.2d 1012 (9th Cir. 1991) ....... 6

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*
10 F.3d 693 (9th Cir. 1993) ....... 2, 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016) .......... 14

*Learning Res., Inc. v. Trump*
146 S. Ct. 628 (2026) .......... 4

*Maryland v. King*
567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .......... 12

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*
606 U.S. 146 (2025) .......... 1, 9

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) .......... 12

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003) .......... 9

*Nebraska v. Su*
121 F.4th 1 (9th Cir. 2024) .......... 8

*Nehmer v. U.S. Dep't of Veterans Affs.*
494 F.3d 846 (9th Cir. 2007) .......... 1, 15

*New York v. United States*
505 U.S. 144 (1992) .......... 12

*Orantes-Hernandez v. Holder*
713 F. Supp. 2d 929 (C.D. Cal. 2010) .......... 3

*Pub. Citizen v. U.S. Trade Rep.*
5 F.3d 549 (D.C. Cir. 1993) .......... 8

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) .......... 14

*Rufo v. Inmates of Suffolk Cnty. Jail*
502 U.S. 367 (1992) .......... 6

*Russello v. United States*
464 U.S. 16 (1983) .......... 10

**TABLE OF AUTHORITIES (continued)**

**Page**

*Sable Offshore Corp. v. Cal. Coastal Comm'n*
No. 2D CIV. B347601, 2026 WL 1745438 (Cal. Ct. App. June 17, 2026) .......... 13
Case No. 25CV00974 (Santa Barbara Superior Court) .......... 12

*SEC v. Coldicutt*
258 F.3d 939 (9th Cir. 2001) .......... 3

*Southern Pacific Pipe Lines, Inc. v. U.S. Department of Transportation*
796 F.2d 539 (D.C. Cir. 1986) .......... 6, 7

*Sprietsma v. Mercury Marine*
537 U.S. 51 (2002) .......... 11

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995) .......... 5, 11

*Util. Air Regul. Grp. v. E.P.A.*
573 U.S. 302 (2014) .......... 5

*Washington v. Trump*
145 F.4th 1013 (9th Cir. 2025) .......... 14

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 7

**STATUTES**

28 United States Code
§ 1450 .......... 4

49 United States Code
§ 60105 .......... 1, 7, 15

50 United States Code
§ 4511(a) .......... 9
§ 4511(c) .......... 9

Cal. Gov. Code
§ 51010 et seq. .......... 12

## TABLE OF AUTHORITIES
## (continued)

**Page**

Cal. Pub. Res.
§ 30106 ... 12
§ 30262 ... 12
§ 30262(b) ... 12

**CONSTITUTIONAL PROVISIONS**

Tenth Amendment ... 12

**OTHER AUTHORITIES**

10 C.F.R.
§ 217.20 ... 9
§ 217.31 ... 9
§ 217.54(a) ... 9
§ 217.54(b) ... 9
§ 271.31 ... 9
§ 271.51(f) ... 9

W. Baude & S. Bray, *When the Executive Has Unclean Hands*, 135 Yale L.J.F. 567 ... 3

## INTRODUCTION

The Court directed the parties to file supplemental briefs addressing the most important issues in *California v. Wright* and *United States v. Plains All-American Pipeline*[1] and responding to the Court's questions at the June 8, 2026, hearing. *Wright* ECF 47, Hr'g Tr., 86:15-90:21, June 8, 2026. This brief does so, addressing the overlapping issues between *Wright* and *Plains* to assist the Court's resolution of the motions pending in both matters.

The legal issues require coordinated resolution. In *Plains*, California seeks to retain its authority to oversee restart and operation of two onshore oil pipelines, regulatory authority afforded it by the Pipeline Safety Act's (PSA) delegation of authority to states to regulate intrastate pipelines, and by this Court's 2020 Consent Decree. The U.S. and Sable offer two arguments for modification: (1) the Wright Order compelled restart of the pipeline irrespective of the pending Consent Decree and the California Office of State Fire Marshall's (OSFM) directives; and (2) the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration's (PHMSA) Federalization Order overrides the Consent Decree and substitutes PHMSA for OSFM as the pipeline regulator and accordingly preempts OSFM authority. Both of these arguments demand resolution of preemption and are incorrect as a matter of law. By placing the Wright Order (under the Defense Production Act (DPA)) and the Federalization Order (under the PSA) at issue in *Plains*, the U.S. and Sable make the Wright Order reviewable in that case. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.,* 606 U.S. 146, 156 (2025).[2] That opens the door to review of the validity of the orders are and whether the Wright Order carries preemptive effect.

---

[1] Because this brief is filed in two cases, we refer to record documents by case short name (*Wright* or *Plains*) followed by ECF number and pincite.

[2] Nor can a party to a consent decree, by its own action, eliminate the jurisdiction of the court enforcing the consent decree. *Nehmer v. U.S. Dep't of Veterans Affs.,* 494 F.3d 846, 861 (9th Cir. 2007).

As to the DPA, that statute confers discretion on the Executive Branch to deputize private parties to provide goods and services, but the U.S. invocation of the DPA Order fails for two reasons: (A) it is an invalid order because it does not "allocate" or "prioritize" and lacks the legally-mandated end date, and (B) even a valid DPA Order cannot broadly preempt California law and would operate only as between the U.S. and Sable. If the Court agrees with California as to either (A) or (B), then the DPA does not justify the U.S. and Sable's position.

Nor does the PSA confer discretion to determine which pipelines are *inter*state and subject to federal regulation, versus *intra*state and subject to state regulation. On this point, the U.S. and Sable's arguments rise or fall not on Executive power, but on Congress's determination. Again, there are two principal reasons the assertion of federal authority fails: (A) as a matter of statutory interpretation, based on undisputed facts, pipelines CA-324/325 are intrastate pipelines that connect two points within California, and PHMSA's "re-definition" to include other facilities is contrary to statute; and (B) this Court's Consent Decree requires approval by California's State Fire Marshal, and neither the U.S. nor Sable offers sufficient evidence of "changed circumstances" to displace the Consent Decree. As with the DPA, if the Court agrees with California as to either (A) or (B), then the PSA does not justify the U.S. and Sable's position.

## ARGUMENT

### I. THE COURT SHOULD GRANT CALIFORNIA'S MOTION TO ENFORCE THE CONSENT DECREE AND DENY THE U.S. MOTION TO MODIFY OR TERMINATE.

#### A. The Court Should Not Permit the U.S. and Sable To Defy, Modify, or Dissolve the Consent Decree.

Enforcement of a consent decree is proper when a party demonstrates that the non-moving party violated the court's order by "clear and convincing evidence." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

California's motion to enforce is straightforward: the Consent Decree prohibits Sable, which assumed Plains's obligations via an Assumption Agreement, from restarting the pipelines then designated as Lines 901 and 903 (now CA-324/325) unless and until Sable has (1) obtained State Waivers (which Sable did), (2) based on completion of those terms of the Waivers, obtained restart approval from OSFM (neither of which Sable did). *Plains* ECF 6-1, RJN Exh. E. The State Waivers required remediation of all relevant pipeline deterioration "prior to restarting." *Plains* ECF 55-1 at 140 (State Waiver for CA-324, ¶ 9), 156 (State Waiver for CA-325, ¶ 9). Sable never complied, and OSFM rightly declined to approve Sable's restart plan. Sable nonetheless restarted pipeline operations in March 2026, saying that it "relinquishes, surrenders and abandons the State Waivers." *Plains* ECF 55-1 at 125. By restarting without first complying with the State Waivers required by the Consent Decree, Sable acted in direct disobedience to a specific and definite court order—making judicial enforcement proper. *Dual–Deck Video*, 10 F.3d at 695.

A party's open and intentional defiance of an injunction, taking active steps to avoid compliance, weighs in favor of denying a motion to dissolve that injunction. *Orantes-Hernandez v. Holder*, 713 F. Supp. 2d 929, 954 n.38 (C.D. Cal. 2010) (citing *Bd. of Educ. of Okla. City Pub. Schs. v. Dowell,* 498 U.S. 237, 249 (1991)) ("compliance is an important and often dispositive factor in deciding whether to lift an injunction."). An injunction—even involving "the federal government"— is "supposed to be complied with unless or until it is stayed, modified, dissolved, or reversed." W. Baude & S. Bray, *When the Executive Has Unclean Hands*, 135 Yale L.J.F. 567, 592 (2026) (citing *Walker v. City of Birmingham*, 388 U.S. 307, 320-21 (1967)). This principle has a practical component: examining a defendant's compliance with court orders is a reasonable part of an inquiry into whether the defendant can be trusted to act lawfully in the future. *See, e.g.*, *SEC v. Coldicutt,* 258 F.3d 939, 942-43 (9th Cir. 2001) (examining defendant's compliance with

injunction to determine likelihood of future violations). Here, there are two injunctions: the Consent Decree, and the Santa Barbara County Superior Court's preliminary injunction (which, since removal on May 14, 2026, has been an order of this Court—*see* 28 U.S.C. §1450). Sable has intentionally violated both injunctions for over three months. Because Sable unilaterally took affirmative steps to defy the Superior Court's orders, without attempting to comply in good faith, this Court should neither dissolve the Consent Decree nor decline to enforce it.

### B. Modification of the Consent Decree Is Not Justified by Any Preemptive Effect of the Wright Order.

The U.S. and Sable argue that the Consent Decree must be modified due to conflict and impossibility preemption, because the Wright Order "makes compliance with [OSFM's] separate regulatory oversight legally impermissible and factually impossible." *Plains* ECF 49 at 19. The U.S. and Sable cannot succeed without showing that the Wright Order has the legal force to displace California's authority over pipeline safety—a showing they cannot make.

To be clear: California is not asking this Court to review the Executive Branch's factual or discretionary national security determinations.[3] Instead, California calls on the Court only to hold the Executive to the statutory bounds set by Congress—a task well within the Court's expertise and constitutional duty. *See, e.g.*, *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 638 (2026) (rejecting tariffs as not authorized by International Emergency Economic Powers Act); *Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (rejecting student loan forgiveness as not authorized by COVID legislation).

The Wright Order *cannot* broadly preempt California state law, and concluding that it does would require adopting a novel interpretation of the DPA, contrary to two federal circuits. *Hercules, Inc. v. United States*, 24 F.3d 188, 204

[3] At the hearing, the Court expressed concern about second-guessing national security determinations by the Executive, but California is not asking this Court to do so here, as the national security findings are not at issue in the present dispute.

(Fed. Cir. 1994), *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995); *see also* Brief for Respondent United States, *Hercules, Inc. v. United States*, 516 U.S. 417, 1995 WL 495540, at *37-38 (No. 94 818) ("every court that has considered the matter has, like the courts below, rejected the argument that Congress intended the DPA's protection to sweep as broadly as Thompson claims"). That was also the federal government's consistent position, until its current, contrived reversal. *See, e.g.*, *Hercules*, 516 U.S. 417, 430 n.14 (1996) (noting U.S.'s position that § 707 "only bar[s] liability to customers whose orders are delayed or displaced on account of the priority accorded Government orders under § 101 of the DPA"). In *Hercules*, the U.S. told the Supreme Court that the DPA provides "protection against liability for government-caused disruptions in existing business-customer relationships" and does not absolve a contractor of its other applicable legal duties. *Id.* at 436.

The U.S.'s current claim, which proposes an apparently unbounded power in the DPA that courts and the federal government itself have long denied, is not tenable. *Cf. Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("[w]hen an agency [of the Executive Branch] claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' . . . [courts] typically greet its announcement with a measure of skepticism"); *Bond v. United States*, 572 U.S. 844, 858 (2014) ("when legislation 'affect[s] the federal balance, the requirement of clear statement [by Congress, not the Executive] assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision'" (citation omitted)).

### C. Modification of the Consent Decree Is Not Justified by PHMSA's Unlawful Federalization Order.

PHMSA's December 17, 2026 Federalization Order, *Plains* ECF 43-1 at 13-15, does not provide a basis for modifying this Court's Consent Decree. Since the Refugio Spill and Consent Decree, every party, including PHMSA itself, accepted

the pipelines as intrastate until political convenience demanded otherwise.[4] This understanding was memorialized in a 2016 Letter Agreement between PHMSA and OSFM and incorporated into the 2020 Consent Decree that the U.S., with a signature by PHMSA's chief counsel, joined as co-plaintiff. *Plains*, ECF 55, Exh. H. Ninth Circuit precedent forecloses PHMSA's effort to circumvent that Consent Decree by its unilateral reversal. *Flores v. Rosen,* 984 F.3d 720, 741 (9th Cir. 2020) ("We reject the notion that the executive branch of the government can unilaterally create the change in law that it then offers as the reason it should be excused from compliance with a consent decree"); *see Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1017 (9th Cir. 1991) (government agency cannot simply ignore a consent decree without following the proper procedure to obtain relief).

During the June 8, 2026 hearing, the U.S. argued that the Court may modify the Consent Decree in response to changed factual circumstances. According to the U.S., jurisdiction shifted to California in 2016 only because the pipeline was not in use (as if jurisdiction turns on whether the pipeline is turned on or off). Hr'g Tr., 48:1-10. Then, according to the U.S, Sable's "unified ownership" and resumed operation of the pipelines was a "changed factual circumstance." *Id*. But the attempt to resume operation was anticipated in the Consent Decree itself. Indeed, that was a major focus of that decree, as evidenced by Appendices B and D's provisions governing restart. And "modification [of a consent decree] should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 385 (1992).

PHMSA's underlying legal position also fails. In *Southern Pacific Pipe Lines Inc. v. U.S. Department of Transportation*, 796 F.2d 539 (D.C. Cir. 1986), Southern

[4] Initially, the pipeline was classified as interstate because of a planned downstream connection into Arizona. Today the downstream end of the pipeline is Pentland, California. No party contends that the nonexistent connection to Arizona controls now. Instead, the U.S. and Sable base their arguments purely on the contention that a segment of an adjacent but separate pipeline upstream reaches federal waters by traversing through the Las Flores Canyon processing plant.

Pacific contended that its oil pipeline systems—containing main trunk lines that crossed into other states and lateral lines entirely within California—were integrated interstate pipelines.[5] *Id.* at 541. The D.C. Circuit rejected this argument, noting that most intrastate pipelines connect to interstate pipelines, so relying on such connections would undermine Congress's intent, "which has always recognized a major role for the states in pipeline safety." *Id.* (quoting 50 Fed. Reg. 39,011 (1985)); *see also Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946 (E.D. Wash. 1997) (rejecting ownership as factor for PHMSA jurisdiction). This case is even clearer than *Southern Pacific*. Southern Pacific's lateral lines connected directly to its main trunk lines, moving the same product that was in the interstate lines. Here, the offshore oil emulsion pipeline connects to the processing plant, where hydrocarbons are separated and treated, before a different product is delivered to Lines CA-324/325.

## II. THE COURT SHOULD GRANT CALIFORNIA'S REQUEST FOR A PRELIMINARY INJUNCTION AND STAY THE WRIGHT ORDER.

For California's request for a preliminary injunction in *California v. Wright*, California "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief," and that the balance of equities and the public interest favor the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). California has a strong likelihood of success on the merits that the Wright Order is unlawful because: (1) the Order violates Title I of the DPA and U.S. Department of Energy's (DOE) regulations;

[5] At the hearing on June 8, 2026, counsel for California and OSFM conceded that "[i]f PHMSA's determination is correct and the PSA applies [to Lines CA-324/325 as interstate pipelines] then California is preempted from regulating the pipeline." Hr'g Tr., 73:2-4. While this statement was correct in context, Counsel should have been more specific: if PHMSA's determination is correct, OSFM is preempted from regulating pipeline safety, but other California agencies retain state police powers beyond the scope of preemption under the PSA, including regulation of employment and state agencies' own property rights. California expects Sable will agree concerning employment but will disagree about State Parks's property rights.

and (2) the DPA cannot displace the state laws and court orders at issue. The equitable factors and public interest also support a preliminary injunction and stay since the ongoing operation of the pipeline causes irreparable harm to California's sovereign and property interests, and the equities and public interest tilt strongly in favor of forcing DOE to respect statutory and constitutional limitations.

### A. The Wright Order Is Subject to Judicial Review.

Agency action is not immunized from review just because it is linked to a presidential proclamation. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021). "The APA applies to any 'final agency action,'" and "[n]o language in the APA prevents or exempts review of an agency action that implements a presidential action." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also Helgeson v. Bureau of Indian Affs., Dep't of Interior*, 153 F.3d 1000, 1003 (9th Cir. 1998) (noting "strong presumption that Congress intends judicial review of administrative actions"). *Franklin v. Mass.*, 505 U.S. 788, 789 (1992) does not say otherwise, and only limits APA review of actions by the President himself.

Neither the text of the Wright Order nor any of the evidence presented by Defendants indicate that the President was involved "at the final stage of the process," or had an important role in the "integrity of the process," such that the Wright Order could be construed to be presidential action. *See Pub. Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C. Cir. 1993) (citing *Franklin*, 505 U.S. at 789). Indeed, counsel for the U.S. stated at the June 8, 2026, hearing that Secretary Wright exercised "independent judgment" in issuing the Wright Order and that the President's delegation did *not* "tell the Secretary of Energy what to do." Hr'g Tr., 7:2-7. Thus, the Wright Order is a reviewable *agency* action because its issuance lacked presidential involvement.

Even if the Wright Order was not reviewable in *Wright*, it would remain reviewable in *Plains* because the U.S. and Sable offered the Wright Order as a predicate for granting relief on their motion seeking modification of the Consent

Decree and a defense to OSFM's motion to enforce the Consent Decree. Where a party offers a federal order as a predicate basis for relief, that order is subject to APA review unless a federal statute unambiguously provides for adequate and exclusive review through an alternative process. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 156 (2025).

**B. California Is Likely To Succeed on the Merits That the Wright Order Is Unlawful.**

**1. The Wright Order Exceeds the DPA's Grant of Authority and Violates DOE's Own Regulatory Requirements.**

Although the Wright Order purports to proceed under Sections 101(a) and (c) of the DPA, it exceeds the Secretary's authority under each. Under those provisions, the federal government may order a private actor to "prioritiz[e]" performance of certain contracts over others and to honor a particular "allocat[ion]" of material and services among competing needs. *See* 50 U.S.C. § 4511(a),(c); 10 C.F.R. §§ 217.20, 217.31. The Wright Order does neither because Sable had no relevant contracts and therefore it cannot prioritize one over another. And, instead of allocating oil already produced, Sable and the U.S. argue that the Wright Order directed Sable to *begin* production and transportation of oil through a dormant pipeline (*Wright* ECF 23 at 12; ECF 24-4 at 3), in violation of state law, federal law, and two court orders.

The Wright Order is also unlawful because it violates DOE's regulations. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) (agencies must follow their own rules). The Order lacks start and end dates, 10 C.F.R. §§ 271.51(f), 217.54(b), detailed descriptions of what is to be prioritized or allocated, 10 C.F.R. §§ 271.51(f), 217.54(a), and priority ratings (DO or DX), 10 C.F.R. § 271.31. These requirements constrain executive power, and should not be discarded. For example, the U.S. asks the Court to excuse the lack of an end date because the Secretary could issue a new order. But a new order would require the

Secretary to, in good faith, find that the circumstances in the future justify a DPA order. The Court should not prejudge the future and should require compliance with the rules that place guardrails on the use of the DPA.

**2. DOE and Sable Have Placed the Wright Order's Preemptive Effect at Issue, and DOE's Attempts To Preempt Are Barred by the Statute and the Constitution.**

DOE and Sable urge the Court to refrain from deciding the preemptive effect of the Wright Order because California's arguments are hypothetical and "must be considered in a case or controversy involving an alleged conflict between the Order and a specific state law." *Wright* ECF 23 at 14; *see Wright* ECF 24-4 at 7-9. Whether the Wright Order displaces state law is not merely hypothetical in these matters. DOE maintains that "the Order preempts any California law that conflicts with its directives that Sable immediately operate the Pipeline." Opp.15. And Sable's and DOE's assertion that the DPA preempts state law is what has caused, and continues to cause, oil to actually flow through Lines CA-324/325 in violation of California's state laws and two judicial orders.

The DPA cannot be construed to broadly preempt state law. First, Congress adopted express provisions targeted to specific state laws that the DPA would preempt, such as state antitrust laws that might consider collusive some activities that DPA orders might require companies to engage in. *Wright* ECF 16-2 at 12 (citing 50 U.S.C. § 4558(j)). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). If a DPA order automatically preempted all state laws that potentially conflict with the order, Congress would have had no need to include such specific express provisions.

Second, any reliance on section 707 of the DPA for "broad preemptive operation" is misplaced. *Wright* ECF 24-4 at 12. As California explained in its

motion, *Wright* ECF 16-2. at 13, section 707 is a limited immunity provision that "extends only to shield a contractor from *breach of contract* liability arising as a consequence of such re-prioritization" and goes no further. *Hercules Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994) (emphasis added); *see United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995) (similar); *see supra* p. 10. This provision shifts the risk of loss—it does not excuse compliance with law.[6]

Third, there is no "conflict preemption" here of the sort that occurs "'where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (citation omitted). The purpose and objective of section 101(a) is to require a contractor to prioritize defense consumption above non-defense consumption, notwithstanding existing private contracts. *Wright* ECF 16-2 at 8-9, 13-15. Enforcement of state laws pertaining to safety, environmental protection, or property rights over state-owned land does not interfere with the goal of prioritizing some contracts over others. Nor can the DPA reasonably be read to have intended to authorize the Executive Branch to flout judicial orders. It is not "necessary" (*Wright* ECF 32 at 7) to "allow[] a government contractor to violate the laws with impunity" in order for it to "perform[] a rated contract" under section 101(a). *Vertac*, 46 F.3d at 812.

Finally, both the federal government and Sable interpret the Wright Order to require California to dedicate state property to Sable's immediate restart of the

---

[6] The Court inquired whether the DPA might displace the Consent Decree, as consent decrees have certain features of contracts. Hr'g Tr., 72:2-18. But consent decrees are not *only* contracts, they are also judgments. The purpose of entering consent decrees as judgments (rather than mere out of court settlements) is to provide finality and certainty. A party to a consent decree lacks the power to unilaterally compel a change to the consent judgment. *Flores v. Rosen,* 984 F.3d 720, 741 (9th Cir. 2020). More, the kind of requirements imposed by the Consent Decree are not provisions that impose *risk of loss* on a particular party—it establishes regulatory powers and responsibilities. A provision like Section 707, which shifts risk of loss, does not authorize changes to agency powers.

pipelines. *Wright* ECF 16-2 at 9 & n.5. Forcing California to reorder its property rights in Gaviota State Park commandeers state government in much the same way as if the federal government made California the owner of Sable's undesirable assets without California's consent. *Cf. New York v. United States*, 505 U.S. 144, 176 (1992) (invalidating federal statute that offered States choice between accepting ownership of nuclear waste and regulating according to federal instructions). The Constitution's structural federalism principles, as well as the Tenth Amendment, forbids such an outcome.

### C. The Injunction Is Needed To Prevent Irreparable Harm to California.

California has suffered and will continue to suffer irreparable harm every day that the Wright Order remains in effect. The Wright Order's interference with California's constitutional sovereignty is itself irreparable harm. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("the deprivation of constitutional rights unquestionably constitutes irreparable injury") (quotation marks omitted). The Wright Order's violation of the DPA, APA, and separation of powers also results in California's inability to enforce its laws. For instance, the Wright Order stands to inhibit California's enforcement of the Elder California Pipeline Safety Act (Cal. Gov. Code § 51010 et seq.), Senate Bill 237 (2025) (amending Cal. Pub. Res. § 30262), and the California Coastal Act (Cal. Pub. Res. §§ 30106 and 30262(b)), and purports to mandate that Sable ignore court injunctions in *Sable Offshore Corporation v. California Coastal Commission*,

Case No. 25CV00974 (Santa Barbara Superior Court),[7] and *Center for Biological Diversity v. California Department of Forestry and Fire Protection*, Case No. 25CV02244 (Santa Barbara Superior Court). These "intangible injuries" have "no adequate legal remedy, such as an award of damages," because California cannot accept a payment as inducement to not enforce its laws; thus, they are irreparable harms. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).[8]

Notably, California's basis for irreparable harm is distinct from that of State Parks in *State Parks v. Sable*, such that this Court can, and should, grant California's motion for preliminary injunction despite its denial of State Parks's motion for the same relief. Contrary to the U.S.'s argument, *Wright* does not merely "repackage" the cause of action in *State Parks*. In the first place, *Wright* alleges a violation of sovereign constitutional rights against *an entirely different defendant* (the federal government) for an entirely different action. *See* Hr'g Tr., 11. Due to sovereign immunity, the federal government presumably does not view itself as amenable to the type of damages remedy that this Court considered adequate in *State Parks.* And second, California's causes of action here involve a different kind of irreparable harm than that of the trespass action in *State Parks.* In *Wright*, California's harm is sovereign injury, not merely a property interest. In *State Parks*, this Court found no irreparable harm from inability to regulate because State Parks has a landowner's—rather than a regulator's—role in the restart. *See State Parks*, ECF 60, at 7. To the contrary, California has been deprived of its ability to regulate Lines CA-324/325 while the Wright Order stands. Accordingly, this Court's

---

[7] On June 17, 2026, the California Court of Appeal for the Second District affirmed the lower court's preliminary injunction. *Sable Offshore Corp. v. Cal. Coastal Comm'n*, No. 2D CIV. B347601, 2026 WL 1745438 (Cal. Ct. App. June 17, 2026).

[8] Additionally, the Wright Order exposes California to a significant risk of harm to public health and safety and the environment, including not only another oil spill but also adverse impacts from Sable's maintenance and operation of the Pipeline. *Wright* ECF 16-2 at 19-20; ECF 16-4 at ¶¶ 3-12; ECF 16-5 at ¶¶ 5-11. Operation of the Pipeline itself, given its history and hazardous contents, creates a cognizable risk.

decision not to grant preliminary injunctive relief in *State Parks* does not affect the availability of the relief here.

**D. Equitable Factors Weigh in Favor of a Preliminary Injunction.**

When a plaintiff establishes a likelihood that a defendant's actions are unlawful, it has "established that both the public interest and the balance of the equities favor" preliminary injunctive relief. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d at 1069. That is because it is neither equitable nor in the public interest for the government to violate federal law. *Id.* And the public has a strong "interest [in ensuring] that the laws enacted by their representatives are not imperiled by executive fiat." *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (internal quotation marks and citations omitted). In contrast, defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), and there "is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

**E. The Court Should Grant Preliminary Relief Against the Wright Order Regardless of Relief in Related Cases.**

While related, the three pending cases involving the State of California and Lines CA-324/325 raise distinct legal issues. Although California encourages the Court to make consistent findings of fact and apply uniform interpretations of law across all related cases, each case contains unique requests for relief. California's statutory and constitutional causes of action in *Wright* are not claims in either the *Plains* or *PHMSA* case. As such, this Court can issue a ruling on the validity of the Wright Order regardless of judicial outcomes in those related cases.

If this Court terminates or amends the Consent Decree in *Plains*, California's claims in *Wright* are unchanged. California challenges the legality of the Wright Order based on the facts and circumstances present at the time Defendants acted.

Under Ninth Circuit precedent, a federal agency may not issue decisions contrary to a consent decree to manufacture changed circumstances, *see infra*, Section I.C., or even to divest the district court of jurisdiction. *Flores v. Rosen*, 984 F.3d 720, 741 (9th Cir. 2020); *see Nehmer v. U.S. Dep't of Veterans Aff.*, 494 F.3d 846, 860 (9th Cir. 2007). Since the U.S. did not obtain modification or termination of the Consent Decree from the district court at the time that DOE issued the Wright Order, the Order is contrary to law and Defendants' action violates separation of powers. Alternatively, if this Court were to enforce the Consent Decree against Sable, Sable would be enjoined from transporting oil unless or until it complies with all of the Consent Decree's Appendix B requirements.

Furthermore, this Court can decide the *Wright* motion without waiting for the Ninth Circuit's decision in *California v. PHMSA*. California does not expect the Ninth Circuit to issue a declaration on whether Lines CA-324/325 are intra- or interstate. The relief the State seeks there is vacatur of the three PHMSA orders on the basis that they violate the APA. And further, whether OSFM or PHMSA is the rightful regulator of the restart does not frustrate California's APA and constitutional arguments in *Wright*. A Ninth Circuit ruling declaring federal jurisdiction over Lines CA-324/325 would moot California's pipeline safety preemption argument, but it would not negate California's DPA Title I arguments and constitutional claims. In the alternative, a Ninth Circuit ruling upholding the intrastate status will only confirm Congress's intent in the PSA that states, not PHMSA, regulates intrastate pipeline safety (*see* 49 U.S.C. § 60105), and California's preemption argument in *Wright* will be undisturbed.

## CONCLUSION

The Court should: (1) grant California's motion to enforce the Consent Decree; (2) deny the U.S.'s motion to modify or terminate the Consent Decree; and (3) stay the Wright Order and preliminarily enjoin Defendants, and all those acting in concert with Defendants, from enforcing or relying on it.

Dated: June 18, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY M. BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief is 15 pages in length, which complies with the page limit set by the Court.

Dated: June 18, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| STATE OF CALIFORNIA, Plaintiff, vs. CHRIS WRIGHT, ET AL, Defendants. | CASE NO: 2:26-cv-03396-SVW-SSC<br>CIVIL<br>Los Angeles, California<br>Monday, June 8, 2026<br>(2:06 p.m. to 4:37 p.m.) |
| UNITED STATES OF AMERICA, ET AL, Plaintiffs, vs. PLAINS ALL AMERICAN PIPELINE LP, ET AL, Defendants. | CASE NO: 2:20-cv-02415-SVW-SSC<br>CIVIL |

SECOND A M E N D E D TRANSCRIPT

NEW CASE STATUS CONFERENCE;

MOTION FOR PRELIMINARY INJUNCTION RE AND STAY AGAINST ALL DEFENDANTS [DKT.NO.16];

MOTION FOR ORDER FOR TERMINATION OR MODIFICATION OF THE CONSENT DECREE [DKT.NO.49];

MOTION TO ENFORCE CONSENT DECREE [DKT.NO.55]

BEFORE THE HONORABLE STEPHEN V. WILSON,
UNITED STATES DISTRICT JUDGE, PRESIDING

<u>APPEARANCES</u>: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy., Suite 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES**:

For Plaintiffs: MICHAEL STEPHEN DORSI, ESQ.
California Attorney General's Office
455 Golden Gate Ave.
Suite 11000
San Francisco, CA 94102

ALICIA IRENE ROESSLER, ESQ.
California Department of Justice
Office of Attorney General
300 S. Spring Street
Suite 1702
Los Angeles, CA 90013

STEFAN J. BACHMAN, ESQ.
DOJ-Enrd
7611 Ben Franklin Station
Washington, DC 20044

For Defendants: RILEY WALTERS, ESQ.
ADAM R.F. GUSTAFSON, ESQ.
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

NICHOLAS MCDANIEL, ESQ.
Babst Calland Clements & Zomnir
505 Ninth St. NW
Suite 602
Washington, DC 20004

JESSICA STEBBINS BINA, ESQ.
Latham & Watkins
10250 Constellation Boulevard
Suite 1100
Los Angeles, CA 90067

COLIN A. DEVINE, ESQ.
Munger Tolles & Olson
350 S. Grand Ave.
50th Floor
Los Angeles, CA 90071

Courtroom Deputy: Daniel Tamayo

**Los Angeles, California; Monday, June 8, 2026; 2:03 p.m.**

**(Call to Order)**

**THE CLERK:** Thank you, counsel. We're going to call the next case at this time.

We are going to call the next three matters together.

Calling Item 5, 2:20-cv-0241 --

**THE COURT:** Let me just say this. There's so many -- is everybody in the courtroom here involved in the case or are they just spectators or other people? Is everybody a lawyer in this case? I guess everybody's a layer in the case. And but I mean there must be some lawyers who are going to speak for their clients so when we call the case, would those lawyers who are going to address the Court for your respective clients just make appearances.

**THE CLERK:** Calling Item 5, 2:20-cv-02415, *United States of America versus Plains All American Pipeline, L.P.*

Counsel, please come forward and state your appearances for the record.

**MR. DORSI:** Good afternoon. Deputy Attorney General Michael Dorsi on behalf of the California Office of the State Fire Marshal. I'm joined by my colleague, Alicia Roessler.

**THE COURT:** What was your name again? Sorry.

**MR. DORSI:** Michael Dorsi. It is spelled D-o-r-s-i.

**THE COURT:** Okay.

**MR. BACHMAN:** Good afternoon, your Honor. My name is

Stefan Bachman for the United States.

**MR. WALTERS:** Good afternoon, your Honor. Riley Walters on behalf of the Department of Justice.

**MS. STEBBINS BINA:** Good afternoon, your Honor. Jessica Stebbins Bina on behalf of Non-Party Sable Offshore.

**MR. MCDANIEL:** Hello, your Honor. Nicholas McDaniel on behalf of Sable Offshore.

**MR. DEVINE:** Good afternoon, your Honor. Colin Devine on behalf of the Plains Defendants.

**MR. GUSTAFSON:** Good morning, your Honor. Adam Gustafson for the United States.

**THE CLERK:** Also calling Item 6, 2:26-cv-00339 --

**THE COURT:** No, maybe it wasn't a good idea to call all three cases. These appearances were made in the *All Plains* case. Is that right?

**MS. SPEAKER:** Yes, your Honor.

**THE COURT:** Okay, you've made your appearances. Would you go back and take your seat. Sorry.

Let's call the Wright case.

**THE CLERK:** Calling item 6, 2:26-cv-03396, State of California versus Chris Wright.

Counsel, please state your appearances for the record.

**MR. DORSI:** Good afternoon, Deputy Attorney General Michael Dorsi on behalf of the State of California. I am

joined by my colleague, Alicia Roessler.

**MR. WALTERS:** Good afternoon, Your Honor, Riley Walters on behalf of federal government.

**MR. BACHMAN:** Good afternoon, Your Honor, Stefan Bachman on half of the United States.

**MR. MCDANIEL:** Hello, Your Honor, Nicholas McDaniel on behalf of Sable Offshore Corp.

**MS. STEBBINS BINA:** And Jessica Stebbins Bina on behalf of Sable Offshore.

**THE COURT:** Okay. You can be seated.

I want to first -- and let me just say this for -- can everyone hear me okay? Can you all hear me? Yeah.

I want to make sure that we do this in a way that's most helpful to me. I have to decide this case, so when you speak, think of helping the Court decide the case. Understandably your arguments are going to be as persuasive as you can for your clients, but I want you to stay on point, because if you don't stay on point we'll just meander and you've already written tones about what you analyzed.

So the point of oral hearing is to get to the heart of things as best as possible.

So first I want to start in the Wright case with the Secretary of Energy's order.

First I want to hear from the United States. Who speaks for the United States?

**MR. WALTERS:** I am, Your Honor, Riley Walters on behalf of --

**THE COURT:** Would you take the lectern?

The argument by the United States is that this Secretary of Energy order starting the -- allowing Sable to start the pipeline was pursuant to the Defense Production Act, and that the Defense Production Act effectively preempts any state action, correct?

**MR. WALTERS:** Not quite, Your Honor, we --

**THE COURT:** But let me -- maybe I started to get into that too early.

In the Secretary's order Sable applied to the Secretary of Energy, correct, for permission to start the pipeline?

**MR. WALTERS:** Sable did request --

**THE COURT:** Yeah.

**MR. WALTERS:** -- actually under the DPA.

**THE COURT:** And how does the executive order relate to what the Secretary of Energy did?

In other words, was the Secretary of Energy directed by the executive order to do certain things, or was the Secretary of Energy considering various options in making the decision? Walk me through that.

**MR. WALTERS:** Okay. Your Honor, I think there are two executive orders and then there's the DPA order. So three

orders I want to touch on here.

The first executive order would be the order from January of 2025, that's the executive order declaring a national energy emergency.

That order directed executive branch officials to take action to address the energy emergency, but that was not the legal basis for the Secretary's DPA order.

Later on in March of this year, it was March 13th of this year, the President issued another executive order delegating certain authorities under the Defense Production Act to the Secretary of Energy, and then the Secretary of Energy --

**THE COURT:** Well let me stop you for a second.

**MR. WALTERS:** Certainly.

**THE COURT:** So when the President delegated certain authority to the Secretary of Energy, that seems to mean that without that delegation the Secretary of Energy would not have had that authority.

**MR. WALTERS:** Correct, Your Honor.

So in the Defense Production Act Congress vested authority in the President, and so whenever a secretary exercises authority under the DPA, the President first needs to delegate authority to that official.

**THE COURT:** And you're saying that the January 2025 didn't do that.

**MR. WALTERS:** No, Your Honor, that was -- that's a

separate executive order. I think that order may mention the Defense Production Act, but that order did not delegate authority under the Defense Production Act.

**THE COURT:** And so what was the specific authority that was the delegation?

**MR. WALTERS:** I'm sorry, Your Honor, just to clarify --

**THE COURT:** What was the specific delegation in the March 20 -- 13, 2025 order to the Secretary of Energy?

**MR. WALTERS:** Yes. So the President issued that order, and delegated I believe it was the authority under 50 U.S.C. 4511(c) to make certain findings.

The Secretary already had some DPA authority based on an executive order from 2012, and so this executive order just delegated a few additional authorities under the DPA, and that came down on March 13th. So --

**THE COURT:** But when he delegated authority to the Secretary of Energy, did the delegation tell the Secretary of Energy what to do?

**MR. WALTERS:** No, Your Honor, it did not. The Secretary used the authority that was delegated to him to form an independent judgment on the national security issues and he issued that order under his authority.

**THE COURT:** And the basis was that the -- there was an energy crisis in California based upon the fact that

California imports most of its oil, that the dependency upon foreign oil created an emergency, especially in California, which is the state with the most military bases.

**MR. WALTERS:** I think you hit all the key points, Your Honor.

Yes, the Secretary determined that there are emergency vulnerabilities on the west coast that jeopardize our national security, namely the fact that California imports over 60 percent of its oil from foreign nations, which leaves our most populous state and the 32 military bases there highly vulnerable to disruptions in the global supply chain like what we're seeing now as a result of the conflict in the Persian Gulf.

**THE COURT:** And so I started to mention a preemption and you sort of questioned that.

Can you tell me what your view of that presidential order and the action of the Secretary of Energy is as it relates to preemption?

**MR. WALTERS:** Yeah, absolutely, Your Honor. And I think it might be helpful if I clarify what's at issue in this case on the merits.

**THE COURT:** Yes.

**MR. WALTERS:** So I'll start with what's at issue.

What's at issue is the facial legality of the Defense Production Act order, and now that California has withdrawn its

arbitration and capricious argument, I think for purposes of this motion only, they didn't remove it from their complaint -- but I think they stepped back from their arbitrary and capricious argument -- so California has raised three live issues that go to this order's legality.

First is whether the DPA order is a valid exercise of the President's prioritization and allocation authorities granted by the Defense Production Act.

The second issue, as they frame it in their PI briefing, is whether the constitutional avoidance cannon forecloses the federal government's interpretation of the DPA.

And then the third issue is whether the DPA order violates Department of Energy regulations, and if so, whether that justifies California requested relief.

What's not at issue in this case is preemption. Whether the DPA order preempts state law is irrelevant to its facial legality.

If California is right that the DPA order lacks preemptive effect, then California can bring an enforcement action against Sable like it has done in other cases, such as the *State Parks* case, and if California is right then Sable's preemption defense would fail, but the DPA order would still be valid, just like a federal statute is still valid even if it doesn't preempt a particular state law.

Now, I'll note that California has now filed three

briefs in support of its motion, and it will present argument today, and until today they have not identified a single case, not one case holding that an order or regulation is unlawful simply because it lacks preemptive effect.

And so our position is that the preemption question is irrelevant for purposes of this case on the merits.

**THE COURT:** Okay. But address the arguments that are on the table.

**MR. WALTERS:** Certainly, Your Honor. On the merits?

**THE COURT:** Yeah.

**MR. WALTERS:** I just want to take one step back because I do think -- they do raise preemption as a basis for irreparable harm, and I think it could be relevant there, I just think it's it fails. Can I address that?

**THE COURT:** But the preemption issue, at least as I see it now, is that even if this Court finds that the Secretary's order is lawful, then the -- California is going to argue that you still can't allow the oil to flow because this is trespass on State land.

**MR. WALTERS:** Yes, Your Honor, that is what they're going to argue, and that I think underscores why this is a separate question.

So this case is challenging the legality of the Defense Production Act order. If Your Honor holds that the order is lawful, then California can still continue on with its

trespass action in the *State Parks* case and the Court may need to decide the DPA preemption question there.

Your Honor may not reach that question because I understand that Sable has raised non-DPA related defenses to the trespass action, but if Your Honor rejects those defenses then it would have to reach the DPA preemption question.

**THE COURT:** All right. Then let's stay with what you outlined.

**MR. WALTERS:** On the merits, Your Honor, or irreparable harm? Because I do think their preemption argument does play into the irreparable harm points, and it might be helpful if I address it.

**THE COURT:** All right, go ahead.

**MR. WALTERS:** Okay. So California in this case raises three arguments in favor of irreparable harm, and this Court has effectively already rejected two of the them in the *State Parks* case.

So their first argument is that there's a risk of an oil spill harming the environment and endangered species, but this Court rejected a similar argument in the *State Parks* case when it said, quote, the evidence militates to indicate the absence of such an imminent risk, and the same is true here.

The United States has introduced unrebutted evidence from PHMSA showing that the pipeline is operating safety under federal supervision, and has been operating safety for nearly

three months now. California introduces no evidence of the other side. So -- much less evidence that there's likely to be an oil spill during the pendency of this litigation.

So that's their first theory of irreparable harm.

Their second theory is that the DPA order deprives state parks of its property rights, but this is just repackaging of the exact same argument they made in the State trespass case that Your Honor has already rejected, and to reach this issue here to -- you have to conclude that the DPA order in fact deprives California of its property rights, but that's the issue that's being litigated in the *State Parks* case and the Court should not prejudged the merits of that litigation in the context of the PI here.

And finally this is where preemption comes in. California argues that its suffering irreparable harm because the DPA order preempts the State's regulatory powers, but this is just legalese to cover up a policy disagreement over the restart of the pipeline.

California doesn't identify what regulatory powers are being displaced or what laws the State can't enforce.

As Your Honor knows, the State is enforcing its laws against Sable, including in the State trespass case, and its arguing in that litigation and it's arguing on the merits here, improperly, that the DP order lacks preemptive effect.

California cannot have its preemption cake and eat it

too. The DPA order either preempts State law or it doesn't, and California's position is inconsistent on this issue. But again, they haven't identified any law that it's being displaced.

The best they can do is to conjure up two hypotheticals.

One involving Cal gyms inspection duties, the other involving the Department and Fishing Wildlife's permitting requirements, and then they ask this Court to issue an advisory opinion on the possibility of preemption in those hypothetical scenarios.

You don't have to take my word for it, just look at California's own declarations. The Sharma declaration at paragraph -- I'm sorry, Your Honor -- the Sharma declaration at paragraph 11 says, and I quote, if Sable denies access to Cal gym inspectors on the basis of the Wright order it would impede Cal gym's ability to ensure compliance. That's Cal gym.

Now the Fish and Wildlife Department, the Vance declaration addresses this, this is paragraph 15 of the Vance declaration, it says, and I quote, depending on the type of maintenance repair or other work to the pipeline that will need to be completed, certain permits might be required before the work may begin.

Based on these daisy changes of speculation California wants Your Honor to hold that the State is likely to

suffer irreparable harm during the pendency of this litigation.

As Your Honor recognized in the *Parks* case, California is grasping at straws and the Court can deny the PI motion on that basis alone. We think it offers a simple path out of the emergency litigation that California has created, and you don't even need to reach the merits here.

Moving on I'd also like to address the public interest and equities which merged here.

It goes without saying that there is no greater public interest than the security of the nation.

**THE COURT:** Well let's turn to the arguments that they do make --

**MR. WALTERS:** Okay.

**THE COURT:** -- about the lawful nature of the Secretary's order.

**MR. WALTERS:** Absolutely, Your Honor.

We -- the United States has introduced a threshold question there that none of their arguments are reviewable under the APA because they are effectively challenging presidential action, which is unreviewable under the APA.

And I'm happy to go into that, I know we briefed it, I do want to respond to a couple of the points that California makes in its reply brief.

It notes that the *Nebraska v. Su* case forecloses this argument, but that's just not correct. That case did not

involve a delegation of presidential authority to an agency. There the President directed agencies to include minimum wage requirements in federal contracts and the Department of Labor simply implemented that policy by promulgating a rule through notice and comment. There was no delegation of presidential authority to the Department of Labor.

The case Your Honor should look at on this issue is the case we cite, the *Jensen* case from the Ninth Circuit. In that case there was a treaty that delegated authority to the President to approve fishing regulations. The President then subdelegated that authority to the Secretary of State and the Secretary of State approved a regulation.

When the plaintiffs brought an APA challenge the court held that the Secretary was exercising presidential authority and therefore his actions were those of the President and therefore unreviewable under the APA.

And that's the exact same set up we have here, the DPA delegates authority to the President, the President subdelegated that authority to the Secretary of Energy, and then the Secretary of Energy relied solely on that authority to issue the DPA order.

So this case is on all fours with *Jensen*.

California notes that *Jensen* was decided before *Franklin*, which is the Supreme Court case that made clear that APA doesn't provide review of presidential action, but that

only strengthens *Jensen's* conclusion. Again, *Jensen* held that because the Secretary was exercising presidential authority, his actions were those of the president, and *Franklin* makes clear that if the actions are those of the President they're not reviewable under the APA.

So we think Your Honor doesn't node to reach the merits, none of them are reviewable, even their constitutional arguments. We recognize that they raise two constitutional claims in their complaint, but for purposes of their PI motion, California relies on the doctrine of constitutional avoidance or I should say the cannon of constitutional avoidance, which is a cannon of statutory construction, and as the Supreme Court has explained, constitutional avoidance is not a method of adjudicating institutional questions by other means.

When a litigant invokes the cannon of avoidance, he seeks to vindicate his own statutory rights, not his constitutional rights. This is *Clark v. Martinez*, 543 US 371, 381 to 82, from 2005.

Because California is using its constitutional arguments to address the meaning of the APA -- or the DPA, it's making a statutory argument that must be channeled through the APA, and therefore those arguments are unreviewable as well.

So Your Honor can conclude there's no likelihood of success of the merits based solely on the reviewability issues, but I do want to address Your Honor's questions on the merits

of the other three issues they raise.

So I'll start with the President's prioritization and allocation authorities.

The DPA order really is a straightforward exercise of those authorities, and I'll start with the allocation authority, which broadly authorizes the President to, quote, allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense. Applying that text to the facts here it's really a straightforward analysis.

The order allocates oil that were stranded in an offshore oil field by moving it to where it's most needed on the west coast, and by directing Sable to transport the oil through the pipeline the order directs the manner and the conditions of that allocation. That's the extent of the analysis.

California makes, you know, a lot of --

**THE COURT:** Well they make one argument that the allocation aspect is not fulfilled because there's no beginning and no end to the allocation.

**MR. WALTERS:** Well that's an argument they make with respect to the third issue I flagged about compliance with departmental regulations.

**THE COURT:** Yes.

**MR. WALTERS:** The statutory text doesn't impose any limitation on the duration of an allocation order --

**THE COURT:** I see.

**MR. WALTERS:** -- and honestly nor do the regulations. The regulations require an end date, and our position as we laid out in the brief, is that this does have an end date, it doesn't have a specific calendar date because it's impossible to know in advance when the problems necessitating the order are going to abate, and so the Secretary explained that the order is in effect until those problems go away.

We think that complies with departmental regulations, but even if Your Honor disagreed, the APA incorporates a harmless error standard in 5 U.S.C. Section 706, and California has not explained how the lack of a specific calendar end date changed the outcome here.

The secretary issued the order based on his national security determination stemming from the energy vulnerabilities on the west coast, an end date had no effect on that decision, nor does California explain how it's harmed by the lack of an end date.

If California is right and there had to be a specific calendar date, then the secretary can just input a date and if we get to that date and the problems are still there the Secretary can just change the date.

And so this is -- you know, this is a little bit of

the tail wagging the dog. I think this is a bit of a distraction.

But back to the statutory text, which does not require a specific end date, California says it's not an allocation because we're ordering production. That's actually a misstatement of what the order is doing. The order does not compel production, it didn't have to. California law was not preventing Sable from extracting oil on its offshore oil platforms that are, you know, part of federal leases, Sable could do that before the DPA order.

And in fact my understanding is that when the oil started flowing through the pipeline on March 14th, that oil had already been produced and extracted independent of the DPA order.

And so all the DPA order is doing is telling Sable to move that oil from a stranded offshore oil field to where it's actually needed on the west Coat coast.

But even if the DPA order implicitly compelled production, that's allowed by the DPA, as we explain in our brief, the DPA authorizes the President to allocate services, and services is defined to include any effort that is needed for or incidental to production or distribution. And so right there in the text it says that the DPA can be used to compel production.

So that's the allocation authority, Your Honor, you

can sustain the order on that basis alone, but we also invoke the prioritization authority, and basically what the order does is instructs Sable to prioritize the performance of contracts for hydrocarbon transportation and priority to other contracts, and we think it's a valid exercise of that authority as well.

Those are the statutory arguments, Your Honor, I'll move to the institutional avoidance arguments they make, unless you have any questions on -- okay.

So again California raises the doctrine of constitutional avoidance to say our interpretation of the DPA is wrong, but interpreting the DPA as written does not violate the constitution. They cite the anti-commandeering doctrine and the separation of powers. I'll start with the anti-commandeering doctrine.

That doctrine doesn't fit because the DPA order does not directly regulate California. The anti-commandeering doctrine prohibits the federal government from directly imposing an obligation on the states and ordering them to do or not do something.

If you look at the Supreme Court's landmark anti-commandeering cases this is very clear. For example, in *New York versus United States* the federal government required states to regulate radioactive waste according to the instructions of Congress.

In the *Prints* case the federal government required

state and local law enforcement officials to conduct background checks on prospective handgun buyers.

And then in *Murphy*, most recently, the federal government prohibited states from authorizing sports gambling.

The DPA order here doesn't do anything like that. It imposes an obligation on Sable, and California cites no case to support its theory that there's an anti-commandeering doctrine simply because the federal government's action has an indirect effect on the state.

California's second constitutional argument is a separation of powers argument. They accuse us of encroaching on judicial power by violating the consent decree, but the DPA order does not violate the consent decree for two reasons.

First there's no conflict with the consent decree because no provision of the consent decree conditioned or limited the United States's ability to exercise its authority under the Defense Production Act.

The second reason is that to the extent there is a conflict between the DPA order and the consent decree, Supreme Court precedent, namely in *Rufo*, requires that the consent decree be modified. It requires it to be modified because federal law has now made impermissible certain obligations under the consent decree, and if the DPA order requires the consent decree to be modified it cannot logically be in violation of it.

**THE COURT:** Well does the DPA order, in to have effect, require a modification of a consent decree?

**MR. WALTERS:** No, Your Honor.

**THE COURT:** So why did you make that argument?

**MR. WALTERS:** No, I made that argument in response to California's argument only, because California is arguing that the DPA order violates the consent decree and that's a constitutional violation, and therefore the DPA --

**THE COURT:** I see.

**MR. WALTERS:** -- is invalid.

And my only point is to say, even if there's some tension between the DPA order and the terms of the consent decree, the DPA order cannot logically or legally be in violation of the consent decree, because under the Supreme Court's decision in *Rufo* the DPA order would require the consent decree to be modified.

So the United States is not encroaching on judicial power, California is trying to use the consent decree to encroach on executive and legislative power.

And finally, Your Honor, I think that's the three merits issues. If I could just say a few words about the public interest and the equities --

**THE COURT:** Just one --

**MR. WALTERS:** -- because I don't want those to get lost.

**THE COURT:** Just one moment.

**(Pause)**

**THE COURT:** California advises the Court that there have been several out of circuit cases which control this issue. One from the Eighth Circuit, I forget the other case, and they also cite a fairly recent Ninth Circuit case, I think. Are you -- how do you address those?

**MR. WALTERS:** Yes, Your Honor, thank you for the question.

And so I think they point to the *Hercules* case from the Federal Circuit and then the *Vertack* case from the Eighth Circuit, and our position is neither of those cases are relevant, and I'd offer Your Honor three reasons.

First, those cases were interpreting the immunity provision in the DPA at 50 U.S.C. Section 4557, they were interpreting the scope of the DPA's immunity provision. That's not relevant to whether the order is valid under the DPA under 4511. So that's point one.

Point two --

**THE COURT:** Can you explain that a little clearer to me?

**MR. WALTERS:** Yes, Your Honor.

So at issue in case this is the orders legality under 50 U.S.C. Section 4511, that's the provision in the DPA that authorizes these prioritization and allocation orders.

The two Courts of Appeals cases Your Honor referenced address the meaning of the immunity provision in the DPA, and what that provision says is that when an entity is complying with a DPA order, even an order that's later determined to be invalid, they are immune from penalties and damages as a result of that compliance. And so that's a completely separate question from whether the DPA order is lawful.

That question would only come into play if Your Honor held that the DPA order was unlawful and then California tried to impose penalties or damages on Sable, then you would have to interpret the scope of that immunity provision, but totally separate question. So that's point one.

Point two is even on the preemption question, which is not at issue in this case for reasons I stated earlier, the *Hercules* and *Vertack* cases did not address whether, you know, implied conflict preemption was available under the Defense Production Act. Those cases again were interpreting the scope of the immunity provision, and regardless of the scope of that provision, it's still entirely consistent with those decisions to hold that when a DPA order is in conflict with the application of state law and it's impossible to comply with both, the DPA order preempts state law. So again, two separate questions.

And then finally those two cases are just fundamentally different on the merits. They were addressing

the downstream consequences arising out of the performance of DPA contracts.

This case is about whether Sable is barred by State law from merely complying with a DPA order.

For this case to be remotely similar to *Hercules* or *Vertack*, Sable would need to operate the pipeline, they would need to be an oil spill, and then Sable would need to claim that it's immune from penalties or damages arises out of that oil spill, but that's just not the factual set up we have here.

**THE COURT:** Okay.

**MR. WALTERS:** So the bottom line, Your Honor, we think those cases are irrelevant to the issues before you, the only issue before you is the legality of the DPA order.

**THE COURT:** Are you -- I didn't -- I sort of cut you off on a few other issues. Can you go through those quickly?

**MR. WALTERS:** Yes, I'll go through those quickly, Your Honor, and then I'm happy to answer any questions --

**THE COURT:** Yes.

**MR. WALTERS:** -- you have.

So it goes -- and this is on the public interest and the equities, which merge here.

It goes without saying that there is no greater public interest than the security of the nation, and like the Supreme Court's decision in *Winter*, the executive branch's national security determination should make this analysis

straightforward.

As we talked about earlier, the Secretary issued the DPA order to address energy vulnerabilities on the west coast that jeopardize our national security, namely the fact that California imports over 60 percent of its oil supply from foreign nations which leaves our nation's most populous state and the 32 military bases there highly vulnerable to disruptions in the global supply chain.

Congress enacted the Defense Production Act to address precisely that type of problem. The statute explicitly recognizes that energy security is national security, so it provides the President with an array of authorities to ensure that our domestic energy supply supports the national defense.

The DPA order here is a textbook exercise of what the statute is designed to do. Because of the order nearly 50,000 barrels per day of domestic crude oil that were stranded off the coast of California is now flowing into the State, where it will go to instate refineries that supply essential U.S. military installations --

**THE COURT:** Let me ask you a question about that oil storage. Are you arguing that all the oil that's been going through the pipeline was already produced?

**MR. WALTERS:** No, Your Honor, not arguing that.

My understanding -- and this may be a better question to ask Sable's counsel -- but my understanding is when Sable

turned on the spigot and started moving oil through the pipeline on March 14th, that oil had already been extracted from the offshore site.

Our position is not that all of it had already been produced.

**THE COURT:** I see.

**MR. WALTERS:** And so the oil is going to go to instate refineries that supply essential U.S. military installations and activities, and California's requested relief would eliminate that concrete benefit, cast aside the national security determinations of the executive branch, and increase the State's dependence, and by extension our military's dependence on foreign oil at a time when in the ongoing conflict if the middle east is disrupting the global supply chain. Compared to the speculative harms that California raises, the equities here do not present a close question.

And so, Your Honor, we would ask that you deny the motion, I think the simplest way for doing that is simply to deny it for the utter failure of California to demonstrate irreparable harm, and you can reserve the merits questions for another day, but if Your Honor reaches the merits we win clearly on those issues as well.

Happy to answer any questions you have, otherwise I'll rest on our briefs.

**THE COURT:** I may have a question later.

I'll give the State an opportunity to speak. Who speaks for the State?

I'm most interested in the arguments regarding irreparable harm and not so much, unless you want to address those, you know, the national interests and the Defense Production Act and its purposes and whether they were fulfilled here. It's more the push-pull between the State and that order.

**MR. DORSI:** Thank you, Your Honor.

So then I'll start with that.

**THE COURT:** Okay.

**MR. DORSI:** I do think this is going to inevitably cross over into the consent decree case, so if you ever want to stop me and tell me that's for the consent decree just go ahead and I can --

**THE COURT:** Well so I mean how are you saying it will -- briefly just so I can start to get my thinking about that -- how will it spill over into the consent decree?

I mean the United States did argue that -- it seemed to argue that the Secretary's order would require a modification of the consent decree.

**MR. DORSI:** Right. So to sort of -- I'll take this in two parts if that's all right, Your Honor.

Is first, the irreparable harm, the principle irreparable harm to the State of California here is its

inability to carry out its laws.

The State is irreparably harmed when it is not able to carry out its functions, enforce its own laws, is prevented from doing so, this is well-established in Supreme Court precedence.

And you know, one formulation of irreparable harm, which you used in the *State Parks* case, was irreparable harm is something that can't with compensated for with money.

The State of California cannot accept a payment of money as like we'll pay you this money for you to not enforce your laws. So this is the kind of harm, the displacement of the State's enforcement --

**THE COURT:** Well but what -- you're arguing that the State has the right to regulate and enforce its laws, but the order of the Secretary is based upon a national energy emergency.

Are you saying that that order should not supplant the ability of the State to regulate the pipeline?

**MR. DORSI:** You guessed my second part to this answer, Your Honor.

**THE COURT:** I mean is your answer, yes?

**MR. DORSI:** Yes. My answer is that the federal order can't do that, and can't for two reasons.

The first is, the federal government cannot compel the change of a consent decree based on an action of the

Case: 26-5409, 10/02/2026, DktEntry: 19.1 (286 of 1218)



executive branch.

So their argument here was based on the *Rufo* case, and I think they're reading more into the *Rufo* case than is actually there.

**THE COURT:** But they're just saying they can't change the consent decree, but I issue the consent decree, so why can't I change the consent decree?

**MR. DORSI:** So the precedence in this -- in the Ninth Circuit say that you can change the consent decree based on changed underlying factual circumstances, but not changed on a federal government order, and the federal government has tried this in --

**THE COURT:** Well but aren't there changed factual circumstances?

I mean among the changed circumstances -- well maybe not a presidential order, but a changed circumstance might be this national emergency, energy emergency, it might be the fact that it's now interstate, not intrastate, that's another question, because that issue is before the Ninth Circuit I know in another case, and I notice it's going to be argued shortly, I think July 7th, and -- but regardless of that case of course I would be bound by whatever the Ninth Circuit decided.

Couldn't this Court decide whether it's now preempted, it's now intra -- interstate.

**MR. DORSI:** So I think you have three or four

questions baked in there, and I'll try to take them one at a time.

**THE COURT:** Well I mean if I gobbled them together simplify them.

**MR. DORSI:** Sure. So the Ninth Circuit case asks you to -- asks -- we are asking the Ninth Circuit to resolve a different question than what we're asking you to resolve.

The Ninth Circuit case asks whether the Pipeline and Hazardous Material Safety Administration's orders were arbitration and capricious or are contrary to law.

So that case is evaluating whether PHMSA considered substantial evidence, considered the things it was supposed to do.

You may be disappointed if you wait for that case and it comes back saying that, well PHMSA just didn't consider things that it was supposed to and it needs to make another attempt to do it.

In this case when it comes to the issue of interstate versus intrastate it's a different legal standard.

So for modification of a consent decree, this is what I was talking about a minute ago with the *Rufo* case, is there has to be a showing of changed circumstances, and the Ninth Circuit in a couple of cases has interpreted that to mean a factual circumstance change, not a legal circumstance change, at least not from the executive branch.

So the executive branch is a party to the consent decree, it can't then go and issue an order in some other context --

**THE COURT:** Meaning the presidential order itself is not a changed circumstance.

**MR. DORSI:** Exactly.

**THE COURT:** But -- so are you arguing that other than the presidential order there are no changed circumstances?

**MR. DORSI:** Not so -- not changed circumstances that suffice to change -- to justify changing the order under the standards for consent decree in this circuit, and let me take them one at a time.

**THE COURT:** Okay.

**MR. DORSI:** So when it comes to the Pipeline Safety Act orders by PHMSA, the basis -- and this is in the -- this is in PHMSA's own order, and this is in the opposition brief in the consent decree case -- the basis is this unified ownership and operation of the pipeline, the offshore pipeline, the onshore processing facility, and then the onshore pipeline calling it a single integrated facility.

So this is the same position that a different pipeline company, Southern Pacific Pipeline's asserted in *Southern Pacific Pipeline versus Department of Transportation* in the D.C. Circuit, and the D.C. Circuit I think analyzed this quite well and said, no, the ownership of the pipeline and the

integrated operation doesn't matter, because if you looked at it that way you would eliminate many of the traditional preserved roles that the State has in regulating local pipelines.

That decision I think holds up quite well --

**THE COURT:** But wasn't it always interstate?

In other words way back when it started wasn't the -- wasn't oil being produced offshore, transported to a facility, and then into the pipeline?

**MR. DORSI:** So --

**THE COURT:** Well I mean isn't that interstate?

**MR. DORSI:** Not under the Pipeline Safety Act. Maybe under the commerce clause.

So if there was a different statute from Congress then there could have been that rule, but that's not the rule under this statute. And if you look and compare a variety of relevant statutes the Pipeline Safety Act's definition of interstate commerce for oil is actually narrower than the Pipeline Safety Act's definition of interstate commerce for gas, and it's defined by where the pipeline is.

And PHMSA understands this and you can tell that from PHMSA's December 17th order where PHMSA says, we are redefining not where the oil goes, but the facility itself to include the undersea pipeline from the offshore platform to shore, the onshore processing facility, and then the onshore pipeline.

So the basis for interstate commerce under the Pipeline Safety Act is probably the narrowest interstate commerce definition that I've seen in any statute.

**THE COURT:** Well let me ask you to stop at that point and explain to me further.

Are you arguing that the question of whether something is interstate or not is governed by a particular act rather than the constitution?

**MR. DORSI:** Yes, absolutely.

**THE COURT:** Okay.

**MR. DORSI:** The statute says, for purposes of this statute a national gas pipeline has one definition of interstate, an oil pipeline has a different.

**THE COURT:** Okay.

**MR. DORSI:** Now those -- let me be clear -- there's an outer bound on those. You -- Congress can't have a statute that defines as interstate something that would be beyond the bounds of the commerce clause, but Congress is perfectly within its power to define interstate commerce more narrowly under a particular statute. It does that here, it does that with railroads, it does that with electricity. There's a number of different statutes, and they make sense given the technical features of the particular technology that make it easier to draw the delineations of the lines.

**THE COURT:** All right. Okay.

**MR. DORSI:** So I've gotten a little bit afield from the question that you have in front of you on this question about the Pipeline Safety Act. The question you have is whether there's a change in circumstances. It's a factual change, not PHMSA's order, but whatever the underlying factual basis is that is sufficient to justify changing the consent decree. And our answer to that is no, because a change in ownership doesn't matter. And I think I've made it through --

**THE COURT:** And the presidential order doesn't matter. And the executive order doesn't matter.

**MR. DORSI:** No, I don't think an executive order about an emergency can change whether a pipeline would be interstate or intrastate. That's going to matter. I'll get back to that on the defense production act side.

**THE COURT:** It doesn't matter with a presidential order whether it is interstate or intrastate.

**MR. DORSI:** So I think you're asking me if I lose the other half of the case, do I lose the case?

**THE COURT:** I'm just trying to get as much information as I can to make the best decision I can. I'm obviously not going to make a decision now.

**MR. DORSI:** Sure.

**THE COURT:** So I don't know what my end game is. So I'm just trying to get information.

**MR. DORSI:** Sure. So the other point I wanted to

make about interstate versus intrastate is there's a second case that's dealt with this question of does combined ownership matter. It's Exxon Corporation v. Department of Transportation from the Eastern District of Washington. It takes a slightly different approach than the D.C. Circuit. It does a more textualist approach and says there's nothing in the text here that says that matters. It doesn't matter for this statute. It isn't the kind of change that would make the difference. So I think that's pretty well -- I know you called me up here on the Defense Production Act case, but I'm trying to answer your question, and it goes to the consent decree case.

**THE COURT:** No, I mean, I appreciate the arguments, and if you have to go a different direction to make your point, then do it.

**MR. DORSI:** Sure. So then, you know, I think the second necessary question then on the consent decree is the changed circumstances for the Defense Production Act order. Was there a changed circumstance that justifies that? And if you look at the brief, it's just the so-called -- the alleged changed circumstance is one order backed by another order, and the Ninth Circuit has rejected that basis of changed circumstances.

**THE COURT:** Explain that to me.

**MR. DORSI:** Sure. So if you look, it's in -- the idea, the concept. Let me walk through the cases, and then

we'll walk through what the argument is here. So in the Namer case, there was a requirement to go through the consent decree for treatment of veterans with Agent Orange to have certain evaluations done. And the Department of Veterans Affairs issued a regulation that was contrary to that process and then insisted that that case had to be reviewed -- that regulation had to be reviewed in the Federal Circuit, because regulations of the Department of Veterans Affairs had a statute that says you review them in the Federal Circuit. I think that's -- the U.S. can tell me if that statute is still in place.

In any event, the district court says no, this is a consent decree, everyone's agreed to be here. One party to a judgment and a contract cannot get out of it by doing that. So you get two conclusions. First, the case stays with the district court, correctly in front of it. And second, they have to have the substantive change circumstance, not just their rules. The same thing happens in the Flores case, where this district was presented with a Homeland Security rule, rejected the change, said the federal government's own orders can't create the change. So you'd have to have some sort of change circumstance that's a factual change, not just the president declared an energy emergency or the president issued a delegation.

**THE COURT:** Well, why not? I mean, basically, I mean, the president says that there's a national energy

emergency, and a court five, six years ago entered a consent decree, and it's a national emergency, and the court then says, sorry, I know there's a national emergency, but this consent decree doesn't allow you to carry out that order. So you're saying and arguing that I can't -- this Court can't modify the consent decree to allow the order to go forward.

**MR. DORSI:** So if the argument is based purely on the president's order or cabinet secretary's order, then my answer to that is yes, and the Ninth Circuit's answer to that is yes, in the Namer case and in the Flores case. They could make a case for factual change, but the factual change here is an oil price that's within the range that we've had, you know, in the years preceding the consent decree, and in a spike that we've had after that. It's not the kind of change --

**THE COURT:** But the argument is not just the price of the oil. It's the vulnerability to dependence on importing oil and the presence of an extraordinary number of military bases in California. I mean, not just the price of the oil. It's what if these countries decide for political reasons not to sell the oil.

**MR. DORSI:** Sure. So I think if you're looking at that, then you're looking at is there a changed circumstance about military readiness from 2020 when the consent decree was entered.

**THE COURT:** So now you're asking me to get into the

bowels of what the president has done with a very, very broad textual statute. In other words, you're saying courts should get into the nitty-gritty here about the price of oil, whether there really is an emergency, whether Venezuela will still -- I'm making that up -- still sell oil to California and sort of analyze in some depth the appropriateness of the national emergency. Is that your argument?

**MR. DORSI:** I think there could be hard cases and there could be cases with some deference, but I think this is an easier case.

**THE COURT:** So in other words, easy because it's absurd or because you think there's reason to doubt it?

**MR. DORSI:** I think it's an easier case because it's a -- you're making a different argument than what the United States has made in this case for the change of circumstances in the consent decree.

**THE COURT:** I'm not making any argument.

**MR. DORSI:** You are --

**THE COURT:** I'm just asking a question.

**MR. DORSI:** You are asking me a question based on a premise that's different than their argument. And the question is sort of based on a concern that I think is a kind of ongoing concern rather than a changed circumstance. So for the consent decree, there's sort of two core problems. The first is they're not pointing to an underlying change. And the second

is they have to come here first. And that's in our brief as well, that a party can't simply -- the United States can't simply push through the consent decree. It has to come to the Court and ask because the consent decree is an order of the Court.

**THE COURT:** Well, what if I do modify the consent decree now?

**MR. DORSI:** If you do modify the consent decree now, you would have backward-looking violations for the time between the change -- between the violation and the consent decree, and then you would change the consent decree now. By failing to go to the Court after the United States has agreed to a consent decree, it is a contract party and a judgment party. It is choosing to be the judge in its own case rather than coming to the Court and asking the court to modify the judgment. And that's beyond the power that it has. That's an issue that the United States has raised in this court and --

**THE COURT:** Let me ask you something. You've raised some questions that I have for the United States. You may have a lot more to say, but have you at least said enough for me to get some response from the United States, or is there something that really is at the heart of your argument? I'm understanding what you're saying. I want to go back to the United States and maybe give you a chance to then respond.

**MR. DORSI:** If you'll promise me that I can come back

up, I will happily let you give it to the United States.

**THE COURT:** I give you that promise.

**MR. DORSI:** Can I wrap up a couple of issues then?

**THE COURT:** Yes. Yes.

**MR. DORSI:** All right. So, on the consent decree case, I don't think there's really a serious dispute about formal, complete compliance. Paragraph 21 of the consent decree imposes injunctive relief. It uses those words. Paragraph -- it requires completion of Appendix B, which delegates to the State Fire Marshal, the control over restart of the pipelines.

**THE COURT:** I'm going to stop you right there. The Fire Marshal's approval, I mean, in Appendix B, I can't recall the exact language, but there's an either or part of it. One of the or's is the Fire Marshal's approval. And if, how would you respond to this, I don't know, argument or, how else do I put it, argument? What else? What can I substitute for argument? It sounds like I'm advocating. Okay, you understand what I mean.

**MR. DORSI:** Yes, I understand. What's the hypothetical?

**THE COURT:** Okay, the -- if the PHMSA is the federal regulator and the consent decree is modified to have the PHMSA as the regulator, then could it be argued, could it be argued, that the provision of the consent decree that requires the Fire

Marshal is no longer in place?

**MR. DORSI:** Well, certainly anything could be argued, but I'd argue that it's wrong.

**THE COURT:** Okay, it's wrong. Tell me why it's wrong.

**MR. DORSI:** Right.

**THE COURT:** I mean, I'm all ears.

**MR. DORSI:** Sure. Consent decrees are bargains and parties need to be held to their bargains, even on issues that might be challenging questions of law, where they divide up who's going to have responsibility. And it undercuts the ability to have stability in the court's judgments and stability in those agreements if a party can come in and ask to revisit that on a question that could have been raised at the time of the original consent decree.

So this is, I think, gets back to the Rufo case that they were talking about. The Rufo case is about changed circumstances. So you made the point about the pipeline being connected to another state. At one point, there was a contemplated connection to Texas, but it's never been viewed until this year or until late last year as a single pipeline connected to the Outer Continental Shelf. That's not a changed circumstance. So a changed circumstance can justify a change, but a changed view on the law or wanting to have another bite at the apple after you've made a bargain undermines the ability

to have stability in those agreements.

**THE COURT:** Let me ask you one other question while you're on that subject. One of the arguments of the U.S. Government is that, I mean, this goes to the modification issue, that the U.S. Government is not an assignee or a successor, but they're a transferee because All Plains sold the pipeline to them, and as a transferee, they have limited obligations. They don't really explain, at least I couldn't see, what the limited obligations are. Can you, before I get to them, I should have asked them, but they didn't get into the consent decree. Tell me how you see that question.

**MR. DORSI:** Yes. So paragraph four says that the consent decree applies to successors, assigns, as well as any other entities or person otherwise bound by law with the consent decree. So Sable has at various times referred to Plains as their predecessor-in-interest. That may or may not be the exact correct description, but it's clearly at least a party otherwise bound by law. So there's another part of the consent decree that tells you what they are bound to do, and that's in paragraph 88 of the consent decree.

**THE COURT:** One minute.

**MR. DORSI:** Sure. And when we finish the consent decree, I have one point I want to make on the Defense Production Act.

**THE COURT:** Just one second here. What page is it

on?

**MR. DORSI:** I have it right here. Give me just a moment. It's paragraph 88 is on page 49 of the consent decree. That's using the numbers at the bottom of the page.

**THE COURT:** Oh, yeah. Okay. Give me a second. Okay. I mean, what the U.S. is relying on is in paragraph 88, the language that says, unless defendants have already completed the required action or unless OSFM agrees to relieve the transferee of any obligations of any otherwise applicable provision. I think that's what they're relying on.

**MR. DORSI:** Right. So I --

**THE COURT:** And they're saying that they have satisfied the requirements because OSFM is no longer required to give approval.

**MR. DORSI:** I think there's actually two arguments baked in here, and I want to make sure that I'm getting them differently, and the U.S. can tell me if I got this wrong when they do their response. The first is a question of, did these obligations transfer to Sable when it took over ownership of the pipelines? And then the second question is, did Sable substantially comply after it took over ownership? So our position is yes and no. The first one, yes. These provisions, because at the time that Sable took over, the state waivers had not been issued, the repairs had not been done. It was clear that the pipeline had not been remediated. So this provision

here in paragraph 88 says that the transferee must agree to be bound by the provisions of the consent decree and appendices B and D that are specifically applicable to the assets acquired. And it goes through this in one way that this is material, is there are specific requirements for each pipeline, and so Sable acquired lines 901 and 903. It didn't acquire line 2000, so Sable doesn't owe any duties as to line 2000.

The other argument they're making, as I understand it is a distinct argument, is that they substantially complied, and I just don't think that makes a lot of sense when the state fire marshal has said you have to remediate these anomalies on the pipeline. It's important enough for them to go run to the federal government to not have to do it. And really it sounds a lot like a kid who goes and asks mom for permission, and mom says no and goes and asks dad. You haven't substantially complied with getting permission from mom.

So I don't think that the substantial compliance argument really works here. In addition, some of the cases they cite are consent decrees that say substantial compliance suffices and this one doesn't. So if it's okay with Your Honor, unless you have any more questions about the consent decree, I'll shift to the DPA.

**THE COURT:** No, I appreciate your argument and I'll get back to you. Why don't the U.S. Government, do you want to speak to what his argument is?

**MR. WALTERS:** Yes, Your Honor. So I'm the lead counsel in the Defense Production Act case, the Wright case. If Your Honor is okay with it, could I make a 30-second point about the Wright order? And then my colleague, Stefan Bachman, who's our lead attorney in the consent decree case, will come up and address the arguments relevant to the consent decree modification.

**THE COURT:** Okay.

**MR. DORSI:** So I'll come back to the Defense Production Act later then, Your Honor.

**THE COURT:** Yes.

**MR. WALTERS:** So, Your Honor, I think the lines are getting a little blurred between the cases here, most of which you just heard was about the consent decree case and my colleague will address those. I just want to make one quick point.

**THE COURT:** I mean, to some extent there is some blurring, but it's only blurring because the state seems to say that the energy order can't be affected without some modification of the consent decree.

**MR. WALTERS:** Understood, Your Honor. I'll just say one brief thing about the Wright case and then I'll turn it over to my colleague. So Your Honor said you were interested in irreparable harm and my friend on the other side said that their principal harm is the, quote, inability to carry out

their law. If Your Honor noticed, they still have not identified what state law they cannot carry out. They filed three briefs now and they have presented an argument and they still have not identified a single law they can't enforce. And as Your Honor knows, they are bringing enforcement actions against Sable. And so we would say they have utterly failed to show irreparable harm here. And on that basis alone, the Court can deny the motion for a preliminary injunction.

**THE COURT:** Let me hear from your colleague.

**MR. BACHMAN:** Your Honor, my name is Stefan Bachman. So let me respond to California's arguments related to modification of the consent decree first. So California, I think, misstates the United States' position on changed circumstances. The United States argues that there are two significant and unanticipated changes in fact and law that warrant modification of the consent decree.

**THE COURT:** I mean, did you understand the State to say that the changed circumstances can only be factual or is it your argument they could be both?

**MS. BACHMAN:** They can be both, Your Honor. And Ruffus supports that position. But also here, California is focused on the wrong events when it argues that the United States changed the circumstances itself. So focusing first on PHMSA's decision to recognize jurisdiction over the lines at issue here, lines 901 and 903, the pipeline segments,

California has focused heavily on this idea that unified ownership cannot cause these pipelines to become interstate and therefore that's not a changed factual circumstance. But that's actually the wrong question. It's not just that these pipelines are now owned by Sable and connected with other assets that form the Santa Ynez pipeline system. It's that these pipelines are once again being operated in a way to transport oil from the outer continental shelf to processing facilities in California. For decades, these pipelines were classified as interstate while transporting oil from the --

**THE COURT:** They went back and forth. They were interstate, then intrastate, correct?

**MS. BACHMAN:** Only once, Your Honor.

**THE COURT:** Once. So the -- you're right. Go ahead.

**MS. BACHMAN:** And let me just clarify that when they were reclassified as interstate, that was after the 2015 spill. And as I understand it, the pipelines were essentially non-operational at that time. And so while they weren't transporting oil, it made sense for PHMSA to reevaluate their jurisdictional status and they classified them as interstate. When Sable acquired Pacific Pipeline Company, bringing all of the assets under common ownership, it wasn't just that. It's also that they made the decision to again begin operating these pipelines as an interstate pipeline. And that, Your Honor, that is a changed factual circumstance that the parties did not

anticipate when they negotiated the consent decree.

**THE COURT:** Can you -- I probably should have been aware of this, but just so many briefs, you know, and limited, what do they call it, in the computer storage capacity, you know? So less and less storage capacity. You know, like my doctor said, you're not really getting any dumber. It's just that you are getting a longer Rolodex, you know, longer Rolodex.

**MR. BACHMAN:** Understood, Your Honor.

**THE COURT:** So in other words, it takes more electricity to make the connection. But getting back to your point here, or the question I had on PHMSA, I'm sort of not clear about PHMSA, how they get into this and the actions of the Secretary. Can you sort of walk me through that, just to refresh my memory?

**MS. BACHMAN:** Sure, Your Honor. So they are a bit distinct. So let me start with how PHMSA came, you know, their role in reclassifying these.

**THE COURT:** And the timing of all of it.

**MS. BACHMAN:** And the timing of it as well. So the pipelines were classified as interstate when the consent decree was negotiated and when it was entered. And they remained interstate for many years after that, because again, they were non-operational. Once Sable purchased the pipelines, it began to implement requirements in Appendix B to bring the pipelines.

**THE COURT:** I missed what you just said, I'm sorry. You said when the consent decree was negotiated, the pipeline was interstate?

**MS. BACHMAN:** It was intrastate at that time, Your Honor.

**THE COURT:** Intra.

**MS. BACHMAN:** Intra. Intra. It's frustratingly close --

**THE COURT:** Yeah.

**MS. BACHMAN:** -- together. It was intrastate at the time that the consent decree was negotiated.

**THE COURT:** Right.

**MS. BACHMAN:** And it remained so until December of 2025.

**THE COURT:** And that you said was because there was no oil flowing.

**MS. BACHMAN:** Correct. My understanding is during that time period, the pipelines were non-operational. They were not being used. And the Sable, after acquiring Pacific Pipeline, started to go through the process of bringing these pipelines back online. During that process in December of 2025, Sable asked PHMSA to reevaluate whether these lines, when operated again as a single system from the outer continental shelf to processing facilities in California, were now interstate pipelines again. And I just want to point out

that --

**THE COURT:** And that preceded the executive order and the secretary's order.

**MS. BACHMAN:** That's correct, Your Honor. That all happened before the secretary's order and before the DPA order was issued in March of 2026. And I do just want to point out that it's not unusual for a pipeline company to ask PHMSA to reevaluate the jurisdictional status of a pipeline. PHMSA, as I understand it from their website, regulates millions of miles of pipeline in the United States. And so the common practice is when a pipeline company maybe purchases new assets or operates their assets in a different way, PHMSA isn't sort of like roving around, if you will, looking to reclassify pipelines, but it responds to requests. And that's what happened here, Your Honor. Sable asked PHMSA to reevaluate the jurisdictional status. PHMSA took a hard look at that and then decided that the current plan to operate the lines from the outer continental shelf to California made them interstate pipelines once again.

**THE COURT:** When did they actually say that? What month and year?

**MS. BACHMAN:** That was in December of 2025, late December of 2025, Your Honor.

**THE COURT:** And so, I mean, they're finding that it was an interstate pipeline at that point. I mean, that enables

federal jurisdiction, correct?

**MS. BACHMAN:** That's correct.

**THE COURT:** The argument by the State is that the interstate issue is decided agency by agency and it isn't the normal or usual Commerce Clause analysis.

**MS. BACHMAN:** So I think you correctly said how this works, Your Honor. Under the Pipeline Safety Act, once PHMSA has jurisdiction over a pipeline, that authority preempts any state authority over that pipeline. So here, once PHMSA determined that the pipeline should be reclassified as interstate, the Pipeline Safety Act preempted California's further authority and regulation over that pipeline. So then fast forwarding just a bit, Your Honor, to get to the DPA order, which is a separate and independent reason for modifying the consent decree, in March of 2026, Secretary Wright issued a DPA order, which we've already talked about extensively. And that order directed Sable to immediately begin transporting oil through the pipeline again.

**THE COURT:** Did it direct Sable to produce oil or did it allow it to produce oil?

**MS. BACHMAN:** It directed, Your Honor.

**THE COURT:** It directed.

**MR. BACHMAN:** It directed Sable to transport hydrocarbons, is actually the way that it's phrased in the order, to transport hydrocarbons through the pipeline

immediately. But underlying that order are additional factual determinations made by the Secretary. And you've already noted, Your Honor, that the President declared a national emergency as well, which all of those things are based on factual changes. So those are, those factual changes under GERD --

**THE COURT:** Were the factual changes California's dependency on foreign oil?

**MS. BACHMAN:** Yes, Your Honor. That is -- that will -- it, well, it -- that is among the factual changes, but the Secretary's order includes other findings as well related to national security concerns, and dependence on adversarial oil here in California. And those were all the bases for entering the order.

**THE COURT:** Do you have any other arguments?

**MR. DORSI:** Well, so let me also note, Your Honor, California spent a lot of time talking about two cases, Namer and Flores. Let me talk about those for just a minute, Your Honor. Those cases are quite different than what's happening here. They are not on point. So both of those cases were quite complicated, Your Honor. In those instances, first, the United States was a defendant, which it is not here, and it had obligations that it was required to complete under the consent decree, which is also not true here.

But moreover, those consent decrees require the

United States to engage in rulemaking and other regulatory findings to essentially codify consent decree obligations that it had agreed to into law. And in both cases, when the United States went through that rulemaking or issued regulations, it codified the rule in a way that differed somewhat from the consent decree. And that's what the Ninth Circuit was looking at when it ruled in both Namer and Flores that the United States was not allowed to do that.

The United States in those cases was essentially independently interpreting the consent decree in a way that relieved it of obligations under the decree. But none of that is true here. Instead, we are asking the Court to apply the consent decree -- apply the termination standard in the consent decree as drafted. We are not asking the Court to relieve the United States of any obligation under the consent decree, nor are we asking the court to relieve any other party of any obligation under the consent decree. The modification, and of course, the modification argument, Your Honor, you only get to it if you decide not to terminate the consent decree. But the modification --

**THE COURT:** Let's start with the termination. How do you argue that?

**MR. BACHMAN:** The termination argument, Your Honor, is, I think, straightforward. The consent decree includes a clear and unambiguous termination standard. That is on

paragraph 100 of the consent decree.

**THE COURT:** Let me just get to the --

**MR. BACHMAN:** Let me get you the page, Your Honor. So that's page 55, Your Honor. And again, that's the bottom pages. And so let me just --

**THE COURT:** Hold on one second. But the paragraph says five years, three months from the effective date, and B, complied with the requirements of this consent decree. The State is arguing that there hasn't been compliance.

**MR. BACHMAN:** They make that argument, Your Honor, but the first thing, I think, for the Court to evaluate when it's looking at this paragraph is whether the plain language is met. And this standard focuses only on defendants. And defendants is defined to mean Plains. Plains All-American Pipeline and Plains Pipeline Company. The defendants in the original case that the United States and California filed in 2020. That's whose conduct was at issue when the United States and California negotiated the consent decree. That's who owned the pipeline at the time of the rupture. And this consent decree was really directed at curing Plains' conduct during that time. So --

**THE COURT:** But the argument is that under the language of the assumption agreement, that it applies to assignee's successor, and that Sable is a successor. Why not?

**MR. BACHMAN:** California has made that argument, Your

Honor. But let me tell you why not, and I'll try to break it down into a few points. So we have to go back to the consent decree just a bit. There's basically an operation between two paragraphs in the decree here. The first is paragraph four, which let me flip to that and find the page number for you. That appears on page 7 of the consent decree.

**THE COURT:** Give me a second to look at it.

**MR. BACHMAN:** Yes, Your Honor.

**THE COURT:** Well, I read it. What point are you making from it?

**MR. BACHMAN:** And then the point is that you have to read paragraph 4 and paragraph 88.

**THE COURT:** Wait a second. You said paragraph 7, just one minute.

**MR. BACHMAN:** Paragraph 4, Your Honor, on page 7.

**THE COURT:** Okay, one minute. It's a long paragraph. I've read some of it.

**MR. BACHMAN:** Paragraph 88, Your Honor, is lengthy.

**THE COURT:** No, I mean, it gets into great detail.

**MR. BACHMAN:** It gets into a lot of detail. Let me try to short-circuit this a bit. So paragraph 4, it does bind Plains' successors and assigns to the entire consent decree. Every obligation in this consent decree would apply to a party that falls within the scope of paragraph 4 under this consent decree. Paragraph 88 does something different. It permits

Plains to --

**THE COURT:** One minute, one minute.

**MR. BACHMAN:** And paragraph 88 is on page 49, Your Honor.

**THE COURT:** Okay, that's the same paragraph we looked at before.

**MR. BACHMAN:** Yes, Your Honor. And so this paragraph does something different. It allows Plains to transfer some of its assets to a third-party transferee if that party agrees to be contractually bound by only, in assuming only limited obligations through contract, through a contractual assumption agreement.

**THE COURT:** Where do you get the term limited obligations?

**MR. BACHMAN:** So limited obligations, when I say that, Your Honor, what I mean is that under paragraph 88, there's subparts A, B, C, and D, and that defines the contractual obligations that the transferee is required to assume in an assumption agreement.

**THE COURT:** One minute, okay.

**MR. BACHMAN:** And so my point, Your Honor, is that paragraphs 4 and paragraphs --

**THE COURT:** What about those A through D? How do they relate to your argument?

**MR. BACHMAN:** Well, they relate in the sense that

they're more limited than the entire consent decree, Your Honor. So paragraph 4 applies to a true successor and assign, a situation where a company is a continuing business enterprise with a continuity of operations that might include having the same employees and using all of the same equipment and the same ownership structure. That's what a successor is under paragraph 4 of the consent decree. Paragraph 88 allows Plains to contractually transfer more limited obligations to a transferee.

**THE COURT:** But with regards to those limited obligations, has Sable complied with those?

**MR. BACHMAN:** Sable has complied with the obligations that it assumed under paragraph 88. It is true that it has not received sign off from the fire marshal before restarting the pipelines, and that is one of the obligations in Appendix B. However, it -- the -- after --

**THE COURT:** By that time, PHMSA had declared the pipeline interstate.

**MR. BACHMAN:** That's exactly right, Your Honor. So it has received approval for of a restart plan from PHMSA. The --

**THE COURT:** Well not really. I mean, PHMSA just made that determination. PHMSA didn't give them the green light to start flowing oil.

**MR. BACHMAN:** It did approve the restart plan to --

**THE COURT:** It did?

**MR. BACHMAN:** It did approve a restart plan, Your Honor. Yes. And it evaluated a plan that Sable had submitted to it, and made a factual determination that that restart plan could be implemented. Now --

**THE COURT:** So why then was a national energy emergency order and the Secretary of Energy's order necessary if PHMSA did all of this?

**MR. BACHMAN:** So I think they're two separate issues. I think a national -- a DPA order may be necessary regardless of whether a company can -- is otherwise legally allowed to operate a pipeline or any other factory or facility because once a DPA order is issued, it triggers other things that the company, you know, may need to do in order to follow the terms of the DPA order.

So it's not really a difference of like, you know, deciding that you don't need a DPA order because PHMSA has already approved the restart plan, the DPA order operates independently of the restart plan. I will also note, Your Honor, that although PHMSA approved Sable's restart plan in December of 2025, Sable did not immediately restart the pipeline during that time period. Instead, it continued to try to work out any differences that it had with the fire marshal and with California to try to avoid where we're at right now, candidly.

**THE COURT:** I know, but some of what the fire marshal was addressing, this gets into the details what was the degree that to which the metal on the pipeline was attested and whether the results -- whether proper testing devices were used to get the results.

**MR. BACHMAN:** So let me address that, Your Honor, because I think it does get convoluted in the briefing. So first, let me explain what Sable has done to get the lines ready for restart. And it did these things under the terms of a waiver that the fire marshal actually issued. It's replaced valves, a number of valves on the pipelines --

**THE COURT:** Are you asking me to decide whether Sable has complied with the consent decree?

**MR. BACHMAN:** No. No, I'm not asking you to make that that decision, Your Honor.

**THE COURT:** I mean, so go ahead.

**MR. BACHMAN:** Oh, so I think just as context, Your Honor, to describe this this kind of narrow dispute that the fire marshal and Sable have, so Sable performed a number of things to get the lines ready for restart. It replaced valves. It subjected the lines to hydrostatic pressure testing, which means it increased the pressure in the lines, so like 150 percent of their operating capacity. There were no leaks during that time. It also, and this is this is important, it also remediated all areas of the pipeline with 40 percent metal

loss or more. And those were all things that were required under the state waiver that the fire marshal issued.

After doing all these things, the fire marshal reinterpreted its waiver and told Sable that it also needed to apply a tool tolerance to the remediation of the pipeline thickness. Sable was always going to do that, Your Honor, so the dispute here really is just about when that final belt and suspenders inspection was going to take place. Sable, you know, its understanding and this may be an argument better made by Sable, but its understanding as I understand it was that the fire marshal was going to permit them to do that final inspection as the pipelines became operational, as they became pressurized. And the reason for that is because many of the things that needed to do required that the lines to be operating.

PHMSA determined that it can happen that way. So the fire marshal later determined that they wanted -- excuse me, Sable to do this final inspection before restarting the pipelines. PHMSA said in its restart plan Sable can do this final inspection after they restart the pipelines. And so it's going to happen either way, Your Honor. The special -- emergency special permit that PHMSA has issued --

**THE COURT:** Let me ask you a basic question. In your argument, where does the fire marshal stand? In other words, PHMSA said is interstate pipelines are regulated by the PHMSA.

Didn't the PHMSA order displace the fire marshal?

**MR. BACHMAN:** Yes, Your Honor. The Pipeline Safety Act preempts the fire marshal's authority over the lines.

**THE COURT:** So once the fire marshal's authority is not required, then how do you interpret paragraph 88 along with Paragraph 7?

**MR. BACHMAN:** I think this this brings us precisely to why the consent decree, if it's not terminated, and just to be clear, these arguments are not relevant to termination. If the Court finds the termination standard is met and it should because it is, it doesn't need to get to these arguments?

**THE COURT:** Why should I find the termination standard has met? Give me a short answer if you can.

**MR. BACHMAN:** Let me give you a sentence, Your Honor. Because the termination standard applies to Plains' conduct and Plains' alone and nobody disputes that Plains has met its obligations under the consent decree, period.

**THE COURT:** And so -- when Plains -- at the time Plains sold its interest in the pipeline to Sable, was that 2022 or something or 2023?

**MR. BACHMAN:** The -- so it's a little bit complicated. They first sold the pipeline to another company, Pacific Pipeline Company purchased the assets in 2022. Sable later purchased Pacific Pipeline Company.

**THE COURT:** Same year or later?

**MR. BACHMAN:** Later, Your Honor, in 2024.

**THE COURT:** But you're saying from 2016 to 2022, there's no evidence that All Plains was not in compliance with the consent decree.

**MR. BACHMAN:** I'm saying, Your Honor, that from 2016 to today, there is no evidence that Plains is not in compliance with the consent decree.

**THE COURT:** But I'm losing the thought process here because Sable is, your argument, not a successor, but it was required to be bound by all the terms of the consent decree. So isn't it Sable's compliance not All Plains that is relevant?

**MR. BACHMAN:** No, Your Honor, and for a few reasons. The first reason being that that's not what the text of the consent decree says. The text of the consent decree says that the Court should look at Plains' compliance. But secondarily, because the way this decree is structured, Sable only agreed to contractual obligations. It did not agree to the jurisdiction provisions in the consent decree or to become a party to this case or to the Court's --

**THE COURT:** But I thought --

**MR. BACHMAN:** -- oversight.

**THE COURT:** But I thought -- let me see something here. Give me one second here.

So when you look at roman numeral 3 in the consent decree it says subject to the terms herein, the obligations of

this consent decree apply to and are binding upon the parties and any successors, assigns as well as any other entities of persons otherwise bound by law to comply with this consent decree. Otherwise, bound by law, how do you deal with that second clause?

**MR. BACHMAN:** So I sort of deal with it in the same way. So again, if someone is otherwise bound by law under paragraph 4 then that means everything in this consent decree would apply to it, but that's not what paragraph 88 says for a transferee.

So otherwise bound by law does not mean assuming limited assets under paragraph 88. It means something else. Perhaps if, you know, maybe a veil piercing situation or something like that, Your Honor.

And the point here, Your Honor, is that under California's reading, paragraphs 88 and paragraph 4 collapse together, but the Court needs to give them independent meaning, they have independent legal outcomes. So becoming a transferee under paragraph 88 does not mean that someone is a successor, assign or otherwise bound by law under paragraph 4 of the consent decree. They're two separate rails.

**THE COURT:** All right. Now turn to the modification argument.

**MR. BACHMAN:** So the modification argument I think where we left off, Your Honor, was as distinguishing the Flores

and Namer (phonetic) which California cites and I was pointing out that those cases really are not on point here at all. In both of those cases, the United States was a defendant. The decree required the United States to go through rulemaking and to codify certain parts of the consent decree into law.

When the United States did that, it issued its regulations or went through its rulemaking to limit or interpret its obligations under the consent decree in a way that the Ninth Circuit said was not allowed. That's not what's happening here at all.

So what we're doing here is we are simply asking the Court to conform, to modify the consent decree, to conform its text to the current legal and factual reality on the ground. And that is that this pipeline is an interstate pipeline, PHMSA is the regulator of this pipeline under the Pipeline Safety Act and therefore PHMSA is the party or is the agency rather that should, if the Court again doesn't terminate the decree that should supervise this pipeline under the decree moving forward.

**THE COURT:** And -- but you're not asking that the terms of the consent decree be otherwise modified?

**MR. BACHMAN:** Our request, Your Honor, if the Court determines that modification is appropriate, our request is relatively narrow and we're asking that the areas of the consent decree and we set this out in our proposed order to the Court, Your Honor, but we are asking that the terms of the

consent decree that currently give the fire marshal authority to regulate the pipeline under the decree, so again it's not allowed to regulate it under the Pipeline Safety Act, but the terms of the decree currently focusing on the fire marshal be modified to insert PHMSA instead.

And then we've also included a request to modify the decree to future requests for a future motion to terminate the decree, which the United States would bring to the Court.

**THE COURT:** How do you respond to one of the arguments by the State of California that there is a timing problem that the -- in order to start the pipeline, you need the -- I'm not sure I remember it, but I know there was a timing problem between the PHMSA order and the start, what was your argument there, counsel, can you give me that timing problem again?

**MR. DORSI:** Yes, Your Honor. Our argument was that they should have come to the Court to modify the consent decree before taking actions that in their description compelled Sable to violate it.

**THE COURT:** I mean the emergency order.

**MR. DORSI:** So I think they could have come all the way back in December after the PHMSA orders, but they also could have come in March around the time of the emergency order.

**THE COURT:** Now I seem to recall saying that the

Secretary of Energy's order requires a modification of the consent decree, correct?

**MR. DORSI:** That's correct, Your Honor.

**THE COURT:** And that at the time of the order, the consent decree was not modified, so what?

**MR. DORSI:** So it's a violation of an injunction and another injunction in place of the state court and they should -- the Court shouldn't be indulging parties that violate injunctions. They come into the court with unclean hands, you shouldn't give them equitable relief.

**THE COURT:** I see, okay, got that.

**MR. BACHMAN:** So, Your Honor, the United States did move promptly to modify the consent decree. And let me get back --

**THE COURT:** Say it again.

**MR. BACHMAN:** We did move promptly to modify the consent decree, based on changed factual circumstances and let me just go back --

**THE COURT:** Go back to the chronology.

**MR. BACHMAN:** Let me go back to the chronology a bit. So it was only in this late December 2025 that PHMSA recognized that it now has jurisdiction over the pipeline. And so right after that, Sable did not immediately restart the pipeline at that time. Nobody argues that there was any noncompliance with the consent decree during that time by Plains or Sable or

anybody.

So during that time Sable and California were engaged in negotiations to try to avoid litigation before this Court, but unfortunately obviously that -- they were unable to resolve those differences.

The DPA order was issued only on December 13th, 2026 and the United States moved to modify the consent decree just about two weeks later. So --

**THE COURT:** The DPA order was issued when?

**MR. BACHMAN:** I'm sorry, March 13th, 2026, Your Honor, I'm also starting to lose track of some of the dates here. March 13th, 2026 and the United States moved to modify the consent decree only two weeks after that. So that is an appropriate timeline to move for modification.

And I'll just note that nothing in the consent decree precludes the United States from exercising its statutory authority under the Defense Reduction Act or any other act, and so it's appropriate once the United States determines that a DPA order is needed for it to issue that order and for Sable at that time to comply with it immediately.

**THE COURT:** Okay. Did you -- I promised you an opportunity.

**MR. DORSI:** I will try to keep it short, but I would like to wrap up.

**THE COURT:** Go ahead.

**MR. BACHMAN:** Can I just make one --

**THE COURT:** No, go ahead, yeah. Hold on just one second.

**MR. BACHMAN:** I just want to make one final point on termination, Your Honor, and pipeline safety. I want to make sure it's clear to the Court that the pipeline has now operated for almost three months. There have been no leaks, there have been no spills. PHMSA personnel have been on site overseeing the restart of the pipeline.

As I mentioned before, the pipeline has been subjected to extensive testing and remediation before starting -- before restarting the flow of oil through the lines, so. And California has not submitted any evidence on the record of any actual pipeline safety issues or environmental harms --

**THE COURT:** In those three months.

**MR. BACHMAN:** During those three months, exactly, Your Honor. So my point is, Your Honor, it is just not true that restarting these pipelines posing the environmental risks or the pipeline safety risks that California suggests.

**THE COURT:** But then you're asking me to be the decisionmaker on whether there's compliance with the consent decree.

**MR. BACHMAN:** I'm more just responding to arguments that California has raised in its brief, Your Honor.

**THE COURT:** Before you go, guys.

**(Pause)**

**THE COURT:** Go ahead.

**MR. BACHMAN:** I'm more just responding to arguments that California has raised in its brief, Your Honor, and pushing back on those arguments because it can get lost in the shuffle sometimes how much remediation actually has already taken place on this pipeline. And the very narrow dispute that actually remains between the California Office of the State Fire Marshal and Sable over this final belt and suspenders in line inspection that is going to occur. My understanding is Sable has already started that process and will complete that process.

**THE COURT:** But then why should the fire marshal be involved?

**MR. BACHMAN:** It shouldn't, Your Honor, it should not be involved and it's not involved and that's part of the point is that events have overtaken the fire marshal's involvement. These are now intrastate pipelines they are operating safely. The fire marshal should not continue to be involved in the implementation of this consent decree.

**THE COURT:** All right. Let me hear from --

**MR. BACHMAN:** Thank you, Your Honor.

**MR. DORSI:** Thank you, Your Honor. When I left off earlier I was about to talk about the Defense Production Act

and ultimately this is a question of statutory interpretation for you. You need to figure out what that statute means. And so I want to start with some principles that have crystalized in recent Supreme Court decisions and most likely -- most notably in Loper Bright Enterprises v Raimondo. These principles include that silence in federal statutes are not -- is not an implicit delegation. Agencies don't have the power to tell you what power they have, in fact, we look to Congress to see what power has been and what powers agencies have.

And we know what Congress was thinking about as far as preemption in the Defense Production Act because it has two preemption provisions in it. It has in Section 4558(j), an anti-trust provision that nobody contends applies here. And it has in Section 4557 the liability shield upon which they rest so much of their argument saying no damages or penalties means that the company under a Defense Production Act order can do anything it wants contrary to law.

And this is really well argued in the brief by the United States, in the Supreme Court Hercules case. Now, the Supreme Court ends up deciding the case on other grounds, but it's a really good brief and I know with I think it's 22 briefs you already have, you're really looking for another one to read, but I would encourage you to go and take a look at that brief.

It starts by looking at the statutory texts, notes

that the Section 4557 talks about priority and preference, it's clearly talking about contracts. It looks at the structure of Section 4511 and 4557 mirroring each other. It looks at what's not in the statute and knows that Congress -- notes that Congress knows how to create broader preemption and didn't do so there.

It looks at precedence up to that date, which seemingly stayed -- seemed to be the standard, at least until the Johnson case a couple of years ago, which is one district court case which we've explained in the brief why you shouldn't follow, but this is a longstanding interpretation that the Defense Production Act does not create this.

**THE COURT:** Well are you arguing that the Defense Production Act is limited to preemption under anti-trust and contracts?

**MR. DORSI:** That's right. So the Defense Production Act is --

**THE COURT:** Let me ask, is the consent decree a contract?

**MR. DORSI:** The consent decree has features of both a contract and a judgment. So I don't think the Defense Production Act should be understood to preempt to the consent decree. In any event it's --

**THE COURT:** A consent decree in many ways seems like a contract, it's a contract supervised by the Court, but the

parties made a certain bargain and they agreed to it. And I guess unlike a normal contract they can't sue each other, but otherwise it has many of the same attributes.

**MR. DORSI:** So it does have a lot of attributes of contracts, but it also has attributes of final judgments. This one says that it is a final judgment and even if the consent decree were displaced, California law, assuming you ruled in our favor, related to the Pipeline Safety Act issue and California law were in place.

**THE COURT:** You're saying that PHMSA's determination that it was interstate is not a determination that it's interstate for these purposes, for --

**MR. DORSI:** It is -- our argument is that PHMSA's determination is incorrect. And I want to make clear one --

**THE COURT:** That it's incorrect?

**MR. DORSI:** Yes, and I want to be clear about this --

**THE COURT:** But if it's correct what's the fall out?

**MR. DORSI:** If PHMSA's determination is correct and the Pipeline Safety Act applies then California is preempted from regulating the pipeline. I want to follow that with a key point here and I don't think the United States disagrees with me about this, but I think the way they framed it might be a little confusing. It's not a statute that delegates to PHMSA of decision or discretion to decide when it is interstate or intrastate. It is PHMSA's obligation to get it right. And

when PHMSA gets it wrong, the Court's obligation is to get it right.

There's no deference, to the extent there may have been deference to this kind of decision under Chevron, that's been abolished under local right.

**THE COURT:** So now you're saying that the PHMSA decision is not being reviewed by the Ninth Circuit?

**MR. DORSI:** It could be -- but if it's a decision --

**THE COURT:** But if they reviewed in a different context.

**MR. DORSI:** So the decision is being reviewed, but it may well be that the outcome of that decision doesn't particularly help you, so I don't think -- I don't think it's a good idea to wait. I also strongly encourage you not to wait for the Ninth Circuit, because there's an argument in the Ninth Circuit briefing about what the consent decree may control the outcome in that case, and you could end up in a situation where both you and the Ninth Circuit are waiting for each other and I would not want that to happen.

I do want to get back though --

**THE COURT:** All right.

**MR. DORSI:** -- to the Defense Production Act and I thought this was a really good explanation by the United States in the Hercules case. It said while it is not inconceivable that Congress might enact some broad protection in some

circumstances, it is extremely unlikely that it would do so in an ambiguous manner without extensive consideration and debate and this is at page 36 in the United States' brief in the Hercules case.

So I think that that -- I know that the United States says preemption is not at issue in the Cal v Wright case. I think that's wrong. I think we've explained that in the brief, but I think it's also evident from their argument today, the arguments by the United States for irreparable harm are based on being able to push California law out of the way.

Their arguments for the injury and for the equities that they are suffering require the preemption to be correct and for California to be displaced from regulating these pipelines. In fact, it is California state law, most notably the other Pipeline Safety Act that is our state statute by which California imposes safety requirements on pipelines that are otherwise noncompliant and just -- I don't think this is in dispute either. This is a noncompliant pipeline because it's anti-corrosion system doesn't work, because it's a buried insulated pipeline the system designed to use electrical current to prevent corrosion doesn't work, that's why the first oil spill happened.

So while it's true that there hasn't been a spill in the last three months, unless there's testing and remediation, this pipeline is going to be dangerous tomorrow than it is

today. It's going to be more dangerous the day after tomorrow than it is tomorrow unless --

**THE COURT:** Well, they're saying PHMSA is testing it.

**MR. DORSI:** And this is the -- I think we've put our -- so they're saying that they're testing it. They have not shown in any test results in the evidence. They've had three months to provide them. We don't have access to the pipeline so we are not able to perform any tests. We're not able to tell you how it's operating.

I think the absence of evidence on that is a point in our favor --

**THE COURT:** Let me ask you this, should I decide the preemption question?

**MR. DORSI:** Yes.

**THE COURT:** Do you agree?

**MR. WALTERS:** No, Your Honor, for the reasons I stated preemption is not relevant to the orders.

**THE COURT:** Well, if it is relevant, should I decide it?

**MR. WALTERS:** Well, if Your Honor concluded it's relevant to the legality of the DPA order I think you would, but can I tell you just briefly what --

**THE COURT:** You don't have to do it now, I'll give you a chance.

**MR. WALTERS:** Okay.

**THE COURT:** I want to let counsel complete his remarks.

**MR. DORSI:** Yeah, so two more things I want to cover and then I'll -- so the first is, there was a question about what was happening between the December orders and now. And what happened was the December orders enabled, according to the United States, were it to enable the restart of the pipeline. And then Sable went into the state court and asked for permission to lift the state court preliminary injunction, which is part of the next case, the remand motions. That injunction is now an injunction of this Court under 28 U.S.C. 1450 injunctions of a state court when removed become injunctions of the federal court.

And Sable sought relief from that and the state court said no. And so when the state court -- when Sable had asked for permission, the state court says no, the next time Sable decides just to ask for forgiveness and I don't think the Court should be blessing that strategy, they should have to come to the Court and ask for relief before, not after they violate orders.

And I'll wrap up by noting a final point. California's rules, the rule for remediating these anomalies that Sable has not remediated, this is a plain text rule in the state waiver. It says, remediate anomalies prior to restart. We were defending a case against the environmental groups in

state court alongside Sable if we tried to change our position and say that remediate prior to restart, doesn't mean remediate prior to restart we would have lost that case.

So this is a -- you know, we took the reasonable position and Sable instead of working with us or instead of seeking to challenge that determination in state court ran to the federal government for help. But these were terms that were in the state waivers when Sable asked for the waivers, when Sable didn't object when the state fire marshal issued the proposed waivers and the state fire marshal, consistent with federal law, sent those waivers to the federal Pipeline Hazardous Materials Safety -- to PHMSA. And they didn't object either.

Everyone was okay with these rules until we pointed out to Sable that they hadn't complied with these rules. And so what's really going on here is wanting to change the rules of the game after they're part way through and we think you should hold the parties to the rules they agreed to and make Sable comply with those rules, issue an order enforcing the consent decree and not allow the federal government through these other orders to displace the consent decree of this Court.

I'm ready for any other questions, but I'm also ready to pass it off because I know I've spoken for a while.

**THE COURT:** Thank you.

**MR. DORSI:** Thank you.

**THE COURT:** Did you want to make that last --

**MR. WALTERS:** I'll make a quick point.

**THE COURT:** Yeah.

**MR. WALTERS:** So, Your Honor, on the validity of the DPA order my friend got up and started talking about preemption without explaining why preemption is relevant to the facial legality of the order. And let me state what I think the legal rule is and this should show you why it's not relevant.

When Congress delegates authority to the executive branch to issue orders or regulations, those orders and regulations have the force of federal law and preempt state law under the exact same rules that apply to federal statutes. Congress does not have to delegate preemption authority to an agency. And I'll quote two cases for you that we cite in our brief.

The first one is Fidelity Federal Savings and Loan Association v De la Cuesta, 458 U.S. 141 from 1982. There the Supreme Court said, quote, a preemptive regulation's force does not depend on express congressional authorization to displace state law.

Another case from the Ninth Circuit, Cohen v Apple, Inc., 46 F4th 1012, Ninth Circuit, 2022. The Ninth Circuit relied on the De la Cuesta case and said quote, Congress need not expressly delegate preemptive authority to an agency for

its regulations to preempt state law.

And so whether or not Congress delegated preemptive authority to the Secretary to issue orders that preempt state law, that's not relevant. The Secretary's order has the force of law and preempts state law under the same rules that apply to federal statutes.

But even if Your Honor concluded that Congress had to delegate that authority and the DPA didn't do so, that would not mean that the DPA order is legally invalid, which is what they're arguing here. All it would mean is that the DPA order lacks preemptive effect.

And so California could bring an enforcement action against Sable as it has done in the State Parks trespass case and Sable's preemption defense would fail, just like a preemption defense fails if a federal statute lacks preemptive effect, but that doesn't mean the statute's invalid and it doesn't mean the DPA order is invalid.

Preemption has to be decided in a concrete factual context because it's a context specific inquiry, especially when we're talking about conflict preemption. It can't be entered in the abstract here, and even if it could, it would not be relevant to the order's validity which is the only claim California has brought.

**THE COURT:** Okay.

**MR. WALTERS:** Thank you, Your Honor.

**THE COURT:** I haven't heard from Sable, but are they really -- do you really have something to say other than, you know, haven't your positions been argued? I don't want to hear them all over again.

**MR. MCDANIEL:** Your Honor, I think I can be extremely brief. But California has moved to enforce the consent decree against Sable, I mean, they essentially asked to find Sable in contempt of the consent decree. They don't label it contempt, but that's essentially what they asked.

**THE COURT:** I mean the arguments that Sable would make have been made, haven't they? What else can you say? If you have something that hasn't been argued, I'm happy to hear it.

**MR. MCDANIEL:** I'll take two points, Your Honor --

**THE COURT:** Okay.

**MR. MCDANIEL:** -- less than five minutes.

**THE COURT:** Okay.

**MR. MCDANIEL:** And I'll only address the motion to enforce, I think it's right that the arguments relating to consent decree termination, modification and preliminary injunction motion in Wright have already been addressed and I don't have any more to add there.

So I'll only address two reasons why California's motion to enforce should be denied that haven't been addressed so far today.

One is that Sable is caught in an impossible position in the middle of two co-plaintiffs to the same consent decree. So it has one co-plaintiff California that says it has authority over the pipeline segments and that Sable is not allowed to operate the pipeline segments. It has another co-plaintiff the United States that says PHMSA has jurisdiction over the pipeline and it says that Sable must operate the pipeline segments.

And so that's the circumstance where California is moving to enforce the consent decree and essentially find Sable in contempt. But the case law is clear about this, that the Court should not find contempt in these circumstances because of the changed circumstances and because of the impossibility of Sable complying with two co-plaintiffs that are both under the same consent decree.

The other point I'll make about California's motion to enforce is that the consent decree itself recognizes that compliance might sometimes be impossible with its terms. So even if Sable --

**THE COURT:** Where does it say that?

**MR. MCDANIEL:** Yes, Your Honor. It's the force majeure paragraph.

**THE COURT:** There is a force majeure paragraph, I did see that. That's at page 35.

**MR. MCDANIEL:** Yes, Your Honor. It's paragraph 44 on

page 35.

**THE COURT:** Let me just read it, one minute.

**MR. MCDANIEL:** Uh-huh.

**(Pause)**

**THE COURT:** But I mean, force majeure is, you know, generally described as an act of God or something like that, correct? Why is this -- why is force majeure applicable here?

**MR. MCDANIEL:** Well, Your Honor, if you look at the language here of paragraph 44, force majeure is any event arising from causes beyond the control of defendants that delays or prevents performance under the consent decree. And so --

**THE COURT:** What if -- you're saying is conflict.

**MR. MCDANIEL:** Correct, Your Honor. When you have two co-plaintiffs both asserting jurisdiction and both telling Sable conflicting directives --

**THE COURT:** That doesn't sound like a force majeure, but I mean, I get the point.

**MR. MCDANIEL:** Right. I think it is a force majeure, because it's an instance where it's impossible to comply, right. You have one co-plaintiff saying you have to do one thing, one co-plaintiff saying stop, one co-plaintiff saying go. That's -- there's -- it's impossible to comply in those circumstances.

**THE COURT:** That's similar to an earthquake.

**MR. MCDANIEL:** If -- you could, sure, make the analogy that -- it's not an act of God and Sable isn't taking the position that it's an act of God. But Sable is taking the position that California is asking to do something that the United States is telling it it can't do.

And so in those circumstances, you know, even if Sable were a party to the consent decree, Sable would have the ability to claim force majeure which it has here out of an abundance of caution.

**THE COURT:** You're saying -- you're arguing that as you are as an argument against any penalty for noncompliance, is that what you're saying?

**MR. MCDANIEL:** Yes, Your Honor, against granting California's motion to enforce essentially, whether that sounds in penalties or injunctive relief, this is an argument against granting the motion to enforce.

**THE COURT:** Okay. I understand.

**MR. MCDANIEL:** And just to play it out just a little bit longer, Sable did submit a force majeure notice, the consent decree has an entire structure where if there's a disagreement about force majeure it goes to dispute resolution. Sable has also submitted a notice of that dispute resolution and at the end of that process, the consent decree sets up potential stipulated penalties for noncompliance.

And so -- and that includes a stipulated penalty that

applies specifically to the noncompliance that California is alleging here. And California just ignores all of that and I think it kind of gives the game away about what's actually at issue here.

California bargained for a consent decree that had this process, so even Sable were a party to the consent decree, Sable would at least have the protections of going through this process and the stipulated penalty provisions and dispute resolution provisions, but California has ignored that and come to the Court with a motion to enforce.

**THE COURT:** Thank you.

**MR. DEVINE:** Your Honor, may I be heard quickly?

**THE COURT:** Who are you representing?

**MR. DEVINE:** Plains All American Pipeline.

**THE COURT:** Who are you?

**MR. DEVINE:** Plains All American Pipeline, the defendant in the --

**THE COURT:** Oh, I see. Why are you interested?

**MR. DEVINE:** That's a great question, Your Honor, and one I will address just very briefly. Plains is still the defendant in the consent decree and the consent decree has not yet been terminated as to Plains. But there's no dispute that Plains has met all of the consent decree termination requirements.

So all we're asking is that in whatever order the

Court issue, now Plains' right to termination doesn't depend on any of the issues that you've heard today.

**THE COURT:** What Plains' termination occurred when it sold the pipeline?

**MR. DEVINE:** No, Plains is still part of the consent decree because the consent decree applies must more broadly than just these two pipelines at issue but --

**THE COURT:** Why has Plains complied with all the terms?

**MR. DEVINE:** Plains has complied with all the various terms throughout the five years and three months of the consent decree and that's all that's required for termination.

**THE COURT:** That's not a dispute?

**MR. DEVINE:** That's not disputed. But the State only wants to hold the consent decree open so that they can apply it to Sable. But when Plains sold the pipeline in 2022 it complied with those consent decree provisions and I don't think there's any argument from the State that Plains is not in compliance.

So all we ask is that in whatever order the Court issues, whether that's modification or otherwise, it make clear that Plains -- the consent decree is terminated as to Plains specifically.

**THE COURT:** Okay.

**MR. DEVINE:** Thank you.

**THE COURT:** Let me take a short recess, get my thoughts together and then we'll talk for a few minutes, okay.

**THE CLERK:** All rise. This court is in recess.

**(Recessed at 4:14 p.m.; reconvened at 4:23 p.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** I know that -- I think I have I don't know 20 or 25 briefs total here and I've heard the argument for over a couple of hours. What would be helpful to me at this point because maybe I've raised some questions, maybe that you want to respond to each other in writing.

So I don't know what you would call it, I guess you'd call it a post-trial brief if we were at trial, but call it a post argument brief or something. After everything is said, I would appreciate sort of a -- what's the term in fencing, whatever you call that, point and what is it, what is it no fencers here. You know when you --

**MR. BACHMAN:** Is it pari, Your Honor?

**THE COURT:** Pari, yeah, I don't know what the first one is, pari, thrust and pari or something. Anyway, sort of that kind of argument, you know, point, counterpoint, okay. Sort of a sum up type brief, one brief, joint brief from the U.S., Sable and Plains on the termination of the consent decree and that would focus, you know, on the -- I'll call it the DPA order, the PHMSA interaction and the argument by the United States that there is no preemption issue at this point because

the order itself, you know, allows federal jurisdiction.

And then a second -- and then there would be a brief I guess in that same brief to modify or terminate the consent decree, but my aim is not to have a regurgitation of everything you've already loaded up which is several hundred pages or more, but you know, making the argument, choosing the most persuasive authority for like the key case or two or provision of the consent decree.

In other words, view it as sort of a -- maybe this is not a good metaphor but I mean, when you were in law school you took notes in the class, right, and then afterwards you tried to read your notes, so I'm trying to read my notes, you're going to try to help me read my notes, you know what I mean. Something like that, you know what I mean? That's the idea.

And then from the State, you know, a brief to counter their brief and argue your point to enforce the consent decree. But it should be along the lines of the real guts of your positions and to some extent a rejoinder to the things that seem to concern me or at least the things that I addressed and the arguments that seem to be at the forefront of each other's argument.

So you think that is doable?

**MR. DORSI:** I think it's a good idea, Your Honor, but I do want to offer one request.

**THE COURT:** Yes.

**MR. DORSI:** I think you should order us to file these identical copies of these briefs in the two cases, so that we're not writing two different briefs, but the brief does speak to both California versus Wright and the consent decree case.

**THE COURT:** Yes.

**MR. DORSI:** And that may be relevant for appellate purposes so it needs to be filed in each case.

**THE COURT:** That's okay, I agree to that. And you think you can do that? I mean, I know you've spent a lot of time, but this is mainly a little more education for me. I know you know your positions, I think I know your positions, but it's an important issue I want to make sure I'm not missing something.

**MR. WALTERS:** Yes, Your Honor, that's definitely doable.

**THE COURT:** And, you know, do it, you know, without the adjectives, you know what I mean. Don't write the brief the other guy is just trying to do this or that, overcome -- keep motives out of it and except I mean, like you argued, bad faith is a part of equity, so I mean that's dirty hands or whatever, unclean hands, you know, if you consider those things. But stay with the focus, in other words, don't point daggers at each other, just respond to each other with the guts of your argument, a reference to a case or something and keep

Case 2:26-cv-03396-SVW-SSC Document 53 Filed 06/16/26 Page 91 of 96 Page ID #:1949



it as -- keep in mind that I'm not looking at this for its persuasive value, I just want to make sure I understand all of the positions.

Of course, you have to be a little bit of an advocate, I understand that, but keep that to a minimum okay. And I mean a lot has been said. I won't give you a page number, but you know, try to do it in as few pages if you can, if it's 20, 30, I don't know whatever it takes, less, more, I don't know.

I just want to make sure I have it. You know your two arguments, where's the other guy --

**MR. WALTERS:** I believe he's in the gallery.

**THE COURT:** Oh, which guy? Oh, that guy, yeah. And --

**MR. WALTERS:** Your Honor, if I may and if you don't want to set any page limits we totally respect that decision and we'll do what the Court orders, but we would respectfully request some page limit so we don't get off rails here and address --

**MR. DORSI:** We agree.

**THE COURT:** I mean, I'm thinking 25 pages. Is that fair? I don't know. If it's 27, that's okay, you know.

**MR. DORSI:** And can we get a schedule?

**THE COURT:** Yes, I mean the sooner the better, because it's sort of fresh. I mean, I've been looking at this

as we go along, but there's just so much to digest and I mean, I'd like to do this this way.

Opening brief, simultaneous opening brief ten days. And then simultaneous reply briefs, say seven days, but of course in the reply brief, let's say it has to be 12 or 14 pages. In other words, sometimes in these briefs I do this in court cases where, you know, like in summary judgment, there's always somebody who has the last word and you don't -- and always makes some argument that there's no response to. So this way, you both make your argument, you load out, and then you have a chance to correct any misstatements or omissions and corrections and that way I have it.

So let's do it that way. Okay? Is that okay or not?

**MR. DORSI:** I think that will work, but I want to confirm something, Your Honor. You're asking for these briefs for the same relief that's requested on the pending motions, you're not trying to convert this into a summary judgment or a merits on California versus Wright?

**THE COURT:** No, no, no.

**MR. DORSI:** Okay.

**THE COURT:** Just --

**MR. DORSI:** Same relief requested.

**THE COURT:** Yeah. And is it --

**MR. WALTERS:** Your Honor, I just had a question to clarify what issues we're briefing. You mentioned the

termination, the modification and then you mentioned preemption.

**THE COURT:** Well, I mean, raise the issues that you think are relevant, that you argued or that were raised or that I raised questions about.

**MR. DORSI:** Your Honor, one of the supervisors from my office is in the room, can I have a moment to consult with him?

**THE COURT:** Sure.

**MR. DORSI:** Thank you.

**THE COURT:** You have a supervisor?

**(Pause)**

**MR. DORSI:** So to do this, we're going to want the transcript. I assume the United States and Sable will want the transcript of today as well.

**MR. WALTERS:** That's right.

**MR. DORSI:** Can we agree to put in a joint transcript order and split the cost?

**THE COURT:** Well, let me see, this is a new thing, you know, this is electronic which I don't like, but it's the new order of things. How quickly can we get this? 24 hours?

**(Court confers with clerk)**

**THE COURT:** 24 hours, oh let's get it. We may have one of the advantages of this is 24 hours, that's pretty good.

**MR. WALTERS:** Your Honor, if I may request

respectfully because we have three parties that are going to be filing a joint brief --

**THE COURT:** Yeah.

**MR. WALTERS:** Could we get a little bit more time than ten days.

**THE COURT:** Why can't you all agree, I mean, what is the difference between you and Sable and Plains? It's really one party, isn't it?

**MR. WALTERS:** Well, Your Honor, we haven't filed a joint brief.

**THE COURT:** I know, but are you going to -- Sable, are you really going to -- they're carrying your water, aren't they?

**MR. WALTERS:** Respectfully, Your Honor, no, the United States is defending --

**THE COURT:** I know, I know, but they're making you all the arguments so, Sable, do you think you're going to have some issue with the United States on how they present things?

**MR. WALTERS:** We can do it on whatever schedule.

**THE COURT:** Do it one. You know, this is not nitpicking, this is giving -- this is education, okay. And I mean it's been well argued and the briefs are very professional, but there's just a lot and I just want to make sure I understand it, I'm trying. I mean, I could come up here and do something, but I'd rather feel good about it. I mean,

even if I'm wrong, I'd rather feel good about it.

So all right, thank you all --

**MR. WALTERS:** Your Honor, one more question and then I'm happy to --

**THE COURT:** Yeah.

**MR. WALTERS:** So there's the other case that Your Honor was scheduled hear today, the remand motion.

**THE COURT:** Yes, let me -- I just forgot about that. Let's hear a little argument about that, the remand. Is there another lawyer doing that?

**(On the record concluded at 4:37 p.m.; audio ended)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**



**June 15, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***

No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al.*,
*Defendants-Appellants.*

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

**EXCERPTS OF RECORD – VOLUME 3 OF 6**

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-1981
Fax: (510) 622-2270
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov
Brian.Calavan@doj.ca.gov

*Attorneys for Plaintiff State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

Case No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S REPLY TO INTERVENORS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**

Date: June 8, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| ARGUMENT | 1 |
| I. California Files This Reply to Sable's Untimely Opposition. | 1 |
| II. California Is Likely To Succeed on the Merits. | 2 |
| A. The Wright Order Is Not Valid Priorities or Allocation Order. | 2 |
| B. Like Defendants, Sable Incorrectly Seeks To Shield the Wright Order from Judicial Review. | 2 |
| C. The Preemptive Effects of the DPA Order Are Not Hypothetical. | 3 |
| D. The DPA Does Not Support Sable's Claimed Scope of Preemption. | 4 |
| III. The Remaining Factors Favor an Injunction. | 7 |
| A. The Wright Order Irreparably Harms California. | 7 |
| B. The Balance of Equities and Public Interest Favor California. | 10 |
| IV. The Court Should Not Require a Bond from California. | 11 |
| CONCLUSION | 12 |

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Fed'n of Tchrs. v. Dep't of Educ.*
779 F. Supp. 3d 584 (D. Md. 2025) ........ 12

*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*
626 F. Supp. 3d 1030 (W.D. Wis. 2022) ........ 11

*Bondi v. VanDerStok*
604 U.S. 458 (2025) ........ 4

*Caribbean Marine Servs. Co. v. Baldrige*
844 F.2d 668 (9th Cir. 1988) ........ 9

*DISH Network L.L.C. v. DelVecchio*
831 F. Supp. 2d 595 (W.D.N.Y. 2011) ........ 11

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ........ 10

*Florida v. Dep't of Health & Hum. Servs.*
19 F.4th 1271 (11th Cir. 2021) ........ 7

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ........ 5, 6

*Indiana v. Haaland*
No. 24-cv-1665, 2024 WL 5213401 (D.D.C. Dec. 24, 2024) ........ 7

*Johnson v. Couturier*
572 F.3d 1067 (9th Cir. 2009) ........ 11

*Johnson v. Tyson Foods, Inc.*
580 F. Supp. 3d 382 (N.D. Tex. 2022) ........ 7

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) ........ 8

*New York v. United States*
505 U.S. 144 (1992) ........ 7

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*
143 F.3d 800 (3d Cir. 1998) .......... 10

*Sierra Club v. Clinton*
689 F. Supp. 2d 1123 (D. Minn. 2010) .......... 11

*United States v. Salerno*
481 U.S. 739 (1987) .......... 4

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995) .......... 5, 6, 7

*Washington v. United States Dept. of Educ.*
807 F. Supp. 3d 1275 (W.D. Wash. 2025) .......... 12

**STATUTES**

5 U.S.C. § 705 .......... 12
50 U.S.C. § 4557 .......... 5
50 U.S.C. § 4558(j) .......... 5

**COURT RULES**

Local Rule
7-9 .......... 1
7-10 .......... 1, 2

**OTHER AUTHORITIES**

*Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*
No. 2:26-cv-02946 (C.D. Cal. Apr. 3, 2026) .......... 2, 3

Federal Rules of Civil Procedure, rule 65(c) .......... 11

*United States et al. v. Plains All Am. Pipeline L.P. et al.*
No. 2:20-cv-02415 (C.D. Cal. Apr. 27, 2026) .......... 3

## INTRODUCTION

Intervenors Sable Offshore Corp. and Pacific Pipeline Company (Sable) portray their opposition to California's motion as an attempt to preserve the status quo. Yet until two and a half months ago, the status quo for over a decade was a complete absence of the flow of oil through Lines CA-324/325. That status quo also included standard state oversight of Sable's pending requests to restart the pipelines pursuant to the laws applicable to pipelines carrying hazardous liquids, state oversight over its own property, and judicial oversight pursuant to a consent decree's conditions for the pipeline's restart. Sable moved to upend that status quo by asking the federal government for orders that, in Sable's view, freed it from having to follow federal and state court orders blocking that restart. But, contrary to Sable's position, the Defense Production Act (DPA) does not grant the federal government absolute power to displace this oversight. And Sable should not be heard to complain about hardships resulting from an injunction against unlawful federal action that Sable solicited specifically so that it could *violate* an existing injunction. This Court should restore the yearslong status quo that existed before the Wright Order upset it, and grant California's motion.

## ARGUMENT

### I. CALIFORNIA FILES THIS REPLY TO SABLE'S UNTIMELY OPPOSITION.

Per Local Rule 7-10, the deadline for California to reply to any party's then-filed opposition to California's motion was May 18, 2026, and California timely filed its reply to the federal government's opposition.[1] On that date, however, Sable's Motion to Intervene and Proposed Opposition were still pending. On May 20, 2026, the Court granted intervention and deemed the Proposed Opposition and its supporting papers "filed as of today"—nine days after the standard deadline for opposition papers under Local Rule 7-9. Due to the delayed filing of Sable's

[1] On May 27, 2026, the Court continued the hearing on California's motion from June 1, 2026 to June 8, 2026. See Dkt. 31.

Proposed Opposition, California must submit its Reply to Sable's Proposed Opposition now, which is later than the standard deadline for reply papers under Local Rule 7-10, but still seven days after the filing of that opposition, as is standard under the typical motion schedule.

## II. California Is Likely To Succeed on the Merits.

### A. The Wright Order Is Not Valid Priorities or Allocation Order.

Sable argues that the Wright Order has valid legal underpinnings and that Defendants made the findings that Section 101 requires procedurally. Sable Opp. at 5. Sable cites no evidence in support of this contention and impliedly relies upon documents that were not previously available to the public, were not cited or attached to the Wright Order, and were not previously submitted in any of the earlier-filed related cases pending before this Court. *See id.* at 5*;* Defs. Opp., Ex. A, Nunes Decl., Attach. 2; *see* Reply to Defs. Opp. at 5 n.2. But regardless of the validity or sufficiency of these newly produced documents, Sable does nothing to rebut California's explanation of how the Wright Order does not qualify as an order to prioritize or allocate within the meaning of the *statute*. *See* Mot. at 9-10; Reply to Defs. Opp. at 5-8.

### B. Like Defendants, Sable Incorrectly Seeks To Shield the Wright Order from Judicial Review.

Like the federal government, Sable asserts that "the preemptive effect of the [Wright] Order [is] not properly before the Court" and should instead be resolved in other actions. Sable Opp. at 7. As a practical matter, Sable's position aligns with the federal government's strategy to insulate the Wright Order from judicial review by directing the Court to consider California's challenges in other cases, while simultaneously arguing in those cases that California's challenges to the Order are "collateral." *See id.* at 21-22, Sable's Opp., *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal. Apr. 3, 2026), Dkt. 24 ("This Court should allow its sister courts to resolve" whether the Wright Order is invalid

"rather than issue an injunction that would collaterally attack [that] proceeding[]."); Sable's Opp. to Mot. to Enf., at 22, *United States et al. v. Plains All Am. Pipeline L.P. et al*., No. 2:20-cv-02415 (C.D. Cal. Apr. 27, 2026), Dkt. 61 (citing to the Complaint in this case, "the legal consequences of the [Wright] Order are better resolved in other litigation, including the separate action that California initiated for that purpose."). Indeed, Sable does not hide this strategy, as it asserts its position that "the Consent Decree and Gaviota State Park actions might be decided without any discussion of the DPA." Sable Opp. at 6.

As a legal matter, Sable's attempt to render the Wright Order unreviewable is meritless. Sable "does not dispute that this case is the appropriate forum to challenge the *validity* of the [Wright] Order." *Id.* at 7 n.3. But one of the reasons the Wright Order is invalid is its purported preemptive effect—a power Congress never conferred on federal agencies under the DPA.

### C. The Preemptive Effects of the DPA Order Are Not Hypothetical.

Next, Sable contends that California's preemption arguments are grounded in "some speculative scenario not being litigated here." *Id.* at 7. To the contrary, California's preemption arguments are based on Sable and the federal government's own, very real assertions that the Wright Order preempts California from enforcing the state laws, regulations, and property rights that would otherwise govern the restart of Lines CA-324/325. Far from being "speculative" and "hypothetical" (*id.*), the preemption that Sable and the federal government assert is what has caused, and continues to cause, oil to *actually* flow through Lines CA-324/325 over California's objection.[2] Sable's contention that it does not view the Wright Order as

[2] Sable claims that "California and its agencies are already arguing in parallel cases that the [Wright] Order *does not* preempt any state laws, exactly the opposite of their stance here." Sable Opp. at 8 n.5. California is unsure which case or filing Sable is referring to, because the footnote does not include a citation. In any event, California has consistently maintained that a DPA Order *cannot* have the broad preemptive effect the federal government and Sable assert it does, because of

(continued…)

"preempt[ing] all state laws touching upon Sable's operations" (*id.* at 7-8) is beside the point. Whether Sable intends to comply with other California laws of its choosing does not affect the very real harm California suffers from violation of the California laws Sable is presently flouting by relying on the Wright Order.

Nor does California need to show that "every possible preemption scenario is unlawful" to be entitled to injunctive relief. Sable Opp. at 8. First, contrary to Sable's assertions (*id.* at 8 n.6), it remains an open question whether the "no set of circumstances" standard from *United States v. Salerno*, 481 U.S. 739, 745 (1987), applies to APA regulatory challenges. *Compare Bondi v. VanDerStok*, 604 U.S. 458, 467 n.2 (2025) (majority op.) (leaving "further analysis of the proper test for another day"), *with id.* at 496 n.5 (Thomas, J., dissenting) ("the majority avoids settling whether the framework in [*Salerno*] is appropriate for regulatory challenges in the APA context."). In any event, California does not raise broad facial challenges to the DPA or its implementing regulations. Instead, California challenges the Wright Order, as applied to these particular pipelines, and challenges Sable's reliance on the Wright Order's purported preemptive effect to take actions that ignore state regulatory requirements, property rights, and consent decree requirements that would otherwise govern.

### D. The DPA Does Not Support Sable's Claimed Scope of Preemption.

Sable contends that "the DPA both expressly and impliedly preempts conflicting state laws." Sable Opp. at 9. With respect to express preemption, Sable goes further than the federal government and embraces the theory introduced in the March 13, 2026, U.S. Department of Justice Office of Legal Counsel opinion ("OLC Opinion") that section 707 of the DPA "presupposes . . . broad preemptive

---

statutory and constitutional considerations. *See, e.g.*, Department of Parks & Recreation's Reply at 6-7, *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal. Apr. 10, 2026), Dkt. 30. Sable and the federal Defendants are acting, however, in reliance on its purported preemptive effect—which is what causes California harm and constitutes the controversy in this case.

operation." *Id.* at 12. But as California explained in its motion (Mot. at 13), section 707 is a limited immunity provision that, as to prioritization orders, "extends only to shield a contractor from *breach of contract* liability arising as a consequence of such re-prioritization," and goes no further, as the federal Courts of Appeals have held. *Hercules Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994) (emphasis added); *see United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995) (similar). And Sable has no answer to California's observation that the DPA's express preemption of state antitrust laws is not matched by any similar express provision preempting the types of state laws at issue here. *See* Mot. at 12 (citing 50 U.S.C. § 4558(j)).

Sable argues that the text of section 707 offers broad preemption because it "shields against 'damages or penalties'" and "contains no reference to 'contract' law at all." Sable Opp. at 13 (quoting 50 U.S.C. § 4557). This is flatly wrong. Section 707 explicitly references contract law: As the Federal Circuit explained, the "second sentence of section 707, [] prohibits discrimination 'against *contracts* to which priority is assigned[.]'" *Hercules*, 24 F.3d at 204 (quoting 50 U.S.C. § 4557) (emphasis added). This language "reinforce[d] the [court's] view that the immunity from suit provided by section 707 [did] not extend to" shield a contractor from the liability at issue there: "tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users." *Id.*

And the phrase "damages or penalties" in the previous sentence of section 707 should not be read in isolation. "[I]t is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent." *Hercules*, 24 F.3d at 204. Section 707 must be read in light of a contractor's obligation under "DPA section 101(a) . . . to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract." *Id.* When read together, "the protection provided by DPA section 707 extends only to shield a contractor from breach of

contract liability arising as a consequence of such re-prioritization." *Id.* "To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule" of statutory construction. *Id.*

In the OLC Opinion, the Department of Justice did not engage with the contrary holdings in *Hercules* and *Vertac*. Sable now attempts to distinguish them, claiming they only concerned whether private parties could claim "*indemnification* from the United States for personal injury claims" arising out of their activities as contractors to produce Agent Orange for the federal government. Sable Opp. at 12. Sable is correct that that was *one* of the several issues the courts considered. *See, e.g.*, *Vertac*, 46 F.3d at 812 ("Hercules *separately argues* that it is entitled to indemnity from the United States arising out of Hercules' immunity under § 707, the United States' waiver of immunity, and the United States' liability under CERCLA.") (emphasis added). But to decide the indemnification issue, those courts determined that the scope of "'the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA'"—period. *Vertac*, 46 F.3d at 812 (quoting *Hercules*, 24 F.3d at 204). Accordingly, the courts also construed section 101(a). *Id.*

Sable is also wrong to argue that the Wright Order creates conflict preemption of the sort "where 'a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law[.]'" Sable Opp. at 9. As California has explained, the purpose and objective of section 101(a) is to require a contractor to prioritize defense consumption above non-defense consumption, notwithstanding existing private contracts. Mot. at 8-9, 13-15. Enforcement of state laws pertaining to safety, environmental protection, or property rights over state-owned land do not interfere with the goal of prioritizing some contracts over

others.[3] Nor can the DPA reasonably be read to have intended to authorize the Executive Branch to flout judicial orders. It is not "necessary" (Sable Opp. at 8) to "allow[] a government contractor to violate the laws with impunity" in order for it to "perform[] a rated contract" under section 101(a). *Vertac*, 46 F.3d at 812.[4]

## III. The Remaining Factors Favor an Injunction.

### A. The Wright Order Irreparably Harms California.

Sable admits the Wright Order displaces California's sovereign authority yet argues that this deprivation of sovereign rights does not constitute irreparable harm. Sable Opp. at 18-19. Sable's argument fails for the same reasons that Defendants' does. *See* Reply to Defs. Opp. at 10.

Sable cites two cases in support of its claim that a federal agency action purporting to preempt state law does not inflict irreparable harm on the state. Sable Opp. at 18 (citing *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1292 (11th Cir. 2021); *Indiana v. Haaland*, No. 24-cv-1665, 2024 WL 5213401, at *9 (D.D.C. Dec. 24, 2024)). But Sable misunderstands the import of these cases, which support California's argument, not Sable's or Defendants'. The court in each case found that the federal government acted *within* the scope of its express statutory authority delegated by Congress, and that the actions that preempted state law therefore did not constitute irreparable harm. *Florida*, 19 F.4th 1271 at 1287, 1292; *Indiana*, 2024 WL 5213401 at *9. Sable cites no authority supporting a lack of irreparable harm as a result of the federal government's displacement of state law

[3] Like the federal government, Sable argues that "anticommandeering doctrine is inapplicable" because the Order here "is directed to a private party—Sable." Sable Opp. at 13. As explained in reply to that argument, both the federal government and Sable interpret the Order to require California to dedicate state property to Sable's immediate restart of the pipelines. Reply to Defs. Opp. at 9 & n.5. Forcing California to reorder its property rights in Gaviota State Park commandeers state government in much the same way as it commandeers state government for the federal government and makes California the owner of a private party's undesirable assets (such as nuclear waste) without California's consent. *See New York v. United States*, 505 U.S. 144, 176 (1992).

[4] For the same reasons in response to the federal government's opposition, Sable's reliance (Sable Opp. at 11) on *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022) is misplaced. *See* Reply to Defs. Opp. at 6-7, 9 n.4.

by acting *outside* the scope of statutory authority, as the Secretary has done here. *See* Mot. at 8-12.

Sable alternatively argues that any irreparable harm to California's sovereignty "cannot support injunctive relief," because Defendants would suffer greater irreparable harm from an injunction of the Wright Order that would result in "the United States's inability to 'effectuat[e]' the congressionally authorized Defense Production Act." Sable Opp. at 19 (quoting Mot. at 20). But Sable again misunderstands the basis for irreparable harm. Defendants cannot be harmed by an injunction that prevents them from acting outside the scope of their authority. *See* Mot. at 21 (citing *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (federal government "cannot suffer harm from an injunction that merely ends an unlawful practice")). And Sable overstates the extent of relief sought here, which would exclusively enjoin the Wright Order, and not affect the United States's ability to lawfully effectuate the DPA in any other instance.

When addressing the requirements for showing irreparable harm, Sable incorrectly conflates ultra vires acts generally with constitutional violations to argue that California must show irreparable harm independent of a likelihood of success on the merits. But controlling precedent holds that the opposite is true for violations of constitutional rights. *See* Mot. at 7 (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("the deprivation of constitutional rights unquestionably constitutes irreparable injury") (internal quotation marks omitted). Sable attempts to distinguish *Melendres* by contrasting the unlawful detention at issue there against what it characterizes as the "academic harm" inflicted on California. Sable Opp. at 19-20. But Sable ignores the holding of *Melendres*, in which the court found irreparable harm not simply because plaintiffs there "faced a real possibility" of detention, but because the likely detention would have been unlawful and "a deprivation of constitutional rights." *Melendres,* 695 F.3d at 1002. In any event, California's harms are far from academic: Sable is *actually* running the Pipelines in

violation of California law. But for the Wright Order, California agencies would have engaged in environmental reviews and approvals—and ensured that adequate environmental protections and easements were in place—before those pipelines restarted; as a regulator and a landowner, California is directly harmed by the Wright Order sidelining its agencies entirely.

Additionally, Sable parrots Defendants' contention that the risk of harm to public health and safety and to the environment and natural resources is impermissibly speculative. Sable Opp. at 15-17; Defs. Opp. at 22, 24. California addressed those arguments in its Reply to Defendants' Opposition, and they equally apply here. *See* Reply to Defs. Opp. at 10-11. Sable also repeatedly quotes *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988). But the point of *Caribbean Marine Services* is that "a plaintiff seeking preliminary injunctive relief must demonstrate that it will be *exposed* to irreparable harm." *Id.* at 674 (emphasis added). California has made that showing here. *See* Mot. at 19-20; Sharma Decl., ¶¶ 5-11 (describing state law requirements and duties of California Geologic Energy Management Division to ensure safety of the Pipelines and "prevent harm to life, health, property, and natural resources" (*id.* at ¶ 8)); Vance Decl., ¶¶ 3-15 (describing state law protections and permitting requirements to minimize the risk of harm to threatened or endangered species and waterways). Sable also claims that it is speculative to say that "operation of the [Pipelines] presents a safety risk" and "that the safety risk can cause identified harms," yet these Pipelines caused one of the most destructive oil spills in recent history and caused catastrophic damage to California's public health, economy, and environment. *See* Compl. at ¶¶ 2, 25-29; Mot. at 3-4, 19-20; Reply to Defs. Opp. 10-11.

Sable also misunderstands California's claims and requested relief when it argues that California is alleging it will suffer financial harm. Sable Opp. at 17. California brings this case against the Secretary and DOE, not Sable, and

California's claims in this case do not seek monetary relief. Instead, California claims "[i]ntangible injuries," which constitute irreparable harm because they cannot be reduced to money damages. Mot. at 19-20; Reply to Defs. Opp. at 10; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

Lastly, Sable disputes that California can suffer irreparable harm as a property owner. Sable Opp. at 20. It overlooks the examples in California's motion of its rights and obligations as a property owner that Sable's reliance on the Wright Order infringes or prevents. Mot. at 20-21. And while Sable claims that oil flowing through an underground pipeline has no effect on the environment (Sable Opp. at 20), that ignores not only the past history of these very pipelines but also the legal rule that California does not need to show a present effect on the environment to show a *likelihood* of irreparable harm.

**B. The Balance of Equities and Public Interest Favor California.**

Sable claims it would be harmed as the result of an injunction. Sable Opp. at 20-21. But the harm Sable claims is entirely self-inflicted: its own conduct created the purported harms it now claims. The "self-inflicted nature of any harm suffered by [Sable] weighs in favor of granting preliminary injunctive relief." *Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 806 (3d Cir. 1998). Sable not only purchased Lines CA-324/325 knowing they had been dormant for a decade due to a catastrophic oil spill, but also agreed to be bound by a consent decree which set specific constraints on any restart of the lines. Flores Decl., ¶ 9; Mot. at 4. Over seven months before Sable restarted the lines, a state court enjoined Sable from restarting them until Sable met certain conditions. Mot. at 5. Instead of complying with that court's order and the federal consent decree, Sable lobbied the federal government for the Wright Order, which Sable thought would allow it to restart the pipelines while ignoring court orders to the contrary. But a party that decides for itself that it may defy injunctions against it may not come into court to assert its own equities against an injunction that would halt that unauthorized

conduct. The only hardship Sable will suffer "would be to prevent [it] from engaging in further illegal activity, so the balance clearly weighs in [California's] favor." *DISH Network L.L.C. v. DelVecchio*, 831 F. Supp. 2d 595, 601-02 (W.D.N.Y. 2011).

California has already demonstrated the public interest favors an injunction. *See* Mot. at 21; Reply to Defs. Opp. at 12. Sable's attempt to show otherwise relies on language from the Wright Order, effectively asking this Court to give that order conclusive deference in abdication of the judicial role. Sable Opp. at 21. The Court should reject this circular reasoning. Moreover, Sable's cited authority is clearly distinguishable from the facts of this case. *See Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.,* 626 F. Supp. 3d 1030, 1037, 1057 (W.D. Wis. 2022) (concerning pipeline that operated continuously for nearly 70 years and was subject to international treaty prohibiting any measure that would impede the flow of oil); *Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1147 (D. Minn. 2010) (public's interests in construction of pipeline "slightly outweigh[ed]" the interest in avoiding environmental harm because pipeline was being constructed in an existing pipeline corridor which mitigated such harm).

## IV. THE COURT SHOULD NOT REQUIRE A BOND FROM CALIFORNIA.

Lacking any authority other than a passing citation (and an incorrect analysis) of Rule 65(c), Sable asks this Court to require California to post a *100-million-dollar* bond. Sable Opp. at 22. This Court should decline Sable's invitation to reward Sable for its blatant disregard and violation of a federal consent decree and court order. Moreover, contrary to Sable's argument, "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks omitted); Sable Opp. at 22. Indeed, courts have discretion to waive the bond requirement on a plaintiff state seeking to enjoin

unlawful agency action in public interest litigation. *See Washington v. United States Dept. of Educ.,* 807 F. Supp. 3d 1275, 1293 (W.D. Wash. 2025). That is precisely what California seeks to do here: enjoin *Defendants* from implementing, invoking, or enforcing the unlawful Wright Order. California should not be forced to front the cost of Defendants' and Sable's haphazard gamble with the rule of law. The Court should exercise its discretion to waive the bond requirement here.[5]

## CONCLUSION

California's motion for a preliminary injunction and stay should be granted.

Dated: May 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY M. BROWN
Supervising Deputy Attorney General
ALICIA ROESSLER
REBECCA HUNTER
MARY HALEY OUSLEY
Deputy Attorneys General

*/s/ Brian Calavan*

BRIAN CALAVAN
Deputy Attorney General
*Attorneys for Plaintiff State of California*

[5] As for California's requested stay, the APA (5 U.S.C. § 705) does not contemplate any such bond. *Am. Fed'n of Tchrs. v. Dep't of Educ.,* 779 F. Supp. 3d 584, 623 n.14 (D. Md. 2025).

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief contains 3,969 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

Dated: May 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
MARY HALEY OUSLEY
Deputy Attorneys General

*/s/ Brian Calavan*

BRIAN CALAVAN
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-1981
Fax: (510) 622-2270
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov
Brian.Calavan@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff*,

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants*.

Case No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF INTERVENORS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND STAY**

Date: June 8, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

Plaintiff State of California ("California") submits the following objections to evidence submitted by Intervenors Sable Offshore Corp. and Pacific Pipeline Company ("Sable") in support of their Opposition to Plaintiff's Motion for a Preliminary Injunction and Stay.

Although district courts "may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015). As set forth below, the J. Caldwell Flores and Steve Rusch declarations are objectionable for several reasons. Accordingly, the majority of these declarations should be disregarded or given little to no weight in the determination of California's Motion.

As an initial matter, neither Mr. Caldwell Flores nor Mr. Rusch are qualified as an expert witness. *See* Fed. R. Evid. 702 (requiring qualification "as an expert by knowledge, skill, experience, training, or education."). Mr. Caldwell Flores states that he is the "President and Chief Operating Officer" of Sable." Caldwell Flores Decl. ¶ 1. Mr. Caldwell Flores does not state how long he has held that position and did not provide any additional background information. This is not sufficient to indicate that Mr. Caldwell Flores meets the requirements of Federal Rules of Evidence 702 to opine on, for example, scientific or engineering knowledge related to oil spill prevention or safety risks associated with pipeline shutdown, national security considerations and military activities, or financial interests of federal, state, and local entities. *See, e.g., id.* at ¶¶ 12, 32, 53, 59, 60, 67, 72-74. Fed. R. Evid. 702(a) (a witness qualified as an expert may testify in the form of an opinion if they demonstrate "scientific, technical, or other specialized knowledge"). Mr. Caldwell Flores' declaration includes statements on all of these topics.

Mr. Rusch states that he is the "Vice President, Regulatory & Environmental

Affairs" of Sable" but does not state how long he has held that position or what his position entails. Mr. Rusch further states that he has "over 46 years of experience in the oil and gas industry," lists several titles he has held at other companies in the past, that he has a bachelor's decree in civil engineering, and has been licensed by the state of California "as a Professional Engineer." Rusch Decl., ¶ 1. However, this is not sufficient to indicate that Mr. Rusch is qualified to opine on, for example, Sable's current or historic compliance with laws or regulations, or the meaning of California's laws. *See id.* ¶¶ 7-13, 16. Mr. Rusch's declaration includes statements on these topics.

As such, both declarations should be governed by Federal Rules of Evidence 701 regarding opinion testimony by lay witnesses. *Cf. Siebert v. Gene Security Network, Inc.*, 75 F.Supp.3d 1108, 1113 (N.D. Cal. 2014) (permitting lay witness testimony via declaration from director of the Office of Policy for Extramural Research Administration at NIH because her declaration contained "observations about the ordinary inner workings of the NIH, derived from her personal experience" and not matters that required "scientific, technical, or specialized knowledge.").

California's specific objections are as follows:

## I. CALIFORNIA'S OBJECTIONS TO THE DECLARATION OF J. CALDWELL FLORES (DKT. NO. 24-1):

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 1. "These valves reduce the worst-case potential release of oil by almost 40%." ¶ 12. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 2. "Contemporary analyses confirm that crude oil pipelines operated with limited cathodic protection are not more likely to result in oil spills or oil spills of increased size when other appropriate leak detection and prevention methods are implemented, such as those identified in the PHMSA Special Permit." ¶ 15. | Inadmissible hearsay; lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 801, 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 3. "OSFM confirmed that Sable's Operations and Maintenance Manual incorporated all procedural modifications contemplated by the Consent Decree. OSFM also confirmed that Sable has instituted a management of change plan to ensure any future procedural changes are similarly incorporated into the Operations and Maintenance Manual." ¶ 21. | Inadmissible hearsay. Fed. R. Evid. 801. |
| 4. "OSFM . . . confirmed the enhancements satisfied all applicable Consent Decree requirements." ¶ 24. | Inadmissible hearsay. Fed. R. Evid. 801. |
| 5. "These developments exacerbated an already-acute oil shortage on the West Coast as recognized in Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025), creating threats to national security and domestic energy supplies." ¶ 32. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

| **Evidence Objected To:** | **Grounds for Objection:** |
|---|---|
| 6. "A court-ordered pipeline shutdown would be a difficult, complex, time-consuming process that carries additional safety risks. Sable would first need to make operational adjustments at the Las Flores Canyon Facility, to allow for safe storage of produced oil. Sable would then need to cease additional oil flow into the Pipeline Segments and divert that oil to storage. Sable would next insert pipeline intervention tools ("pigs") in the Pipeline Segments to remove remaining oil and clean the lines utilizing nitrogen. Sable would then repressurize the Pipeline Segments with nitrogen to mitigate against internal corrosion. The amount of time required for these tasks can be significant depending on the availability of the necessary nitrogen, equipment and qualified technicians. Additionally, although Sable would employ best practices if ordered to shut down the Pipeline Segments, the topography of this pipeline requires significant planning to employ necessary safety procedures to safely purge the crude oil while avoiding over pressuring the pipelines." ¶ 53. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

| **Evidence Objected To:** | **Grounds for Objection:** |
|---|---|
| 7. "A business disruption of this magnitude could dramatically lower the company's share price, destroying value for shareholders, including not just institutional investors but also workers across the country whose pensions and retirement plans hold equity in Sable." ¶ 55. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 8. "Continued operation of the SYU and the SYPS is also indispensable to the livelihoods of approximately 300 well-paid contractors, including laborers, operators, welders, mechanics, electricians, engineers, longshoremen, and construction workers, many of whom are unionized. Because of the dearth of oil production in California, these jobs will also be difficult to replace if lost. Moreover, informing contractors that there is no longer work for them would compromise goodwill and jeopardize longstanding relationships between those individuals and Sable." ¶ 57. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 9. "Loss of these jobs would not only hurt the employees, contractors, and their families: local governments, principally Santa Barbara County, but also San Luis Obispo County and Kern County, would be negatively affected by the loss of revenue from income, sales, and property taxes," ¶ 59. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 10. "California is currently facing an energy crisis. It has the highest retail gasoline and aviation fuel costs in the United States, and the state must import most of its oil from foreign countries to satisfy its residents' growing energy demands. According to the California Energy Commission, over 61% of the crude oil feeding California refineries was imported from foreign countries, many in the turbulent Middle East. See Cal. Energy Comm'n, *Annual Oil Supply Sources to California Refineries*, https://tinyurl.com/4hkecyjn (last visited May 9, 2026). Whereas approximately thirty years ago in-state production constituted 50% of oil supply (and Alaskan production represented another 38%, for a domestic total of 88%), foreign imports have risen from 12% in 1997 to 61% last year. Iraq alone is responsible for 17% of California's foreign crude oil imports, and Middle Eastern imports collectively represent over a quarter of California's oil imports. See Cal. Energy Comm'n, *Foreign Sources of Crude Oil Imports to California*, https://tinyurl.com/yjtu77rx (last visited May 9, 2026)." ¶ 60. | Inadmissible hearsay; lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 801, 602, 701.<br><br>These statements do not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. Indeed, Mr. Caldwell Flores relied on information contained in online articles, which he linked to in his declaration. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 11. "Many of these tankers must traverse the Strait of Hormuz, which is currently the site of intense military activity . . ." ¶ 60. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 12. "In September 2025, the pipeline's owner sent a letter to California Governor Gavin Newsom, noting that the operator was in severe financial distress because of the pipeline's sudden underutilization. Without relief, the letter warned, the pipeline would have to be shut down, which would have severely negative consequences. The CEO added that California crude oil production was meeting only 25% of refinery demand and encouraged Governor Newsom to allow the SYU to reopen, which would reinfuse the pipeline system and allow more crude oil to flow north from Kern County. But without additional production coming online, by the end of 2025, the pipeline was essentially empty, and as of now, it is shut down. Prospects for restart are dim, as the economics of the pipeline remain highly challenged due to declining regional production and strict environmental regulations." ¶ 61. | Inadmissible hearsay; lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 801, 602, 701.<br><br>These statements do not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 13. "And these refineries are needed to supply needed fuel, including gasoline, not just to California but also the rest of the West Coast, including inland states like Nevada and Arizona that are dependent on California." ¶ 62. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 14. "If a court prevents Sable from producing oil and gas from the SYU and transporting oil through the SYPS to market, it is highly unlikely that the SYU will ever be produced, stranding billions of dollars of valuable natural resources owned by the public and destroying significant economic activity." ¶ 65. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 15. "An injunction would eliminate this significant contribution to the U.S. Treasury . . ." ¶ 67. | Lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 16. "Sable is one of Santa Barbara County's highest taxpayers." ¶ 69. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 17. "California is home to more than 40 major military installations, the highest concentration of any U.S. state. These bases serve as critical hubs for training, logistics, and research across every branch of the Armed Forces." ¶ 72. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 18. "Among these installations are Naval Base San Diego, the largest naval base on the West Coast and home to the U.S. Pacific Fleet; Camp Pendleton, the Marine Corps' premier West Coast expeditionary training facility; Edwards Air Force Base, where the world's most extensive aircraft testing takes place; and Vandenberg Space Force Base, the country's primary West Coast space launch and missile testing facility." ¶ 73. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |
| 19. "A reliable domestic supply of crude oil to the West Coast is essential to military readiness and homeland security." ¶ 74. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Caldwell Flores' personal knowledge or experience. |

## II. CALIFORNIA'S OBJECTIONS TO THE DECLARATION OF STEVE RUSCH (DKT. NO. 24-6):

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 1. "The impacts of that existing pipeline on the environment were addressed in the original comprehensive Environmental Impact Statement and Environmental Impact Report prepared by the federal Bureau of Land Management and the California State Lands Commission prior to construction of the Pipeline Segments and pursuant to the National Environmental Policy Act and the California Environmental Quality Act, respectively. The original EIS/EIR is available at: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt." ¶ 4. | Inadmissible hearsay. Fed. R. Evid. 801. |
| 2. "The original EIR/EIS analyzed the potential environmental effects of long term operation, repairs that might become necessary, and ongoing maintenance. They also considered the risk to species that may occur in and around the pipeline as a result of long term operation, repairs, and maintenance." ¶ 5. | Inadmissible hearsay. Fed. R. Evid. 801. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 3. "Sable has never taken the position that it is not obligated to take appropriate measures to protect ecologically sensitive environments." ¶ 7. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 4. "Sable has not taken the position that the DPA Order excuses compliance with any particular provision of the California Fish and Game Code. To the contrary, since the DPA Order was entered, Sable has continued to work with the California Department of Fish and Wildlife on past permitting issues." ¶ 8. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 5. "The LFC has never been regulated by the California Geologic Energy Management Division ("CalGEM")." ¶ 11. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 6. "Facilities are 'attendant to' oil and gas production, and therefore subject to CalGEM jurisdiction, only when they are within the lease area of oil and gas fields. LFC is not located within any operating designated oil and gas field nor within the boundary of any oil and gas lease. The LFC is not properly subject to CalGEM's jurisdiction for this and other reasons." ¶ 13. | Lack of foundation, personal knowledge; improper lay opinion testimony, including improper legal conclusion. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience, including his legal conclusions regarding CalGEM's jurisdiction. |
| 7. "However, on September 26, 2024, CalGEM asserted for the first time that LFC is a "production facility" subject to CalGEM's jurisdiction, bonding, and other regulatory requirements. CalGEM has demanded a bond of $57,258,121." ¶ 14. | Inadmissible hearsay; lack of foundation, personal knowledge. Fed. R. Evid. 801, 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 8. "Despite not being regulated by CalGEM, the LFC is subject to other regulatory regimes and is complying with them. For example, PHMSA regulates the LFC." ¶ 16. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 9. "Throughout its jurisdictional dispute with CalGEM, Sable has continued to cooperate with CalGEM, whose agents have been accommodated at LFC on five separate days for inspections: October 31, 2024; August 28, 2025; and September 2–4, 2025." ¶ 17. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 10. "Sable continues to cooperate with CalGEM, consistent with its legal obligations and a reservation of its rights." ¶ 18. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 11. "On March 16, 2026, counsel for the Department of Conservation contacted Sable regarding an inspection of LFC. Sable promptly responded to this request and, in both its initial response and subsequent communications, has reiterated its willingness to accommodate CalGEM's inspection request, subject to a full reservation of Sable's rights at law and in equity. This includes, without limitation, the right to dispute and challenge any asserted jurisdiction by CalGEM over LFC, and the requirement that any inspection proceed in accordance with the applicable provisions of the California Civil Discovery Act ("CDA") in light of the parties' ongoing dispute concerning CalGEM's jurisdiction over LFC." ¶ 19. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 12. "Sable further offered to identify an inspection date earlier than the 30 days from service required under the CDA, even as soon as the following week, provided that Sable is afforded sufficient time to receive CalGEM's demand and serve its written objections in advance of any inspection." ¶ 20. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 13. "On May 2, 2024, Sable met with CDPR to discuss the process for renewing the easement and making the needed repairs to comply with the Consent Decree. Sable informed CDPR that the pipeline would be repaired, not replaced. Sable informed CDPR that, at that time, it anticipated resuming oil transportation in the repaired line by September 2024. In response, CDPR stated that the process of obtaining the easement would be extensive, likely taking a year or more. Sable's notes concerning this call reflect that both parties understood that oil would flow through Segment CA-325 during the period while the easement was being finalized." ¶ 26. | Inadmissible hearsay; lack of foundation, personal knowledge; speculative; improper lay opinion testimony. Fed. R. Evid. 801, 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience because there is no indication that Mr. Rusch personally attended the referenced meeting or prepared the referenced notes. Additionally, Mr. Rusch's statement regarding Sable's notes is hearsay and speculative as to how State Parks understood that oil would flow through the pipeline during the period the easement was being finalized. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 14. "On May 22, 2025, Sable met with CDPR to discuss the easement renewal process and the steps required. During that meeting, representatives for the State again stated that further CEQA review would not be required." ¶ 33. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 801, 602, 701<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience because there is no indication that Mr. Rusch personally attended the referenced meeting. |
| 15. "On July 3, 2025, CDPR's Chief Counsel informed Sable's representatives that it was likely that easement renewal was exempt from the California Environmental Quality Act ("CEQA") and that no further environmental review would be needed, because environmental review had already been completed at the time Segment CA-325 was initially constructed. This was consistent with the position that CDPR had taken with respect to the repairs in the May 9, 2025 Notice of Exemption, and with CDPR's prior statements to Sable." ¶ 35. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience because there is no indication that State Parks' Chief Counsel made any of the alleged statements to Mr. Rusch. |
| 16. "I understand that Sable's representative responded immediately to Ms. Siverson, asking about the new meeting date. He received no response." ¶ 45. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 17. "I understand that Sable's representative followed up on September 11, 2025, to Ms. Siverson and her colleague, Chief Counsel Tara Lynch, but received no reply." ¶ 46. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 18. "I understand that Sable's representative followed up again on September 14, 2025, and on September 15, 2025, with both Ms. Siverson and Ms. Lynch, but received no reply." ¶ 47. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 19. "On September 17, 2025, CDPR stated that it would 'reach out as soon as we can to schedule a meeting with Sable.'" ¶ 48. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 20. "I understand that Sable's representative followed up again with a phone call to Ms. Siverson on September 22, 2025, but received no response." ¶ 49. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |

| **Evidence Objected To:** | **Grounds for Objection:** |
|---|---|
| 21. "I understand that Sable's representative followed up again with a call to Ms. Siverson on September 24, 2025. Ms. Siverson responded by email, stating only that "State Parks is reviewing internally. I will let you know as soon as we are ready to meet." ¶ 50. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 22. "I understand that Sable's representative followed up again on September 25, 2025, with a message to Ms. Lynch, but received no response." ¶ 51. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 23. "I understand that Sable's representative followed up again on September 30, 2025, with a call to Ms. Lynch, but received no response." ¶ 52. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 24. "I understand that Sable's representative followed up again on October 7, 2025, with a call to Ms. Lynch, but received no response." ¶ 53. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |

| **Evidence Objected To:** | **Grounds for Objection:** |
|---|---|
| 25. "I understand that Sable's representative followed up again on October 28, 2025, with a call to Ms. Lynch, but received no response." ¶ 54. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 26. "I understand that Sable's representative followed up again on November 6, 2025, with a message to Ms. Siverson asking for a call, but received no response." ¶ 55. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 27. "Nothing under Sable's proposed easement with CDPR would authorize Sable to conduct any activities in the Park that were not already evaluated under CEQA in the original EIR/EIS, or which CDPR has not already found to be exempt from further CEQA review." ¶ 60. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 28. "I understand that Sable's representative followed up on December 22, 2025, to Ms. Siverson and Ms. Lynch." ¶ 61. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |

| **Evidence Objected To:** | **Grounds for Objection:** |
|---|---|
| 29. "On December 26, 2025, Ms. Siverson requested a meeting with Sable, promising to send 'a list of available times" within the 'next couple days.'" ¶ 62. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 30. "I understand that, on December 30, 2025, Sable's representative followed up, but Ms. Siverson still had no meeting times to propose." ¶ 63. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 31. "On December 31, 2025, Ms. Siverson sent a corrected Right of Entry Permit, but still no meeting times." ¶ 64. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 32. "A meeting finally took place on January 5, 2026. I understand that, at that meeting, CDPR reported that it had not commenced the 'Initial Study' it had claimed on November 13, 2025, was necessary for environmental review." ¶ 66. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience. |

| Evidence Objected To: | Grounds for Objection: |
|---|---|
| 33. "Another meeting was set for January 26, 2026. Sable continued to try to meet CDPR's ever-changing demands, but CDPR continued to stonewall." ¶ 67. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>This statement does not appear to be based on Mr. Rusch's personal knowledge or experience. |
| 34. "Further, I understand that Sable's counsel sought clarification as to the scope of biological and cultural survey information CDPR wanted for its review. In a response email that was accidentally sent to Sable's counsel, CDPR wrote back, 'I would tell him that it is not our job to tell them what we need; it is their job to submit any and all information thet [sic] they want included in our evaluation.'" ¶ 67. | Lack of foundation, personal knowledge; improper lay opinion testimony. Fed. R. Evid. 602, 701.<br><br>These statements do not appear to be based on Mr. Rusch's personal knowledge or experience because there is no indication that Mr. Rusch has any personal knowledge of the alleged email from State Parks. |

Dated: May 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
ALICIA ROESSLER
REBECCA HUNTER
MARY HALEY OUSLEY
Deputy Attorneys General

*/s/ Brian Calavan*

BRIAN CALAVAN
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Telephone: (510) 879-1981
Fax: (510) 622-2270
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov
Brian.Calavan@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

Case No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S RESPONSES TO INTERVENORS' OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

Date: June 8, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

Filed concurrently with: Reply to Intervenors' Opposition to Plaintiff's Motion for Preliminary Injunction; Plaintiff's Objections to Evidence in Support of Intervenors' Opposition to Motion for Preliminary Injunction

Plaintiff State of California ("California") submits the following Responses to Intervenors Sable Offshore Corp.'s and Pacific Pipeline Company's ("Sable") objections to evidence submitted by California in support of its Motion for Preliminary Injunction and Stay.

Courts apply a more relaxed admissibility standard to evidence proffered for a preliminary injunction and may consider otherwise inadmissible evidence. *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (observing that the rules of evidence do not strictly apply to preliminary injunction proceedings). While evidentiary issues are not irrelevant to preliminary injunction proceedings, such issues "properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n*, 119 F. Supp. 3d at 1185.

## I. CALIFORNIA'S RESPONSES TO SABLE'S OBJECTIONS TO THE DECLARATION OF DENA BELLMAN (DKT. NO. 16-3).

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| 1. "It is my understanding that Sable does not have a fee interest in any land at Gaviota State Park. Also, although CA-325 crosses Highway 101 near Gaviota State Beach, no portion of CA-325 under Gaviota State Park follows a public right-of-way." ¶ 4. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. *See GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1026 (C.D. Cal. 2017) ("Legal arguments are inappropriate in declarations."). | Ms. Bellman's testimony does not constitute a legal conclusion, but rather factual statements based on personal knowledge under Federal Rules of Evidence (FRE) 601 and 602. In paragraphs 6-8 of Ms. Bellman's declaration, she proffers the factual basis for this cited testimony. Additionally, Ms. Bellman's opinion is admissible lay opinion pursuant to FRE 701 as it is rationally based on her perception and personal |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
| --- | --- | --- |
| | | knowledge of the easement negotiations between Sable and the California Department of Parks and Recreation (State Parks) during her time as the District Superintendent of the Channel Coast District, which includes Gaviota State Park. This testimony is therefore relevant and admissible under FRE 401 and 402. |
| 2. "Neither Celeron nor Sable was granted a new easement, and Sable does not currently have an easement to transport oil under or across Gaviota State Park." ¶ 7. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402; *see also GemCap*, 269 F. Supp. 3d at 1026. The assertion about the status of the easement in Gaviota State Park is the subject of a related litigation. *See Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946 SVW-SSC (C.D. Cal). | Ms. Bellman's testimony does not constitute a legal conclusion, but rather factual statements based on personal knowledge under FRE 601 and 602. Additionally, Ms. Bellman's opinion is admissible lay opinion pursuant to FRE 701 as it is rationally based on her perception and personal knowledge of the facts regarding the historical relationship between State Parks and Sable, including the easement negotiations during her time as the District Superintendent of the Channel Coast District, which includes Gaviota State Park. This |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| | | testimony is therefore relevant and admissible under FRE 401 and 402. |
| 3. "Those permits are necessary because, as mentioned above, Sable does not have an easement that would otherwise allow it to access the Park." ¶ 9. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402; *see also GemCap*, 269 F. Supp. 3d at 1026. The assertion about the status of the easement in Gaviota State Park is the subject of a related litigation. *See Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946-SVW-SSC (C.D. Cal). | This testimony does not constitute a legal conclusion. Rather, it constitutes a factual statement based on personal knowledge under FRE 601 and 602. Additionally, Ms. Bellman's expressed opinion is admissible lay opinion pursuant to FRE 701 as it is rationally based on her perception and personal knowledge of the facts regarding the historical relationship between State Parks and Sable, including the easement negotiations during her time as the District Superintendent of the Channel Coast District, which includes Gaviota State Park. It is therefore relevant and admissible for the Court to consider under FRE 401 and 402. |
| 4. "The Annual Permit does not allow PPC or Sable to transport oil through that portion of CA 325 | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. Moreover, the statement is hearsay, Fed. R. Evid. 801, and the document in | This testimony does not constitute a legal conclusion. Rather, it is an admissible lay opinion pursuant to FRE 701 as it |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| that passes through Gaviota State Park." ¶ 11. | question speaks for itself. *Cf. United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001) (holding lay witnesses may not testify on "the correct interpretation of a contract"). | is rationally based on Ms. Bellman's perception of the most recent Right of Entry permit ("Annual Permit"), which was negotiated and issued by State Parks during Ms. Bellman's time as the District Superintendent. This testimony helps the Court understand Ms. Bellman's perception related to the Annual Permit and is therefore relevant and admissible under FRE 401 and 402. |
| 5. "To my knowledge, no one at State Parks asked Sable to remove CA-325 itself from Gaviota State Park prior to March 14, 2026, when State Parks sent Sable the above-referenced letter. Thus, it is my understanding that Sable had permission from State Parks to keep CA-325 and minimally maintain it in a dormant state at Gaviota State Park consistent with applicable ROE permits until the letter was issued and the | This assertion is speculative and lacks foundation. *See* Fed. R. Evid. 602, 701.<br><br>This is also a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402; *see also GemCap*, 269 F. Supp. 3d at 1026. The assertion about the status of the easement in Gaviota State Park is the subject of a related litigation. *See Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946 SVW-SSC (C.D. Cal). | Ms. Bellman's testimony is within her personal knowledge and not based on speculation. The foundation for her testimony is provided in the preceding paragraph detailing a letter in which Ms. Bellman is copied during her time as the District Superintendent of the Channel Coast District, which includes Gaviota State Park. It thus complies with FRE 602 and 701. This testimony is also relevant under FRE 401 and 402 because it helps the Court understand the easement negotiations between |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| right to keep CA 325 was revoked." ¶ 13. | | Sable and State Parks. |

## II. California's Responses to Sable's Objections to the Declaration of Julie Vance (Dkt. No. 16-4).

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| 1. "Species listed under CESA as endangered, threatened, or candidate in proximity to the portion of the Pipelines that traverse San Luis Obispo and Kern counties include: California jewel flower (Caulanthus californicus); Crotch's bumblebee (Bombus crotchii); Nelson's antelope squirrel (Ammospermophilus nelsoni); giant kangaroo rat (Dipodomys ingens); Tipton kangaroo rat (D. nitratoides nitratoides); and San Joaquin kit fox (Vulpes macrotis mutica). This list is based on an ITP Application that Plains Pipeline, L.P. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance admits that the ITP Application submitted by Plains Pipeline L.P. is irrelevant, as it was "for a project that would have fully replaced the Pipeline," and "the project never moved forward." ¶¶ 8-9. Ms. Vance never explains how the environmental impacts of putting in a new pipeline are comparable to occasional maintenance on an existing pipeline.<br><br>This is further irrelevant and speculative because Ms. Vance only lists plants and animal species in San Luis Obispo and Kern Counties without describing any harm that has befallen any of these species or making any assertion that the | Ms. Vance's testimony is within her personal knowledge as Regional Manager of the Central Region of the California Department of Fish and Wildlife and not based on speculation. Ms. Vance's testimony is admissible lay opinion, directly relevant to the Court as it considers the risk of harm to species protected under the California Endangered Species Act posed by Sable restarting its pipeline. Ms. Vance clearly states that the list of species is based on a proposed pipeline "within the same footprint" as Sable's pipeline. Thus, Ms. Vance's testimony is relevant and admissible under FRE 401, 402, and 701. |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| ('Plains Pipeline') submitted to CDFW's Central Region office in August 2020 for a project that would have fully replaced the Pipeline within the same footprint." ¶ 8. | subsurface transportation of hydrocarbons in a sealed pipeline impacts these species in any way. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."). | |
| 2. "On October 8, 2020, CDFW sent a letter to Plains Pipeline, informing Plains Pipeline that its ITP Application was incomplete. CDFW received a revised ITP Application from Plains Pipeline on November 9, 2020. On December 9, 2020, CDFW sent another letter to Plains Pipeline, informing Plains Pipeline that its revised ITP Application was incomplete. Ultimately, the project never moved forward." ¶ 9. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance admits that the ITP Application submitted by Plains Pipeline L.P. is irrelevant, as it was "for a project that would have fully replaced the Pipeline," and "the project never moved forward." ¶¶ 8-9. Ms. Vance never explains how the environmental impacts of putting in a new pipeline are comparable to occasional maintenance on an existing pipeline. | Ms. Vance's testimony is relevant to help the Court understand prior state regulatory efforts to update the pipeline at issue. Ms. Vance's testimony is admissible lay opinion, directly relevant to the Court as it considers the risk of harm to species protected under the California Endangered Species Act posed by Sable restarting its pipeline. Thus, Ms. Vance's testimony is relevant and admissible under FRE 401, 402, and 701. |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| 3. "Western burrowing owl (Athene cunicularia hypugaea); Blunt nosed leopard lizard and California condor (Gymnogyps californianus) are also known to occur in proximity to the portion of the Pipeline that traverses San Luis Obispo and Kern counties. Western burrowing owl was listed as a candidate species under CESA in October 2024 and Blunt-nosed lizard and California condor are both fully protected species." ¶ 10. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance lists plant and animal species who are "known to occur" in "San Luis Obispo and Kern Counties," ¶¶ 8, 10, without describing any harm that has befallen any of these species or making any assertion that the subsurface transportation of hydrocarbons in a sealed pipeline impacts these species in any way. *See Caribbean Marine*, 844 F.2d at 674. | Ms. Vance's testimony is within her personal knowledge as Regional Manager of the Central Region of the California Department of Fish and Wildlife and not based on speculation. Ms. Vance's testimony is directly relevant to the Court as it considers the risk of harm to species protected under the California Endangered Species Act posed by Sable restarting its pipeline. Thus, Ms. Vance's testimony is relevant and admissible under FRE 401 and 402. |
| 4. "The CNDBB indicates the following species occur in proximity to the portion of the Pipeline that traverses Santa Barbara County: unarmored threespine stickleback (Gasterosteus aculeatus williamsoni); southern California | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance again simply lists plant and animal species who "occur" in "Santa Barbara County," ¶ 12, without describing any harm that has befallen any of these species or making any assertion that the subsurface transportation of | Ms. Vance's testimony is within her personal knowledge as Regional Manager of the Central Region of the California Department of Fish and Wildlife and not based on speculation. Ms. Vance's testimony is directly relevant to the Court as it considers the risk of harm to species protected under the California |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| steelhead (Oncorhynchus mykiss); California red-legged frog (Rana draytonii); and California newt (Taricha torosa)." ¶ 12. | hydrocarbons in a sealed pipeline impacts these species in any way. *See Caribbean Marine*, 844 F.2d at 674. | Endangered Species Act posed by Sable restarting its pipeline. Thus, Ms. Vance's testimony is relevant and admissible under FRE 401 and 402. |
| 5. "Depending on the type of maintenance, repair, or other work to the Pipeline that will need to be completed, an ITP or LSAA from CDFW might be required before the work may begin." ¶ 15. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance concedes that "*[d]epending* on the type of maintenance, repair, or other work to the Pipeline that will need to be completed, an ITP or LSAA from CDFW *might* be required before the work may begin." ¶ 15 (emphasis added). Ms. Vance cannot point to any work on the Pipeline that requires or is likely to require any permit from CDFW. *See Caribbean Marine*, 844 F.2d at 674. | Ms. Vance's testimony is within her personal knowledge as Regional Manager of the Central Region of the California Department of Fish and Wildlife and not based on speculation. Ms. Vance's testimony is relevant to help the Court understand state regulatory requirements applicable to the pipeline at issue. This testimony is also directly relevant to the Court as it considers the risk of harm to species protected under the California Endangered Species Act posed by Sable restarting its pipeline. Thus, Ms. Vance's testimony is relevant and admissible under FRE 401 and 402. |

## III. CALIFORNIA'S RESPONSES TO SABLE'S OBJECTIONS TO THE DECLARATION OF ROHIT SHARMA (DKT. NO. 16-5).

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| 1. "The Las Flores Canyon Facility is subject to requirements under, *inter alia*, California Public Resources Code sections 3106, 3224, and 3270, and implementing regulations, California Code of Regulations ("C.C.R."), title 14, section 1712 et seq. These requirements include: conducting tests or inspections that the State Oil and Gas Supervisor, acting through CalGEM, has deemed necessary to establish reliability of the Facility's pipeline system, 14 C.C.R. § 1774.1(c); pressure testing before returning to service pipelines that have leaked and released a certain amount of fluids, and submitting test results to CalGEM within seven days of the test, 14 C.C.R. § | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. Whether the Las Flores Canyon Facility is subject to CalGEM jurisdiction is the subject of separate litigation. *See Sable Offshore Corp. v. Cal. Geologic Energy Mgmt. Div.*, No. 26WM000036 (Cal. Super. Ct. Sacramento Cnty. Feb. 17, 2026). It is thus inappropriate for a declaration. *See GemCap*, 269 F. Supp. 3d at 1028. | Mr. Sharma's testimony does not constitute a legal conclusion. Rather, it is rationally based on Mr. Sharma's personal knowledge and perception as Chief Deputy of Operations at CalGem regarding the state regulatory requirements applicable to the Las Flores Canyon Facilities. It is thus admissible under FRE 602 and 701. This testimony is also directly relevant to the Court as it considers the risk of harm posed by the Wright Order to California's regulatory authority. Thus, Mr. Sharma's testimony is relevant and admissible under FRE 401 and 402. |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| 1774.1(d); modifying the design or construction of newly installed pipelines, and/or conducting additional testing and maintenance of such pipelines, at CalGEM's request, 14 C.C.R. § 1774; and maintaining production facilities in good condition and in a manner that prevents leakage or corrosion and safeguards life, health, property, and natural resources, 14 C.C.R. § 1777(a)." ¶ 5. | | |
| 2. "The following are examples of regulatory violations that, if present, would be identified and addressed during a CalGEM inspection, and the potential threats to safety and the environment if the violations are not addressed: a. Failure to properly dispose of oilfield waste and refuse could result in a spill or leak, | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Mr. Sharma points only to "regulatory violations that, *if present*, would be identified during a CalGEM inspection." ¶ 9 (emphasis added). Mr. Sharma cannot point to a single regulatory violation at the Las Flores Canyon Facility. Mr. Sharma does not point to any actual harm suffered or about to be suffered by CalGEM. *See* | Mr. Sharma's testimony does not constitute a legal conclusion. Rather, it is rationally based on Mr. Sharma's personal knowledge and perception as Chief Deputy of Operations at CalGem regarding the state regulatory requirements applicable to the Las Flores Canyon Facilities. It is thus admissible under FRE 602 and 701. This testimony is also directly |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| potentially releasing contaminants into storm drains, contaminating soil, groundwater, and/or drinking water, and causing a public nuisance. 14 C.C.R. § 1775(a). b. Failure to maintain production facilities in good condition and in a manner that prevents leakage or corrosion in accordance with 14 C.C.R. § 1777(a) increases threats to public safety and the environment. Gas leaks at certain concentration levels create ignition risks and can also release greenhouse gases into the atmosphere. Fluid leaks can result in the release of contaminants into storm drains, the contamination of soil, groundwater, and/or drinking water, and cause a public nuisance. A standing pool of hydrocarbon fluid can present a fire hazard. Equipment submerged in fluid | *Caribbean Marine*, 844 F.2d at 674. | relevant to the Court as it considers the risk of harm posed by the Wright Order to California's regulatory authority. Thus, Mr. Sharma's testimony is relevant and admissible under FRE 401 and 402. |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| can corrode over time, making it inoperable and prone to leaks. c. Failure to maintain adequate secondary containment in accordance with 14 C.C.R. § 1773.1 poses a threat of contamination to the surrounding areas in the event of a spill. | | |
| 3. "The oil and gas production facilities at the Las Flores Canyon Facility include an Oil Treating Plant and Cogeneration Facility, Stripping Gas Treatment Plant, and Pacific Offshore Pipeline Company Gas Treatment Facility, consisting of hundreds of structures and other units such as oil sludge thickener tanks, equalization tanks, vacuum flash drums, aeration basins, vessels, pipelines, and secondary containment, all of which CalGEM needs | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. Whether CalGEM "needs to be able to inspect" the Las Flores Canyon Facility depends on whether it is subject to CalGEM jurisdiction, which is the subject of separate litigation. *See Sable Offshore Corp. v. Cal. Geologic Energy Mgmt. Div.*, No. 26WM000036 (Cal. Super. Ct. Sacramento Cnty. Feb. 17, 2026). It is thus inappropriate for a declaration. *See GemCap*, 269 F. Supp. 3d at 1028. | Mr. Sharma's testimony does not constitute a legal conclusion. Rather, it is rationally based on Mr. Sharma's personal knowledge and perception as Chief Deputy of Operations at CalGem regarding the state regulatory requirements applicable to the Las Flores Canyon Facilities. It is thus admissible under FRE 602 and 701. This testimony is also directly relevant to the Court as it considers the risk of harm posed by the Wright Order to California's regulatory authority. Thus, Mr. Sharma's testimony is relevant and admissible under FRE |

| Evidence Objected To: | Grounds for Objection: | California's Response: |
|---|---|---|
| to be able to inspect on at least an annual basis." ¶ 10. | | 401 and 402. |
| 4. "If Sable denies access to CalGEM inspectors on the basis of the Wright Order, it would impede CalGEM's ability to ensure compliance with oil and gas production facility requirements and to prevent damage to life, health, property, and natural resources." ¶ 11. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Mr. Sharma does not identify a single example of a time that CalGEM inspectors were denied access to the Las Flores Canyon facility because of the DPA Order. Instead, she testifies that *"[i]f Sable denies access to CalGEM inspectors on the basis of the Wright Order*, it would impede CalGEM's ability to ensure compliance with oil and gas production facility requirements." ¶ 11 (emphasis added). This is speculative. Mr. Sharma does not point to any actual harm suffered or about to be suffered by CalGEM. *See Caribbean Marine*, 844 F.2d at 674. | Mr. Sharma's testimony does not constitute a legal conclusion. Rather, it is rationally based on Mr. Sharma's personal knowledge and perception as Chief Deputy of Operations at CalGem regarding the state regulatory requirements applicable to the Las Flores Canyon Facilities. It is thus admissible under FRE 602 and 701. This testimony is also directly relevant to the Court as it considers the risk of harm posed by the Wright Order to California's regulatory authority. Thus, Mr. Sharma's testimony is relevant and admissible under FRE 401 and 402. |

Dated: May 27, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
ALICIA ROESSLER
REBECCA HUNTER
MARY HALEY OUSLEY
Deputy Attorneys General

*/s/ Brian Calavan*

BRIAN CALAVAN
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br>**PLAINTIFF'S REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

## TABLE OF CONTENTS

**Page**

Introduction .... 1
Argument .... 1
I. The Wright Order Is Reviewable. .... 1
1. The Wright Order Is Not Unreviewable Presidential Action. .... 2
2. This Motion Does Not Concern Judgments "Committed to Agency Discretion," and California Does Not Lack Standing. .... 4
II. California Is Likely To Succeed on the Merits. .... 5
A. The Wright Order Is Not a Valid Priorities and Allocations Order Under the DPA. .... 5
1. The Wright Order Is Not a Prioritization Order. .... 6
2. The Wright Order Is Not an Allocation Order. .... 6
3. The Wright Order Fails To Comply with the Department of Energy's Regulatory Requirements for Allocation Orders. .... 7
B. Defendants' Theory of Unlimited Preemption Is Not Supported by the DPA. .... 8
C. Defendants' Interpretations Would Transform the DPA into an Unconstitutional Law. .... 9
III. The Remaining Factors Favor an Injunction. .... 10
A. The Wright Order Irreparably Harms California. .... 10
B. The Balance of Equities and Public Interest Favor California. .... 11
Conclusion .... 12

## TABLE OF AUTHORITIES

Page

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018) .......... 10

*Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*
950 F.2d 1401 (9th Cir. 1991) .......... 10

*Cap. Power Corp. v. FERC*
156 F.4th 644 (D.C. Cir. 2025) .......... 5

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) .......... 10

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) .......... 3, 10

*Franklin v. Massachusetts*
505 U.S. 788 (1992) .......... 2, 3, 4

*Glenn v. Tyson Foods, Inc.*
40 F.4th 230 (5th Cir. 2022) .......... 7

*Greater Yellowstone Coal. v. Flowers*
321 F.3d 1250 (10th Cir. 2003) .......... 10

*Heckler v. Chaney*
470 U.S. 821 (1985) .......... 4

*Helgeson v. Bureau of Indian Affs., Dep't of Interior*
153 F.3d 1000 (9th Cir. 1998) .......... 2

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) .......... 6, 8, 9

*Hercules Inc. v. United States*
516 U.S. 417 (1996) .......... 8

*Jensen v. National Marine Fisheries Service*
512 F.2d 1189 (9th Cir. 1975) .......... 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Johnson v. Tyson Foods, Inc.*
580 F. Supp. 3d 382 (N.D. Tex. 2022) ... 6, 7, 9

*Khodara Env't, Inc. v. Blakey*
376 F.3d 187 (3rd Cir. 2004) ... 5

*League of Women Voters of United States v. Newby*
838 F.3d 1 (D.C. Cir. 2016) ... 12

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003) ... 7

*Nat'l Med. Enter. v. Bowen*
851 F.2d 291 (9th Cir. 1988) ... 7

*Nebraska v. Su*
121 F.4th 1 (9th Cir. 2024) ... 2, 3, 4

*Newsom v. Trump*
141 F.4th 1032 (9th Cir. 2025) ... 4

*Printz v. United States*
521 U.S. 898 (1997) ... 9

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) ... 12

*Sierra Club v. Clinton*
689 F. Supp. 2d 1147 (D. Minn. 2010) ... 4

*State of California v. PHMSA*
No. 26-508 (9th Cir.) ... 5

*Texas E. Transmission, LP v. Perano*
230 F. App'x 134 (3d Cir. 2007) ... 10

*Tulare County v. Bush*
185 F. Supp. 2d 18 (D.D.C. 2001) ... 4

*United States v. Vertac Chem. Corp.*
46 F.3d 803 (8th Cir. 1995) ... 8, 9

**TABLE OF AUTHORITIES (continued)**

**Page**

*Washington v. Trump*
847 F.3d 1151 (9th Cir. 2017) ........ 11

**STATUTES**

50 U.S.C.
§ 4511(a) ........ 5
§ 4511(a)(1) ........ 6
§ 4511(c) ........ 5
§ 4558(j) ........ 8

**OTHER AUTHORITIES**

10 C.F.R.
§ 217.54 ........ 7

Brief of the U.S. as Amicus Curiae in Support of Appellees, *Glenn et al. v. Tyson Foods, Inc.*
2022 WL 110715 (Jan. 3, 2022) ........ 7

Statement of Int.Interest of the U.S., *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*
No. 26-cv-02946-SVW-SSC (C.D. Cal. Apr. 23, 2026), Dkt. 38 ........ 1, 9

U.S.' Opp. to ex parte Emergency Mot. To Enforce Consent Decree, *United States v. Plains All Am. Pipeline*
No. 2:20-cv-02415-SVW-SSC (C.D. Cal.), Dkt. 45 ........ 1

## INTRODUCTION

In the federal government's view, a Defense Production Act (DPA) order may authorize private parties to ignore any state law that is inconvenient, and no court may review the lawfulness of that order. The federal government is wrong on both counts. The DPA does not displace judicial authority any more than it displaces State authority beyond the narrow instances in which Congress provided for express preemption. Because the federal government's actions violate both the DPA and the Constitution and work an immediate and ongoing harm to California, a preliminary injunction should be granted.

## ARGUMENT

### I. THE WRIGHT ORDER IS REVIEWABLE.

The federal government is playing a shell game. When Sable raised the Wright Order as a defense to the State's trespass case and the State argued that the order violated the DPA, the federal government filed a Statement of Interest telling this Court that such assertions could not be decided there and instead should be challenged in this case. Statement of Int. of U.S. at 7, *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal. Apr. 23, 2026), Dkt. 38. Here, they say the opposite. Opp. at 14 (arguing "the preemptive scope of the Order must be considered in a case or controversy involving an alleged conflict between the Order and a specific state law"). When the State moved to enforce the parties' consent decree in the case where that decree was entered, the federal government argued that the State's constitutional arguments were an improper "collateral attack on the [Wright] Order." *See* U.S.' Opp. to ex parte Emergency Mot. To Enforce Consent Decree, *United States et al. v. Plains All Am. Pipeline L.P. et al.* at 13-14, No. 2:20-cv-02415-SVW-SSC (C.D. Cal.), Dkt. 45. In this case, which is a *direct* challenge to the Order, they say review is still unavailable.

The federal government's ultimate position is that a DPA order can *never* be challenged—that a cabinet secretary's order under the DPA is in fact a diktat, the

legality of which cannot be challenged either offensively or defensively. This envisions a shocking—and apparently limitless—expansion of Executive power. But neither statute nor precedent supports the federal government's view. The Judicial Branch can and *must* decide whether the defendants have exceeded their statutory and constitutional authority here.

**1. The Wright Order Is Not Unreviewable Presidential Action.**

"[T]he [Administrative Procedure Act's (APA)]'s language is plain. The APA applies to any 'final agency action,'" and "'[n]o language in the APA prevents or exempts review of an agency action that implements a presidential action." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also Helgeson v. Bureau of Indian Affs., Dep't of Interior*, 153 F.3d 1000, 1003 (9th Cir. 1998) (noting the "strong presumption that Congress intends judicial review of administrative action"). Because it is undisputed that the Wright Order is a final agency action by the Secretary of Energy, it falls squarely within the APA's purview.

Defendants claim review is unavailable because of *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), which held that the President himself is not an "agency" for purposes of the APA. There, "[t]he Court reasoned that although the President is not explicitly excluded from the definition of 'agency' in [the APA], his unique constitutional position is enough to overcome this 'textual silence.'" *Nebraska*, 121 F.4th at 15 (quoting *Franklin*, 505 U.S. at 800). But nothing in *Franklin* indicates that the actions of agency heads—who do not share the President's "unique conditional position"—are exempt from APA review merely because their actions were taken pursuant to delegated presidential authority.

Indeed, *Nebraska* rejected the argument defendants now raise. There, a federal statute authorized the President to "prescribe" the "policies and directives" governing federal contracting, and the President used that authority to instruct federal agencies to include minimum wage requirements in such contracts. 121

F.4th at 7. When an agency implemented the requirement, various States sued. The Ninth Circuit held that *Franklin* did not bar the claim. To insulate the agency's action merely because it resulted from the President's exercise would "def[y] fundamental principles of administrative law" and "conflict[] with the plain language of the APA and existing precedent." *Id.* at 15. And exempting agency actions from review merely because they derive from executive orders would permit agencies "to implement regulations without the public involvement, transparency, and deliberation required under the APA"—and without any action by Congress to create an exemption from the APA. *Id.* at 16. Nor can *Nebraska* be distinguished as concerning an agency action that "simply implemented" the executive order. Opp. at 9. In *Nebraska*, the Ninth Circuit reviewed not only the agency's implementation but the statutory authority for the President's decision as well. As that case demonstrates, review is not barred where a Presidential order and agency action *together* create the legal obligations being challenged. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021) (*Franklin* did not bar review of agency's rule where the Presidential "Proclamation and Rule *together* create[ed] [the] 'operative rule of decision'").

In seeking to evade these precedents, defendants rely on *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189 (9th Cir. 1975). But that case predates both the Supreme Court's decision in *Franklin* and the Ninth Circuit's decisions in *Nebraska* and *E. Bay Sanctuary*. It concerned a commission created under a bilateral treaty to manage international fishing rights, and the court relied in part on the fact that "presidential action in the field of foreign affairs" presents non-justiciable political questions. *Id*. at 1191. Such considerations are not present here—the Wright Order is an economic regulation with purely domestic application, and defendants do not attempt to assert that the political questions doctrine applies. And defendants' reliance on various district court cases is also unavailing. Opp. at 8. Those cases have not been found to be persuasive by other courts. *See, e.g.*,

*Sierra Club v. Clinton,* 689 F. Supp. 2d 1147, 1157 n.3 (D. Minn. 2010). And they could not displace on-point Ninth Circuit authority such as *Nebraska*—particularly since most of the district court rulings identified by Defendants rely on the analysis from *Tulare County v. Bush*, 185 F. Supp. 2d 18 (D.D.C. 2001), which the Ninth Circuit viewed as "misapprehend[ing] the APA." *Nebraska*, 121 F.4th at 16.[1]

### 2. This Motion Does Not Concern Judgments "Committed to Agency Discretion," and California Does Not Lack Standing.

Defendants suggest—but do not explicitly argue—that review may be unavailable because the Wright Order was "committed to agency discretion" under the APA. Opp. at 19. That, too, is incorrect. California seeks judicial review of matters as to which there exist "meaningful standard[s]," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)—such as whether an order to restart a dormant pipeline notwithstanding state law and binding court orders can be viewed as a "prioritization" or "allocation" order, and whether particular procedural requirements in the statute and regulations have been met. It is among the "traditional understandings and basic principles" of our system of government that, absent clear congressional intent to the contrary, "executive determinations generally are subject to judicial review." *Newsom v. Trump*, 141 F.4th 1032, 1050 (9th Cir. 2025).

Defendants are also incorrect to argue that California lacks standing to challenge their assertion that the Wright Order displaces all California regulatory authority. Opp. at 24. Defendants' argument is that regardless of the Order, state authority was already displaced when PHMSA declared the pipelines to be interstate and approved their restart. Opp. at 24. But in the three months between

[1] Regardless of APA reviewability, presidential actions "may still be reviewed for constitutionality." *Franklin*, 505 U.S. at 801 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)). California's Complaint includes a claim that the Order violates the Constitution and separation of powers. Complaint, Dkt. 1, ¶¶ 139-50. As a result, if the Court concludes that the Order is not reviewable under the APA, California would still be able to move for an injunction directly under the Constitution.

issuance of the PHMSA orders and the Wright Order, Defendants and Sable asserted only that PHMSA had displaced California's Office of the State Fire Marshal as the *pipeline safety* regulator; Defendants and Sable have never contended that anything but the Wright Order displaces *all other* state regulations that would independently bar the pipeline's operations under state law (such as environmental regulations) even if it satisfies federal or state pipeline safety regulations. Opp. at 14. As a result, while the PHMSA orders are also preventing California from exercising its sovereign powers over pipeline safety regulation—and California is thus challenging them as well (*see generally State of California v. PHMSA*, No. 26-508 (9th Cir.))—California also has standing to challenge the Wright Order's purported abrogation of other State regulations that, if enforced, would separately regulate the pipeline. "When a litigant's injury-in-fact stems from two independently sufficient causes, it may separately challenge both of them, even though success in only one proceeding might not fully redress its injury." *Cap. Power Corp. v. FERC*, 156 F.4th 644, 650 (D.C. Cir. 2025) (citing *Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 194-95 (3rd Cir. 2004) (Alito, J.)).

## II. CALIFORNIA IS LIKELY TO SUCCEED ON THE MERITS.

### A. The Wright Order Is Not a Valid Priorities and Allocations Order Under the DPA.

The Wright Order exceeds the Congress's grant of authority under sections 101(a) and (c) of the DPA. 50 U.S.C. § 4511(a), (c).[2]

[2] California previously raised arguments that the Wright Order (1) does not make the findings required by section 101(b) and (2) merely recites the findings required by section 101(c), without providing any reasoning supporting those findings. With their opposition, Defendants submitted documents that purport to satisfy these requirements. *See* Opp., Ex. A, Nunes Decl., Attach. 2. To California's knowledge, these documents were not previously available to the public, were not cited or attached to the Order, and Defendants have not filed these documents in any of the related cases pending before this Court. Nonetheless, given these documents, California withdraws the two above-referenced arguments for purposes of this motion. However, California does not concede the validity or sufficiency of Defendant U.S. Department of Energy's reasoning, as set forth in these newly produced documents.

**1. The Wright Order Is Not a Prioritization Order.**

Defendants do not confront at all the fundamental mismatch between the Wright Order and the prioritization power that Congress actually provided in the DPA. Section 101(a)(1) allows the government to "require" that certain contracts "take priority over performance under any other contract." 50 U.S.C. § 4511(a)(1). And Section 101(c) similarly authorizes orders for "priority" and "allocation." *Id.* § 4511(c). These provisions grant the Executive the power "to dictate that preference be given to government contracts which are necessary to promote the national defense," even at the expense of existing private contracts. *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994). As California has argued (Mot. at 9-10), priority is about relative position: Giving priority to one contract means *deprioritizing* another. The problem here is that there are no other contracts the Order tells Sable to deprioritize. As a result, it is not a prioritization order at all.

Defendants address a straw man when they contend that the DPA allows the government to accept and "prioritize contracts not yet formed." Opp. at 10. But nothing in the DPA allows the government to require a company to "prioritize contracts not yet formed" that require actions that are *illegal under state law*. That would not be directing an operating facility to "prioritize" some contracts over others; that would be directing a facility that was nonoperational for failure to meet regulatory conditions to start operating in the first place.

**2. The Wright Order Is Not an Allocation Order.**

Defendants argue that the order is an "allocation" because it effectively orders that oil be reallocated from the oil field to onshore sites. Opp. at 12. But the Wright Order is an order to begin production—not to allocate existing, lawful production. Defendants analogize this case to *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022), which Defendants say concerned an order to restart a meatpacking plant that was closed during the COVID-19 outbreak. Opp. at 12-13. But *Johnson* has no value at all as an analysis of DPA power, because that case

did not involve a DPA order at all. Rather, as the Fifth Circuit clarified in deciding a related case, although the Department of Agriculture sent a letter warning that they might issue a DPA order, the agency "did not issue a DPA order to Tyson or any other meatpacking company." *Glenn v. Tyson Foods, Inc.,* 40 F.4th 230, 234 (5th Cir. 2022); see also Brief of U.S. as Amicus Curiae in support of Appellees, *Glenn v. Tyson Foods, Inc.* (5th Cir. 2022), 2022 WL 110715 at *4 (conceding as much). In any event, the order that *Johnson* incorrectly thought existed would have only required the restarting of facilities that had briefly closed. That does not remotely resemble an order to restart these pipelines, which had been closed for over a decade.

### 3. The Wright Order Fails To Comply with the Department of Energy's Regulatory Requirements for Allocation Orders.

Consistent with their overarching disregard for the limits of DPA orders, Defendants concede that the Wright Order does not include an end date, as required by Defendant U.S. Department of Energy's (DOE) own regulations governing allocation orders.[3] Opp. at 17; *see* 10 CFR 217.54 ("Each allocation order must include:" "the specific start and end calendar dates for each required allocation action"). Defendants ask the court to excuse their non-compliance by deeming it harmless error. But the regulations carry "the force of law." *Nat'l Med. Enter. v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988); *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) (agencies "must follow" the policies they choose to promulgate). And the requirement that allocation orders include an end date serves an important purpose: it places a temporal limit on the federal government's exercise of power under the DPA, which in turn protects those whose rights are adversely affected by the order. Defendants' failure to include an end-

[3] Defendants also do not dispute the fact that the regulations for an allocations order must also include, *in the order itself*, a specific calendar start date, and specific description of what is being allocated, which it fails to do, in addition to meeting several other elements that were not included in the Wright Order. Opp. at 17; *see* 10 C.F.R. § 217.54.

date in the Wright Order is no mere procedural error—it is an unlawful attempt to authorize Sable to flow oil through the Pipelines, in defiance of California law, indefinitely.

**B. Defendants' Theory of Unlimited Preemption Is Not Supported by the DPA.**

Defendants maintain that "the Order preempts *any* California law that conflicts with its directive that Sable immediately operate the Pipeline." Opp. at 15. But nowhere in the DPA did Congress provide for global preemption of that sort. On the contrary, Congress adopted express provisions targeted to specific state laws that it saw fit to preempt, such as state antitrust laws that might consider collusive some activities that DPA orders might require companies to engage in. Mot. at 12 (citing 50 U.S.C. § 4558(j)). If a DPA order automatically preempted *all* state laws that potentially conflict with the order, Congress would have had no need to include such specific express provisions.

To the extent the DPA impliedly preempts any state law, it does so only with respect to state contract law that would inherently be in conflict with the power to reprioritize contracts under the DPA. Indeed, until this year, the federal government itself acknowledged that preemption under the DPA is limited to matters of contract law. Opp. at 1. Its sudden reversal of position, out of a desire to open this one pipeline, simply underscores how far the federal government is willing to stray from longstanding commitments in this case.

DPA preemption goes no further. Two federal Courts of Appeals—*Vertac* and *Hercules,* which defendants ignore—have rejected interpreting the DPA to have "the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995); *see also, e.g.*, *Hercules*, 24 F.3d at 204; *Hercules Inc. v. United States*, 516 U.S. 417, 430 n.14 (1996). Those are the only Court of Appeals decisions on the issue, yet defendants do not even

acknowledge they exist—let alone attempt to distinguish them or show their reasoning to be faulty.[4]

### C. Defendants' Interpretations Would Transform the DPA into an Unconstitutional Law.

As California previously explained, defendants' interpretation and actions would transform the DPA from a constitutionally valid protection for the Nation into an unconstitutional infringement on the powers of States and of the Judicial Branch.

Defendants claim that the Wright Order cannot have anti-commandeering implications because it "does not conscript California into doing anything." Opp. at 16. But Defendants are interpreting the Order to do just that: that California *must* dedicate its state-owned property to Sable's unauthorized flow of oil. *See* Opp. at 15; Statement of Int. of U.S. at 10-11, *Cal. Dep't of Parks & Recreation*, No. 2:26-cv-02946 (C.D. Cal. Apr. 23, 2026), Dkt. 38. Defendants clearly do not believe that California is allowed to exercise its sovereign property rights to block oil from flowing through that portion of the pipeline. Defendants thus seek to conscript the State's property. In contrast, no such constitutional concerns would be raised if the DPA is limited to Congress's intended scope of providing for relative prioritizations and allocations, and no more.[5]

---

[4] Defendants cite the district court decision in *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022) in support of its position that DPA allocation orders can preempt conflicting state laws. But *Johnson* involved no DPA order at all, as discussed above (at p. 7). Plus, *Johnson*'s thinly-reasoned discussion does not engage with the statutory and constitutional defects raised here, and has not been adopted by other courts. The stronger authority comes from the Court of Appeals decisions in *Vertac* and *Hercules.*

[5] Defendant suggests that the conscription of state land for federal purposes would be better handled as a Takings claim. Opp. at 16. If the federal government had initiated an eminent domain proceeding, then any compensation issues would indeed be determined by Takings law. But the federal government is not seeking to acquire State property. Instead, Defendants are leaving the property with the State but requiring them to devote it to federal use. That is a commandeering issue—just as it is a commandeering issue when the federal government requires state employees to execute federal tasks instead of hiring federal employees to do them. *See generally Printz v. United States*, 521 U.S. 898 (1997).

So too with respect to the Consent Decree. It is only Defendants' position—that the Wright Order automatically displaces the federal court's Consent Decree—that raises the prospect of an encroachment on the Judicial Branch's power. In contrast, if the DPA is read as keeping in place the normal rule that the Executive Branch must first seek modification of the Consent Decree (and justify that request according to normal rules of equity), then the constitutional conflict is averted.

## III. The Remaining Factors Favor an Injunction.

### A. The Wright Order Irreparably Harms California.

Defendants admit that the Wright Order displaces California's sovereign authority. Opp. at 14-15; *see also* Opp. at 21, Ex. A, Nunes Decl., Attach. 3 (DPA Memo), at 12. Although defendants argue that this displacement does not constitute irreparable harm, Opp. at 21-22, they fail to acknowledge—let alone distinguish—controlling authority that says otherwise. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("it is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined"). These types of "[i]ntangible injuries" to California constitute irreparable harm, because they cannot be reduced to money damages, and thus California has no other remedy at law but a stay or injunction. *E. Bay Sanctuary Covenant*, 993 F.3d at 677.

Defendants further complain that the risk of harms to public health and safety and to the environment and natural resources is impermissibly speculative. Opp. at 22, 24. But "an injury is not speculative simply because it is not certain to occur." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003); *see, e.g.*, *Texas E. Transmission, LP v. Perano*, 230 F. App'x 134, 136 (3d Cir. 2007) (safety concerns regarding natural gas pipeline constitute irreparable harm sufficient to support preliminary injunction); *see also Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991) (a

plaintiff "must demonstrate that it will be exposed to some significant risk of irreparable injury"). California bears a significant risk of harm resulting from Sable's reliance on the Wright Order to restart the Pipelines and from California's inability to ensure that the Pipelines and their operations meet safety requirements under state law—harms that include not only another oil spill but also adverse impacts from Sable's maintenance and operation of the Pipeline. Mot. at 19-20; Sharma Decl., ¶¶ 5-11; Vance Decl., ¶¶ 3-12. Operation of the Pipeline itself, given its history and hazardous contents, creates a cognizable risk.

Defendants complain that, because California did not immediately seek an injunction, California must not have been experiencing irreparable harm. Opp. at 22. But California sought this injunction within a few weeks of the Pipeline's restart. And California did not stand idle during those weeks. It promptly pursued judicial means of averting the harm—such as moving in just days to enforce the Consent Decree's bar on the Pipeline's restart and seeking an injunction against Sable's use of the Pipeline through state-owned land. Mot. at 5-6. California has been diligently pursuing judicial remedies, on multiple parallel fronts.

Lastly, Defendants contradict themselves and state that the Wright Order does not displace the state's authority, repeating their earlier argument that PHMSA already caused such displacement in 2025. Opp. at 24; *see also supra*, § I.2. Defendants' contention, however, is inapposite, and the same reasons that California has standing to challenge the Wright Order also apply here to the irreparable harm analysis. *See id.*

**B. The Balance of Equities and Public Interest Favor California.**

Defendants argue that the Wright Order is supported by national security needs and a current need for oil. Opp. at 24-25. But the government interest in national security "cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal." *Washington v. Trump*, 847 F.3d 1151, 1163 (9th Cir. 2017) (quoting *United States v. Robel*, 389 U.S. 258, 264

(1967)). And the timeline reflects that Sable and federal authorities were collaborating on plans to evade the consent decree, remove California's authority, and resume pipeline operation without full safety measures well before current military hostilities began. *See, e.g.*, Mot. at 5 (in December 2025, PHMSA redesignated Lines CA-324/325 as interstate at Sable's urging and Sable requested DOE authorize Sable to restart the lines by invoking the DPA). Besides, there is no interest that can justify the federal government engaging in unlawful conduct, as it has done in issuing the Wright Order. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns"). By contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of United States v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

## CONCLUSION

The motion for a preliminary injunction and stay should be granted.

Dated: May 18, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief contains 4,035 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

Dated: May 18, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
REBECCA HUNTER
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

# CERTIFICATE OF SERVICE

Case Name: **State of California v. Chris Wright; U.S. Dept. of Energy** No. **2:26-cv-03396**

I hereby certify that on May 18, 2026, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFF'S REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on May 18, 2026, at Los Angeles, California.

| | |
|---|---|
| Valerie Thompson | /s/ *Valerie Thompson* |
| Declarant | Signature |

SA2026301439

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants. | Case No. 2:26-cv-03396-SVW-SSCx<br><br>**UNOPPOSED**<br><br>**SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S NOTICE OF MOTION, MOTION TO INTERVENE, AND SUPPORTING MEMORANDUM**<br><br>Date: June 8, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br>Courtroom: 10A |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 8, 2026 at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Stephen V. Wilson in Courtroom 10A of the U.S. District Court for the Central District of California, Western Division, located at 350 West 1st Street, Suite 4311, Los Angeles, CA 90012, Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") pursuant to Federal Rule of Civil Procedure 24, will and hereby does respectfully move the Court for an order granting Sable's intervention as a defendant.

Pursuant to Local Rule 7-3, Counsel for Sable has conferred with counsel for the parties regarding this motion. Both California and the United States have stated that they do not intend to take a position on Sable's motion for intervention. As neither party intends to file an opposition, Sable is filing the motion as unopposed.

This motion is made pursuant to this Notice of Motion and Motion to Intervene, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations of Jessica Stebbins Bina and J. Caldwell Flores, the pleadings and records on file herein, and upon all other arguments and evidence that may be presented to this Court.

Dated: May 11, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Jessica Stebbins Bina*

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission St., Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

## TABLE OF CONTENTS

Page

I. **INTRODUCTION** ....... 1

II. **BACKGROUND** ....... 2

A. The Santa Ynez Unit And The Santa Ynez Pipeline System ....... 2

B. Sable Has Significant Protectable Interests Related To The Subject Of This Action ....... 3

C. Executive And Administrative Actions And DPA Issuance ....... 4

D. The Complaint ....... 5

III. **ARGUMENT** ....... 6

A. Sable Is Entitled To Intervention As A Matter Of Right ....... 6

1. Sable's Intervention Motion Is Timely ....... 6

2. Sable Has Significant Protectable Interests Related To The Subject Of This Action ....... 7

3. Sable's Ability To Protect Its Interests Would Be Impaired By A Decision In California's Favor ....... 9

4. Existing Parties Will Not Adequately Represent Sable's Interests ....... 10

B. Alternatively, This Court Should Grant Permissive Intervention ....... 12

C. Sable Has Complied With Federal Rule Of Civil Procedure 24(c) ....... 13

IV. **CONCLUSION** ....... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arakaki v. Cayetano*, 324 F.3d 1078 (9th Cir. 2003) .......... 10

*Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992) .......... 13

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893 (9th Cir. 2011) .......... 7, 9–12

*Env't Def. Ctr. v. Bureau of Safety & Env't Enf't*, 14-cv-9281-PSG-SHx, 2015 WL 12734012 (C.D. Cal. Apr. 2, 2015) .......... 9, 10

*Nw. Forest Res. Council v. Glickman*, 82 F.3d 825 (9th Cir. 1996) .......... 7

*Perry v. Proposition 8 Official Proponents*, 587 F.3d 947 (9th Cir. 2009) .......... 12

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:23-CV-00804, 2024 WL 2111755 (D. Utah May 10, 2024) .......... 8

*Sable Offshore Corp. v. County of Santa Barbara*, No. 25-4165-DMG (AGRx), 2025 WL 2412147 (C.D. Cal. July 25, 2025) .......... 7

*Sequoia Forestkeeper v. Price*, No. 1:16-CV0759 AW JLT, 2017 WL 56655 (E.D. Cal. Jan. 5, 2017) .......... 11

*Sequoia Forestkeeper v. Watson* 1:16-CV-1865 AWI JLT, 2017 WL 4310257 (E.D. Cal. Sept. 28, 2017) .......... 9, 11

*Sierra Club v. EPA*, 995 F.2d 1478 (9th Cir. 1993) .......... 6

*Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001) .......... 6, 8, 12

*Trbovich v. United Mine Workers*,
404 U.S. 528 (1972) ........ 10
*United States v. Oregon*,
839 F.2d 635 (9th Cir. 1988) ........ 10
*W. Watersheds Project v. Haaland*,
22 F.4th 828 (9th Cir. 2022) ........ 10
*Wilderness Soc'y v. U.S. Forest Serv.*,
630 F.3d 1173 (9th Cir. 2011) ........ 6, 7, 10
*Mont. Wildlife Fed'n v. Haaland*,
No. 20-35793, 2022 WL 42794 (9th Cir. Jan. 5, 2022) ........ 11
*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
No. 10-0254-WS-C, 2010 WL 5139101 (S.D. Ala. Dec. 9, 2010) ........ 12
*Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*,
695 F.3d 1310 (Fed. Cir. 2012) ........ 11

**Statutes**

5 U.S.C. § 551 ........ 2, 8
28 U.S.C. § 1331 ........ 12
50 U.S.C. § 4501 ........ 1

**Rules**

Fed. R. Civ. P. 24 ........ 1–2, 6, 8–10, 12, 13

**Regulations**

91 Fed. Reg. 8949 (Feb. 24, 2026) ........ 4

# I. INTRODUCTION

The State of California asks this Court to prohibit the U.S. Department of Energy and Secretary Chris Wright (collectively, the "United States"), and anyone operating as their agents or acting in concert with them, from relying on an Order that Secretary Wright issued under the Defense Production Act ("DPA Order"), 50 U.S.C. § 4501 et seq., to commence transportation services for hydrocarbons from the Santa Ynez Unit ("SYU") through the interstate pipeline system running from the SYU to the Pentland Station terminal, known as the Santa Ynez Pipeline System ("SYPS"). ECF 1 ¶ 3. Though not named as a defendant, Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") are the target of California's requested relief. Sable is the lessee and operator of the SYU and the operator of the SYPS, and it has reasonably relied on the DPA Order to immediately resume operations of the SYPS as directed. California's challenge to the DPA Order accordingly directly impairs Sable's legally protectable interest in operating the SYPS in accordance with the DPA Order and indirectly threatens Sable's legally protectable interest in producing hydrocarbons from the SYU.

For these reasons and those set forth below, Sable moves this Court for intervention of right under Federal Rule of Civil Procedure 24(a)(2) or, alternatively, permissive intervention under Federal Rule of Civil Procedure 24(b). Sable satisfies all requirements for intervention of right: Sable's motion is timely; Sable has significant, legally protectable interests at stake in this action; a decision in California's favor in this action could significantly impair Sable's interests given that California seeks vacatur of the DPA Order and cessation of SYPS operations; and Sable's unique, private interests in the DPA Order are not adequately represented by the United States. Sable also satisfies all requirements for permissive intervention: there is an independent ground for jurisdiction because California challenges the DPA Order under the U.S. Constitution and Administrative Procedure

Act, 5 U.S.C. § 551 et seq.; Sable's motion is timely; and Sable would defend its interest in operating the SYPS in accordance with the DPA Order.

## II. BACKGROUND

### A. The Santa Ynez Unit And The Santa Ynez Pipeline System

The SYU consists of 16 federal leases issued by the U.S. Department of the Interior, including three offshore oil platforms located five to nine miles offshore in federal waters north of Santa Barbara, California: the Hondo, the Harmony, and the Heritage. *See* Declaration of J. Caldwell Flores ¶ 3 ("Flores Decl."). These assets were previously owned by Exxon Mobil Corporation ("Exxon") and Mobil Pacific Pipeline Company (together with Exxon, "EM").

The SYPS is a single integrated and continuous pipeline system for moving oil from the SYU onshore and then inland. *Id.* ¶ 4. The SYPS primarily comprises offshore subsea pipelines that transport crude oil from the SYU through a wholly owned onshore midstream processing facility in Las Flores Canyon that processes the crude oil, which is then transported through the onshore segments of the system to Pentland Station in Kern County, California. *Id.* Two of the onshore pipeline segments are known as CA-324 and CA-325 (the "Pipeline Segments"). *Id.*

In 2015, before Sable owned the pipeline segments, a leak along Segment CA-324 resulted in the Refugio oil spill. *Id.* ¶ 6. PHMSA ordered a temporary halt to oil flow through Segments CA-324 and CA-325 while pipeline conditions were evaluated. In 2020, the prior operator, the United States, and California entered into a Consent Decree to resolve claims related to the spill. *See* ECF 16-1, Ex. 2. In exchange for civil penalties, damages payments, and compensation, the parties agreed on a path to resume oil transportation through Segments CA-324 and CA-325. *Id.* at 29, 86–99.

### B. Sable Has Significant Protectable Interests Related To The Subject Of This Action

On February 14, 2024, Sable acquired the leases and other assets constituting the SYU in federal waters offshore California, the Las Flores Canyon midstream processing facility, and 100% of the equity of Pacific Pipeline Company, which owned the Pipeline Segments of the SYPS (the "Purchase Agreement"). Flores Decl. ¶ 9.

Since acquiring the SYU and the SYPS, Sable has diligently invested in, repaired, and upgraded them to facilitate the resumption of production from the SYU and to ensure the safe resumption of transportation through the SYPS. *Id.* ¶ 9. Sable has worked with both state and federal regulators, including those at the California Office of the State Fire Marshal ("OSFM") and the federal Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA"), to ensure the Pipeline Segments are repaired and maintained in a manner consistent with the Consent Decree and all applicable law. *Id.* ¶ 10.

For example, Sable conducted physical inspection, repair, and maintenance activities along the SYPS to remediate certain anomalous conditions detected during inspections conducted by the prior owner. *Id.* ¶ 11. Sable performed over 200 anomaly repairs along the SYPS under the direct oversight of OSFM personnel. *Id.* ¶ 11. Sable also installed 27 safety valves along the SYPS and conducted several hydrotests to confirm that the SYPS could be operated at pressures in exceedance of the defined maximum operating pressures for both short periods ("spike" hydrotests) and longer durations. *Id.* ¶¶ 12, 19. In short, Sable has expended significant time and resources to ensure the SYPS could be safely returned to service.

In November 2025, due to Sable's unified ownership and operation of the integrated SYPS, including those portions originating on the Outer Continental Shelf, PHMSA redesignated the SYPS as an interstate pipeline and resumed federal

oversight on that basis. *See id.* ¶¶ 25–27. PHMSA reviewed and approved Sable's Restart Plan, and granted Sable an emergency Special Permit imposing heightened safety standards which matched special conditions previously imposed by OSFM. *See id.* ¶¶ 28–30. Sable has since applied for a non-emergency Special Permit on substantially identical terms, and PHMSA noticed that permit for public comment, which comment period closed on April 3, 2026. *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026). Sable is complying with all terms of the emergency Special Permit while it awaits PHMSA action on the non-emergency Special Permit. *See* Flores Decl. ¶ 31.

**C. Executive And Administrative Actions And DPA Issuance**

On January 20, 2025, President Trump issued Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025), declaring a national emergency on the basis that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* at 8434. President Trump found that, "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets. An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Id.* at 8433. President Trump further determined that these problems are most pronounced on the United States' West Coast. *Id.* at 8434.

On March 13, 2026, President Trump issued an Executive Order titled, *Adjusting Certain Delegations Under the Defense Production Act*, which delegated certain authorities of the President under the DPA to the Secretary of Energy. 91 Fed. Reg. 13199 (Mar. 13, 2026). That same day, Secretary Wright issued an order pursuant to Title I of the DPA, directing Sable to immediately restart the SYPS.

Pursuant to the DPA Order, Sable resumed the transportation of hydrocarbons through the SYPS according to the Restart Plan beginning on March 14, 2026.

### D. The Complaint

This Complaint, ECF 1, is California's latest salvo in a litigation campaign designed to halt a vital energy project in its own state. The claims center on the DPA Order, which California characterizes as unlawful largely because it requires Sable to resume operations of the SYPS notwithstanding California's preferred regulatory outcome. But stripped of rhetoric, the Complaint seeks to invalidate a federal order issued under delegated authority of the President that Sable is obligated to follow and upon which Sable has reasonably relied, among other federal approvals, to resume operations critical to its business and contractual obligations.

The Complaint repeatedly places Sable at the center of the dispute, alleging that Sable requested the federal action, relied on the challenged order to restart operations, and continues to operate pursuant to that order. The Complaint also raises speculative allegations about the preemptive effect that the DPA Order might have on other state regulation. The relief that California seeks—a declaration that the DPA Order is unlawful and an order enjoining Defendants from invoking the DPA Order to authorize or compel operation of the SYPS, ECF 1 at 35-36—could directly impair Sable's ability to operate its facilities. Indeed, California wishes to halt implementation of the DPA Order for the pendency of this proceeding, as requested in its May 1, 2026, Notice of Motion and Motion for Preliminary Injunction and Stay Against All Defendants, ECF 16, seeking to prevent implementation of the DPA Order and enjoining the United States and persons acting in concert with the United States or on its behalf from compelling the flow of oil through the Pipeline Segments. This alone demonstrates the need for Sable to intervene so that it can protect its interests immediately during this proceeding and thereafter.

## III. ARGUMENT

### A. Sable Is Entitled To Intervention As A Matter Of Right

Under Federal Rule of Civil Procedure 24(a)(2), "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

In determining whether an applicant meets the requirements of Rule 24(a)(2), district courts in the Ninth Circuit apply a four-part test: "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (quoting *Sierra Club v. EPA,* 995 F.2d 1478, 1481 (9th Cir. 1993)) (confirming that intervention as of right shall be granted whenever the four elements are met). Courts must apply "[a] liberal policy in favor of intervention," *id.* at 1179 (citation omitted), "guided primarily by practical considerations, not technical distinctions," *Sw. Ctr. for Biological Diversity v. Berg,* 268 F.3d 810, 818 (9th Cir. 2001) (citation and internal quotation marks omitted).

As discussed below, Sable meets each of these factors to permit intervention as of right.

1. Sable's Intervention Motion Is Timely

The "traditional features" of a timely intervention motion are that the motion "was made at an early stage of the proceedings, the parties would not have suffered

prejudice from the grant of intervention at that early stage, and intervention would not cause disruption or delay in the proceedings." *Citizens for Balanced Use v. Mont. Wilderness Ass'n,* 647 F.3d 893, 897 (9th Cir. 2011). Sable's motion is timely. Sable is moving to intervene immediately upon learning of California's Motion for Preliminary Injunction, which comes less than six weeks after California filed its Complaint and before any substantive proceedings have taken place.[1] *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996), *as amended on denial of reh'g* (May 30, 1996) (intervention was timely when undertaken shortly after answer filed and before any proceedings had taken place); *Sable Offshore Corp. v. County of Santa Barbara*, No. 25-4165-DMG (AGRx), 2025 WL 2412147, at *3 (C.D. Cal. July 25, 2025) (holding that a motion to intervene was "undoubtedly timely" when filed only one month after the filing of the complaint). Sable moreover will abide by all existing deadlines, including the briefing schedule for California's Motion for Preliminary Injunction.

Sable thus satisfies the timeliness requirement for intervention of right.

2. Sable Has Significant Protectable Interests Related To The Subject Of This Action

To determine whether an intervenor has a "significantly protectable" interest in the subject of the action, "the operative inquiry [is] whether the 'interest is protectable under some law' and whether 'there is a relationship between the legally protected interest and the claims at issue.'" *Wilderness Soc'y*, 630 F.3d at 1180–81. No specific legal or equitable interest is required, and the intervenor's interest "need not be protected by the statute under which the litigation is brought." *Id.* at 1179.

---

[1] California initially filed this action in the Northern District of California on March 23, 2026. *See California v. Wright*, No. 26-cv-02500 (N.D. Cal.). After that court issued an Order to Show Cause requiring California to show cause why it was the proper venue, *see California v. Wright*, No. 26-cv-02500, ECF 3, California voluntarily dismissed that action and refiled it in this district.

Sable has significant protectable property, economic, and contractual interests that are directly related to the subject of this action. The DPA Order that is the subject of California's Complaint and pending Motion for Preliminary Injunction requires Sable to transport hydrocarbons from its offshore oil and gas leases in the SYU through its SYPS. The SYU leases issued by the federal government are legally protectable "license[s]" under the Administrative Procedure Act, *see* 5 U.S.C. § 551(8) ("'[L]icense' includes the whole or a part of an agency permit, certificate, approval, registration . . . or other form of permission"), and transportation through the SYPS is currently the only avenue to get production from the SYU to market. Furthermore, since acquiring these assets, Sable has diligently invested in and upgraded the facilities, as appropriate, to facilitate a restart of production from the SYU and transportation through the SYPS. "To date, Sable has invested over $1.4 billion, endeavoring to resume SYU production and SYPS transportation after a more than decade-long period of dormancy." Flores Decl. ¶ 9. As described in Section II.B above, Sable has also made substantial investment of time and resources into safely resuming operations, including numerous inspections and repairs, drills, and engagement with various regulators. Moreover, the expected revenue from production of oil from the SYU and transportation of oil through the SYPS is estimated to be $4.73 million per day (or $143.86 million per month), which would immediately convert to lost profit if transportation through the SYPS were to be halted. *Id.* ¶ 54.

Courts routinely find that Rule 24(a)(2) recognizes and protects property interests of this nature. *See, e.g., S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:23-CV-00804, 2024 WL 2111755, at *3 (D. Utah May 10, 2024) (holder of oil-and-gas leases was entitled to intervene in suit challenging leases; owning challenged leases "alone" was sufficient to satisfy burden for significant protectable interest prong of intervention standard); *Sw. Ctr. for Biological Diversity*, 268 F.3d

at 820–21 (finding proposed intervenor had a protectable interest where lawsuit implicated "projects that are in the pipeline for design and mitigation . . . and approval" because "[c]ontract rights are traditionally protectable interests"); *Env't Def. Ctr. v. Bureau of Safety & Env't Enf't*, 14-cv-9281-PSG-SHx, 2015 WL 12734012, at *3 (C.D. Cal. Apr. 2, 2015) (finding proposed intervenor Exxon's "personal financial interest" in the Santa Ynez Unit a significantly protectable interest because it "invested significant resources in obtaining" permits); *Sequoia Forestkeeper v. Watson*, 1:16-CV-1865 AWI JLT, 2017 WL 4310257, at *2 (E.D. Cal. Sept. 28, 2017) (holding proposed intervenor had protectable interest in National Environmental Policy Act action where intervenor possessed contracts to implement projects that were subject of litigation).

As previously recognized by federal courts under analogous circumstances, Sable thus has significantly protectable interests in the SYPS operations that are directly challenged in this action. If transportation through the SYPS is halted, production from the SYU would be stranded for the foreseeable future.

3. <u>Sable's Ability To Protect Its Interests Would Be Impaired By A Decision In California's Favor</u>

The disposition of this matter threatens to impair Sable's interests in ongoing and future operations. Under the third element of the Rule 24(a)(2) inquiry, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." *Citizens for Balanced Use*, 647 F.3d at 898 (quoting Fed. R. Civ. P. 24, advisory committee notes (1966 Amendment)). A party is even entitled to intervene in an action that *potentially* threatens its interests. *See id*. at 900 ("[I]ntervention of right does not require an absolute certainty that a party's interests will be impaired.").

Here, the threat of impairment is obvious. California asks this Court to hold that the DPA Order is unlawful and does not authorize Sable to operate the SYPS.

*See* ECF 1 ¶¶ 1–3. Indeed, California's Motion for Preliminary Injunction seeks to enjoin the United States and any persons acting on its behalf from enforcing or relying upon the DPA Order to authorize or compel the flow of oil through the SYPS. ECF 16 at 2. A decision in California's favor might therefore prevent Sable from operating the SYPS in which it has invested hundreds of millions of dollars, which would indirectly cause Sable to shut in production at the SYU. *See Wilderness Soc'y*, 630 F.3d at 1180; *see also Env't Def. Ctr.*, 2015 WL 12734012, at *3 ("The relief sought by Plaintiff would undoubtedly have a 'significant detrimental impact on [Exxon's]' interests in its Santa Ynez Unit leases and permits."). If Sable is not made party to this action, Sable faces the prospect of having no legal means to challenge the relief California seeks while it remains in effect for whatever untold duration. *See United States v. Oregon*, 839 F.2d 635, 639 (9th Cir. 1988) (holding that intervention is appropriate when intervenor cannot obtain effective remedies in separate or subsequent litigation).

Sable's ability to protect its interests in the operation of the SYPS under the DPA Order and, indirectly, production from the SYU, thus will be practically impaired if not permitted to intervene.

4. <u>Existing Parties Will Not Adequately Represent Sable's Interests</u>

To satisfy the fourth element of the Rule 24(a)(2) inquiry, "[t]he burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898 (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)); *see also Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). Indeed, the Ninth Circuit has held that even a trade group with "the same 'ultimate objective' of upholding the [government's] lease sales" for oil and gas cannot adequately represent the interests of an individual lessee. *W. Watersheds Project v. Haaland*, 22 F.4th 828, 841–42 (9th Cir. 2022) (holder of oil-and-gas

leases was entitled to intervene as of right in case challenging leases, because "as a party with a legally protected interest in contract rights with the federal government, [the individual oil-and-gas lessee] would offer a necessary element to the proceeding that other parties would neglect"); *see also Mont. Wildlife Fed'n v. Haaland*, No. 20-35793, 2022 WL 42794, at *1 (9th Cir. Jan. 5, 2022) (reversing district court's denial of leaseholder's motion to intervene in lawsuit challenging lease sale of 24,000 acres of intervenor's oil-and-gas lease, finding trade organization could not adequately represent leaseholder's interest). Although a presumption of adequate representation applies when the government is a party, *Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*, 695 F.3d 1310, 1315 (Fed. Cir. 2012), that presumption is overcome where interests diverge, *id.* at 1317.

In this case, the United States does not share Sable's interests in this action. To determine adequacy of representation, courts in the Ninth Circuit consider the following: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Citizens for Balanced Use*, 647 F.3d at 898 (citation omitted). The public interest represented by government parties is not "identical to the individual parochial interest" of private parties by virtue of "both entities occupy[ing] the same posture in the litigation." *See id.* at 899. Government agencies advance the "broad public interest." *See Watson*, 2017 WL 4310257, at *3; *Sequoia Forestkeeper v. Price*, No. 1:16-CV0759 AW JLT, 2017 WL 56655, at *1 (E.D. Cal. Jan. 5, 2017). In contrast, Sable's interest in this matter is centered on protecting its property, contractual, and overall financial interests relating to the SYU and SYPS. Because the United States does not share Sable's unique interests in this action, it may be incapable of making, and indeed unwilling to make, arguments that advance and

protect Sable's interests as a private party. Even where the United States and Sable may share a common litigation posture, they "do not have sufficiently congruent interests" to warrant a finding of adequate representation. *See Sw. Ctr. for Biological Diversity*, 268 F.3d at 823; *see also Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, No. 10-0254-WS-C, 2010 WL 5139101, at *3 (S.D. Ala. Dec. 9, 2010) (holding that oil and gas lessee meets "minimal" requirement of showing inadequacy of representation because lessee has "narrowly focused, direct and specific interest in [] controversy").

As the owner and operator of the SYU and the SYPS, Sable is uniquely positioned to provide relevant information to the Court to address the merits and potential ramifications of California's arguments and requested relief. As such, Sable meets its "minimal" burden of demonstrating that the United States' representation of Sable's protectable interests may be inadequate, and Sable must be granted intervention. *See Citizens for Balanced Use*, 647 F.3d at 898-99.

Sable thus is not adequately represented by the existing parties to this Action, meaning that it satisfies all requirements for intervention of right under Rule 24(a)(2).

### B. Alternatively, This Court Should Grant Permissive Intervention

In the alternative, this Court should allow Sable to intervene because Sable also meets all the requirements for permissive intervention under Rule 24(b). Rule 24(b)(1)(B) provides that on timely motion, "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In determining whether to grant permissive intervention, district courts in the Ninth Circuit apply a three-part test: "(1) independent grounds for jurisdiction exist; (2) the request is timely; and (3) the applicant's claim or defense and the main action share common questions of law or fact." *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009).

Courts also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

Sable satisfies the standard for permissive intervention under Rule 24(b). *First*, there are independent grounds for jurisdiction under 28 U.S.C. § 1331 because California has challenged the DPA Order under the U.S. Constitution and Administrative Procedure Act. *Second*, Sable's request is timely for the reasons discussed in the context of intervention of right. *Third*, Sable's defense of its right to operate the SYPS will share common questions of law and fact with California's challenge to the DPA Order. And, *fourth*, Sable's early intervention and agreement to be bound by all existing deadlines means that the original parties' rights will not be unduly delayed or prejudiced.

In the event that this Court declines to permit intervention as of right, Sable thus requests that the Court grant Sable permissive intervention due to its significant interests at issue in this matter.

### C. Sable Has Complied With Federal Rule Of Civil Procedure 24(c)

District courts within the Ninth Circuit may grant intervention without a formal pleading where "the court was otherwise apprised of the grounds" for intervention. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992). Sable has met this standard by lodging with its motion a proposed opposition to California's Motion for Preliminary Injunction that apprises the Court and the existing parties of its grounds for intervention and position in this litigation. Sable will also file a formal pleading in intervention if required by the Court.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Sable respectfully requests that this Court grant its unopposed motion to intervene as of right or, in the alternative, to grant permissive intervention.

Dated: May 11, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Jessica Stebbins Bina*

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission St., Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th St., NW, Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company, hereby certifies that this Proposed Opposition to Motion for Preliminary Injunction and Stay contains 4,125 words, which complies with the word limit for Local Rule 11-6.1.

Dated: May 11, 2026

/s/ Jessica Stebbins Bina

Jessica Stebbins Bina

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice forthcoming*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice forthcoming*)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice forthcoming*)
*matt.leopold@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

THE STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

Case No. 2:26-cv-3396-SVW-SSCx

**DECLARATION OF J. CALDWELL FLORES IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION TO INTERVENE AND PROPOSED OPPOSITION TO CALIFORNIA'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**

Date: June 8, 2026
Time: 1:30pm

Judge: Hon. Stephen V. Wilson
Courtroom: 10A
Trial Date: Not Set
Action Filed: March 31, 2026

Pursuant to 28 U.S.C. § 1746(2), I, J. Caldwell Flores, hereby declare as follows:

1. I am President and Chief Operating Officer of Sable Offshore Corp. and President of Pacific Pipeline Company (collectively "Sable"). I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently to them.

2. Sable is a publicly traded oil and gas company focused on responsibly operating the Santa Ynez Unit ("SYU") and the Santa Ynez Pipeline System ("SYPS").

The Santa Ynez Unit and the Santa Ynez Pipeline System

3. The SYU consists of approximately 76,200 acres of offshore oil and gas leaseholds located in federal waters of the Outer Continental Shelf ("OCS") off the coast of Santa Barbara County, past the three-mile state boundary line. The SYU is the largest producing offshore oilfield in the United States. It includes three offshore production platforms—Platform Heritage, Platform Harmony, and Platform Hondo.

4. The SYPS is a single integrated and continuous pipeline system for moving oil from the SYU onshore and then inland. The SYPS primarily comprises offshore subsea pipelines that transport crude oil from the SYU through a wholly owned onshore processing facility in Las Flores Canyon that processes the crude oil, which is then transported through the onshore segments of the system to the Pentland Station in Kern County, California. Two of the onshore pipeline segments are known as CA-324 and CA-325 (collectively, the "Pipeline Segments").

5. When at capacity, as it is presently, the SYPS holds approximately 532,000 barrels of oil, which at current prices is worth more than $50 million. If a court orders the Pipeline Segments to shut down, that oil may be trapped, unable to reach refineries where it can be converted into products that are integral to supply both California consumers and the U.S. military. Similarly, because the SYPS is the only existing means to transport oil from the SYU to market, Sable would be unable to

develop and transport hundreds of millions of barrels that could help offset California's dependence on oil produced abroad.

The Refugio Oil Spill and Consent Decree

6. After almost twenty-five years of operation, in 2015, under a prior owner, a leak along Segment CA-324 resulted in the Refugio oil spill. The Pipeline Segments were emptied of oil and filled with nitrogen gas, after which the prior owner voluntarily withdrew the then-operative Federal Energy Regulatory Commission tariffs. The Pipeline Segments were then redesignated as an intrastate pipeline subject to regulation by the California Office of the State Fire Marshal ("OSFM"). In 2020, the United States, a range of California agencies, including CDPR, and the former owner of the Pipeline Segments entered into a Consent Decree, which laid out the preconditions to resuming the flow of oil.

7. Appendix B of the Consent Decree required "State Waivers" from OSFM prior to resuming the flow of oil. These waivers were to address "the limited effectiveness of cathodic protection" before resuming petroleum transportation through the Pipeline Segments. Cathodic protection refers to one corrosion prevention method (of many) that was installed along the Pipeline Segments when they were first constructed. Industry experts have long recognized that cathodic protection systems may be weakened if insulation around a pipeline becomes compromised by water intrusion.

8. Appendix D of the Consent Decree also required the owner of the Pipeline Segments to submit a "Restart Plan" before resuming petroleum transportation.

Sable's Acquisition and $215 Million Investments in Pipeline Safety

9. Sable acquired the SYU and the SYPS in February 2024. Unlike under the previous owner, these onshore and offshore assets are now held under the same ownership umbrella. Since then, Sable has invested over $1.4 billion, endeavoring to

resume SYU production and SYPS transportation after a more than decade-long period of dormancy. This has included over $215 million in repairs and upgrades to the SYPS.

10. Sable has decades of experience safely operating in California. Sable's operational team strictly adheres to all federal, state, and local safety regulations and implements robust monitoring systems to detect potential issues. Since February 2024, Sable has worked tirelessly with both state and federal regulators, including those at OSFM and the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA"), to ensure the Pipeline Segments are repaired and maintained in a manner consistent with the Consent Decree's requirements.

11. In May 2024, Sable began conducting physical repair and maintenance activities along the Pipeline Segments to remediate certain anomalous conditions detected during inspections conducted by the Pipeline Segments' prior owner. These activities, referred to as "anomaly repair work," are routine repair and maintenance activities that have been conducted on numerous occasions along the Pipeline Segments since it was first constructed. Sable performed over 200 anomaly repairs along the Pipeline Segments under direct oversight from OSFM personnel.

12. In September 2024, Sable installed twenty-seven safety valves along the Pipeline Segments in compliance with California Assembly Bill 864. These valves reduce the worst-case potential release of oil by almost 40%. Sable installed the required safety valves only after the County of Santa Barbara confirmed that it lacked permit authority or jurisdiction over the safety valve installation work.

13. On December 17, 2024, following lengthy technical discussions and inspections of Sable's pipeline facilities, OSFM issued State Waivers for the Pipeline Segments. Later, when PHMSA re-assumed jurisdiction, PHMSA issued a Special Permit to substitute for the State Waivers and approved Sable's "Restart Plan" for the Pipeline Segments. Both the State Waivers and the Special Permit impose over sixty

conditions to address the limited effectiveness of cathodic protection along the Pipeline Segments and to provide regulatory relief from 49 C.F.R. § 195.452, subd. (h)(4)(iii)(H). These conditions included requirements to conduct water pressure tests ("hydrostatic pressure tests" or "hydrotests") along the Pipeline Segments before resuming petroleum transportation, limitations on the maximum operating temperature and maximum operating pressure for crude oil transported through the Pipeline Segments, more stringent inspection frequency requirements and thresholds for anomaly remediation, as well as detailed validation, data analysis, recordkeeping, and reporting requirements.

14. Sable has also implemented pipeline integrity and corrosion-prevention mechanisms, including automated safety valves, in-line inspections, a new pipeline control system with real-time leak detection and automatic shutdown capability, and other ongoing upgrades. These measures exceed pipeline industry standards.

15. Contemporary analyses confirm that crude oil pipelines operated with limited cathodic protection are not more likely to result in oil spills or oil spills of increased size when other appropriate leak detection and prevention methods are implemented, such as those identified in the PHMSA Special Permit. Moreover, the heightened patrolling, monitoring, emergency shutdown, training, inspection, and corrosion prevention requirements proposed by Sable in its Restart Plans collectively will reduce the risk and magnitude of any potential oil spill.

16. Sable has updated its programs and procedures, including its Integrity Management Plan, Control Room Management Plan, Operations & Maintenance Manual, and Standard Operating Procedures, consistent with the requirements of the Consent Decree. These updates include provisions related to inspections, repair criteria, coating repair, preventative and mitigative measures, leak detection, SCADA alarms, and patrolling and surveillance of the Pipeline Segments. *See* ECF 16-1, Ex.

2, App. B, §§ 4.A, 12.A; *id.* Ex. 1, App. D §§ 1.b, 1.f. Pursuant to federal law, Sable has also maintained liability insurance with spill coverage of $700 million and a plan for notifying authorities in the event of a spill.

17. OSFM has reviewed Sable's updated Integrity Management Plan, a document outlining Sable's processes and procedures intended to provide for active reduction in operating risk through the ongoing evaluation of risk, implementation of integrity assessments, evaluation and implementation of risk-reducing actions, and the evaluation of program effectiveness, in conjunction with inspections and meetings in 2024 and 2025.

18. In May 2025, Sable completed all anomaly repairs along the Pipeline Segments falling within the heightened repair criteria established by the Consent Decree.

19. After completing all anomaly repair work, Sable conducted successful hydrotests along the Pipeline Segments between March and May 2025. These occurred under OSFM's supervision and as required by the then-effective State Waivers. Sable's hydrotests confirmed that the Pipeline Segments could be operated at pressures in exceedance of the Pipeline Segments' defined maximum operating pressures for both short periods ("spike" hydrotests) and longer durations.

20. On July 25, 2024, and again on July 17, 2025, Sable held oil spill response preparedness drills which included approximately 35 representatives from the U.S. Environmental Protection Agency, PHMSA, U.S. Coast Guard, National Oceanic and Atmospheric Administration's Office of National Marine Sanctuaries, California Department of Fish and Wildlife's Office of Spill Prevention and Response, Santa Barbara County Air Pollution Control Department, Santa Barbara County Office of Emergency Management, Santa Barbara County Fire Department, and Santa Barbara County Certified Unified Program Agency.

21. From August 6 to 8, 2025, OSFM met with Sable to review Sable's Operations and Maintenance Manual. OSFM confirmed that Sable's Operations and Maintenance Manual incorporated all procedural modifications contemplated by the Consent Decree. OSFM also confirmed that Sable has instituted a management of change plan to ensure any future procedural changes are similarly incorporated into the Operations and Maintenance Manual.

22. From August 12 to 14, and again on August 20, 2025, OSFM met with Sable to discuss the process of resuming petroleum transportation through the Pipeline Segments. OSFM also conducted inspections of Sable's control room and site visits to the Pipeline Segments' pump stations and valve sites.

23. From August 12 to 14, 2025, Sable met with OSFM to discuss its Fill Plan and Start Up Procedures. The Fill and Start Up Procedures were submitted to OSFM on September 11, 2025.

24. From September 2 to 5, 2025, OSFM met with Sable to inspect Sable's Control Room Management plan. OSFM tested and reviewed all alarms and systems, including the Master Control Room enhancements, during these inspections and confirmed the enhancements satisfied all applicable Consent Decree requirements.

PHMSA's Assumption of Jurisdiction

25. On November 26, 2025, Sable submitted a letter to PHMSA seeking confirmation of Sable's determination that the Pipeline Segments are part of an interstate pipeline facility under the Pipeline Safety Act and requesting PHMSA's assessment of that determination. Sable's assessment relied on the unified ownership of the offshore and onshore pipeline segments as part of a single SYPS.

26. PHMSA then conducted on-site facilities inspections of the Pipeline Segments, pump stations, and control room from December 9 to 11, 2025. PHMSA

also reviewed Sable's written procedures and records and program inspections previously completed by OSFM.

27. Based on its review and on-site facilities inspections, on December 17, 2025, PHMSA issued a letter to Sable concurring with Sable's determination that the Pipeline Segments are part of an "interstate" pipeline facility subject to PHMSA's jurisdiction.

28. On December 22, 2025, after reviewing documents submitted by Sable and in light of PHMSA's field inspections of the facilities, PHMSA approved Sable's Restart Plans for the Pipeline Segments, including Sable's Fill Plan and Start Up Procedures, Linefill Positioning Plan Assignments, and Linefill Contact List.

29. On December 23, 2025, PHMSA granted Sable an emergency "Special Permit" for the Pipeline Segments. On January 22, 2026, Sable submitted a request for a non-emergency Special Permit. On February 23, 2026, PHMSA "preliminarily determined that the issuance of the special permit would not be inconsistent with pipeline safety" and noticed the Special Permit application for public comment. *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026).

30. The Special Permit waives compliance with a single regulatory requirement, 49 C.F.R. § 195.452, subd. (h)(4)(iii)(H), and imposes additional safety measures to ensure pipeline integrity. The Special Permit includes substantially the same conditions as those found in the OSFM State Waiver, to provide continuity based on the Pipeline Segments' change to interstate status.

31. Sable has committed to implementing the conditions of the Emergency Special Permit in the interim while PHMSA's review of the non-emergency special permit is pending, and PHMSA technical staff have been onsite during the process of resuming flow.

Sable's Resumption of Oil Transportation Pursuant to the Defense Production Act Order

32. In late February 2026, the United States became involved in the ongoing Iran conflict, which has resulted in serious disruptions to oil supplies and significant increases in the cost of oil. These developments exacerbated an already-acute oil shortage on the West Coast as recognized in Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 29, 2025), creating threats to national security and domestic energy supplies.

33. On March 13, 2026, President Trump issued an Executive Order titled "Adjusting Certain Delegations Under the Defense Production Act," which delegated certain authorities of the President under the DPA to the Secretary of Energy.

34. On March 13, 2026, the United States, through the U.S. Secretary of Energy, issued an order commanding Sable to immediately provide services requiring the flow of crude oil through the Santa Ynez Pipeline System, pursuant to the Defense Production Act, 50 U.S.C §§ 4501 *et seq*. As recognized by the DPA Order, ECF 16-1, Ex.1, at 9, "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" *Id.* The Santa Ynez Unit is a critical resource on the West Coast.

35. Pursuant to the DPA Order, Sable resumed the transportation of hydrocarbons through the Pipeline Segments according to the Restart Plan beginning on March 13, 2026. On the morning of March 14, 2026, the Director of the Western Region for the Office of Pipeline Safety and two other qualified PHMSA safety inspectors arrived onsite to observe the resumption of oil flow. Two PHMSA safety

inspectors were on site at the Las Flores facility, where Sable was bringing online one of the two mainline pumps. One PHMSA inspector was in the control room.

36. Consistent with the Consent Decree, the Restart Plan provides for a staged process where each segment of the system is brought up to pressure that is held for two hours before moving to a higher pressure for another two hours. This operational procedure is called a stand-up pressure test. During the procedure, the line pressures are checked for any change in pressure that could indicate an issue. The Pipeline Segments also are monitored by aircraft for any signs of releases. There have been no releases or other problems during the resumption of oil flow.

37. Sable began by filling CA-324 with hydrocarbons that had been stored in tanks. Sable put a device inside CA-324 to expel nitrogen and turned on its shipping pump to pump the oil through the Pipeline Segments. Once the stand-up pressure tests in one segment of the Pipeline Segments were complete, Sable started the next segment. If there had been issues maintaining pressure, Sable would have shut down the segments at issue. There have been no issues maintaining pressure.

38. Sable started the process during daylight hours, as laid out in the Restart Plan, and notified local emergency response personnel.

39. Three PHMSA inspectors were onsite monitoring the process again on March 15, 2026. That morning, Sable and a PHMSA inspector visited the control room to make sure the resumption of oil flow was proceeding according to plan. Sable monitored pressure, conducted safety checks on the Pipeline Segments, and made sure aircraft were conducting the required flyovers. Sable detected no safety concerns.

40. Sable completed filling CA-324 with hydrocarbons on the morning of March 15, 2026. Sable conducted two stand-up pressure tests that passed the Restart Plan's conditions.

41. By late afternoon on March 15, 2026, Sable began filling CA-325 with product from Gaviota to Valve Site 13. On March 19, 2026, Sable completed filling a segment called CA-325A with hydrocarbons from Gaviota to Sisquoc Pump Station. On that date, Sable successfully conducted two stand-up pressure tests of CA-325A that passed the Restart Plan's conditions.

42. On March 20, 2026, Sable flooded Sisquoc Station and successfully tested station piping in accordance with the Restart Plan.

43. On that same date, Sable began filling CA-325B with product. On March 29, 2026, Sable completed filling CA-325B from Sisquoc Pump Station to Pentland Station. On that same date, Sable successfully conducted a stand-up pressure test of CA-325B. Sable then flooded and successfully tested its Pentland Station facility piping in accordance with the Restart Plan's conditions.

44. Once these operations were completed, on March 29, 2026, Sable commenced deliveries of hydrocarbons through a custody transfer meter owned by the Pentland Station operator and into the operator's own Pentland Station piping.

45. The process has gone smoothly, consistent with the Consent Decree and the Restart Plan, with no safety concerns.

<u>Sable's Plans for Continued Operation</u>

46. Sable plans to take additional protective measures, beyond those required by the Consent Decree, as it continues to operate the Pipeline Segments. This includes diligent inspections of the Pipeline Segments, identification of any anomalies that require repairs, and prompt repair activities, consistent with Special Permit conditions and all applicable pipeline safety law.

47. Sable will perform ILI ultrasonic thickness wall measurement (UTWM) and ultrasonic shear wave crack detection (USCD) tools for segment CA-324 between early May 2026, and June 6, 2026, the earliest available ILI tool dates.

48. Sable will perform ILI using UTWM and USCD tools for the larger diameter segment CA-325 as soon as practicable thereafter. If the onshore portions of the SYPS have not achieved sustained flow rates (60,000 barrels per day) needed to confidently meet necessary specifications for running the ILI tools on segment CA-325 and obtaining accurate and reliable data to characterize anomalies on the pipe, Sable is proposing to perform the ILI in an earlier timeframe by storing enough volume of crude oil in two out of four breakout tanks at the Las Flores Canyon midstream processing facility such that it can reinject it into CA-325A to achieve the necessary flow rate of 60,000 barrels per day.

49. After performing these ILIs, Sable will complete its review and analysis of the ILI report within 15 days of receiving the report from the ILI tool vendor, consistent with Appendix D of the Consent Decree. Sable will then identify, evaluate, and remediate any immediate and 180-day repair conditions, consistent with the conditions in the Special Permit.

50. Sable submitted its proposed ILI schedule for segment CA-324 to PHMSA in a letter on April 23, 2026.

51. After the Consent Decree is terminated, Sable will continue to be regulated by PHMSA and will continue to comply with the conditions in Sable's Special Permit, which embody all forward-looking Consent Decree safety provisions, in addition to all applicable requirements under 49 C.F.R. Part 195.

<u>Consequences to Sable from a Court-Ordered Shutdown</u>

52. On May 1, 2026, Plaintiff filed a Motion for Preliminary Injunction and Stay, ECF 16, seeking to immediately halt Sable's operations pending resolution of this case. If the Court were to grant a preliminary injunction, Sable would be forced to immediately shut in wells and cease pipeline operations that are already underway pursuant to the DPA Order.

53. A court-ordered pipeline shutdown would be a difficult, complex, time-consuming process that carries additional safety risks. Sable would first need to make operational adjustments at the Las Flores Canyon Facility, to allow for safe storage of produced oil. Sable would then need to cease additional oil flow into the Pipeline Segments and divert that oil to storage. Sable would next insert pipeline intervention tools ("pigs") in the Pipeline Segments to remove remaining oil and clean the lines utilizing nitrogen. Sable would then repressurize the Pipeline Segments with nitrogen to mitigate against internal corrosion. The amount of time required for these tasks can be significant depending on the availability of the necessary nitrogen, equipment and qualified technicians. Additionally, although Sable would employ best practices if ordered to shut down the Pipeline Segments, the topography of this pipeline requires significant planning to employ necessary safety procedures to safely purge the crude oil while avoiding over pressuring the pipelines.

54. If operation of the Pipeline Segments is enjoined, the production and transportation of oil will halt, precluding Sable from supplying California refineries. Sable will lose substantially all its revenue, totaling approximately $4.73 million per day (or $143.86 million per month), based on current data and projections.

55. Sable Offshore Corp. is publicly traded on the New York Stock Exchange. A business disruption of this magnitude could dramatically lower the company's share price, destroying value for shareholders, including not just institutional investors but also workers across the country whose pensions and retirement plans hold equity in Sable.

56. Sable employs approximately 200 full-time employees across its operations in California. These jobs are good-paying, not easily replicated, and offer substantial benefits and room for upward mobility. If SYU or SYPS operations are enjoined, Sable may be forced to suspend or lay off some of its employees.

57. Continued operation of the SYU and the SYPS is also indispensable to the livelihoods of approximately 300 well-paid contractors, including laborers, operators, welders, mechanics, electricians, engineers, longshoremen, and construction workers, many of whom are unionized. Because of the dearth of oil production in California, these jobs will also be difficult to replace if lost. Moreover, informing contractors that there is no longer work for them would compromise goodwill and jeopardize longstanding relationships between those individuals and Sable.

58. Collectively, the combined annual direct employee and indirect contractor payroll is estimated to range between $100 and $200 million.

59. Loss of these jobs would not only hurt the employees, contractors, and their families: local governments, principally Santa Barbara County, but also San Luis Obispo County and Kern County, would be negatively affected by the loss of revenue from income, sales, and property taxes, as detailed below.

<u>Consequences for California's Energy Supply from a Court-Ordered Shutdown</u>

60. California is currently facing an energy crisis. It has the highest retail gasoline and aviation fuel costs in the United States, and the state must import most of its oil from foreign countries to satisfy its residents' growing energy demands. According to the California Energy Commission, over 61% of the crude oil feeding California refineries was imported from foreign countries, many in the turbulent Middle East. *See* Cal. Energy Comm'n, *Annual Oil Supply Sources to California Refineries*, https://tinyurl.com/4hkecyjn (last visited May 9, 2026). Whereas approximately thirty years ago in-state production constituted 50% of oil supply (and Alaskan production represented another 38%, for a domestic total of 88%), foreign imports have risen from 12% in 1997 to 61% last year. Iraq alone is responsible for 17% of California's foreign crude oil imports, and Middle Eastern imports collectively

represent over a quarter of California's oil imports. *See* Cal. Energy Comm'n, *Foreign Sources of Crude Oil Imports to California*, https://tinyurl.com/yjtu77rx (last visited May 9, 2026). Many of these tankers must traverse the Strait of Hormuz, which is currently the site of intense military activity, and then travel thousands of nautical miles before offloading their cargos into the California market.

61. The current state of affairs is exemplified by the recent ordeal involving the San Pablo Bay Pipeline used to transport crude oil from Kern County to Bay Area refineries. In September 2025, the pipeline's owner sent a letter to California Governor Gavin Newsom, noting that the operator was in severe financial distress because of the pipeline's sudden underutilization. Without relief, the letter warned, the pipeline would have to be shut down, which would have severely negative consequences. The CEO added that California crude oil production was meeting only 25% of refinery demand and encouraged Governor Newsom to allow the SYU to reopen, which would reinfuse the pipeline system and allow more crude oil to flow north from Kern County. But without additional production coming online, by the end of 2025, the pipeline was essentially empty, and as of now, it is shut down. Prospects for restart are dim, as the economics of the pipeline remain highly challenged due to declining regional production and strict environmental regulations. Now that the San Pablo Bay Pipeline is shut down, oil producers in Kern County have shifted transportation to the road, deploying upward of 100 trucks each day to move crude oil, which is more polluting, more expensive, and more hazardous.

62. California refineries have faced similar dire challenges. Over the past several years, numerous California refineries have been converted to alternative feedstock sources, idled, or shuttered. These include Marathon's Martinez refinery and Phillips 66's Rodeo refineries, which were converted to sources other than crude oil for feedstock, and Phillips 66's Los Angeles refinery and Valero's Benicia refinery,

which were shuttered. And these refineries are needed to supply needed fuel, including gasoline, not just to California but also the rest of the West Coast, including inland states like Nevada and Arizona that are dependent on California.

63. Flowing oil through the SYPS from the SYU to refineries helps to alleviate California's energy crisis. Indeed, Sable is immediately increasing in-state oil production by approximately 17%.

64. Sable has a contract with Chevron by which it is purchasing the oil currently being produced at the SYU and transported through the SYPS.

65. If a court prevents Sable from producing oil and gas from the SYU and transporting oil through the SYPS to market, it is highly unlikely that the SYU will ever be produced, stranding billions of dollars of valuable natural resources owned by the public and destroying significant economic activity.

66. Without the continued supply of oil from the SYU through the SYPS, the remaining refineries would be forced to obtain feedstock oil and refined products from other sources, including oil imported from foreign countries or from the Gulf Coast, which requires a lengthy and costly ocean voyage (and in many cases, through the Panama Canal) for delivery to California.

<u>Consequences for the Federal, State, and Local Fiscs from a Court-Ordered Shutdown</u>

67. Oil producers like Sable are required to pay royalties—a percentage of the value of the oil produced from leased land—to the State of California and the federal government. Sable pays a royalty of 16.39% of gross revenue to the federal government, worth approximately $339 million annually at current crude oil market prices and Sable's current production rate. An injunction would eliminate this significant contribution to the U.S. Treasury, which is a primary source of funding for the Land and Water Conservation Fund (the "LWCF"). The LWCF funds federal land

acquisition and provides grants to state and local governments for park development, including numerous projects in Santa Barbara County.

68. Sable's real estate and infrastructure are also subject to local property taxes paid into county-level general funds, where the money can be used to fund essential public services. These tax contributions, as a percentage of Sable's net revenue, are substantial.

69. In fact, Sable is one of Santa Barbara County's highest taxpayers. In 2014, the final full year of operation for the SYPS, the county received approximately $5 million in tax revenue from Sable's predecessor-in-interest.

70. Sable's operations also generate significant tax proceeds for the State of California and the United States Government as well in the form of sales, corporate, and income taxes paid by Sable, its employees, and its contractors.

Consequences for the U.S. Military from a Court-Ordered Shutdown

71. Flow of oil through the Pipeline Segments helps meet the urgent needs of the U.S. military to supply West Coast military installations and serve U.S. Indo-Pacific Command.

72. California is home to more than 40 major military installations, the highest concentration of any U.S. state. These bases serve as critical hubs for training, logistics, and research across every branch of the Armed Forces.

73. Among these installations are Naval Base San Diego, the largest naval base on the West Coast and home to the U.S. Pacific Fleet; Camp Pendleton, the Marine Corps' premier West Coast expeditionary training facility; Edwards Air Force Base, where the world's most extensive aircraft testing takes place; and Vandenberg Space Force Base, the country's primary West Coast space launch and missile testing facility.

74. A reliable domestic supply of crude oil to the West Coast is essential to military readiness and homeland security.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on May 11, 2026, in Houston, Texas.

/s/
J. Caldwell Flores

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission St., Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants. | Case No. 2:26-cv-03396-SVW-SSCx<br><br>**DECLARATION OF JESSICA STEBBINS BINA IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION TO INTERVENE**<br><br>Date: June 8, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br>Courtroom: 10A |

**DECLARATION OF JESSICA STEBBINS BINA**

I, Jessica Stebbins Bina, declare as follows:

1. I am an attorney admitted to practice before this Court. I am a partner with Latham & Watkins LLP, counsel of record for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable"). I make this declaration based on my personal knowledge, and, if called as a witness, I could and would testify competently thereto.

2. Pursuant to Local Rule 7-3, my co-counsel and I spoke with counsel for Plaintiff the State of California, and with counsel for Defendants, Chris Wright, in his official capacity as Secretary of the U.S. Department of Energy, and the United States Department of Energy (collectively, the "United States"), on Monday, May 4, 2026, to discuss intervention by Sable in this action.

3. Both California and the United States have stated that they do not intend to take a position on Sable's motion for intervention. In light of this position, I informed counsel for both parties by email dated May 6, 2026, that Sable intended to file this motion for intervention as unopposed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on May 11, 2026, in Los Angeles, California.

/s/ *Jessica Stebbins Bina*
Jessica Stebbins Bina

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

THE STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

Case No. 2:26-cv-03396-SVW-SSCx

**[PROPOSED] ORDER GRANTING SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION TO INTERVENE**

Hearing
Date: June 8, 2026
Time: 1:30 p.m.
Judge: Hon. Stephen V. Wilson
Courtroom: 10A

Having considered Sable Offshore Corp. and Pacific Pipeline Company's unopposed Motion to Intervene as defendants pursuant to Federal Rule of Civil Procedure 24(a)(2), the Motion to Intervene is **GRANTED.**

**IT IS HEREBY ORDERED THAT**:

Sable Offshore Corp. and Pacific Pipeline Company are granted intervention as of right for all purposes in this action. Sable Offshore Corp. and Pacific Pipeline Company's Proposed Opposition to Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants, and the exhibits thereto, is filed as of today. Sable Offshore Corp. and Pacific Pipeline Company shall file their responsive pleadings under Rule 24(c) on the same date as Defendants' deadline for responding to Plaintiff's Complaint or three days after intervention is granted, whichever is later.

**IT IS SO ORDERED.**

Dated: ____________________

____________________
Hon. Stephen V. Wilson
United States District Judge

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

THE STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

Case No. 2:26-cv-03396-SVW-SSCx

**PROPOSED INTERVENORS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S PROPOSED OPPOSITION TO CALIFORNIA'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**

Date: June 1, 2026
Time: 1:30pm
Courtroom: 10A
Judge: Hon. Stephen V. Wilson

## TABLE OF CONTENTS

I. **INTRODUCTION** ........ 1

II. **BACKGROUND AND STATEMENT OF INTEREST** ........ 2

III. **LEGAL STANDARD** ........ 4

IV. **ARGUMENT** ........ 5

A. California Is Not Likely To Succeed On The Merits ........ 5

1. The Court Lacks Jurisdiction To Decide Hypotheticals About The Preemptive Effect Of The DPA Order ........ 5

2. The Hypothetical Preemptive Effect Of The DPA Order Is Not A Reason To Overturn The DPA Order ........ 7

3. If It Reaches The Consequences Of The DPA Order, The Court Should Affirm Its Preemptive Effect ........ 9

B. California Does Not Show Imminent And Irreparable Harm ........ 14

1. Unspecified Alleged Pipeline "Risks" Do Not Constitute Imminent And Irreparable Harm ........ 15

2. Federal Preemption Does Not Constitute Imminent And Irreparable Harm ........ 18

3. The Mere Assertion Of An Ultra Vires Regulatory Action Does Not Constitute Imminent And Irreparable Harm ........ 19

4. California Does Not Show Imminent And Irreparable Harm As A Property Owner ........ 20

C. An Injunction Will Harm Sable And The Public Interest ........ 20

1. An Injunction Will Seriously Harm Sable's Finances And The Livelihoods Of Hundreds Of

Sable Employees ......................................................... 20

2. An Injunction Will Harm The Public Interest ......................... 21

D. The Severity Of The Harm California Seeks To Cause Necessitates A Bond ......................................................... 22

V. **CONCLUSION** ......................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahlman v. Barnes*,
No. 20-55568, 2020 WL 3547960 (9th Cir. June 17, 2020) ............ 14

*Akhtar v. Burzynski*,
384 F.3d 1193 (9th Cir. 2004) ............ 8

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ............ 4

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*,
781 F. Supp. 3d 920 (N.D. Cal. 2025) ............ 19

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
167 F.4th 1247 (9th Cir. 2026) ............ 21

*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*,
626 F. Supp. 3d 1030 (W.D. Wis. 2022) ............ 22

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) ............ 8

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ............ 15, 16, 17

*Chemehuevi Indian Tribe v. McMahon*,
No. EDCV151538DMGFFMX, 2017 WL 6820023 (C.D. Cal. Oct. 31, 2017) .. 8

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ............ 10

*Crowe & Dunleavy, P.C. v. Stidham*,
640 F.3d 1140 (10th Cir. 2011) ............ 17

*Doe #1 v. Trump*,
957 F.3d 1050 (9th Cir. 2020) .......... 14

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) .......... 18

*Free v. Bland*,
369 U.S. 663 (1962) .......... 9

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) .......... 10

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) .......... 19

*Hercules, Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) .......... 12

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996) .......... 12, 13

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 10

*Indiana v. Haaland*,
No. 24-cv-1665, 2024 WL 5213401 (D.D.C. Dec. 24, 2024) .......... 18

*INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*,
502 U.S. 183 (1991) .......... 8

*Johnson v. Tyson Foods, Inc.*,
580 F. Supp. 3d 382 (N.D. Tex. 2022) .......... 11

*Kentucky v. United States ex rel. Hagel*,
759 F.3d 588 (6th Cir. 2014) .......... 17

*La. Pub. Serv. Comm'n v. F.C.C.*,
476 U.S. 355 (1986) .......... 7

*Maryland v. King*,

567 U.S. 1301 (2012) ........................................................................................ 19

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ........................................................................ 19

*Montalvo v. Spirit Airlines*,
508 F.3d 464 (9th Cir. 2007) .......................................................................... 9

*Murphy v. NCAA*,
584 U.S. 453 (2018) ................................................................................ 11, 13

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Svc.*,
886 F.3d 803 (9th Cir. 2018) ........................................................................ 15

*Nat'l Fed. of the Blind v. United Airlines Inc.*,
813 F.3d 718 (9th Cir. 2016) ........................................................................ 10

*New York v. Dep't of Just.*,
343 F. Supp. 3d 213 (S.D.N.Y. 2018) ............................................................ 13

*New York v. United States*,
505 U.S. 144 (1992) ........................................................................................ 9

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
418 U.S. 264 (1974) ........................................................................................ 9

*Pub. Utilities Comm'n of State of Cal. v. United States*,
355 U.S. 534 (1958) ........................................................................................ 9

*Reed v. Tyson Foods, Inc.*,
No. 21-cv-01155, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021) ..................... 11

*Reno v. Flores*,
507 U.S. 292 (1993) ........................................................................................ 8

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ...................................................................................... 14

*Russello v. United States*,
464 U.S. 16 (1983) ........................................................................................ 10

*Santa Barbara County v. Hickel*,
426 F.2d 164 (9th Cir. 1970) .......... 14

*Sierra Club v. Clinton*,
689 F. Supp. 2d 1123 (D. Minn. 2010) .......... 22

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 6

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 19

*U.S. v. Fruehauf*,
365 U.S. 146 (1961) .......... 8

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 8

*United States v. Shih*,
73 F.4th 1077 (9th Cir. 2023) .......... 21

*United States v. Vertac Chemical Corp.*,
46 F.3d 803 (8th Cir. 1995) .......... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 4, 14, 17, 20, 21

*Wit v. United Behav. Health*,
No. 14-CV-02346-JCS, 2024 WL 1016069 (N.D. Cal. Feb. 6, 2024) .......... 20

**Statutes**

50 U.S.C. § 4511 .......... 5

50 U.S.C. § 4557 .......... 11, 13

50 U.S.C. § 4558 .......... 10, 13

U.S. CONST. art. VI, cl. 2 .......... 7

**Rules**

Fed. R. Civ. P. 65 .................................................. 22

**Regulations**

91 Fed. Reg. 8949 (Feb. 24, 2026) .................................................. 3

# I. INTRODUCTION

California asks for an extraordinary injunction to stop the federal government from accessing oil in federal waters—oil that the Secretary of Energy has determined is "necessary," "scarce, critical and essential" to the Nation's defense. The Secretary did so under express authority created by Congress and duly delegated to him by the President. California's contrary suggestion—that the President cannot, even in a declared national energy emergency, direct energy production from federal offshore oil and gas leases and operation of a critical supporting pipeline—is wrong as a matter of statutory, regulatory, and constitutional law.

The motion fails on the merits and every equitable factor. The challenged Defense Production Act order ("DPA Order") does not exceed the federal government's authority, and the possibility that federal law may sometimes preempt state law is not only a far cry from irreparable injury but instead a fundamental feature of the American constitutional design. In any event, California's speculative parade of preemption-related horribles is neither a part of this case nor a proper basis to overturn the DPA Order, since California ties its preemption arguments to only two concrete circumstances: whether Sable must comply with a 2020 Consent Decree and whether it may transport hydrocarbons through Gaviota State Park. Both questions are being litigated in separate actions before this Court and are resolvable without reference to the DPA. Because California's facial challenge here cannot show that there is no set of circumstances in which the DPA Order is invalid, it is best adjudicated through as-applied challenges California has already brought in those cases.

By contrast, Sable is likely to suffer significant, concrete harm if California's overbroad injunction request is granted. An injunction could eliminate Sable's sole source of revenue, placing a tremendous burden on Sable, its employees, and shareholders. And California's request ignores the core public interests at stake here:

The United States has ordered Sable to transport oil through the pipeline to "promote the national defense" and "address energy vulnerabilities on the West Coast." ECF 16-1 at 9-10. California presents zero evidence to counter these national defense and energy emergency findings. These considerations weigh heavily in favor of preserving the status quo and denying injunctive relief.

California's motion should be denied.

## II. BACKGROUND AND STATEMENT OF INTEREST

Sable operates the Santa Ynez Pipeline System ("SYPS"), which connects the single largest producing offshore oilfield in the United States—three oil production platforms in sixteen federal leases comprising approximately 76,000 acres of the Outer Continental Shelf in the federal waters of the Santa Barbara Channel—to an onshore terminal in Kern County, California. *See* Declaration of J. Caldwell Flores ¶¶ 3-4 ("Flores Decl."). The SYPS consists of offshore-to-onshore lines, a midstream processing facility at Las Flores Canyon, and onshore pipeline segments that transport the oil to Pentland Station in Kern County. *Id.* In 2015, before Sable owned the SYPS, a leak along one of the onshore pipeline segments resulted in the Refugio oil spill. *Id.* ¶ 6.

Sable acquired the SYPS in 2024 through transactions with ExxonMobil and its subsidiaries. Then Sable began performing repair and maintenance work along the pipeline under the direct oversight of state and federal regulators and consistent with heightened repair criteria established by the 2020 Consent Decree that resolved spill-related claims against the pipeline segment's prior owner. *Id.* ¶ 11. Over the past two years, Sable has invested over $215 million in the SYPS, installed 27 new safety valves, and accomplished hundreds of repairs. *Id.* ¶¶ 9, 12. Sable has implemented above-industry-standard methods of ensuring integrity against corrosion, a new control system with real-time leak detection and automatic

shutdown capability, and other ongoing maintenance consistent with the Consent Decree. *Id.* ¶¶ 14-17.

In November 2025, due to Sable's unified ownership and operation of the integrated SYPS, including those portions originating on the Outer Continental Shelf, PHMSA redesignated the SYPS as an interstate pipeline and resumed federal oversight on that basis. *See id.* ¶¶ 25-27.[1] PHMSA reviewed and approved Sable's Restart Plan and granted Sable an Emergency Special Permit imposing heightened safety standards that matched special conditions previously imposed by California's pipeline regulator, the Office of State Fire Marshal ("OSFM"). *See id.* ¶¶ 29-30. Sable has since applied for a non-emergency Special Permit on substantially identical terms, and PHMSA noticed that permit for public comment, which comment period closed on April 3, 2026. *See* 91 Fed. Reg. 8949, 8949 (Feb. 24, 2026). Sable is implementing all conditions of the Special Permit. *See* Flores Decl. ¶ 31.

On March 13, 2026, on behalf of and under authority delegated by the President of the United States, the Secretary of Energy issued the DPA Order ordering Sable to immediately resume petroleum transportation throughout the SYPS, concluding such transportation is "necessary or appropriate to promote the national defense." Pipeline Capacity Prioritization and Allocation Order, ECF 16-1 at 9. The Secretary cited Executive Order 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025), which declared a "National Energy Emergency," and concluded that consumers and the military require Sable's "continuous production to address energy vulnerabilities on the West Coast." *Id.* at 9–10. Sable complied with the DPA Order and accordingly restarted oil transportation throughout the SYPS. PHMSA technical staff have been

---

[1] At the time of the 2020 Consent Decree, the onshore pipeline segments were considered intrastate and subject to the jurisdiction of the California Office of State Fire Marshal.

onsite during the restart process, supervising compliance with safety requirements. *See* Flores Decl. ¶¶ 35-39.

California's challenge to the DPA Order directly affects Sable. The Motion for Preliminary Injunction repeatedly places Sable at the center of the dispute, alleging that Sable requested the DPA Order, relied on it to restart operations of the SYPS, and continues to operate pursuant to that order's directives. ECF 16-2 at 1–2. And California's requested injunction is crafted broadly in a clear attempt to enjoin Sable from operating the SYPS.

## III. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*[2] "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter,* 555 U.S. at 20). "'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can [also] support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id. at* 1135. The movant must "make a showing on all four prongs." *Id.*

---

[2] Emphasis added and internal quotations/citations omitted throughout unless otherwise stated.

## IV. <u>ARGUMENT</u>

### A. California Is Not Likely To Succeed On The Merits

California has not established that it is likely to succeed on the merits of any of its theories for overturning the DPA Order. The United States will likely address threshold questions of reviewability under the Administrative Procedure Act, as well as Secretary Wright's statutory authority to issue the DPA Order and his compliance with the applicable regulations. It suffices here to state that the DPA Order, to the extent it is reviewable, is on firm statutory and regulatory footing. Secretary Wright made the required findings under both section 101(a) ("necessary or appropriate to promote the national defense") and section 101(c) ("materials" or "services" are "scarce," "critical" and "essential" to the "domestic energy supplies"). 50 U.S.C. § 4511(a), (c). California argues the DPA merely empowers the President to reprioritize existing contracts and orders, but this argument ignores the statute's text, which authorizes the President "to *allocate* materials, services, and facilities . . . ." 50 U.S.C. § 4511(a) (emphasis added). While the first subsection of §101(a) addresses priorities of orders and contracts, the second subsection addresses and authorizes allocation. Secretary Wright made the required findings for allocation for §101(a) and section 101(c) both.

#### *1. The Court Lacks Jurisdiction To Decide Hypotheticals About The Preemptive Effect Of The DPA Order*

Sable focuses the remainder of its argument on California's other primary argument on the merits: the constitutional implications of the DPA Order's preemptive effect. The Court should decline California's invitation to render an advisory opinion on the preemptive effect of the DPA Order. "Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive

Branches, or of private entities. And federal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

California ties its arguments on the preemptive effect of the DPA Order to only two concrete circumstances: whether Sable must comply with the Consent Decree and whether Sable may transport hydrocarbons through portions of the SYPS located in Gaviota State Park. ECF 16-2 at 12–15. But these issues are being litigated in separate actions before the Court. *United States v. Plains All Am. Pipeline*, No. 2:20-cv-02415 (C.D. Cal. Filed Mar. 13, 2020) (Consent Decree); *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal. removed Mar. 19, 2026) (Gaviota State Park). The Court should reserve its decision on the merits of those issues to those actions, where the parties can fully develop the factual record and brief the law.

The Court's discretion is particularly important because the Consent Decree and Gaviota State Park actions might be decided without any discussion of the DPA. In the Consent Decree litigation, multiple dominos must fall before the Wright Order would come into play: the Court would have to deny the United States' pending motion to terminate the Consent Decree, hold next that Sable is bound by the Consent Decree, hold further that Sable has violated the Consent Decree, and hold finally that any violations warrant the imposition of sanctions. Only then would the Court need to evaluate the DPA Order's impact. Likewise, in the Gaviota State Park litigation, the Court would need to resolve Sable's multiple non-DPA defenses to California's trespass allegations—including consent, estoppel, and preemption under the Pipeline Safety Act—before reaching the consequences of the DPA Order. The failure of any one of these conditions precedent would turn California's arguments about the preemptive effect of the DPA Order into abstract propositions.

California may challenge the preemptive effect of the DPA Order in the specific contexts in which it might arise—whether in the Consent Decree action, the

Gaviota State Park action, or some other pending or future action.[3] What California may not do is obtain an advisory opinion on the consequences of the DPA Order in *this* action. The Court thus should reject California's arguments on the preemptive effect of the DPA Order as not properly before the Court.

*2. The Hypothetical Preemptive Effect Of The DPA Order Is Not A Reason To Overturn The DPA Order*

California further argues that the DPA Order is invalid because, in some speculative scenario not being litigated here, it may have a preemptive effect on state law that California disagrees with. This is not a valid basis for finding the DPA Order unlawful.

Federal preemption of state law is commonplace. Preemption is a product of the Supremacy Clause of the United States Constitution, which provides that the Constitution, federal laws, and treaties "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. From this constitutional command flows the principle that state laws that interfere with or are contrary to federal law must yield. *See, e.g.*, *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368 (1986).

Characterizing the United States as asserting "limitless" preemption power, California raises hypothetical preemption scenarios that it claims are unlawful—some invented out of whole cloth—as a supposed basis for overturning the DPA Order.[4] California's hypothetical preemption scenarios attack a strawman. Neither

---

[3] To be clear, to the extent it is reviewable at all, Sable does not dispute that this case is the appropriate forum to challenge the *validity* of the DPA Order.

[4] California, for instance, merely identifies the *possibility* that the DPA Order might displace CalGEM and CDFW from asserting jurisdiction. In the case of CalGEM, it speculates that the DPA Order *might* preclude it from inspecting the Las Flores Canyon facility, which *might* cause certain assumed regulatory violations to go unaddressed, which *might* result in environmental harm. ECF 16-5 ¶¶ 6–11. And in the case of CDFW, California presumes that Sable *might* be required to perform work on the SYPS that *might* take place in a location where certain water features or protected species are present. ECF 16-4 ¶¶ 10–15.

the United States nor Sable contends that the DPA Order preempts all state laws touching upon Sable's operations. *See, e.g.,* OLC Opinion at 16 (tying the President's power to expressly preempt state laws to whether preemption is "necessary" to performance of obligations under an order).[5] Sable, for example, can abide by generally applicable employment laws without any consequence for its duties under the DPA Order. Indeed, it is precisely because of this abstraction that courts have consistently refused to give "such advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests . . . ." *U.S. v. Fruehauf*, 365 U.S. 146, 157 (1961).

California, the United States, and Sable may disagree about the exact scope of state law preemption under the DPA Order. But if California wishes to bring a preemption-based challenge, it must show "no set of circumstances exist[] under which the [DPA Order] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[6] In other words, California—which claims that the DPA Order engages in "limitless preemption," Mot. 13—would have to show that *every possible preemption scenario* is unlawful, because the fact that the DPA Order "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.* And courts must not strike down an entire federal

---

[5] Indeed, California and its agencies are already arguing in parallel cases that the DPA Order *does not* preempt any state laws, exactly the opposite of their stance here. *See id.* California "cannot now reverse its position in order to suit its current objectives." *Chemehuevi Indian Tribe v. McMahon,* No. EDCV151538DMGFFMX, 2017 WL 6820023, at *3 (C.D. Cal. Oct. 31, 2017).

[6] The Supreme Court has repeatedly suggested that *Salerno*'s "no set of circumstances" rule applies to APA challenges. *See Bondi v. VanDerStok*, 604 U.S. 458, 467 (2025); *Reno v. Flores*, 507 U.S. 292, 301 (1993); *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 188 (1991). The Ninth Circuit has done the same. *See Akhtar v. Burzynski*, 384 F.3d 1193, 1198 (9th Cir. 2004).

statute when a narrowing construction or severability analysis could eliminate any constitutional defect. *New York v. United States*, 505 U.S. 144, 170, 186 (1992). This case is a textbook example: California has brought multiple as-applied challenges to the DPA Order, and questions about the DPA Order's preemptive scope can be litigated in those cases with the benefit of a factual record. Granting broad-based relief here on preemption grounds would short-circuit those analyses through an entirely speculative ruling.

*3. If It Reaches The Consequences Of The DPA Order, The Court Should Affirm Its Preemptive Effect*

California's criticisms of the DPA Order's preemptive effects, while not properly before the Court, are also wrong on the merits. Consistent with its purpose to support the national defense and domestic energy supplies, the DPA both expressly and impliedly preempts conflicting state laws.

Federal preemption may be either express or implied. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007). Implied preemption takes two forms: conflict preemption, where "a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law," and field preemption, where "Congress indicates in some manner an intent to occupy a given field to the exclusion of state law." *Id.* Executive agencies may validly preempt state laws when acting within the scope of their statutory authority. *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974); *cf. Free v. Bland*, 369 U.S. 663, 666 (1962); *Pub. Utilities Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543–44 (1958). "It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of

discretionary Presidential action." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000).

California relies on *Russello v. United States*, 464 U.S. 16 (1983), to argue that Congress did not intend for the DPA to generally preempt state laws because it included express language preempting certain laws relating to antitrust, loans, and investments. ECF 16-2 at 12. But *Russello* is a statutory interpretation decision that has no relevance to the preemption analysis. It is well-established that "the inclusion of . . . an express preemption clause within a statutory scheme does not foreclose the application of ordinary implied preemption principles." *Nat'l Fed. of the Blind v. United Airlines Inc.*, 813 F.3d 718, 731 (9th Cir. 2016). The Supremacy Clause supplies preemptive force *automatically* whenever a regulated party cannot comply with both federal and state directives, and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Crosby*, 530 U.S. at 372–73 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Express preemption clauses such as § 308(j), 50 U.S.C. § 4558(j), operate where express displacement is required even absent a direct conflict (e.g., antitrust scrutiny of joint defense-production activity that no state law specifically forbids); they say nothing about the well-settled background rule that conflicting state law yields whenever compliance with both is impossible. *See id.*; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–74 (2000). Were California's position correct, no executive order issued under any statute lacking an express preemption clause could ever displace conflicting state law—a proposition the Supreme Court has consistently rejected. *See Hines*, 312 U.S. at 67–68. In any case, California does not seem to believe its own argument: it concedes that the DPA might at least impliedly preempt certain state contract laws. ECF 16-2 at 12.

The Court, moreover, need not look far for cases applying § 101 of the DPA to impliedly preempt conflicting state laws. When the Secretary of Agriculture invoked the DPA in 2020 to require meat-processing plants to remain operational notwithstanding state-law obstacles, courts uniformly held that conflicting state requirements—including those sounding in tort law, not just contract—were preempted. *See Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022); *Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021). As the *Johnson* court explained, the plaintiffs sought "to impose liability … for failure to operate consistent with state-law standards," but those standards conflicted with standards imposed "pursuant to [the President's] delegated DPA authority." 580 F. Supp. 3d at 389. Because the "application of those state-law standards would undermine the President's statutory authority" under the DPA, the plaintiffs' claims were preempted. *Id.*; *see also Reed*, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions …, the state law must yield." (cleaned up)).

California's *Russello* premise is wrong on its own terms in any event. The DPA *does* contain an express preemption provision in § 101's immediate neighborhood. Section 707, 50 U.S.C. § 4557, provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." As the Office of Legal Counsel has explained, § 707 "is an express preemption provision," because it "confers on private entities … a federal right to engage in certain conduct – conduct required by a DPA order – subject only to certain (federal) constraints, not constraints imposed by state law." OLC Opinion at 11–12 (citing *Murphy v. NCAA*, 584 U.S. 453, 478–79 (2018)). And § 707's reference to acts resulting "indirectly" from compliance demonstrates that Congress "anticipated

that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible." *Id.* at 18 n.7. The DPA's text thus presupposes, rather than precludes, the broad preemptive operation California now denies.

California's parallel effort to limit the scope of § 707 to breach-of-contract claims fares no better because California overstates the cases on which it relies. ECF 16-2 at 13. In *Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994) ("*Hercules I*"), the Federal Circuit held that the plaintiff was not entitled to *indemnification* from the United States for personal injury claims arising from its manufacture of Agent Orange under DPA orders. While *Hercules I* was on appeal to the Supreme Court, the Eighth Circuit adopted its reasoning in *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 812–13 (8th Cir. 1995), to hold that the defendant was not entitled to *indemnification* from the United States for environmental liabilities—also arising from its manufacture of Agent Orange under DPA Orders. Both courts nonetheless left open the possibility that § 707 might provide *immunity* in other circumstances. *Hercules I*, 24 F.3d at 203 n.15, *Vertac*, 46 F.3d at 812 n.11. The Supreme Court then issued its decision: it specifically declined to limit § 707 to situations only where "orders are delayed or displaced," as *Hercules I* did with respect to indemnity, or otherwise opine on the scope of § 707's immunity, explaining that the section "plainly provides immunity, not indemnity," and thus it did not need to reach the question of scope. *Hercules, Inc. v. United States*, 516 U.S. 417, 430 and n.14 (1996) ("*Hercules II*").

Neither *Hercules I* nor *Vertac* decided (because neither case asked) whether a DPA order can preempt conflicting state requirements that obstruct the conduct it commands. The answer to that question is *yes*. Indeed, California's narrower premise—that § 707 reaches only liability arising from priority orders, *see* ECF 16-2 at 13—cannot be squared with the statutory text. Section 707 provides immunity

for "any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter," 50 U.S.C. § 4557. There is no express or implied limitation to priority orders, and—as noted above—the Supreme Court expressly declined to endorse one. *See Hercules II*, 516 U.S. at 429 n.14. Two further textual features confirm the breadth of the immunity. *First*, § 707 shields against "damages or penalties." *Second*, § 707 contains no reference to "contract" law at all. When Congress meant to preempt only a discrete category of law under the DPA, it said so expressly—as it did with respect to antitrust laws in § 708, 50 U.S.C. § 4558(j). The absence of any comparable limiting term in § 707 forecloses the suggestion that Congress silently confined that section to contract-based liability arising from priority orders, while leaving recipients of allocation orders exposed to whatever non-contract liabilities or penalties state law might impose for the very conduct the federal order compels.

California's remaining arguments against preemption also fail. *First*, the anticommandeering doctrine is inapplicable, because it only prohibits the federal government from "issu[ing] orders *directly* to the States." *Murphy*, 584 U.S. at 470 (2018). The DPA Order imposes no obligations on California; it is directed to a private party—Sable—and happens to conflict with certain state law obligations California seeks to enforce. That is preemption, and "commandeering does not occur when Congress validly preempts state law through the Supremacy Clause." *New York v. Dep't of Just.*, 343 F. Supp. 3d 213, 232 (S.D.N.Y. 2018). *Second*, the DPA Order does not purport to vacate, modify, or review the Consent Decree; it imposes a federal regulatory obligation on a private party that, under ordinary Supremacy Clause principles, supersedes any inconsistent state law conditions incorporated into its terms. That again is preemption, not Executive review of Article III judgments. To the extent the Consent Decree's terms are in conflict with the DPA Order (something that has not yet been determined), the Consent Decree "must be

modified." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) (consent decree must be modified if obligation "has become impermissible under federal law"); OLC Opinion at 22. A DPA order has the force of federal law; if the Consent Decree purports to require what federal law now forbids (or vice-versa), the Consent Decree must yield, not the federal directive.

The Court may reserve decision on the preemptive effect of the DPA Order for the specific cases in which it is being litigated. But to the extent the Court addresses it here, the text, structure, and purpose of the DPA are clear: the DPA Order prevails over conflicting state law.

### B. California Does Not Show Imminent And Irreparable Harm

California also fails to demonstrate any immediate, irreparable harm. "[A] showing of irreparable injury is an absolute prerequisite" to injunctive relief. *Ahlman v. Barnes*, No. 20-55568, 2020 WL 3547960, at *2 (9th Cir. June 17, 2020); *see also Santa Barbara County v. Hickel*, 426 F.2d 164, 168 (9th Cir. 1970). California further has the "burden of showing that irreparable injury is likely to occur during the period before the [case] is decided." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). In this third recent attempt at emergency relief, California can still point to *no specific real-world consequence it has or will experience from pipeline operation under the DPA Order.* California hints at a range of alleged harms, but all are speculative and none are irreparable. At most, California raises a mere "possibility" of harm, "inconsistent with [the] . . . extraordinary remedy that may only be awarded upon a clear showing." *Winter*, 555 U.S. at 22.

*1. Unspecified Alleged Pipeline "Risks" Do Not Constitute Imminent And Irreparable Harm*

California gestures at alleged "pipeline[] risks," ECF 16-2 at 19, but the State's two-page discussion of irreparable harm never quantifies those risks or explains how pipeline operation would cause them. The two scenarios named in the brief—"the risk of harm to species" and the possibility that California's "protections for public health" would be displaced, *id.* at 19–20—are entirely speculative. To secure a preliminary injunction, the State "must do more than merely allege imminent harm": it "must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Yet in its briefing and declarations, California does not even *claim* such an injury, nor does it *ever actually identify a safety risk with the pipeline*. Thus, California's request presents two levels of speculation: *first*, that operation of the SYPS presents a safety risk; and, *second*, that the safety risk can cause the identified harms.

*First,* California's brief nowhere explains how, where, and to what degree pipeline operation would pose a "risk of harm to species." ECF 16-2 at 19. The supporting Vance Declaration, ECF 16-4, merely lists protected species that are *somewhere in the same county* as an SYPS pipeline segment. *Id.* ¶¶ 8, 10, 12. It also relies on the species impact of constructing an entirely new pipeline based on a proposal that pre-dates Sable's ownership—something that Sable has never proposed, let alone done. *See* Declaration of Steve Rusch ("Rusch Decl.") ¶ 6. Nowhere does it ever articulate how flowing oil through the existing pipeline would harm a single endangered species. In any case, any species impact was already considered in the pipeline's original environmental documents. *See id.* ¶ 5. California's only case to support its position is *National Wildlife Federation v. National Marine Fisheries Service*, 886 F.3d 803 (9th Cir. 2018), which held that

irreparable harm to a species need not involve an "extinction-level threat." *Id.* at 818. Yet California identifies *no* threat to *any* species here.

California alternatively suggests that Sable may someday need a "lake or streambed" permit for future construction work and that the State would be injured if this process were preempted. ECF 16-4 ¶ 13; ECF 16-2 at 20. But Sable has continued to work with CDFW to obtain permits after the issuance of the DPA Order. *See* Rusch Decl. ¶ 8. California also concedes that whether a permit "*might* be required" will "[d]epend[] on the type of maintenance, repair, or other work to the Pipeline that will need to be completed," ECF 16-4 ¶ 15. The future possibility that Sable *might* ignore CDFW permitting, for unknown and unplanned construction that then *might* affect unknown species is precisely the kind of "[s]peculative injury [that] does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine*, 844 F.2d at 674.

*Second,* California's reliance on the preemption of its "protections for public health"—which appears to refer to CalGEM's regulatory regime—is similarly unavailing. As an initial matter, CalGEM's jurisdiction is in active dispute in *Sable Offshore Corp. v. California Geologic Energy Management Division*, No. 26WM000036 (Cal. Super. Ct. Sacramento Cnty. Feb. 17, 2026). But even if CalGEM could properly exercise regulatory authority over Las Flores Canyon—something it has never done in the facility's thirty-year history—California provides no allegation or evidence whatsoever of a safety risk. Instead, both the State's motion and the Sharma Declaration, ECF 16-5, simply recite generalized potential dangers that regulation could theoretically guard against. *See, e.g.*, *id.* ¶ 9. California argues that "*[i]f* Sable denies access to CalGEM inspectors . . . it would impede CalGEM's ability to ensure compliance" with regulations, *id.* ¶ 11, but California nowhere argues that Sable has *ever* denied access to inspectors. In fact, Sable believes it has fully cooperated with CalGEM, whose agents have been accommodated at the

facility on five separate inspection days. Rusch Decl. ¶¶ 17-18. Neither the brief nor the Sharma Declaration argue that there is in fact a safety problem at Las Flores Canyon, and California therefore cannot meet its burden to "*demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine*, 844 F.2d at 674.

In reality, the SYPS operates under a comprehensive federal safety regulatory scheme that includes extensive oversight, liability insurance, and rapid remediation measures in the unlikely event of a spill. Sable safely resumed the transportation of hydrocarbons through the SYPS only after implementing significant repair and maintenance tasks with multiple qualified PHMSA safety inspectors onsite to observe the resumption of oil flow. Flores Decl. ¶¶ 35-39. PHMSA inspectors returned to monitor the process once the SYPS was operating, and Sable has continued to monitor pressure and conduct safety checks, including aircraft flyovers to monitor operations. *Id.* These efforts have been successful: the SYPS has now been operating for eight weeks and no issues have been detected. *Id.* ¶ 45.

*Third,* California's assertion that it may "bear" irreparable financial costs is incorrect, especially given California's entirely unsubstantiated theories of harm. California cites *Crowe & Dunleavy, P.C. v. Stidham*, 640 F.3d 1140 (10th Cir. 2011), and *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588 (6th Cir. 2014), for the proposition that monetary damages are irreparable if the defendant has sovereign immunity. *See* ECF 16-2 at 19. Yet California does not seek monetary damages in this litigation, and in any event, Sable carries insurance with spill liability coverage of $700 million. Flores Decl. ¶ 16. Simply put, California cannot show irreparable injury, financial or otherwise, "is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

*2. Federal Preemption Does Not Constitute Imminent And Irreparable Harm*

California's other major theory of harm is the alleged "[i]ntangible injur[y]" of "the Wright Order divest[ing] the State of its regulatory authority." ECF 16-2 at 19. But a state does not suffer "irreparable injury" merely because "federal law preempts conflicting state law." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1292 (11th Cir. 2021). "[T]o conclude otherwise would mean that a state would suffer irreparable injury from all [] federal laws with preemptive effect." *Id.*; *see also Indiana v. Haaland*, No. 24-cv-1665, 2024 WL 5213401, at *9 (D.D.C. Dec. 24, 2024) (rejecting similar state claim of "sovereign injury"). To the extent California wishes to challenge PHMSA's determination that the pipeline is interstate because it transports hydrocarbons from the Outer Continental Shelf—outside of California's jurisdiction—into California, it is already doing so before the Ninth Circuit, with oral argument set for July 7. *See California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026).

Nor has Sable ever claimed that the DPA Order is—as California repeatedly and wrongly asserts—a universal trump card. The consequence of the DPA Order is to preempt State laws that contravene the actions directed by the DPA Order. *See* DPA Order, ECF 16-1 at 9–12; § 707. Sable has argued the DPA provides a defense to certain specific state law claims; it has not argued that it is free to ignore all state laws that touch on any aspect of the SYPS. *See, e.g.*, Opp'n to Mot. for Prelim. Inj. at 21, *Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946-SVW-SSC, ECF 24 (Apr. 3, 2026). As explained above, the preemptive effect of the DPA with respect to individual laws involves fact-intensive inquiries that can be evaluated in specific individual challenges. But the mere possibility of future preemption is not immediate and irreparable harm.

In any event, California's asserted injury from an inability to "effectuat[e] [its] statutes," Mot. 20 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)), cannot support injunctive relief. California's suit requires this Court to choose between federal and state law. Any harm that California would suffer from preemption would, in the event of an injunction, be experienced in greater measure by the United States's inability to "effectuat[e]" the congressionally authorized Defense Production Act. And while the Supremacy Clause means that preemption does not give rise to irreparable injury to a state, the United States *does* experience a serious injury when its enactments are enjoined. *See Trump v. CASA, Inc.*, 606 U.S. 831, 835 (2025).

### *3. The Mere Assertion Of An Ultra Vires Regulatory Action Does Not Constitute Imminent And Irreparable Harm*

The State's one-sentence statement that the "deprivation of constitutional rights" alone constitutes irreparable harm, *see* ECF 16-2 at 7, is likewise incorrect. Courts consistently require an independent showing of irreparable harm. *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 781 F. Supp. 3d 920, 940 (N.D. Cal. 2025) (finding federal government engaged in an "ultra vires act" but that "plaintiffs' contention that they continue to face irreparable organizational harms falls short"); *cf. Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (holding success on the merits does not create a presumption of irreparable harm). California's only contrary case, *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), concerned plaintiffs who were "subjected to unlawful detention" for their immigration status, and the court there found irreparable harm because "Plaintiffs faced a real possibility that they would again be stopped or detained," *id.* at 1002. The theoretical and academic harm inflicted by the existence of an allegedly ultra vires federal regulatory action—especially when California cannot articulate a real-

world injury—bears no similarity to the injury experienced by an individual unconstitutionally arrested and detained.

*4. California Does Not Show Imminent And Irreparable Harm As A Property Owner*

California's passing assertion that the DPA Order "displace[s] State Parks's rights and obligations as a property owner," ECF 16-2 at 20, does not constitute irreparable harm, either. The State does not cite a single case for this proposition. And its parenthetical citation to a CEQA statute does not argue that irreparable harm exists. In any event, as Sable has demonstrated in different briefing before this Court, California cannot point to any harm suffered by State Parks, nor any environmental review State Parks has requested concerning transport of oil through the pipeline—nor could it, because oil contained in an existing underground pipeline has no effect on the environment. *See* Opp'n to Mot. for Prelim. Inj. at 17–19, *Cal. Dep't of Parks & Rec.*, ECF 24 (C.D. Cal. Apr. 3, 2026).

**C. An Injunction Will Harm Sable And The Public Interest**

Because California has not demonstrated irreparable harm, the Court need not reach the remaining *Winter* factors. *See Wit v. United Behav. Health*, No. 14-CV-02346-JCS, 2024 WL 1016069, at *1–2 (N.D. Cal. Feb. 6, 2024). Nevertheless, proper consideration of the balance of equities and public interest also requires denial of the requested injunctive relief. *Winter*, 555 U.S. at 23.

*1. An Injunction Will Seriously Harm Sable's Finances And The Livelihoods Of Hundreds Of Sable Employees*

The Santa Ynez Unit and the SYPS are Sable's sole assets. Since 2024, Sable has invested more than $215 million in safely restoring them to full operation and began oil sales on March 29, 2026. Flores Decl. ¶¶ 9, 44. Shutting down the pipeline segments would be a difficult, complex, time-consuming process that carries additional safety risks. *Id.* ¶ 53. Sable would need to make operational adjustments

at the Las Flores Canyon facility, utilize pipeline intervention tools or "pigs" to remove oil and clean the lines, and repressurize the pipeline segments with nitrogen—all tasks that would require significant time and resources. *Id.* ¶ 53. If operation of the SYPS is enjoined, Sable will lose substantially all its revenue, totaling approximately $4.73 million per day or $143.86 million per month, based on current data and projections. *Id.* ¶ 54. A business disruption of this magnitude will immediately and significantly harm Sable's finances and threaten its ability to pay its approximately 200 full-time employees across California. *Id.* ¶ 56. A court-ordered shutdown would also jeopardize longstanding relationships with contractors, whose jobs are not easily replaced if lost. The combined annual direct employee and contractor payroll supported by Sable is estimated at $100 to $200 million. *Id.* ¶ 57. Shutdown could also cause a decline in the company's share price, destroying value for institutional investors and workers whose pensions and retirement plans hold equity in Sable. *Id.* ¶ 55. These severe harms tip the equities sharply in Sable's favor.

*2. An Injunction Will Harm The Public Interest*

*Winter* itself noted that the balance of equities tips in the government's favor when the President has determined that the challenged activity is "essential to national security." 555 U.S. at 26. Here, the federal government has determined that the SYPS is "a critical energy resource" necessary to address "energy vulnerabilities on the West Coast" and "adversarial dependence" on hostile foreign actors. *See* ECF 16-1 at 10. Courts must be "hesitant to review the executive's declaration of a national emergency," *United States v. Shih*, 73 F.4th 1077, 1091–92 (9th Cir. 2023), and deference is heightened "when the President is exercising congressionally delegated national security authority, for which an appreciable measure of deference is traditionally afforded." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 167 F.4th 1247, 1257 (9th Cir. 2026).

California advances only a single argument about the public interest, claiming it supports an injunction because an injunction would prevent an alleged violation of federal law. *See* ECF 16-2 at 21. But this argument is a tautology: it assumes that the DPA Order is unlawful. If California cannot show success on the merits, as it cannot, then it necessarily has no irreparable harm. Moreover, in the pipeline context, courts have held that, despite compelling allegations of trespass and environmental harm (not present here), where "an immediate shutdown of the pipeline would have significant public and foreign policy implications" *an injunction should not issue*. *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*, 626 F. Supp. 3d 1030, 1037, 1055 (W.D. Wis. 2022); *see also Sierra Club v. Clinton*, 689 F. Supp. 2d 1123, 1147 (D. Minn. 2010) (declining to enjoin pipeline where federal government concluded the national interest would be served by continued operations).

### D. The Severity Of The Harm California Seeks To Cause Necessitates A Bond

Finally, a preliminary injunction must be supported by an appropriate bond. *See* Fed. R. Civ. P. 65(c). California seeks to enjoin an operating business generating approximately $5 million each day, for an indeterminate time, while this litigation proceeds, and California has ample financial resources to post a bond. Given that California is not an officer or agency of the United States, California should be required to post a bond in the amount of $100,000,000.

## V. <u>CONCLUSION</u>

California's motion should be denied.

Dated: May 11, 2026 Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Jessica Stebbins Bina*

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission St., Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company, hereby certifies that this Proposed Opposition to Motion for Preliminary Injunction and Stay contains 7,000 words, which complies with the word limit for Local Rule 11-6.1.

Dated: May 11, 2026

/s/ Jessica Stebbins Bina

Jessica Stebbins Bina

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice forthcoming*)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice forthcoming*)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice forthcoming*)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice forthcoming*)
*matt.leopold@hklaw.com*
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY, | Case No. 2:26-cv-03396-SVW-SSCx<br><br>**DECLARATION OF STEVE RUSCH IN SUPPORT OF SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br><br>Date: June 1, 2026 |

| | |
|---|---|
| Defendants. | Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br>Courtroom: 10A<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

**DECLARATION OF STEVE RUSCH**

I, Steve Rusch, declare as follows:

1. I am the Vice President, Regulatory & Environmental Affairs of Sable Offshore Corp. (together with its subsidiary, Pacific Pipeline Company, "Sable"). I have over 46 years of experience in the oil and gas industry. Before my current position with Sable, I was the Vice President, Environment, Health and Safety ("EHS") and Government Affairs at Freeport-McMoRan Oil & Gas and Plains Exploration & Production Company, a Senior Staff Engineer at Exxon Mobil Corporation, and the Principal at Rusch Consulting. I have a Bachelor's Degree in Civil Engineering from the University of California at Berkeley and have been licensed by the State of California as a Professional Engineer. I have personal knowledge of the facts set forth in this declaration, either directly or through my role at Sable, and, if called as a witness, could and would testify competently to them.

2. I am responding to the Declarations of Dena Bellman, Julie Vance, and Rohit Sharma in Support of Plaintiff's Motion for Preliminary Injunction. Ms. Vance's declaration concerns the California Department of Fish and Wildlife ("CDFW"), in conjunction with Ms. Vance's position as Regional Manager of the Central Region of CDFW. Mr. Sharma's declaration concerns the California Geologic Energy Management Division ("CalGEM"), in conjunction with Mr. Sharma's position as Chief Deputy of Operations for CalGEM. Ms. Bellman's declaration concerns the California Department of Parks and Recreation ("CDPR"), in conjunction with Ms. Bellman's position as District Superintendent of the Channel Coast District at CDPR. I have reviewed these declarations and am responding to various statements made therein.

**Response to Vance Declaration**

3. In paragraphs 8-9 of the Vance Declaration, Ms. Vance describes a 2020 Incidental Take Permit Application filed by Plains Pipeline, L.P., regarding a potential replacement pipeline project. As Ms. Vance notes, that project never moved forward.

4. Sable is operating the existing pipeline: as relevant, here, the existing Segments CA 324 and CA-325. The impacts of that existing pipeline on the environment were addressed in the original comprehensive Environmental Impact Statement and Environmental Impact Report prepared by the federal Bureau of Land Management and the California State Lands Commission prior to construction of the Pipeline Segments and pursuant to the National Environmental Policy Act and the California Environmental Quality Act, respectively. The original EIS/EIR is available at: https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

5. The original EIR/EIS analyzed the potential environmental effects of long-term operation, repairs that might become necessary, and ongoing maintenance. They also considered the risk to species that may occur in and around the pipeline as a result of long-term operation, repairs, and maintenance.

6. The environmental effects of the proposal Plains made, to dig up and entirely replace the pipeline, are substantially different from the environmental effects of operating and maintaining the existing pipeline, and—unlike the effects of operating and maintaining the existing pipeline—were not analyzed in the original EIS/EIR. Thus, the 2020 Incidental Take Permit for a now defunct project has no bearing on operation of the existing pipeline.

7. Paragraphs 10-12 of the Vance Declaration describe various endangered, threatened, or candidate species that are present in Kern, San Luis Obispo, and Santa Barbara Counties. The Declaration does not suggest that Sable's operation or maintenance of the pipeline threatens those species, and Sable has never taken the position that it is not obligated to take appropriate measures to protect ecologically sensitive environments.

8. Paragraph 13-15 describe provisions of the California Fish and Game Code and states that it is possible that some undescribed future repair or maintenance work to the pipeline might implicate those provisions and require permitting. Again, the

Declaration does not suggest that there is any current or planned work related to the pipeline implicating those provisions, and again, Sable has not taken the position that the DPA Order excuses compliance with any particular provision of the California Fish and Game Code. To the contrary, since the DPA Order was entered, Sable has continued to work with the California Department of Fish and Wildlife on past permitting issues.

**Response to Sharma Declaration**

9. In February 2024, Sable acquired the Santa Ynez Unit ("SYU") and Santa Ynez Pipeline System ("SYPS") assets. The SYU consists of approximately 76,200 acres of offshore oil and gas leaseholds located in federal waters off the coast of Santa Barbara County, past the three-mile state boundary line. It includes three offshore production platforms—Platform Heritage, Platform Harmony, and Platform Hondo.

10. The SYPS is a single integrated and continuous pipeline system for moving oil from the SYU onshore and then inland. The SYPS primarily comprises offshore subsea pipeline segments that transport crude oil from the SYU through a wholly owned onshore processing facility in Las Flores Canyon ("LFC") that processes the crude oil, which is then transported through the onshore segments of the system to the Pentland Station in Kern County, California.

11. The LFC has never been regulated by the California Geologic Energy Management Division ("CalGEM").

12. Under Public Resources Code section 3106, CalGEM regulates "the drilling, operation, maintenance, and abandonment of wells and the operation, maintenance, and removal or abandonment of tanks and facilities attendant to oil and gas production," known as "production facilities," to "prevent, as far as possible, damage to life, health, property, and natural resources." Such production facilities are required to provide a bond in an amount determined by CalGEM to

fully cover the costs of plugging and abandonment, facility decommissioning, and site restoration.

13. Facilities are "attendant to" oil and gas production, and therefore subject to CalGEM jurisdiction, only when they are within the lease area of oil and gas fields. LFC is not located within any operating designated oil and gas field nor within the boundary of any oil and gas lease. The LFC is not properly subject to CalGEM's jurisdiction for this and other reasons.

14. However, on September 26, 2024, CalGEM asserted for the first time that LFC is a "production facility" subject to CalGEM's jurisdiction, bonding, and other regulatory requirements. CalGEM has demanded a bond of $57,258,121.

15. On February 2, 2026, Sable filed an action challenging CalGEM jurisdiction. *See Sable Offshore Corp. v. CalGEM, et al.*, 26WM000036, Superior Court, County of Sacramento.

16. Despite not being regulated by CalGEM, the LFC is subject to other regulatory regimes and is complying with them. For example, PHMSA regulates the LFC.

17. Throughout its jurisdictional dispute with CalGEM, Sable has continued to cooperate with CalGEM, whose agents have been accommodated at LFC on five separate days for inspections: October 31, 2024; August 28, 2025; and September 2–4, 2025.

18. Despite this ongoing lawsuit with CalGEM, Sable continues to cooperate with CalGEM, consistent with its legal obligations and a reservation of its rights.

19. On March 16, 2026, counsel for the Department of Conservation contacted Sable regarding an inspection of LFC. Sable promptly responded to this request and, in both its initial response and subsequent communications, has reiterated its willingness to accommodate CalGEM's inspection request, subject to

a full reservation of Sable's rights at law and in equity. This includes, without limitation, the right to dispute and challenge any asserted jurisdiction by CalGEM over LFC, and the requirement that any inspection proceed in accordance with the applicable provisions of the California Civil Discovery Act ("CDA") in light of the parties' ongoing dispute concerning CalGEM's jurisdiction over LFC.

20. Sable further offered to identify an inspection date earlier than the 30 days from service required under the CDA, even as soon as the following week, provided that Sable is afforded sufficient time to receive CalGEM's demand and serve its written objections in advance of any inspection.

**Response to Bellman Declaration**

21. At the time Sable acquired the SYPS, Segments CA-324 and CA-325 were subject to a Consent Decree, to which both the United States and the State of California, including CDPR, were parties. The Consent Decree contemplated that oil flow through Segments CA-324 and CA-325 could be resumed if certain conditions were met. Since acquiring the SYPS, Sable has worked tirelessly with both state and federal regulators, including those at California's Office of the State Fire Marshal ("OSFM") and the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") to ensure Segments CA-324 and CA-325 are repaired and maintained in a manner consistent with the Consent Decree's requirements and other requirements under applicable pipeline safety regulations.

Right of Entry Permits

22. In connection with this work, Sable and its predecessors in interest obtained a series of "Right of Entry Permit[s]" from CDPR that allowed for maintenance and repairs to be completed on a portion of Segment CA-325 located within Gaviota State Park (the "Park"). Consistent with the Consent Decree's acknowledgment that oil flow through Segment CA-325 under the Park could

resume if the Consent Decree's conditions were satisfied, some of these permits explicitly contemplated that oil could flow through Segment CA-325 in the future. For example, the 2019 Right of Entry Permit, attached hereto as **Exhibit A**, authorized access to the Park for both the "maintenance and operations" of Segment CA-325, incorporated the original easement conditions, referred to "pipeline production," and required the pipeline owner to "take all necessary precautions" "associated with ensuring pipeline is in safe working order." Similarly, the 2022 Right of Entry Permit, attached as **Exhibit B**, included notification requirements "[i]n the event of an oil spill of pipeline contents onto State land."

23. The most recent Right of Entry Permit, attached to the Bellman Declaration, ECF 16-3, Ex. E, lasts until July 26, 2026. *See id.* Ex. E ¶ 3. It grants Sable "permission to enter" the Park "for the purpose of pipeline maintenance and access for existing [Segment CA-]325" through July 26, 2026. *Id.* Ex. E ¶ 1.

24. Sable has at all times complied with the terms of the Right of Entry Permits.

<u>Timeline of Easement Renewal Negotiations</u>

25. Although the Consent Decree does not require that Sable obtain a renewed easement from CDPR for the portion of Segment CA-325 located within the Park before resuming petroleum transportation through Segment CA-325, CDPR took the position with Sable that an easement renewal was required. Sable initially planned to renew the easement immediately upon purchasing the Santa Ynez Pipeline System. To that end, on April 11, 2024, Sable sent a formal letter to Kate Wilson, Senior Park and Recreation Specialist and Chief Planner for the Channel Coast District, requesting initiation of the process to renew the 1987 pipeline easement through the Park.

26. On May 2, 2024, Sable met with CDPR to discuss the process for renewing the easement and making the needed repairs to comply with the Consent

Decree. Sable informed CDPR that the pipeline would be repaired, not replaced. Sable informed CDPR that, at that time, it anticipated resuming oil transportation in the repaired line by September 2024. In response, CDPR stated that the process of obtaining the easement would be extensive, likely taking a year or more. Sable's notes concerning this call reflect that both parties understood that oil would flow through Segment CA-325 during the period while the easement was being finalized.

27. In light of the need to make immediate repairs to Segment CA-325 in compliance with the Consent Decree, Sable negotiated with CDPR to obtain a Right of Entry Permit—just as Sable's predecessors in interest had done—to begin repairing the portion of Segment CA-325 in the Park immediately. Relying on CDPR's representations and in good faith, Sable engaged in extensive discussions with CDPR throughout 2024 to negotiate Right of Entry Permits to complete the repairs.

28. In August and September 2024, Sable provided detailed information, including engineering reports, to CDPR regarding planned repairs to Segment CA-325 and paid a fee of approximately $19,000. CDPR responded that it "believe[d] the [repair work] qualified for an exemption" under CEQA, "and could be processed as such."

29. On October 25, 2024, Sable engaged in a Zoom call with CDPR in which Sable reiterated that it was seeking both a long-term easement renewal and Right of Entry Permits to complete repairs in order to safely resume the transportation of oil.

30. On December 20, 2024, CDPR responded with a formal letter requiring a comprehensive project description before it would evaluate Sable's easement renewal request. CDPR stated that Sable would need to include: the scope of work permitted by the easement, access points and locations of proposed activity, frequency of access for operations, management and maintenance, conditions

imposed by other agencies, details on emergency responses, and information on how monitoring and other work would occur over the life of the easement. CDPR stated that, once it had this information, it would then "be better able to articulate the process and cost to you of obtaining an easement, including the necessary indemnifications and fees required for any transactional work and environmental review associated with a final decision."

31. Sable's representatives had a meeting and multiple follow up calls in January 2025 to further discuss the proposed easement renewal.

32. Meanwhile, Sable continued to move forward with pipeline repairs and negotiated an additional agreement regarding excavation in the Park needed to complete repairs contemplated by the Consent Decree. On May 9, 2025, CDPR issued a Notice of Exemption from CEQA with respect to these repairs. That Notice is attached to the Bellman Declaration. *See* Bellman Decl., Ex. A. The Notice of Exemption stated, "[n]o potential for significant or cumulative impacts to the environment is anticipated in compliance with CEQA § 15301, 15302, 15304, and 15305, as the project consists of repairs to an existing facility with no expansion of use. The footprint of the pipeline remains the same." *Id.* at 9. The Notice of Exemption further stated that, under the existing permit, "project activities are undertaken within an existing right-of-way and the permit requires the right-of-way to be restored to its condition prior to the project; and the permit requires the permittee to comply with all conditions otherwise authorized by law." *Id.*

33. On May 22, 2025, Sable met with CDPR to discuss the easement renewal process and the steps required. During that meeting, representatives for the State again stated that further CEQA review would not be required.

34. On June 27, 2025, CDPR sent Sable a letter laying out its easement application requirements.

35. On July 3, 2025, CDPR's Chief Counsel informed Sable's representatives that it was likely that easement renewal was exempt from the California Environmental Quality Act ("CEQA") and that no further environmental review would be needed, because environmental review had already been completed at the time Segment CA-325 was initially constructed. This was consistent with the position that CDPR had taken with respect to the repairs in the May 9, 2025 Notice of Exemption, and with CDPR's prior statements to Sable.

Sable's Repeated Unsuccessful Attempts to Meet with CDPR

36. Meanwhile, throughout 2025, the California Legislature—supported by Governor Newsom—negotiated, drafted, and passed Senate Bill 237 ("SB 237"). In return for allowing oil production in Kern County, SB 237 expressly aimed to make it substantially harder for Sable to resume petroleum transportation by imposing new regulatory requirements—as evidenced by its legislative history directly naming Sable and referring to the Santa Ynez Pipeline System. SB 237 was signed into law on September 19, 2025, with an effective date of January 1, 2026.

37. As SB 237 moved towards passage, CDPR and other state agencies abruptly stopped cooperating with Sable's efforts to safely resume petroleum transportation through the SYPS, including Segment CA-325.

38. On July 11, 2025, Sable submitted a formal application for an easement. Despite CDPR's prior representations that it would not likely consider further environmental review to be necessary, State Parks Senior Staff Counsel Emma Siverson responded that it was "much too early in the process" for a new easement and that the easement process would "require[] an appraisal and compensation" and, "[d]epending on what your project entails, it may also include mitigation." CDPR offered only to renew the annual Right of Entry Permit for maintenance access and recommended a meeting to discuss the easement process. CDPR also suggested Sable's operations "could require CEQA and cultural monitoring."

39. Notwithstanding CDPR's change of position, Sable continued to cooperate with CDPR in this process. Sable submitted a real estate appraisal to the Department of General Services on July 4, 2025, and a revised appraisal based on Department of General Services comments on August 13, 2025.

40. On July 17, 2025, Sable submitted additional Paragon title reports.

41. On August 7, 2025, Sable submitted a Biological Resources Assessment.

42. On August 11, 2025, Sable submitted a Cultural Resources Assessment.

43. On August 24, 2025, Sable submitted updated preliminary title reports.

44. On September 9, 2025, CDPR abruptly canceled an easement process meeting it had requested. However, I understand that CDPR wrote that the meeting could be rescheduled to early the following week.

45. I understand that Sable's representative responded immediately to Ms. Siverson, asking about the new meeting date. He received no response.

46. I understand that Sable's representative followed up on September 11, 2025, to Ms. Siverson and her colleague, Chief Counsel Tara Lynch, but received no reply.

47. I understand that Sable's representative followed up again on September 14, 2025, and on September 15, 2025, with both Ms. Siverson and Ms. Lynch, but received no reply.

48. On September 17, 2025, CDPR stated that it would "reach out as soon as we can to schedule a meeting with Sable."

49. I understand that Sable's representative followed up again with a phone call to Ms. Siverson on September 22, 2025, but received no response.

50. I understand that Sable's representative followed up again with a call to Ms. Siverson on September 24, 2025. Ms. Siverson responded by email, stating

only that "State Parks is reviewing internally. I will let you know as soon as we are ready to meet."

51. I understand that Sable's representative followed up again on September 25, 2025, with a message to Ms. Lynch, but received no response.

52. I understand that Sable's representative followed up again on September 30, 2025, with a call to Ms. Lynch, but received no response.

53. I understand that Sable's representative followed up again on October 7, 2025, with a call to Ms. Lynch, but received no response.

54. I understand that Sable's representative followed up again on October 28, 2025, with a call to Ms. Lynch, but received no response.

55. I understand that Sable's representative followed up again on November 6, 2025, with a message to Ms. Siverson asking for a call, but received no response.

56. On November 13, 2025, CDPR finally responded, stating that, at this time, "we will not be preparing an exemption for the project," but rather was preparing an "Initial Study." A true and correct copy of CDPR's email and the reply of Sable's counsel is attached hereto as **Exhibit C**. CDPR stated that they would send a map showing the footprint of the proposed easement, covering not just Segment CA-325 but any area that Sable needed to service the pipeline. (Of note, CDPR did not actually send the map until January 2026.) CDPR noted that the easement footprint diagram could impact the scope of the appraisal and that a survey would likely be required. CDPR also requested additional data not included in Sable's project description, including data on how often repairs were expected to occur based on Segment CA-325's age and construction.

57. CDPR's proposal completely disregarded the original Environmental Impact Report/Environmental Impact Statement prepared for Segment CA-325 and other onshore pipeline segments, which minimized Segment CA-325's pipeline

operational right-of-way, reduced the right-of-way to a maximum of 50 feet in certain sensitive areas, and required the route to avoid other sensitive areas.

58. CDPR's proposal was also not reasonable because the scope of a repair depends on the type of repair required. For this reason, Sable's practice is to send CDPR a plan for each repair to confirm compliance with the applicable Right of Entry Permit before performing the repair.

59. I understand that, on November 13, 2025, Sable's representative wrote to Ms. Siverson, asking for a "particular reason or basis" for CDPR's change in view on the application of CEQA exemption, but received no response. *See* Ex. C.

60. While I understand that CDPR is now claiming in this lawsuit that easement renewal is not exempt from CEQA, that is a change from prior positions CDPR has taken over time. Nothing under Sable's proposed easement with CDPR would authorize Sable to conduct any activities in the Park that were not already evaluated under CEQA in the original EIR/EIS, or which CDPR has not already found to be exempt from further CEQA review. When a third-party environmental organization had asked CDPR to find that the easement renewal required new CEQA review, Sable rebutted those arguments on the record in a letter on September 14, 2025. A true and correct copy of Sable's letter is attached hereto as **Exhibit D**. Sable explained and demonstrated that "renewal of the Easement falls squarely within the prior Environmental Impact Report." *See* Ex. D.

61. I understand that Sable's representative followed up on December 22, 2025, to Ms. Siverson and Ms. Lynch.

62. On December 26, 2025, Ms. Siverson requested a meeting with Sable, promising to send "a list of available times" within the "next couple days."

63. I understand that, on December 30, 2025, Sable's representative followed up, but Ms. Siverson still had no meeting times to propose.

64. On December 31, 2025, Ms. Siverson sent a corrected Right of Entry Permit, but still no meeting times.

65. I understand that, on January 2, 2026, Sable's representative asked for an immediate meeting.

66. A meeting finally took place on January 5, 2026. I understand that, at that meeting, CDPR reported that it had not commenced the "Initial Study" it had claimed on November 13, 2025, was necessary for environmental review.

67. Another meeting was set for January 26, 2026. Sable continued to try to meet CDPR's ever-changing demands, but CDPR continued to stonewall. Further, I understand that Sable's counsel sought clarification as to the scope of biological and cultural survey information CDPR wanted for its review. In a response email that was accidentally sent to Sable's counsel, CDPR wrote back, "I would tell him that it is not our job to tell them what we need; it is their job to submit any and all information thet [*sic*] they want included in our evaluation."

68. On February 11, 2026, Sable's representatives met again with Ms. Siverson and her colleague Kathryn Tobias. CDPR stated at the meeting that it would take them until at least August 2026 to complete the "Initial Study" it claimed was necessary. Sable's representatives explained that the law was clear that the original Environmental Impact Report/Environmental Impact Statement was still in effect, and that no new review was necessary, but continued to cooperate and provide CDPR with the materials it claimed to need.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on May 11, 2026, in Houston, Texas.

[signature]

Steve Rusch

# EXHIBIT A

| | |
|---|---|
| **RIGHT OF ENTRY PERMIT** | Agency: Department of Parks and Recreation<br>Project: Plains Pipeline<br>Gaviota State Park |

This Right of Entry Permit (Permit) is made and entered into this 31st day of July, 2019, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and Plains Pipeline L.P. hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Permittee or Party, or collectively the Parties.

**RECITALS**

- **Whereas**, the State owns, operates and maintains the State Park known as Gaviota State Park, in the County of Santa Barbara, State of California; and
- **Whereas**, Permittee has applied to State for permission to access Gaviota State Park for purposes of carrying out Permittee's **maintenance and operations** of the Plains All American Pipeline (the Project); and
- **Whereas**, the State desires to accommodate Permittee's request for permission to enter Gaviota State Park for purposes of the Project, as provided herein and as, and to the extent, such Project was ultimately described, permitted, approved and conditioned by Permittee's environmental document entitled Celeron/All American and Getty Pipeline Projects (the Environmental Document) , and subsequently attached hereto as **Exhibit A** and herein incorporated by reference, and as may be conditioned by any other regulatory agency having jurisdiction, if applicable.

**TERMS AND CONDITIONS**

**Now therefore**, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:** By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted and/or described on **Exhibit B** (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of operating and maintaining the existing Plains All American Pipeline Line 903, the limits of which are described in **Exhibit A** (the Environmental Document).

2. **Permit Subject to Laws and Regulatory Agency Permits:** This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

   Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.

3. **Term of Permit:** This Permit shall only be for the period beginning on July 27, 2019 and ending on July 26, 2020 or as may be reasonably extended by written mutual agreement of the Parties.

4. **Consideration:** Permittee agrees to pay State the sum of twenty-eight thousand seven hundred fifty four dollars and ninety three cents ($28,754.93) as consideration for the rights granted by this Permit. Payment is due upon execution of this Permit. Fee Schedule calculation shown on **Exhibit C**.

5. **Permit Subject to Existing Claims:** This Permit is subject to existing contracts, permits, licenses, encumbrances and claims which may affect the Property.

6. **Waiver of Claims and Indemnity:** Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted. Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7. **Contractors:** Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder. Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein. Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see DEFAULT paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8. **Insurance Requirements: Plains currently has a Certificate of insurance on file covering until August 1, at which time they will send the new certificate to cover the remainder of the term.** As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

**A. Commercial Permittees**

Permittee shall maintain motor vehicle liability with limits of not less than $1,000,000 per accident. Such insurance shall cover liability arising out of a motor vehicle, including all owned, hired, and non-owned motor vehicles.

Permittee shall maintain statutory Workers' Compensation and employer's liability insurance coverage in the amount of $1,000,000/employee/disease/each accident, for all its employees who will be engaged in the performance of work on the Property, including special extensions where applicable. Said policy shall include a waiver of subrogation in favor of State. If the permittee has no employees and/or the owner(s) have elected not to be covered by workers' compensation, Permittee shall provide State with a written confirmation that Permittee is not required to be, and/or has elected not to be, covered by Workers' Compensation.

Permittee shall procure commercial general liability insurance at least as broad as the most commonly available ISO policy form CG 0001 covering premises operations, products/completed operations, personal/advertising injury and contractual liability with limits not less than $1,000,000 per occurrence and $2,000,000 general aggregate. Said policy shall apply separately to each insured against whom any claim is made or suit is brought subject to the Permittee limits of liability

Each policy of insurance required by this provision shall: (a) be in a form, and written by an insurer, reasonably acceptable to State and (b) be maintained at Permittee's sole expense.

Permittee shall provide to the State within five (5) business days following receipt by contractor a copy of any cancellation or non-renewal of insurance required by this Permit.

Insurance companies issuing such policies shall have a rating classification of "A-" or better and financial size category ratings of "VII" or better according to the latest edition of the A.M. Best Key Rating Guide. All Insurance companies issuing such policies shall be licensed admitted insurers or eligible surplus lines insurers authorized to do business in the State of California.

Said motor vehicle liability and commercial general liability policies shall contain an endorsement naming the STATE OF CALIFORNIA and the CALIFORNIA DEPARTMENT OF PARKS AND RECREATION as an additional insured at no cost to State. The endorsements shall be provided and not substituted by referring to such coverage on the certificate of insurance.

Permittee shall provide to State evidence that the insurance required to be carried by this Permit, including the endorsements affecting the additional insured status and waiver of subrogation, is in full force and effect and that premiums therefore have been paid. Such evidence shall, at State's discretion, be in the form of a Certificate of Insurance **or** DPR Form 169A, Certificate of Insurance for

Concession Contracts/Special Events, **or** a certified copy of the original policy, including all endorsements.

Permittee is responsible for any deductible or self-insured retention contained within the insurance program.

Should Permittee fail to keep the specified insurance in effect at all times, Permittee shall be considered to be in default of this Permit, and State may, in addition to any other remedies it has, terminate this Permit.

Permittee shall require and ensure that all contractors and subcontractors have adequate insurance meeting the coverage requirements in this provision.

Any insurance required to be carried shall be primary and not excess to any other insurance carried by State.

Coverage shall be in force for the complete term of this Permit, including any extension thereof, and for all work being done for which this Permit is required.

9. **Reservation of Rights:** State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

10. **Access Limits and Conditions:** Access to the Property shall be limited to the access designated by State as described by conditions outlined in original Easement dated August 6, 1987 attached as **Exhibit D** and its subsequent amendment dated September 25, 1995 and attached as **Exhibit E**.

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least forty-eight (48) hours prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property. Permittee shall also notify the State contact[s] listed below in writing at least forty-eight (48) hours prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**
Contact: Greg Martin, Superintendent
District: Channel Coast
Address: 911 San Pedro St
Ventura, CA 93001
Telephone: 805-585-1847
Fax: 805-585-1857

**PERMITTEE:**
Contact: George N. Polydoros Jr.

Address: 333 Clay St. Suite 1600
Houston, Texas, 77002
Telephone: 713-993-5681
Fax: 713-646-4146

12. **Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13. **Public Safety:** Permittee shall take all necessary precautions and affix all available monitoring equipment associated with ensuring pipeline is in safe working order and in compliance with all regulatory requirements of all agencies. In the event such compliance is not achieved, the pipeline shall cease operation until such time that repairs can be permitted and executed.

14. **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified in **Exhibit D** shall be followed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the term of this document. State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site. Permittee shall abide by District Superintendent

or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring. During excavation, the State archaeological monitor may observe and report to the State on all excavation activities. State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee. The specific protocol, guidelines and channels of communication outlined by the California Native American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed. Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days. Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:** Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first. This obligation shall survive the expiration or termination of this Permit.

16. **Performance Bond:** If required by State in order to ensure that Permittee performs and completes its obligations in accordance with the terms of the Permit, Permittee shall obtain a Performance Bond in the amount of from a surety duly licensed in the State of California. Permittee shall provide State with a copy of such insurance bond.

17. **Right to Halt Work:** The State reserves the right to halt work and/ or pipeline production and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

18. **Use Restrictions:** The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park. Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

19. **State's Right to Enter:** At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all

places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

Permittee shall not interfere with State's right to enter.

20. **Protection of Property:** Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

(a) Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

(b) Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

(c) Permittee shall not cut, prune or remove any vegetation upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(d) Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(e) Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as herein permitted, or subsequently approved in writing by the District Superintendent.

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

21. **Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

22. **State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at

Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

23. **Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

24. **Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

25. **Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

26. **Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

27. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

28. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

29. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

30. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

| | |
|---|---|
| **STATE OF CALIFORNIA**<br>Department of Parks and Recreation | **PLAINS PIPELINE, L.P.**<br>Plains GP LLC<br>Its General Partner |
| By: ______________________ | By: ______________________ |
| Name: Greg Martin<br>Title: District Superintendent | Name: George N. Polydoros Jr.<br>Title: Vice President |

# EXHIBIT B

| **RIGHT OF ENTRY PERMIT** | Agency: Department of Parks and Recreation<br><br>Project: **Plains Pipeline 2022-23**<br>Gaviota State Park |
|---|---|

This Right of Entry Permit (Permit) is made and entered into this 25th day of **July, 2022**, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Plains Pipeline, L.P.**, hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

**RECITALS**

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota SP, in the County of Santa Barbara, State of California; and
- **Whereas**, Permittee has applied to State for permission to access Gaviota SP for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 903 that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 903 in Gaviota SP has expired. **Activities related to any new or future projects, or construction of a new pipeline are not included in the Project and are not covered by this Right of Entry.**
- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota SP for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline.** The environmental document is attached hereto as Exhibit "A" and Exhibit "A-1" and herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

**TERMS AND CONDITIONS**

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:** By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A for the purpose of **pipeline maintenance and access for existing Line 903 that is currently subject to closure orders** (the Project), **and detailed below:**

   a) **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
   b) **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance withal applicable laws, rules, and regulations.**
   c) **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required.**
   d) **In the event of an oil spill of pipeline contents onto State land, Permittee shall immediately notify State's District Superintendent or authorized representative. Information to be reported includes but is not limited to location, volume of oil spilled, cause, time of spill, name and callback number of person reporting, and action taken so far. Thereafter, a written report will be filed with the State the summary of all details of the spill event.**
   e) **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads. Permittee shall be responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent.**

**If Permittee damages any road it shall immediately repair the damage in accordance with State standards.**

f) **In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.**

g) **Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.**

h) **No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.**

2. **Permit Subject to Laws and Regulatory Agency Permits:** This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

   Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.

3. **Term of Permit:** This Permit shall only be for the period beginning on **July 27, 2022**, and ending on, **July 26, 2023** or as may be reasonably extended by written mutual agreement of the Parties.

4. **Consideration:** Permittee agrees to pay State the sum of **$ 38,740.00** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5. **Permit Subject to Existing Claims:** This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6. **Waiver of Claims and Indemnity:** Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted. Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7. **Contractors:** Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder. Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein. Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see DEFAULT paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8. **Insurance Requirements:** As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

   **General Provisions Applying to All Policies**

   A. **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

   B. **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor

fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

C. **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

D. **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

E. **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management. If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

F. **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

G. **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

H. **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR). The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

I. **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

J. **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State. This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract. Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence. Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

9. **Reservation of Rights:** State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

10. **Access Limits and Conditions:** Access to the Property shall be limited to the access designated by State .

- **Access to Gaviota State Park shall be for access to and maintenance of existing 903 pipeline as outlined in original lease and amendment. See Exhibits "A" and "A-1".**
- **Activities related to any new or future projects, or construction of a new pipeline are not covered by this Right of Entry.**

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least forty-eight (48) hours prior to any entry upon the

Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property. Permittee shall also notify the State contact[s] listed below in writing at least forty-eight (48) hours prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

| **STATE:** | **PERMITTEE'S CONTACT:** |
|---|---|
| Contact: Dena Bellman,<br>District Planning Chief<br>Dena.Bellman@Parks.Ca.Gov | Contact: George Polydoros Jr.,<br>Vice President<br>GPolydoros@PAALP.Com |
| District: Channel Coast<br>Address: 911 San Pedro Street<br>Ventura, CA | Address: 333 Clay St, Ste. 1600<br>Houston, Texas 77002 |
| Telephone: (805) 331-3955 | Telephone: (713) 993-5173 |

**12. Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

**13. Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone. Permittee shall remove such fencing within two (2) days after the completion of work. Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

**14. Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work. State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site. Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring. During excavation, the State archaeological monitor may observe and report to the State on all excavation activities. State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee. The specific protocol, guidelines and channels of communication outlined by the California Native American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed. Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days. Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:** Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first. This obligation shall survive the expiration or termination of this Permit.

16. **Performance Bond:** If required by State in order to ensure that Permittee performs and completes its obligations in accordance with the terms of the Permit, Permittee shall obtain a Performance Bond in the amount of from a surety duly licensed in the State of California. Permittee shall provide State with a copy of such insurance bond.

17. **Right to Halt Work:** The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

18. **Use Restrictions:** The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

    Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park. Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

    Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

    Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

19. **State's Right to Enter:** At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

    Permittee shall not interfere with State's right to enter.

20. **Protection of Property:** Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

    (a) Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

    (b) Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

    (c) Permittee shall not cut, prune or remove any vegetation upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (d) Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(e) Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as herein permitted, or subsequently approved in writing by the District Superintendent.

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

**21. Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

**22. State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

**23. Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

**24. Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

**25. Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

26. **Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

27. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

28. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

29. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

30. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: [signature]

Date: 7/25/2022

Name: **Greg Martin**
Title: District Superintendent
Channel Coast District

**PLAINS PIPELINE L.P.**

Signature: [signature]

Date: 7-27-22

Name: **George Polydoros, Jr.**
Title: Vice President of Plains GP LLC

# EXHIBIT C

# RE: Gaviota SP - Sable Easement Req

| | |
|---|---|
| **From:** | "Marsh, Christian L." <christian.marsh@stoel.com> |
| **To:** | "Siverson, Emma@Parks" <emma.siverson@parks.ca.gov> |
| **Date:** | Thu, 13 Nov 2025 14:59:18 -0800 |

Thank you Emma. I would appreciate the opportunity to discuss at your earliest convenience. Is there a particular reason or basis for the change in the District's view on the application of the exemptions?

Best,

Christian

**Christian Marsh** | Partner
**STOEL RIVES LLP** | 1 Montgomery Street, Suite 3230 | San Francisco, CA 94104
Direct: (415) 500-6539
christian.marsh@stoel.com | Bio | vCard | www.stoel.com

Stoel Rives LLP

This email may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient. Any unauthorized review, use, or distribution is prohibited and may be unlawful.

**From:** Siverson, Emma@Parks <Emma.Siverson@parks.ca.gov>
**Sent:** Thursday, November 13, 2025 2:37 PM
**To:** Marsh, Christian L. <christian.marsh@stoel.com>
**Subject:** Gaviota SP - Sable Easement Req

Hi Christian,

Thank you for your patience while State Parks was reviewing Sable's easement request materials. State Parks will be preparing an Initial Study to determine the proper CEQA documentation. At this time, we will not be preparing an exemption for the project.

Regarding the footprint of the easement for the project description, State Parks will be sending you a map for your review. As I explained in a previous email, the footprint of the proposed easement will cover any area that the applicant needs to service the easement.

Thanks,
Emma

Emma Siverson (she, her, hers)
Senior Staff Counsel
California State Parks
715 P Street
Sacramento, California 95814
(916) 584-5567 Mobile

SAVE OUR WATER
saveourwater.com

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient. Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including, but not limited to, the Electronic Communications Privacy Act. If you are not the intended recipient, please immediately contact the sender and destroy all copies of the communication.

# EXHIBIT D

Stoel Rives LLP

September 14, 2025

Christian L. Marsh
1 Montgomery Street, Suite 3230
San Francisco, CA 94104
D. (415) 500-6539
christian.marsh@stoel.com

**VIA EMAIL**

Armando Quintero, Director
California Department of Parks and Recreation
715 P Street
Sacramento, California 95814
Armando.Quintero@parks.ca.gov

Dena Bellman, District Superintendent
California Department of Parks and Recreation
Channel Coast District
911 San Pedro Street
Ventura, California 93001
Dena.Bellman@parks.ca.gov

**Re: Pacific Pipeline Company's Easement Application for Line CA-325 (Gaviota State Park) and Compliance with the California Environmental Quality Act**

Dear Mr. Quintero and Ms. Bellman:

I am writing on behalf of Pacific Pipeline Company ("PPC") to address the July 29, 2025 letter from the Environmental Defense Center ("EDC")[1] regarding PPC's pending application to renew its pipeline easement for Line CA-325 through Gaviota State Park (the "Easement"). Citing authorities generally applicable to new projects (and not PPC's long-existing facilities already subjected to extensive environmental analysis), EDC asks the California Department of Parks and Recreation ("State Parks") to conduct a new round of environmental review of the renewal Easement under the California Environmental Quality Act ("CEQA"). However, renewal of the Easement does not require new construction within Gaviota State Park. Instead, State Parks' renewal of the Easement falls squarely within the prior Environmental Impact Report's ("EIR") impact analysis and the Existing Facilities Exemption (Class 1).

EDC's contentions mischaracterize the scope of the Easement, neglect to acknowledge State Park's limited role as a responsible agency, and ignore the standards disfavoring subsequent review under CEQA. Thousands of permits and entitlements are renewed each year for the ongoing operation of regulated facilities. Courts have consistently recognized that each such

[1] The July 29, 2025 EDC Letter states that it was submitted on behalf of Get Oil Out!, Santa Barbara County Action Network, Sierra Club, by and through the Santa Barbara-Ventura Chapter, Santa Barbara Channelkeeper, and the Environmental Defense Center.

renewal is not an occasion to examine past CEQA compliance for existing facilities and operations. This is particularly true where, as here, the responsible agency's jurisdiction over the whole project is limited. State Parks, as a responsible agency, does not regulate pipeline safety on behalf of the State, and the Easement comprises only four miles (about 3%) of the roughly 123-mile pipeline. Many of EDC's assertions pertain to other pipeline segments or overall pipeline safety *and not* those pipeline segments within Gaviota State Park.

As it stands, future pipeline service and maintenance activities that may occur within Gaviota State Park will be minimal and non-invasive. While there are new safety protocols in place that may require subsurface investigations within Gaviota State Park at some point during the Easement's 30-year term, the precise location and frequency are speculative and would occur within the existing, previously disturbed right-of-way ("ROW"). As required by the California Office of the State Fire Marshal ("OSFM"), PPC must conduct annual in-line inspection integrity tool runs. (Easement Application, p. 4.)[2] In the event an anomaly is detected that warrants further investigation or repair, PPC must coordinate with OSFM and will coordinate with the State Parks Superintendent to ensure that any maintenance and repair activities are protective of visitor safety and minimize possible effects on park operations or resources. (*Ibid.*) While the method of potential future repairs may vary, no repair method would add, enlarge, or expand the pipeline or its operations. (Easement Application, p. 5.) To the contrary, such repairs would occur within the pipeline's existing ROW where the EIR anticipated impacts would be permanent. Additionally, PPC will restore any disturbed sites upon completion of potential future repairs. (*Ibid.*) Under these circumstances, the Easement approval is exempt from CEQA and no subsequent environmental review by State Parks is warranted or required.

## I. BACKGROUND

### A. Original Environmental Impact Report and Approvals.

The California State Lands Commission and Bureau of Land Management originally prepared an EIR/Environmental Impact Statement (collectively referred to herein as the "EIR") for the Celeron All American and Getty Pipeline ("Pipeline Project") (SCH No. 1983110902) to satisfy the requirements of CEQA and the National Environmental Policy Act ("NEPA"). The State certified the EIR for the Pipeline Project in 1985. The Pipeline Project included an approximate 123-mile pipeline segment proposed to extend from Las Flores Canyon in Santa Barbara County to Pentland Station in Kern County, California. That segment, which encompasses Lines CA-325 and CA-324, is now referred to as the Las Flores Pipeline System. A four-mile stretch of Line CA-325 passes through Gaviota State Park. The EIR fully evaluated the Pipeline Project, including the segment through Gaviota State Park.

---

[2] In California, OSFM oversees and exercises authority over oil pipeline safety. (See Gov. Code, §§ 51010, 51013.1, subd. (g)(2).)

The EIR analyzed the environmental effects of the Pipeline Project through construction, operation, maintenance, and abandonment. Based on feedback received in the public scoping process, the EIR focused on (among other impact areas) potential impacts to river crossings, access, hydrology, biology, historical and cultural resources, employment, and impacts related to oil spills. The EIR found that the Pipeline Project would have potentially significant construction and operation impacts. (DEIR, p. S-2.) Construction impacts would result from clearing, trenching, and backfilling construction activities, and by the presence and needs of the labor force. (*Ibid*.) Operational impacts, on the other hand, would primarily result from potential oil spills and leaks. (*Ibid*.) The EIR found the Pipeline Project would result in significant and unavoidable impacts from construction and operation to soils, surface water, groundwater, aquatic biology, terrestrial biology, land use and recreation, cultural resources, visual resources, and noise. (See DEIR, pp. S-4–S-14.)

**B. Pre-existing Easement and Right-of-Way Through Gaviota State Park.**

On August 6, 1987, State Parks granted a pipeline easement to PPC's predecessor for the four-mile pipeline segment within the Gaviota State Park (document No. 88-02049 of the Official Records of Santa Barbara County, California). As one of many responsible agencies, State Parks relied on the EIR certified by the State Lands Commission when it approved the Easement, which in turn allowed for the construction, operation, and ongoing maintenance of the pipeline together with its appurtenances for the transportation of oil across Gaviota State Park.

On July 11, 2025, PPC submitted a request for renewal of the Easement for Line CA-325. All potential maintenance work within the Easement is consistent with historical maintenance, operation, and investigation conducted by the former operators. PPC prepared and submitted two detailed Cultural and Biological Resources Evaluations along the previously disturbed ROW. The Cultural Resources Evaluation included background research and archival research of the project area and records searches, and review of official maps and records and historical aerial photographs and pedestrian surveys. The report concluded that renewal of the Easement will not impact deposits and features associated with known cultural resources in Gaviota State Park. The Biological Resources Evaluation documented existing conditions along the CA-325 pipeline easement right-of-way through Gaviota State Park and evaluated the potential for any substantial direct or indirect effects on plant or animal life and wetland or riparian resources. The Evaluation concluded that implementation of the applicable mitigation measures from the original EIR, as well as construction best management practices and site restoration that is part of the proposed activity, would address any potential effects of pipeline maintenance on plant and animal life. As such, operation, maintenance, inspection, and possible future repair activities are not expected to adversely affect plant or animal life, native plant communities, or otherwise reduce the habitat for fish and wildlife species.

**C. Regulation of the Pipeline and Response to Release.**

**1. PHMSA and OSFM's exclusive authority over safety and restart of Line CA-325.**

Under the federal Hazardous Liquid Pipeline Safety Act, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") is granted authority to regulate oil pipelines in "furtherance of the highest degree of safety in pipeline transportation and hazardous materials transportation" and may certify appropriate state authorities to prescribe and enforce safety standards and practices of intrastate pipelines. (49 U.S.C. §§ 108, subd. (b), 60105, subd. (a).) In California, OSFM is the ***sole*** agency certified by PHMSA and authorized by the California Legislature to exercise authority over oil pipeline safety. (See Gov. Code, §§ 51010, 51013.1, subd. (g)(2).) In a clear expression of intent to occupy the field of regulatory, safety, and enforcement authority over intrastate oil pipelines, Government Code section 51010 states that "[i]t is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise *exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines*. . . ." (Emphasis added.) *State Parks has no regulatory jurisdiction over pipeline safety and its authority is limited to the small portion of the pipeline within state park boundaries to issue, and in this case renew, easements and rights of way for pipeline access.* (See Pub. Resources Code, § 5012.) Accordingly, CEQA does not grant State Parks the obligation or authority to second-guess OSFM's judgment in its evaluation of pipeline safety through State Parks' easement process. Moreover, State Parks does not possess the expertise to engage in a review of OSFM's independent expert judgment as to pipeline safety—an area where it is the sole designated expert authority under California and federal law.

**2. The 2020 Consent Decree reaffirms that OSFM is the only agency that can authorize restart of Line CA-325.**

After the 2015 Refugio oil spill, PHMSA, OSFM, and multiple federal and state agencies—including State Parks—sued the former operator of the pipeline. The lawsuit resulted in a consent decree entered by the U.S. District Court in 2020 ("Consent Decree"), which recognizes the vested right of any successor owner of the pipeline to restart pipeline operations after it meets certain safety requirements and obtains approval by OSFM. State Parks approved the Consent Decree.

The terms of the Consent Decree ensure that the pipeline is safe to operate *before* oil transportation is resumed. The Consent Decree imposes more stringent standards under which the Pipeline's operator must inspect the pipeline and remediate certain pipeline defects, also referred to as anomalies, than currently are imposed under applicable federal regulations. Specifically, Appendix B to the Consent Decree imposes a series of safety enhancements that the operator must satisfy before OSFM approves restart of the pipelines, including, but not limited to, the following:

- The operator must apply for, and receive, a State Waiver from OSFM to address the effectiveness of cathodic protection;

- The operator must submit a written Restart Plan for CA-325 to OSFM for review and approval, which is to include installation of additional safety valves and pressure sensors, provisions for adequate patrolling of CA-325 during the restart process, and Master Control Room enhancements; and

- The operator must create long-term plans to address the possible risks of corrosion that meet federal requirements.

Consistent with the authorities set forth above, the Consent Decree reaffirms PPC's right to restart after it meets the Consent Decree's requirements and obtains approval by OSFM, which has the exclusive jurisdiction and authority to decide whether the pipeline satisfies the conditions for restart. State Parks, as a signatory to the Consent Decree, agreed to those terms and acknowledged OSFM's authority over pipeline restart.

**D. PPC's Safety Enhancement Efforts.**

As noted above, Line CA-325 is regulated by OSFM. The pipeline conforms to industry accepted best practices and Best Available Technology in adherence with the Elder California Pipeline Safety Act, regulations adopted to comply with California Assembly Bill 864 ("AB 864"), as well as all applicable state and federal requirements for design and construction.

PPC has been diligently working with OSFM to add all safety enhancements to the pipelines necessary for restart. In compliance with the Consent Decree, PPC in April 2024 submitted a State Waiver application to OSFM for Line CA-325. On December 17, 2024, OSFM granted State Waivers and imposed over sixty separate conditions on PPC's operation of the pipelines to reflect the enhanced regulatory standards required under the Consent Decree, including measures to address potential corrosion under insulation and ensure that the pipeline can be safely operated notwithstanding any limitations to the effectiveness of the cathodic protection system.[3]

In May 2024, PPC separately began anomaly repair and maintenance work on the pipelines per the Consent Decree and under the approvals and permits previously issued for the pipelines by the Counties of San Luis Obispo and Santa Barbara.[4] On February 12 and March 21, 2025, in

[3] In April 2025, various entities, including EDC, filed complaints challenging OSFM's issuance of the State Waivers (Super. Ct. Santa Barbara County, Case Nos. 25CV02244 and 25CV02247). On June 3, 2025, the Santa Barbara County Superior Court issued a temporary restraining order that enjoined OSFM and PPC "from proceeding with the restart and operation of the Las Flores Pipeline System." On July 18, 2025, the Court issued a preliminary injunction that allows OSFM to process PPC's Restart Plan pursuant to the Consent Decree, but enjoins the restart of the Las Flores Pipelines "until 10 court days following the filing and service of notice by or on behalf of [PPC] that [PPC] has received all necessary approvals and permits for restart and that PPC intends to commence such restart."

[4] PPC's predecessors completed numerous tests and anomaly repairs mandated by the Consent Decree.

response to PPC's request to address claims from the California Coastal Commission that the maintenance work was not authorized, the County of Santa Barbara ("County") confirmed that no further permits were required for PPC's anomaly repair work. PPC proceeded to complete the anomaly repairs pursuant to the County's express authorization, and all anomaly repairs and subsequent pipeline hydrotesting were completed under OSFM supervision.

In addition, PPC submitted a Restart Plan to OSFM on July 29, 2024. OSFM has taken no final action on the Restart Plan, which remains under review. Before OSFM authorizes the Restart Plan, OSFM will ensure that PPC has satisfied all conditions of the Consent Decree and State Waivers and is adhering to all relevant safety and operation laws and requirements.

PPC also installed safety valves to meet the requirements of AB 864 and reduce the volume of a potential release. AB 864 requires pipeline operators with assets in environmentally and ecologically sensitive areas of the coastal zone to implement "best available technologies" (e.g., "leak detection technologies, automatic shutoff systems, or remote controlled sectionalized block valves, or any combination of these technologies") to reduce the potential volume of releases for the protection of state waters and wildlife. (Gov. Code, § 51013.1, subd. (b)(1), emphasis added; see also Cal. Code Regs., tit. 19, §§ 2100-2120 [implementing regulations].) As required by AB 864, a risk analysis was conducted along the pipeline and determined that retrofitting the pipeline with sixteen (16) new valves in Santa Barbara County will significantly reduce the amount of fluid released in the event of a potential line failure. Eleven (11) motor operated values ("MOV") and five (5) check valves (CHK) have been installed along the pipeline from the Gaviota Coast to the Los Padres National Forest, seven (7) of which are located within the coastal zone.[5] Consistent with the OSFM-approved AB 864 Plan and the separate federal Consent Decree entered in *United States of America v. Plains All American Pipeline L.P.* (Case No. 2:20-cv-02415), Sable constructed all MOVs and CHK valves underground and within the previously-disturbed operations corridor described and approved in the land use entitlements approved by the County of Santa Barbara.

As State Parks is aware, PPC also has an approved Integrated Contingency Plan regulated by the California Department of Fish & Wildlife Office of Spill Prevention and Response. The ICP provides guidance on the immediate procedures and notifications which should be followed in an emergency, such as fire, explosion, injury, or release of chemicals, hazardous substances, hazardous wastes, liquified petroleum gases, crude oil, refined petroleum products, or gases. The ICP is reviewed and updated annually to incorporate new response techniques and procedures as they become available to the industry.

---

[5] CHK valves utilize a one-way valve system that automatically closes when any backward flow occurs, whereas MOVs stop the flow of oil using an external power source.

Ultimately, PPC's work, the above-referenced enhanced procedures, and the additional safeguards in place to comply with the Consent Decree and State Waivers (e.g., automatic shut-off valves), have all contributed to a safer pipeline.

## II. STATE PARKS' ROLE AS RESPONSIBLE AGENCY IS LIMITED

Under CEQA, when a project involves two or more public agencies, ordinarily only one agency can serve as the lead agency. (CEQA Guidelines, §§ 15050, 15051.) Where the lead agency has "principal responsibility" for the project, a responsible agency is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (Pub. Resources Code, §§ 21067, 21069.) "[T]he public agency that shoulders primary responsibility for creating and implementing a project is the lead agency, even though other public agencies have a role in approving or realizing it." (*Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 239.) An agency with a collateral role in approving or carrying out the project should not be designated as the lead agency. (*Planning and Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 906-907 [local water authority was improper lead agency for statewide water policy document].)

Contrary to EDC's assertions, State Parks does not have authority to approve or deny the potential restart of Line CA-325. EDC ignores the fact that State Parks only has limited jurisdiction over a four-mile segment of Line CA-325, which itself is approximately 113 miles long. As such, State Parks does not have "principal responsibility for carrying out or approving" the potential restart. (See Pub. Resources Code, § 21067.) Instead, State Parks' appropriate role under CEQA is as a responsible agency. A responsible agency complies with CEQA by considering the EIR prepared by the lead agency and by reaching its own conclusions on whether and how to approve the project involved. (CEQA Guidelines, §§ 15096(a), (f).) Accordingly, State Parks was listed as a consulting agency in the EIR (Final EIR, Section 2.0, pp. 2-3, 2-16) and made responsible agency findings for the original easement to enable access to the pipeline system segment within its jurisdiction for the original construction and ongoing operations. (CEQA Guidelines, §§ 15050(b), 15096(f).)

As a responsible agency, State Parks may only consider the portion of the pipeline that is subject to its jurisdiction. (Pub. Resources Code, §§ 21104, 21153, subd. (c), 21069; *We Advocate Through Environmental Review v. City of Mount Shasta* (2022) 78 Cal.App.5th 629, 635, 638–639; *RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1201.) Similarly, State Parks is only responsible for mitigating or avoiding the environmental impacts of the parts of the project that are subject to its authority. (CEQA Guidelines, § 15096(g)(1); see also Pub. Resources Code, § 21004; CEQA Guidelines, § 15040; *Sierra Club v California Coastal Com.* (2005) 35 Cal.4th 839, 858 [Coastal Commission had no authority to require mitigation for impacts of project outside coastal zone].) Pursuant to this limited authority, State Parks has subsequently issued multiple right-of-entry permits and easements allowing operation of this portion of the pipeline, consistent with the original EIR. Under these circumstances—as well as the fact that PPC is merely seeking renewal of an easement already granted to an existing

facility—there is no obligation for State Parks to assume a lead agency role if it finds the Easement is exempt or the EIR is adequate. (CEQA Guidelines, § 15096(e).)

## III. THE IMPACTS OF THE PROJECT WERE FULLY ANALYZED IN THE PRIOR EIR

The EIR analyzed and mitigated all environmental effects of the construction, operation, and maintenance of the Pipeline Project, which includes Line CA-325. EDC argues that a new EIR is required for State Parks to approve the proposed Easement. (EDC Letter, p. 7.) Not so. The EDC Letter describes the standard for when an EIR is required under CEQA in the first instance: when the "lead agency is presented with a fair argument that a project may have a significant effect on the environment." (See EDC Letter, pp. 5–6; CEQA Guidelines, § 15064(f)(1).) This standard is wholly inapplicable to State Parks' consideration of the proposed Easement where an EIR already has been certified and the Project constructed and operating.

The appropriate standard is whether CEQA requires subsequent environmental review. Here, the federal and state lead agencies already prepared and certified an EIR for the Pipeline Project, which encompasses the proposed Easement. The maintenance, operation, and investigation activities proposed under the Easement fall within the original Pipeline Project, which was approved in 1986 by Santa Barbara County. The Pipeline Project was permitted by Santa Barbara County pursuant to Final Development Permit No. 88-DPF-033 (RV01) and 88-CP-60 (RV01), (88-DPF-25cz; 85-DP-66cz; 83-DP-25cz), as modified. The EIR fully analyzed the environmental impacts of the activities proposed under Easement, including construction along the pipeline route and the risk of a potential oil spill. No new or substantively different activities within the Gaviota Park pipeline segment are proposed. For the reasons discussed below, no subsequent environmental review shall be required under these circumstances.[6]

### A. The Risk of an Oil Spill Was Analyzed in the EIR.

The environmental effects of the Pipeline Project were evaluated in the EIR, including impacts related to oil spills. Unavoidable significant adverse impacts from potential oil spills were identified for soils, surface water, groundwater, aquatic biology, land use and recreation, and terrestrial biology. (Draft EIR, Section 4.11 [overview of impacts].) The EIR also includes a detailed analysis addressing the possibility of an oil spill based on historic data, pipeline statistics, and spill prevention measures. (Draft EIR, Section 4.2.15.)

The EIR describes project design features that help minimize these potential impacts, including a leak detection system, fire control system, corrosion protection, and an oil spill control system. (Draft EIR, p. 4-107.) However, the EIR recognizes that despite the engineering design,

---

[6] See Pub. Resources Code, § 21166 [Unless specific circumstances are present, "*no subsequent or supplemental environmental impact report shall be required* by the lead agency or by any responsible agency. . . ."].

specifications, and safeguards built into the pipeline system, the potential for oil spills still exists. (Draft EIR, p. 4-117.)

Recognizing that the risk of an oil spill was significant and unavoidable, the EIR's analysis of oil spill impacts utilized a worst-case oil spill volume of 15,000 barrels. (Draft EIR, p. 4-25, 4-46, 4-51, 4-166.) This worst-case scenario is significantly higher than the volume of the accidental release in 2015. Within the coastal zone, where the 2015 Refugio release occurred, the EIR estimated possible releases at multiple sensitive locations and identified potential spill volumes ranging from 1,753 barrels to 6,157 barrels. (Draft EIR, p. 4-121.) The 2015 Refugio release encompassed approximately 2,934 barrels—consistent with and well within the range of potential spill volumes in the coastal zone identified in the original EIR.

**B. Inspection and Maintenance Activities Were Analyzed in the EIR.**

The EIR includes a description of maintenance activities that are consistent with the proposed activities within the Easement. The EIR provides that maintenance activities associated with the pipeline and ROW would include inspection and maintenance of the following: cathodic protection system; block valves; pipeline mileposts; road-crossing markers; and pipeline, highway, and utility crossings. (Draft EIR, p. 2-32.) The EIR also incorporated certain draft Oil Spill Emergency Response Plans that contemplated regular inspections to "measure the severity of corrosion and to inspect pipeline defects." (Draft EIR, Appendix H, p. H-37.) According to EIR, "[t]he purpose of all monitoring activities would be to quickly identify problem areas so that correct mitigative measures may be employed to correct any problems." (Draft EIR, p. 2-32.) As such, the Oil Spill Emergency Response Plans confirmed that, if required, identified pipeline defects (i.e., anomalies) would be repaired, "cleaned and recoated" or "removed and replaced." (Draft EIR, Appendix H, p. H-37.) The EIR contemplates the potential need to make repairs to "all instrumentation," including heating and pumping units and valves. (Draft EIR, p. 2-32.) Additionally, pipeline spill prevention measures analyzed in the EIR include hydrostatic pressure testing and corrosion prevention and inspection. (Draft EIR, p. 4-114.) The EIR's discussion is consistent with the minimal and non-invasive ongoing service, maintenance, inspections, and repairs PPC described in its Easement application. (See Easement Application, Project Description, pp. 3–4.)

Additionally, the County, which is the land use authority covering portions of the pipeline subject to the Easement, has concurred that the EIR covers inspections and associated maintenance—including anomaly repairs. In late 2024, PPC submitted Zoning Clearance applications to the County for planned and ongoing anomaly repairs on the Las Flores Pipeline System. The County conducted a detailed review of the pipeline permitting history and

concluded that the pipeline anomaly repair work was analyzed in the prior EIR and authorized by existing land use permits.[7]

## IV. RENEWAL OF A PRE-EXISTING ENTITLEMENT IS NOT A "NEW" PROJECT REQUIRING NEW ENVIRONMENTAL REVIEW

EDC argues that the Easement is a new "project" such that State Parks must prepare a new EIR. (EDC Letter, pp. 7–8.) However, the Easement is not a new "project"; it is a subsequent discretionary approval in furtherance of the existing Pipeline Project.

A "project" under CEQA "refers to the activity which is being approved and which may be subject to *several* discretionary approvals by governmental agencies." (CEQA Guidelines, § 15378(c), emphasis added; see also *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 853 (*Committee for a Progressive Gilroy*).) The term "project" *does not mean* each separate governmental approval. (*Ibid.*) For example, in *Committee for a Progressive Gilroy*, a city prepared a final EIR for expansion of the city's wastewater treatment plant. Subsequently, the project required the re-establishment of discharge requirements within previously approved levels from the State Water Resources Control Board. The court found that the re-establishment of discharge requirements did "not itself constitute a new project under CEQA"; the court held that, "unless a subsequent or supplemental EIR is required, the original CEQA actions are conclusive." (*Committee for a Progressive Gilroy*, *supra*, 192 Cal.App.3d at p. 863.)

The expiration and renewal of a permit similarly does not present an opportunity to undertake a new round of CEQA review. (CEQA Guidelines, § 15378(c); see also *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315 [finding renewal of permits for medical waste treatment facility qualify for the "existing facility" exemption].) In *Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1056 (*Moss*), the First District Court of Appeal held that expiration of a tentative map did not convert a subdivision project into a new project such that new environmental review was required under CEQA. "[W]here the environmental impacts of a project have previously been studied, subsequent changes 'are meaningful *only* to the extent they affect the environmental impacts of a project.'" (*Ibid*, quoting *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1401.) The *Moss* court reasoned that:

> "Expiration of the tentative map was an abstract occurrence that had no effect on the project's environmental impacts. Rather, it was the expiration of a discretionary approval by a governmental agency, and the Guidelines make it clear that a CEQA project is

---

[7] Letter, County of Santa Barbara, Planning and Development, Zoning Clearance Applications - 24ZCl-00090, 24ZCl-00091, 24ZCl-00095, and 24ZCl-00096 (Feb. 12, 2025).

> *not* to be defined by each of the discretionary approvals that may be required from government agencies."

(*Ibid.*, emphasis added.) So too here. The "project" for purposes of CEQA is the Pipeline Project fully analyzed in the EIR. As with the subdivision map at issue in *Moss*, the expiration of State Parks' original Easement was an abstract occurrence that has no effect on the Project's environmental impacts. Thus, State Parks' renewal of the Easement for the small portion of pipeline within its jurisdiction thus does not re-open the CEQA review process for the entire Pipeline Project. Like in *Committee for a Progressive Gilroy*, the uses proposed within the Easement are consistent with historical maintenance, operation, and investigation conducted by the former operator and fully analyzed in the EIR. (*Committee for a Progressive Gilroy*, *supra*, 192 Cal.App.3d at p. 853.) And as in *Moss*, the fact that the original Easement has since expired does not transform State Parks' renewal into a new project. (*Moss*, *supra*, 162 Cal.App.4th at p. 1056.)

## V. NO SUPPLEMENTAL OR SUBSEQUENT REVIEW IS REQUIRED

Under CEQA and the CEQA Guidelines, there are strong presumptions against requiring any further environmental review once an EIR for a project has been prepared. (Pub. Resources Code, § 21166 [providing that an agency is not required to create a supplemental or subsequent EIR *unless* one of the statutory exceptions exists]; *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 949 (*Friends of College*); *San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 934; *Melom v. City of Madera* (2010) 183 Cal.App.4th 41, 48; *Moss*, *supra*, 162 Cal.App.4th at p. 1049.) Once the statute of limitations for challenging an EIR has run, the adequacy of the document is presumed. The age of the original environmental document is not a relevant consideration. (*Snarled Traffic Obstructs Progress v. City & County of San Francisco* (1999) 74 Cal.App.4th 793; *Friends of College*, *supra*, 1 Cal.5th at p. 949 [recognizing the importance of having a degree of finality to the results of environmental review].)

Per Public Resources Code section 21166 and CEQA Guidelines section 15162, once an EIR is certified, the lead agency or a responsible agency shall not require the preparation of a subsequent or supplemental EIR unless one or more of the following three conditions is present:

1. Substantial changes in the project are proposed that will require major revisions of the EIR;

2. Substantial changes occur in the circumstances under which the project is being undertaken which will require major revisions in the EIR; or

3. New information of substantial importance, which was not known and could not have been known at the time the EIR was certified, becomes available and meets the four requirements detailed later in this letter.

"[S]ection 21166 comes into play precisely because in-depth review has already occurred, [and] the time for challenging the sufficiency of the original EIR has long since expired. . . ." (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073.) Thus, all three of the following conditions must be met to trigger subsequent or supplemental review: (1) the change in the project is substantial; (2) the change involves new or more severe environmental impacts; and (3) the change will require major revisions to the previous EIR based on the new or more severe impacts. (Pub. Resources Code, § 21166, subd. (a); CEQA Guidelines § 15162(a)(1).) However, CEQA's subsequent review provisions are not "an occasion to revisit environmental concerns laid to rest in the original analysis." (*Friends of College*, *supra*, 1 Cal.5th at p. 949, citation omitted.)

**A. The Easement Is Within the Project's Environmental Baseline.**

The operational Pipeline Project is within the "baseline" State Parks must use to evaluate the potential environmental impacts of the Easement under the rules governing subsequent CEQA review.

The existing environmental setting for a particular project will typically constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. (CEQA Guidelines, § 15125(a).) However, when an agency is evaluating a proposed change to a project that has previously been reviewed under CEQA, the agency must apply CEQA's standards limiting the scope of subsequent review. (See, *infra*, Section IV.B.) Unlike the "existing conditions" baseline that normally applies to projects undergoing CEQA review in the first instance, the environmental baseline for existing projects or projects previously approved under an EIR are adjusted under CEQA's subsequent review rules. "In effect, 'the baseline for purposes of CEQA is adjusted such that the originally approved project is assumed to exist.'" (Kostka & Zischke, *Practice Under the Cal. Env't Quality Act* (2d ed. Cal. CEB 2025), § 12.23 5.) In that vein, the project impacts as reviewed in a prior EIR are properly treated as part of the environmental baseline in a subsequent or supplemental EIR. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 542.) Here, the appropriate baseline is the Pipeline Project fully built and operational consistent with the project description in the EIR. (See *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1477.) Restart of the pipeline and the maintenance, operation, and investigation proposed within the Easement is consistent with the Pipeline Project as analyzed in the EIR and, therefore, within the applicable baseline.

Further, an "existing conditions" baseline for an existing project normally considers historical operations. Here, the existing Line CA-325 was constructed in 1988, operated continuously for three decades, and has been idle since 2015. After the 2015 spill, the pipeline system was placed in a preserved but maintained state for an indefinite period. Such period of non-operation should not alter the baseline, as an historical operations baseline may exclude a "temporary lull or spike in operations that happens to occur at the time [of] environmental review" so long as such historical baseline is supported by substantial evidence. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328; see also *North County Advocates v. City of Carlsbad* (2015) 241 Cal.App.4th 94, 105 [upheld agency's use of traffic

baseline assuming full occupancy of a department store based on the historical operation of the space]; *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 728–729 [upholding county's finding that existing physical conditions included an operating refinery, despite the fact the operations were shut down].)

**B. There Has Been No Change Triggering Further Environmental Review.**

Under Public Resources Code section 21166, subdivision (a) and CEQA Guidelines section 15162(a)(1), no subsequent or supplemental environmental impact report shall be required unless substantial changes to the project are proposed that require major revisions to the EIR. However, even major changes in a project do not trigger supplemental or subsequent environmental review if they do not result in new significant impacts or a substantial increase in the severity of previously identified significant impacts. (*City of Lomita v. City of Torrance* (1983) 148 Cal.App.3d 1062, 1069; see Pub. Resources Code, §21166, subd. (a); CEQA Guidelines, §15162(a)(1).) For example, in *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544 (*Fund for Environmental Defense*), the court held that changes to a proposed medical research and laboratory complex that involved a 30 percent increase in building space, increased parking, redesign of location of proposed buildings, additional grading, additional impermeable surfaces, and a new water provider did not require subsequent EIR because no new significant impacts would result. Additionally, significant environmental impacts that could result from changes in a project will not trigger the need for a further EIR if, through application of mitigation measures in the project EIR, they are avoided or substantially reduced. (See, e.g., *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 179-180 (*River Valley*) [no subsequent EIR required for new visual impacts caused by increasing height of berm for light rail right-of-way because landscaping and other measures in project EIR would mitigate impacts].)

EDC argues there have been substantial changes to the Pipeline Project because (a) PPC is proposing to operate Line CA-325 without a cathodic protection system; and (b) PPC's enhanced safety protocols may require additional excavations or anomaly investigations to monitor and repair any anomalies in the pipeline that might arise. (EDC Letter, pp. 20–21.)

Contemporary knowledge about the effectiveness of cathodic protection systems is not a substantial change that would involve new or more severe environmental impacts than analyzed in the EIR. As discussed above, the EIR recognized that the risk of oil spill was significant and unavoidable. (See, *supra*, Section III.A.) Recognizing that the effectiveness of cathodic protection may fluctuate, the EIR contemplated several other corrosion control methods, including installing block valves, radiograph inspections of pipeline seam welds, hydrotesting pipeline segments, maintaining a centralized data monitoring and leak detection system, regular inspections, and, where required, anomaly repairs. (Draft EIR, Appendix H, pp. H-35–H-37.) The EIR concluded that despite the safeguards built into the system—including cathodic protection—the potential for oil spills still exists and the associated impacts would remain significant and unavoidable. (Draft EIR, p. 4-117.)

Operating under the State Waivers issued by the OSFM is not a substantial change to the Pipeline Project. EDC fails to acknowledge the purpose of State Waivers. A State Waiver is an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety. OSFM evaluates state waiver applications in consultation with the PHMSA to determine if the proposed alternative measures can provide an "equal or greater level of safety" than the required regulations and may grant a state waiver accordingly.[8] In granting the State Waivers, OSFM has implicitly acknowledged that PPC's alternative safety measures will be equally or more effective at preventing oil spills than cathodic protection.[9]

The potential for increased anomaly digs and repairs is similarly not a substantial change that would require preparation of supplemental or subsequent environmental impact report. The EIR discussed the need to conduct maintenance and potential repairs on the pipeline. (See, *supra*, Section III.B.) The proposed maintenance, operation, and investigation activities within the Easement will occur within the previously disturbed operational corridor for the pipeline. (Easement Application, Project Description, p. 6.) And PPC will utilize existing roads to access the Easement. PPC's Easement application also included a detailed resource evaluation, which concluded that the Easement would not adversely affect any environmental resources, including cultural and biological resources. (See Easement Application, Project Description, pp. 10–17.) Upon completion of any repair, PPC will restore all excavated anomaly sites. (Easement Application, Project Description, p. 5.) PPC will also implement construction best management practices in all aspects surrounding potential repairs, which will avoid any environmental impacts. (Easement Application, Project Description, p. 5.) Additionally, all ongoing applicable mitigation measures from the EIR will continue to apply to work under the Easement. (Easement Application, Project Description, p. 14.)

In sum, operating with cathodic protection that is only partially effective and increasing the possible frequency of anomaly inspections and repairs do not constitute significant changes in the Project or its circumstances and thus do not trigger the need for further environmental review. Indeed, the environmental impacts related to the Easement are substantially less than those related to the original Pipeline Project, which involved months of construction and installation of the entire, 123-mile pipeline. The Easement will only authorize activities that were previously allowed under the original easement. No increase in the severity of environmental impacts has been identified for the Easement and the CEQA findings and mitigation measures for the Pipeline Project continue to apply.

---

[8] Office of the State Fire Marshal, *Pathways for Restarting CA-324 and CA-325* (Revised May 7, 2025), https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines.

[9] See Gov. Code, § 51011; 49 U.S.C. § 60118.

**C. There Has Been No Change in Circumstances Triggering Further Environmental Review.**

Under Public Resources Code section 21166, subdivision (b) and CEQA Guidelines section 15162(a)(2), no supplemental or subsequent environmental review is required unless substantial changes with respect to the circumstances under which the project is being undertaken necessitate major revisions in the EIR.

As with changes in a project, determining the significance of changed circumstances depends entirely on whether there are new significant impacts. The focus of the inquiry is not on the nature, scope, or extent of the changed circumstances but whether the new circumstances trigger significant new impacts of the project not previously considered. (*Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1255 (*Committee for Re-Evaluation*) [changes in neighborhood near project did not constitute change in circumstances that would require further EIR because effects of those changes were anticipated and analyzed in prior EIR].) If the previous EIR for the project covered the resulting environmental impacts, changed circumstances will not require a subsequent or supplemental EIR. (*Fund for Environmental Defense*, *supra*, 204 Cal.App.3d at p. 1550 [change in circumstances raised no new adverse effects that were not raised, analyzed, and discussed in original EIR].)

EDC argues there has been a substantial change in circumstances because the pipeline is vulnerable to corrosion, the pipeline experienced a spill in 2015, and new species have been designated as endangered or threatened since certification of the EIR. (EDC Letter, pp. 21–22.) These contentions are without merit.

The pipeline's vulnerability to corrosion is not a change in circumstances requiring additional environmental review. Such vulnerability was anticipated and analyzed in the EIR and therefore does not require additional environmental review. (*Committee for Re-Evaluation*, *supra*, 6 Cal.App.5th at p. 1255.) As noted above, the EIR acknowledged that despite the safeguards built into the system—including cathodic protection—the potential for oil spills still exists and associated impacts would be significant and unavoidable. (Draft EIR, p. 4-117.)

Similarly, contemporary knowledge about the effectiveness of cathodic protection systems is not a change in circumstances necessitating major revisions in the EIR. The original EIR evaluated the potential for oil spills at release volumes much higher than the 2015 Refugio spill. (See, *supra*, Section III.A.) Consequently, the mere fact that a release occurred in 2015 despite the cathodic protection system does not constitute a change in circumstances from those evaluated in the EIR.

Additionally, the mere listing of new endangered or threatened species does not trigger the need for subsequent or supplemental environmental review. (See *Moss*, *supra*, 162 Cal.App.4th at p. 1065 [listing of coho salmon as a threatened species did not alone justify further environmental review]; see also *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38

Cal.App.4th 1574 [no supplemental EIR required due to federal government's post-approval decision designating critical habitat for endangered desert tortoise].) EDC points to the federal or state listing of southern California steelhead, tidewater goby, and California red-legged frog. (EDC Letter, p. 22.) However, EDC presents no evidence of any new or increased severity in potential impacts to these species—nor could it—since the habitat impacted by any work under the Easement is the same habitat analyzed by the EIR analyzed and impacted by construction and ongoing maintenance of the Pipeline Project.

The Biological Resources Assessment PPC submitted in support of its Easement application concludes that operation, maintenance, inspection, and possible repair activities are not expected to adversely affect plant or animal life. (Easement Application, Biological Resources Assessment, p. 11.) The Biological Resources Assessment recognizes that the tree species identified by EDC may occur in Gaviota Creek. (See Easement Application, Biological Resources Assessment, Exhibit BIO-1.) While the Easement crosses Gaviota Creek west of the Highway 101 pipeline crossing, the pipeline is buried and ongoing operations are not expected to impact the creek. (See Easement Application, Biological Resources Assessment, p. 8.)

No inspections or repairs are currently contemplated within Gaviota Creek; however, any future inspections or repairs would implement the relevant mitigation measures from the original EIR and best management practices. (Easement Application, Biological Resources Assessment, p. 9.) The Biological Resources Assessment found that potential repair activities requiring excavation of the pipeline might result in temporary and short-term effects on plant and animal life. However, implementation of the applicable mitigation measures from the original EIR, biological resources best management practices, and site restoration, would address any potential effects on plant and animal life. (Easement Application, Biological Resources Assessment, p. 11.) Thus, the subsequent listing of southern California steelhead, tidewater goby, and California red-legged frog do not lead to new significant project impacts not previously considered. No further environmental review is required on this basis.

**D. No Significant New Information Triggers Subsequent Review.**

Under Public Resources Code section 21166, subdivision (c) and CEQA Guidelines section 15162(a)(3), no subsequent or supplemental EIR is required unless "[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.) This trigger only applies to new information that was not known and could not have been known "with the exercise of reasonable diligence" when the prior environmental review was completed, and that the new information must be of "substantial importance." (CEQA Guidelines, § 15162(a)(3).) Under CEQA, further environmental review is required only if the new information shows that: (1) the project will have one or more significant effects not discussed in the previous EIR; (2) significant effects previously examined will be substantially more severe than shown in the previous EIR; (3) mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or

alternative; or (4) mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative. (*Ibid*.)

"The obvious policy behind [Public Resources Code section 21166(c)] is to head off demands for further environmental review simply because a new study relevant to the issues in an EIR or a negative declaration can later be developed through additional efforts." (Kostka & Zischke, *Practice Under the Cal. Env't Quality Act* (2d ed. Cal. CEB 2025), § 19.21.) It is well settled that a new EIR is not required "whenever '*any* new, arguably significant information or data' is proposed, 'regardless of whether the information reveals environmental bad news.' [Citation.]." (*Moss*, *supra*, 162 Cal.App.4th at p. 1057, citing *River Valley*, *supra*, 37 Cal.App.4th at p. 168.)

Repacking its earlier arguments, EDC argues that new information regarding the integrity of the cathodic protection and the existence of threatened or endangered species warrants further environmental review. These arguments are equally flawed here.

The effectiveness of the cathodic protection does not trigger the need for additional environmental review because it does not show that the Easement will have new or substantially more severe significant effects than those discussed in the previous EIR. (See CEQA Guidelines, § 15162(a)(3).) The EIR analyzed the risk of oil spills and concluded that the environmental impact would be significant and unavoidable. (See, *supra*, Section, III.A.) The EIR also analyzed the potential environmental impacts of oil spills and found significant and unavoidable impacts to soils, surface water, groundwater, aquatic biology, land use and recreation, terrestrial biology. (See *ibid*.) The EIR fully analyzed and disclosed the risk of oil spills and potential resulting environmental consequences. Further, additional safeguards are now in place (e.g., new shut-off valves, improved assessment technologies, and best management practices) that will greatly reduce the risks of a spill and the volume of a spill should it occur. Thus, information about the effectiveness of cathodic protection does not demonstrate new or substantially more severe significant impacts.

The listing of new species and designation of Environmentally Sensitive Habitat Areas ("ESHA") in the Gaviota Coastal Plan also does not constitute new information requiring additional environmental review. As discussed above, the listing of new endangered and threatened species does not automatically trigger the need for further environmental review. (See, *supra*, Section IV.C.) The Biological Resources Assessment PPC submitted with its Easement application demonstrates that the Easement will not adversely affect these species. (See *ibid*.) The Biological Resources Assessment also analyzed potential impacts to ESHA. (See Easement Application, Biological Resources Assessment, p. 7.) Three Santa Barbara County mapped ESHAs intersect with the Easement ROW; however, the likelihood is low that operations, inspection, or maintenance proposed under the Easement would ever require any physical work or disturbance within or nearby mapped ESHA. (*Ibid*.) Any work or disturbance within or nearby mapped ESHA would be within the scope of impacts analyzed under the EIR and previously authorized by the County Coastal Development Permit. Thus, the Easement

would result in no new adverse impacts to ESHA. EDC's protestations that ESHA somehow will be impacted beyond what was previously analyzed are speculative and unsupported.

## VI. THE EASEMENT IS EXEMPT FROM CEQA

In addition to falling within the original EIR, the Easement is exempt from CEQA under the Existing Facilities (Class 1) categorical exemption. (See CEQA Guidelines, § 15301.) The Class 1 Exemption exempts from CEQA:

> "[T]he operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of *existing* public or private structures, facilities, mechanical equipment, or topographical features, involving *negligible or no expansion of existing or former use*."

(*Ibid.*, emphasis added; see also *San Diegans for Open Government v. City of San Diego* (2018) 31 Cal.App.5th 349, 371 ["The relevant issue . . . is whether the project involves 'expansion of use beyond that existing or former use.'"].) Renewal of the Easement qualifies for the Class 1 Exemption. (See *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1315 (*Bloom*) [renewal of permits for medical waste treatment facility qualified for the "existing facility" exemption.].) In *Bloom*, the court explained:

> "We presume that thousands of permits are renewed each year for the ongoing operation of regulated facilities, and we discern no legislative or regulatory directive to make each such renewal an occasion to examine past CEQA compliance at every facility built in the last 24 years."

(*Ibid.*) Here, the Easement replaces the prior easement, which is essentially identical. The renewed Easement will not expand the pipeline beyond its existing or former use. All proposed work within the Easement is consistent with historical maintenance, operation, and investigation conducted by the former operator. The terms of the Easement are expected to be consistent with the terms of the original easement executed in 1987.

Several projects, similar in scope to the Easement, have been upheld as constituting minor alterations of existing facilities. (See *Turlock Irrigation Dist. v. Zanker* (2006) 140 Cal.App.4th 1047 [new rules metering the amount of water delivered to customers was exempt because it required only minor changes to the existing water delivery facilities—new meters—and did not permit an expansion of previous use]; *Creed-21 v. City of San Diego* (2015) 234 Cal.App.4th 488 [re-vegetation project exempt because it was logical that existing facility exemption covers improvement as well as maintenance of existing landscape].) Further, project impacts analyzed in a prior EIR are properly considered part of the environmental baseline. (*May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1319 [condominium project was "exempt" from CEQA because it was "consistent with the certified EIR" for the previously approved specific plan.].)

Should future anomaly inspections and repairs become necessary, such repairs may also be covered by the Existing Facilities (Class 1) categorical exemption or the Statutory 8-Mile Exemption. (See Pub. Resources Code, § 21080.23; CEQA Guidelines, § 15284.) Under the Statutory 8-Mile Exemption, CEQA does not apply to qualifying projects consisting of the inspection, maintenance, repair, restoration, or reconditioning of an existing pipeline. (CEQA Guidelines, § 15284(a).) To qualify for the exemption, the diameter of the affected pipeline must not be increased, the affected section must be less than eight (8) miles in length, and actual construction and excavation activities must not be undertaken over a length of more than one-half mile at a time (among other requirements). While the Easement and operations do not require coverage under the Statutory 8-Mile Exemption because they are exempt under the Existing Facilities categorical exemption, possible future maintenance or anomaly inspections and repairs within Gaviota State Park should satisfy all the requirements of the Statutory 8-Mile Exemption under CEQA Guidelines section 15284, subdivisions (a) and (b).

## VII. NONE OF THE EXCEPTIONS TO EXEMPTION APPLY HERE

Categorical exemptions may be subject to certain exceptions. (See, e.g., CEQA Guidelines, § 15300.2(a)–(f).) Under CEQA, exceptions to the exemptions can negate a categorical exemption in the following circumstances: (1) the cumulative effect of successive projects of the same type in the same place, over time, is significant (CEQA Guidelines, § 15300.2(b)); (2) the project may have a significant environmental impact due to unusual circumstances (CEQA Guidelines, § 15300.2(c)); or (3) the project may damage scenic resources (i.e. trees, historic buildings, or rock outcroppings) within an official state scenic highway (CEQA Guidelines, § 15300.2(d)). Additionally, Categorical Exemptions listed as Class 3, 4, 5, 6, and 11 may be precluded if the project may impact an environmental resource of hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies. (CEQA Guidelines, § 15300.2(a).) None of these exceptions apply to the renewed Easement.

### A. The Location Exception Does Not Apply.

EDC argues the Easement's sensitive location precludes the invocation of categorical exemptions for minor alterations. (EDC Letter, p. 18.) The location exception, however, does not apply because the Easement is exempt under the Class 1 Exemption for Existing Facilities, and not the Class 4 or 5 Exemptions. (See CEQA Guidelines, § 15300.2(a).) Thus, EDC's arguments regarding the sensitive location are irrelevant to the exemption analysis.

Should State Parks decide to also rely on the Class 3 or 4 Exemptions, the location exemption would not be implicated. The location exception only applies if the activity may have an impact on an "environmental resource" of "hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies." (CEQA Guidelines, § 15300.2(a).) Courts have strictly and narrowly interpreted this statutory language and the scope of the location exception. (See *Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 362–363 (*Don't Cell Our Parks*) [declining to apply location exception to a

dedicated park]; *Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880 [location exception does not apply to designated earthquake fault zones or earthquake-induced landslide areas because they are not "resources"].)

It is also speculative whether any inspection or repair of the pipeline within Gaviota State Park during the term of the Easement will impact sensitive resources or sensitive locations. State Parks recently completed 18 anomaly inspections within Gaviota State Park authorized under a series of statutory and categorical exemptions. None of those anomaly digs resulted in any significant adverse effects to the environment.

**B. The Unusual Circumstances Exception Does Not Apply.**

Categorical exemptions may not apply if there is a "reasonable possibility" that an activity will have a significant effect on the environment due to "unusual circumstances." (CEQA Guidelines, § 15300.2(c).) This exception applies only where there are (1) unusual circumstances; and (2) a significant impact resulting from those unusual circumstances. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1104 (*Berkeley Hillside Preservation*); *California Construction & Industrial Materials Assn. v. County of Ventura* (2023) 97 Cal.App.5th 1, 13.)

Here, there are no unusual circumstances. EDC argues that an easement to allow the operation of an oil pipeline inside a state park is itself an unusual circumstance. (EDC Letter, p. 20.) This is far from unusual as PPC seeks renewal of a prior easement for an existing pipeline that was constructed and maintained within a state park for decades. As discussed in Section IV.A., *supra*, the Easement is within the Pipeline Project's baseline. Where there is no change from the existing baseline condition, the unusual circumstances exception does not apply. (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 872 (*North Coast Rivers Alliance*) ["Where a project involves ongoing operations or a continuation of past activity, the established levels of a particular use and the physical impacts thereof are considered to be part of the existing environmental baseline"].) The Easement is also not unusual because other pipeline easements exist within properties under the jurisdiction of State Parks, including Gaviota State Park. (See *Don't Cell Our Parks*, *supra*, 21 Cal.App.5th at p. 362 [evidence demonstrated that siting wireless telecommunications facilities in a dedicated park is not unusual given large number of such facilities in other parks in area].)

Since there are no unusual circumstances present, it is unnecessary to analyze whether there are any resulting significant impacts. (*Anderson v. County of Santa Barbara* (2023) 94 Cal.App.5th 554, 577 [the second prong of the test only comes into play if some circumstance of the project is unusual].) There is an alternative means of establishing the existence of unusual circumstances by showing that the project *will have* a significant effect on the environment. (*Berkeley Hillside Preservation*, *supra*, 60 Cal.4th at p. 1105.) Here, there is no evidence that the Easement *will* have a new significant environmental effect not previously identified in the prior EIR. The Easement is consistent with the prior EIR and thus will not cause new or substantially more severe impacts. (See, *supra*, Section III.)

**C. The Cumulative Impacts Exception Does Not Apply.**

The Easement is also not subject to the exception for the "cumulative impact of successive projects of the same type in the same place, over time is significant." (CEQA Guidelines, § 15300.2(b).) Here, there are no cumulative impacts.

EDC argues that the operation of the segment of the pipeline through Gaviota State Park is part of a much larger project that allegedly impacts biological resources. (EDC Letter, p. 20.) However, much of the Las Flores Pipeline System is, by definition, outside the scope of the cumulative impacts exception. Under the cumulative effects exception, the impacts must be of the "same type" and in the "same place." (*North Coast Rivers Alliance*, *supra*, 227 Cal.App.4th at p. 876 [short-term, interim renewal water service contracts do not amount to "successive projects of the same type"]; *Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950, 958 [interpreting "same place" to refer to "area whose size and configuration depend on the nature of the potential environmental impact of the specific project under consideration"]; *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1030 ["without a limitation as to the location of the projects whose cumulative impact must be considered, agencies deciding whether the exception applies to a project would be required, in every instance, to consider the cumulative environmental impact of all successive similar projects in their jurisdictions, at least, and perhaps regionally or even statewide."].) The larger Las Flores Pipeline System is not all located in the "same place" as the proposed Easement, and therefore the exception does not apply.

A project challenger has the burden to demonstrate the cumulative impacts exception applies. It is not enough to merely point to other work on the larger pipeline system. (See *Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 439; *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 857; *Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039, 1051 ["speculation that potential future projects similar to the one under consideration *could* cause a cumulative adverse impact," is "not sufficient to negate a categorical exemption."].) There is no evidence that the Easement would overlap with the same type of projects within the same place (i.e., Gaviota State Park). And any allegations of significant effects related to segments of the pipeline outside of State Parks' jurisdiction are not determinative of whether the Class 1 Exemption applies to the Easement.

\\

\\

\\

\\

\\

## VIII. CONCLUSION

As a renewal of a previously granted entitlement for an existing facility, the Easement is within the scope of the prior EIR and the environmental baseline and does not require further CEQA review under Public Resources Code section 21166. Additionally, the Easement re-authorizes existing mechanical equipment and facilities within one limited four-mile pipeline segment, all without expanding the existing *or former use*. Thus, the Easement falls squarely within the Class 1 Categorical Exemption for Existing Facilities. Accordingly, no further environmental review is required for the Easement.

Very truly yours,

Christian L. Marsh

cc: California Department of Parks and Recreation
Tara Lynch, Chief Counsel
Emma Siverson, Senior Staff Counsel

Pacific Pipeline Company
J. Caldwell Flores, President
Anthony Duenner, General Counsel
Lee Alcock, Assistant General Counsel

SCS Engineers
James Thompson, Project Manager

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

THE STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

Case No. 2:26-cv-03396-SVW-SSC

**[PROPOSED] ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

Hearing
Date: June 1, 2026
Time: 1:30 p.m.
Judge: Hon. Stephen V. Wilson
Courtroom: 10A

The Court, having considered Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants (ECF 16), the United States' Opposition to that Motion, Sable Offshore Corp. and Pacific Offshore Company's Opposition to that Motion, and all additional papers filed by all Parties and any oral argument heard, hereby **DENIES** Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants.

**IT IS SO ORDERED.**

Dated: ______________________

______________________
Hon. Stephen V. Wilson
United States District Judge

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission St., Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT et al.,<br><br>Defendants. | Case No. 2:26-cv-03396-SVW-SSCx<br><br>**EVIDENTIARY OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br><br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson<br>Courtroom: 10A |

Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable"), hereby object to the following evidence presented by Plaintiff State of California ("California") in connection with California's Motion for Preliminary Injunction and Stay Against all Defendants, ECF 16, which is set for hearing on June 1, 2026, at 1:30 p.m., before this Court.

## I. OBJECTIONS TO THE DECLARATION OF DENA BELLMAN (ECF NO. 16-3)

| Material Objected to: | | Grounds for Objection: |
|---|---|---|
| 1 | "It is my understanding that Sable does not have a fee interest in any land at Gaviota State Park. Also, although CA-325 crosses Highway 101 near Gaviota State Beach, no portion of CA-325 under Gaviota State Park follows a public right-of-way." ¶ 4. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. *See GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1026 (C.D. Cal. 2017) ("Legal arguments are inappropriate in declarations."). |
| 2 | "Neither Celeron nor Sable was granted a new easement, and Sable does not currently have an easement to transport oil under or across Gaviota State Park." ¶ 7. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402; *see also GemCap*, 269 F. Supp. 3d at 1026. The assertion about the status of the easement in Gaviota State Park is the subject of a related litigation. *See Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946-SVW-SSC (C.D. Cal). |
| 3 | "Those permits are necessary because, as mentioned above, Sable does not have an easement that would otherwise allow it to access the Park." ¶ 9. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402; *see also GemCap*, 269 F. Supp. 3d at 1026. The assertion about the status of the easement in Gaviota State Park is the subject of a related litigation. *See Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946- |

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| | | SVW-SSC (C.D. Cal). |
| 4 | "The Annual Permit does not allow PPC or Sable to transport oil through that portion of CA-325 that passes through Gaviota State Park." ¶ 11. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. Moreover, the statement is hearsay, Fed. R. Evid. 801, and the document in question speaks for itself. *Cf. United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001) (holding lay witnesses may not testify on "the correct interpretation of a contract"). |
| 5 | "To my knowledge, no one at State Parks asked Sable to remove CA-325 itself from Gaviota State Park prior to March 14, 2026, when State Parks sent Sable the above-referenced letter. Thus, it is my understanding that Sable had permission from State Parks to keep CA-325 and minimally maintain it in a dormant state at Gaviota State Park consistent with applicable ROE permits until the letter was issued and the right to keep CA-325 was revoked." ¶ 13. | This assertion is speculative and lacks foundation. *See* Fed. R. Evid. 602, 701.<br><br>This is also a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402; *see also GemCap*, 269 F. Supp. 3d at 1026. The assertion about the status of the easement in Gaviota State Park is the subject of a related litigation. *See Cal. Dep't of Parks & Rec. v. Sable Offshore Corp.*, No. 2:26-cv-02946-SVW-SSC (C.D. Cal). |

## II. <u>OBJECTIONS TO THE DECLARATION OF JULIE VANCE (ECF NO. 16-4)</u>

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| 1 | "Species listed under CESA as endangered, threatened, or candidate in proximity to the | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance admits that the ITP Application |

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| | portion of the Pipelines that traverse San Luis Obispo and Kern counties include: California jewel flower (Caulanthus californicus); Crotch's bumblebee (Bombus crotchii); Nelson's antelope squirrel (Ammospermophilus nelsoni); giant kangaroo rat (Dipodomys ingens); Tipton kangaroo rat (D. nitratoides nitratoides); and San Joaquin kit fox (Vulpes macrotis mutica). This list is based on an ITP Application that Plains Pipeline, L.P. ('Plains Pipeline') submitted to CDFW's Central Region office in August 2020 for a project that would have fully replaced the Pipeline within the same footprint." ¶ 8. | submitted by Plains Pipeline L.P. is irrelevant, as it was "for a project that would have fully replaced the Pipeline," and "the project never moved forward." ¶¶ 8-9. Ms. Vance never explains how the environmental impacts of putting in a new pipeline are comparable to occasional maintenance on an existing pipeline.<br><br>This is further irrelevant and speculative because Ms. Vance only lists plants and animal species in San Luis Obispo and Kern Counties without describing any harm that has befallen any of these species or making any assertion that the subsurface transportation of hydrocarbons in a sealed pipeline impacts these species in any way. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."). |
| 2 | "On October 8, 2020, CDFW sent a letter to Plains Pipeline, informing Plains Pipeline that its ITP Application was incomplete. CDFW received a revised ITP Application from Plains Pipeline on November 9, 2020. On December 9, 2020, CDFW sent another letter to Plains Pipeline, informing Plains Pipeline that its revised ITP Application was incomplete. Ultimately, the | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance admits that the ITP Application submitted by Plains Pipeline L.P. is irrelevant, as it was "for a project that would have fully replaced the Pipeline," and "the project never moved forward." ¶¶ 8-9. Ms. Vance never explains how the environmental impacts of putting in a new pipeline are comparable to occasional maintenance on an existing pipeline. |

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| | project never moved forward." ¶ 9. | |
| 3 | "Western burrowing owl (Athene cunicularia hypugaea); Blunt-nosed leopard lizard and California condor (Gymnogyps californianus) are also known to occur in proximity to the portion of the Pipeline that traverses San Luis Obispo and Kern counties. Western burrowing owl was listed as a candidate species under CESA in October 2024 and Blunt-nosed lizard and California condor are both fully protected species." ¶ 10. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance lists plant and animal species who are "known to occur" in "San Luis Obispo and Kern Counties," ¶¶ 8, 10, without describing any harm that has befallen any of these species or making any assertion that the subsurface transportation of hydrocarbons in a sealed pipeline impacts these species in any way. *See Caribbean Marine*, 844 F.2d at 674. |
| 4 | "The CNDBB indicates the following species occur in proximity to the portion of the Pipeline that traverses Santa Barbara County: unarmored threespine stickleback (Gasterosteus aculeatus williamsoni); southern California steelhead (Oncorhynchus mykiss); California red-legged frog (Rana draytonii); and California newt (Taricha torosa)." ¶ 12. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance again simply lists plant and animal species who "occur" in "Santa Barbara County," ¶ 12, without describing any harm that has befallen any of these species or making any assertion that the subsurface transportation of hydrocarbons in a sealed pipeline impacts these species in any way. *See Caribbean Marine*, 844 F.2d at 674. |
| 5 | "Depending on the type of maintenance, repair, or other work to the Pipeline that will need to be completed, an ITP or LSAA from CDFW might be required before the work may begin." ¶ 15. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Ms. Vance concedes that "*[d]epending* on the type of maintenance, repair, or other work to the Pipeline that will need to be completed, an ITP or LSAA from CDFW *might* be required before |

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| | | the work may begin." ¶ 15 (emphasis added). Ms. Vance cannot point to any work on the Pipeline that requires or is likely to require any permit from CDFW. *See Caribbean Marine*, 844 F.2d at 674. |

## III. OBJECTIONS TO THE DECLARATION OF ROHIT SHARMA (ECF NO. 16-5)

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| 1 | "The Las Flores Canyon Facility is subject to requirements under, *inter alia*, California Public Resources Code sections 3106, 3224, and 3270, and implementing regulations, California Code of Regulations ("C.C.R."), title 14, section 1712 et seq. These requirements include: conducting tests or inspections that the State Oil and Gas Supervisor, acting through CalGEM, has deemed necessary to establish reliability of the Facility's pipeline system, 14 C.C.R. § 1774.1(c); pressure testing before returning to service pipelines that have leaked and released a certain amount of fluids, and submitting test results to CalGEM within seven days of the test, 14 C.C.R. § 1774.1(d); modifying the design or | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. Whether the Las Flores Canyon Facility is subject to CalGEM jurisdiction is the subject of separate litigation. *See Sable Offshore Corp. v. Cal. Geologic Energy Mgmt. Div.*, No. 26WM000036 (Cal. Super. Ct. Sacramento Cnty. Feb. 17, 2026). It is thus inappropriate for a declaration. *See GemCap*, 269 F. Supp. 3d at 1028. |

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| | construction of newly installed pipelines, and/or conducting additional testing and maintenance of such pipelines, at CalGEM's request, 14 C.C.R. § 1774; and maintaining production facilities in good condition and in a manner that prevents leakage or corrosion and safeguards life, health, property, and natural resources, 14 C.C.R. § 1777(a)." ¶ 5. | |
| 2 | "The following are examples of regulatory violations that, if present, would be identified and addressed during a CalGEM inspection, and the potential threats to safety and the environment if the violations are not addressed:<br>a. Failure to properly dispose of oilfield waste and refuse could result in a spill or leak, potentially releasing contaminants into storm drains, contaminating soil, groundwater, and/or drinking water, and causing a public nuisance. 14 C.C.R. § 1775(a).<br>b. Failure to maintain production facilities in good condition and in a manner that prevents leakage or corrosion in accordance with 14 C.C.R. § 1777(a) increases threats to public safety and the environment. Gas leaks at certain concentration levels create | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Mr. Sharma points only to "regulatory violations that, *if present*, would be identified during a CalGEM inspection." ¶ 9 (emphasis added). Mr. Sharma cannot point to a single regulatory violation at the Las Flores Canyon Facility. Mr. Sharma does not point to any actual harm suffered or about to be suffered by CalGEM. *See Caribbean Marine*, 844 F.2d at 674. |

| | Material Objected to: | Grounds for Objection: |
|---|---|---|
| | ignition risks and can also release greenhouse gases into the atmosphere. Fluid leaks can result in the release of contaminants into storm drains, the contamination of soil, groundwater, and/or drinking water, and cause a public nuisance. A standing pool of hydrocarbon fluid can present a fire hazard. Equipment submerged in fluid can corrode over time, making it inoperable and prone to leaks.<br>c. Failure to maintain adequate secondary containment in accordance with 14 C.C.R. § 1773.1 poses a threat of contamination to the surrounding areas in the event of a spill. | |
| 3 | "The oil and gas production facilities at the Las Flores Canyon Facility include an Oil Treating Plant and Cogeneration Facility, Stripping Gas Treatment Plant, and Pacific Offshore Pipeline Company Gas Treatment Facility, consisting of hundreds of structures and other units such as oil sludge thickener tanks, equalization tanks, vacuum flash drums, aeration basins, vessels, pipelines, and secondary containment, all of which CalGEM needs to be able to inspect on at least an annual basis." ¶ 10. | This is a legal conclusion and thus irrelevant. Fed. R. Evid. 401, 402. Whether CalGEM "needs to be able to inspect" the Las Flores Canyon Facility depends on whether it is subject to CalGEM jurisdiction, which is the subject of separate litigation. *See Sable Offshore Corp. v. Cal. Geologic Energy Mgmt. Div.*, No. 26WM000036 (Cal. Super. Ct. Sacramento Cnty. Feb. 17, 2026). It is thus inappropriate for a declaration. *See GemCap*, 269 F. Supp. 3d at 1028. |

| Material Objected to: | | Grounds for Objection: |
|---|---|---|
| 4 | "If Sable denies access to CalGEM inspectors on the basis of the Wright Order, it would impede CalGEM's ability to ensure compliance with oil and gas production facility requirements and to prevent damage to life, health, property, and natural resources." ¶ 11. | This is irrelevant and speculative. Fed. R. Evid. 401, 402, 602, 701. Mr. Sharma does not identify a single example of a time that CalGEM inspectors were denied access to the Las Flores Canyon facility because of the DPA Order. Instead, she testifies that "*[i]f Sable denies access to CalGEM inspectors on the basis of the Wright Order*, it would impede CalGEM's ability to ensure compliance with oil and gas production facility requirements." ¶ 11 (emphasis added). This is speculative. Mr. Sharma does not point to any actual harm suffered or about to be suffered by CalGEM. *See Caribbean Marine*, 844 F.2d at 674. |

Dated: May 11, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ *Jessica Stebbins Bina*

LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

BABST CALLAND
Nicholas McDaniel (*pro hac vice* forthcoming)
*nmcdaniel@babstcalland.com*
505 Ninth St., NW, Suite 602
Washington, DC 20004
Telephone: +1 202.853.3455
Facsimile: +1 202.853.3491

HOLLAND & KNIGHT LLP
Andrew Klair (Bar No. 334960)
*andrew.klair@hklaw.com*
560 Mission St., Suite 1900
San Francisco, CA 94105
Telephone: +1 415.743.6962
James W. Noe (*pro hac vice* forthcoming)
*jim.noe@hklaw.com*
Rafe Petersen (*pro hac vice* forthcoming)
*rafe.petersen@hklaw.com*
Matthew Z. Leopold (*pro hac vice* forthcoming)
*matt.leopold@hklaw.com*
800 17th St., NW, Suite 1100
Washington, DC 20006
Telephone: +1 202.469.5525

*Attorneys for Proposed Intervenors Sable Offshore Corp. and Pacific Pipeline Company*

No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al.*,
*Defendants-Appellants.*

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

**EXCERPTS OF RECORD – VOLUME 4 OF 6**

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, *et al.*,
*Defendants-Appellants.*

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

**EXCERPTS OF RECORD – VOLUME 4 OF 6**

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General
RILEY W. WALTERS
Email: Riley.Walters usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 514-5442

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

STATE OF CALIFORNIA,

Plaintiff,

v.

CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,

Defendants.

Case No. 2:26-cv-03396-SVW-SSC

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY**

Hearing Date: June 1, 2026
Time: 1:30 pm
Judge: Honorable Stephen V. Wilson

# TABLE OF CONTENTS

INTRODUCTION ........ 1
BACKGROUND ........ 3
I. The Defense Production Act ........ 3
II. The Pipeline Capacity Prioritization and Allocation Order ........ 4
III. Related Litigation ........ 5
LEGAL STANDARD ........ 6
ARGUMENT ........ 6
I. California Is Not Likely to Succeed on the Merits ........ 6
A. The Defense Production Act Order is not reviewable under the Administrative Procedure Act because the Order is presidential action, not agency action ........ 7
B. The Defense Production Act Order is both lawful and rational ........ 9
1. The Defense Production Act Order is not contrary to law ........ 9
2. The Defense Production Act Order is rational ........ 19
II. California Has Not Established that it Is Likely to Suffer Irreparable Harm or that the Equitable Factors Favor a Preliminary Injunction and Stay ........ 21
A. California is not likely to suffer irreparable harm absent preliminary relief ........ 21
B. The balance of harms and the public interest weigh strongly against an injunction ........ 24
CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*All. for The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .....21

*Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676 (9th Cir. 2011) .....22

*Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 801 F. Supp. 2d 383 (D. Md. 2011) .....8, 9

*Bloate v. United States*, 559 U.S. 196 (2010) .....12

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) .....21

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) .....22

*Chairez v. Mayorkas*, 168 F.4th 1227 (9th Cir. 2026) .....7

*City of New York v. FCC*, 486 U.S. 57 (1988) .....15

*Clam Ventures LLC v. Newsom*, 2021 WL 1502657 (C.D. Cal. Mar. 25, 2021) .....23

*Cohen v. Apple Inc.*, 46 F.4th 1012 (9th Cir. 2022) .....14

*Dalton v. Specter*, 511 U.S. 462 (1994) .....7

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) .....9, 19

*Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016) .....8, 9

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir. 1976) .....3

*FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025) ........ 18

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ........ 14

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180 (5th Cir. 2023) ........ 16

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ........ 7

*Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir. 2006) ........ 11

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ........ 6

*Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006) ........ 7

*Haig v. Agee*, 453 U.S. 280 (1981) ........ 24

*Heckler v. Chaney*, 470 U.S. 821 (1985) ........ 19

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981) ........ 16

*Hou. Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185 (5th Cir. 1981) ........ 10

*Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025) ........ 6

*Immigrant Defs. Law Ctr. v. Noem*, 781 F. Supp. 3d 1011 (C.D. Cal. 2025) ........ 21

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) ........ 20

*Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189 (9th Cir. 1975) ........ 7, 8

*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382 (N.D. Tex. 2022) ........ 13, 15

*Knick v. Township of Scott*,
588 U.S. 180 (2019) .......... 16

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 19

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 6

*McDaniel v. Wells Fargo Invs.*,
717 F.3d 668 (9th Cir. 2013) .......... 10

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 15, 16

*Nat. Res. Def. Council v. U.S. Dep't of State*,
658 F. Supp. 2d 105 (D.D.C. 2009) .......... 8, 9

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
23 F.3d 1508 (9th Cir. 1994) .......... 22

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) .......... 9

*Nelson v. Stewart*,
422 F.3d 463 (7th Cir. 2005) .......... 14

*New York v. United States*,
505 U.S. 144 (1992) .......... 15, 16

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 22

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*,
418 U.S. 264 (1974) .......... 14

*Pacific Dawn LLC v. Pritzker*,
831 F.3d 1166 (9th Cir. 2016) .......... 20

*Pennsylvania Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) .......... 9

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) .......... 21, 22

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) .......... 17

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) .......... 20

*Sisseton–Wahpeton Oyate v. U.S. Dep't of State*,
659 F. Supp. 2d 1071 (D.S.D. 2009) .......... 8

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) .......... 16

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 20

*United States v. Hatch*,
722 F.3d 1193 (10th Cir. 2013) .......... 16

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 19, 20

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 6, 21, 22, 25

**Statutes**

5 U.S.C. § 701(a)(2) .......... 19

5 U.S.C. § 702 .......... 7

5 U.S.C. § 704 .......... 7

5 U.S.C. § 706 .......... 18

49 U.S.C. § 60119(a) .......... 24

50 U.S.C. § 4502(a)(1) .......... 3

50 U.S.C. § 4502(a)(3) .......... 3, 12

50 U.S.C. § 4502(a)(4) .......... 3

50 U.S.C. § 4502(a)(5) .......... passim

50 U.S.C. § 4511 .......... 8

50 U.S.C. § 4511(a)(1) .......... 10

50 U.S.C. § 4511(a)(2) .......... passim

50 U.S.C. § 4511(a)-(c) .......... 21

50 U.S.C. § 4511(a), (c) .......... 3

50 U.S.C. § 4511(b) ........................................ 13
50 U.S.C. § 4511(c) ........................................ 12
50 U.S.C. § 4516 ........................................ 4, 20
50 U.S.C. § 4552(13) ........................................ 11
50 U.S.C. § 4552(14) ........................................ 20
50 U.S.C. § 4552(16)(A) ........................................ 11, 12
50 U.S.C. § 4552(8) ........................................ 12
50 U.S.C. § 4554(a) ........................................ 8

**Regulations**

10 C.F.R. § 216.4(b) ........................................ 18
10 C.F.R. § 216.4(c) ........................................ 18
10 C.F.R. § 217.31(a)(3) ........................................ 18
10 C.F.R. § 217.52 ........................................ 18
10 C.F.R. § 217.53(b) ........................................ 12
10 C.F.R. § 217.54(a) ........................................ 18
10 C.F.R. § 217.54(b) ........................................ 17
10 C.F.R. § 217.54(d) ........................................ 17
10 C.F.R. § 217.56 ........................................ 19
10 C.F.R. § 217.62 ........................................ 18
10 C.F.R. Part 217 ........................................ 18

**Other Authorities**

77 Fed. Reg. 16651 (Mar. 16, 2012) ........................................ 3
85 Fed. Reg. 26313 (Apr. 28, 2020) ........................................ 13
90 Fed. Reg. 8433 (Jan. 20, 2025) ........................................ 1, 4
91 Fed. Reg. 13199 (Mar. 13, 2026) ........................................ 3
Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245 (2001) ........................................ 9

H.R. Rep. No. 2759, 81st Cong., 2d Sess. (1950) ....................................................10

## INTRODUCTION

The Defense Production Act (DPA) grants the President broad power to maximize domestic energy supplies and to ensure that private industry supports national defense requirements. Having been delegated DPA authority by the President, the Secretary of Energy determined that the immediate flow of oil through the Santa Ynez Pipeline System (the Pipeline) is necessary and appropriate to meet core national security needs. The West Coast generally, and California in particular, is a geographically isolated energy market with declining production and increasing reliance on imports, which makes the region's energy supply particularly vulnerable to disruptions like the recent global supply shock caused by the conflict in Iran. *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 9-10.[1] Nearly a third of California's crude oil imports come from the Persian Gulf, where Iran's actions in the Strait of Hormuz started affecting supply in early March. Ex. A (Nunes Decl.) ¶ 13.

Shortly thereafter, the Secretary issued a DPA order (the Order) directing the Pipeline's owner, Sable Offshore Corp. and Pacific Pipeline Company (Sable), to immediately resume transporting oil through the Pipeline. For two months, the Pipeline has operated safely, delivering about 30,000 barrels per day to domestic refineries. Ex. A (Nunes Decl.) ¶ 17. That is enough to meet the daily motor vehicle gasoline needs for Fresno. *Id.* ¶ 18. And the volume is expected to eventually reach around 60,000 barrels per day, enough to supply the daily needs of San Diego. *Id.* ¶¶ 17-18. At bottom, the Order reflects what both the President and Congress have recognized: Our national security is tied to our energy security. *See Declaring a National Energy Emergency*, Exec. Order No. 14156, § 1, 90 Fed. Reg. 8433 (Jan. 20, 2025); 50 U.S.C. § 4502(a)(5).

But California thinks it knows better. Despite the concrete benefits provided by the Pipeline's operation, California asks for emergency relief to shut it down and

[1] Page cites for exhibits refer to the printed numbers in the original document.

strip the President of the power Congress gave him to "assure the availability of domestic energy supplies for national defense needs." 50 U.S.C. § 4502(a)(5). California is not entitled to the extraordinary relief it seeks.

To begin, California fails to show that it is likely to succeed on the merits. Its Administrative Procedure Act (APA) claims fail out of the gate because the Order—an exercise of presidential authority—is not reviewable under that statute and binding precedent. Even if California's APA claims were reviewable, they would still fail. California's lead argument, for example, is that the President's DPA authority is confined only to reordering existing contracts with the Federal Government. That argument ignores the DPA's plain text. *See, e.g.*, 50 U.S.C. § 4511(a)(2) (power includes "allocat[ing] materials, services, and facilities" as the President "deem[s] necessary or appropriate to promote the national defense"). With no textual support for its position, California tries to squeeze presidential authority out of the DPA through constitutional avoidance. But it is not even clear what constitutional violation California is trying to avoid. And California's other arguments about preemption are irrelevant—the question how the Order may interact with various state laws and programs is not before the Court. The only issue here is whether the Order itself is lawful on its face. It is.

California also fails to identify an imminent, irreparable injury. The *possibility* of an oil spill in the future does not qualify, especially when the evidence shows that the Pipeline is operating safely under federal supervision. Nor do *hypothetical* conflicts that may or may not arise between the Order and state programs that are not even at issue in this case. And California's position becomes weaker still when its alleged harm is balanced against the national security interests underlying the Order and the public interest in oil flowing through the Pipeline, which offsets slowed imports from abroad.

California falls far short of meeting its burden to justify the extraordinary remedy it seeks. The Court should deny its motion.

## BACKGROUND

### I. The Defense Production Act

The DPA grants the President—and any department head to which he delegates authority—"a sweeping delegation of power" to ensure that domestic industry can support the national defense. *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976). Congress enacted the DPA because "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States." 50 U.S.C. § 4502(a)(1); *see also id.* § 4502(a)(3) (finding that "the development of domestic productive capacity" is necessary "to provide for the national security" of the United States and "national defense preparedness"). Consistent with this prophylactic focus, the DPA grants the President "an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4).

As relevant here, the President may require entities to prioritize the performance of certain contracts, and to allocate materials, services, and facilities as he shall "deem necessary or appropriate" to promote the national defense and maximize domestic energy supplies. *See id.* § 4511(a), (c). The President has delegated these authorities to the Secretary of Energy and other executive department and agency heads. *See Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026); *National Defense Resources Preparedness*, Exec. Order. No. 13603, 77 Fed. Reg. 16651 (Mar. 16, 2012).

Throughout the DPA, Congress emphasized the link between domestic energy supplies and the national defense. For example, the DPA makes clear that "national defense preparedness" depends on "the availability of domestic energy supplies for national defense needs." 50 U.S.C. § 4502(a)(5). It defines "national defense"

broadly to include "energy production or construction." *Id.* § 4552(14). And it specifically designates energy as a "strategic and critical material." *Id.* § 4516.

**II. The Pipeline Capacity Prioritization and Allocation Order**

In January 2025, the President declared a National Energy Emergency, finding that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy"—threats that are "most pronounced" on the West Coast. Exec. Order No. 14156, § 1. The West Coast, and especially California, "is a geographically distinct region and market for petroleum" within the United States. Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 2. That is because "[t]here are no inbound petroleum pipelines to California from other states." *Id.* This isolation makes California a "fuel island"; to meet demand, the state must rely on either in-state production or imports. *Id.* at 7.

At the same time, California hosts "the highest concentration of defense-related activities in the United States," with 32 military bases that support U.S. Indo-Pacific Command and serve as the "vanguard" against nuclear adversaries, including China, Russia, and North Korea. *Id.* at 3, 9. A rapid and reliable fuel supply for these forces is critical to our national security and military readiness. *Id.* at 3.

Although in-state oil production historically met these defense needs, since 2001, California has overseen a 65 percent drop in its in-state production. *Id.* at 4. This fact, combined with the lack of inbound pipelines from other states, has left California—and essential U.S. military personnel and installations—heavily dependent on imports. California now imports 61 percent of its crude oil from foreign sources, making it the most oil-import-dependent state in the Nation. *Id.* Much of that oil comes from the Persian Gulf, where an ongoing conflict with Iran and crisis in the Strait of Hormuz has constrained this supply chain. *Id.* at 9-10; Ex. A (Nunes Decl.) ¶¶ 13-14. All this harms Californians. It also exposes "military fuel disruption vulnerabilities that now compromise U.S. force readiness and

national security." Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 4.

Meanwhile, the Santa Ynez Unit (the Unit)—one of the largest offshore oil fields in the United States—sits in federal waters off the coast of California. *Id.* at 1-2 & n.1. California has access to the Unit through the Pipeline, which can carry the sitting and available oil from offshore oil rigs to onshore refineries. *Id.* at 2. Although operating the Pipeline "would help alleviate California's petroleum scarcity by providing a secure, consistent, [and] local source of crude oil," the Pipeline has sat idle since 2015. *Id.* at 6. As a result, "the oil reserves in [the Unit] have become a stranded resource." *Id.*

After the start of the Iran conflict, the Secretary of Energy took action to address these problems. The Secretary determined that restarting the Pipeline is essential to core national defense and security needs stemming from West Coast energy shortages and supply chain risks. *See generally* Ex. A (Nunes Decl.) Attach. 1 (DPA Order); *id.* Attach. 2 (DPA Findings). He therefore issued the Order, which directs Sable to immediately prioritize and allocate transportation services for hydrocarbons from the Unit through the Pipeline, and to start performing under contracts for such transportation. *Id.* Attach. 1 (DPA Order) at 3. In issuing the Order, the Secretary also prepared separate documents with relevant findings and determinations. *Id.* Attach. 2 (DPA Findings), Attach. 3 (DPA Memo).

## III. Related Litigation

California's rendition of the background facts is disputed, but for present purposes, what matters is that the Pipeline and the Order are implicated in other cases. In March 2026, the United States moved to terminate or modify a 2020 consent decree resolving claims related to a 2015 leak of the Pipeline that led to an oil spill, before Sable owned the Pipeline. *See United States et al. v. Plains All Am. Pipeline L.P. et al.*, 2:20-cv-02415-SVW-SSC (C.D. Cal.) (*Plains*), Dkt. No. 49. As the United States explains in its motion, Sable is not a party to the consent decree. *See id.* at 5, 11-14. California is also challenging the federal Pipeline and Hazardous

Materials Safety Administration's (PHMSA) recognition in late 2025 that the Pipeline is interstate in nature and thus falls within PHMSA's exclusive regulatory jurisdiction. *See* Pet. for Rev., *California v. PHMSA*, 26-508 (9th Cir. Jan. 23, 2026), Dkt. No. 1. Contrary to California's assertions, PHMSA's action is consistent with its longstanding treatment of pipelines originating on the Outer Continental Shelf. Finally, the California Department of Parks and Recreation (CDPR) brought a trespass action against Sable for operating the Pipeline, a small portion of which runs underneath a state park. *See CDPR v. Sable Offshore Corp.*, 2:26-cv-02946-SVW-SSC (C.D. Cal. Mar. 19, 2026) (*CDPR*), Dkt No. 1. Sable disputes the trespass claim as time-barred, estopped, and preempted by the Pipeline Safety Act and the DPA Order. *See id.*, Dkt. No. 24. The United States filed a statement of interest in that litigation and has moved to intervene. *Id.*, Dkt. Nos. 38, 52.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The first factor—likely success on the merits—is the most important, and if a movant fails to make that showing, a court need not consider the other factors. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). "[T]he preliminary injunction factors also determine when a court should grant a stay of agency action under section 705 of the APA.'" *Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 983-84 (9th Cir. 2025).

## ARGUMENT

### I. California Is Not Likely to Succeed on the Merits.

California is unlikely to succeed on the merits because the Order is

unreviewable under the APA and, in any event, is consistent with both the DPA and the Constitution. The Court need not reach the other *Winter* factors, but if it does, they also cut against California's request for extraordinary relief.

**A. The Defense Production Act Order is not reviewable under the Administrative Procedure Act because the Order is presidential action, not agency action.**

Because the DPA does not create a private right of action, California's only statutory path to judicial review is the APA. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 808 n.7 (9th Cir. 2006). The APA waives sovereign immunity for, and structures judicial review around, "agency action." 5 U.S.C. §§ 702, 704; *Chairez v. Mayorkas*, 168 F.4th 1227, 1231 (9th Cir. 2026). Because the President is not an "agency," the APA's waiver and review provisions do not apply to presidential action. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Dalton v. Specter*, 511 U.S. 462, 469-70 (1994).

California's claims are not reviewable under the APA. The Secretary of Energy issued the Order under a delegation of authority that Congress vested in the President. The only question here is whether it matters that a *delegee*, rather than the President *personally*, exercised discretionary authority vested in the President by law. The answer is no.

Under Ninth Circuit precedent, when an agency head exercises the President's delegated authority, the action is presidential action for purposes of APA review. In *Jensen v. National Marine Fisheries Service*, a treaty gave the President authority to approve fishing regulations issued by a commission, and the President delegated that authority to the Secretary of State. 512 F.2d 1189, 1190-91 (9th Cir. 1975). In rejecting an APA challenge to the Secretary's exercise of that authority, the Ninth Circuit held that "[f]or purposes of this appeal the Secretary's actions are those of the President, and therefore by the terms of the APA the approval of the regulation at issue here is not reviewable." *Id.* at 1191.

Other courts have held that the bar on APA review of presidential action extends to agency action taken pursuant to a delegation of presidential authority. For example, the court in *Detroit International Bridge Company v. Government of Canada* held that the Secretary of State's exercise of delegated presidential authority to approve a permit for an international bridge was "presidential in nature"—and thus "unreviewable under the APA"—because it "involved the exercise of discretionary authority committed to the President" by the International Bridge Act of 1972. 189 F. Supp. 3d 85, 100-02 (D.D.C. 2016), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018); *see also Ancient Coin Collectors Guild v. U.S. Customs and Border Prot.*, 801 F. Supp. 2d 383, 404 (D. Md. 2011) (holding that "actions taken pursuant to delegated presidential authority will not be held subject to review under the APA"), *aff'd on other grounds*, 698 F.3d 171 (4th Cir. 2012); *Nat. Res. Def. Council (NRDC) v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 111-13 (D.D.C. 2009) (holding that "an act need not be carried out by the President personally to constitute presidential action exempt from judicial review under the APA" because an agency "stands in the President's shoes" when it exercises "the President's inherent discretionary power"); *Sisseton–Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071, 1082 (D.S.D. 2009) ("The President is free to delegate some of his powers to the heads of executive departments and those delegation actions that are carried out create a presumption of being as those of the President.").

So too here—the Secretary of Energy's "actions are those of the President," *Jensen*, 512 F.2d at 1191, and the issuance of the Order is "unreviewable presidential action because it involved an exercise of discretionary authority committed to the President by law" in the DPA. *Detroit Int'l Bridge*, 189 F. Supp. 3d at 102; *see* 50 U.S.C. §§ 4511, 4554(a). What is more, the "separation of powers concerns" undergirding the court's holding in *Detroit International Bridge* are weightier here because the case arises in the "sensitive" and "complex" area of national security.

189 F. Supp. 3d at 103; *Ancient Coin*, 801 F. Supp. 2d at 403; *NRDC*, 658 F. Supp. 2d at 111; *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (noting that "courts traditionally have been reluctant to intrude" into "national security affairs").

None of this is to say that agency action becomes unreviewable whenever it is directed by the President. APA review is available for "actions involving authority delegated by Congress to an agency" but "directed by the President." *Detroit Int'l Bridge*, 189 F. Supp. 3d at 104 (quoting Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001)). That explains why courts review agency actions that simply implement executive orders. *See Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). But when, as here, the President formally delegates *his* statutory or constitutional authority to an agency head, and the agency head then acts solely under *that* authority, there is presidential action beyond the scope of the APA.

**B. The Defense Production Act Order is both lawful and rational.**

Even if California could clear this reviewability barrier, it is still unlikely to succeed on the merits. The Order complies with the DPA, the Constitution, and Department of Energy regulations. And California's arbitrary-and-capricious challenge not only mischaracterizes the record—it invites the Court to second-guess the national security determinations that Congress assigned to the Executive Branch.

**1. The Defense Production Act Order is not contrary to law.**

California makes three arguments about the legality of the Order, but it is incorrect on all of them. The Order (1) is a proper exercise of DPA authority to prioritize and allocate, (2) is consistent with the Constitution, and (3) accords with Department of Energy regulations.

***a. Prioritization and Allocation***. In the Order, the Secretary invokes both prioritization and allocation authorities under section 4511. California suggests that section 4511(a) is only about *contract prioritization*, citing the section title. *See* Pl.'s Mem. in Support of Mot. for Prelim. Inj. at 9, Dkt. No. 16-2 ("CA Mem."). But "the title of a statute cannot limit the plain meaning of the text." *Pennsylvania Dep't of*

*Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). And the plain text establishes two distinct authorities: (1) prioritization of contracts or orders, 50 U.S.C. § 4511(a)(1), and (2) allocation of materials, services, and facilities, *id.* § 4511(a)(2). California's attempt to collapse these authorities into a single authority about contract prioritization defies the statute's plain text. And whether taken individually or in combination, section 4511(a)'s two "broad and flexible" authorities plainly allow the Secretary to order the Pipeline to operate. H.R. Rep. No. 2759 at 4, 81st Cong., 2d Sess. (1950).

Prioritization. Under section 4511(a)(1), the President may "require that performance under contracts or orders which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). And "for the purpose of assuring such priority," he may "require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance." *Id.* This statutory text reveals two important points. First, prioritization is not limited to contracts with the Federal Government—the President may also prioritize the performance of contracts between and among private parties. *See McDaniel v. Wells Fargo Invs.*, 717 F.3d 668, 677 (9th Cir. 2013) ("Under the standard rules of statutory construction, we will not read into the statute a limitation that is not there." (cleaned up)). Second, the President's authority is not limited to prioritizing *existing* contracts—he may also "require *acceptance* and performance" of contracts deemed essential to the national defense, which necessarily means that he may direct parties to prioritize contracts not yet formed. 50 U.S.C. § 4511(a)(1) (emphasis added); *Hou. Dairy, Inc. v. John Hancock Mut. Life Ins. Co.*, 643 F.2d 1185, 1186 (5th Cir. 1981) ("It is fundamental that a contract is formed only upon acceptance of an offer.").

The Secretary thus acted well within his authority in ordering Sable to immediately prioritize the performance of contracts for hydrocarbon transportation services and "to accept and perform such contracts or order[s] up to and so long as

the [Pipeline] has capacity to transport." Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3. And Sable, of course, could not comply with this command without restarting the pipeline. *See Freeman v. Gonzales*, 444 F.3d 1031, 1036 (9th Cir. 2006) ("A statutory grant of power carries with it, by implication, everything necessary to carry out the power and make it effectual and complete." (cleaned up)). California's contrary argument—that the Secretary could only prioritize outstanding contracts between Sable and the Federal Government, contracts that Sable could not even perform given the dormant pipeline—imposes atextual limitations on the Secretary's prioritization authority. *See also* Presidential Memorandum on Order Under Defense Production Act Regarding General Motors Company (Mar. 27, 2020), https://tinyurl.com/2k8jkmzu (invoking DPA to order General Motors to accept, perform, and prioritize contracts for *ventilator* production).

Allocation. If there were any doubt about the Secretary's ability to order the Pipeline's operation, his invocation of the DPA's allocation authority eliminates it. Section 4511(a)(2) broadly authorizes the President "to allocate *materials*, *services*, and *facilities* in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2) (emphasis added). California claims that this authority merely allows the President to reshuffle existing resources, not to order a pipeline to operate. CA Mem. at 10. But California misreads both the Order and the DPA.

To begin, the Order allocates an existing "material" (hydrocarbons in the Unit) for transfer through the Pipeline to onshore sites and, ultimately, to market. *See* 50 U.S.C. § 4552(13) (defining "materials" to include "any raw materials" and "services ancillary to the use of any such materials"). Or, to borrow from California, the Order "apportion[s]" hydrocarbons in the Unit "for a specific purpose." CA Mem. at 10. Relatedly, the Order allocates the "service" of transportation from the Unit to onshore sites through an existing "facility" (the Pipeline). *See* 50 U.S.C. § 4552(16)(A) (defining "services" to include "any effort that is needed for or

incidental to" the "development" or "production" or "distribution" of "an industrial resource"); *id.* § 4552(8) (defining "facilities" to include "all types of buildings, structures, or other improvements to real property" and "services relating to the use of any such building, structure, or other improvement"). Thus, even if California's narrow reading of "allocate" were correct, the Order is a permissible allocation because it simply directs Sable to move oil from an oil field to onshore sites "in such manner" and "to such extent" as the Secretary deems necessary and appropriate to ensure the national defense. *Id.* § 4511(a)(2).

California's flawed reading—that ordering the Pipeline to operate is not an "allocation"—also ignores critical statutory text. *See Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010) (reliance "upon a dictionary definition" must "account for the governing statutory context"). Recall that section 4511(a)(2) authorizes the President to allocate "services," which is defined to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." 50 U.S.C. § 4552(16)(A). Productive activity is thus something the President may allocate—and section 4511(a)(2) grants him broad discretion to do so "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." *Id.* § 4511(a)(2). This grant of authority necessarily includes the power to compel production. *See id.* § 4502(a)(3) (Congressional finding that "the development of domestic productive capacity" is critical for ensuring the national defense); *id.* § 4511(c) (providing that an allocation order may be used to "maximize domestic energy supplies"); 10 C.F.R. § 217.53(b) (providing that an allocation order may "require[] a person to take or refrain from taking certain actions"). So the Secretary acted well within his authority in directing a dormant pipeline to operate.

Indeed, such power has been exercised—and upheld—before. In the wake of the COVID-19 pandemic, the Secretary of Agriculture used DPA allocation authority to order meat and poultry processing plants to remain in operation—and,

for plants that had closed, to promptly *resume operations*—under specialized federal health guidance.[2] Recognizing that "the DPA accords the Executive Branch great flexibility," the district court held that the Secretary had permissibly exercised his allocation authority to determine the "manner," "conditions," and "extent" of meat and poultry processors' operations, and that the DPA order preempted conflicting state law that would have impeded those operations. *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388-89 (N.D. Tex. 2022) (cleaned up), *aff'd on other grounds*, 2023 WL 2645553 (5th Cir. Mar. 27, 2023). The Secretary of Energy has acted similarly in ordering Sable to resume operation of the Pipeline.

In short, the Order is a valid exercise of the Secretary's DPA authorities. And, contrary to California's assertion, the findings required under section 4511(b) are inapplicable because directing Sable to operate a specific pipeline does not "control the *general* distribution of any material in the civilian market." 50 U.S.C. § 4511(b) (emphasis added). As the Secretary explained, the Order leaves private parties "free to contract and negotiate hydrocarbon materials themselves and otherwise distribute and sell them through civilian markets." *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 11. Nor does section 4511(b) apply to the allocation of pipeline *facilities* and transportation *services*; it applies only to "material[s]." 50 U.S.C. § 4511(b). Still, the Secretary *did* make the required findings under section 4511(b) in the alternative. *See id.* Attach. 2 (DPA Findings) at 3.[3]

---

[2] *See Delegating Authority Under the Defense Production Act With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19*, Exec. Order No. 13917, 85 Fed. Reg. 26313 (Apr. 28, 2020); Letter from Secretary Purdue *Re: Executive Order 13917 Delegating Authority Under the Defense Production Act with Respect to the Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* (May 5, 2020), https://tinyurl.com/3tb3zfb5.

[3] For all the same reasons, the Secretary properly exercised his prioritization and allocation authorities under section 4511(c) "to maximize domestic energy supplies." *Contra* CA Mem. at 11-12.

***b. Preemption and Anticommandeering*.** California next urges that the Order is unconstitutional and contrary to law because (1) the relevant DPA provisions lack preemptive language, (2) the Order impairs California's property rights, and (3) the Order conflicts with a federal consent decree. Each point is fatally flawed.

*First*, California's claim that the Order is contrary to law because it does not preempt state law is a non sequitur. *See* CA Mem. at 12-13. The preemptive effect of the Order is distinct from its legal validity. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) (whether an action preempts state law is distinct from "whether that action is within the scope of the [agency's] delegated authority"). And the only question before this Court is the Order's legal validity under federal law—the preemptive scope of the Order must be considered in a case or controversy involving an alleged conflict between the Order and a specific state law, which would likely involve Sable seeking declaratory relief against California (as in *Sable Offshore Corp. v. Quintero*, 2:26-cv-02739-SVW-SSC) or raising preemption as a defense to a state-law claim (as in *CDPR*). *See Nelson v. Stewart*, 422 F.3d 463, 466 (7th Cir. 2005) ("Most often, a defendant raises federal preemption as a defense to a state-law action."). The Secretary is unaware of any case—and California cites none—holding that a federal action was unlawful simply because it failed to preempt state law.

Still, California is wrong that the Order lacks preemptive force. An order issued under authority that Congress delegated to the President preempts conflicting state law. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974). And contrary to California's misplaced focus on whether Congress authorized preemption in the DPA, an order's preemptive effect "does not depend on express congressional authorization to displace state law." *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 154. When considering the preemptive force of Executive action, courts "do not focus on Congress's intent to supersede state law," but on whether the *Executive* " meant to pre-empt' the state law." *Cohen v.*

*Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022). And as with federal statutes, such intent is implied for "any state or local law that conflicts with such [Executive action] or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988). Accordingly, the Order preempts any California law that conflicts with its directive that Sable immediately operate the Pipeline. *See Johnson*, 580 F. Supp. 3d at 388-89 (holding that a DPA allocation order preempted conflicting state law).

*Second*, California's contention that the Order impairs its property rights is misguided for similar reasons. Whether the Order even affects a specific property interest cannot be answered in the abstract; it requires its own concrete case or controversy—such as the *Quintero* and *CDPR* actions. The question should not (and cannot) be collaterally decided here.

And even if the Order did affect California's property interests, that would not mean that the Order is invalid. California still must ground its argument in the violation of some *federal* law. The DPA, for its part, nowhere suggests that property interests somehow limit the President's prioritization and allocation authorities. To the contrary, these authorities necessarily affect property interests because they involve directing the use of private resources. That likely explains why California grounds its argument in constitutional avoidance rather than the text of the DPA (though even California's overly restrictive reading of the statute allows the President to affect property rights).

But constitutional avoidance is about interpreting statutes to—as the name suggests—avoid constitutional problems. And California's insistence on a constitutional problem is untethered to any recognized constitutional *doctrine*. For example, California's attempt to dress up its argument with anticommandeering language fails because that doctrine prohibits the Federal Government from "issu[ing] orders *directly* to the States." *Murphy v. NCAA*, 584 U.S. 453, 470 (2018) (emphasis added). It reflects the basic principle that the "Constitution confers upon Congress the power to regulate individuals, not States." *New York v. United*

*States*, 505 U.S. 144, 166 (1992). Or put differently, "[w]here a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." *Id.* at 178. Here, the Order imposes an obligation directly on *Sable*, not California. That obligation may conflict with obligations imposed by state law—which, in the proper case, would tee up preemption, not anticommandeering, *see Murphy*, 584 U.S. at 470-71, 477-79—but it does not conscript California into doing anything.

Insofar as California relies on the Tenth Amendment more generally, the Supreme Court "long ago rejected the suggestion" that the Federal Government "invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority ... in a manner that displaces the States' exercise of their police powers." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981). If the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013). And here, the Secretary acted pursuant to a valid federal statute.

In truth, California's argument sounds much more like a takings or due process claim. *See* CA Mem. at 14-15 ("it would be unconstitutional to deploy the DPA to force States to dedicate state land to the federal government's ends"). But it has not brought a takings claim, which would fail anyway because taking property is not unconstitutional—only failing to provide just compensation—and claims for compensation must be brought in the Court of Federal Claims; they are not reviewable under the APA. *Knick v. Township of Scott*, 588 U.S. 180, 205 (2019); *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 191 (5th Cir. 2023). Nor has California brought a due process claim, which also would fail because states lack due process rights. *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966).

*Finally*, California's argument that the Order conflicts with the federal consent decree assumes that Sable is a party to the consent decree. But as the United States explains in its motion to terminate or modify the consent decree, Sable is not

a party, which means that there is no conflict. *See Plains*, Dkt. No. 49 at 5, 11-14; *id.*, Dkt. No. 60 at 4-9. What is more, California's portrayal of the Order as a frontal assault on the consent decree is false. The Order does what Congress authorized: direct Sable to operate a pipeline to satisfy critical national security needs. California cites no support for the proposition that a consent decree conditions the President's authority under the DPA.

California gets things exactly backwards. Consent decrees are creatures of equity and "*must* be modified if one or more of the obligations placed upon the parties has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992) (emphasis added); *see also id.* (consent decrees may also be modified "when the statutory or decisional law has changed to make legal what the decree was designed to prevent"). The Order now makes it "impermissible under federal law" for Sable *not* to operate the Pipeline *immediately*. *Id.* Thus, the Order *requires* that the consent decree be modified—relief the Federal Government has sought from this Court in the consent decree case—which necessarily means that it does not *violate* the consent decree. *Id.* At the very least, the Court should decide the United States' motion to terminate or modify the consent decree before resolving this motion, as doing so would crystallize the issues here.

***c. Department of Energy Regulations***. The Secretary acted consistent with departmental regulations in issuing the Order. *First*, the Order "reads in substance" (10 C.F.R. § 217.54(d)) like the language in the regulation—it makes clear that (1) it is an "allocation" order in both the title and body, (2) it is necessary for the "national defense," and (3) Sable is the covered entity and must immediately "comply" with its terms. Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 1, 3. *Second*, by directing Sable to act "immediately," the Order's start date is the date it was signed—March 13, 2026. 10 C.F.R. § 217.54(b). And rather than pick an arbitrary end date that may not reflect conditions on the ground, the Order reasonably directs Sable to comply "until such time as the conditions necessitating the issuance

of this order abate or until Sable is directed otherwise." Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3; *see* 50 U.S.C. § 4511(a)(2) (authorizing the President to allocate "in such manner" and "to such extent" as he deems "necessary or appropriate"). *Third*, the Order gives a detailed description of the required allocation action—Sable must "allocate pipeline transportation services for hydrocarbons from the [Unit] through the [Pipeline], including transportation service activities at the onshore facilities in Las Flores Canyon, California, to Pentland Station terminal in Pentland, California." Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3; 10 C.F.R. § 217.54(a). Notably, Sable—the party these regulations are designed to protect—has expressed no uncertainty over its obligations.

*Fourth*, the rated order provisions in 10 C.F.R. Part 217, Subpart C do not apply because the Order is a "Priorities Directive," not a rated order, which is why no "D /DO" ratings were required. *See* Ex. A (Nunes Decl.) Attach. 1 (DPA Order) at 3; 10 C.F.R. § 217.62 ("A Priorities Directive takes precedence over all" rated orders); *id.* § 217.31(a)(3) (same). *Fifth*, the Secretary was not required to submit findings to the President under 10 C.F.R. § 217.52, because the Order does not control the general distribution of a material in the civilian market. *See* Ex. A (Nunes Decl.) Attach. 2 (DPA Findings) at 3; *supra* at 13. And *sixth*, the Secretary considered all relevant factors in making the determinations in 10 C.F.R. § 216.4(b) (*see* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 3, 4, 5-6, 7, 9, 13) and findings in 10 C.F.R. § 216.4(c) (*see id.* at 2, 4, 5, 6, 9).

Even if the Order did not satisfy some aspect of a regulation, the Court should not grant California's extraordinary relief for two reasons. For one, the APA expressly incorporates the harmless-error rule, and California was not prejudiced by any purported failure to follow the regulations. 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542, 930 (2025) ("When it is clear that the agency's error had no bearing on the procedure used or the substance of the decision reached, a remand

would be pointless." (cleaned up)). Indeed, the Secretary issued the Order based on his determination that it was *necessary* to the national defense. California thus cannot plausibly argue that a minor procedural error in issuing the Order changed the outcome.

For another, Department regulations provide that "[a]n allocation order may be changed by official action." 10 C.F.R. § 217.56. So if the Court concludes that the Order violates a regulation and that the error is not harmless, it should allow the Secretary to fix the error through the simple process provided in the regulations, rather than preliminarily enjoining the Order and disrupting ongoing operations of a pipeline that the Executive Branch has deemed critical to the national defense.

**2. The Defense Production Act Order is rational.**

As an initial matter, agency action is committed to agency discretion—and thus unreviewable—if "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); 5 U.S.C. § 701(a)(2). Review is also unavailable for "certain categories" of actions "traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191-93 (1993). This is why the APA's general presumption of reviewability "runs aground when it encounters concerns of national security." *Egan*, 484 U.S. at 527.

In its motion, California wisely does not challenge the national defense determination under section 4511(a). *See* CA Mem. at 17-18; *Webster v. Doe*, 486 U.S. 592, 600 (1988) (holding that statute authorizing CIA Director to terminate employees when he "shall *deem* such termination necessary or advisable in the interests of the United States" "foreclose[d] the application of any meaningful judicial standard of review"). California instead challenges the Secretary's findings under section 4511(c), which are distinct from his use of section 4511(a) and would not, even if invalid, support enjoining the entire Order.

But California is wrong that the Secretary's findings under section 4511(c)

were arbitrary and capricious. Even in the ordinary case, "[t]he arbitrary or capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). And when, as here, national security is involved, review is even more deferential. *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018) ("our inquiry into matters of national security is highly constrained"); *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("our review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential"). Section 4511(c)—though nominally about maximizing domestic energy supplies—is no less concerned with national security than section 4511(a), given the DPA's explicit and repeated recognition of the link between domestic energy supplies and our national security. *See, e.g.*, 50 U.S.C. §§ 4502(a)(5), 4516, 4552(14) ; *Webster*, 486 U.S. at 600 (considering the "overall structure" of the statute to determine reviewability).

California asserts that the Secretary's use of his authority under section 4511(c) relied on the mere recitation of the required findings, without providing any support for them. That is false—the Secretary provided an extensive factual basis for, and explanation of, these findings. *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 5-8, 11-13. That is more than enough, especially given that the Order is "a preventative measure in the context of national security," so the Secretary was "not required to conclusively link all of the pieces in the puzzle before courts grant weight to his empirical conclusions." *Trump*, 585 U.S. at 686-87. Nor does California explain how courts could even review these determinations, given that the DPA does not require the President to provide a detailed basis for his determinations; it simply requires that he *make* the determinations. *Cf. id.* at 685-86.

As for California's claim that the Secretary ignored important aspects of the problem, the Secretary considered "the relevant factors required by the [DPA]," *Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016)—whether the

Order was "necessary or appropriate to promote the national defense" and satisfied the required findings, 50 U.S.C. 4511(a)-(c). Congress itself recognized in the DPA that shortfalls in the energy supply harm the national defense, *see* 50 U.S.C. § 4502(a)(5), so the same determination—and resulting action—by the Secretary could not be arbitrary and capricious. California's argument that the Secretary overlooked the effect of the Order on the consent decree or on California's sovereign interests begs the question on the merits of those claims and would require the Secretary to consider factors different from what the DPA directs. Finally, the Secretary explained his finding under section 4511(c)(2). *See* Ex. A (Nunes Decl.) Attach. 3 (DPA Memo) at 13.

**II. California Has Not Established that it Is Likely to Suffer Irreparable Harm or that the Equitable Factors Favor a Preliminary Injunction and Stay.**

"Regardless of the strength of its showings on the other factors, a plaintiff may not obtain a preliminary injunction unless he or she establishes that irreparable harm is likely to result in the absence of the requested injunction." *Immigrant Defs. Law Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1032-33 (C.D. Cal. 2025) (citing *All. for The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). California comes nowhere close to establishing that it is *likely* to suffer irreparable harm absent preliminary relief. And the balance of equities and public interest, which merge here, tip decisively in the Federal Government's favor.

**A. California is not likely to suffer irreparable harm absent preliminary relief.**

In *Winter*, the Supreme Court held that a party seeking preliminary relief must demonstrate that irreparable harm is "likely," not just that it is a "possibility." 555 U.S. at 22. The likelihood must be "grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014) (citation omitted); *Boardman v. Pac. Seafood Grp.*, 822 F.3d

1011, 1022 (9th Cir. 2016) ("speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction" (cleaned up)). Irreparable harm must also be "immediate." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) ("harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough").

California waited nearly two months—and over a month after filing this action—to seek emergency relief against the Order. *See Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Its theories of irreparable harm explain the lack of urgency. California first claims that the Order causes irreparable harm "by forcing the State to bear the noncompliant pipeline's *risks* while immunizing Sable from the consequences, thus reducing Sable's *incentive* to invest in safe operations." CA Mem. at 19 (emphasis added). Second, California argues that the operation of the Pipeline subjects it "to the *risk* of harm to species protected under the California Endangered Species Act." *Id.* (emphasis added). Both theories traffic in pure speculation, relying on (in California's own words) alleged "risks" and reduced "incentive" to operate safely. *Id.* These layers of speculation, at most, support the mere *possibility* of harm at some indefinite future time, not likely and imminent irreparable harm that is "grounded in evidence." *Winter*, 555 U.S. at 22; *Caribbean Marine Servs.*, 844 F.2d at 674; *Pom Wonderful*, 775 F.3d at 1133. Indeed, California offers no evidence that the Pipeline is unsafe, much less that it is being operated in a manner that is *likely* to result in an *imminent* spill that, in turn, would be severe enough to cause environmental damage or harm to an endangered species. *See Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (irreparable harm requires "a definitive threat of future harm to protected species, not mere speculation").

California mentions the 2015 spill caused by external corrosion of the Pipeline, when a different company operated it, and *over two decades* after

operations began. *See* Pl.'s Request for Judicial Notice, Ex. 3 at 4-5 (noting no reported releases outside of pump stations from the early 1990s to 2015). But its condition now is nothing like what existed in 2015. Since then, Sable has remediated all anomalies with metal loss over 40 percent, installed 27 new safety valves, implemented an enhanced leak detection system, and upgraded the Pipeline's control room. Ex. B (Hubbard Decl.) ¶ 9, Attach. 1. It has also performed rigorous strength and hydrostatic spike tests that increased internal pressure significantly above the Pipeline's maximum operating pressure. *Id.* ¶ 10, Attach. 2. No leak occurred during the tests, demonstrating that the Pipeline has no serious defects and is fit for service. *Id.* And that has proven true—Sable has now operated the Pipeline for nearly two months with no releases or safety concerns. *Id.* ¶ 21.

California wrongly asserts that the preconditions for safely restarting the Pipeline are unmet. The restart occurred pursuant to a comprehensive plan approved by PHMSA, and federal pipeline safety inspectors have been overseeing Sable's compliance with the plan since operations resumed. *Id.* ¶¶ 12-15, 19-20. Sable also continues to comply with an emergency special permit from PHMSA containing substantially the same provisions already approved by California in state waivers, and Sable has applied for a regular permit with the same provisions. *Id.* ¶¶ 16-18, Attachs. 5-7. On this record, California cannot establish likely irreparable harm.

Nor is there merit to California's other theories of irreparable harm. California is not entitled to the presumption of irreparable harm for constitutional violations because it has not established a likelihood of success on its constitutional claims. *See Clam Ventures LLC v. Newsom*, 2021 WL 1502657, at 8 (C.D. Cal. Mar. 25, 2021). California also asserts irreparable injury based on the Order's alleged displacement of state regulatory authority, but such displacement of a particular state law or action is not before the Court.

To be sure, California ticks off "state regulatory powers" and "rights" that the Order allegedly "purports to displace." CA Mem. at 20. But these "powers" and

"rights" are not part of this case or controversy—which means that the Court would be issuing an advisory opinion if it opined on how the Order interacts with, for example, the California Geologic Energy Management Division's testing or the Department of Fish and Wildlife's duties to protect endangered species. Even California's own declarants cannot say how (or if) the Order will affect those activities. *See* Sharma Decl. ¶ 11, Dkt. No. 16-5 ("*If* Sable denies access to CalGEM inspectors on the basis of the Wright Order, it *would* impede CalGEM's ability to ensure compliance ." (emphasis added)); Vance Decl. ¶ 15, Dkt. No. 16-4 ("*Depending* on the type of maintenance repair, or other work to the Pipeline that will need to be completed, [certain permits] *might* be required before the work may begin." (emphasis added)). Not only does California lack standing to raise these hypothetical future harms—they are purely speculative, not *likely*.

Insofar as California contends that the Order displaces the State's authority over the Pipeline's operation, that is inaccurate—if anything, PHMSA displaced that authority in late 2025 when it recognized that the Pipeline is interstate (placing it within PHMSA's exclusive jurisdiction) and approved the Pipeline's restart. Ex. B (Hubbard Decl.) ¶¶ 14-18. California thus lacks standing to challenge the Order on this basis. Worse, to hold that the Order—which was issued later, in March 2026—displaced California's authority would effectively declare that PHMSA's prior exercise of jurisdiction and approval of a restart was invalid and ineffective, which would interfere with the Ninth Circuit's ongoing consideration of that issue and exceed this Court's jurisdiction. *See* 49 U.S.C. § 60119(a).

**B. The balance of harms and the public interest weigh strongly against an injunction.**

"It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (cleaned up). In *Winter*, the Supreme Court held that the public interest and balance of equities tipped "strongly in favor" of the government based on the President's

determination that the challenged activity was "essential to national security." 555 U.S. at 26. So too, the Secretary issued the Order based on his determination that the immediate operation of the Pipeline is necessary to promote the national defense. As in *Winter*, that determination should be decisive, especially given the weaknesses in California's theories of harm.

But if more were needed, enjoining the Order would result in the immediate loss of between 30,000 and 60,000 barrels per day of domestic oil supply—quantities large enough to meet the daily motor vehicle gasoline needs of major cities—which is especially critical given the ongoing situation in the Strait of Hormuz and resulting 200,000-barrel-per-day supply gap. Ex. A (Nunes Decl.) ¶¶ 13-14, 18-19, 21. Enjoining the Order would also affect other states that rely on California for their own supply needs. *Id.* ¶ 11. Compared to California's evidence-free, speculative harms, these public interest impacts tip the scales decisively in the Federal Government's favor.

## CONCLUSION

The Court should deny California's motion for a preliminary injunction and stay.

DATED: May 11, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
JUSTIN D. HEMINGER
Deputy Assistant Attorneys General

*/s/ Riley W. Walters*
Riley W. Walters
Email: Riley.Walters usdoj.gov
Counsel (DC Bar No. 90008638)
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 514-5442

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Federal Defendants, certifies that this brief contains 25 pages, which:

____ complies with the Court's New Case Order, Dkt. No. 18 at 2, setting a 25-page limit for opposition briefs.

DATED: May 11, 2026

/s/ *Riley W. Walters*

Riley W. Walters

# Exhibit A

Case: 26-5409, 10/02/2026, DktEntry: 19.1, (613 of 1218)

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
ROBERT N. STANDER
Deputy Assistant Attorneys General
RILEY W. WALTERS
Email: Riley.Walters@usdoj.gov
Counsel
U.S. Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Phone: (202) 514-5442

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br><br>Defendants. | Case No. 2:26-cv-03396-SVW-SSC<br><br>**DECLARATION OF ASHLEY NUNES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY**<br><br>Hearing: June 1, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Stephen V. Wilson |

Case: 26-5409, 10/02/2026, DktEntry: 19.1, (614 of 1218)

**DECLARATION OF ASHLEY NUNES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY**

I, Ashley Nunes, hereby declare as follows:

1. I am the Director of the Office of Policy at the U.S. Department of Energy ("DOE"). I have served in this role since August 2025. In this capacity, I lead a team that advises the Secretary of Energy and DOE, more generally, on issues related to energy production, job creation, infrastructure development, and state, local, and tribal policy. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto.

2. I am aware that on January 20, 2025, the President issued Executive Order 14156, determining that the nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."

3. I am aware that on March 13, 2026, the Secretary of Energy issued an order under the Defense Production Act, entitled, "Pipeline Capacity Prioritization and Allocation Order" (the "DPA Order"), as a response to the declared National Energy Emergency, rooted in a severe and growing energy crisis on the West Coast that has profound implications for the entire nation. A true and correct copy of the DPA Order is attached to this declaration as Attachment 1.

4. I am aware that concurrent with the DPA Order, the Secretary of Energy issued a separate document entitled, "United States Department of Energy (DOE) Findings and Determinations and Prioritization and Allocation Plan for Hydrocarbon Transportation Services." A true and correct copy of this document is attached to this declaration as Attachment 2.

5. As part of my official duties on behalf of DOE, I contributed to the preparation of a memorandum addressing whether to issue a DPA Order directed

Case: 26-5409, 10/02/2026, DktEntry: 19.1, (615 of 1218)

to Sable Offshore Corporation and Pacific Pipeline Company regarding the Santa Ynez Pipeline System. A true and correct copy of that memorandum is attached to this declaration as Attachment 3.

6. The emergency described in E.O. 14156 is particularly pronounced in California—home to 32 federal military installations (the largest concentration of defense facilities in the United States and the linchpin of the United States' military posture in the Indo-Pacific region), 15 coast guard stations, 38.3 million (11.5%) of the United States' citizens, and $4.3 trillion (13.8%) of the country's GDP.

7. Energy security is national security. Economic success, military readiness, and geopolitical power depend on "the uninterrupted availability of energy sources at an affordable price;" in other words, energy security. The inability to access to reliable, cheap energy can produce "severe social unrest and inflame conflict between nations." Thomas Wackman, *Energy Security is National Security*, April 2023, https://www.instituteforenergyresearch.org/wp-content/uploads/2023/04/Energy-Security-Is-National-Security-Wackman.pdf (accessed May 11, 2026). The oil embargo of 1973 is but one example of this. The event caused social unrest, widespread frustration and panic buying, reportedly prompting the United States government to consider seizing oil fields in the Middle East. Glenn Frankel, *U.S. Mulled Seizing Oil Fields In '73*, Washington Post, Dec. 31, 2003, https://www.washingtonpost.com/archive/politics/2004/01/01/us-mulled-seizing-oil-fields-in-73/0661ef3e-027e-4758-9c41-90a40bbcfc4d/ (accessed May 11, 2026).

8. California is vital to U.S. energy security – and consequently, national security – as both the most populous state and a major energy producer. *U.S. Energy Information Administration*, www.eia.gov/states/CA/analysis (accessed May 11, 2026).

Case: 26-5409, 10/02/2026, DktEntry: 19.1, (616 of 1218)

9. However, California faces unique challenges as an "oil island," with no inbound pipelines to bring domestic sources of oil and refined products into the state. As in-state oil production and marine imports from Alaska have declined, the state has increasingly relied on foreign crude oil to satisfy the approximately 1.4 million barrels per day ("bpd") that California consumes. In addition, 95% of California's inbound crude oil and refined fuel products are delivered by maritime tankers. Attach. 3 at 4.

10. In 1982, California imported only 5.6% of its crude oil from foreign sources. Attach. 3 at 4. By 2025, however, that figure had increased to 61.1%, with imports coming from the following countries:

**Brazil** – 52.1 million barrels of crude oil (18.0%)

**Iraq** – 50.8 million barrels of crude oil (17.5%)

**Guyana** – 39.7 million barrels of crude oil (13.7%)

**Canada** – 35.5 million barrels of crude oil (12.2%)

**Ecuador** – 34.6 million barrels of crude oil (11.9%)

**Argentina** – 25.6 million barrels of crude oil (8.8%)

**Saudi Arabia** – 22.8 million barrels of crude oil (7.9%)

**Colombia** – 10.9 million barrels of crude oil (3.8%)

**United Arab Emirates** – 9.7 million barrels of crude oil (3.4%)

**Other countries** – 8.2 million barrels of crude oil (2.8%)

*Foreign Sources of Crude Oil Imports to California*, California Energy Commission, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports (accessed May 11, 2026).

11. This dependency has regional implications, as California supplies about 33% and 88% of Arizona and Nevada's gasoline market, respectively. These states have maintained their reliance on California refined products and are therefore subject to similar vulnerabilities as California. *Arizona and Nevada Brace for Impact as California Refinery Exodus Creates Gasoline Supply Crunch*,

Case: 26-5409, 10/02/2026, DktEntry: 19.1, (617 of 1218)

Stillwater Associates, June 3, 2025, https://stillwaterassociates.com/arizona-and-nevada-brace-for-impact-as-california-refinery-exodus-creates-gasoline-supply-crunch/ (accessed May 11, 2026).

12. Such a heavy dependency on foreign oil subjects the United States to the volatility of global conflicts and the risk of intentional action by foreign nations to disrupt the supply chain, which is precariously dependent on a small number of international shipping routes vulnerable to global shipping disruptions.

13. For example, about 29% of California's foreign sources of marine crude oil imports originated from the countries in the Persian Gulf in 2025, and the recent incident in the Strait of Hormuz has significantly impeded these shipments. *Foreign Sources of Crude Oil Imports to California*, California Energy Commission, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports (accessed May 11, 2026).

14. As the final ship has arrived in California from the Persian Gulf, there will potentially be a 200,000-bpd supply gap of crude oil inputs to California compared to 2025 due to the situation in the Strait of Hormuz.

15. Global oil supply shocks are not new. Over the course of the last 75 years, global oil supply has been affected by events such as the 1956-57 Suez Canal Crisis, the 1973-74 Arab Oil Embargo, the 1978-79 Iranian Revolution, and the 1990-91 Gulf War. What has changed is a drastic reduction in California's crude production (which continues to decline at a rate of about 18,000 barrels per day annually) and refining capacity (down from 23 refineries in 2000 to just 11 today) and a resulting dependence on foreign imports that has, in turn, dramatically increased exposure to global supply shocks while leaving California consumers with the highest gas prices in the United States. Joseph B. Silvi, James W. Rector, Michael A. Mische, *A Study of SB 237 to Stabilize Oil Production in California*, at 8, October 2025, https://californiaglobe.com/wp-content/uploads/2025/10/A-

Case: 26-5409, 10/02/2026, DktEntry: 19.1, (618 of 1218)

Study-of-SB-237-to-Stabilize-Oil-Production-in-California-Definitive.pdf (accessed May 11, 2026).

16. The DPA Order addresses these problems by prioritizing crude oil delivery from Santa Ynez Unit ("SYU"), one of the largest known production units off the Pacific coast of the United States, which has been stranded for over a decade following the 2015 closure of the Santa Ynez Pipeline System ("SYPS")—the only pipeline capable of transporting oil from the SYU to onshore refineries.

17. The Order is designed to alleviate this impasse and unlock the potential production of nearly 60,000 barrels of oil equivalents per day ("BOE/D"); the DPA Order is currently facilitating the production and delivery of approximately 30,000 BOE/D as the SYPS operator ramps up production. *Investor Presentation.* Sable Offshore Corporation, April 20, 2026, https://s202.q4cdn.com/300304768/files/doc_presentation/2026/Sable-Offshore-Corp-Investor-Presentation_April-2026.pdf (accessed May 11, 2026).

18. This oil is a significant supply. For context, 60,000 BOE/D can approximately supply the daily motor gasoline needs for vehicles utilized in the city of San Diego, CA or Bakersfield, CA based on 2024 sales. 30,000 BOE/D could approximately supply the daily motor gasoline needs for vehicles utilized in the city of Fresno, CA based on 2024 sales.

19. The DPA Order addresses an existing and increasing threat to the nation's security and economic stability. It directly serves the public interest by immediately increasing domestic supply by approximately 30,000 BOE/D (with production expected to increase to nearly 60,000 BOE/D), unlocking a vital domestic energy source and thereby helping to address the potential 200,000 bpd supply gap, enhance military readiness by increasing the availability of domestically produced crude available to be refined into military grade fuel products, and provide economic relief to the public.

20. By comparison, California's most significant attempt to address this emergency—SB 237, which permits the drilling of new wells in Kern County—may deliver an additional 10,000 bpd each year through 2030. Even with the passage of SB 237, California production will still decline approximately 7,900 bpd on average per year. Joseph B. Silvi, James W. Rector, Michael A. Mische, *A Study of SB 237 to Stabilize Oil Production in California*, at 8, October 2025, https://californiaglobe.com/wp-content/uploads/2025/10/A-Study-of-SB-237-to-Stabilize-Oil-Production-in-California-Definitive.pdf (accessed May 11, 2026).

21. Accordingly, an order enjoining the DPA Order would directly and negatively harm the public interest, immediately exacerbating the supply gap, reducing the amount of domestically produced crude available to be refined into fuel products, deepening dependency on foreign imports, and increasing the United States' exposure to ongoing and additional global supply shocks.

I hereby declare to the best of my knowledge and belief, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 11th day of May, 2026, at Washington, D.C.

Ashley Nunes

# Attachment 1

# PIPELINE CAPACITY PRIORITIZATION AND ALLOCATION ORDER

## I. AUTHORITY

The Department of Energy (DOE) is authorized to issue orders pursuant to Executive Order 13603 section 201, which delegates to the Secretary of Energy the authority of the President conferred by the Defense Production Act of 1950 (DPA), sections 101(a) & (c). By delegation, section 101(a) authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense with respect to all forms of energy. Section 101(c)[1] authorizes the Secretary to require the allocation of, or the priority performance of contracts or orders relating to, materials, equipment, and services to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation.

## II. COVERED ENTITIES

Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable")
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

## III. NEED FOR PRIORITY PERFORMANCE AND ALLOCATION

In Executive Order 14156, President Trump declared a national emergency, determining that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[2] Further, President Trump found, "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets. An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."[3] The President determined that problems are most pronounced in our Nation's West Coast, "where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[4]

Sable is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California.[5] Sable and the Department of the Interior are

[1] Pub. L. No. 81-774 (50 U.S.C. §§ 4511(a), 4511(c)).

[2] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[3] *Id.*

[4] *Id.*

[5] Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf ("the 'Santa Ynez Unit' or 'SYU' refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and

currently updating a previously approved Development and Production Plan, which would allow for continuous production to address energy vulnerabilities on the West Coast.[6] The SYU is a critical energy resource on the West Coast. It is one of the largest known offshore oilfields in the United States.[7] This resource cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence, without reliable transport of SYU's production through the Santa Ynez Pipeline System (SYPS) to market on mainland California.

For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California.[8] From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System.[9] This interstate pipeline system running from the SYU to the Pentland Station terminal in Pentland, California is known as the SYPS, which Sable owns and operates.[10] According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS. As Sable reports, "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[11]

---

Heritage), and associated ancillary facilities located in federal waters offshore California") (hereinafter "Sable 10-K").

[6] *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James Noe, Partner, Holland & Knight, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1-2 (Dec. 12, 2025) (hereinafter "Sable Request").

[7] U.S. Energy Information Administration, *Top 100 U.S. Oil and Gas Fields*, at 5 (Mar. 2015), https://www.eia.gov/naturalgas/crudeoilreserves/top100/pdf/top100.pdf.

[8] Sable Request at 2.

[9] *Id.*

[10] *Id. See also*, Letter for Linda Daugherty, Acting Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration (PHMSA), from J. Caldwell Flores, President and Chief Operating Officer, Pacific Pipeline Company / Sable Offshore Corp., *RE: Application for Emergency Special Permit Sable Offshore Corp.* at 1 (Dec. 19, 2025) ("As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS)."); Letter for J. Caldwell Flores, President and Chief Operating Officer, Sable Offshore Corp., *RE: Determination of Interstate Classification* at 2 (Dec. 17, 2025) ("PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline."); Sable 10-K at 1-2 ("the 'Santa Ynez Pipeline System' (or 'SYPS') refers to the interstate pipeline connecting the Santa Ynez Unit to the Pentland Station terminal, inclusive of 'Pipeline Segment 324' and 'Pipeline Segment 325', or collectively referred to as 'Pipeline Segments 324 and 325' (formerly known as '901/903 Assets' and as defined in the Sable-[Exxon Mobil Corporation] Purchase Agreement), the Las Flores Canyon ('LFC') onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the Santa Ynez Unit to LFC. The SYU Assets include the Santa Ynez Unit and the Santa Ynez Pipeline System.").

[11] Sable Request at 6.

## IV. ORDER

In light of my findings and determinations in accordance with Title I of the DPA that the actions directed below are necessary or appropriate to promote the national defense and to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration, production, refining, transportation cannot reasonably be accomplished without exercising the authority in this Order, it is directed that:

A. Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

B. Sable is directed to immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, at which point hydrocarbons move through the Plains All American Line 2000 for transport to refineries.

C. Such contracts for hydrocarbon transportation services from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, shall take priority over other non-SYPS hydrocarbon transportation contracts or orders for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the SYPS be entered into for hydrocarbon transportation services from the point of production in the SYU. For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the SYPS has capacity to transport.

D. Any person contracting for or ordering, or who hereinafter does contract for or order hydrocarbon transportation services from Sable from the point of production in the SYU is directed to prefer and utilize such capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, in preference to other such non-pipeline contracts or orders by other persons capable of hydrocarbon transportation service, including but not limited to by truck, vessel, or alternative pipeline, up to the capacity of the SYPS.

E. Sable, and any person seeking hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, are authorized to enter into such orders and contracts as those parties negotiate, as appropriate.

F. Sable is directed to provide a monthly report to DOE via askcr@hq.doe.gov on the use of this priority and allocation order, including the volumes of hydrocarbons transported or contracted for under this Order during the previous month.

G. Sable is ordered to comply with this order immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.

Issued in Washington, D.C. on this 13th day of March 2026

______________________

Chris Wright

Secretary of Energy

# Attachment 2

# United States Department of Energy (DOE) Findings and Determinations and Prioritization and Allocation Plan for Hydrocarbon Transportation Services

In accordance with White House Executive Order (E.O.) 14156, *Declaring a National Energy Emergency*, signed on January 29, 2025, and extended on January 12, 2026, DOE makes the following *Findings and Determinations* and promulgates the *Prioritization and Allocation Plan for Hydrocarbon Transportation Services* (hereafter referred to as the Prioritization and Allocation Plan) in conformance with the DOE Energy Priorities and Allocations System (EPAS) regulations [*see* 10 CFR Part 217].[1] This Prioritization and Allocation Plan is issued in conjunction with the Pipeline Capacity Prioritization and Allocation Order, signed on March 13, 2026, and enclosed herewith.

E.O. 14156 invokes the Defense Production Act of 1950 (DPA) legal authorities. In section 3, President Trump directed agencies to identify and use all lawful emergency authorities available to them, including the DPA, to facilitate the supply, refining, and transportation of energy in and through, specifically, the West Coast of the United States. The Findings and Determinations and Prioritization and Allocation Plan are made in accordance with the Congressional Declaration of Policy in section 2(a)(5) of the DPA in which Congress established a link between assuring the availability of energy supplies and maintaining defense preparedness when it found that "in order to ensure national defense preparedness, it is necessary and appropriate to assure the availability of domestic energy supplies for national defense needs."[2]

The DPA allows DOE to allocate resources and prioritize contracts related to all forms of energy [*see* 10 CFR 217.2(a)(2)]. The Prioritization and Allocation Plan in the appendix outlines DOE's approach to, *inter alia*, implement E.O. 14156, under the designated authorities of the Secretary of Energy to utilize the DPA.

[1] DOE's regulations pertaining to findings required by section 101(c)(2)(A) of the Defense Production Act of 1950 are found at 10 C.F.R. Part 216 ("Materials Allocation and Priority Performance Under Contracts or Orders to Maximize Domestic Energy Supplies"). Unlike DOE's regulations at 10 C.F.R. Part 217, Part 216 does not contemplate, let alone require, an Allocation Plan. Accordingly, this Prioritization and Allocation Plan only pertains to the prioritization and allocation order issued by DOE pursuant to the authority under section 101(a) of the Defense Production Act of 1950, and requirements of 10 C.F.R. Part 217.

[2] 50 U.S.C. § 4502(a)(5).

**Findings and Determinations**

In accordance with section 101 of the DPA and section 202 of Executive Order 13603, as amended, I make the following findings and determinations:

**I. Pursuant to section 101(a):**

A. The immediate performance and prioritization of contracts and orders for the service of transportation of hydrocarbons from the Santa Ynez Unit (SYU) through the Santa Ynez Pipeline System (SYPS), including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California,[3] is necessary and appropriate to promote the national defense,[4] including with respect to energy production, distribution and use, and directly related activities;

B. Given the national security imperatives of the Pipeline Capacity Prioritization and Allocation Order (enclosed), should these options be rendered impossible, then the allocations action taken in the Pipeline Capacity Prioritization and Allocation Order under 10 CFR Part 217 Subpart E shall be deemed appropriate and required, as there is insufficient supply of a material, service, or facility to satisfy national defense supply requirements through the use of the priorities authority or when the use of the priorities authority would cause a severe and prolonged disruption in the supply of materials, services, or facilities available to support normal U.S. economic activities. The immediate allocation of the service of transportation of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, is necessary and appropriate to promote the national defense, including with respect to energy production, distribution and use, and directly related activities; and

C. Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable"), as lessee, owner, and operator of the SYU and owner and operator of the SYPS, is a person capable of performance of such pipeline hydrocarbon transportation contracts or orders in preference to other current, contingent, pending, or potential contracts or orders for hydrocarbon

---

[3] Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf ("the 'Santa Ynez Unit' or 'SYU' refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and Heritage), and associated ancillary facilities located in federal waters offshore California, and . . . the 'Santa Ynez Pipeline System' (or 'SYPS') refers to the interstate pipeline connecting the Santa Ynez Unit to the Pentland Station terminal, inclusive of 'Pipeline Segment 324' and 'Pipeline Segment 325', or collectively referred to as 'Pipeline Segments 324 and 325' (formerly known as '901/903 Assets' and as defined in the Sable-[Exxon Mobil Corporation] Purchase Agreement), the Las Flores Canyon ('LFC') onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the Santa Ynez Unit to LFC. The SYU Assets include the Santa Ynez Unit and the Santa Ynez Pipeline System.").

[4] "National defense" is defined in section 702(14) as "programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity. Such term includes emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act [42 U.S.C. 5195 et seq.] and critical infrastructure protection and restoration." (50 U.S.C. § 4552(14)).

transportation service.[5]

**II. Pursuant to section 101(b):**

D. The ordering paragraphs of the Pipeline Capacity Prioritization and Allocation Order regard pipeline capacity service and do not direct or control the general distribution of any hydrocarbon material—whether transported by the SYPS or otherwise—in the civilian market, nor direct or control any orders or contracts for the hydrocarbon materials themselves.

E. Notwithstanding the foregoing,

(1) the transportation of hydrocarbons via pipeline from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, is a scarce and critical service[6] essential to the national defense, of a scarce and critical material[7] essential to the national defense; and

(2) the requirements of the national defense for such service and material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship.

**III. Pursuant to section 101(c):**

Given the national security imperatives of the Pipeline Capacity Prioritization and Allocation Order, should the prioritization and allocation options under section 101(a) be rendered impossible, then the prioritization and allocations actions taken in the Pipeline Capacity Prioritization and Allocation Order under section 101(c) shall be deemed appropriate and required.

F. Pipeline transportation services of hydrocarbons between the SYU and SYPS are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation to maximize domestic energy supplies;

---

[5] I take administrative notice that the Office of Legal Counsel has long opined that section 101(a) could "be used to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." Energy Supply Interruption, 6 Op. O.L.C. 644, 665 (1982).

[6] The term "services" includes "any effort that is needed for or incidental to": (A) "the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item"; (B) "the construction of facilities"; (C) "the movement of individuals and property by all modes of civil transportation"; or (D) "other national defense programs and activities." Section 702(16) of the DPA (50 U.S.C. § 4552(16)).

[7] "Energy" is a "strategic and critical material" within the DPA. *See* section 106 of the DPA (50 U.S.C. § 4516). Further, "material" encompasses "any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply," as well as "any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." Section 702(13) of the DPA (50 U.S.C. § 4552(13)).

G. domestically produced hydrocarbons in California are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation to maximize domestic energy supplies; and

H. maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the section 101(c) authority.

Issued in Washington, D.C. on this 13th day of March 2026.

______________________

Chris Wright

Secretary of Energy

**APPENDIX: Prioritization and Allocation Plan for Hydrocarbon Transportation Services**

**Section 1. Requirement for a DOE Allocations Action.**

In accordance with 10 CFR 217.51(b), below is a detailed description of the situation to include any unusual events or circumstances that have created the requirement for an allocations action.

Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable") is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California. The SYU is a critical energy resource on the West Coast—it is one of the largest known offshore oilfields in the United States. For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System (LFPS). This interstate pipeline system is known as the Santa Ynez Pipeline System (SYPS), which Sable owns and operates, and it ends at the Pentland Station terminal in Pentland, California, at which point hydrocarbons move through the Plains All American Line 2000 for transport to refineries. According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS following its closure in 2015, increasing petroleum scarcity and prices at the pump.

California's unrivaled concentration of defense-related activities and personnel require sufficient fuel access to enable military ships and planes to operate at home and abroad. The United States Indo-Pacific Command (USINDOPACOM), as the "vanguard" of U.S. forces facing both potential nuclear adversaries and terrorist organizations, must reach designated theaters and threats within 72 hours. The military readiness of USINDOPACOM is vital to U.S. national security and defense. Further, USINDOPACOM's military readiness depends on the ability of the military installations within its command structure to access regional domestic fuel supplies.

California's commercial refineries historically met this critical need, producing and distributing (via commercially available pipelines) enough fuel to meet Defense Fuel Support Points cover levels for California military installations. However, a 65% reduction in California's in-state oil production since 2001 has left California and, by extension, the U.S. military, dependent on foreign imports. Dependence on foreign imports creates fuel supply disruption risks that are incompatible with military readiness and national security. California's increasing reliance on foreign imports weakens the United States' position in international markets and endangers our national security.

Reliance on foreign energy resources poses an actual—not theoretical—threat to our national security. For example, on February 28, 2026, Iran attacked neighboring countries, prompting precautionary shutdowns of oil and gas facilities across the Middle East. Operations were suspended at Saudi Arabia's largest domestic oil refinery, Ras Tanura, after a drone strike, as well as most oil production halted in Iraqi Kurdistan.[8] Iran also has attacked tankers in the Strait

[8] Reuters, *Qatar LNG, Saudi refinery, Israeli oil, gas fields down due to Mideast strikes*, Mar. 2, 2026, https://www.reuters.com/business/energy/saudi-aramco-shuts-ras-tanura-refinery-after-drone-strike-source-says-

of Hormuz, through which a fifth of the world's oil and liquefied gas typically passes.[9] It has been reported that tankers and container ships are avoiding the waterway after insurers cancelled coverage for vessels and global oil and gas shipping rates soared, with concerns increasing after Iranian media reported that Iran will fire on any ship trying to pass through the Strait of Hormuz.[10] Further, this is not a new development. Iran attacked Saudia Arabia's energy facilities with missiles and drones in 2019, temporarily knocking out more than half of the kingdom's crude production.[11] In 2021, Iran-aligned Houthis in Yemen attacked Saudi Arabia's Ras Tanura refinery.[12] In 2024, California imported crude oil from Saudi Arabia and Iraq, among other countries.[13]

Increasing the affordability and access to domestic crude oil resources on the Outer Continental Shelf via the SYPS will promote the national defense, as well as result in direct consumer savings for the public and military facilities in the region. Accordingly, performance and prioritization contracts and orders for the service of transportation of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, are necessary and appropriate to promote the national defense.

Given the national security imperatives of the Pipeline Capacity Prioritization and Allocation Order, DOE takes the position that priority rated contracts or orders under 10 CFR Part 217 Subpart C and special priorities assistance under 10 CFR Part 217 Subpart D are sufficient to address these unusual events and circumstances. Nevertheless, if it is later determined that these options are impossible, then the allocations action taken here under 10 CFR Part 217 Subpart E is appropriate and required, as there is insufficient supply of a material, service, or facility to satisfy national defense supply requirements through the use of the priorities authority or when the use of the priorities authority would cause a severe and prolonged disruption in the supply of materials, services, or facilities available to support normal U.S. economic activities. Further, this allocation order will not be used to ration materials or services at the retail level.

2026-03-02/.

[9] Reuters, *Oil prices soar 6% to highest since 2024 as Middle East conflict widens*, Mar. 3, 2026, https://www.reuters.com/business/energy/saudi-aramco-shuts-ras-tanura-refinery-after-drone-strike-source-says-2026-03-02/ https://www.reuters.com/business/energy/oil-rises-expanding-us-israeli-conflict-with-iran-elevates-supply-risks-2026-03-03/.

[10] *Id.*

[11] *See* California Energy Commission, *Foreign Sources of Crude Oil Imports to California 2024*, accessed on Mar. 3, 2026, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports.

[12] *Id.*

[13] *Id.*

**Section 2. Objective of the Allocation Action.**

2.1. In working toward the specified objective below,

1) The Secretary shall use the delegated authority under section 101 of the Act (50 U.S.C. 4511) to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure a continued and adequate supply of the transportation services for hydrocarbon from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California; and

2) The Secretary shall issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement E.O. 14156.

2.2. In accordance with, 10 CFR 217.51(c), a statement of the specific objective(s) of the allocations action is included below.

Utilizing the delegated authorities, DOE shall work to ensure continued and adequate hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, without placing the corporate viability of any hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California to the Pentland Station terminal in Pentland, California, at risk.

Ensuring an adequate supply of hydrocarbon transportation services is crucial to the national security and defense, including domestic energy production, which is essential to protecting the livelihoods and safety of Americans. Ensuring robust domestic hydrocarbon transportation services in California is fundamental to American economic and national security.

**Section 3. List of Materials, Services, or Facilities.**

In accordance with 10 CFR 217.51(d) and 10 CFR 217.51(e), below is a list of the materials, services, or facilities to be allocated; a list of sources of the materials, services, or facilities subject to the allocations action.

***3.1 Materials, as applicable, but not limited to:***
Hydrocarbons from the SYU.

***3.2 Services, as applicable, but not limited to:***
The use of the term Services in this Prioritization and Allocation Plan refers to services relating to the transportation of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

***3.3 Facilities, as applicable, but not limited to:***
Facilities relating to the transportation of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

**Section 4. Provisions for Allocations Orders.**

In accordance with 10 CFR 217.51(f), below is a detailed description of the provisions that will be included in the allocations orders, including the type(s) of allocations orders, the percentages or quantity of capacity or output to be allocated for each purpose, and the duration of the allocation action.

4.1. Types of allocation orders, as defined by 10 CFR 217.53, are:

a) *Set-aside:* An official action that requires a person to reserve materials, services, or facilities capacity in anticipation of the receipt of rated orders.

b) *Directive:* An official action that requires a person to take or refrain from taking certain actions in accordance with the provisions. For example, a directive can require a person to: stop or reduce production of an item; prohibit the use of selected materials, services, or facilities; or divert the use of materials, services, or facilities from one purpose to another; and

c) *Allotment:* An official action that specifies the maximum quantity of a material, service, or facility authorized for a specific use.

4.2. DOE shall leverage pertinent allocation orders from the types above for action once specific quantities, capacities, and/or output considerations are determined. These will take place within timelines designated by DOE leadership and authorities.

**Section 5. Impact of Proposed Allocation Actions on Civilian Market.**

In accordance with 10 CFR 217.51(g), below is an initial estimate for an evaluation of the impact of the proposed allocations action on the civilian market.

Over the last four decades, idiosyncratic California state policies have created military fuel disruption vulnerabilities that now compromise U.S. force readiness and national security. Notably, California is now the most oil import-dependent state in the United States.[14] Furthermore, because California has no inbound pipelines from other states supplying crude oil,

---

[14] *Id.*

gasoline or aviation fuels, 95% of its inbound crude and fuel products are delivered by maritime tankers.[15]

Enabling the additional production of nearly 60,000 barrels of oil equivalents per day (BOE/D) from the SYU by opening the pipeline would help alleviate California's petroleum scarcity by providing a secure, consistent, and local source of crude oil.[16] The 124.4-mile Las Flores Pipeline System (LFPS) is the only midstream infrastructure connecting ongoing upstream oil production in the SYU to California's downstream processing and refining centers. The oil resources held at Las Flores Canyon are frozen assets that cannot be transported due to the closure of Pipelines CA-324 and CA-325.

Petroleum pipeline infrastructure, such as LFPS, is critical to national economic security and public health and safety in California. These pipelines are the primary and most efficient means to move substantial volumes of crude oil to California's processing facilities and refineries. Consequently, the degradation of these pipeline systems has a debilitating impact on California's economic security by increasing energy costs, exacerbating supply chain vulnerabilities, and diminishing the state's ability to maintain a reliable and affordable energy supply for its citizens and businesses.

The opening of this interstate pipeline connecting the SYU to the shore enables the United States to increase its supply, reducing cost and volatility impacts of production in Russia, Iran, and OPEC nations. Thus, preventing additional California crude production and transport undermines U.S. foreign trade policy and empowers foreign countries. Pipeline restart would unlock the potential production rate of nearly 60,000 BOE/D and thereby ensure the consistent supply of refined petroleum products, which are essential for transportation, agriculture, and various industrial processes and services.

California crude oil extraction has decreased 74 percent from 1981 to 2025.[17] As noted above, California is also the most oil import-dependent state in the United States, with California-produced petroleum becoming increasingly scarce. In-state refining capacity has also been in steep decline. California refineries face several critical limitations preventing the replacement of California-produced crude with other domestic sources of crude, including geographic, infrastructure, crude quality, facility designs, and regulatory limitations.

Petroleum is essential to modern life, both as a fuel for transportation and energy production, and as a chemical feedstock, ranging from adhesives and plastics to pharmaceuticals and textiles.

---

[15] *California Energy & Fuel Policies: A Clear and Present Threat to National Security and Force Readiness* (Oct. 10, 2025), https://ad32.asmrc.org/wp-content/uploads/2025/10/CA-Impact-on-Force-Readiness.pdf.

[16] *See* Sable Offshore Corp., *November 2025 Investor Presentation*, at 20 (Nov. 2025), https://s202.q4cdn.com/300304768/files/doc_presentation/2025/Sable-Offshore-Corp-Investor-Presentation_November-2025_vFinal.pdf.

[17] U.S. Energy Information Administration, *California Field Production of Crude Oil* (Jun. 20, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=MCRFPCA2&f=A.

Petroleum products constitute an essential component of the manufacturing sector and United States economic growth.

**Section 6. Proposed Actions to Mitigate Disruptions to Civilian Market Operations.**

In accordance with 10 CFR 217.51(h), below are proposed actions, to mitigate disruptions to civilian market operations.

DOE does not anticipate that the civilian market operations will be disrupted through this action. Nevertheless, DOE will minimize disruptions, if any, to the supply chain and civilian market operations by working with Sable, or other transportation services of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, to identify, review, and make determinations quickly regarding any identified and agreed upon potential disruptions. In addition, while performance by the Sable pipeline will require actions that do not comply with certain state laws, DOE will condition its orders on requiring Sable to comply with Federal pipeline safety and other Federal environmental, health, and safety regulations.

**Enclosure:**
Pipeline Capacity Prioritization and Allocation Order (Mar. 13, 2026)

# Attachment 3

**Department of Energy**
Washington, DC 20585

MEMORANDUM FOR THE SECRETARY

| | |
|---|---|
| DATE: | MARCH 13, 2026 |
| THROUGH: | JAMES P. DANLY, DEPUTY SECRETARY |
| FROM: | OFFICE OF POLICY, HYDROCARBONS AND GEOTHERMAL ENERGY OFFICE |
| SUBJECT: | CALIFORNIA LAS FLORES PIPELINE RESTART |

**ISSUE: Whether to issue a Defense Production Act prioritization/allocation order for the Sable pipeline.[1]**

**BACKGROUND:**

America's national security is tied to its energy security. The disruption of energy supply impedes the military's ability to maintain mission readiness. This compromises both defensive posture and offensive capability.[2]

Energy insecurity impedes national security in another way. Energy is a key enabler of public welfare and economic growth. Petroleum is an essential material, used in fueling a

---

[1] Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable") is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California. Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf (hereinafter "Sable 10-K"). For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James Noe, Partner, Holland & Knight, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1-2 (Dec. 12, 2025) (hereinafter "Sable Request"). From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System (LFPS). *Id.* at 2. This interstate pipeline system is known as the Santa Ynez Pipeline System (SYPS), which Sable owns and operates. *Id. See also* Letter for J. Caldwell Flores, President and Chief Operating Officer, Sable Offshore Corp., *RE: Determination of Interstate Classification* at 2 (Dec. 17, 2025) ("PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline."); Sable 10-K at 1-2. According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS. Sable Request at 6. Sable also is operator of the SYPS. *See also*, Letter for Linda Daugherty, Acting Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration (PHMSA), from J. Caldwell Flores, President and Chief Operating Officer, Pacific Pipeline Company / Sable Offshore Corp., *RE: Application for Emergency Special Permit Sable Offshore Corp.* at 1 (Dec. 19, 2025) ("As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS).").

[2] *Center For Energy Security and Infrastructure Resilience.* Naval Academy, (Jul. 8, 2025), https://www.usna.edu/CESIR/Energy_and_Energy_Security.php

vast network of freight, farm equipment, and passenger vehicles which underpin the West Coast economy. Petroleum is used as a feedstock for a myriad of products like plastics, fertilizers, and pharmaceuticals. Consequently, nations labor tirelessly to guarantee access to reliable and affordable energy supply. Supply shortfalls can increase dependence on nonaligned and even adversarial nations and produce social unrest.[3]

History supports such reasoning. Between 1950 and 1970, the United States increased its dependence on, and consumption of oil sourced from the Middle East. However, in 1973, a Saudi-led cartel of oil-producing nations declared an oil embargo on the United States owing to its support for Israel. The embargo both banned petroleum exports to the United States and introduced cuts in overall oil production.[4] The impact on the U.S. economy was immediate and widespread. Average gas prices increased 36 percent, prompting nationwide rationing.[5] In response, truckers staged nationwide blockades, motorists waited for hours at gas stations, and public anger grew.[6]

The West Coast of the United States, and California in particular, is a geographically distinct region and market for petroleum than the broader United States. California gasoline prices are already the highest anywhere in the country.[7] This is due in part to California regulatory policy preventing crude oil extraction and refining.

There are no inbound petroleum pipelines to California from other states. To satisfy demand, California has increasingly relied on foreign imports from countries including Iraq and Saudia Arabia. California has access to the Monterey Formation, one of the largest offshore oil fields in the U.S. and a pipeline in place to carry oil from existing offshore oil rigs to nearby refineries. Notwithstanding limited supply, the state has refused to allow the pipeline to operate after its 2015 closure, increasing petroleum scarcity and prices at the pump.[8]

---

[3] Wackman, Thomas. "Energy Security is National Security." Institute for Energy Research, (Apr. 2023), https://www.instituteforenergyresearch.org/wp-content/uploads/2023/04/Energy-Security-Is-National-Security-Wackman.pdf

[4] *Milestones in the History of U.S. Foreign Relations - Office of the Historian*. *Milestones in the History of U.S. Foreign Relations - Office of the Historian*, https://history.state.gov/milestones/1969-1976/oil-embargo, Accessed Mar. 06, 2026

[5] *Alternative Fuels Data Center: Maps and Data - Average Annual Retail Fuel Price of Gasoline.* Alternative Fuels Data Center, https://afdc.energy.gov/data/10641, Accessed Mar. 06, 2026

[6] Haluga, Meredith, "The Oil Crisis of 1973: President Nixon's Actions to Maintain American Prosperity." *American Studies Forum*, 2017, https://digitalcommons.providence.edu/american_studies_forum/2.

[7] *Gasoline and Diesel Fuel Update*, U.S. Energy Information Administration, (Mar. 03, 2026), https://www.eia.gov/petroleum/gasdiesel/

[8] *Trump Reopens the Santa Ynez Unit in the Pacific to Oil Production,* Institute for Energy Research, (Aug. 18, 2025), https://www.instituteforenergyresearch.org/fossil-fuels/trump-reopens-the-santa-ynez-unit-in-the-pacific-to-oil-production/

**CALIFORNIA ENERGY SECURITY:**

In 1981, California crude oil extraction was 1,001,000 barrels per day (BPD), and in 2025, California crude oil extraction was 257,000 BPD, a 74 percent decrease.[9] Meanwhile, the Gulf of America currently produces about 2,000,000 BPD of crude oil, accounting for roughly 15 percent of U.S. crude production.[10] Executive Order 14156 calls out this geographical mismatch. The President noted that the national energy emergency was most pronounced on the West Coast, "where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[11]

**NATIONAL SECURITY:**

With 32 military bases, California has the highest concentration of defense-related activities in the United States.[12] Navy Base San Diego serves as the principal home port for the Pacific Fleet's Surface Navy with over 50 ships and various support units, including Naval Air Station North Island. The state also houses 5 major active-duty U.S. Air Force bases, including Travis AFB, Beale AFB, and Edwards AFB; United States Marines bases at Camp Pendleton, Twenty-Nine Palms, Miramar, and Barstow; and U.S. Coast Guard ports and stations located inland and along the state's 840-mile coastline.

Under the command of U.S. Northern Command (USNORTHCOM), these military installations support U.S. Indo-Pacific Command (USINDOPACOM) and other DoW requirements worldwide. These installations "sit at the vanguard of U.S. forces with direct facing to potential nuclear adversaries such as North Korea, Russia, and the People's Republic of China (PRC) and transnational terrorist organizations in the Philippines, Malaysia, and Middle East" and require fuel access sufficient to enable their ships and planes to reach designated theaters and threats within 72 hours.[13]

A rapid and reliable regional fuel supply is therefore critical to national security and military readiness.[14] California commercial refineries historically met this critical need, producing and distributing (via commercially available pipelines) enough fuel to meet

---

[9] *California Field Production of Crude Oil*, U.S. Energy Information Administration, (Jun. 20th, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=MCRFPCA2&f=A

[10] *Federal Offshore—Gulf of America Field Production of Crude Oil*, Energy Information Administration, (Feb. 27th, 2026) https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfp3fm2&f=m

[11] United States, Executive Office of the President [Donald Trump]. Executive Order 14156: Declaring a National Energy Emergency. Jan. 20, 2025, Federal Register, vol. 90, no. 18, Jan 29. 2025, pp. 8433–37 https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02003.pdf

[12] *California Military Installations and Operational Areas,* Office of Governor, https://militarycouncil.ca.gov/s_californiamilitarybases/, Accessed Mar. 06, 2026

[13] *California Energy & Fuel Policies: A Clear and Present Threat to National Security and Force Readiness?*, (Oct. 10, 2025), https://ad32.asmrc.org/wp-content/uploads/2025/10/CA-Impact-on-Force-Readiness.pdf.

[14] *See* 50 U.S.C. §. 4502(a)(1) ("Congress finds that—the security of the United States is dependent on the ability of the domestic industrial base to supply materials and service for the national defense and to prepare for and respond to military conflicts….").

DoW fuel requirements located in the Western United States and elsewhere, as is required.[15]

However, California's policies have created military fuel disruption vulnerabilities that now compromise U.S. force readiness and national security.

**ADVERSARIAL DEPENDENCE:**

A 65% reduction in California's in-state oil production since 2001 has left California and, by extension, the U.S. military, dependent on foreign imports. In 1982, California imported just 5.6% of its crude petroleum from foreign sources; by 2025, that number had increased to 61%,[16] making California the most oil import-dependent state in the U.S. despite having the 4th largest economy in the world and the 5th largest crude reserves in the U.S. (see Table 1 in Appendix).[17]

Because California has no inbound pipelines from other states supplying crude oil, gasoline or aviation fuels, 95% of its inbound crude and fuel products are delivered by maritime tankers, including tanker ships owned by Russia's SCF Group and China's Cosco Shipping Energy Transportation.[18] As made clear by the impacts of current events in Iran and the Hormuz Strait on international oil markets, dependence on foreign imports creates fuel supply disruption risks. These risks are incompatible with military readiness and national security.[19]

Even California's intrastate San Pablo Bay Pipeline, the last remaining link between southern production fields and Bay Area refineries, is facing the risk of closure. Refinery closures have reduced flow to half of its 60,000 barrel per day economic minimum.[20]

By April 2026, California will have just 8 refineries, down from 30 in 1990.[21,22] California refineries cannot simply replace California-produced crude with other

---

[15] *An Aviation Fuel Crisis May Be Coming to California,* Institute for Energy Research, (Nov. 25, 2025), https://www.instituteforenergyresearch.org/big-green/an-aviation-fuel-crisis-may-be-coming-to-california/,

[16] *Annual Oil Supply Sources to California Refineries,* California Energy Commission, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/annual-oil-supply-sources-california, Accessed Mar. 10, 2026

[17] *Foreign Sources of Crude Oil Imports to California*, California Energy Commission, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports, Accessed Mar. 06, 2026

[18] *California Energy & Fuel Policies: A Clear and Present Threat to National Security and Force Readiness*, (Oct. 10, 2025), https://ad32.asmrc.org/wp-content/uploads/2025/10/CA-Impact-on-Force-Readiness.pdf.

[19] *See* 50 U.S.C. § 4502(a)(4) ("Congress finds that…in order to ensure national defense preparedness, it is necessary and appropriate to assure the availability of domestic energy supplies for national defense needs.").

[20] https://www.eenews.net/articles/california-regulators-try-to-save-critical-oil-pipeline-with-rate-hike/

[21] *California Number of Operating Refineries,* U.S. Energy Information Administration, (Jun. 20, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?f=A&n=PET&s=8_NA_8OO_SCA_C&utm

[22] The DOE internally analyzed refineries operating in California based on publicly available information and press releases to determine the actual number of active California refineries.

domestic sources of crude. In addition to the geographic, infrastructure, and regulatory limitations that make it difficult for California refineries to access oil produced from shale formations in New Mexico and the Gulf Coast, oil produced from shale tends to be light, sweet crude. Refineries are designed to process specific blends of crude oil. The majority of U.S. refining capacity, including capacity in California, was built prior to 1970 and designed to ingest heavy crude.[23] Crude produced in California tends to have a lower American Petroleum Institute (API) gravity, which indicates a heavier crude.[24] Crude produced from the Monterey Formation, the location of SYU, is considered heavy oil, with API gravity from 10° to 23°.[25] This is suitable for use in CA refineries, while other oil produced in the United States may not be.

The increasing reliance on foreign imports weakens the U.S. position in international markets and endangers our national security. China, hedging against market volatility, typically expands strategic crude oil stockpiles in response to higher spot prices, further inflating prices by up to 10 percent, and increasing revenues for Russia and Iran, from whom China heavily imports.[26]

The opening of the pipeline connecting the Santa Ynez Unit to the shore will enable the United States to increase its supply, reducing cost and volatility impacts of production in Russia, Iran, and OPEC nations. While China has diversified its oil imports, continued reduction in U.S. share in global markets strengthens its bargaining power in bilateral trade. Thus, loss of California crude production and transport undermines U.S. foreign trade policy and empowers Russia and Iran to challenge U.S. interests and those of allies like Ukraine and Israel.

**SCARCE:**

Despite the importance of oil to energy and national security, California crude oil production within the state has fallen by 74 percent since the 1980s.[27] In-state refining capacity has also been in decline, falling 35 percent over the same period.[28] California petroleum has become increasingly scarce due to depleting wells and an evolving regulatory environment, including a lack of new drilling permits.[29] Enabling the

---

[23] *When was the last refinery built in the United States,* U.S. Energy Information Administration, (Jan. 2024), https://www.eia.gov/tools/faqs/faq.php?id=29&t=6

[24] EIA. "Crude Oil and Lease Condensate Production by API Gravity." February 27, 2026. https://www.eia.gov/dnav/pet/pet_crd_api_adc_mbblpd_m.htm

[25] Idol, Keith. "Producing Heavy Oil from Offshore Platforms at the Santa Ynez Unit." Hedberg Research Conference, Veracruz, Mexico. 2006. https://www.searchanddiscovery.com/abstracts/html/2006/hedberg/abstracts/short/idol.htm

[26] *Expanding Strategic Oil Stocks in China Support Crude Oil Prices*, U.S. Energy Information Administration, (Oct. 2025), https://www.eia.gov/todayinenergy/detail.php?id=66319.

[27] *California Field Production of Crude Oil*, U.S. Energy Information Administration, (Jun. 20, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=MCRFPCA2&f=A

[28] *California Refinery Operable Atmospheric Crude Oil Distillation Capacity as of January 1*, U.S. Energy Information Administration, (Jun. 20, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=8_NA_8D0_SCA_4&f=A

[29] *New Oil Drilling Permit Approvals Fall To Zero For First Time Since Newsom Came To Office, Making History*, Consumer Watchdog, (Apr. 19, 2024), https://consumerwatchdog.org/energy/oil-drilling-permit-

additional production of nearly 60,000 barrels of oil equivalents per day (BOE/D) from the Santa Ynez Unit (SYU) by opening the pipeline would help alleviate California's petroleum scarcity by providing a secure, consistent, local source of crude oil.[30]

ExxonMobil previously owned and operated SYU and the Las Flores Pipeline System (LFPS) network before leasing to Sable. LFPS has been inoperable following its closure in 2015. Truck transport was explored. The Santa Barbara County Board of Supervisors blocked permits that prevented Exxon from transporting crude oil via truck to nearby refineries, instead of using the closed pipeline.[31]

As an alternative, Sable proposes to purchase an Offshore Storage and Treating Vessel (OS&T), a specialized vessel which receives raw fluids from subsea wells and separates them into oil, gas, and water, and store the processed crude in their hull for later transfer to tankers. Sable estimates that total capital required to pursue an OS&T strategy, assuming the purchase of a vessel, and vessel and platform upgrades and installation, is approximately $450 million.[32]

With such a vessel, Sable further proposes that hydrocarbon product will be sold into domestic refineries outside of California, or into international markets. In order to transport the hydrocarbons to ports domestically, the vessels would further need to be authorized under the Jones Act. The Jones Act requires energy transported between two U.S. points, such as an OS&T and a U.S. port, to be carried by U.S. flagged vessels.[33] The scarcity and relative cost of these vessels makes this strategy more complex and expensive. The OS&T strategy therefore does not address petroleum scarcity in California and is not responsive to the energy emergency.

Once the onshore crude oil storage becomes filled, the three platforms comprising the Santa Ynez Unit—Harmony, Heritage, and Hondo—will be backed up and can no longer continue producing crude. In effect, the oil reserves in SYU have become a stranded resource. This blockage underscores the scarcity of crude oil transport options and pipeline infrastructure, and crude oil more generally, in California.

---

approvals-fall-to-zero-for-first-time-since-newsom-came-to-office-making-history-consumer-watchdog-and-fractracker-alliance-say/

[30] Sable Offshore Corp., *November 2025 Investor Presentation*, at 20 (Nov. 2025) https://s202.q4cdn.com/300304768/files/doc_presentation/2025/Sable-Offshore-Corp-Investor-Presentation_November-2025_vFinal.pdf

[31] *US judge refuses to overturn Exxon permit denial to truck crude oil in California*, Reuters, (Sep. 27, 2023), https://www.reuters.com/business/energy/us-judge-refuses-overturn-exxon-permit-denial-truck-crude-oil-california-2023-09-27/

[32] Sable Offshore Corp., *November 2025 Investor Presentation*, at 7 (Nov. 2025) https://s202.q4cdn.com/300304768/files/doc_presentation/2025/Sable-Offshore-Corp-Investor-Presentation_November-2025_vFinal.pdf

[33] Congressional Research Service, *Shipping Under the Jones Act: Legislative and Regulatory Background*, at 2 (Nov. 21, 2019), https://www.congress.gov/crs-product/R45725

**CRITICAL:**

Petroleum pipeline infrastructure, such as LFPS, is critical to national economic security and public health and safety in California. These pipelines are the primary and most efficient means to move substantial volumes of crude oil to California's processing facilities and refineries. The state's unique "fuel island" status, characterized by declining in-state crude oil production and refining capacity, and significant reliance on imported petroleum, renders its energy supply particularly vulnerable to disruptions.[34]

Pipeline restart would enable a consistent supply of refined petroleum products essential for daily life and emergency services. Nationally, 66.6 percent of petroleum is used for transportation and 27.7 percent for industrial processes. Petroleum products are indispensable for transportation (ambulances, fire trucks, public transit, and personal vehicles), agriculture (food production and distribution), and various industrial processes that underpin essential services.[35] The alternative OS&T strategy would bypass California's refinery system and potentially direct crude to other markets, thus not directly addressing the nation's in-state supply needs and cost structures in California.[36]

The degradation of these pipeline systems has a significant impact on California's economic security by increasing energy costs, exacerbating supply chain vulnerabilities, and diminishing the state's ability to maintain a reliable and affordable energy supply for its citizens and businesses.

**ESSENTIAL:**

The 124.4-mile Las Flores Pipeline System is the only midstream infrastructure connecting ongoing upstream oil production in the Santa Ynez Unit to California's downstream processing and refining centers. In May 2025, Sable initiated production from Platform Harmony at 6,000 barrels per day.[37] The produced oil has been transported via Pipeline CA-324 to Las Flores Canyon for storage. However, the oil resources held at Las Flores Canyon are frozen assets that cannot be transported due to the closure of Pipelines CA-324 and CA-325. When the 540,000-barrel capacity Las Flores Canyon container is full, it could block the transportation and production of further oil from the Santa Ynez Unit. Restart of pipelines CA-324 and CA-325 is essential to functional and reliable oil production at Santa Ynez Unit, unlocking the potential production rate of nearly 60,000 BOE/D.

---

[34] *The California Energy Island: Why Hormuz Hits The West Coast Hardest*, Forbes, (Mar. 03, 2026), https://www.forbes.com/sites/rrapier/2026/03/03/the-california-energy-island-why-hormuz-hits-the-west-coast-hardest/.

[35] *Oil and Petroleum Products Explained*, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/oil-and-petroleum-products/use-of-oil.php, Accessed Mar. 09, 2026.

[36] Sable Offshore Corp., *November 2025 Investor Presentation*, at 8 (Nov. 2025) https://s202.q4cdn.com/300304768/files/doc_presentation/2025/Sable-Offshore-Corp-Investor-Presentation_November-2025_vFinal.pdf.

[37] *News Details,* Sable Offshore, (May 19, 2025), https://sableoffshore.com/news/news-details/2025/Sable-Offshore-Corp--Reports-Restart-of-Oil-Production-at-the-Santa-Ynez-Unit-and-Anticipated-Oil-Sales-from-the-Las-Flores-Pipeline-System-in-July-2025/.

Petroleum is a material essential to modern life, both as a fuel and as a chemical feedstock. A significant portion of refined petroleum, approximately 50% in 2023, is dedicated to finished motor gasoline, another 25% to distillate fuel or fuel oil (including diesel) which is used for transportation or heating and power generation, and 9% to jet fuel with the remainder going to other products.[38] Petroleum serves as the raw material for countless products, ranging from adhesives and plastics to pharmaceuticals and textiles. Liquid feedstocks in the United States are valued at $117 billion in 2025 and projected to grow to $175 billion by 2035.[39] Petroleum products constitute an essential component of the manufacturing sector and United States economic growth.

**ECONOMIC VIABILITY:**

Retail gasoline prices at the pump in California are the highest in the nation due to a combination of higher-than-average state taxes, environmental non-tax policies (e.g., Low Carbon Fuel Standard and Cap and Trade program on carbon emissions), and supply and infrastructure cost premiums. The California Energy Commission reports the average retail price of gasoline in 2025 was $4.41/gallon with an average crude oil acquisition cost of $71.82.[40] In 2025, the average West Texas Intermediate (Cushing, OK Spot Price) is reported by the Energy Information Agency to be $65.46.[41] This equates to a $6.23 supply and infrastructure premium on the production and delivery of crude oil to California refineries.

Given the history of production at SYU and the proximity of the resource to the refineries, Sable expects to be able to sell into the market at an economically viable price that will lower refiner feedstock costs. Sable estimated in their December 19, 2025 application for emergency special permit to the Pipeline and Hazardous Material Safety Administration (PHMSA) that returning the Santa Ynez Pipeline sections CA-324 and CA-325 (A & B) to service would reduce refinery feedstock prices by approximately $3/barrel.[42] DOE estimates the effect on California retail gasoline prices, based on a $3/barrel crude oil savings, would be a $0.07/gallon savings, or 1.6 percent reduction in retail prices.

---

[38] *Oil and Petroleum Products Explained*, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/oil-and-petroleum-products/refining-crude-oil-inputs-and-outputs.php, Accessed Mar. 10, 2026.

[39] *Demand for Petroleum Liquid Feedstock in USA (2025 – 2035)*, Future Market Insights Inc., (Nov. 20, 2025), https://www.futuremarketinsights.com/reports/united-states-petroleum-liquid-feedstock-market

[40] *Estimated Gasoline Price Breakdown and Margins,* California Energy Commission, https://www.energy.ca.gov/estimated-gasoline-price-breakdown-and-margins, Accessed Mar. 09, 2026.

[41] *Cushing, OK WTI Spot Price FOB,* https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=M *Cushing, OK WTI Spot Price FOB,* U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=RWTC&f=M, Accessed Mar. 09, 2026.

[42] Pipeline and Hazardous Materials Safety Administration. *Special Permit for Sable Offshore Corp, Docket No. PHMSA-2025-1052*. Department of Transportation, (Dec. 19, 2025), https://budsoffshoreenergy.com/wp-content/uploads/2026/02/phmsa-2026-0464-0005_dea-attachment_1.pdf.

Setting aside pending legal and permitting disputes disrupting restart of the pipelines, the project is economically viable. Considering a $2/barrel to $4/barrel range would result in a $0.05/gallon to $0.10/gallon savings (1.1 to 2.2 percent) compared to the 2025 average California retail price of $4.44. Increasing the affordability and access to domestic crude oil resources on the Outer Continental Shelf via the Santa Ynez pipeline system will result in direct consumer savings for the public and military facilities in the region.

**RECOMMENDED FINDINGS:**

**A. The immediate performance and prioritization of contracts and orders for the service of transportation of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores, California, to the Pentland Station terminal in Pentland, California, is necessary and appropriate to promote the national defense,[43] including with respect to energy production, distribution and use, and directly related activities.**

California's unrivaled concentration of defense-related activities and personnel require sufficient fuel access to enable military ships and planes to operate at home and abroad. USINDOPACOM, as the "vanguard" of U.S. forces facing both potential nuclear adversaries and terrorist organizations, must reach designated theaters and threats within 72 hours. The military readiness of USINDOPACOM is vital to U.S. national security and defense. Further, USINDOPACOM's military readiness depends on the ability of the military installations within its command structure to access regional domestic fuel supplies.

California commercial refineries historically met this critical need, producing and distributing (via commercially available pipelines) enough fuel to meet DFSP cover levels for the California military installations listed above. However, a 65% reduction in California's in-state oil production since 2001 has left California and, by extension, the U.S. military, dependent on foreign imports. Dependence on foreign imports creates fuel supply disruption risks that are incompatible with military readiness and national security. California's increasing reliance on foreign imports weakens the United States' position in international markets and endangers our national security.

Reliance on foreign energy resources poses an actual—not theoretical—threat to our national security. For example, on February 28, 2026, Iran attacked neighboring countries, prompting precautionary shutdowns of oil and gas facilities across the Middle East. Operations were suspended at Saudi Arabia's largest domestic oil refinery, Ras

[43] "National defense" is defined in section 702(14) as "programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity. Such term includes emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act [42 U.S.C. 5195 et seq.] and critical infrastructure protection and restoration." (50 U.S.C. § 4552(14)).

Tanura, after a drone strike, as well as most oil production halted in Iraqi Kurdistan.[44] Iran also has attacked tankers in the Strait of Hormuz, through which a fifth of the world's oil and liquefied gas typically passes.[45] It has been reported that tankers and container ships are avoiding the waterway after insurers cancelled coverage for vessels and global oil and gas shipping rates soared, with concerns increasing after Iranian media reported that Iran will fire on any ship trying to pass through the Strait of Hormuz.[46] Further, this is not a new development. Iran attacked Saudia Arabia's energy facilities with missiles and drones in 2019, temporarily knocking out more than half of the kingdom's crude production.[47] In 2021, Iran-aligned Houthis in Yemen attacked Saudi Arabia's Ras Tanura refinery.[48] In 2024, California imported crude oil from Saudi Arabia and Iraq, among other countries.[49]

Increasing the affordability and access to domestic crude oil resources on the Outer Continental Shelf via the SYPS will promote the national defense, as well as result in direct consumer savings for the public and military facilities in the region. Accordingly, performance and prioritization contracts and orders for the service of transportation of hydrocarbons from the SYU through the SYPS are necessary and appropriate to promote the national defense.

**B. The immediate allocation of the service of transportation of hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, is necessary and appropriate to promote the national defense, including with respect to energy production, distribution and use, and directly related activities.**

For the same reasons outlined above for Recommended Finding A, the allocation of the service of transportation of hydrocarbons from the SYU through the SYPS is necessary and appropriate to promote the national defense.

**C. Sable, as lessee, owner, and operator of the SYU and owner and operator of the SYPS, is a person capable of performance of such pipeline hydrocarbon transportation contracts or orders in preference to other current, contingent,**

---

[44] Reuters, *Qatar LNG, Saudi refinery, Israeli oil, gas fields down due to Mideast strikes*, Mar. 2, 2026, https://www.reuters.com/business/energy/saudi-aramco-shuts-ras-tanura-refinery-after-drone-strike-source-says-2026-03-02/.
[45] Reuters, *Oil prices soar 6% to highest since 2024 as Middle East conflict widens*, Mar. 3, 2026, https://www.reuters.com/business/energy/saudi-aramco-shuts-ras-tanura-refinery-after-drone-strike-source-says-2026-03-02/ https://www.reuters.com/business/energy/oil-rises-expanding-us-israeli-conflict-with-iran-elevates-supply-risks-2026-03-03/.
[46] *Id.*
[47] *Supra* note 50.
[48] *Id.*
[49] See California Energy Commission, *Foreign Sources of Crude Oil Imports to California 2024*, accessed on Mar. 3, 2026, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports.

**pending, or potential contracts or orders for hydrocarbon transportation service.**

Sable is lessee and operator of the SYU and operator of the SYPS. LFPS has been inoperable following its closure in 2015. The Santa Barbara County Board of Supervisors blocked permits that prevented Exxon, the previous owner and operator, from transporting crude oil via truck to nearby refineries instead of using the closed pipeline. Given the history of production at SYU and the proximity of the resource to the refineries, Sable stands by ready to transport hydrocarbons and expects to be able to sell into the market at an economically viable price that will lower refiner feedstock costs. Accordingly, Sable is a person capable of performance.

**D. An order prioritizing or allocating hydrocarbon transportation services does not direct or control the general distribution of any hydrocarbon material—whether transported by the SYPS or otherwise—in the civilian market, nor direct or control any orders or contracts for the hydrocarbon materials themselves.**

Prioritizing or allocating transportation service will not direct or control the general distribution of hydrocarbons themselves. Parties are free to contract and negotiate for hydrocarbon materials themselves and otherwise distribute and sell them through the civilian markets.

**E. Notwithstanding the foregoing, (1) the transportation of hydrocarbons via pipeline from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, is a scarce and critical service[50] essential to the national defense, of a scarce and critical material[51] essential to the national defense; and**
**(2) the requirements of the national defense for such service and material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship.**

The scarcity and criticality of hydrocarbons and the transportation of hydrocarbons via pipeline are discussed below in Recommended Findings F and G. For the same reasons outlined above for Recommended Findings A and B, hydrocarbons and the transportation of hydrocarbons via pipeline are essential to the national defense.

---

[50] The term “services” includes “any effort that is needed for or incidental to”: (A) “the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item”; (B) “the construction of facilities”; (C) “the movement of individuals and property by all modes of civil transportation”; or (D) “other national defense programs and activities.” Section 702(16) of the DPA (50 U.S.C. § 4552(16)).

[51] “Energy” is a “strategic and critical material” within the DPA. *See* section 106 of the DPA (50 U.S.C. § 4516). Further, “material” encompasses “any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply,” as well as “any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items.” Section 702(13) of the DPA (50 U.S.C. § 4552(13)).

Furthermore, the requirements cannot otherwise be met. LFPS has been inoperable following its closure in 2015, and local government has blocked permits and prevented the transportation of crude oil via truck to nearby refineries. The resource is going undeveloped. Sable has proposed an alternative in which it would purchase an OS&T vessel, but states that it would result in hydrocarbon products being sold into refineries outside of California, or into international markets. This is an expensive strategy that does not address petroleum scarcity in California, and therefore, is not responsive to the requirements of national defense outlined above. After 10 years of closure, stranding one of the largest offshore oil fields in the United States,[52] this also illustrates that certain Federal, state, and local laws, consent decrees, or policies are in conflict with energy development necessary and appropriate to promote the national defense (and maximize domestic energy supplies).[53]

**F. Pipeline transportation services of hydrocarbons between the SYU and SYPS are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation to maximize domestic energy supplies.**

Over the last four decades, idiosyncratic California state policies have created military fuel disruption vulnerabilities that now compromise U.S. force readiness and national security. Notably, California is now the most oil import-dependent state in the United States. Furthermore, because California has no inbound pipelines from other states supplying crude oil, gasoline or aviation fuels, 95% of its inbound crude and fuel products are delivered by maritime tankers.

Enabling the additional production of nearly 60,000 barrels of oil equivalents per day (BOE/D) from the SYU by opening the pipeline would help alleviate California's petroleum scarcity by providing a secure, consistent, and local source of crude oil. The 124.4-mile Las Flores Pipeline System is the only midstream infrastructure connecting ongoing upstream oil production in the SYU to California's downstream processing and refining centers. The oil resources held at Las Flores Canyon are frozen assets that cannot be transported due to the closure of Pipelines CA-324 and CA-325.

Petroleum pipeline infrastructure, such as LFPS, is critical to national economic security and public health and safety in California. These pipelines are the primary and most efficient means to move substantial volumes of crude oil to California's processing facilities and refineries. Consequently, the degradation of these pipeline systems has a debilitating impact on California's economic security by increasing energy costs, exacerbating supply chain vulnerabilities, and diminishing the state's ability to maintain a reliable and affordable energy supply for its citizens and businesses.

[52] U.S. Energy Information Administration, *Top 100 U.S. Oil and Gas Fields*, at 5 (Mar. 2015), https://www.eia.gov/naturalgas/crudeoilreserves/top100/pdf/top100.pdf.
[53] Sable reports, "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations." *Id.* at 6.

The opening of the pipeline connecting the SYU to the shore enables the United States to increase its supply, reducing cost and volatility impacts of production in Russia, Iran, and OPEC nations. Thus, preventing additional California crude production and transport undermines U.S. foreign trade policy and empowers foreign countries. Pipeline restart would unlock the potential production rate of nearly 60,000 BOE/D and thereby ensure the consistent supply of refined petroleum products, which are essential for transportation, agriculture, and various industrial processes and services.

**G. Domestically produced hydrocarbons in California are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation to maximize domestic energy supplies.**

California crude oil extraction has decreased 74 percent from 1981 to 2025. California is also the most oil import-dependent state in the United States. Further, California crude oil production within the state has fallen by 74 percent since the 1980s. California petroleum has become increasingly scarce. In-state refining capacity has also been in steep decline. Enabling the additional production of nearly 60,000 BOE/D from the SYU by opening the pipeline would help alleviate California's petroleum scarcity by providing a secure, consistent, local source of crude oil. California refineries face a number of critical limitations preventing the replacement of California-produced crude with other domestic sources of crude, including geographic, infrastructure, crude quality, facility designs, and regulatory limitations.

Petroleum is essential to modern life, both as a fuel for transportation and energy production, and as a chemical feedstock, ranging from adhesives and plastics to pharmaceuticals and textiles. Petroleum products constitute an essential component of the manufacturing sector and United States economic growth.

**H. Maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the section 101(c) authority.**

Without governmental action as is proposed, the oil reserves in SYU are a stranded resource, which underscores the scarcity of crude oil transport options and pipeline infrastructure in California. Despite the value of the resources to national security, and to maximize domestic energy, this resource has been underused for a decade. Accordingly, maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the section 101(c) authority for hydrocarbon transportation services in this area.

**APPENDIX:**




**Figure 1: Field Production of Crude Oil in California (1981-2025)**[54]




**Figure 2: Refining Capacity of California (1982-2025)**[55]

[54] *California Field Production of Crude Oil*, U.S. Energy Information Administration, (Jun. 20, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=MCRFPCA2&f=A

[55] *California Refinery Operable Atmospheric Crude Oil Distillation Capacity as of January 1*, U.S. Energy Information Administration, (Jun. 20, 2025), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=8_NA_8D0_SCA_4&f=A

| Country | Thousands of Barrels | Percentage |
|---|---|---|
| Iraq | 68,406 | 21.26% |
| Brazil | 65,675 | 20.41% |
| Guyana | 50,840 | 15.80% |
| Ecuador | 43,766 | 13.60% |
| Canada | 29,796 | 9.26% |
| Saudi Arabia | 17,081 | 5.31% |
| United Arab Emirates | 14,226 | 4.42% |
| Columbia | 13,076 | 4.06% |
| Argentina | 7,934 | 2.47% |
| Other | 11,031 | 3.43% |
| Total | 321,831 | 100.00% |

**Table 1: Foreign Sources of Marine Crude Oil Imports to California 2024**[56]

**<u>Las Flores Pipeline System:</u>**
The Las Flores Pipeline System is a set of crude oil pipelines that run 124.4 miles from the Santa Ynez Unit (SYU) to the Pentland Terminal in Kern County. The Santa Ynez Unit (SYU) consists of three offshore platforms (Hondo, Harmony, and Heritage) and an onshore processing facility located along the Gaviota Coast at Las Flores Canyon. The POPCO Gas Plant is within the SYU and processes natural gas from the offshore platforms for the local market.[57]

CA-324 and CA-325 are two pipelines part of the Las Flores Pipeline System (LFPS) and have been closed since 2015. CA-324 is an onshore pipeline running 10.9 miles and carrying crude oil from the Las Flores Canyon processing facility to the Gaviota Pump Station. CA-325 consists of two segments, CA-325A and CA-325B, running 38.7 miles and 74.8 miles respectively. CA-325A carries crude oil from the Gaviota Pump Station to Sisquoc Pump Station, and CA-325B carries crude oil from the Sisquoc Pump Station to the Pentland Station where it can be distributed to refineries connected to the pipeline.

[56] *Foreign Sources of Crude Oil Imports to California*, California Energy Commission, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports, Accessed Mar. 06, 2026
[57] County of Santa Barbara Planning & Development. *SYU, POPCO Gas Plant & Las Flores Pipelines Permit Transfer*. (Dec. 16, 2025), https://www.countyofsb.org/4189/SYU-POPCO-Gas-Plant-Las-Flores-Pipelines




**Figure 3: Map of the Las Flores Pipeline System**[58]

[58] Pipeline and Hazardous Materials Safety Administration. *Special Permit for Sable Offshore Corp, Docket No. PHMSA-2025-1052*. Department of Transportation, (Dec. 19, 2025), https://budsoffshoreenergy.com/wp-content/uploads/2026/02/phmsa-2026-0464-0005_dea-attachment_1.pdf

# Exhibit B

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA,<br>Plaintiff,<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy; UNITED STATES DEPARTMENT OF ENERGY,<br>Defendants. | Civil Action No.<br>2:26-cv-03396-SVW-SSC<br><br>**DECLARATION OF DUSTIN B. HUBBARD IN SUPPORT OF UNITED STATES' OPPOSITION TO CALIFORNIA'S MOTION FOR A PRELIMINARY INJUNCTION** |

I, Dustin B. Hubbard, declare as follows:

1. I am the Director of the Western Region for the Office of Pipeline Safety at the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), an operating administration within the United States Department of Transportation. I have been in my current position since April 2019. My business address is 12300 W. Dakota Avenue, Suite 340, Lakewood, CO 80228.

2. I received my Bachelor of Science in Mechanical Engineering from the University of California, San Diego in 2002 and a Master of Science in Mechanical Engineering from the California State University, Long Beach in 2006.

3. In my current position as Region Director, I oversee the inspection, investigation, and enforcement of the federal safety standards and reporting requirements that apply to owners and operators of pipeline facilities, primarily in the western United States, including Alaska and Hawaii. Prior to serving as the Director, I was a Senior Inspector and Data Analyst with PHMSA dating back to 2010. Prior to my work with the federal government, I was a structural analyst in the aerospace industry and an Engineroom Supervisor with the U.S. Navy onboard the USS Wabash and USS Duluth.

4. I submit this declaration in support of the United States' Opposition to California's Motion for a Preliminary Injunction. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently testify to the truth of these facts.

**I. BACKGROUND**

5. Sable Offshore Corporation and Pacific Pipeline Company (together, "Sable") currently own the Santa Ynez Pipeline System ("SYPS"), an interstate pipeline facility that transports crude oil produced on the Outer Continental Shelf through an onshore processing facility in Santa Barbara County, California, to a terminal in Kern County, California. The SYPS contains two pipeline segments that transport crude oil from the onshore processing facility to the terminal. These

pipeline segments are now known as CA-324 and CA-325 and were previously called Lines 901 and 903, respectively ("the Segments").

6. In 2015, before Sable's acquisition of the Segments, Segment 901/CA-324 experienced a rupture that led to a release of crude oil. PHMSA conducted an accident investigation and determined that the cause of the rupture was external corrosion. Following the rupture, PHMSA issued a Corrective Action Order (CAO) to the Segments' then-owner and operator, Plains All American Pipeline, L.P. and Plains Pipeline, L.P. (Plains). A true and correct copy of the CAO is available at https://primis.phmsa.dot.gov/enforcement-data/case/520155011H. The CAO initially directed Plains to shut down Segment 901/CA-324 and to implement certain corrective measures to address the root cause of the release. PHMSA subsequently applied the same conditions to Segment 903/CA-325 in an amended CAO.

7. In 2020, Plains entered into a consent decree with the United States and several entities representing the State of California in *United States & People of the State of California v. Plains All American Pipeline, L.P. et al.*, 2:20-cv-02415. The consent decree incorporated all outstanding corrective measures imposed in the CAO. When Sable acquired the SYPS, it agreed to comply with certain Segment-specific provisions in the consent decree.

## II. PREPERATIONS TO RESTART THE SEGMENTS

8. All of the corrective measures set forth in the CAO that have accrued to date have been completed.

9. **Attachment 1** to this declaration is a true and correct copy of a bi-annual report submitted pursuant to the consent decree. PHMSA received and maintained this report in the course of its regularly conducted activities. As set forth in the report, since acquiring the Segments Sable has remediated all portions of the Segments with metal loss of 40 percent or greater. In addition, twenty-seven (27) new safety valves were installed on the Segments within Santa Barbara, Kern,

and San Luis Obispo Counties, an enhanced Computational Pipeline Monitoring Real Time Transient Model leak detection system has been implemented, construction of a primary operations control center was completed, and additional control room enhancements were made.

10. **Attachment 2** to this declaration is a true and correct copy of a January 22, 2026 letter from Sable to PHMSA. PHMSA received and maintained this letter in the course if its regularly conducted activities. As described in the letter, from March to May 2025, Sable subjected the Segments to extensive safety testing, including strength and spike hydrostatic pressure testing. The testing involved increasing the pressure in Segment 901/CA-324 to 150 percent of its maximum operating pressure and increasing the pressure in Segment 903/CA-325 to 139 percent of its maximum operating pressure. Neither Segment experienced any leakage during the strength or spike test. The successful completion of strength and spike hydrostatic pressure testing without leakage demonstrates that a pipeline does not have any injurious anomalies or defects and is otherwise fit for service.

11. **Attachment 3** to this declaration is a true and correct copy of a December 17, 2024 waiver Sable received for the Segments from the California Office of the State Fire Marshal. PHMSA received and maintained a copy of the waivers in the course of its regularly conducted activities. The waivers specify pressure and temperature operating limits, in-line inspection frequency, repair criteria, and strength and spike pressure testing, among other conditions.

12. From December 9 through December 11, 2025, I and several qualified Office of Pipeline Safety inspectors conducted an on-site inspection of the SYPS as part of a jurisdictional audit. The inspection included reviewing Sable's written procedures and records for the SYPS and conducting field observations of the Las Flores pipeline facility, pump stations at Gaviota and Sisquoc, control room in Santa Maria, and the offshore Harmony platform.

13. I and several qualified PHMSA inspectors on my staff also reviewed Sable plans and procedures for restarting the Segments and discussed its processes and safety procedures for restart with Sable personnel.

14. **Attachment 4** to this declaration is a true and correct copy of a December 22, 2025 letter I issued approving Sable's restart plan for the Segments. The approval letter was written and is maintained in the course of PHMSA's regularly conducted activities.

15. The restart plan provided for the gradual restart of the Segments in phases. During restart, each portion of the system was brought up to operating pressure in stages where each stage is a pressure increment that was held for a minimum of two hours before proceeding to a higher-pressure increment. These holding periods are referred to as a stand-up pressure test. During the hold periods between pressure increments, the line pressures were monitored for any fluctuation that could indicate a problem holding pressure. The pipeline was also patrolled by aircraft flyovers for any indications of a leak. Once the pressure remained steady for a minimum of two hours, the next pressure stage was initiated. If at any time, there was an indication that pressure is not holding, the pipeline would have been shut down and the reason for the pressure drop investigated and corrected before continuing. The Segments passed all of the stand-up pressure tests without issue.

16. **Attachment 5** to this declaration is a true and correct copy of a December 22, 2025 emergency special permit PHMSA issued to Sable for the Segments. The emergency special permit was written and is maintained in the course of PHMSA's regularly conducted activities. The emergency special permit[1] is substantially identical to the waiver received from the California Office of the State Fire Marshal, adopting the same strict operational and safety conditions,

[1] Special permits issued by PHMSA are the federal equivalent to state waivers issued by the California Office of the State Fire Marshal.

including the same operating limits, in-line inspections, repair criteria, and testing. The emergency special permit expired on February 21, 2026, but Sable has agreed to continue following the conditions until PHMSA issues a decision on its request for a non-emergency special permit.

17. **Attachment 6** to this declaration is a true and correct copy of an excerpt from a January 22, 2026 application for a non-emergency special permit from PHMSA that would apply to the Segments. PHMSA received and is maintaining the non-emergency special permit application in the course of its regularly conducted activities. If granted, the non-emergency special permit would impose substantially the same conditions on the operation of the Segments as the emergency special permit.

18. **Attachment 7** to this declaration is a true and correct copy of a draft non-emergency special permit PHMSA posted for public comment. The draft non-emergency special permit is maintained in the course of PHMSA's regularly conducted activities. The comment period ended on March 26, 2026, and comments received are currently under review.

**III. RESTART OF THE SEGMENTS**

19. On the morning of March 14, 2026, I arrived onsite with two other PHMSA pipeline safety inspectors to observe restart of the Segments. Since then, I and other PHMSA safety inspectors have been onsite to supervise the restart or, when not onsite, in communication with Sable about the progress of the restart. Based on my personal observations, the observations of my staff, and information from Sable, the Segments have been filled with oil and pressurized, and transporting crude oil since March 29, 2026 without any signs of release or other safety issues.

20. Based on my personal observations, the observations of my staff, and information from Sable, Sable has complied and continues to comply with the

restart plan. PHMSA will continue to supervise operation of the Segments until Sable has fully executed the special permit conditions.

21. The Segments have now operated for over 40 days with no incident.

22. PHMSA retains authority, pursuant to federal law (49 U.S.C. § 60112), to order the immediate shutdown of the SYPS if PHMSA determines the pipeline is or would be hazardous to life, property, or the environment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 8, 2026 in Lakewood, Colorado.

Dustin Hubbard

Dustin Hubbard
Director, Western Region

# Attachment 1

**Pacific Pipeline Company (PPC)**
**Consent Decree Bi-Annual Report**
**September 30, 2025**

**Introduction**
This report has been prepared in compliance with the requirements of Section XIV of the Consent Decree (Civil Action 2:20-cv-02415) (hereinafter referred to as "CD") with an effective date of October 14, 2020 ("Effective Date"). This report is submitted to update the status of PPC's compliance with the CD, including any measures taken to comply with the injunctive relief requirements in Appendices B and D.

The reporting period for this bi-annual report is from the date of the last bi-annual report (March 31, 2025), and encompasses the period from April 1, 2025 to September 30, 2025 ("Reporting Period").

This report is presented in three sections: the first covers measures taken to comply with the requirements of the body of the CD (Section I through XXIX); the second covers the measures taken to comply with the Injunctive Relief requirements presented in Section IX and Appendix B of the CD; and the third covers the measures taken to comply with Section X (Correction Action Order) which addresses the outstanding terms and obligations from the closed out PHMSA Corrective Action Order ("CAO"), which outstanding terms and obligations are now set forth in Appendix D of the CD.

## I. Requirements of the Consent Decree

During the Reporting Period, PPC engaged in the following activities as required by the CD:

- Section III – Applicability
- Section IX – Injunctive Relief
- Section XIV – Reporting

The compliance status of each of these sections is presented below.

**Section III – Applicability**
Copies of the CD have been provided to all PPC officers, employees and agents whose duties may reasonably include ensuring compliance with provisions of the CD. When applicable, PPC will provide a copy of the CD to those contractors who may perform work required under the CD. As additional officers, employees, agents and contractors are identified whose duties and work pertain to compliance with CD obligations, they will be provided a copy of the CD.

**Section IX – Injunctive Relief**
Per Paragraph 21 of the CD, PPC agreed to implement applicable injunctive relief measures set forth in Appendix B of the CD. The status of these actions are described in more detail in Section II (Requirements of Appendix B – Injunctive Relief) below.

**Section XIV – Reporting**
This report serves as a bi-annual report as required under Section XIV. Within the report, PPC describes the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement. This report is only applicable to the transferred assets, specifically Line 901 (hereinafter referred to as "CA-324") and the Gaviota to Pentland segment of Line 903 (hereinafter referred to as "CA-325").

## II. Requirements of Appendix B - Injunctive Relief requirements under Appendix B of the CD

Under Section XVIII, Paragraph 88, PPC is bound by provisions under paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B related to existing but non-operational segments of CA-324 and CA-325 and paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B for any lines built to replace CA-324 or CA-325. CA-324 and CA-325 are active

and maintained and inspected pursuant to applicable regulations. CA-324 and CA-325 are not currently transporting product, and they are categorized as active and maintained and inspected pursuant to applicable regulations. (PPC notes that the CD uses the terms "operational" and "non-operational" to describe whether the pipeline is currently transporting petroleum (operational) vs. being maintained and inspected, but not transporting petroleum ("non-operational"). "Non-operational" as used in this context does not connote a status other than active per PHMSA regulations.)

PPC has reviewed the sections of the CD that apply to the transferred assets and provides the following updates:

Appendix B, Article I - Section 2.B: PPC plans to restart in accordance with the Consent Decree (including Appendix D) during the fourth quarter of 2025.

Appendix B, Article I – Sections 4, 5, 6, and 7.A: Although these requirements only apply to operating segments, and CA-324 and CA-325 are not currently operating, PPC has proactively addressed and complied with these provisions in anticipation of restart of these Lines.

Section 4. All metal loss anomalies found to date on CA-324 and CA-325 through ILI runs with reported depth of 40% or greater wall loss have been analyzed and 100% of the remediations have been completed. These ILIs, analyses, and remediation efforts have been conducted consistent with the specifications provided in Section 4 of Appendix B of the Consent Decree.

Sections 5 and 6. PPC has procured a total of twenty-seven (27) valves for installation on CA-324 and CA-325 within Santa Barbara, Kern and San Luis Obispo Counties. Following a settlement with Santa Barbara County to authorize valve installation to the county's earlier denial of approvals to install the valves, installation work immediately commenced at locations indicated by Plains EFRD analysis, as well as a risk analysis submitted by Plains pursuant to the Coastal Best Available Technology (CBAT) Rule under 19 CCR 2111(c). With installation of these safety valves (along with implementation of enhanced leak detection measures and emergency response measures), CA-324 and CA-325 reflect implementation of the best available technology to limit discharge volume in the event of a release incident pursuant to the CBAT Rule. This installation exceeds the requirements of Section 6 of the Consent Decree, which gives the operator discretion to determine how to implement the results of a risk analysis. All twenty-seven (27) valves have been installed as follows: CA 324: seven (7) valves installed in Santa Barbara County; CA 325: nine (9) valves installed in Santa Barbara County, nine (9) valves installed in San Luis Obispo County and two (2) valves installed in Kern County.

Section 7.A. As noted in the CBAT risk analysis above, PPC has implemented a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) leak detection system that complies with API 1130. The system implemented by PPC is part of a suite of measures that constitute best available technology to limit discharge volume in the event of a release.

Appendix B, Article II – Section 12.A:
PPC has completed construction of its primary operations control center, located east of Santa Maria, California, and has completed the below items in accordance with the terms of the Consent Decree:

Section 12.A1. PPC has completed communication commissioning for all MOVs and pump stations at their physical locations. Point-to-point verifications are 100% complete.

Section 12.A2. PPC has updated its P&ID, software, manuals, and operating procedures to reflect the existing field configuration.

Section 12.A3. PPC has updated its SCADA alarm configuration, programming, and alert notifications.

Section 12.A4. PPC has updated the names of all facilities, equipment, devices, measurement points and allocations, and finalized its Control Room Management Plan, Control Center General Procedures, shift reports, and form templates.

**III. Requirements of Appendix D – Remaining Corrective Actions from the PHMSA CAO**

PPC met with OSFM from August 12 – 14, 2025 to (1) review and discuss PPC's completion of all mandated actions required prior to restart under the Consent Decree, (2) review and discuss the linefill and restart procedures, and (3) conduct field visits of pump stations and valve sites.

OSFM conducted its Operations & Maintenance inspections from August 6 – 8, 2025 and found no preliminary findings of either unsatisfactory results or concerns.

OSFM conducted its Control Room Management inspections from September 2 – 5, 2025 and found no preliminary findings of either unsatisfactory results or concerns.

By letter dated September 11, 2025, PPC requested OSFM's approval of the Restart Plans for Lines CA-324 and CA-325.

# Attachment 2

SABLE
OFFSHORE CORP.

January 22, 2026

VIA ELECTRONIC MAIL

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Safety Administration (PHMSA)
US Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

***RE: Application for Special Permit***
***Sable Offshore Corp.***

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) respectfully submits this Application for Special Permit pursuant to 49 U.S.C. § 60118(c)(1) and 49 C.F.R. § 190.341. As part of this Application, Sable requests that PHMSA issue a Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS). The Application seeks waiver of certain provisions under 49 C.F.R. Part 195 to implement Appendix B, Article I.1.A and Appendix D, Section 1.b.10 and 1.f of the Consent Decree issued in Civil Action No. 2:20-CV-02415 in the US District Court for the Central District of California (Consent Decree).

Sable shares PHMSA's commitment to pipeline safety and is proposing to comply with substantial alternative measures that provide an equivalent, if not greater, measure of safety as compared to the Part 195 regulation from which it seeks relief. These alternative measures are specifically designed to address the risk of cathodic protection shielding and the attendant external corrosion threats on CA-324 and CA-325 due to degradation of its original coating. These measures include, but are not limited to, significantly increased frequency of In-Line Inspection (ILI) tool runs and more stringent anomaly repair criteria. PHMSA granted Sable an Emergency Special Permit pursuant to 49 C.F.R. § 190.341(g) on December 23, 2025. This application requests substantially the same conditions as provided in the Emergency Special Permit.

In addition, these conditions are substantially the same measures that have already been reviewed and approved by the California Office of the State Fire Marshal (OSFM) through issuance of State Waivers dated December 17, 2024 granting waiver of the same standards for

CA-324 and 325, at a time when these segments were considered part of an intrastate pipeline facility. As part of the State Waiver process, PHMSA evaluated and approved the State Waivers pursuant to its federal oversight obligation in 49 U.S.C. § 60118(d) by issuing letters of no-objection to OSFM on February 11, 2025.[1]

Sable seeks this Special Permit from PHMSA due in part to Sable's November 26, 2025 determination, and PHMSA's December 17, 2025 concurrence that Lines CA-324 and 325 (formerly known as Lines 901 and 903, respectively) are properly classified as pipeline segments that are part of the interstate SYPS pipeline facility. As an interstate pipeline, SYPS is subject to PHMSA's exclusive pipeline safety oversight under 49 U.S.C. § 60104(c). As a result, and for the additional reasons provided in this application, Sable respectfully requests that PHMSA issue a special permit to replace the Emergency Special Permit issued for CA-324 and 325. Sable has patterned this application on its Emergency Special Permit application and the Pacific Pipeline Company's July 10, 2023 applications for state waivers.

Below please find the information specified in 49 C.F.R. § 190.341 in support of this Application:

***(1) The name, mailing address, and telephone number of the applicant and whether the applicant is an operator;***

Sable Offshore Corp. PPC (Operator ID #40881)
Attn: Lance Yearwood
845 Texas Avenue
Suite 2920
Houston, TX 77002
(713) 579-8118

***(2) A detailed description of the pipeline facilities for which the special permit is sought, including:***

*(i) The beginning and ending points of the pipeline mileage to be covered and the Counties and States in which it is located*

Sable operates the SYPS pipeline facility that encompasses, among other things, a Part 195-regulated emulsion line that transports oil from offshore oil production platforms to the Las Flores Canyon Processing Facility (LFC), LFC, and the Las Flores Pipeline, consisting of Part 195-regulated segments CA-324 and CA-325. A Special Permit is sought specifically for segments CA-324 and CA-325. CA-325 can be further divided into two sub-segments: CA-325A and CA-325B. Table 2-1 summarizes relevant information. A map of the pipeline system is included as ***Attachment A*** and further details about these segments are below:

[1] See Docket Nos. PHMSA-2025-0002 and PHMSA-2025-0003.

**Table 2-1: Pipeline Segments Applicable to Special Permit Application**

| Pipeline Facility Name | Pipeline Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|---|
| SYPS | CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| SYPS | CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| SYPS | CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

*a. Description of CA-324 and CA-325*

The CA-324 24-inch pipeline segment (formerly referred to as Line 901) is approx. 10.86 miles in length and generally parallels U.S. Highway 101 along the south coast between the LFC consolidated oil and gas processing facility and Gaviota Pump Station. This pipeline segment is located north of U.S. Highway 101 and generally follows powerline and/or natural gas pipeline rights-of-way across coastal terraces and incised canyons.

The CA-325A 30-inch pipeline segment (formerly referred to as Line 903 – Gaviota to Sisquoc) is approx. 38.72 miles in length. This pipeline segment extends west from Gaviota Pump Station to an MOV located east of Gaviota Creek and U.S. Highway 101. It then enters Gaviota State Park approx. 0.5 miles east of U.S. Highway 101 and extends westerly across the gently sloping coastal terrace and Cañada del Barro before dropping into the Cañada de la Gaviota drainage area. It then crosses U.S. Highway 101 and Gaviota Creek (Cañada de la Gaviota) immediately south of the U.S. Highway 101 "Caltrans" rest stop area. The pipeline segment then extends west and north from the Gaviota Creek MOV.

CA-325A continues west up a broad spur ridge to the ridge crest and the westerly boundary of Gaviota State Park. The pipeline segment traverses narrow ridge crests, crosses out of the Park and onto Hollister Ranch for approx. 0.5 miles, and then crosses back into the Park before descending toward the west fork of Gaviota Creek (Betty Creek). The right-of-way passes west of the Vista del Mar School and Las Cruces Adobe and then crosses beneath Highway 1 west of its intersection with U.S. Highway 101. The pipeline segment continues northward along the west side of U.S. Highway 101 through the Santa Ynez Mountains. It crosses long expanses of grasslands across the Las Cruces Ranch and steep walled canyons that form part of the Nojoqui Creek watershed. North of Moonshine Creek, the route crosses ridges with rock outcroppings.

The pipeline crosses beneath the Santa Ynez River west and south of Buellton and continues north across the Purisima and Solomon Hills. It crosses the northern edge of the San Rafael Mountains and the eastern edge of the Santa Maria Valley. The pipeline segment crosses beneath the Sisquoc River and continues north across the River Valley. It traverses moderately to severely sloping foothills at Kelly Canyon and extends west to the Sisquoc Pump Station at the southern end of Santa Maria Canyon.

The CA-325B 30-inch pipeline segment (formerly referred to as Line 903 – Sisquoc to Pentland) is approx. 74.84 miles in length. The pipeline segment follows Santa Maria Canyon after leaving the Sisquoc Pump Station. It then extends northeast towards Tepusquet Road. The route crosses relatively gentle terrain until it reaches the crest of the Sierra Madre Mountains where it traverses steep slopes approaching Suey Canyon and Buckhorn Canyon. The pipeline segment follows the northern edge of the Sierra Madre Mountains south of State Highway 166 through the Los Padres National Forest. The route crosses rugged terrain across the crests of the Sierra Madre Mountains, descends the mountains, crosses the Sierra Madre Ridge Road, and enters the Cuyama River Valley near Gypsum Canyon. At the Cuyama River crossing, CA-325B exits Santa Barbara County and enters San Luis Obispo County. The pipeline segment continues for approx. 44.5 miles through ranch land, terminating at the Pentland Station in Kern County.

Table 2-2 indicates High Consequence Areas (HCAs) along the Lines CA-324 and 325.

**TABLE 2-2: HIGH CONSEQUENCE AREA SUMMARY**

| Pipeline Segment Designation | Total Mileage | High Consequence Area (HCA) Type |
|---|---|---|
| CA-324 | 10.86 | Impact to ecologically sensitive regions (coastline) |
| CA-325A | 38.72 | Impact to the city of Buellton (population center, drinking water), and ecologically sensitive regions |
| CA-325B | 74.84 | Impact to ecologically sensitive regions |

Lines CA-324 and 325 traverse multiple Counties as well as State and Federal land. Approximate mileage is included in Table 2-3, below.

**TABLE 2-3: JURISDICTIONAL MILEAGE**

| | Jurisdiction | CA-324 (miles) | CA-325A (miles) | CA-325B (miles) | Total (miles) |
|---|---|---|---|---|---|
| **County** | Santa Barbara County | 10.9 | 38.7 | 23.8 | 73.4 |
| | San Luis Obispo County | 0 | 0 | 37.2 | 37.2 |
| | Kern County | 0 | 0 | 13.8 | 13.8 |
| | Total | 10.9 | 38.7 | 74.8 | 124.4 |
| **Sub-Jurisdiction *(Note 1)*** | California State Parks and Recreation (Gaviota State Park) | 0 | 4.1 | 0 | 4.1 |
| | U.S. Forest Service | 0 | 0 | 6.3 | 6.3 |
| | U.S. Fish and Wildlife (Bitter Creek Wildlife Refuge) | 0 | 0 | 4.5 | 4.5 |
| | California Dept. of Fish and Wildlife (Carrizo Plain Ecological Reserve) | 0 | 0 | 4.5 | 4.5 |
| | Bureau of Land Management | 0 | 0 | 1.0 | 1.0 |
| | City of Buellton | 0 | 1.1 | 0 | 1.1 |
| | Total | 0 | 5.2 | 16.3 | 21.5 |

*Note 1: Mileage included in County jurisdiction.*

*(ii) Whether the pipeline is interstate or intrastate and a general description of the right-of-way including proximity of the affected segments to populated areas and unusually sensitive areas*

The SYPS pipeline facility that Sable operates, including segments CA-324 and 325 that are parts of the SYPS, are all interstate. CA-324 and 325 have potential to impact HCAs, including unusually sensitive areas. A map of the pipeline facility is included as Attachment A and further details about CA-324 and 325 and its right-of way are provided above.

*(iii) Relevant pipeline design and construction information including the year of installation, the material, grade, diameter, wall thickness, and coating type;*

a. *Pipeline Design and Construction Information*

The CA-324 segment was constructed from low carbon steel pipe. It contains predominantly 0.344-inch nominal wall thickness, high frequency electric resistance welded (HF-ERW) API 5L X65 pipe manufactured in 1985 and 1986 by Nippon Steel Corp., Hikari Works mill, in Japan

using plate steel with UOE pipe forming process. A summary of CA-324 line pipe specifications is included in Table 2-4.

The CA-325A/B segment was constructed from low carbon steel pipe . It contains various grades and wall thicknesses of double submerged arc welded (DSAW) API 5L pipe manufactured between 1984 and 1986, from a variety of mills in Belgium, Brazil, France, Germany, and Israel, summarized in Table B-4. Additionally, it includes small portions of replaced sections with newer pipe, including HF-ERW. A summary of CA-325A/B line pipe specifications is included in Table 2-4.

**TABLE 2-4: LINE PIPE SPECIFICATIONS**

| Pipeline Segment Designation | Outside Diameter (in) | Nominal Wall Thickness (in) | Grade | Seam Type | Year Installed | Length (mi) |
|---|---|---|---|---|---|---|
| CA-324 Las Flores Canyon to Gaviota | 24 | 0.344 | X65 | HF-ERW | 1990 | 10.69 |
| | 24 | 0.375 | X65 | HF-ERW | 1990 | 0.02 |
| | 24 | 0.5 | X60 | HF-ERW | 1990 | 0.16 |
| CA-325A Gaviota to Sisquoc | 30 | 0.281 | X70 | DSAW | 1986 | 21.85 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 12.47 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 2.27 |
| | 30 | 0.375 | X65 | DSAW | 2014 | 0.12 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.38 |
| | 30 | 0.406 | X65 | HF-ERW | 2000 | 0.03 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 0.17 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.75 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.562 | X65 | DSAW | 1986 | 0.06 |
| | 30 | 0.75 | X65 | DSAW | 1986 | 0.35 |
| CA-325B Sisquoc to Pentland | 30 | 0.281 | X70 | DSAW | 1986 | 19.29 |
| | 30 | 0.344 | X65 | DSAW | 1986 | 17.03 |
| | 30 | 0.344 | X65 | DSAW | 2007 | 0.24 |
| | 30 | 0.375 | X65 | DSAW | 1986 | 12.88 |
| | 30 | 0.375 | X70 | DSAW | 2017 | 0.16 |
| | 30 | 0.375 | X70 | DSAW | 2018 | 0.02 |
| | 30 | 0.406 | X65 | DSAW | 1986 | 0.12 |
| | 30 | 0.438 | X70 | DSAW | 1986 | 24.41 |
| | 30 | 0.5 | X60 | DSAW | 1986 | 0.13 |
| | 30 | 0.5 | X70 | DSAW | 1986 | 0.28 |
| | 30 | 0.625 | X65 | DSAW | 1986 | 0.01 |
| | 30 | 0.75 | X70 | DSAW | 1986 | 0.27 |

***b. Coating***

Lines CA-324 and 325 are externally coated with the following coating system as illustrated in Figure 2-5:

- Coal tar urethane (CTU) coating in intimate contact with the steel pipe
- Layer of rigid thermal polyurethane (PU) foam insulation
- Outer layer of polyethylene (PE) tape wrap

**FIGURE 2-5: EXTERNAL COATING SYSTEM DIAGRAM**




Shrink sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at original construction pipeline field joints. The use of the PU foam and PE tape was selected at the time of original construction to minimize heat loss of the crude oil within the pipeline during transit. The pipeline segments have an impressed-current cathodic protection (CP) system that was energized at the time of installation. The CP system consists of active rectifiers at Las Flores Canyon Station, Gaviota Station, and Sisquoc Station, a critical bond and new, deep well anode bed at Pentland Station, as well as over 140 test stations across the entire CA-324 and CA-325A/B pipeline segments. The PU insulation and PE tape wrap has the ability to “shield” the cathodic protection, such that the CP current may not reach the pipe surface to arrest corrosion in the limited instance the CTU coating becomes disbonded. As a result, despite ongoing operation of the cathodic protection system in compliance with applicable regulations, the pipeline remains at risk of corrosion under insulation (CUI).

The CP system remains active and provides a level of external corrosion deterrence, and it is highly effective on portions of the pipeline without insulation (e.g. fusion bonded epoxy (FBE) and epoxy-coated regions). Cathodic protection has and will continue to be implemented, tested, and maintained on the pipeline at appropriate levels and in compliance with applicable

regulations.[2] Additionally, the use of modern, advanced in-line inspection technologies, along with explicit integrity management programs and procedures for robust characterization, validation, and stringent criteria for anomaly repair support supplemental integrity management steps that exceed regulatory corrosion protection requirements and enable safe, responsible operation. Comprehensive conditions for effective management of the external corrosion risks associated with shielding of CP are described in subsequent sections in this Application.

*(iv) Relevant operating information including operating, leak history, and most recent testing or assessment results;*

*a. Operating Information and Leak History*

Lines CA-324 and 325 were previously owned and operated by Plains All American Pipeline LP to transport crude oil, and were formerly known as Lines 901 and 903, respectively. These pipeline segments have remained under "active" status pursuant to PHMSA's Part 195 regulations,[3] but have not transported crude oil since May 19, 2015.

Prior to May 19, 2015, there were no releases from CA-324 or 325 which met reportable criteria under PHMSA's Part 195 standards. On May 19, 2015, CA-324 (then known as Line 901) experienced a release on a section of buried pipe. PHMSA's Failure Investigation Report (May 2016) attributed the rupture of the pipeline to "progressive external corrosion of the insulated, 24-inch diameter steel pipeline." PHMSA's findings indicate that the direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released crude oil. PHMSA's investigation identified the following categories of contributory causes:

1. Ineffective protection against external corrosion of the pipeline
   - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
   - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.

2. Failure to detect and mitigate corrosion

[2] As noted in PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016), pipelines with coatings that result in cathodic protection "shielding" may nonetheless still be in compliance with 49 C.F.R. Part 195 subpart H. CA-324 and 325 have not been previously determined as out of compliance with any cathodic protection or corrosion control regulations in Part 195, nor is it apparent that there is any such regulation in Part 195 with which these segments' cathodic protection system do not comply. As noted elsewhere in this application, even to the extent there were such regulations, the same conditions proposed to be established through this special permit would properly address any integrity risks presented by the limited effectiveness of cathodic protection on CA-324 and 325, and fulfill the Consent Decree's and CAO's directive to obtain a special permit for these purposes.

[3] See Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.") See also, PHMSA December 17, 2025 Determination of Interstate Classification, p.3, n.8, confirming active status of Las Flores Pipeline.

- The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.

Subsequently, PHMSA issued a Corrective Action Order (CAO) to the operator (Plains).[4] PHMSA's third amendment to the CAO provided options for how the operator could address the risks associated with shielded cathodic protection and CUI.[5] Specifically, PHMSA provided that the operator could mitigate these risks through a special permit that included a "long-term continuous monitoring plan to address the ineffective CP under insulation."[6] That amended CAO provided that the CUI plan must be based on one of several specified methods, including submitting a request for a Special Permit containing the following provisions to "mitigate the threat of CUI":

1) Accelerated reassessments;

2) Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking;

3) Coordination of data from the appropriate alternating ILI technologies;

4) More stringent repair criteria targeted at CUI; and

5) Advanced data analysis techniques to account for the potential growth of CUI including interaction criteria for anomaly assessment.[7]

This Special Permit Application includes provisions to address all of these topics, as noted further below.

On October 14, 2020, the Consent Decree was entered by the United States District Court for the Central District of California.[8] The Consent Decree adopted relevant remaining provisions of PHMSA's Corrective Action Order in Appendix D, section 1.[9]

In October 2022, Pacific Pipeline Company (PPC), then a subsidiary of ExxonMobil, acquired CA-324 and 325 from Plains. In 2024, Sable acquired PPC and currently serves as the designated operator of CA-324 and 325, as well as other components of the SYPS pipeline facility.

Maximum Operating Pressure (MOP) information for CA-324 and 325 is provided in Table 2-6.

---

[4] Plains Pipeline, LP, CPF No. 5-2015-5011H, Corrective Action Order (May 21, 2015), subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016.
[5] Amendment No. 3 to the Corrective Action Order, Item 2 (c), p.8, CPF No. 5-2015-5011H (June 16, 2016).
[6] *Id.*
[7] *Id.* See also PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016).
[8] *United States et al v. Plains All American Pipeline, LP et al*, no. 2:20-CV-02415 (C.D. Cal. Oct. 14, 2020).
[9] *Id.* at 91 ("All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree…").

**TABLE 2-6: DOCUMENTED MOP and %SMYS[10]**

| Pipeline Designation | %SMYS | Documented MOP (psig) |
|---|---|---|
| CA-324 | 55.8% | 1003 (maximum)<br>(1.5 x MOP Spike test (15 mins) = 1505 psi;<br>1.25 x MOP strength test (8 hrs) = 1254 psi) |
| CA-325A | 69.3% | 1000 (maximum)<br>(1.39 x MOP spike test (15 mins) = 1390 psi<br>1.25 x MOP strength test (8 hrs) = 1250 psi) |
| CA-325B<br>(MP 49.57-107.55) | 71.5% | 1292<br>(1.25 x MOP strength test (8 hrs) = 1615 psi) |
| CA-325B<br>(MP 107.55-124.42) | 72.0% | 1170[11]<br>(1.25 x MOP strength test (8 hrs) = 1463 psi) |

b. *Most Recent Testing and Assessment Results*

i. Hydrostatic Testing

CA-324 was originally hydrostatically pressure-tested on November 25, 1990 to 1765 pounds per square inch gauge (psig), as calculated at the highest elevation. CA-325A was originally hydrostatically pressure-tested in nine separate segments between pressures of approx. 778 to 1757 psig, as calculated at the highest elevations of each segment, between October 14, 1986 and December 3, 1986. CA325B was originally hydrostatically pressure-tested within eleven separate sections between pressures of 686 to 1753 psig, as measured at the highest elevations of each segment, between January 13, 1986 and November 8, 1986. Portions of pipe replaced after original construction hydrotest were tested at or above the originally established test pressure and established maximum operating pressure (MOP) prior to being placed into service.

Sable hydrostatically pressure-tested Segments CA-324 and 325 from March 30 through May 27, 2025, dividing the lines in 8 sections. Segments CA-324 and CA-325A were spike-tested as well to 150% and 139% of MOP, respectively. No test failures occurred during the 2025 hydrostatic

[10] MOP for the pipeline is adjusted by the change in elevation at that location compared to the lowest elevation in each section where the MOP is established. CA-324 and CA-325A each have one MOP low elevation point where MOP is established. CA-325B has two MOP control points. Test pressure for each segment is based upon the MOP at the low point for each pipe section.

[11] Test pressure for this segment was based on the maximum allowable MOP limited by 72% SMYS at the lowest elevation of the pipe.

tests or spike tests. These pressure test results combined with 2022 and 2023 ILI assessments, discussed in the following section of this application and repairs performed according to the more stringent Consent Decree criteria at Appendix B, section 4.A.1 of the Consent Decree, provide a high degree of assurance that CA-324 and CA-325 are fit to resume service.[12]

A summary of the percent of specified minimum yield strength (% SMYS) and the corresponding MOP, as established by the construction hydrotest records, is included above in Table 2-7. A summary of hydrotest records by segment are included in Table 2-8.

**TABLE 2-8: HYDROSTATIC TEST SUMMARY**

| Pipeline Segment | Location | Date | Begin Station | End Station | Type | High Point Min Pressure (psig) | Low Point Max Pressure (psig) | Elevation Adjusted MOP (psig) |
|---|---|---|---|---|---|---|---|---|
| CA-324 | Las Flores Sta | 5/12/25 | 0+00 | 573+75 | Spike (150%) | 1166 | 1514 | 1003 |
| | | | | | 8-hour (125%) | 915 | 1264 | 1003 |
| CA-325A | Gaviota Sta | 5/27/25 | 554+21 | 1337+21 | Spike (139%) | 872 | 1400 | 1000 |
| | | | | | 8-hour (125%) | 730 | 1260 | 1000 |
| | MP 25.71 | 3/30/25 | 1338+21 | 2602+76 | Spike (139%) | 800 | 1289 | 1000 |
| | | | | | 8-hour (125%) | 660 | 1149 | 1000 |
| CA-325B | Sisquoc Sta | 4/13/25 | 2603+76 | 3186+76 | 8-hour (125%) | 892 | 1625 | 1292 |
| | MP 60.63 | 4/14/25 | 3187+76 | 3914+76 | 8-hour (125%) | 751 | 1614 | 1292 |
| | MP 74.44 | 4/22/25 | 3915+76 | 4455+76 | 8-hour (125%) | 1209 | 1379 | 1292 |
| | MP 84.65 | 5/2/25 | 4456+76 | 5669+76 | 8-hour (125%) | 922 | 1253 | 1292 |
| | MP 107.64 | 5/9/25 | 5670+76 | 6554+49 | 8-hour (125%) | 459 | 1473 | 1170 |
| | Pentland Sta | | | | | | | |

[12] See, e.g., NACE Publcation 10A392, "Effectiveness of Cathodic Protection on Thermally Insulated Underground Metallic Structures," Sept. 2006 at p. 8 (appended to Line 901 Failure Investigation Report), available at https://www.phmsa.dot.gov/foia/plains-pipeline-lp-line-901-failure-investigation-report ("The use of internal pipeline corrosion inspection tools to locate/detect metal loss on external metallic surfaces has been relatively successful in evaluating corrosion control" and recommending "When practical, the thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss (e.g., an internal pipeline inspection tool could be used"); PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016),

ii. In-Line Inspection History

The following Table 2-9 provides a summary of CA-324, CA-325A, and CA-325B ILI activities, as of July 2023. Note that CA-324 Las Flores Canyon to Gaviota has been inspected since the 2015 release, in February and December of 2022 (circumferential magnetic flux leakage (MFL-C) and ultrasonic wall measurement (UTWM) surveys, respectively). Also note that CA-325A Gaviota to Sisquoc, and CA-325B Sisquoc to Pentland, have been inspected since the 2015 release, with axial magnetic flux leakage (MFL-A) surveys in September and October 2023, respectively.

**TABLE 2-9: IN LINE INSPECTION SUMMARY**

| Pipeline Segment | Date of Inspection | Technology | Vendor |
|---|---|---|---|
| CA-324 | 6/18/07 | Def+MFL+IMU | Rosen |
| | 7/3/12 | Def+MFL+IMU | Rosen |
| | 5/6/15 | Def+MFL+IMU | Rosen |
| | 2/23/22 | CMFL | Baker Hughes |
| | 12/10/22 | UTWM | Baker Hughes |
| CA-325A | 1/1/03 | Def+MFL+IMU | Tuboscope |
| | 3/20/08 | Def+MFL+IMU | Rosen |
| | 4/29/13 | Def+MFL+IMU | TD Williamson |
| | 9/20/23 | AMFL | Baker Hughes |
| CA-325B | 10/1/94 | Unknown | Tuboscope |
| | 1/8/03 | Def+MFL | Tuboscope |
| | 10/21/06 | Def+MFL | Tuboscope |
| | 3/10/12 | Def+MFL | TD Williamson |
| | 6/12/13 | AMFL | TD Williamson |
| | 10/1/23 | AMFL | Baker Hughes |

The 2022 and 2023 assessments listed above were run in nitrogen. These tools were selected specifically to identify internal and external corrosion anomalies as well as potential clusters of anomalies. During April 2024 to May 2025, Sable repaired all defects as required under 49 C.F.R. § 195.452 as well as the more stringent repair criteria set out in Appendix B, section 4.A.1 of the Consent Decree. Altogether, Sable conducted approximately 170 digs and made over 200 pipeline repairs based on the 2022 and 2023 assessments.

To account for the possibility of any continuing external corrosion, Sable has proposed in Condition 10 to run an ILI tool within 7 days of steady state operation upon restart. Moreover, Sable has also proposed significantly increased ILI tool runs in Condition 14 to evaluate the pipeline for external corrosion and other threats. Finally, Sable has proposed stringent repair criteria for any defects detected through these assessments, in Conditions 16-17.

***c. Other Activities***

In addition to hydrostatic and spike testing and ILI assessments and associated anomaly repairs, Sable has conducted several additional activities on or relating to the pipeline to further mitigate the risk and consequences of a spill.

*EFRD Analysis and Valve Installation*. Pursuant to Appendix B, Section 10.A of the Consent Decree, analyses to determine the need for emergency flow restricting devices (EFRDs) had been performed, and Sable actioned these results by installing a total of 27 new safety valves along CA-324 and 325. These safety valves serve to limit the spill volume in the event of a rupture, reflecting best available technology to minimize spill volume pursuant to California AB 864.

*Pipeline Control and Leak Detection*. Sable has installed an API 1130-compliant Real Time Transient Model Computational Pipeline Monitoring (RTTM CPM) leak detection system, to limit release detection time and further minimize release volumes in the event of a leak. The RTTM CPM system also reflects best available technology to minimize spill volume pursuant to California AB 864. Sable also has installed new flow meters at Gaviota and Sisquoc Pump Stations to increase detection resolution of the leak detection system by providing flow data via the pipeline's supervisory control and data acquisition (SCADA) system to the control center, and installed additional pressure transmitters for enhanced pressure surveillance as integrating with the leak detection system. Sable has further installed an automatic shutoff system (ASOS) that would automatically initiate a pump shutdown sequence and valve closures upon receipt of a rupture alarm as indicated by the above and other existing instrumentation on CA-324 and 325.

*Updated Programs and Procedures*. Pursuant to the Consent Decree, Sable has implemented enhancements to its control room management (CRM) procedures and operations, including point-to-point verification reviews for each component of its SCADA system, and updated

piping and instrumentation diagrams, software, manuals, and operating procedures to confirm they reflect existing field configuration. Sable has also made enhancements to the pipeline master control room, including adjusting alarm thresholds to better account for topography, sensor location, and to integrate with the above control and leak detection capabilities. Sable has also implemented updated integrity management procedures to reflect the more stringent assessment, data integration, and anomaly repair requirements in the Consent Decree.

*Enhanced Spill Response Resources*. Sable has developed a Tactical Response Plan to supplement its existing Incident Contingency Plan, with a focus on furthering emergency response preparation and planning within coastal zones and high pressure areas along the segments. Further, Sable has undertaken enhanced engagement with local emergency responders, including the Santa Barbara County Fire Department.

These actions collectively demonstrate that these segments and the overall pipeline is fit to resume operation. In addition to these activities that have established pipeline integrity today, Sable will continue to provide integrity assurance in future years through application of comprehensive conditions proposed in this application, which go well beyond what is required in Part 195.

***(3) A list of the specific regulation(s) from which the applicant seeks relief;***

Sable seeks relief from 49 C.F.R. § 195.452(h)(4)(iii)(H), requiring remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld.[13]

Moreover, Sable is seeking this Special Permit pursuant to Appendix B Sections1.A and B and Appendix D, Sections 1.b.10 and 1.f of the Consent Decree, stating that a "State Waiver" for limited effectiveness of cathodic protection must be applied for and received prior to restarting Lines 901 and 903 (now CA-324 and 325).[14] As noted in PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016), pipelines with coatings that result in cathodic protection "shielding" may nonetheless still be in compliance with 49 C.F.R. Part 195 subpart H.

Given that CA-324 and 325 were then-considered intrastate at the time of the Consent Decree but are now considered interstate (removing any regulatory jurisdiction of OSFM over these

[13] Waiver of this provision does not fully obviate the need for Sable to repair corrosion of or along a longitudinal seam weld. Sable will still be required to remediate corrosion and other anomalies according to the remaining criteria in § 195.452(h) and the enhanced anomaly criteria in this proposed special permit.
[14] CA-324 and 325 have not been previously determined as out of compliance with any cathodic protection or corrosion control regulations in Part 195, nor is it apparent that there is any such regulation in Part 195 with which these segments' cathodic protection system do not comply. As noted elsewhere in this application, even to the extent there were such regulations, the same conditions proposed to be established through this special permit would properly address any integrity risks presented by the limited effectiveness of cathodic protection on CA-324 and 325, and fulfill the Consent Decree's and CAO's directive to obtain a special permit for these purposes.

pipelines), Sable interprets these provisions to require obtaining a special permit from PHMSA for limited effectiveness of cathodic protection prior to restarting CA-324 and 325. Sable already received an Emergency Special Permit and State Waivers from OSFM pursuant to this language of the Consent Decree. Sable now seeks a Special Permit from PHMSA that substantially carries over the conditions entered in the Emergency Special Permit and the State Waivers.

***(4) An explanation of the unique circumstances that the applicant believes make the applicability of that regulation or standard (or portion thereof) unnecessary or inappropriate for its facility;***

***A. General External Corrosion Under Insulation***

CA-324 and 325 were shut down in 2015 following the above-described release on CA-324. A Consent Decree was entered by the US District Court for the Central District of California on October 14, 2020, that requires a State Waiver prior to restarting CA-324 and CA-325A/B. CA-324 and 325 are comprised of buried and insulated pipe. The pipeline has a coal-tar coating system and insulation wrap that provides corrosion deterrence.

Sable seeks approval to manage external corrosion risk on CA-324 and 325 through a supplemental combination of more frequent reassessments, usage of the appropriate assessment tools, integration of data from the appropriate alternating ILI technologies, enhanced anomaly response criteria targeted at corrosion under insulation, and advanced data analysis techniques to account for potential growth of corrosion under insulation including feature interaction criteria for anomaly assessment. As noted above, the Consent Decree specifically incorporated the outstanding requirements of a CAO (as amended), which provided that a long-term CUI plan as part of restart could be based on a special permit that included the above measures. Table 4-1 below summarizes each of these measures and the proposed condition number(s) in Attachment B of this Application that address them.

**TABLE 4-1: SUMMARY OF CAO CUI PLAN REQUIREMENTS AND CORRESPONDING SPECIAL PERMIT CONDITIONS**

| CAO Special Permit-based CUI Plan Requirement | Proposed Special Permit Condition Number(s) (see Appx. B) and Summary |
|---|---|
| *Accelerated reassessments* | *Condition 14(c):*<br>Requires two Ultrasonic Wall Measurement (UTWM) ILI assessments per year for the first two years following restart, then, at minimum, annual ILI assessments thereafter, to assess metal loss, including due to corrosion. Part 195 only requires such |

| | |
|---|---|
| | integrity assessments on a once-per-five year schedule, and the Special Permit Segments were previously only assessed on a once-per-three year schedule. The higher assessment frequency established in the Special Permit will facilitate the timely detection and repair of such anomalies before they pose integrity risks.<br><br>*Condition 14(d):*<br>Requires, at minimum, annual Ultrasonic Shear Wave Crack Detection (USCD) ILI assessments. Part 195 only requires such assessments on a once-per-five year schedule. The higher assessment frequency established in the Special Permit will facilitate the timely detection and repair of such anomalies before they pose integrity risks.<br><br>*Condition 14(e):*<br>Requires running high-resolution deformation ILI tool along with each UTWM ILI assessments |
| *Usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking* | *Condition 14(c) and (e):*<br>UTWM tools are appropriate specifically to assess metal loss anomalies arising from the threat of internal or external corrosion, the latter of which is a special threat due to limited effectiveness of cathodic protection on the Special Permit Segments. Moreover, high-resolution deformation tools are appropriate to assess anomalies resulting from threats of geological or other external force threats (e.g., erosion and ground movement), or construction anomalies.<br><br>*Condition 14(d):*<br>USCD tools are appropriate to detect crack-based anomalies due to, among other things, stress corrosion cracking. |
| *Coordination of data from the appropriate alternating ILI technologies;* | *Condition 14(i)-(k):*<br>Requires ILI tool vendor to determine tool tolerance per API 1163 2nd Ed. and include that tolerance in determining the size of each indication reported to Sable. Sable must account for this tool tolerance and anomaly growth rates in scheduling repairs and future reassessment intervals, and must demonstrate ILI tool accuracy for each run by using calibration, excavations, and unity plots demonstrating tool accuracy meets the vendor's specifications (typical for depth within 10% accuracy for 80% of |

| | |
|---|---|
| | the time). Sable must perform at least four validation digs in accordance with Level 2 of API 1163. |
| *More stringent repair criteria targeted at CUI* | *Conditions 16-17:*<br>Requires immediate repair of crack or crack-like anomalies equal to or greater than 50% of wall thickness (vs 80% threshold in § 195.452(h)(4)(i)).<br><br>Requires 180-day repair of all internal or external metal loss anomalies with an ILI-reported depth of 40% wall loss or more, including tool tolerance (vs 50% wall loss threshold in § 195.452(h)(4)(iii)(F)). |
| *Advanced data analysis techniques to account for the potential growth of CUI including interaction criteria for anomaly assessment* | *Condition 18:*<br>Requires Sable to develop a corrosion growth rate procedure to annually calculate corrosion growth rates between successive ILI assessments, including the most accurate signal matching between ILI data sets.<br><br>*Condition 21(b)-(f):*<br>Requires Sable to field-analyze a sample of assessment-identified anomalies to compare, and to apply 6t by 6t interaction criteria, and to use an approved third-party to review all ILI reports, verification dig results, unity plots, field findings, and any other finding that could affect the integrity of the Special Permit Segments within 6 months of each ILI assessment. |

Each of the components of the special permit approach to a long-term CUI plan are addressed by the conditions of this proposed Special Permit. The proposed Special Permit is appropriate to mitigate risks associated with limited effectiveness of cathodic protection.

### ***B. Selective Seam Weld Corrosion (SSWC)***

The PHMSA Fact Sheet on Selective Seam Corrosion (known in industry as SSC or SSWC) describes SSWC as "a localized corrosion attack along the bond line of low-frequency electric resistance welded (LF-ERW) and electric flash welded (EFW) piping, that leads to the

development of a wedge-shaped groove that is often filled with corrosion products."[15] The Fact Sheet goes on to say that "LF-ERW or EFW pipe manufacturing processes first came into use in the 1920s. Both types of pipe are manufactured by forming steel plates into round cylinders and then joining the longitudinal edges through a welding process. Due to technology and quality control issues with some of the pipe manufactured prior to 1970, the weld bondline may be susceptible to corrosion processes. This is particularly true if the pipeline has the following conditions present:

- Exposure to corrosive conditions due to poor or absent coating;
- Ineffective cathodic protection; or
- The presence of non-metallic inclusions in the weld bondline region (e.g., contaminants present during the manufacturing process).

SSWC is generally not considered to be a concern with pipe manufactured after 1970 due to the use of cleaner steels having greatly reduced sulfur contents and the replacement of low frequency welding equipment with high frequency equipment in the manufacturing process." As noted above, Line CA-324 contains exclusively high frequency ERW (HF-ERW) longitudinal seamed pipe manufactured in 1985 and 1986. When ILI tools call corrosion along the seam, it may simply be corrosion incidental to the seam rather than corrosion that preferentially attacks the seam. Indeed, SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this system. Therefore, the threat of SSWC is not considered applicable to Line CA-324. As such, selection of future inspection technologies will prioritize the identification and characterization of external blunt metal loss as the primary threat to this buried, insulated line, namely ultrasonic wall measurement (UTWM) and axial magnetic flux leakage (MFL-A) technologies.

Note that Sable only accepts calls from circumferential magnetic flux leakage (MFL-C), spiral magnetic flux leakage (SMFL), ultrasonic crack detection (UTCD) and/or electromagnetic acoustic transducer (EMAT) ILI systems when applying criteria for corrosion interaction with the longitudinal seam weld, as these technologies are designed for and, therefore are best suited for detection of the longitudinal seam weld and axially oriented corrosion. MFL-A and/or UTWM are not designed for detection of the longitudinal seam weld or axially oriented corrosion, so calls from those ILI systems are not reviewed for longitudinal seam weld interaction.

CA-324 was inspected using an MFL-C tool in February 2022, to better characterize the threat of external metal loss under insulation. Since SSWC has not been observed in the previous direct examinations that make up the extensive dig history on this pipeline, Sable is therefore requesting PHMSA to issue a special permit which allows for the use of engineering analysis

[15] PHMSA Fact Sheet on Selective Seam Corrosion, December 1, 2011; https://primis.phmsa.dot.gov/comm/FactSheets/FSSelectiveSeamCorrosion.htm

and protocols to differentiate between corrosion anomalies that do not present a specific risk to the seam weld and associated heat affected zones in lieu of the current requirement under 49 C.F.R. § 195.452(h)(4)(iii)(H). Remediation and repair activities would then be scheduled according to the findings of the proposed evaluation.

***(5) A description of any measures or activities the applicant proposes to undertake as an alternative to compliance with the relevant regulation, including an explanation of how such measures will mitigate any safety or environmental risks***

The Application includes memorializing certain integrity management procedures included in the Consent Decree in addition to further measures beyond Part 195 to maintain the integrity of the pipeline, including measures specific to SSWC. Many of these measures were negotiated and agreed upon as part of the Consent Decree.

A comprehensive list of these proposed measures is contained in draft Special Permit conditions, at Attachment B. These measures include, among other things, temperature limitations and monitoring, hydrostatic testing, including spike test, requirements (which Sable has already completed), a five-fold more frequent than required by § 195.452 ILI assessment schedule, a substantially more stringent set of anomaly repair criteria, corrosion growth rate analysis, in-field direct examination, and additional recordkeeping and reporting requirements, as compared to the baseline Integrity Management requirements in Part 195. These measures, in their totality, in addition to hundreds of recently completed anomaly repairs under the repair conditions of the Consent Decree, will substantially minimize the possibility that future conditions that threaten the integrity and safety of the pipeline will go undiscovered or unremediated.

***(6) A description of any positive or negative impacts on affected stakeholders and a statement indicating how operating the pipeline pursuant to a special permit would be in the public interest***

Grant of the Special Permit would create positive impacts on affected stakeholders and operating the covered pipeline segments in accordance with the special permit would be in the public interest. Grant of the Special Permit would be consistent with operation of CA-324 and 325, which would help address the national energy emergency that has been declared by the President in Executive Order (EO) 14156 (January 20, 2025), which recognizes the seriousness of the West Coast energy shortage, and seeks to boost domestic energy production to address the shortage. Specifically, EO 14156 determined and declared pursuant to the National Emergencies Act (50 U.S.C. 1601 et seq) that the energy production and transportation capacity of the United States “are all far too inadequate to meet our Nation’s needs” and that “hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets.” EO 14156 specifically notes that these problems “are most

pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs and devastate the prosperity of not only local residents but the entire United States population." EO 14156 concludes that our nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy," and that "in light of these findings, [the President] hereby declare[s] a national emergency."

Grant of the Special Permit helps address the energy security and supply issues that acutely affect the West Coast, as noted in EO 14156 by supporting operation of a vital source of crude oil transportation to local and regional refineries (amounting to 10-15% of current California-wide production levels), and helps reverse unfavorable market conditions for refineries. It would also help displace the need for imported oil and gasoline from other nations to California. See Attachments C-F for additional materials in support of these benefits.

***(7) A certification that operation of the applicant's pipeline under the requested waiver would not be inconsistent with pipeline safety***

Sable certifies that operation of CA-324 and 325 under the requested special permit is not inconsistent with pipeline safety and maintains equivalent or greater protection than that prescribed under 49 C.F.R. Part 195.

***(8) If the application is for a renewal of a previously granted waiver or special permit, a copy of the original grant of the waiver or permit; and***

As discussed, PHMSA previously granted an Emergency Special Permit to Sable, and this application seeks to carry forward substantially the same conditions as the Emergency Special Permit and the two existing state waivers issued by OSFM on December 17, 2024. A copy of the Emergency Special Permit is attached to this application at Attachment G.

***(9) Any other information PHMSA may need to process the application including environmental analysis where necessary.***

This application does not seek relief from 49 C.F.R. § 195.563 and the requirements to provide cathodic protection for buried pipelines. The cathodic protection system remains active and continues to be maintained on CA-324 and 325. Further, this cathodic protection system continues to achieve the specifications provided in § 195.571 and the applicable sections it references in NACE SP 0169-2007, as well as other corrosion control regulations in Part 195. Rather, Sable proposes the aforementioned inspection and remediation actions as a means of addressing the limitations of cathodic protection PHMSA observed for buried, insulated pipe.

Cathodic protection will continue to be implemented on the pipeline system at appropriate levels in adherence to 49 C.F.R. 195 and tested at appropriate intervals. Cathodic protection will continue to function with high effectiveness at pipeline repair locations where the thermal insulation has been removed.

CA-324 and 325 have not been previously determined as out of compliance with any cathodic protection or corrosion control regulations in Part 195, nor is it apparent that there is any such regulation in Part 195 with which these segments' cathodic protection system do not comply. As noted elsewhere in this application, the same conditions proposed to be established through this special permit would properly address any integrity risks presented by the limited effectiveness of cathodic protection on CA-324 and 325, and fulfill the Consent Decree's and CAO's directive to obtain a special permit for these purposes.

As noted above, Sable already received an Emergency Special Permit on December 23, 2025 and State Waivers from OSFM in December 2024 (which PHMSA evaluated and approved) regarding waiver of the same standards for CA-324 and 325. Sable is seeking from PHMSA a special permit to supersede the Emergency Special Permit, which contains substantially the same conditions as reflected in the Emergency Special Permit and State Waivers (with adjustments for tasks already completed by Sable).

Sable includes a proposed Draft Environmental Assessment with this application, at Attachment G.

Sable believes that the proposed Special Permit reflects a conservative and measured approach to the identification and remediation of external corrosion metal loss features on CA-324 and 325, will adequately manage risk factors associated with cathodic protection, and enable safe, long-term operation of the pipeline.

We appreciate PHMSA's consideration of this Application. Should you have any questions, or require anything further to conduct your review of this Application please do not hesitate to contact me.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer, Sable Offshore Corp.
President, Pacific Pipeline Company

# Attachment 3

STATE OF CALIFORNIA —NATURAL RESOURCES AGENCY Gavin Newsom, Governor

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT: LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator: Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline: OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's ( ) state waiver request ( ) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) **rr** **r** **d** **d** for Sable CA-324.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
    a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
    b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
    c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G **M rD r R r rr d d** If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**<u>Pressure Testing</u>**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.
14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.
15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure
17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

**In-Line Inspection (ILI) Assessment and Frequency**

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

c) In-line inspection tool vendor(s)
d) Required tool specifications including operational specifications and anomaly sizing tolerances
e) Tool validation methodology
f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
g) Criteria used to identify locations for excavation and field verification
h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
20. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).
21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
b. USCD Performance Specification Requirements
    i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.
    ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
    iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
    iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.
23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.
24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.
25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.
27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**<u>Discovery of Condition</u>**

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**<u>Immediate Repair Conditions</u>**[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in **d r r d** and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

**180-Day Repair Conditions**[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in **d** **d** and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].
41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.
[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

   b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
   c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]
47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
   a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
   b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).
49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.
50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.
52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.
53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**<u>Data Requirements for Predicted Failure Analysis</u>**

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.
55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in **r** **r** **d** records.

**<u>Recordkeeping</u>**

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.
57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

e. Evaluation methodology used
f. Models used
g. Direct in situ examination data
h. All in-line inspection tool assessments information evaluated
i. Pressure test data and results
j. All in-the-ditch assessments performed on the pipeline segments
k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
l. All finite element analysis results
m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o. Safety factors used for fatigue life and/or predicted failure pressure calculations
p. Reassessment time interval and safety factors
q. The date of the review
r. Confirmation of the results by qualified technical subject matter expert(s)
s. Approval by responsible Sable management personnel
t. Records of additional preventive and mitigative (P&M) measures performed
u. Reports required by this State Waiver.

**Reporting**

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, **M** **r –** **d** .[17]
59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, **M** **r –** **R** **r** . The email notification shall include, if applicable:
    a. Tool type and run date
    b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c. Dig sheets
    d. Field contact information for Sable
    e. Time and location of the field evaluation and repair.
60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, **M** **r –** **r** **d** and include:

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

a. Tool type
b. Run date
c. Summary of Conditions Report[18]
d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, **M** **r –** **R** **r** . At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
   c. The third-party ILI expert reviews in accordance with Condition 52
   d. AC and DC Interference surveys that are due in accordance with Condition 53
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**Limitations**

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,




JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc: Doug Allen, Supervising Pipeline Safety Engineer, OSFM
Andy Chau, Supervising Pipeline Safety Engineer, OSFM
Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
Tuan Tran, Pipeline Safety Engineer, OSFM
Josh Cleaver, Staff Counsel, CAL FIRE
Max Kieba, Engineering and Research Division, PHMSA
Joshua Johnson, Engineering and Research Division, PHMSA

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY Gavin Newsom, Governor

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT: LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A B)**

Operator: Sable Offshore Corp
OPID# 40851
845 Texas Avenue, Suite 2920
Houston, Texas 77002

Pipeline: OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's ( ) state waiver request ( ) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) **rr r d d** for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B. The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc. CA-325A is approximately 38.72 miles long. The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]
9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.
10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G **M rD r R r rr d d** If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.
11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    - **a** All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    - **b** All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

**In-Line Inspection (ILI) Assessment and Frequency**

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.
    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.
    b. USCD Performance Specification Requirements
        i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.
        ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
        iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
        iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.
23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.
24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.
25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.
26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.
27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.
29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**<u>Discovery of Condition</u>**

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**<u>Immediate Repair Conditions</u>**[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in **d r r d** and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

**180-Day Repair Conditions**[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**Corrosion Growth Rate Analysis (CGRA)**

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in d d and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.
[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.
[11] At a minimum, Sable must include signal matching between ILI data sets.
[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.
[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.
    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]
48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**Integrity Management**

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).
50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.
51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).
52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.
53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.
54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

**Data Requirements for Predicted Failure Analysis**

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.
56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in **r** **r** **d** records.

**Recordkeeping**

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.
58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o. Safety factors used for fatigue life and/or predicted failure pressure calculations
p. Reassessment time interval and safety factors
q. The date of the review
r. Confirmation of the results by qualified technical subject matter expert(s)
s. Approval by responsible Sable management personnel
t. Records of additional preventive and mitigative (P&M) measures performed
u. Reports required by this State Waiver.

**Reporting**

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, **M** **r –** **d** .[17]
60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, **M** **r –** **R** **r** . The email notification shall include, if applicable:
    d. Tool type and run date
    e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    f. Dig sheets
    g. Field contact information for Sable
    h. Time and location of the field evaluation and repair.
61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, **M** **r –** **r** **d** and include:
    i. Tool type
    j. Run date
    k. Summary of Conditions Report[18]
    l. Final Vendor Report and Pipe Tally
62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, **M** **r –** **R** **r**

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.
[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

. At a minimum, the annual report shall contain the following, if applicable:

a. A Closure Report for the previous calendar (CY) which contains:
    i. Features that were remediated in previous CY
        1. Provide documentation for the in-the-ditch assessments and repairs
    ii. Identify features that remain to be assessed
    iii. Unity Plots for previous ILI runs
b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
c. The third-party ILI expert reviews in accordance with Condition 53
d. AC and DC Interference surveys that are due in accordance with Condition 54
e. A copy of the CGRA for prior year including:
    i. Mean corrosion growth rate for the pipeline
    ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

**<u>Limitations</u>**

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,




JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc: Doug Allen, Supervising Pipeline Safety Engineer, OSFM
Andy Chau, Supervising Pipeline Safety Engineer, OSFM
Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
Tuan Tran, Pipeline Safety Engineer, OSFM
Josh Cleaver, Staff Counsel, CAL FIRE
Max Kieba, Engineering and Research Division, PHMSA
Joshua Johnson, Engineering and Research Division, PHMSA

# Attachment 4

U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE: Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

DUSTIN B HUBBARD Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

Exhibit C
Page 404

cc: Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire, jim.hosler@fire.ca.gov

# Attachment 5

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (***special permit segments***), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I. Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The ***special permit segments*** are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the ***special permit segments***. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.
[2] Sable submitted supplemental information related to its application on December 23, 2025.

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The ***special permit segments*** were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the ***special permit segments*** are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the ***special permit segments***.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The ***special permit segments*** may only be used to transport crude oil.

2) Prior to transporting crude oil in the ***special permit segments***, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the ***special permit segments***, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the ***special permit segments***, as follows:

a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9) Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

a) API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

b) API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the ***special permit segments*** that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the ***special permit segments*** cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the ***special permit segment***, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

i. Dates for integrity assessment

ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

iii. In-line inspection tool vendor(s)

iv. Required tool specifications including operational specifications and anomaly sizing tolerances

v. Tool validation methodology

vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

vii. Criteria used to identify locations for excavation and field verification

viii. Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

i. Initial ILI tool runs – Each year, during the first two (2) years of operating the ***special permit segments***, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

ii. Subsequent ILI tool runs – After the first two (2) years of operating the ***special permit segments***, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the ***special permit segment*** within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

i. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

ii. USCD Performance Specification Requirements

1. The USCD tools must have a probability of detection that is

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the ***special permit segment*** in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

a) A crack or crack-like anomaly that meets any of the following criteria:

i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the ***special permit segments*** is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

ii. Sable must increase the metal loss anomaly's depth by 20% when

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the ***special permit segments***. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the ***special permit segments*** and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

i. Technical approach used for the analysis

ii. All data used and analyzed

iii. Pipe and longitudinal weld seam properties

iv. Procedures used to implement emergency special permit conditions

v. Evaluation methodology used

vi. Models used

vii. Direct in situ examination data

viii. All in-line inspection tool assessments information evaluated

ix. Pressure test data and results

x. All in-the-ditch assessments performed on the ***special permit segments***

xi. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii. All finite element analysis results

xiii. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv. Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi. Reassessment time interval and safety factors

xvii. The date of the review

xviii. Confirmation of the results by qualified technical subject matter expert(s)

xix. Approval by responsible Sable management personnel

xx. Records of additional preventive and mitigative (P&M) measures performed

xxi. Reports required by this emergency special permit.

24) Reporting:

a) Any release on the ***special permit segments*** shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

b) An email notification shall be made at least three (3) days prior to a ***special permit segment*** being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

i. Tool type and run date

ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

iii. Dig sheets

iv. Field contact information for Sable

v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

i. Tool type

ii. Run date

iii. Summary of Conditions Report[27]

iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

i. A Closure Report for the previous calendar (CY) which contains:

1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

2. Identify features that remain to be assessed

3. Unity Plots for previous ILI runs

ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

iii. The third-party ILI expert reviews in accordance with condition 21(e).

iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

v. A copy of the CGRA for prior year including:

1. Mean corrosion growth rate for the ***special permit segments***

2. Distribution graph of the corrosion growth rate for the ***special permit segments*** (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the ***special permit segments*** to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY: 49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on December 23, 2025.

LINDA GAIL DAUGHERTY

Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
for Pipeline Safety

# Attachment 6

**Attachment B:**
**Proposed Special Permit Conditions**

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# DRAFT SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-[] |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID #:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | Date |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

**Proposed Grant of Special Permit:**

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] proposes to grant this special permit to Sable Offshore Corp. (Sable) for two hazardous liquid pipelines (Lines CA-324 and CA-325) that are constituents of the interstate Santa Ynez Pipeline System (SYPS) pipeline facility, located on the Outer Continental Shelf (OCS) and in California.

**I. Purpose and Need:**

Sable sought this special permit to waive requirements of 49 CFR §195.452(h)(4)(iii)(H) as applicable to Lines CA-324 and CA-325. The regulation requires remediation within 180 days of discovery of corrosion of or along a longitudinal seam weld. These pipelines present a risk of such corrosion under insulation that may occur as a result of limited effectiveness of cathodic protection due to shielding effects of polyurethane foam and polyethylene tape wrap installed on these pipelines. Sable proposes an alternative approach to appropriately manage this risk, which approach was previously reviewed and

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

approved under an Emergency Special Permit granted by PHMSA on December 23, 2025 and as part of State Waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for segments CA-324 and CA-325.

Sable also sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the US District Court for the Central District of California, which provides, among other things, that a “State Waiver” for the limited effectiveness of cathodic protection must be applied for and received from OSFM prior to restarting Lines CA-324 and 325. Moreover, the Consent Decree incorporates outstanding requirements from the closed Corrective Action Order at CPF No. 5-2015-5011H, as amended, which includes a requirement to include in a Restart Plan a long-term CUI plan based on one of several methods, including obtaining a special permit that requires: 1) accelerated reassessments; 2) usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking; 3) coordination of data from the appropriate alternating ILI technologies; 4) more stringent repair criteria targeted at CUI; and 5) advanced data analysis techniques to account for the potential growth of CUI including interaction criteria for anomaly assessment.[2] This Special Permit addresses each of these requirements through imposing conditions that require substantially more frequent integrity assessments as compared to Part 195, each of which must use threat-appropriate tools (including for wall loss anomalies from external and internal-based corrosion and for detecting crack anomalies from conditions such as stress corrosion cracking). This Special Permit also establishes more stringent anomaly repair criteria as compared to under Part 195. Further, this Special Permit requires integrating data from integrity assessments to continuously gauge assessment performance through comparison with in-the-field and other comparative benchmarks, and requires the performance of a corrosion growth rate analysis to inform Sable’s analysis of integrity assessment data.

CA-324 and 325 were formerly considered intrastate at the time of entry of this Consent Decree, and were regulated by OSFM pursuant to its state certification received under 49 USC § 60105(a). However, these pipelines are now considered interstate pursuant to Sable’s designation on November 26, 2025, and PHMSA’s concurrence on December 17, 2025, of the SYPS as an interstate pipeline facility. As a result, PHMSA, and not OSFM, is the sole pipeline safety regulatory agency with authority to grant waiver of the pipeline safety regulations. This change in designation immediately affected the measures implemented in the two State Waivers issued by OSFM for CA-324 and 325 in December 2024. To address any regulatory gaps between the transition of regulatory oversight from OSFM to PHMSA and respond to the ongoing national energy emergency, PHMSA issued an Emergency Special Permit that

[2] See also PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016),

contained substantially the same conditions as the State Waivers on December 23, 2025. Sable then requested a special permit pursuant to 49 U.S.C. § 60118(c)(1) and 49 CFR § 190.341 to provide an ongoing basis for the waiver requested by Sable and the operation of CA-324 and 325 after the expiration of the Emergency Special Permit. The requested conditions in the special permit application are substantially the same as those approved in the Emergency Special Permit.

## II. Special Permit Segments

This permit pertains to the specified special permit segments and corresponding special permit inspection area defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA proposes to grant this special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR §195.452(h)(4)(iii)(H).

**General Conditions:**

1) The Special Permit Segments may only be used to transport crude oil.

**2)** Prior to transporting crude oil in the Special Permit Segments, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

**3)** Sable shall not exceed maximum operating pressure (MOP) limits for the Special Permit Segments, as follows:

- **a)** The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
- **b)** The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.
- **c)** The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

**4)** Sable shall not exceed maximum operating temperature limits for crude oil transported in the Special Permit Segments, as follows:

- **a)** The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degree Fahrenheit for more than 12 consecutive hours.
- **b)** The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.
- **c)** The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

**5)** This special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this special permit.

**6)** This special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

**7)** In-line inspections (ILIs) performed pursuant to this special permit must include:

**a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

**b)** Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

**c)** Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)** Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[3], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[4]

**9)** Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

**a)** API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

[3] The heat affected zone (HAZ), as used in this special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[4] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

**b)** API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[5]

**10)** All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[6] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

**11)** Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

**12)** Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of the Special Permit Segments.

**13)** Pressure Testing:[7]

[5] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[6] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

[7] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

**a)** Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

**b)** Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

**c)** Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

**d)** Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

**e)** Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

**f)** Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[8]

**i)** Section(s) of the Special Permit Segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this special permit if failure(s) raise the concern that the Special Permit Segments cannot be safely operated.

**14)** In-Line Inspection (ILI) Assessment and Frequency:

**a)** Prior to performing in-line inspections of the Special Permit Segment, Sable shall provide PHMSA with a written notification to describing its assessment plan with the following information:

**i.** Dates for integrity assessment

**ii.** In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[9] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

**iii.** In-line inspection tool vendor(s)

**iv.** Required tool specifications including operational specifications and anomaly sizing tolerances

---

[8] All submissions to PHMSA required by this special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[9] Industry standards referenced in this special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this special permit.

**v.** Tool validation methodology

**vi.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

**vii.** Criteria used to identify locations for excavation and field verification

**viii.** Non-destructive examination

**b)** Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

**c)** Metal Loss Tool(s):

**i.** Initial ILI tool runs – Each year, during the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

**ii.** Subsequent ILI tool runs – After the first two (2) years of operating the Special Permit Segments, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the Special Permit Segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

**d)** Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[10] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

**i.** These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

**ii.** USCD Performance Specification Requirements

**1.** The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

**2.** The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

**3.** The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

**4.** The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

**f)** Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the Special Permit Segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** All ILI tool runs must obtain the Test ID from PHMSA prior to a run.

**h)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

**i)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

[10] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

**j)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[11] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**k)** Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**15)** Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**16)** Immediate Repair Conditions:[12]

**a)** A crack or crack-like anomaly that meets any of the following criteria:

**i.** Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

**ii.** Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

**c)** Any external cluster corrosion or external general corrosion that is located on the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[13]

[11] A minimum of four (4) independent direct examination excavations must be used for unity plots.
[12] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.
[13] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

**17)** 180-Day Repair Conditions:[14]

- **a)** A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
- **b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
- **c)** All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[15]
- **d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**18)** Corrosion Growth Rate Analysis (CGRA):

- **a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the Special Permit Segments is maintained.[16] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
- **b)** The CGRA procedure must include ILI data matching methods[17] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
- **c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

---

[14] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[15] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[16] At a minimum, Sable must include signal matching between ILI data sets.

[17] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

**d)** When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[18]

**e)** All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**19)** Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**20)** In Field Direct Examination of Pipe:

**a)** Direct examinations[19] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[20] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

**b)** Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

ii. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[18] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[19] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[20] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

**c)** Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

**d)** Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[21]

**e)** All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**21)** Integrity Management:

**a)** A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

**b)** Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

**c)** When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

**d)** Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

---

[21] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

**e)** Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the Special Permit Segments. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

**f)** Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.[22]

**22)** Data Requirements for Predicted Failure Analysis:

**a)** Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

**b)** The analyses performed in accordance with this special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

**23)** Recordkeeping:

**a)** Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this special permit shall be kept for the life of the Special Permit Segments and must be submitted to the PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

**b)** Sable must maintain the following records:

i. Technical approach used for the analysis
ii. All data used and analyzed
iii. Pipe and longitudinal weld seam properties
iv. Procedures used to implement special permit conditions

---

[22] Sable indicated in its application that it has already completed the evaluation required in this condition. Sable must submit results to PHMSA prior to restarting Line CA-324 and 325.

v. Evaluation methodology used
vi. Models used
vii. Direct in situ examination data
viii. All in-line inspection tool assessments information evaluated
ix. Pressure test data and results
x. All in-the-ditch assessments performed on the Special Permit Segments
xi. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
xii. All finite element analysis results
xiii. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
xiv. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
xv. Safety factors used for fatigue life and/or predicted failure pressure calculations
xvi. Reassessment time interval and safety factors
xvii. The date of the review
xviii. Confirmation of the results by qualified technical subject matter expert(s)
xix. Approval by responsible Sable management personnel
xx. Records of additional preventive and mitigative (P&M) measures performed
xxi. Reports required by this special permit.

**24)** Reporting:

**a)** Any release on the Special Permit Segments shall be reported to the PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[23]

**b)** An email notification shall be made at least three (3) days prior to a Special Permit Segment being exposed for non-emergency purposes of field evaluation and repair to PHMSA._The email notification shall include, if applicable:

i. Tool type and run date
ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
iii. Dig sheets
iv. Field contact information for Sable
v. Time and location of the field evaluation and repair.

[23] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

**c)** Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

i. Tool type
ii. Run date
iii. Summary of Conditions Report[24]
iv. Final Vendor Report and Pipe Tally

**d)** Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit. At a minimum, the annual report shall contain the following, if applicable:

i. A Closure Report for the previous calendar (CY) which contains:
   1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs
   2. Identify features that remain to be assessed
   3. Unity Plots for previous ILI runs
ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);
iii. The third-party ILI expert reviews in accordance with condition 21(e).
iv. AC and DC Interference surveys that are due in accordance with condition 21(f).
v. A copy of the CGRA for prior year including:
   1. Mean corrosion growth rate for the Special Permit Segments
   2. Distribution graph of the corrosion growth rate for the Special Permit Segments (e.g. occurrences (#) vs. corrosion rate (mpy)

**25)** Limitations:

**a)** This special permit is limited to a term of ten (10) years from the date of issuance. If Sable elects to seek renewal of this special permit, Sable must submit its renewal request at least 180 days prior to expiration of this ten (10) year period to PHMSA pursuant to 49 CFR 190.341(f). The renewal application must demonstrate that the special permit is still consistent with pipeline safety. PHMSA may seek additional information from Sable prior to granting any request for the special permit renewal.

**b)** Should Sable fail to comply with any conditions of this special permit or should PHMSA determine that this special permit is no longer appropriate or is inconsistent with pipeline

---

[24] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

safety, PHMSA may revoke the special permit and require Sable to comply with all appropriate regulatory requirements.

**c)** PHMSA may order the Special Permit Segments to be shutdown if appropriate pursuant to its authority under 49 U.S.C. § 60112.

**d)** PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this special permit. The terms and conditions of any compliance order shall take precedence over the terms of this special permit.

**e)** In the event of conflict between the conditions of this special permit and industry standards, the special permit conditions shall prevail.

**f)** If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the special permit, Sable must provide the PHMSA written notice of the change within 30 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the special permit.

# Attachment 7

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# DRAFT SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | PHMSA-2026-0464 |
| **Requested By:** | Sable Offshore Corp. |
| **Operator ID #:** | 40881 |
| **Original Date Requested:** | January 22, 2026 |
| **Original Issuance Date:** | February X, 2026 |
| **Effective Dates:** | February X, 2026 |
| **Code Section(s):** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Proposed Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS)[1] proposes to grant this special permit to Sable Offshore Corp. (Sable). This special permit would apply to two segments of the Santa Ynez Pipeline System (SYPS), an interstate hazardous liquid pipeline facility that transports crude oil produced on the Outer Continental Shelf (OCS) through an onshore processing facility located in Santa Barbara County, California, to a terminal located in Kern County, California. The two segments that would be subject to the special permit are known as Lines CA-324 and CA-325. The regulation that would be waived is 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H), which requires hazardous liquid pipeline operators to remediate certain longitudinal seam weld corrosion within 180 days of discovery.

## I. Purpose and Need:

Lines CA-324 and CA-325 were originally installed with polyurethane foam and an overlying polyethylene wrap tape to provide thermal insulation. The use of these materials is known to cause shielding, a condition that interferes with the proper functioning of cathodic protection and increases the risk of corrosion in pipeline systems. Sable has requested a special permit authorizing an alternative approach for managing the increased corrosion risk on Lines CA-324

[1] Throughout this special permit, the usage of "PHMSA" or "PHMSA OPS" means the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration Office of Pipeline Safety.

and CA-325 to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California. The Consent Decree includes provisions to address a rupture that occurred on the SYPS in Santa Barbara County, California, in May 2015.

As relevant here, the Consent Decree required the prior operator of the SYPS to obtain a waiver before restarting Lines CA-324 and CA-325 to ensure that effective measures were in place to mitigate the risk of corrosion. The Consent Decree also incorporated the outstanding requirements from a corrective action order that PHMSA issued following the rupture (CPF No. 5-2015-5011H), one of which required the restart plan for Lines CA-324 and CA-325 to include a long-term plan for managing corrosion under insulation (CUI). The Consent Decree provided multiple options for satisfying this requirement, one of which was obtaining a special permit that requires: 1) accelerated reassessments; 2) usage of the appropriate, complementary assessment tools for all threats, including stress corrosion cracking; 3) coordination of data from the appropriate alternating in-line inspection (ILI) technologies; 4) more stringent repair criteria targeted at CUI; and 5) advanced data analysis techniques to account for the potential growth of CUI, including interaction criteria for anomaly assessment.[2]

The conditions in this draft special permit address the requirements in the Consent Decree. Specifically, the conditions require substantially more frequent integrity assessments as compared to the pipeline safety regulations at 49 CFR Part 195, each of which must use threat-appropriate tools (including for wall loss anomalies from external and internal-based corrosion and for detecting crack anomalies from conditions such as stress corrosion cracking); establish more stringent anomaly repair criteria as compared to Part 195; require enhanced data integration from integrity assessments to continuously gauge assessment performance through comparison with in-the-field and other comparative benchmarks; and require the performance of a corrosion growth rate analysis to better inform the analysis of integrity assessment data. PHMSA notes that it previously issued an emergency special permit to Sable imposing similar conditions on the operation of Lines CA-324 and CA-325 on December 23, 2025 (Docket no. PHMSA-2025-1502),[3] and that the California Office of State Fire Marshal (OSFM) issued a waiver to Sable containing essentially the same conditions on December 17, 2024.

PHMSA further notes that the jurisdictional status of Lines CA-324 and CA-325 has changed since the District Court entered the Consent Decree. At that time, CA-324 and CA-325 were considered part of an intrastate hazardous liquid pipeline facility subject to regulation by OSFM pursuant to the terms of its annual certification with PHMSA.[4] However, Sable's subsequent acquisition and reconfiguration of the SYPS to operate as a single pipeline system transporting crude oil from the OCS into and through California makes Lines CA-324 and CA-325 part of an

[2] *See also* PHMSA ADB-2016-04, 81 Fed. Reg. 40398, 40400 (June 21, 2016).

[3] The emergency special permit included several conditions which Sable indicated it had completed prior to the effective date of the emergency special permit but that it had not provided to PHMSA for review. Sable provided additional records to PHMSA following the issuance of the emergency special permit, rendering those conditions no longer necessary for inclusion in this special permit. In addition, on February 13, 2026, Sable requested that its application be considered in accordance with the Notice of Limited Enforcement Discretion and Statement of Policy issued by PHMSA on January 12, 2026. As part of that request, Sable agreed to follow the terms and conditions in the emergency special permit until PHMSA issues a decision on this application.

[4] *See* 49 U.S.C. §§ 60101(a)(10) (defining "intrastate hazardous liquid pipeline facility"); 60105 (establishing requirements for State pipeline safety program certifications).

interstate hazardous liquid pipeline facility.[5] Accordingly, PHMSA has the sole and exclusive authority to regulate the SYPS and to issue the special permit for Lines CA-324 and CA-325 that Sable has requested in this proceeding.[6]

## II. Special Permit Segments

This permit pertains to the specified special permit segments defined in this section.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA proposes to grant this special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with requirements in 49 CFR § 195.452(h)(4)(iii)(H).

**General Conditions:**

**1)** The special permit segments may only be used to transport crude oil.

**2)** Prior to transporting crude oil in the special permit segments, Sable must develop and implement procedures for the conditions and requirements described in the special permit.

**3)** Sable shall not exceed maximum operating pressure (MOP) limits for the special permit segments, as follows:

- **a)** The MOP of Line CA-324 cannot exceed 1,003 pounds per square inch gauge (psig).
- **b)** The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota

[5] *See* 49 U.S.C. § 60101(a)(7); 49 CFR Part 195, Appendix A, Example 7. On November 26, 2025, Sable informed PHMSA that the SYPS will be operated as a single interstate pipeline facility originating at three offshore oil production platforms on the OCS and terminating in Kern County, California. Sable also noted that the SYPS had been considered an interstate pipeline facility in operating under this configuration prior to 2016, when the tariffs filed with the Federal Energy Regulatory Commission (FERC) for CA-324 and CA-325 had been canceled. On December 17, 2025, following an on-site PHMSA inspection of the pipelines, control room, and an offshore platform, as well as review of Sable's records and prior OSFM inspection records, PHMSA's Associate Administrator for Pipeline Safety informed Sable that the agency concurred with Sable's determination that the SYPS is an interstate pipeline facility.

[6] 49 U.S.C. § 60104(c).

and Sisquoc stations) cannot exceed 1,000 psig.

**c)** The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Check Valve 37) cannot exceed 1,292 psig.

**4)** Sable shall not exceed maximum operating temperature limits for crude oil transported in the special permit segments, as follows:

**a)** The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit (°F) for more than 12 consecutive hours.

**b)** The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

**c)** The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 °F for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

**5)** This special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this special permit.

**6)** This special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

**7)** ILIs performed pursuant to this special permit must include

**a)** Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

**i.** Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

**ii.** General corrosion means uniform or gradually varying loss of wall thickness over an area.

**b)** Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

**c)** Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

**8)** Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24-inch pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24-inch pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344 inches that was manufactured by Nippon Steel Corp. in the 1980s. At least three separate tests must be performed to obtain the fracture toughness

values of the pipe body, heat affected zone (HAZ),[7] and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e., three samples for pipe body, three samples for HAZ, and three samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

**9)** Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30-inch pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30-inch pipe specifications:

**a)** API 5L X70 pipe with a nominal thickness of 0.281 inches that was manufactured by the various pipe mills in the 1980s.

**b)** API 5L X65 pipe with a nominal thickness of 0.344 inches that was manufactured by the various pipe mills in the 1980s.

At least three separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, HAZ, and the double submerged arc weld (DSAW) long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e., three samples for pipe body, three samples for HAZ, and three samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

**10)** All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-324 and CA-325A/B.[10] Upon restart Sable must utilize ultrasonic thickness wall measurement (UTWM) and ultrasonic shear wave crack detection (USCD) ILI tools within 7 days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the UTWM and USCD ILI results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

**11)** Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with section 1.2 and exclusions in accordance with section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within 1 inch (circumferentially) of the

[7] The HAZ, as used in this special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing prior to the restart of Line CA-324.

[9] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable has submitted fracture toughness results to PHMSA, and PHMSA will review the results and confirm the completion of required testing prior to the restart of Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

**12)** Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of the special permit segments.

**13)** Pressure testing:[11]

**a)** Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100 percent specified minimum yield strength for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

**b)** Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

**c)** Prior to placing Line 325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

**d)** Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

**e)** Prior to placing Line 325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:

**i.** All metal loss anomalies that have an ILI reported depth of 40 percent and

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable has submitted results to PHMSA. PHMSA will review the submitted records to confirm this Condition is satisfied.

greater wall loss.

**ii.** All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

**f)** Sable must obtain the test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

**g)** Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

**h)** Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

**i)** Section(s) of the special permit segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this special permit if failure(s) raise the concern that the special permit segments cannot be safely operated.

**14)** ILI assessment and frequency:

**a)** Prior to performing ILIs of the special permit segment, Sable shall provide PHMSA with a written notification describing its assessment plan with the following information:

**i.** Dates for integrity assessment.

**ii.** ILI tool(s) selected, in accordance with API Standard 1163, section 5, and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications.

**iii.** ILI tool vendor(s).

**iv.** Required tool specifications, including operational specifications and tool validation methodology.

**v.** Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications.

**vi.** Criteria used to identify locations for excavation and field verification.

**vii.** Non-destructive examination.

**b)** Within 7 days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect

[12] All submissions to PHMSA required by this special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address, Dustin.Hubbard@dot.gov, or his designee.

[13] Industry standards referenced in this special permit must utilize the editions that are incorporated by reference in 49 CFR § 195.3 unless another edition is explicitly specified in this special permit.

the ILI tool performance.

**c)** Metal loss tool(s):

**i.** Initial ILI tool runs – Each year, during the first 2 years of operating the special permit segments, Sable shall conduct at least two ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every 6 months not to exceed 9 months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

**ii.** Subsequent ILI tool runs – After the first 2 years of operating the special permit segments, Sable shall conduct at least one UTWM each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining failure pressure ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the special permit segment within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an IMU.

**d)** Crack detection tools – Sable shall conduct at least one USCD tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

**i.** These crack tool runs must utilize an IMU and must be able to detect and size axial and circumferential cracks.

**ii.** USCD performance specification requirements:

1. The USCD tools must have a probability of detection that is greater than or equal to 90 percent for axial and circumferential cracks.
2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.
3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.
4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

**e)** Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

---

[14] Sable may petition PHMSA to revise the reassessment interval for crack detection tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

**f)** Where any ILI tool fails to record data for 5 percent or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2 percent or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the special permit segment in which the ILI tool velocity was outside of the specified tool velocity range.

**g)** All ILI tool runs must obtain the test ID from PHMSA prior to a run.

**h)** Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10 percent or greater, based on raw data, prior to adding in any correction for tool tolerance.

**i)** Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

**j)** Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10 percent accuracy for 80 percent of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

**k)** Prior to the ILI final report being received, Sable must perform at least four separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

**15)** Discovery of condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

**16)** Immediate repair conditions:[16]

**a)** A crack or crack-like anomaly that meets any of the following criteria:

**i.** Crack or crack-like anomaly that is equal to or greater than 50 percent of pipe wall thickness.

**ii.** Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

[15] A minimum of four independent direct examination excavations must be used for unity plots.

[16] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

**c)** Any external cluster corrosion or external general corrosion that is located on the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

**17)** 180-day repair conditions:[18]

**a)** A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

**b)** Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

**c)** All internal or external metal loss anomalies that have an ILI reported depth of 40 percent or greater wall loss, including tool sizing tolerance for depth.[19]

**d)** For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within 1 inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

**18)** Corrosion growth rate analysis (CGRA):

**a)** Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILIs (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the special permit segments is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

**b)** The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILIs, methodologies for growth rate calculations and errors from comparing ILI data.

**c)** Sable must identify the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss.

**d)** When determining the projected date when remaining metal loss indications will reach a depth of 70 percent or greater wall loss, Sable must account for reported ILI

---

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR § 195.452(h)(4)(iii), except for those associated with 49 CFR § 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31 percent metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41 percent metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by the PHMSA.

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

depth, tool tolerance and corrosion growth rates.[22]

- **e)** All metal loss indications that are projected to reach a depth of 70 percent or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**19)** Pressure reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for 2 months prior to the date of inspection, until the anomaly is repaired.

**20)** In field direct examination of pipe:

- **a)** Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking, such as magnetic particle inspection, shear wave technology, or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
- **b)** Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40 percent in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
  - **i.** Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.
  - **ii.** Sable must increase the metal loss anomaly's depth by 20 percent when it inputs it into the formula for calculating the number of wraps needed for repair method 5.
  - **iii.** After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15 percent of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
- **c)** Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.
- **d)** Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.

**e)** Sable must recoat in accordance with its coating repair procedure.

**f)** All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

**21)** Integrity management:

**a)** A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

**i.** Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

**ii.** Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

**b)** Sable must analyze a sample of additional indications of varying amounts of metal loss between 10 percent and 40 percent for validation. The sample size shall be at least ten, unless fewer than ten indications are reported within that range, in which case Sable would examine the number of indications called.

**c)** When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

**d)** Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

**e)** Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the special permit segments. The review must be conducted within 6 months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

**f)** Within 1 year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.[25]

**22)** Data requirements for predicted failure analysis:

**a)** Unless the defect dimensions have been verified using a direct examination

[25] Sable indicated in its application that it has already completed the evaluation required in this condition. Sable has submitted records of the evaluation, and PHMSA will confirm that the Condition is satisfied prior to the restart of Lines CA-324 and 325.

measurements, Sable must explicitly analyze uncertainties in reported assessment results, including—but not limited to—tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

**b)** The analyses performed in accordance with this special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

**23)** Recordkeeping:

**a)** Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this special permit shall be kept for the life of the special permit segments and must be submitted to the PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

**b)** Sable must maintain the following records:

**i.** Technical approach used for the analysis.

**ii.** All data used and analyzed.

**iii.** Pipe and longitudinal weld seam properties.

**iv.** Procedures used to implement special permit conditions.

**v.** Evaluation methodology used.

**vi.** Models used.

**vii.** Direct in situ examination data.

**viii.** All ILI tool assessments information evaluated.

**ix.** Pressure test data and results.

**x.** All in-the-ditch assessments performed on the special permit segments.

**xi.** All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results.

**xii.** All finite element analysis results.

**xiii.** The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology.

**xiv.** The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods.

**xv.** Safety factors used for fatigue life and/or predicted failure pressure calculations.

**xvi.** Reassessment time interval and safety factors.

**xvii.** The date of the review.

**xviii.** Confirmation of the results by qualified technical subject matter expert(s).

**xix.** Approval by responsible Sable management personnel.

**xx.** Records of additional preventive and mitigative measures performed.

**xxi.** Reports required by this special permit.

**24)** Reporting:

**a)** Any release on the special permit segments shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

**b)** An email notification shall be made at least 3 days prior to a special permit segment being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

**i.** Tool type and run date.

**ii.** Unique identifier (e.g., dig number, joint number, flaw ID, condition type).

**iii.** Dig sheets.

**iv.** Field contact information for Sable.

**v.** Time and location of the field evaluation and repair.

**c)** Sable shall provide a summary of conditions report within 210 days of the last date of an ILI run to PHMSA and include:

**i.** Tool type.

**ii.** Run date.

**iii.** Summary of conditions report.[27]

**iv.** Final vendor report and pipe tally.

**d)** Sable shall provide a report to PHMSA by June 15 of every year for the duration of this special permit. At a minimum, the annual report shall contain the following, if applicable:

**i.** A closure report for the previous calendar year (CY), which contains:

**1.** Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs.

**2.** Identify features that remain to be assessed.

**3.** Unity plots for previous ILI runs.

**ii.** Fracture mechanics and pressure cycling analyses in accordance with condition 21(a).

**iii.** The third-party ILI expert reviews in accordance with condition 21(e).

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, State, or Federal regulations.

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA) to be included in the summary of conditions reports, closure report, and annual reports if information provided is not deemed sufficient.

**iv.** AC and DC interference surveys that are due in accordance with condition 21(f).

**v.** A copy of the CGRA for prior year, including:

**1.** Mean corrosion growth rate for the special permit segments.

**2.** Distribution graph of the corrosion growth rate for the special permit segments (e.g., occurrences (#) versus corrosion rate (mpy)).

**25)** Limitations:

**a)** PHMSA proposes to grant this special permit for the operational life of Lines CA-324 and CA-325. For purposes of 49 CFR § 190.341(j)(ii), a "material change in conditions or circumstances" shall include only conditions or circumstances arising after the issuance of this special permit that implicate directly the national security interests of the United States or that result directly from an emergency as declared by the President of the United States.

**b)** PHMSA may order the special permit segments to be shut down if appropriate pursuant to its authority under 49 U.S.C. § 60112.

**c)** PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this special permit. The terms and conditions of any compliance order shall take precedence over the terms of this special permit.

**d)** In the event of conflict between the conditions of this special permit and industry standards, the special permit conditions shall prevail.

**e)** If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the special permit, Sable must provide the PHMSA written notice of the change within 30 days of the consummation date.

No. 26-5409

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al.*,
*Defendants-Appellants.*

**On Appeal from the United States District Court for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

## EXCERPTS OF RECORD – VOLUME 5 OF 6

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

**NOTICE OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that, pursuant to 5 U.S.C. section 705, Federal Rule of Civil Procedure 65(b), and Civil Local Rules 6-1 and 65-1, Plaintiff State of California ("California") will and does move this Court for a stay and preliminary injunction pending trial in this action. Specifically, California seeks an order: (1) staying Defendant Secretary of Energy Chris Wright's March 13, 2026 order entitled *Pipeline Capacity Prioritization and Allocation Order* (91 Fed Reg. ___ (March 13, 2026)) ("Wright Order"); and (2) enjoining Defendants Wright and the U.S. Department of Energy (DOE), and its employees, agents, and persons acting with DOE or on its behalf, from implementing, invoking, or enforcing the Wright Order to authorize or compel the flow of crude oil through Lines CA-324/325 without Sable having received necessary state-law approvals and without satisfying the terms of other court orders. As set forth in the accompanying Memorandum of Points and Authorities, a stay and preliminary injunction are necessary to prevent immediate and irreparable harm to California's sovereign and property rights, as well as to its environment and public safety.

This motion is based on this Motion, the Complaint for Declaratory and Injunctive Relief (ECF No. 1-1), the accompanying Memorandum of Points and Authorities, the accompanying supporting declarations, as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court. California has not filed any previous applications for similar relief in this matter.

As laid out further below in the Memorandum of Points and Authorities, this Motion is made following the undersigned counsel's provision of notice to counsel for Defendants in accordance with Local Rule 6-1. Pursuant to Local Rule 7-3, as

the present motion is one for preliminary injunction, counsel are exempt from the conference requirements.

Dated: May 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

Pursuant to Federal Rule of Evidence 201, Plaintiff State of California ("California"), respectfully requests that the Court take judicial notice of the following documents in support of its Motion for Preliminary Injunction and Stay.

The Court may take judicial notice of a fact, including the existence of a document "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2). Upon a request from a party and upon being supplied the necessary information showing that a fact is judicially noticeable, the Court must grant judicial notice. Fed. R. Evid. 201(c)(2). Through the present motion, California requests judicial notice of certain documents, the relevance of is set forth in its Memorandum of Points and Authorities in support of its Motion for Preliminary Injunction and Stay.

Each of the documents California seeks in this request are proper subjects of judicial notice. First, **Exhibits 1, 3-5, 10-11, and 13-15,** which include reports, orders, letters, a permit, and opinion authored by government entities are judicially noticeable as government records. Courts may take judicial notice of "records and reports" of government and administrative bodies. *See Lundquist v. Continental Casualty Co.*, 394 F.Supp.2d 1230, 1243 (C.D. Cal. Sept. 30, 2005). "[G]overnment memoranda, bulletins, reports, letters, and statements of public record" fall into the scope of judicially noticeable documents. *Cnty. of Santa Clara v. Trump*, 267 F.Supp.3d 1201, 1217 fn. 11 (N.D. Cal. 2017); *see also S.A. v. Trump*, 363 F.Supp.3d 1048, 1061 n.36 (N.D. Cal. 2018) ("[t]he court can take judicial notice of the Executive Order . . . as a matter of public record"). Similarly, "[p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies" are also judicially noticeable. *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp.3d 1011, 1033 (C.D. Cal. 2015) (internal quotations and citations omitted).

/ /

Second, **Exhibits 2, 6-9, and 12,** which include a consent decree, court order, and other court filings, are judicially noticeable as they are court documents in cases related to the instant matter. *See* Plaintiff's Notice of Related Cases filed in this case on March 31, 2026 (ECF No. 3). The Court may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (internal quotations and citations omitted); *see also Reyn's Pasta Bella, LLC v. Vista, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (courts "may take judicial notice of court filings and other matters of public record."); *Coffee Hut v. Cnty. of Ventura*, 2021 WL 461591, at *2 (C.D. Cal. Feb. 9, 2021) (taking judicial notice of the existence of declarations that were filed in state court actions).

Third, **Exhibit 16,** which includes a press release, is judicially noticeable as it is a press release that is a matter of public record. *See Reyn's Pasta Bella, LLC v. Vista, Inc.*, 442 F.3d 741, 746 fn. 6 (9th Cir. 2006) (a court may take judicial notice of "matters of public record."); *See Knight v. Kia America, Inc.*, 2025 WL 3902218 at *6-7 (C.D. Cal. 2025) (granting judicial review of the existence of, among other materials, press releases as public records). Indeed, the press release California seeks judicial notice of is also filed on the United States Securities and Exchange Commission ("SEC") website, making it judicially noticeable on that ground as well. *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (noting that SEC filings are subject to judicial notice).

/ /

/ /

/ /

/ /

/ /

/ /

Accordingly, California requests that the Court take judicial notice of the following:

1. The Pipeline Capacity Prioritization and Allocation Order (Wright Order) issued by the United States of America Secretary of Energy, Chris Wright on March 13, 2026, available at: https://www.sec.gov/Archives/edgar/data/1831481/000183148126000030/a993doedpa_orderxsablex031.htm. A true and correct copy of the Wright Order is attached hereto as **Exhibit 1**.

2. The Consent Decree filed in *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (Case No. 2:20-cv-02415) on March 13, 2020. A true and correct copy of the Consent Decree is attached hereto as **Exhibit 2**.

3. The Failure Investigation Report prepared by the U.S. Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA), released in May 2016, available at: https://www.phmsa.dot.gov/foia/plains-pipeline-lp-line-901-failure-investigation-report. A true and correct copy of an excerpt from the PHMSA Failure Investigation Report is attached hereto as **Exhibit 3**.

4. The presentation titled *Update on the Status of the Existing Offshore Oil and Gas Production and Pipeline Leases Managed by the Commission prepared by the California State Lands Commission*, prepared by the California State Lands Commission ("CSLC Presentation") , dated April 26, 2022, available at: https://www.slc.ca.gov/oil-gas/leases/. A true and correct copy of the CSLC Presentation is attached hereto as **Exhibit 4.**

5. The Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment ("Final Damage Assessment") prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife

Service, and National Oceanic and Atmospheric Administration, released in June 2021, available at: https://wildlife.ca.gov/ospr/nrda/refugio. A true and correct copy of an excerpt from the Final Damage Assessment is attached hereto as **Exhibit 5**.

6. The Order to Enter Consent Decree ("Consent Decree Order") filed in *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (Case No. 2:20-cv-02415) on October 14, 2020. A true and correct copy of the Consent Decree Order is attached hereto as **Exhibit 6**.

7. Exhibit E to the Request for Judicial Notice filed *United States of America, et al. v. Plains All American Pipeline, L.P., et al.* (Case No. 2:20-cv-02415) in California Plaintiff's Ex Parte Emergency Motion to Enforce the Consent Decree on March 16, 2026. Exhibit E is a letter dated February 19, 2024, and enclosure (the "Assumption Agreement") dated February 14, 2024, from ExxonMobil (Andrew Craig, Venture Manager) to Office of the State Fire Marshal (OSFM) and other government agencies regarding Sable's agreement to be bound by the Consent Decree. A true and correct copy of Exhibits E, excerpted from the Request for Judicial Notice, is attached hereto as **Exhibit 7**.

8. The Order Re: Preliminary Injunction and Undertaking filed in *Ctr. for Biological Diversity, et al., v. California Dep't of Forestry and Fire Protection, et al.*, Santa Barbara Superior Court No. 25CV02244, on July 29, 2025. A true and correct copy of the Order re: Preliminary Injunction and Undertaking is attached hereto as **Exhibit 8**.

9. The Minute Order filed in *Ctr. for Biological Diversity, et al., v. California Dep't of Forestry and Fire Protection, et al.*, Santa Barbara Superior Court No. 25CV02244, entered on April 17, 2026. A true and correct copy of the Minute Order is attached hereto as **Exhibit 9**.

10. Letter from OSFM (Daniel Berlant, State Fire Marshal) to Sable Offshore Corp. ("Sable") (Lance Yearwood, Vice President), dated October 22, 2025, available at:

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148125000086/socc-20251023.htm. A true and correct copy of the Letter is attached hereto as **Exhibit 10**.

11. Letter from PHMSA (Linda Daugherty) to Sable (J. Caldwell) (the "Federalization Order"), dated December 17, 2025, available at: https://www.sec.gov/Archives/edgar/data/1831481/000183148125000137/sablelasflores_121725.htm. A true and correct copy of the Federalization Order is attached hereto as **Exhibit 11**.

12. The Second Supplemental Declaration of Jeffrey D. Dintzer, dated February 26, 2026, filed in *Center for Biological Diversity, et al. v. Cal. Dept. of Forestry and Fire Protection*, *et al.*, Santa Barabra Superior Court Case No. 25CV02244, attaching as Exhibit A a letter in which Sable takes the position that Lines CA-325 is not subject to state regulation and that Sable is abandoning its State Waivers. A true and correct copy of the Second Supplemental Declaration of Jeffrey D. Dintzer is attached hereto as **Exhibit 12**.

13. Slip Opinion issued on March 3, 2026 by the Office of Legal Counsel, U.S. Department of Justice, titled *Preemptive Effective of Defense Production Act Order on State Law* ("OLC Slip Opinion"), available at: https://www.justice.gov/olc/media/1429671/dl?inline. A true and correct copy of the Slip Opinion is attached hereto as **Exhibit 13**.

14. Executive Order 14391 issued by President Donald J. Trump on March 13, 2026, titled *Adjusting Certain Delegations Under the Defense Production Act* ("Delegations EO"), available at: https://www.govinfo.gov/content/pkg/FR-2026-03-18/pdf/2026-05382.pdf. A true and correct copy of the Executive Order is attached hereto as **Exhibit 14**.

15. A press release published on March 13, 2026 by Defendant Department of Energy titled *Secretary Wright Directs Sable Offshore to Restore the Santa Ynez Unit and Pipeline*, available at:

https://www.energy.gov/articles/secretary-wright-directs-sable-offshore-restore-santa-ynez-unit-and-pipeline. A true and correct copy of the press release is attached hereto as **Exhibit 15**.

16. A press release published on March 16, 2026, by Sable titled *Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026*, available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001831481/000183148126000030/socc-20260313.htm. A true and correct copy of the press release is attached hereto as **Exhibit 16**.

Dated: May 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General



ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

# Exhibit 1

# PIPELINE CAPACITY PRIORITIZATION AND ALLOCATION ORDER

## I. AUTHORITY

The Department of Energy (DOE) is authorized to issue orders pursuant to Executive Order 13603 section 201, which delegates to the Secretary of Energy the authority of the President conferred by the Defense Production Act of 1950 (DPA), sections 101(a) & (c). By delegation, section 101(a) authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense with respect to all forms of energy. Section 101(c)[1] authorizes the Secretary to require the allocation of, or the priority performance of contracts or orders relating to, materials, equipment, and services to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation.

## II. COVERED ENTITIES

Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable")
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

## III. NEED FOR PRIORITY PERFORMANCE AND ALLOCATION

In Executive Order 14156, President Trump declared a national emergency, determining that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[2] Further, President Trump found, "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets. An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."[3] The President determined that problems are most pronounced in our Nation's West Coast, "where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[4]

Sable is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California.[5] Sable and the Department of the Interior are

---

[1] Pub. L. No. 81-774 (50 U.S.C. §§ 4511(a), 4511(c)).

[2] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[3] *Id.*

[4] *Id.*

[5] Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf ("the 'Santa Ynez Unit' or 'SYU' refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and

currently updating a previously approved Development and Production Plan, which would allow for continuous production to address energy vulnerabilities on the West Coast.[6] The SYU is a critical energy resource on the West Coast. It is one of the largest known offshore oilfields in the United States.[7] This resource cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence, without reliable transport of SYU's production through the Santa Ynez Pipeline System (SYPS) to market on mainland California.

For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California.[8] From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System.[9] This interstate pipeline system running from the SYU to the Pentland Station terminal in Pentland, California is known as the SYPS, which Sable owns and operates.[10] According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS. As Sable reports, "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[11]

---

Heritage), and associated ancillary facilities located in federal waters offshore California") (hereinafter "Sable 10-K").

[6] *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James Noe, Partner, Holland & Knight, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1-2 (Dec. 12, 2025) (hereinafter "Sable Request").

[7] U.S. Energy Information Administration, *Top 100 U.S. Oil and Gas Fields*, at 5 (Mar. 2015), https://www.eia.gov/naturalgas/crudeoilreserves/top100/pdf/top100.pdf.

[8] Sable Request at 2.

[9] *Id.*

[10] *Id. See also*, Letter for Linda Daugherty, Acting Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration (PHMSA), from J. Caldwell Flores, President and Chief Operating Officer, Pacific Pipeline Company / Sable Offshore Corp., *RE: Application for Emergency Special Permit Sable Offshore Corp.* at 1 (Dec. 19, 2025) ("As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS)."); Letter for J. Caldwell Flores, President and Chief Operating Officer, Sable Offshore Corp., *RE: Determination of Interstate Classification* at 2 (Dec. 17, 2025) ("PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline."); Sable 10-K at 1-2 ("the 'Santa Ynez Pipeline System' (or 'SYPS') refers to the interstate pipeline connecting the Santa Ynez Unit to the Pentland Station terminal, inclusive of 'Pipeline Segment 324' and 'Pipeline Segment 325', or collectively referred to as 'Pipeline Segments 324 and 325' (formerly known as '901/903 Assets' and as defined in the Sable-[Exxon Mobil Corporation] Purchase Agreement), the Las Flores Canyon ('LFC') onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the Santa Ynez Unit to LFC. The SYU Assets include the Santa Ynez Unit and the Santa Ynez Pipeline System.").

[11] Sable Request at 6.

## IV. ORDER

In light of my findings and determinations in accordance with Title I of the DPA that the actions directed below are necessary or appropriate to promote the national defense and to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration, production, refining, transportation cannot reasonably be accomplished without exercising the authority in this Order, it is directed that:

A. Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

B. Sable is directed to immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, at which point hydrocarbons move through the Plains All American Line 2000 for transport to refineries.

C. Such contracts for hydrocarbon transportation services from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, shall take priority over other non-SYPS hydrocarbon transportation contracts or orders for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the SYPS be entered into for hydrocarbon transportation services from the point of production in the SYU. For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the SYPS has capacity to transport.

D. Any person contracting for or ordering, or who hereinafter does contract for or order hydrocarbon transportation services from Sable from the point of production in the SYU is directed to prefer and utilize such capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, in preference to other such non-pipeline contracts or orders by other persons capable of hydrocarbon transportation service, including but not limited to by truck, vessel, or alternative pipeline, up to the capacity of the SYPS.

E. Sable, and any person seeking hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, are authorized to enter into such orders and contracts as those parties negotiate, as appropriate.

F. Sable is directed to provide a monthly report to DOE via askcr@hq.doe.gov on the use of this priority and allocation order, including the volumes of hydrocarbons transported or contracted for under this Order during the previous month.

G. Sable is ordered to comply with this order immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.

Issued in Washington, D.C. on this 13th day of March 2026

______________________

Chris Wright

Secretary of Energy

# Exhibit 2

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Civil Action No.<br>2:20-cv-02415<br>**CONSENT DECREE** |

XAVIER BECERRA
Attorney General of California
ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6635
E-mail: Jessica.BarclayStrobel@doj.ca.gov
*Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast Regional Water Quality Control Board, and California Department of Forestry and Fire Protection's Office of State Fire Marshal*

XAVIER BECERRA
Attorney General of California
CHRISTINA BULL ARNDT
Supervising Deputy Attorney General
NICOLE RINKE (CA Bar Number: 257510)
MITCHELL E. RISHE (CA Bar Number: 193503)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6394
E-mail: Mitchell.Rishe@doj.ca.gov
*Counsel for Plaintiffs California Department of Parks and Recreation and California State Lands Commission*

MARGARET WU (CA Bar Number: 116588)
Deputy General Counsel
BARTON LOUNSBURY (CA Bar Number: 253895)
Senior Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607-5200
Tel: (510) 987-9800
E-mail: barton.lounsbury@ucop.edu
*Counsel for Plaintiff The Regents of the University of California*

**TABLE OF CONTENTS**


I. BACKGROUND ... - 5 -
II. JURISDICTION AND VENUE ... - 6 -
III. APPLICABILITY ... - 7 -
IV. DEFINITIONS ... - 7 -
V. CIVIL PENALTIES ... - 13 -
VI. NATURAL RESOURCE DAMAGES ... - 17 -
VII. TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS ... - 21 -
VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS ... - 22 -
IX. INJUNCTIVE RELIEF ... - 23 -
X. CORRECTIVE ACTION ORDER ... - 27 -
XI. STIPULATED PENALTIES ... - 27 -
XII. FORCE MAJEURE ... - 35 -
XIII. DISPUTE RESOLUTION ... - 37 -
XIV. REPORTING ... - 39 -
XV. CERTIFICATION ... - 40 -
XVI. INFORMATION COLLECTION AND RETENTION ... - 40 -
XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ... - 43 -
XVIII. TRANSFER AND ACQUISITION OF ASSETS ... - 49 -
XIX. COSTS ... - 50 -
XX. NOTICES ... - 51 -
XXI. EFFECTIVE DATE ... - 54 -
XXII. RETENTION OF JURISDICTION ... - 54 -
XXIII. MODIFICATION ... - 54 -

XXIV. TERMINATION ..... - 55 -
XXV. PUBLIC PARTICIPATION ..... - 56 -
XXVI. SIGNATORIES/SERVICE ..... - 56 -
XXVII. INTEGRATION ..... - 57 -
XXVIII. FINAL JUDGMENT ..... - 57 -
XXIX. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ..... - 57 -

A. WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline known as the Line 901 pipeline ("Line 901") owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P., (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County, California. A portion of the oil reached the Pacific Ocean and coastal areas such as Refugio State Beach. The Refugio Incident adversely impacted Natural Resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and the State of California ("California" or the "State").

B. WHEREAS, cleanup actions began immediately after the Refugio Incident at the direction of a Unified Command established by the United States Coast Guard ("USCG") and the State of California Department of Fish and Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR"). The Unified Command was comprised of the United States, State agencies, the County of Santa Barbara, and Plains.

C. WHEREAS, on May 21, 2015, the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No. 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO"). The PHMSA CAO directed Plains, among other things, to purge Line 901 and a portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota and Pentland pump stations, and to keep Line 901 and the purged sections of Line 903 shut down until the actions required by the PHMSA CAO were satisfactorily completed.

D. WHEREAS, on May 19, 2016, PHMSA issued a Failure Investigation Report, which included PHMSA's findings of the "proximate or direct" causes and the "contributing" causes of the Refugio Incident.

E. WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs arising from the Refugio Incident.

F. WHEREAS, CDFW incurred certain additional costs arising from the administration and civil enforcement of pollution laws, including attorneys' fees that have been reimbursed by Plains.

G. WHEREAS, Plains represents that it has implemented and will continue to utilize an electronic tracking tool and software for maintenance activities, including those activities related to mainline valves. The software tracks which maintenance activities are performed, who performs the activity, when prior notifications of maintenance activities by field personnel are received, when problems requiring maintenance are first discovered, and when maintenance problems are corrected. Plains maintains a separate software program to track the training and qualifications of all maintenance personnel.

H. WHEREAS, Plains represents that, following the Refugio Incident and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its Emergency Response Plan and Training Program, and revised and updated its Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield District Response Zone Plan") to reflect modifications resulting from the review and the incorporation of lessons learned. As part of the revision, Plains identified the locations of culverts along the pipelines' rights-of-way and provided containment and recovery techniques for responding to spills that may occur near those culverts. Plains provided drafts of the updated Bakersfield District Response Zone Plan to PHMSA, incorporated comments provided by PHMSA, and received approval of the revised plan from PHMSA on September 26, 2017.

I. WHEREAS, Plains represents that it also created a more detailed Geographic Information System ("GIS") based online Tactical Response Plan for its onshore oil pipelines in Southern California, including Line 2000 and the operational portion of Line 903, that, among other things, identifies culverts along the pipelines' rights-of-way, potential receptors and the equipment, supplies and resources that would be necessary to respond to a spill occurring at any given location along those pipelines, identifies the sources and locations for obtaining those resources, and, in some instances, establishes stored inventories of those resources in specific locations. Plains represents that it intends to keep its Tactical Response Plan updated and available for use in drills and spill response, and that it will make the Tactical Response Plan available to the Plaintiffs upon reasonable request and as needed in connection with a drill or response to a spill.

J. WHEREAS, Plains represents that Plains personnel responding to incidents that trigger the standup of an incident command structure ("ICS") have been provided ICS training appropriate to their responsibilities.

K. WHEREAS, the relevant Natural Resources trustees ("Trustees") for the Refugio Incident are the United States Department of the Interior ("DOI"); United States Department of Commerce, on behalf of the National Oceanic and Atmospheric Administration ("NOAA"); CDFW; California Department of Parks and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and The Regents of the University of California ("UC").

L. WHEREAS, pursuant to Section 1006 of the Oil Pollution Act (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees allege that oil from the Refugio Incident caused injuries to Natural Resources, including birds, marine mammals, shoreline and subtidal habitats, and also had an impact upon human uses of Natural Resources and other public resources. The Federal Trustees are designated pursuant to the National Contingency Plan,

40 C.F.R. § 300.600 and Executive Order 12777. CDFW and CDPR are designated state trustees pursuant to the National Contingency Plan, 40 C.F.R. § 300.605, and the Governor's Designation of State Natural Resource Trustees pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, CDFW has state natural resource trustee authority pursuant to California Fish and Game Code §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (California Government Code § 8670.1 *et seq*.). CDPR and UC have jurisdiction over natural resources within the state park system and the UC Natural Reserve System, respectively, which are held in trust for the people of the State of California. CSLC is a state trustee pursuant to its jurisdiction under Public Resources Code § 6301 and Civil Code § 670.

M. WHEREAS, after the Refugio Incident, the Trustees and Defendants entered into a cooperative Natural Resource Damage Assessment process pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and independently planned and conducted a number of injury assessment activities. These activities included gathering and analyzing data and other information that the Trustees used to determine and quantify resource injuries and damages. As a result of this process and other activities, the Trustees identified several categories of injured and damaged Natural Resources, including birds, marine mammals, and shoreline and subtidal habitats, as well as effects to human use/recreation resulting from impacts on these Natural Resources, and determined the cost to restore, rehabilitate, replace, or acquire the equivalent of injured Natural Resources. By entering this Consent Decree, Defendants do not admit or agree that the Trustees' NRD findings and determinations are accurate.

N. WHEREAS, due to the specific facts surrounding the Refugio Incident, including the timing, degree, and nature of the spill and the affected

environment, the Trustees will not seek additional damages, costs, or expenses for Natural Resources resulting from the Refugio Incident.

O. WHEREAS, Plains agrees to reimburse costs incurred by the Trustees in connection with the NRDA through November 15, 2018, and will not reimburse costs incurred by the Trustees in connection with the NRDA after that date.

P. WHEREAS, by entering into this Consent Decree, Plains does not admit the allegations in the Complaint filed in this action, or any liability to the Plaintiffs.

Q. WHEREAS, on January 28, 2019, PHMSA initiated a regularly-scheduled "Integrated Inspection" of a portion of Defendants' Regulated Pipelines, as described below, and other pipeline facilities and records, pursuant to 49 U.S.C. § 60117.

R. WHEREAS, the Parties agree that settlement of this matter without further litigation is in the public interest and that the entry of this Consent Decree is the most appropriate means of resolving this action.

S. WHEREAS, the Parties agree and the Court by entering this Consent Decree finds, that this Consent Decree: (1) has been negotiated by the Parties at arm's-length and in good faith; (2) will avoid prolonged litigation between the Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal and state environmental protections, and the federal and state pipeline safety laws.

## I. BACKGROUND

The United States, on behalf of PHMSA, the United States Environmental Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California Central Coast Regional Water Quality Control Board ("RWQCB"), and the California Department of Forestry and Fire Protection's - Office of the State Fire

Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*., and associated regulations and orders; OPA, 33 U.S.C. §§ 2701 *et seq*., and associated regulations and orders; the federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq*., and associated regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, California Government Code §§ 8670.1 *et seq.* and associated regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016, 13013; California Water Code §§ 13350, 13385; and the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq*. The Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks penalties, injunctive relief, and Natural Resource Damages.

NOW, THEREFORE, before the trial of any claims and without adjudication or admission of any issue of fact or law and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of the United States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and 60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the United States and the State Agencies have satisfied the requirement.

2. Venue is proper in this District pursuant to Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws, 49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

does business in this District and the alleged claims occurred in this District.

3. For purposes of this Consent Decree or any action to enforce this Consent Decree, Defendants consent to the Court's jurisdiction over this Consent Decree for such action and Defendants consent to venue in this judicial district. For purposes of this Consent Decree and without admission of liability, Defendants agree that the Complaint states claims upon which relief may be granted.

## III. APPLICABILITY

4. Subject to the terms herein, the obligations of this Consent Decree apply to and are binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree.

5. Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained for the purpose of performing work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree by specifying that contractors are obligated to perform work in compliance with this Consent Decree.

6. In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV. DEFINITIONS

7. Terms used in this Consent Decree that are defined in the CWA, OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

have the meanings assigned to them in these statutes and their regulations, unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Appendix A" is the set of maps that generally depict Lines 901, 903, and 2000;

"Appendix B" is the Injunctive Relief that Plains is required to perform under this Consent Decree;

"Appendix C" is intentionally left blank;

"Appendix D" is the list of remaining corrective actions from the PHMSA CAO that Plains is still required to implement under this Consent Decree. For the terms of the PHMSA CAO, *see* https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H.html?nocache=4888#_TP_1_tab_1;

"CDFW" shall mean the California Department of Fish and Wildlife and any of its successor departments or agencies;

"CDPR" shall mean the California Department of Parks and Recreation and any of its successor departments or agencies;

"Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

"Consent Decree" shall mean this Consent Decree and all Appendices attached hereto;

"Control Room Management Plan" shall mean Plains' Control Room Management Plan, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"Control Center General Procedures" shall mean Plains' Control Center General Procedures, dated October 2019, and delivered to PHMSA electronically on October 21, 2019, from counsel for Defendants;

"CSLC" shall mean the California State Lands Commission and any of its successor departments or agencies;

"Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this Consent Decree, the rules set forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

"Defendants" shall mean Plains All American Pipeline, L.P. and Plains Pipeline, L.P.;

"Delivery Lines" as stated in Appendix B shall mean any pipeline that generally operates to move oil from a delivery meter on a pipeline or facility to another pipeline or facility in close proximity;

"DOI" shall mean the United States Department of the Interior, including its bureaus and agencies, and any of its successor departments or agencies;

"Elder California Pipeline Safety Act" shall mean the Elder California Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq*.;

"EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

"Effective Date" shall have the definition provided in Section XXI (Effective Date);

"Federal Trustees" shall mean DOI and NOAA in their capacities as Natural Resource Trustees;

"Integrity Management Plan" or "IMP" shall mean Plains' Integrity Management Plan, dated September 2019, as delivered to PHMSA by letter dated November 19, 2019, from counsel for Defendants;

"Line 901" is Defendants' 24-inch diameter crude-oil pipeline that extends approximately 10.7 miles in length from the Los Flores Pump Station to the Gaviota Pump Station, in Santa Barbara County, California, as generally depicted in Appendix A;

"Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends approximately 129 miles in length from the Gaviota Pump Station in Santa Barbara County, California to the Emidio Pump Station in Kern County,

California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland Mile Post 114.57, as generally depicted in Appendix A;

"Line 2000" is Defendants' 20-inch diameter pipeline that extends approximately 130 miles in length and transports crude-oil produced in the outer continental shelf and the San Joaquin Valley. Line 2000 runs from Bakersfield, California, over the Tehachapi Mountains and through the Grapevine I-5 corridor and extends to delivery locations in the Los Angeles metropolitan area, as generally depicted in Appendix A;

"Mainline pipeline" as stated in Appendix B shall mean the principal pipeline or the parallel pipeline in a given pipeline system, excluding connected lateral lines or branch lines that are used locally to deliver product either into the mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a third-party line;

"Natural Resource" and "Natural Resources" shall mean land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States and/or the State or any subdivision thereof, and shall also mean the services provided by such resources to other resources or to humans;

"Natural Resource Damages" or "NRD" shall mean all damages, including restoration or rehabilitation costs, recoverable by the United States or State Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources including any services such natural resources provide, including the reasonable costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A), resulting from the Refugio Incident;

"Natural Resource Damage Assessment" or "NRDA" shall mean the process of collecting, compiling, and analyzing information, statistics, or data through prescribed methodologies to determine damages for injuries to Natural

Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio Incident;

"NRD Payment" shall mean the payment Defendants are required to pay for the Natural Resource Damages as described in Section VI (Natural Resource Damages);

"Natural Resource Trustees" or "Trustees" are those federal and state agencies or officials designated or authorized pursuant to the CWA, OPA, and/or applicable state laws to act as Trustees for the Natural Resources belonging to, managed by, controlled by, or appertaining to the United States or the State. Participating Trustees in the Natural Resource Damage Assessment and in this Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

"NOAA" shall mean the National Oceanic and Atmospheric Administration and any of its successor departments or agencies;

"Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the fund established pursuant to 26 U.S.C. § 9509, including the claim-reimbursement provisions set forth in 33 U.S.C. § 2712;

"OSFM" shall mean the California Department of Forestry and Fire Protection's - Office of the State Fire Marshal and any of its successor departments or agencies;

"Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral;

"Parties" shall mean the Plaintiffs and Defendants, collectively;

"PHMSA" shall mean the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration and any of its successor departments or agencies;

"PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the Original CAO issued on May 21, 2015, by PHMSA, which was subsequently amended on June 3, 2015, November 12, 2015, and June 16, 2016;

"Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq*., and regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

"Plaintiffs" shall mean the United States and the State Agencies;

"Refugio Incident" shall mean the release of approximately 2,934 barrels of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California on or about May 19, 2015;

"Regulated Pipeline" shall mean any pipeline operated by Plains subject to regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div. 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

"Requests for Information" or "RFI" shall mean PHMSA's RFIs dated August 19, 2015, August 21, 2015, and September 1, 2016. RFIs shall also refer to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

"Restore" or "Restoration" shall mean any action or combination of actions to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including Natural Resource-based recreational opportunities that were injured, lost, or destroyed as a result of the Refugio Incident;

"RWQCB" shall mean the California Central Coast Regional Water Quality Control Board and any of its successor departments or agencies;

"Section" shall mean a portion of this Consent Decree identified by a Roman numeral;

"Segment" as stated in Appendix B shall mean any contiguous portion of a pipeline system for which a single hydrostatic test or ILI may be performed, as determined by Defendants;

"State Agencies" shall mean the People of the State of California, *Ex Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC. The State Agencies do not include any entity or political subdivision of the State of California other than those agencies herein designated the "State Agencies";

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 17 of 102 Page ID #:103

"State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their capacities as Natural Resource Trustees;

"United States" shall mean the United States of America, on behalf of PHMSA, EPA, DOI, NOAA, and USCG;

"UC" shall mean The Regents of the University of California and any of its successor departments or agencies; and

"USCG" shall mean the United States Coast Guard and any of its successor departments or agencies.

## V. CIVIL PENALTIES

A. Within thirty (30) Days after the Effective Date, Defendants shall pay to the United States, CDFW, and RWQCB a total civil penalty of twenty-four million dollars ($24,000,000), together with interest accruing from the date on which the Consent Decree is lodged with the Court, at a rate specified in 28 U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated as follows:

8. Penalty Payment to the United States (PHMSA). For violations of the Pipeline Safety Laws alleged in the United States' Complaint, Defendants shall pay to the United States a civil penalty of fourteen million five hundred thousand dollars ($14,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

a. Thirteen million two hundred fifty thousand dollars ($13,250,000) attributed to Plains' alleged Pipeline Safety Law violations; and

b. One million two hundred fifty thousand dollars ($1,250,000) attributed to Plains' alleged non-compliance with the RFIs.

c. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the United States Department of Justice in accordance with written instructions to be provided to Defendants by the

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Megan Prout
Senior Vice President
Commercial Law and Litigation
Plains All American Pipeline, L.P.
333 Clay Street, Suite 1600
Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d. At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9. Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a. As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 19 of 102 Page ID #:105

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1) To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2) To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3) To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division. Such monies are to be deposited in the OSLTF. The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8). Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day. Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10. Penalty Payment to be Paid to CDFW. For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11. Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI. NATURAL RESOURCE DAMAGES

12. Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961. The NRD Payment shall be allocated as follows:

a. To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment. Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds). Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

Department of the Interior
Natural Resource Damage Assessment and
Restoration Program
Attention: Restoration Fund Manager
1849 "C" Street, N.W. Mail Stop 4449
Washington, D.C. 20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198. DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 23 of 102 Page ID #:109

b. To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund. Payment shall be made by check payable to the California Department of Parks and Recreation. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

The California Department of Parks and
Recreation
Attn: Laura Reimche, Senior Counsel
1416 Ninth Street, Room 1404-6
Sacramento, California 95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund. CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident. CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c. To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF. Payment shall be made by check payable to the National Fish and Wildlife Foundation. At the time of payment, Defendants shall simultaneously send written

notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

California Department of Fish and Game
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the California South Coast Shoreline Parks and Outdoor Recreational Use Account. The California South Coast Shoreline Parks and Outdoor Recreational Use Account shall be managed in accordance with the South Coast Shoreline Parks and Outdoor Recreational Use Account Memorandum of Agreement among the State Trustees and NFWF and shall be used by the Trustees for the purposes set forth in Section VIII (Trustees' Management of Recreational Use Funds).

d. To UC, twenty-six thousand dollars ($26,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into Natural Reserve System Account. Payment shall be made by check payable to The Regents of the University of California. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13. The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII. TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14. DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15. DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

Subaccount, including return on investments or accrued interest, subject to the provisions of this Consent Decree.

16. The Natural Resource Trustees commit to the expenditure of the funds set forth in Paragraph 12 for the design, implementation, permitting (as necessary), monitoring, and oversight of Restoration projects and for the costs of complying with the requirements of the law to conduct a Restoration planning and implementation process. The Natural Resource Trustees will use the funds to Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource and its services, including lost human use of such services, injured, lost, or destroyed as a result of the Refugio Incident and for the administration and oversight of these Restoration projects.

17. The specific projects or categories of projects will be contained in a Restoration Plan prepared and implemented jointly by the Trustees, for which public notice, opportunity for public input, and consideration of public comment will be provided. Plains shall have no responsibility nor liability for implementation of the Restoration Plan or projects relating to the Refugio Incident, including any future project costs other than the payments set forth in Section VII herein. The Trustees jointly retain the ultimate authority and responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD Subaccount to Restore Natural Resources in accordance with applicable law, this Consent Decree, and any memorandum or other agreement among them.

## VIII. TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

18. CDPR shall allocate the monies paid pursuant to Paragraph 12 for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

19. The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20. UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX. INJUNCTIVE RELIEF

21. Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22. Material Changes to Plains' IMP.

a. Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree. Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1) Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2) Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3) White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

4) Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5) Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6) Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

Days. Following the notice period specified in Subparagraphs 22.b and 22.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

23. Material Changes in Control Room Management Plan and Control Center General Procedures.

a. Plains' Control Room Management Plan and Control Center General Procedures (collectively, "Control Center Plan and Procedures") shall serve as the baseline Control Center Plan and Procedures for purposes of this Consent Decree. Plains agrees that it will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4, 9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0, and 500-12 of its Control Center General Procedures throughout the term of this Consent Decree without following the process set forth in this Paragraph. For purposes of this Paragraph, the term "material change" refers to any substantive modification in the Control Center Plan and Procedures that could affect the outcome or effect of a particular procedure or requirement.

b. At least thirty (30) Days prior to making a material modification to the above sections of its Control Room Management Plan and Control Center General Procedures, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 05/13/20 Page 30 of 102 Page ID #:123

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c. In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d. In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24. Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendants have submitted timely applications and have taken all other actions reasonably necessary to obtain all such permits or approvals.

## X. CORRECTIVE ACTION ORDER

25. Upon the Effective Date of this Consent Decree, the PHMSA CAO shall close and be of no further force or effect. All outstanding terms and obligations under the PHMSA CAO as of the Effective Date and which Plains is still required to implement under this Consent Decree are set forth in Appendix D.

## XI. STIPULATED PENALTIES

26. Unless excused under Section XII (Force Majeure), Defendants shall be liable for stipulated penalties for violations of this Consent Decree as specified below. A violation includes failing to perform any obligation required by the terms of this Consent Decree according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

27. <u>Late Payment of Civil Penalties and NRD Payment</u>.

a. If Defendants fail to pay any portion of the Penalty Payment to the United States required under Section V (Civil Penalties) when due, Defendants shall pay to the United States a stipulated penalty of ten thousand dollars ($10,000) per Day for each Day payment is late.

b. If Defendants fail to pay any portion of the Penalty Payment to the CDFW and/or RWQCB as required under Section V (Civil Penalties) when due, Defendants shall pay to the CDFW and/or RWQCB a stipulated penalty of ten thousand dollars ($10,000) each, as applicable, per Day for each Day payment is late.

c. If Defendants fail to pay any portion of the NRD Payments

required under Section VI (Natural Resource Damages) when due, Defendants shall pay a stipulated penalty of five thousand dollars ($5,000) to the United States, and five thousand dollars ($5,000) to the State Trustees, per Day for each Day payment is late.

28. Stipulated Penalties for Non-Performance of Injunctive Relief. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section IX (Injunctive Relief) when due:

a. For failure to timely submit to OSFM the applications for State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of Appendix B;

b. For failure to implement the Integrity Management provisions as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix B;

c. For failure to timely submit to OSFM the EFRD analyses as specified in paragraphs 5.A-5.B of Appendix B;

d. For failure to timely submit to OSFM the risk analysis as specified in paragraph 6.A of Appendix B;

e. For failure to timely submit to PHMSA the modified Section 9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

f. For failure to timely submit to PHMSA the modified P&M Recommendation forms, as specified in paragraph 9.B of Appendix B;

g. For failure to timely conduct EFRD analyses for all Regulated Pipelines for which Plains has not previously conducted an EFRD analysis, as specified in paragraph 10.A of Appendix B;

h. For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i. For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j. For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k. For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l. For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m. For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n. For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o. For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p. For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q. For failure to timely conduct the surveys and update the

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r. For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s. For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t. For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u. For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v. For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w. For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x. For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y. The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

29. Stipulated Penalties for Non-Compliance with Corrective Action Order Terms. Unless excused under Section XII (Force Majeure), the stipulated penalties described in this Paragraph shall accrue per violation per Day for Defendants' failure to perform the following injunctive relief required under Section X (Corrective Action Order) when due:

a. For operation of Line 901 in violation of paragraph 1.a of Appendix D;

b. For failure to timely submit to OSFM a Line 901 Restart Plan, as specified by paragraph 1.b of Appendix D;

c. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

d. For operation of Line 903, in violation of paragraph 1.e of Appendix D;

e. For failure to timely submit to OSFM a Line 903 Restart Plan, as specified by paragraph 1.f of Appendix D;

f. For failure to comply with the operating pressure restriction, including requirements for removal of the pressure restriction, for Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

g. For failure to timely submit to OSFM any notification specified by paragraph 1.i of Appendix D; and

h. For failure to submit to OSFM a final Appendix D Documentation Report, as specified by paragraph 1.j of Appendix D.

i. The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30. Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31. For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32. For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33. For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34. For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

a. Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b. Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c. Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d. If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35. For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36. For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties). Any

transmittal correspondence shall state that payment is for stipulated penalties and shall identify the date of the written demand to which the payment corresponds.

37. Stipulated penalties under this Section shall begin to accrue on the Day after the performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed, or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

38. The United States may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to the United States under this Consent Decree.

39. The applicable State Agencies may, in the unreviewable exercise of their discretion, reduce or waive stipulated penalties otherwise due to the applicable State Agencies under this Consent Decree.

40. Stipulated penalties shall continue to accrue as provided in Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of the United States or the State Agencies, as applicable, that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing to the United States or the State Agencies, as applicable, together with interest, within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or the State Agencies' decision.

b. If the dispute is appealed to the Court and the Plaintiffs prevail in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c. If any Party appeals the Court's decision and a Plaintiff prevails in whole or in part, Defendants shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) Days of receiving the final appellate court decision.

41. If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or the State Agencies from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

42. The payment of stipulated penalties, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

43. Subject to the provisions of Section XVII (Effect of Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or the State Agencies (including, but not limited to, statutory penalties, additional injunctive relief, mitigation or offsets measures, and/or contempt) for Defendants' violation of this Consent Decree or applicable laws.

## XII. FORCE MAJEURE

44. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any

potential Force Majeure event (a) as it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendants' financial inability to perform any obligation under this Consent Decree.

45. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Defendants shall provide notice orally or by electronic transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants first knew that the event might cause a delay. Within ten (10) Days thereafter, Defendants shall provide in writing to such Plaintiffs an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall provide with any notice the documentation that Defendants are relying on to support the claim that the delay was attributable to a Force Majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

46. If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by

Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. Plaintiffs will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47. If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in writing of their decision.

48. If Defendants elect to invoke the Dispute Resolution procedures set forth in Section XIII (Dispute Resolution), in response to Plaintiffs' determination in Paragraph 47 above, it shall do so no later than thirty (30) Days after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to Plaintiffs and the Court.

## XIII. DISPUTE RESOLUTION

49. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by Plaintiffs to enforce any obligation of Defendants arising under this Consent

Decree.

50. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the relevant Plaintiff(s) a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) Days from the date the dispute arises, unless that period is modified by written agreement. If the parties cannot resolve a dispute by informal negotiations, then the position advanced by Plaintiffs shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Defendants invoke formal Dispute Resolution procedures as set forth below.

51. Formal Dispute Resolution. Defendants shall invoke formal Dispute Resolution procedures, within the time period provided in the preceding Paragraph, by serving on Plaintiffs a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

52. Plaintiffs shall serve their Statement of Position within forty-five (45) Days of receipt of Defendants' Statement of Position. Plaintiffs' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Plaintiffs. Plaintiffs' Statement of Position shall be binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

53. Defendants may seek judicial review of the dispute by filing with the Court and serving on the relevant Plaintiff(s), in accordance with Section XX (Notices), a motion requesting judicial resolution of the dispute. The motion

must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54. Plaintiffs shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or by a schedule set by the Court. Defendants may file a reply memorandum to the extent permitted by the Local Rules.

55. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 51, Defendants shall bear the burden of demonstrating that its position complies with this Consent Decree, based on the Statements of Position, and under applicable standards of review.

56. The invocation of Dispute Resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue until the final resolution of the dispute. Payment shall be stayed pending resolution of the dispute. If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XI (Stipulated Penalties).

## XIV. REPORTING

57. After the Effective Date, by March 31 and September 30 of the following years until termination of this Consent Decree per Section XXIV (Termination), Defendants shall submit to the Plaintiffs in accordance with Section XX (Notices) bi-annual reports that shall describe the status of Defendants' compliance with the Consent Decree, including implementation of

the injunctive relief requirements set forth in Appendices B and D. The report will be organized to show the measures taken to comply with each of the requirements set forth in Appendices B and D, whether the measures were taken timely, the status of any permitting action that may affect compliance with the Consent Decree, and whether the measures taken have achieved compliance with the requirement.

## XV. CERTIFICATION

58. Each report submitted by Defendants under Section XIV (Reporting) shall be signed by either the Chief Executive Officer, the President, an Executive Vice President, a Senior Vice President, or General Counsel who is an authorized representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on any personal knowledge and my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59. Plaintiffs and their representatives shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times and upon reasonable notice, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the Plaintiffs in accordance with the terms of this Consent Decree;

c. obtain documentary evidence, including photographs and similar data; and

d. assess Defendants' compliance with this Consent Decree.

60. Until one (1) year after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve or deliver to Plains, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree. At any time during this information-retention period, upon request by the Plaintiffs, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

61. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State Agencies pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

62. For any documents, records, or other information required to be submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim of business confidentiality or other protections applicable to the release of information by Plaintiffs, covering part or all of the information required to be submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains must mark the claim of confidentiality in writing on each page, and include a statement specifying the grounds for each claim of confidentiality.

63. The federal agency Plaintiffs are subject to applicable laws

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq*.). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq*.). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

to be produced in connection with this Consent Decree in, at Defendants' option, either native format via electronic media or secure file transfer protocol ("FTP"). Any encryption or access restriction shall be on a container level only, *i.e.*, only the electronic media or the top-level folder containing the documents shall be encrypted and Plaintiffs shall have unrestricted access to the files/folders within the electronic media or the top-level folder without need for additional decryption or access codes. Regardless of production method or encryption, individual documents shall be produced in a manner that allows the Plaintiffs to view, print, copy, save, download, and share each document within Plaintiffs' own environment without restriction, tracking or monitoring by Defendants, or automatically generated changes to the document (*e.g.*, without entering access codes prior to each download, and without automatically generated watermarks stating the download date and time).

67. At the conclusion of the information-retention period, Defendants shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of internal document destruction policies for documents, records, or other information subject to the requirements of Paragraph 60.

68. [*Intentionally left blank.*]

## XVII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69. This Consent Decree resolves the civil claims of the United States and the State Agencies for the matters alleged in the Complaint filed in this action for the Refugio Incident.

70. Subject to the reservations of rights specified in Paragraph 71, this Consent Decree also resolves all civil and administrative penalty claims that could be brought by PHMSA, for violations of the Pipeline Safety Laws specified below that occurred on any of Defendants' Regulated Pipelines prior to January 28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of Defendants' Regulated Pipelines and other pipeline facilities began. The specific

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

a. 49 C.F.R. Part 194 Subpart B – Response Plans;

b. 49 C.F.R. Part 195 Subpart B – Reporting;

c. 49 C.F.R. Part 195 Subpart E – Pressure Testing;

d. 49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

e. 49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

f. 49 C.F.R. Part 195 Subpart H – Corrosion Control;

g. 49 C.F.R. Part 199 – Drug and Alcohol Testing; and

h. All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71. The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72. This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. The specific Pipeline Safety Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

a. The Pipeline Safety Laws specified in Paragraph 70; and

b. California Government Code §§ 51012.3, 51013, 51013.5, 51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only), and 51018.

73. For any reportable pipeline accident, as defined in 49 C.F.R. § 195.50, occurring on or after January 28, 2019, on any of Defendants' Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA and OSFM to sue or pursue administrative or other remedies for violations (including penalties) under the Pipeline Safety Laws and the Elder California Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall be construed to limit the legal and equitable remedies of the United States or State Agencies, other than PHMSA and OSFM.

74. The United States and the State Agencies reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or the State Agencies to obtain penalties, injunctive relief, or other administrative or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other federal or state laws, regulations, or permit conditions, except as specified in Paragraphs 69, 70, and 72.

75. The United States reserves all legal and equitable remedies to address any imminent and substantial endangerment or threat to the public health or welfare or the environment arising at, or posed by, Defendants' operations, whether related to the violations addressed in this Consent Decree or otherwise. PHMSA further reserves the right to issue to Defendants corrective action orders pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

§ 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies reserve all legal and equitable remedies under California Government Code §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8, California Water Code §§ 13301, 13304, 13340, and 13386, and California Health & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating a substantial risk of an unauthorized discharge of oil into waters of the State of California, (2) a discharge of waste threatening to cause a condition of pollution or nuisance, or (3) a discharge which poses a substantial probability of harm to persons, property or natural resources.

76. This Consent Decree also shall not be construed to in any way limit or waive the claims set forth in the case entitled *California State Lands Commission, et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and Case No. B295632 (Cal. Ct. App.).

77. In any subsequent administrative or judicial proceeding initiated by the United States or the State Agencies for injunctive relief, civil penalties, other appropriate relief relating to Defendants' violations alleged in Plaintiffs' Complaint, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State Agencies in the subsequent proceeding should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 69, 70, and 72.

78. This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action

commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions of federal, state, or local laws, regulations, or permits.

79. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State Agencies against any third-parties, not party to this Consent Decree, nor does it limit the rights of third-parties, not party to this Consent Decree, against Defendants, except as otherwise provided by law.

80. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

81. Plaintiffs will not submit any claim for restitution for Natural Resource Damages in *The People of the State of California v. Plains All American Pipeline, L.P.*, Case No. 1495091 (Cal. Sup. Court).

82. By entering into this settlement, Defendants do not admit the Pipeline Safety Laws violations alleged in the Complaint or described in this Consent Decree by the United States on behalf of PHMSA; therefore, any allegations of violations of these Pipeline Safety Laws do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of violations set forth in the Complaint may be: (1) considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains, and (2) used for statistical purposes to identify violations that PHMSA deems as causal to an incident or to increase the consequences of an incident. Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

be considered by PHMSA to constitute prior offenses in any future PHMSA enforcement action brought by the agency against Plains.

83. By entering into this settlement, Defendants do not admit the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint; therefore, any allegations of violations of these statutes do not constitute a finding of violation and may not be used in any civil proceeding of any kind as evidence or proof of any fact, fault or liability, or as evidence of the violation of any law, rule, regulation, order, or requirement, except in a proceeding to enforce the provisions of this Consent Decree. However, the allegations of California Water Code §§ 13350 and 13385 violations set forth in the Complaint may be considered by the State Water Resources Control Board or Regional Water Quality Control Boards to constitute prior offenses in any future enforcement action brought by any of these agencies against Plains.

84. Subject to the terms of this Consent Decree, no provision contained herein affects or relieves Plains of their responsibilities to comply with all applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or state laws, and the regulations and orders issued thereunder. Subject to the terms of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of access, entry, inspection, and information-gathering or their authority to bring enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, the regulations and orders issued thereunder, or any other applicable provision of federal or state law.

85. Defendants hereby covenant not to sue Plaintiffs for any claims related to the Refugio Incident, or response activities in connection with the Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state laws, or any other law or regulation for acts or omissions through the date on which this Consent Decree is lodged with the Court.

86. Defendants covenant not to sue and agree not to assert any direct or

indirect claim for reimbursement related to the Refugio Incident from the OSLTF or pursuant to any other provision of law.

87. The United States reserves the right to seek reimbursement from Defendants for claims relating to the Refugio Incident paid after the date on which the Consent Decree is lodged with the Court from the OSLTF pursuant to 33 U.S.C. § 2712.

## XVIII. TRANSFER AND ACQUISITION OF ASSETS

88. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants will obtain from the transferee an agreement to be bound by those provisions of this Consent Decree and Appendices B and D that are specifically applicable to the asset(s) acquired, unless Defendants have already completed the required action or unless OSFM agrees to relieve the transferee of the obligations of any otherwise applicable provision. Those provisions of Appendix B are:

a. For existing but non-operational segments of Lines 901 and 903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of Appendix B;

b. For the operational segment of Line 903 from Pentland to Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;

c. For any lines built to replace Lines 901 or 903, paragraphs 2.A.1, 5, 7.B, 12.A of Appendix B; and

d. For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of Appendix B.

89. In the event Defendants sell or transfer ownership of or operating responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, Defendants shall provide a copy of this Consent Decree to the prospective transferee at least fourteen (14) Days prior to such transfer. Defendants shall

provide written notice of any such transfer to OSFM within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM that Defendants have completed certain required actions of this Consent Decree, or request that OSFM relieve the transferee of certain obligations of otherwise applicable provisions, such that the transferee will not be bound by those requirements. Defendants shall provide to Plaintiffs documentation demonstrating the transferee's agreement to be bound by the relevant provisions of the Consent Decree. Defendants shall provide to the transferee copies of those portions of relevant emergency response plans that relate to the transferred asset.

90. In the event of the sale or transfer pursuant to an arm's-length transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or 2000, or any lines built to replace Lines 901 or 903, to an independent third-party transferee, the transferee shall not be subject to the requirements of this Consent Decree. Defendants shall provide a copy of this Consent Decree to the transferee at least fourteen (14) Days prior to such transfer. Defendants shall provide written notice of any such transfer, including documentation demonstrating that the Consent Decree was provided to the transferee, to PHMSA within ten (10) Days after the date Defendants publicly disclose the transaction or the date the transaction is closed, whichever is earlier. Defendants' obligations under this Consent Decree with respect to all non-transferred assets shall not be affected.

91. For all Regulated Pipeline assets that Defendants assume operating responsibility for after the Effective Date, Plains is obligated to apply Article II (Company Wide Provisions) of Appendix B of this Consent Decree to the newly acquired assets.

## XIX. COSTS

92. Except as otherwise stated in this Consent Decree, the Parties shall bear their own costs related to this action and this Consent Decree, including

attorneys' fees; provided, however, the United States and the State Agencies shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

## XX. NOTICES

93. Unless otherwise specified in this Consent Decree, whenever notifications, submissions, reports, or communications are required by this Consent Decree, they shall be made in writing, sent electronically by email provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:
eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-11340

As to the United States by mail:
EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-5-1-1-1130

As to PHMSA:
James M. Pates
Assistant Chief Counsel for Pipeline Safety
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, DC. 20590

As to EPA:
Andrew Helmlinger
Attorney Advisor
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94104

| | |
|---|---|
| As to DOI: | Clare Cragan<br>U.S. Department of the Interior<br>Office of the Solicitor<br>755 Parfet St., Suite 151<br>Lakewood, Colorado 80215 |
| As to NOAA: | National Oceanic and Atmospheric Administration<br>Office of General Counsel<br>Natural Resources Section<br>ATTN: Christopher J. Plaisted<br>501 W. Ocean Blvd, Suite 4470<br>Long Beach, California 90802 |
| As to USCG: | Patricia V. Kingcade<br>Attorney Advisor<br>National Pollution Funds Center, US Coast Guard<br>2703 Martin Luther King Jr. Ave SE<br>Washington, DC 20593-7605 |
| As to the State Agencies: | Michael Zarro<br>Deputy Attorney General<br>Office of the Attorney General<br>Natural Resources Law Section<br>300 S. Spring St., Suite 11220<br>Los Angeles, California 90013 |
| As to CDFW: | California Department of Fish and Wildlife<br>Office of Spill Prevention and Response<br>Attn: Katherine Verrue-Slater<br>Senior Counsel<br>P.O. Box 160362<br>Sacramento, California 95816-0362 |

| | |
|---|---|
| As to CDPR: | California Department of Parks and Recreation<br>Attn: Laura A. Reimche, Senior Counsel<br>1416 Ninth Street, Room 1404-6<br>Sacramento, California 95814 |
| As to CSLC: | California State Lands Commission<br>Attn: Patrick Huber, Legal Division<br>100 Howe Avenue, Suite 100-South<br>Sacramento, California 95825 |
| As to OSFM: | California Department of Forestry and Fire Protection<br>Legal Services Office<br>Attn: Joshua Cleaver, Staff Counsel<br>P.O. Box 944246<br>Sacramento, California 94244-2460 |
| As to RWQCB: | California Central Coast Regional Water Quality Control Board<br>Attn: Naomi Rubin, Attorney III<br>801 K Street<br>Sacramento, California 95814 |
| As to UC: | Barton Lounsbury, Senior Counsel<br>University of California<br>Office of the General Counsel<br>1111 Franklin Street, 8th Floor<br>Oakland, California 94607 |
| As to Defendants: | Megan Prout<br>Senior Vice President<br>Commercial Law and Litigation<br>333 Clay Street, Suite 1600<br>Houston, Texas 77002 |

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California 95814

94. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI. EFFECTIVE DATE

96. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII. RETENTION OF JURISDICTION

97. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII. MODIFICATION

98. The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

99. Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV. TERMINATION

100. After Defendants have: (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation. Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101. Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement. The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree. If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102. If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution). However, Defendants shall not seek Dispute Resolution of

any dispute regarding termination until sixty (60) Days after receipt of the Plaintiffs' response to Defendants' Request for Termination.

**XXV. PUBLIC PARTICIPATION**

103. This Consent Decree shall be lodged with the Court for a period of not fewer than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The Parties agree and acknowledge that the final approval by Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the Consent Decree and a public comment period. Plaintiffs reserve the right to withdraw or withhold consent if the comments disclose facts or considerations that indicate that this Consent Decree is inappropriate, improper, or inadequate.

104. Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless Plaintiffs have notified Defendants in writing that Plaintiffs no longer support entry of the Consent Decree.

**XXVI. SIGNATORIES/SERVICE**

105. Each undersigned representative of Defendants, the State of California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB, UC, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, PHMSA, and EPA certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to the terms of this Consent Decree.

106. This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by emailed PDF) shall have the same effect as an original.

## XXVII. INTEGRATION

107. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII. FINAL JUDGMENT

108. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109. For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of __________, 20__.

___________________________________
UNITED STATES DISTRICT JUDGE

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES OF AMERICA:

3/12/2020
Date

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources
Division U.S. Department of Justice

3/13/2020
Date

BRADLEY R. O'BRIEN
ANGELA MO
Environmental Enforcement Section
Environment and Natural Resources
Division

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

3 March 2020
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

Case 2:26-cv-03396-SVW-SSC Document 16-1 Filed 05/01/26 Page 77 of 265 Page ID #:157

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20
Date

Susan Parker Bodine
SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance Assurance

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2/26/2020
Date

[signature]
AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

3/4/2020
Date

THOMAS M. CULLEN, JR.
Administrator
Office of Spill Prevention and Response

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

3/2/20
Date

LISA ANN L. MANGAT
Director
California Department of Parks and Recreation

Case 2:26-cv-03396-SVW-SSC Document 16-1 Filed 05/01/26 Page 81 of 265 Page ID #:161

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

[signature]
JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020
Date

THOMAS W. PORTER
Director
California Department of Forestry and Fire Protection

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION:

March 2, 2020
Date

[signature]
JOHN ROBERTSON
Executive Officer
Central Coast Regional Water Quality Control Board

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

3/3/20
Date

[signature]
BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

Date

BARTON LOUNSBURY
Senior Counsel
Office of the General Counsel

3 March 2020
Date

PEGGY FIEDLER
Executive Director
UC Natural Reserve System

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS ALL AMERICAN PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR PLAINS PIPELINE, L.P.

2/25/2020
Date

HARRY PEFANIS
President

# APPENDIX A

## (*Set of maps that generally depict Lines 901, 903, and 2000*)




*Appendix A – Line 901*

Scale: 1:100,000

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.

Case 2:25-cv-02418-SVW-AS Document 6-1 Filed 03/13/25 Page 77 of 102 Page ID #:170




*Appendix A – Line 903*

Scale: 1:700,000

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.




*Appendix A – Line 2000*

Scale: 1:966,574

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 79 of 102 Page ID #:165

# APPENDIX B

# *(PHMSA Injunctive Relief)*

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

   a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

   b. Conduct a close interval survey (CIS) and AC/DC interference survey.

   c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

   1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

   2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

   3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

   4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

5. Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6. Comply with additional requirements specified in the scope of work.

C. The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1. The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2. The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3. Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4. Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4. **<u>Integrity Management</u>**

A. For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1. Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a. In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 83 of 102 Page ID #:176

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

  i. Assessment data from ILI tool runs;

  ii. Dig and repair data;

iii. Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

iv. Operational data, such as pressure and flow data;

v. Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

vi. Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

vii. Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2. ILI Measures

a. Initial ILI Runs. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

i. All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

ii. In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

b. Subsequent ILI Runs. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

c. All ILI Runs. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5. **Valves**

A. Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

1. Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

2. Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

B. Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

C. Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6. **Risk Analysis**

A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

1. Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

a. The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

b. Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

c. The risk analysis shall be due within one year from entry of the CD.

7. **Leak Detection**

A. For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

B. Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8. **Non-waiver**

A. Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

**ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES**

9. **Integrity Management**

A. New Procedures for Interim Reviews and Assessments

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

c. The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

2. In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

3. In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C. Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

10. **Valves and O&M**

A. Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B. Within two years of entry of the CD, Plains shall develop and implement procedures to:

1. If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

2. Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

3. Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

4. Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C. Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

D. For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

1. Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E. Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11. **Leak Detection**

A. Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

1. Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B. For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C. Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

1. Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D. Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

1. Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E. Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F. Instrumentation and Display

1. To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a. Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b. Track these conditions through to resolution, including instrumentation relocation when necessary.

12. **<u>Control Room Management</u>**

A. For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1. Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2. Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3. Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4. Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

B. For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C. Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13. **Emergency Response and Oil Spill Response Plans**

A. California-Specific Provisions:

1. Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

B. Company-Wide Provisions

1. Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

2. Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

3. Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4. Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5. Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6. For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14. **Safety Management System (SMS)**

A. Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1. Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 93 of 102 Page ID #:179

B. Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15. **<u>Drug and Alcohol Program</u>**

A. Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

# APPENDIX C

(*Intentionally left blank*)

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

**APPENDIX D**

1. All outstanding corrective actions in PHMSA's closed Corrective Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into this Consent Decree, as outlined below, and subject to the sole regulatory oversight of the OSFM.

a. **Line 901 Shutdown.** Plains shall not operate Line 901 until authorized to do so by the OSFM.

b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for Line 901 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. The Restart Plan shall include:

1) Documentation of the completion of all mandated actions, and a management of change plan to ensure that all procedural modifications are incorporated into Plains' operations and maintenance procedures manual;

2) Provisions for adequate patrolling of Line 901 during the restart process and shall include incremental pressure increases during start-up, with each increment to be held for at least two hours;

3) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes;

4) A specific day-light restart that includes advance communications with local emergency response officials;

5) Master Control Room enhancements, including:

a) Implementation of advanced leak-detection

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;
2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6) Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7) Installation of additional safety valves as a result of Plains' EFRD evaluation;

8) Installation of additional pressure sensors as a result of Plains' surge study;

9) Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10) **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

Case 2:20-cv-02415-SVW-AS Document 6-1 Filed 03/13/20 Page 99 of 102 Page ID #:185

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1) Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2) Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3) Provisions for a daylight restart and advance communications with local emergency response officials.

g. **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h. **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1) The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2) The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.** Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.** If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1) The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2) Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3) The Appendix D Documentation Report shall include but not be limited to:

A. Table of Contents;

B. [*intentionally left blank.*]

C. [*intentionally left blank.*]

D. Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

E. [*intentionally left blank.*]

F. [*intentionally left blank.*]

G. Lessons learned while fulfilling the requirements of this Appendix D.

# Exhibit 3

U.S. Department of Transportation

Pipeline and Hazardous Materials Safety Administration

# Failure Investigation Report

## Plains Pipeline, LP, Line 901
## Crude Oil Release, May 19, 2015
## Santa Barbara County, California

May 2016

## Table of Contents

Executive Summary ..... 3

Final Report Methodology ..... 4

Facility Background ..... 4

Events Immediately Prior to and During the Crude Oil Release ..... 6

Plains' Field Response and National Response Center Notifications ..... 7

PHMSA's Corrective Action Order ..... 9

Pipeline Alignment ..... 9

Las Flores Station to Gaviota Station Line 901 Elevation Description ..... 9

Gaviota to Pentland Station Line 903 Elevation Description ..... 10

Post-Incident Investigation Results ..... 11

Metallurgical Evaluation of Failed Pipe ..... 11

In-Line Inspection Survey Review ..... 12

Number of Anomalies ..... 13

Cathodic Protection Findings ..... 13

Spill Volume Estimate from Plains' Third-Party Consultant ..... 13

Investigation Findings and Conclusions ..... 14

Proximate or Direct Cause ..... 14

Contributory Causes ..... 14

PHMSA Post-Incident Action Chronology ..... 18

Appendices ..... 20

## Executive Summary

At approximately 10:55 a.m. Pacific Daylight Time (PDT) on May 19, 2015, the Plains Pipeline, LP (Plains), Line 901 pipeline in Santa Barbara County, CA, ruptured, resulting in the release of approximately 2,934 barrels (bbl) of heavy crude oil.[i] An estimated 500 bbl of crude oil entered the Pacific Ocean. Line 901 is a 24-inch diameter buried, insulated pipeline which extends approximately 10.7 miles in length and transports heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (PHMSA), a regulatory agency within the U.S. Department of Transportation, issued a Corrective Action Order (CAO) that required the operator to shut down Line 901. Concurrent with the issuance and implementation of the CAO, PHMSA conducted an investigation to identify causal factors that contributed to the occurrence and size of the crude oil release. As the failure investigation progressed, the CAO was amended to address additional safety concerns that were identified. On June 18, 2015, Line 901 was purged and filled with inert nitrogen to enhance safety during the investigation and development of a remedial action plan.[ii] No fatalities or injuries occurred as a result of this rupture and release. The spill resulted in substantial damage to natural habitats and wildlife.

PHMSA's findings indicate that the proximate or direct cause of the Line 901 failure was external corrosion that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. PHMSA's investigation identified numerous contributory causes of the rupture, including:

1) Ineffective protection against external corrosion of the pipeline
    - The condition of the pipeline's coating and insulation system fostered an environment that led to the external corrosion.
    - The pipeline's cathodic protection (CP) system was not effective in preventing corrosion from occurring beneath the pipeline's coating/insulation system.
2) Failure by Plains to detect and mitigate the corrosion
    - The in-line inspection (ILI) tool and subsequent analysis of ILI data did not characterize the extent and depth of the external corrosion accurately.
3) Lack of timely detection of and response to the rupture
    - The pipeline supervisory control and data acquisition (SCADA) system did not have safety-related alarms established at values sufficient to alert the control room staff to the release at this location.
    - Control room staff did not detect the abnormal conditions in regards to the release as they occurred. This resulted in a delayed shutdown of the pipeline.
    - The pipeline controller restarted the Line 901 pipeline after the release occurred.
    - The pipeline's leak detection system lacked instrumentation and associated calculations to monitor line pack (the total volume of liquid present in a pipeline section) along all portions of the pipeline when it was operating or shut down.
    - Control room staff training lacked formalized and succinct requirements, including emergency shutdown and leak detection system functions such as

alarms.

The consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean.

This report contains factual information and analysis regarding the events leading up to the release, information collected during PHMSA's failure investigation to date, and the technical analysis of that information known at the time of the completion of this report. PHMSA used this information to mandate remedial measures on Line 901, Line 903, and associated stations and tankage. PHMSA will also use the information to determine whether violations of the federal pipeline safety regulations occurred.

## Final Report Methodology

PHMSA conducted relevant interviews, gathered and reviewed numerous historical documents and available records, and performed a thorough review of the Plains Control Room in Midland, TX. An ILI subject matter expert (SME) was hired to review the raw magnetic flux leakage (MFL) data and final vendor reports from the MFL surveys, and evaluated Plains actions as a result of their review of the vendor reports. PHMSA issued a CAO which in part instructed Plains to have the failed pipe examined by a PHMSA-approved metallurgical laboratory and to have a root cause failure analysis (RCFA) performed by a third party independent consultant.

The factual evidence reviewed includes: the Plains Integrity Management Plan (IMP), CP records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures and reports obtained from the pipeline operator and PHMSA SMEs.

The arrangement of this report provides a general description of the pipeline system, the events that occurred on the day of the release, and acts or omissions of the operator that led to this failure and release of crude oil. Specific evidence is supplied and pertinent statements from each report are excerpted where appropriate.

## Facility Background

Plains transports crude oil produced in federal and state waters off the coast of Santa Barbara, CA to inland refineries. Plains' pipeline is composed of two major pipeline sections: (1) Line 901, and (2) Line 903. Lines 901 and 903 were constructed in the late 1980s, hydrostatically tested in 1990, and went into crude oil service in 1992 and 1991, respectively. The pipelines are coated with coal tar urethane and covered with foam insulation which in turn is covered by a tape wrap over the insulation. Shrink wrap sleeves, which provide a barrier between the steel pipeline and soil for corrosion prevention, are present at all of the pipeline joints on Line 901 and multiple locations on Line 903. The pipelines carry high viscosity crude oil at a temperature of approximately 135 degrees Fahrenheit to facilitate transport. Lines 901 and 903 are controlled from the Plains Control Room's (PCR) California console in Midland, TX.

(1) Line 901 is a 24-inch diameter pipeline that extends approximately 10.7 miles in length from the Las Flores Pump Station to the Gaviota Pump Station; and (2) Line 903 is a 30-inch diameter pipeline that extends approximately 128 miles in length from the Gaviota Pump Station to the Emidio Pump Station, with intermediate stations at Sisquoc Mile Post (MP) 38.5 and Pentland (MP 114.57). There is a delivery point into Line 901 from Venoco's Line 96 located approximately 2 miles downstream of the Las Flores Station. All of Line 901 crude oil throughput enters Line 903. Line 901 was manufactured of low carbon steel by Nippon Steel

in Japan in 1986. Line 901's pipe specifications are API 5L, Grade X-65 pipe, 0.344-inch wall thickness, with a high frequency-electric resistance welded (HF-ERW) long seam. The line was hydrotested to 1,686 pounds per square inch gauge (psig) on November 25, 1990.




**Figure 1.** Map of Plains' Western Division Pipelines. The arrow points to the approximate release site on Line 901.

At Sisquoc Station, crude oil can be pumped to one of two locations: a nearby refinery via a 12-inch diameter pipeline operated by Phillips 66, or continue down Line 903 to Pentland Station. There are additional crude oil lines coming in and out of Pentland Station with numerous tanks at that station used to blend different crude oils for delivery further downstream. At Emidio Station crude oil is delivered to above-ground storage tanks for future delivery to Los Angeles refineries in a separate pipeline system.

Prior to the May 19, 2015 release, there had been four small releases meeting PHMSA reportable criteria at pump stations on Lines 901 and 903. No releases were reported to PHMSA on the pipelines outside of pump stations prior to 2015. The operator reported maximum operating pressure (MOP) of Line 901 is 1,341 psig.

At the time of the spill, Plains All American Pipeline (PAAPL) operated Line 901 and Line 903 under a Federal Energy Regulatory Commission (FERC) certificate of economic regulatory jurisdiction that was issued in 1987. Plains Pipeline, LP, is a subsidiary of PAAPL. Based on the FERC filing, Lines 901 and 903 were classified as interstate pipelines, pursuant to 49 U.S.C. § 60101(7), as facilities used to transport hazardous liquid in interstate or foreign commerce, and as such, were regulated by PHMSA as interstate pipelines. Plains cancelled the FERC certificates for Lines 901 and 903 on February 12, 2016 and April 29, 2016,

respectively, stating that the transportation service was no longer available in interstate commerce. Line 903 from Gaviota to Sisquoc to Pentland Stations was purged with nitrogen in accordance with Amendment No. 2 to the CAO, and remains shut down between these stations. The Pentland to Emidio segment of Line 903 is active and operating intermittently at low pressures. This section of pipe between Pentland and Emidio is not directly connected to the Gaviota to Pentland segment and is used to transport crude product from breakout tanks in Pentland Station.

## Events Immediately Prior to and During the Crude Oil Release

On the morning of May 19, 2015, Lines 901 and 903 were transporting crude oil with a flow rate setpoint of 1,240 bbl per hour (BPH) leaving the Las Flores Station, and the discharge pressure was approximately 575 psig. Pumps were operating at the Las Flores Station on Line 901 and Sisquoc Station on Line 903. A Plains instrumentation and electrical technician was dispatched that morning to disconnect and remove a motor from a non-operational pump at the Sisquoc Station. While the technician was performing his work, the operational pump (Pump 401) at the Sisquoc Station was shut down unintentionally (i.e., "uncommanded"). When Pump 401 on Line 903 stopped operating, the pressure in Line 901 increased. The pressure rose to a maximum of 696 psig at the Las Flores Station discharge. The controller shut down the pump at Las Flores Station and the pressure remained at 677 psig. Approximately four minutes later, the pump at Las Flores Station was restarted. At approximately 10:55 a.m. PDT, the flow rate at Las Flores Station climbed from zero to 2,042 BPH. Concurrently, the line pressure rose to a high of 721 psig, then dropped to 199 psig, and then slightly increased to approximately 210 psig until the Las Flores pump was shut down a second and final time. Generally, a sudden increase in flow rate accompanied by a decrease in pressure is indicative of a release. PHMSA has determined that Pump 401 going offline in an "uncommanded" manner on the morning of May 19, 2015, was an abnormal event, but that this in itself should not have caused Line 901 to rupture.

PHMSA performed a detailed review of the SCADA event and alarm logs, and pressure and flow records. The review indicated that there was information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure. The alarm was not set at an appropriate value. The alarm also did not have a major priority/severity or safety-related alarm status. The controller did not recognize the information he received as indicative of an abnormal operation. Evidence indicates that the controller was focused on the events at Sisquoc Station (i.e., restarting the Sisquoc pump that had gone down once uncommanded, and a second time on high case temperature along with other duties).[iii]

Due to the Sisquoc Station maintenance activity resulting in an unplanned pump shutdown, the controller anticipated alarms would be activated from the pipeline leak monitoring (PLM) system. According to interviews and a review of the alarm log, the PLM inhibit was requested by the controller to the step-up shift supervisor between 11:15 and 11:22 a.m.[iv] The step-up shift supervisor then inhibited (shut off) the PLM system alarms.[v] Also, during this time, the controller started an investigation of the SCADA data in an attempt to understand the operational abnormalities that were occurring. After attempting to restart the Sisquoc pump twice, the controller shut down the pipeline. PHMSA requested the operator review the flow imbalance calculations and provide a time when the PLM system would have generated an alarm if not inhibited, and it was determined that alarms would have been generated

# Exhibit 4

Item 61

# Update on the Status of the Existing Offshore Oil and Gas Production and Pipeline Leases Managed by the Commission

*Goleta, CA* | April 26, 2022

CALIFORNIA STATE LANDS COMMISSION



# SUMMARY OF STATE OFFSHORE LEASES

- **11** Active Oil-producing Leases
  - -Ventura and Orange Counties
- **5** Inactive Oil and Gas Leases
  - -Awaiting Quitclaim
  - -Compensatory Agreements
- **13** Pipeline Leases
  - -11 Active
  - -1 Expired
  - -1 Terminated





# San Pedro Channel






# Santa Barbara Channel






# SANTA BARBARA COUNTY

## Overview

- **0** Active oil and Gas Leases
- **2** Inactive Oil and Gas Leases
- **3** Recently Quitclaimed Oil and Gas Leases
- **3** Recently Terminated Leases
- **5** Pipeline Leases



California State Lands Commission

5

# SANTA BARBARA COUNTY

## Shell Mounds (Leases 1824, 3150)

**Lessee: Chevron**

**Status:** **Inactive**

- **9,512** Acres
- Site of previously removed 4H platforms
- **$5,000** in annual rent for Lease 1824
- Quitclaim pending






# SANTA BARBARA COUNTY

## Platform Holly and the City of Goleta (Leases 3242, 3120, 421)

**Status: QUITCLAIMED (2017)**

Formerly operated by Venoco Inc.

**Leases 3242 and 3120:**

- Issued in 1964 and 1965
- Produced from platform Holly
- 30 Wells
- Last produced in 2015

**Lease 421:**

- Issued in 1949
- Produced from artificial pier near shore
- 2 Wells
- Last produced in 1994

***Plug and Abandonment operations ongoing…***





# SANTA BARBARA COUNTY

## Carpinteria Oil Field (Leases 7911, 4000, 3133)

**Status: TERMINATED (2019)**

Formerly operated by Carone Petroleum

- Leases originally issued in late 1960s
- All lease facilities removed, and all wells plugged and abandoned by 1996
- Lease areas assigned to Carone in 1996
- Leases terminated by Commission in 2019






# SANTA BARBARA COUNTY

## Pipeline Leases: 5 Active

| Lease | Lessee | Location | Status | Issued/ Expiration | Term (years) | Annual Rent | Bond | Lease Characteristics |
|---|---|---|---|---|---|---|---|---|
| **Lease 7163** (Shore to Federal Platform Harmony) | Exxon Mobil Corp. | offshore El Capitan State Beach, near the City of Goleta | Active | Feb-1988/ Jan-2022 | 34 | $178,174 | $1 million | single point mooring facility, a crude oil/water emulsion pipeline, three power cables, and a produced water outfall |
| **Lease 4977** (Federal Platform Hondo to Shore) | Exxon Mobil Corp. | offshore, near Los Flores Canyon | Active | Jan-1989/ Dec-2021 | 33 | $60,000 | $1 million | Sour Gas Pipeline |
| **Lease 6911** (Federal Platform Irene to Shore) | Plains Exploration and Production (PXP) | near Point Pedernales, offshore of the city of Lompoc | Active | Nov-2009/ Oct-2022 | 13 | $129,285 | $3 million | Power cable, crude oil pipeline, natural gas pipeline, wastewater pipeline. |
| **Lease 6942** (Federal Platform Hermosa to Shore) | Point Arguello Pipeline co. | Offshore, near Point Conception | Active | Feb-2011/ Jan-2031 | 20 | $74, 383 | $100,000 | crude oil emulsion |
| **Lease 6943** (Federal Platform Hermosa to Shore) | Plains Exploration and Production (PXP) | Offshore, near Point Conception | Active | Feb-2011/ Jan-2031 | 30 | $72,144 | $300,000 | na |

- For Pipeline Leases 7163 and 4977, Commission staff is processing the lessee's renewal applications for both leases.



# VENTURA COUNTY

## Overview

- **2** Active Oil and Gas Leases
- **1** Inactive Oil and Gas Lease
- **3** Recently Quitclaimed Oil and Gas Leases
- **3** Pipeline Leases



Offshore Rincon Island- 2018



# VENTURA COUNTY

## West Montalvo (Leases 3314, 735) Status: Active and Producing

**Lessee**: California Resources Petroleum Corp./Vintage Petroleum

| Lease | 3314 | 735 |
|---|---|---|
| Issued | 1965 | 1952 |
| Acres | 5,430 | 220 |
| Royalty Rate | Sliding Scale | 16 2/3% |
| Annual Rent | $ 5,430 | $960 |
| Wells | 18 | 3 |
| Production (bbls) 20/21 | 47,976 | 11,561 |
| Royalty 20/21 | $ 396, 916 | $ 101,229 |
| Bonding | $ 7 Million | |



# VENTURA COUNTY

## Lease 427

**Status: Inactive (Awaiting Quitclaim)**

Lessee: Exxon

- 148 Acres
- Last Produced in 1993
- All wells plugged and abandoned
- Quitclaim pending






# VENTURA COUNTY

## Rincon Island (Leases 145, 410, 1466)

**Status: QUITCLAIMED (2017)**

- Originally Issued in 1940s and 50s
- Last Produced in 2008 and quitclaimed in 2017
- All 75 wells have been plugged and abandoned
- Decommissioning Plan currently in development



Rincon Island- 2021



# VENTURA COUNTY

## Pipeline Leases: 1 Active, 1 Expired, 1 Terminated

| Lease | Lessee | Location | Status | Issued/ Expiration | Term (years) | Annual Rent | Bond | Lease Characteristics |
|---|---|---|---|---|---|---|---|---|
| **Lease 5967** (Shore to Federal Platforms Gina/Gilda) | DCOR, LLC | Santa Barbara Channel, connecting to Mandalay Generating Station | Active | Apr-1981, Apr-2006/Mar-2026 | 20 | $ 102, 525 | 3 million + parental guarentee | two bundled pipeline systems conveying crude oil, natural gas, water, and electrical lines |
| **Lease 4017** (Federal Platform "A" to Shore) | DCOR, LLC | Santa Barbara Channel, near Sea Cliff | Expired | Aug-1968/Aug-2017 | 49 | NA | 3 million + parental guarentee | two 12-inch oil and gas pipelines connecting to Rincon Operating Facility |
| **Lease 3914** (Federal Platform Hogan to Shore) | Signal Hill Service, Inc. | Santa Barbara Channel, near Rincon Point | Terminated | Feb-1968, Sep-2013/June-2019 | 10 | NA | NA | water pipeline, oil pipelines, gas pipeline; outfall pipeline. |

- For Lease 4017, Commission staff is in discussions with the Lessee to eventually renew the Lease.
- For terminated Lease 3914, decommissioning is pending.



# LOS ANGELES COUNTY

## Long Beach Unit and West Wilmington Operations (Granted Lands)

### Long Beach Unit

- FY 2020-21:

  5.86 million barrels of oil

  $52,916,448 state share of net profits

- Total offshore wells: 1349
- Total onshore wells: 903 (June 2021)
- Field Life: 2036*

### West Wilmington

- FY 2020-21:

  1.48 million barrels of oil

  $16,099,372 state share of net profits

- Total onshore wells: 903 (June 2021)
- Field Life: 2036*



Offshore Junipero Beach, Long Beach- 2022

*Based on oil price used in CRC's yea
end 2020 SEC filing ($39.6 per barrel




ER-0907

# ORANGE COUNTY

## Overview

- **9** Active Oil and Gas Leases
- **2** Compensatory Agreements
- **3** Platforms
- **1** Granted Lands Area
- **5** Pipeline Leases



Platform Emmy



# ORANGE COUNTY

## Platform Emmy and Huntington Beach (Leases 91, 163, 392, 425, and 426)

**Status: Active and Producing**

**Lessee:** SoCal Holding, LLC.

| Lease | 91 | 163 | 392 | 425 | 426 |
|---|---|---|---|---|---|
| Issued | 1943 | 1944 | 1938 | 1950 | 1950 |
| Acres | 589 | 640 | 835 | 835 | 649 |
| Annual Rent | $500 | $3,200 | $835 | $4,175 | $3,200 |
| Wells | 13 Onshore | [redacted] | 161 Onshore, 1 Emmy | [redacted] | [redacted] |




- 2017 Royalty Modification
- 1.2 million bbls oil (FY 20/21)
- $ 14.8 million in royalty (FY 20/21)
- $ 30 million Bond + additional Sinking Fu [redacted]



# ORANGE COUNTY

## Platforms Eva and Esther (Leases 3033, 3095, and 3413)

**Status: Active and Producing**

**Lessee**: DCOR, LLC

| Lease | 3033 | 3095 | 3413 |
|---|---|---|---|
| Issued | 1963 | 1964 | 1965 |
| Acres | 2113 | 3360 | 1871 |
| Royalty Rate | 17.26% | 16.88% | 17.26% |
| Annual Rent | $3,200 | $3,360 | $1,871 |
| Wells | 35 Platform Eva | 30 Platform Esther | 7 Platform Eva |

- 425,438 bbls oil (FY 20/21)
- $ 3.5 million in royalty (FY 20/21)
- $ 23 million bond

Platform Eva







# ORANGE COUNTY

## Island Chaffee (Lease 186)

**Status: Active and Producing**

**Lessee:** California Resources Long Beach, Inc.

- Originally issued in 1945 and produces from Belmont Offshore Oil Field.
- 1255 Acres
- Royalty rate of 17.88%
- $ 5,000 annual rent
- 35 wells drilled from Island Chaffee
- $5,000 bond, no state abandonment liability
- 212,446 bbls oil (FY 20/21)
- $1.9 million in royalty (FY 20/21)



Island Chaffee from Rosie's Dog Beach- 2022

California State Lands Commission

# ORANGE COUNTY

## Compensatory Agreements (Agreements 4736, 1482)

## Status: Royalty generating

| Agreement | 4736 | 1482 |
|---|---|---|
| Issued | 1965 | 1955 |
| Location | [redacted] | Alamitos Bay, Seal Beach |
| Acres | 70 | 54 |
| Royalty Rate | [redacted] | 16 2/3% |
| Annual Rent | NA | NA |
| Royalty 20/21 | $22,555 | $16,422 |




- No Wells located within state lease areas
- Royalty generated from nearby “drainage [redacted] wells”



# ORANGE COUNTY

## Pipeline Leases: 5 Active

| Lease | Lessee | Location | Status | Issued/ Expiration | Term (years) | Annual Rent | Bond | Lease Characteristics |
|---|---|---|---|---|---|---|---|---|
| **Lease 6417** (Shore to State platform Eva and Federal Platform Edith) | DCOR, LLC | offshore of Huntington Beach | Active | Dec-2007/Nov-2027 | 20 | $75,044 | $18 million blanket bond | one 24-inch diameter pipeline containing two power cables and use of one six-inch diameter gas pipeline |
| **Lease 3394** (State Platform Esther to Shore) | DCOR, LLC | San Pedro Bay, near Seal Beach | Active | Oct-2010/Oct-2030 | 20 | $49, 680 | $21 million blanket bond | oil pipeline, gas pipeline, freshwater pipeline, electrical conduit. |
| **Lease 3116** (State Platform Eva to Shore) | DCOR, LLC | San Pedro Bay, near Huntington Beach | Active | Mar-1983/ Mar-2029 | 46 | $160,574 | $21 million blanket bond + $350,000 bond | submarine pipelines and a power cable |
| **PRC 5636** (Federal Leases to Shore) | San Pedro Bay Pipeline co. | San Pedro Bay, near Seal Beach and Huntington Beach | Active | Mar-2008/Mar-2028 | 20 | $104,958 | $8.9 million | 16-inch diameter crude oil pipeline |
| **PRC 5663** (State Platform Emmy to Shore) | SoCal Holding, LLC | San Pedro Bay, near Seal Beach and Huntington Beach | Active | May 1979/long as producing | continuous use | NA | [illegible] | [illegible] |



# ORANGE COUNTY

## Newport Beach Granted Lands

The City of Newport Beach owns and operates 16 oil wells that were drilled between 1953 and 1958 and are slant-drilled into the tidelands area of the Newport offshore oil field. There is no revenue sharing with the state, and all revenue generated must be used for the purposes of maintaining the tidelines, such as funding improvements to tidelands property, dredging Lower Newport Bay, lifeguards, and beach cleaning. The Commission has no approval authority over these operations.



# CONCLUSION

In the last six years, the Commission has facilitated the termination of 10 offshore oil and gas leases, returning over 20,000 acres to the Coastal Sanctuary.

We are pursuing parallel tracks of facilitating geothermal, solar, and wind development, while actively working with our state agency partners and lessees to:

- Ensure the State is adequately protected
- Abandon idle wells
- Decommission offshore facilities
- Remediate offshore orphan legacy wel[redacted]
- Implement spill prevention and inspect[redacted]



www.slc.ca.gov

# THANK YOU & QUESTIONS

Nate Dozier
Mineral Resources Management Division
Nate.dozier@slc.ca.gov
562.590.5237

@CAStateLands



# Exhibit 5











# Refugio Beach Oil Spill

## Final Damage Assessment and Restoration Plan/Environmental Assessment

Prepared by:
California Department of Fish and Wildlife
California State Lands Commission
California Department of Parks and Recreation
University of California
The Department of Interior, U.S. Fish and Wildlife Service
National Oceanic and Atmospheric Administration

# Refugio Beach Oil Spill

# FINAL

# Damage Assessment and Restoration Plan/Environmental Assessment

June 2021

**On the Cover:**
Oiled Beach by U.S. Coast Guard
Oiled octopus and invertebrates by Natural Resource Damage Assessment Trustees
Dolphins by Natural Resource Damage Assessment Trustees
Pelicans by Natural Resource Damage Assessment Trustees
Harbor seal by Santa Barbara Channelkeeper

**Suggested Citation:**
Refugio Beach Oil Spill Trustees. 2021. *Refugio Beach Oil Spill Final Damage Assessment and Restoration Plan/Environmental Assessment.* Prepared by the California Department of Fish and Wildlife, California State Lands Commission, California Department of Parks and Recreation, Regents of the University of California, U.S. Department of the Interior, U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration.

# Refugio Beach Oil Spill Natural Resource Damage Assessment Summary:

## Shoreline Habitats

**$5.5 million**

**Injury:** Approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.

## Subtidal and Fish Habitats

**$6.1 million**

**Injury:** Approximately 2,200 acres of benthic subtidal habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, remove Ellwood seawall, restore sand dwelling kelp offshore of Goleta Beach.

## Birds

**$2.2 million**

**Injury:** 558 birds were estimated killed, representing over 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.

## Marine Mammals

**$2.3 million**

**Injury:** 156 pinnipeds and 76 cetaceans were estimated injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbra and Ventura County, and Increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.

## Human Uses

**$3.9 million**

**Injury:** The Trustees estimate over 140,000 lost recreational user days in Santa Barbara and Ventura Counties; six days of beach closures in Los Angeles County; and lost research, education, and outreach opportunities at the University of California, Santa Barbara Coal Oil Point Natural Reserve. Affected recreational activities included camping, sunbathing, beach combing, exercising, swimming, wildlife viewing, fishing, diving, boating and surfing.

**Restoration:**

Restoration funds (53%) will be administered by State Parks for use on projects benefiting camping and shore-based recreation from Gaviota State Park to El Capitan State Beach.

Restoration funds (46%) will be administered by State Trustees for use on projects benefiting coastal recreation in Ventura County, Los Angeles County, and Santa Barbara County downcoast of El Capitan State Beach.

Restoration funds (approximately 1%) will be administered by the University of California for use on projects benefiting research, education, or outreach at the Coal Oil Point Reserve.

## Restoration Planning, Implementation, and Oversight

**$2 million**

## Public Input

Full Document: https://go.usa.gov/xvWEg

Administrative Record: https://go.usa.gov/xvWEc

Submit Questions: RefugioRestoration@fws.gov

## Executive Summary

On May 19, 2015 a 24-inch diameter on-shore pipeline (Line 901) that extends approximately 10.7 miles along the Santa Barbara County coastline in California ruptured resulting in the release of approximately 2,934 barrels (123,228 gallons) of heavy crude oil (U.S. DOT 2016, hereafter referred to as "the spill"). Line 901 is a buried, insulated pipeline that transported heated crude oil from Exxon Mobil's storage tanks in Las Flores Canyon westward to Plains' Gaviota Pumping Station. The pipeline is owned and operated by Plains All American Pipeline, L.P., and Plains Pipeline, L.P. (jointly, Plains). The Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that the cause of the Line 901 failure was external corrosion under insulation that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil. Crude oil from the buried pipeline saturated the soil and flowed into a culvert that crosses under Highway 101 and railroad tracks, and ultimately discharged into the Pacific Ocean at Refugio State Beach.

The crude oil that entered the ocean posed a significant risk to and injured marine plants and wildlife, including seagrasses, kelp, invertebrates, fish, birds, and mammals. In addition to direct natural resource impacts, the closure of beaches and fisheries occurred just days before the Memorial Day weekend, resulting in losses for local businesses and lost opportunities for the public to visit and enjoy the shore and offshore areas. Tar balls attributable to the Line 901 release were carried by southerly ocean currents and eventually reached some beaches in Los Angeles County (California Department of Fish and Wildlife 2016).

The response (cleanup) to this significant spill brought together a number of federal, state, local agencies, and Native American tribes operating under a Unified Command. For the spill response, Incident Commanders consisted of representatives of the United States Coast Guard (USCG), California Department of Fish and Wildlife, Office of Spill Prevention and Response (CDFW-OSPR), Santa Barbara County, and Plains[1]. The Refugio Beach oil spill cleanup effort completed Phase I "active cleanup and gross oil removal" on August 31, 2015, and completed Phase II "refined oil cleanup endpoints for shorelines targeting maximum net environmental benefit" on January 22, 2016 (U.S. Coast Guard, 2016). Phase III monitoring activities were largely concluded on May 26, 2016 and the Unified Command disestablished on March 10, 2017 (U.S. Coast Guard 2017).

In parallel with the response and cleanup effort, the natural resources trustee agencies (Trustees) conducted a Natural Resource Damage Assessment (NRDA) to quantify the injuries to natural resources from the spill and assess natural resource damages. In this case, the Trustees for the natural resources injured by the spill include the United States Department of Commerce represented by the National Oceanic and Atmospheric Administration (NOAA); the United States Department of the Interior represented by the United States Fish and Wildlife Service

[1] The National Contingency Plan calls for the Responsible Party to be a member of the Unified Command; ref. 40 CFR 300.135(d)

(USFWS), National Park Service (NPS) and Bureau of Land Management (BLM); the CDFW-OSPR; the California Department of Parks and Recreation (CDPR); the California State Lands Commission (CSLC); and the Regents of the University of California (the Trustees). As a designated Trustee, each of these agencies is authorized to act on behalf of the public under state and/or federal laws to assess and recover natural resource damages and to plan and implement actions to restore, rehabilitate, replace, or acquire the equivalent of the affected natural resources injured as a result of a discharge of oil.

In accordance with the Oil Pollution Act (OPA) NRDA regulations (33 U.S.C. 2706(e)), the Trustees have cooperatively gathered information and prepared this Final Damage Assessment and Restoration Plan (DARP)/Environmental Assessment (EA). This document describes the injuries resulting from the spill and the restoration projects selected to compensate the public for those injuries. This document is also an Environmental Assessment intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the proposed restoration projects under the National Environmental Policy Act (NEPA) and is therefore called a DARP/EA. Prior to releasing this Final DARP/EA, the Trustees released a Draft DARP/EA for public review and comment. After considering the public comments received, the Trustees prepared this Final DARP/EA. A full environmental review would be premature for some of the selected projects in this Final DARP/EA, as well as projects that were deemed "second tier" or of lower priority. The need for additional NEPA review will be determined once detailed engineering design work or operational plans are developed for selected projects. Additional review may also be required if any second tier projects are implemented.

This document describes the restoration projects selected by the Trustees to address the various resources impacted by the spill, as well as a process to identify appropriate human use projects for funding. All of the selected projects are designed to restore, replace, or acquire the equivalent of the lost resources and/or their services through restorative on-the-ground actions. Furthermore, several of the projects address multiple resources. The projects were selected based upon the biological needs of the injured species and the feasibility of restoring the resources.

Under OPA, the responsible party is liable for the cost of implementing restoration projects, as well as the costs incurred by the Trustees to undertake this damage assessment. The Trustees settled their claim for natural resource damages with Plains. A summary of the injury to each resource category, the approximate allocation of damages and selected restoration projects are shown below. Web links to data used in the injury assessment can be found in Appendix B of the DARP/EA.

SHORELINE HABITATS $5.5 million

**Injury:** Trustees estimate that approximately 1,500 acres of shoreline habitat were impacted including sandy beach and rocky intertidal habitats.

**Restoration:** Remove Ellwood seawall, enhance black abalone populations, and restore degraded sand dune habitats.




SUBTIDAL AND FISH HABITATS $6.1 million

**Injury:** Trustees estimate that approximately 2,200 acres of benthic subtidal and fish habitat were impacted.

**Restoration:** Restore abalone populations in Marine Protected Areas, restore eelgrass beds in Refugio cove, restore sand-dwelling kelp offshore of Goleta Beach, and remove Ellwood seawall.




BIRDS $2.2 million

**Injury:** Trustees estimate 558 birds were killed, representing approximately 28 different species.

**Restoration:** Remove invasive plants from brown pelican nesting colonies on Anacapa Island, reduce seabird injuries from recreational fishing, and implement conservation actions for western snowy plovers.




MARINE MAMMALS $2.3 million

**Injury:** Trustees estimate 156 pinnipeds and 76 cetaceans were injured or killed.

**Restoration:** Increase the capability to recover and rehabilitate marine mammals in distress in Santa Barbara and Ventura Counties, and increase the capability to respond to instances of cetacean entanglement in the Santa Barbara Channel.




HUMAN USE $3.9 million

**Injury:** Trustees estimate over 140,000 recreational user days were lost.

**Restoration:** Various projects to improve human recreation, to be administrated as follows - 53% to State Parks for projects benefitting camping or shore-based recreation including and upcoast of El Capitan State Beach; 46% for a grants program for projects downcoast of El Capitan State Beach, on non-State Parks lands benefitting coastal recreation as well as boating and off-shore recreation in Santa Barbara, Ventura, and Los Angeles Counties; and approximately 1% to Coal Oil Point Reserve for projects benefitting research, education, and outreach.




RESTORATION PLANNING, IMPLEMENTATION, AND OVERSIGHT $2.0 million

The Trustees have prepared this Final DARP/EA to inform the public about the natural resource damage assessment (NRDA) and restoration planning efforts that have been conducted following the spill. This document is also an Environmental Assessment (EA) intended to satisfy the Federal Trustees' requirement to evaluate the environmental impacts of the selected restoration projects, and the alternatives considered, under NEPA. As environmental review would be premature for some of the projects in the document, additional review may be required in some instances. This will be determined once recreational use projects are identified and/or when more detailed engineering design work or operational plans for the selected projects are available. To coordinate and oversee implementation of this DARP/EA, the Trustees have formed a Trustee Council comprised of representatives from each of the Trustee agencies. To submit questions or contact the Trustee Council, please use the following contact information:

## Electronic Mail:

RefugioRestoration@fws.gov

## U.S. Mail:

Refugio Beach Oil Spill Natural Resource Trustees
C/O Ventura Fish and Wildlife Office
2493 Portola Road, Suite B
Ventura, California 93003

Attn:
Michael Anderson, California Department of Fish and Wildlife
Jennifer Boyce, National Oceanic and Atmospheric Administration
Colleen Grant, U.S. Fish and Wildlife Service

# Exhibit 6

FILED
CLERK, U.S. DISTRICT COURT
10/14/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: WH DEPUTY

JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Civil Action No.<br>2:20-cv-02415-PSG-JEM<br><br>~~**[PROPOSED]**~~ **ORDER TO ENTER CONSENT DECREE**<br><br>~~**Date:** October 26, 2020~~<br>~~**Time:** 1:30 p.m.~~<br>~~**Location:** Telephonic~~<br>**Judge:** Hon. Philip S. Gutierrez |

**[~~PROPOSED~~] ORDER**

For the reasons set forth in the United States' Motion to Enter Consent Decree and Memorandum of Law in Support thereof that was filed on August 19, 2020 and for good cause shown, the Consent Decree that was lodged on March 13, 2020 (Docket No. 6-1), is hereby ENTERED and shall constitute final judgment of the Court in this matter.

IT IS SO ORDERED.



DATED: 10/14/2020

THE HONORABLE PHILIP S. GUTIERREZ
UNITED STATES DISTRICT JUDGE

# Exhibit 7

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MICHAEL DORSI (CA Bar Number: 281865)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Tel: (415) 510-4400
E-mail: Michael.Dorsi@doj.ca.gov
*Counsel for Plaintiffs California Department of Forestry and Fire Protection's Office of State Fire Marshal*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P.,<br><br>Defendants. | Case No. 2:20-cv-02415-SVW-SSCx<br><br>**CALIFORNIA PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF EX PARTE EMERGENCY MOTION TO ENFORCE CONSENT DECREE**<br><br>Dept: 10A<br><br>Action Filed: Mar. 13, 2020<br>Judgment: Oct. 14, 2020 |

ERIC M. KATZ
Supervising Deputy Attorney General
MICHAEL ZARRO (CA Bar Number: 110171)
JAKE GOLD (CA Bar Number: 347131)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Tel: (213) 269-6327
E-mail: Michael.Zarro@doj.ca.gov
*Counsel for Plaintiff California Department of Forestry and Fire Protection's Office of State Fire Marshal*

JESSICA TUCKER-MOHL
Supervising Deputy Attorney General
MATTHEW STRUHAR (CA Bar Number: 293973)
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, California 95814-2951
Tel: (916) 210-7246
E-mail: Matthew.Struhar@doj.ca.gov
*Counsel for Plaintiff California Department of Parks and Recreation*

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that Plaintiffs People of the State of California ex rel. California Department of Forestry and Fire Protection's Office of the State Fire Marshal and California State Parks seek judicial notice of the attached documents under Federal Rule of Evidence 201.

The exhibits and the facts that they identify are the proper subject of judicial notice because the facts and documents are publicly available on government websites or otherwise in government records, including private party submissions to government agencies, and the facts for which they are relied upon here can be accurately and readily determined from these sources whose accuracy cannot reasonably be questioned. *See, e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (stating that it was appropriate to take judicial notice of information "made publicly available by government entities" on their websites where "neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein"); *Martinez v. Mead Johnson & Co.*, No. 5:22-cv-00213-JWH-SHK, 2022 WL 15053334, at *4 (C.D. Cal. Oct. 22, 2022) (finding that FDA guidance was judicially noticeable because it was "publicly available and it was disseminated by a government agency"); *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009) ("Information on government agency websites has often been treated as properly subject to judicial notice."); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice."). The documents to be judicially noticed are identified in the attached index.

Dated: March 16, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
ERIC M. KATZ
JESSICA TUCKER-MOHL
Supervising Deputy Attorneys General

*/s/ Michael S. Dorsi*
MICHAEL DORSI
Deputy Attorney General
*Counsel for Plaintiffs State of California, et al.*

**DECLARATION OF AUTHENTICATION**

As the attorney who prepared this Declaration, I attest that I compiled the attached exhibits and confirmed their authenticity by obtaining the documents from official government websites or from government employees with knowledge of their authenticity.

*/s/ Michael S. Dorsi*
MICHAEL DORSI
Deputy Attorney General

# INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A: | Petition for Review filed by California on January 23, 2026 |
| Exhibit A-1: | PHMSA Preemption Letter, dated December 17, 2025 |
| Exhibit A-2: | PHMSA Restart Plan Approval, dated December 22, 2025 |
| Exhibit A-3: | PHMSA Special Permit, dated December 23, 2025 |
| Exhibit B: | Complaint, *Pacific Pipeline Company v. California* (Kern County) (*Exhibits to Complaint omitted*), filed September 29, 2025 |
| Exhibit C: | OSFM Response to Motion for Reconsideration of Preliminary Injunction (Santa Barbara County Superior Court), filed February 1, 2026 |
| Exhibit D: | Opinion by Office of Legal Counsel, United States Department of Justice, titled Preemptive Effect of Defense Production Act Order on State Law, 50 Op. O.L.C. ___ (Mar. 3, 2026) |
| Exhibit E: | Sable Assumption Agreement, dated February 19, 2024 |
| Exhibit F: | Notice of Entry of Orders re Preliminary Injunction, Preliminary Injunction entered on July 29, 2025, Notice of Entry docketed February 27, 2026 |
| Exhibit G: | Selected Pages from Answer by Sable Offshore Corp and Pacific Pipeline Company, filed on September 17, 2025 |
| Exhibit H: | Letter from PHMSA to OSFM re Intrastate Designation, dated May 18, 2016 |
| Exhibit I: | State Waiver for CA-324 |
| Exhibit J: | State Waiver for CA-325 |
| Exhibit K: | OSFM letter to Sable re Tool Tolerance, dated October 22, 2025 |
| Exhibit L: | Sable letter to OSFM re Tool Tolerance, dated October 23, 2025 |
| Exhibit M: | Sable letter to PHMSA re Interstate Designation, dated November 26, 2025 |
| Exhibit N: | Minute Order Denying Motion for Reconsideration of Preliminary Injunction (Santa Barbara County Superior Court), entered February 27. 2026 |
| Exhibit O: | Letter from Sable to OSFM by which “Sable hereby relinquishes, surrenders and abandons the State Waivers,” sent February 26, 2026 |
| Exhibit P: | Sable Announcement of Resumption of Oil Flow, dated March 16, 2026 |
| Exhibit Q: | Secretary of Energy Order under Defense Production Act, dated March 13, 2026 |

# Exhibit E

**ExxonMobil Pipeline Company LLC**
22777 Springwoods Village Parkway
Spring, Texas 77389

February 19, 2024

***Via Electronic Delivery***

Mr. Joshua Cleaver
Staff Counsel
Legal Services Office
California Department of Forestry and Fire Protection
P.O. Box 944246
Sacramento, California 94244
joshua.cleaver@fire.ca.gov

See Attached Service List

**Re: Civil Action No. 2:20-CV-02415 Consent Decree**
**DOJ Case #90-5-1-1-1130**
**Notification of Transfer of Assets**

Mr. Cleaver:

In accordance with Section XVIII, Paragraph 89, of the above referenced Consent Decree, Exxon Mobil Pipeline Company LLC, and its affiliate, Mobil Pacific Pipeline Company, hereby provide notice to the California Department of Forestry and Fire Protection's Office of the State Fire Marshal, of the transfer of certain assets subject to the Consent Decree. All terms used but not defined herein shall have the meanings given such terms in the Consent Decree.

On February 14, 2024, Mobil Pacific Pipeline Company, the exclusive shareholder of Pacific Pipeline Company, divested 100% of its interest in Pacific Pipeline Company to Sable Offshore Corp. Pacific Pipeline Company owns Line 901 and the Gaviota to Pentland segment of Line 903 and all associated personal property related to these lines (collectively, the Assets). Enclosed for your records is a copy of the executed Consent Decree Assumption Agreement whereby Sable Offshore Corp. has agreed to be bound by the provisions of the Consent Decree and Appendices B and D thereof that are transferrable and specifically applicable to the Assets. Please direct future communications concerning the Assets and their corresponding Consent Decree obligations to:

Anthony Duenner
General Counsel
Sable Offshore Corp.
700 Milam St, Suite 3400
Houston, TX 77002
E-Mail: aduenner@sableoffshore.com

ExxonMobil Pipeline Company LLC and its affiliates, including but not limited to, Mobil Pacific Pipeline Company, retain no ownership interest in the Assets or responsibility for complying with the Consent Decree.

If you have any questions, please contact Rebekah Bennett, General Counsel, ExxonMobil Pipeline Company LLC at (346) 467-9756 or rebekah.r.bennett@exxonmobil.com.

Sincerely,

Andrew Craig
Venture Manager
ExxonMobil Pipeline Company LLC

Enclosure
Consent Decree Assumption Agreement

cc: Brian Carlin, ExxonMobil Pipeline Company LLC
Rebekah Bennett, ExxonMobil Pipeline Company LLC
Karah Brazell, ExxonMobil Pipeline Company LLC
Anthony Duenner, Pacific Pipeline Company and Sable Offshore Corp.

# SERVICE LIST: CONSENT DECREE CONTACTS OF RECORD

United States:
EES Case Management Unit
Environmental and Natural Resource Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C 20044-7611
Re: DJ # 90-5-1-1-1130
eescdcopy.enrd@usdoj.gov

PHMSA:
Joseph E. Hainline
Attorney-Advisor
Office of Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials
Safety Administration
1200 New Jersey Ave. SE. E-26
Washington, D.C. 20590
joseph.hainline@dot.gov

EPA:
Andrew Helmlinger
Supervising Attorney
U.S. EPA Region IX
75 Hawthorne Street (ORC-3)
San Francisco, California 94105
helmlinger.andrew@epa.gov

DOI:
Clare Cragan
U.S. Department of the Interior
Office of the Solicitor
755 Parfet St., Suite 151
Lakewood, Colorado 80215
clare.cragan@sol.doi.gov

NOAA:
National Oceanic and Atmospheric
Administration
Office of General Counsel
Natural Resources Section
ATTN: Christopher J. Plaisted
501 W. Ocean Blvd, Suite 4470
Long Beach, California 90802
christopher.plaisted@noaa.gov

USCG:
Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center,
US Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, D.C. 20593-7605
patricia.v.kingcade@uscg.mil

State Agencies:
Michael Zarro
Deputy Attorney General
Office of the Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 11220
Los Angeles, California 90013
michael.zarro@doj.ca.gov

CDFW:
California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Eric B. Milstein
Assistant Chief Counsel
P.O. Box 944209
Sacramento, California 94244-2090
eric.milstein@wildlife.ca.gov

CDPR:
California Department of Parks and Recreation
Attn: Laura A. Reimche, Senior Counsel
1416 Ninth Street, Room 1404-6
Sacramento, California 95814
Laura.Reimche@parks.ca.gov

CSLC:
California State Lands Commission
Legal Division
Attn: Warren L. Crunk,
Assistant Chief Counsel
100 Howe Avenue, Suite 100-South
Sacramento, California 95825
warren.crunk@slc.ca.gov

OSFM:
California Department of Forestry and Fire Protection
Legal Services Office
Attn: Joshua Cleaver, Staff Counsel
P.O. Box 944246
Sacramento, California 94244-2460
joshua.cleaver@fire.ca.gov

RWQCB:
California Central Coast Regional Water
Quality Control Board
Office of Enforcement
Attn: Naomi Rubin, Attorney III
801 K Street, Suite 2300
Sacramento, California 95814
naomi.rubin@waterboards.ca.gov

UC:
Barton Lounsbury, Managing Counsel
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, California 94607
barton.lounsbury@ucop.edu

# CONSENT DECREE ASSUMPTION AGREEMENT

This CONSENT DECREE ASSUMPTION AGREEMENT (this "***Agreement***"), dated as of February 14, 2024 (the "***Effective Date***"), is made and entered into by and between Mobil Pacific Pipeline Company, a Delaware corporation ("***Seller***"), Pacific Pipeline Company, a Delaware corporation ("***PPC***") and Sable Offshore Corp., a Delaware corporation ("***Buyer***").

## WITNESSETH:

**WHEREAS**, reference is made herein to that certain Consent Decree issued by the United States District Court for the Central District of California in relation to Civil Action No. 2:20-cv-02415 (*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*) (the "***Consent Decree***"), a copy of which was provided to Buyer on January 18, 2024;

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated November 1, 2022, by and between Seller and Buyer (the "***Purchase Agreement***") and those certain instruments of sale, assignment, transfer and conveyance executed in connection with the Purchase Agreement, Buyer has acquired one hundred percent (100%) of the issued equity of PPC from Seller.

**WHEREAS,** PPC is the owner of Line 901 (as defined in Consent Decree) and the segment of Line 903 (as defined in the Consent Decree) from Gaviota pump station to Pentland pump station (collectively, the "***Assets***") pursuant to that certain Purchase and Sale Agreement dated October 10, 2022 between Plains Pipeline, L.P. ("***Plains***") and PPC;

**WHEREAS,** Paragraphs 88-89 of the Consent Decree require that PPC agree to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets, unless Seller has already completed the required action or unless the California Department of Forestry and Fire Protection's – Office of the State Fire Marshal (and any of its successor departments or agencies) agrees to relieve Buyer of the obligations of any otherwise applicable provision, which agreement is evidenced by that certain Consent Decree Assumption Agreement dated October 13, 2022 between Plains and PPC (the "***PPC Assumption Agreement***"); and

**WHEREAS**, pursuant to this Agreement, Seller and Buyer intend to evidence Buyer's agreement to cause PPC to be bound by, and to affirm and acknowledge PPC's agreement to those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the acquired Assets as required by Paragraphs 88-89 of the Consent Decree.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth herein and in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller, PPC and Buyer hereby agree as follows:

1. Pursuant to Paragraphs 88-89 of the Consent Decree, PPC hereby agrees to be bound by those provisions of the Consent Decree and Appendices B and D thereof that are specifically applicable to the Assets.

2. From time to time, as and when requested by Seller, PPC shall execute and deliver, and Buyer shall cause to be executed and delivered by PPC, such documents and instruments and shall take, or cause to be taken, such further or other actions, as Seller or its successors and permitted assigns may reasonably deem necessary or desirable to comply with the Consent Decree, including Paragraphs 88-89 thereof.

3. This Agreement may be executed in one or more counterparts (including be means of facsimile or a portable document format (*.pdf)), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

4. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CHOICE OF LAW RULES WHICH MAY DIRECT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HERETO IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT HEREOF SHALL BE BROUGHT AND DETERMINED IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN HOUSTON, HARRIS COUNTY, TEXAS. EACH OF THE PARTIES HERETO HEREBY (I) IRREVOCABLY SUBMITS WITH REGARD TO ANY SUCH ACTION OR PROCEEDING TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE AFORESAID COURTS IN THE EVENT ANY DISPUTE ARISES OUT OF THIS AGREEMENT AND WAIVES THE DEFENSE OF SOVEREIGN IMMUNITY, (II) AGREES THAT IT SHALL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT OR THAT SUCH ACTION IS BROUGHT IN AN INCONVENIENT FORUM AND (III) AGREES THAT IT SHALL NOT BRING ANY ACTION RELATING TO THIS AGREEMENT IN ANY COURT OTHER THAN THE ABOVE COURTS. THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY A PARTY HERETO AGAINST THE OTHER PARTY IN ANY MATTER WHATSOEVER ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT.

5. This Agreement shall not be assigned by any party hereto without the written consent of the other party hereto, and nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

[*Signature Pages to Follow*]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**MOBIL PACIFIC PIPELINE COMPANY**

DocuSigned by:

By: David H. Welsh

6986AB144B9F46F...

Name: David H. Welsh

Title: President

*Signature Page to Consent Decree Assumption Agreement*

**PACIFIC PIPELINE COMPANY**

DocuSigned by:
By: Saul Flota
B9D9FB1AA64D410...

Name: Saul Flota

Title: Vice President

*Signature Page to Consent Decree Assumption Agreement*

**SABLE OFFSHORE CORP.**

By: DocuSigned by: 795CAB5F6771462...

Name: James C. Flores

Title: Chairman and Chief Executive Officer

# Exhibit 8

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 7/25/2025 TC

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
07/29/2025
Darrel E. Parker, Executive Officer
BY Chavez, Terri
Deputy Clerk

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,

Respondents/Defendants.

---

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest.

Case No.: 25CV02244

**~~[PROPOSED]~~ ORDER RE: PRELIMINARY INJUNCTION AND UNDERTAKING**

Hearing: July 18, 2025
Time: 10:00 a.m.
Dept.: 4
Judge: Hon. Donna D. Geck

Action Filed: April 15, 2025
Trial: None Set

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Talia Nimmer for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A**.

**IT IS SO ORDERED.**

DATED: ______________, 2025

**07/29/2025**

Donna D. Geck

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SANTA BARBARA

NOTICE: Effective September 1, 2025, the cost of e-filing will increase from $6.45 to $10.00 per envelope. For more information click here.

Notice: The court is aware of fraudulent messages and scams being sent to the public. For more information please click here.

# Center for Biological Diversity et al vs California Dept of Forestry and Fire Protection et al

## Case Number

25CV02244

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

CMC; OSC Preliminary Injunction; Motion to Compel; Motion to Strike

## Tentative Ruling

(1) The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2) On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3) The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4) For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1) OSC re Preliminary Injunction

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

**Background:**

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

“1. State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

“A. Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

“B. Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic

protection on Line 903. Plains must receive a State Waiver from the OSFM prior

to restarting Line 903.

“C. Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

“D. Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

"E. To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2. Replacement, Restart, or Abandonment of Lines 901 and 903:

"A. Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of

Plains.

"1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b. Conduct a close interval survey (CIS) and AC/DC interference survey.

"c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

"C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid*.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

(A) Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i) CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] … [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

(ii) Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

"General requirements.--A person owning or operating a pipeline facility shall--

"(1) comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2) prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3) allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4) conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1) Nonemergency waivers.--

"(A) In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id*. at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid*.) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id*. at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id*. at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid*.) The District Court dismissed these claims as well. (*Ibid*.)

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco*, *supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id*. at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

(iii) State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

(B) Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

(C) Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D) Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2) Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa
1100 Anacapa Street P.O. Box 21107
Santa Barbara, CA 93121-1107
US

# Exhibit 9

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

| | | | |
|---|---|---|---|
| Dated and Entered: | 04/17/2026 | Time: | 10:00 AM |
| Judicial Officer: | Donna D Geck | | |
| Deputy Clerk: | Preston Frye | Dept: | SB Dept 4 |
| Bailiff/Court Officer: | Eduardo Munoz | Case No: | 25CV02244 |
| Court Reporter: | Michele McNeil | | |

**Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al**

Parties Present:

| | |
|---|---|
| Dintzer, Jeffrey D | Attorney for Real Parties in Interest |
| Dorsi, Michael S | Attorney for Respondents |
| Krop, Linda J | Attorney for Petitioners Environmental Defense Center, Get Oil Oult!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center |
| Large, Trevor | Attorney for Real Parties in Interest |
| Stanton, Garrett B | Attorney for Real Parties in Interest |
| Nimmer, Talia | Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation |
| Frankel, Jeremy | Attorney for Petitioners Environmental Defense Center, Get Oil Outt!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center |
| Simmonds, Julie Teel | Attorney for Petitioner (via Zoom) |
| Roessler, Alicia | Attorney for Respondents |

**NATURE OF PROCEEDINGS*:* Ex Parte Hearing re Application for Enforcement of Preliminary Injunction and for an Order to Show Cause Why Real Parties in Interest Should not be Found in Contempt of Court; Ex Parte Hearing re Request for Immediate Recission of Preliminary Injunction**

The matter was called with appearances as stated above.

Mr. Dintzler, Mr. Dorsi, and Ms. Krop provided oral argument as to the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

# Tentative Ruling

1. (1) For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company to dissolve or modify the preliminary injunction issued in this case is denied.
2. (2) The application of petitioners for issuance of an order to show cause why real parties should not be found in contempt and to enter additional orders is continued to May 22, 2026.

These are two consolidated cases involving the same underlying incidents and activity.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

The court has reviewed all of the papers filed by the parties in reaching this decision. The discussion below provides background to understand the court's reasoning; the discussion is not intended to be a comprehensive summary of the facts or arguments of the parties.
**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)
In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator

"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)
On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id.* & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has

received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. The basis for this motion was the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On February 27, 2026, the court denied Sable's motion for reconsideration.

On March 16, 2026, petitioners filed their ex parte application for an order to show cause (OSC) why Sable should not be held in contempt for violating the preliminary injunction. Also on March 16, Sable filed their ex parte application for an order dissolving the preliminary injunction.

The court held a hearing on the two ex parte applications on March 17, 2026. Noting that the two applications raised issues too complex reasonably to address at an ex parte hearing, the court continued the hearing on both applications to this hearing date of April 17, allowing all parties to file supplemental briefs.

The parties have filed extensive papers both in connection with the original applications and as supplemental briefing.

**Analysis:**

(1) Requests for Judicial Notice

In support of its application, Sable requests that the court take judicial notice of the following documents: (Sable Request for Judicial Notice, filed Mar. 16, 2026 [Sable RJN], exhibit A) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; and (exhibit F) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)).
In further support of its application, Sable also requests that the court take judicial notice of the following documents: (Sable Second Request for Judicial Notice, filed Apr. 1, 2026 [Sable RJN2], exhibit H) Executive Order No. 14156 (90 Fed.Reg. 8433 (Jan. 20, 2025)); and (exhibit J) a minute order, dated

March 23, 2026, in *United States v. Plains All American Pipeline L.P.*, United States District Court for the Central District of California, case No. 2:20-cv-02415-SVW-SSC.
The court will grant judicial notice as to these documents, all of which constitute court records or official acts. (See Evid. Code, § 452, subds. (c), (d).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(2) Application to Dissolve Preliminary Injunction

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)
The party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

Sable argues that the order of the Secretary of Energy (Sable RJN, exhibit A) constitutes a material change justifying dissolution of the preliminary injunction order.

(A) Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for dissolution.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to

address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., dated Jan. 5, 2026, ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., dated Jan. 5, 2026, ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, filed Feb. 13, 2026, exhibit A; Simmonds decl., dated Jan. 6, 2026, ¶¶ 7-11 & exhibits F-J.)

In denying Sable's request for reconsideration or for modification or dissolution of the preliminary injunction on the grounds of the PHMSA actions, the court stated:

"Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

"The Federal Consent Decree provides, among other things, that 'Plains must receive a State Waiver from the OSFM prior to restarting Line 901.' (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

"The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree. " 'In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: "[C]onsent decrees 'have attributes both of contracts and of judicial decrees'; a dual character that has resulted in different treatment for different purposes." As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405], the issue before us is "not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both." [Citation.]' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

"For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

"As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts." (Minute Order, filed Feb. 27, 2026, pp. 8-9.)

After the court denied Sable's application on February 27, the President issued an Executive Order which was followed by an order (DPA Order) from the Secretary of Energy under the Defense Production Act of 1950 (DPA, 50 U.S.C. § 4501 et seq.). Sable's current application is based upon Sable's argument that the DPA Order preempts the preliminary injunction. Petitioners and OSFM dispute the effect of the DPA Order on the preliminary injunction.

(B) Defense Production Act

As set forth in the DPA Order: "Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (DPA Order, § IV(A).) The authority for this order, and the other orders in the DPA Order, is listed as section 101 of the DPA. (DPA Order, § I.)

Section 101 of the DPA is codified in title 50 United States Code section 4511. (See 64 Stat. 799, ch. 932 (Sept. 8, 1950).)

"The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a).)

"(1) Notwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

"(2) The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that--

"(A) such materials, services, and facilities are scarce, critical, and essential--

"(i) to maintain or expand exploration, production, refining, transportation;

"(ii) to conserve energy supplies; or

"(iii) to construct or maintain energy facilities; and

"(B) maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

"(3) During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period." (50 U.S.C. § 4511(c).)

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under subchapter I of this chapter or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner." (50 U.S.C. § 4557.)

(C) Preemption

Sable argues that the DPA Order is inconsistent with the preliminary injunction and therefore the preliminary injunction is preempted by the federal order. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) " ' "[C]ourts are

reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' [Citations.]" (*Ibid*.)

In order to consider this issue, it is important to re-emphasize the limited scope of the court's preliminary injunction. The court determined to enter the preliminary injunction based upon its conclusion that the Federal Consent Decree by its terms requires that Sable, whose rights to use the Las Flores Pipelines are derivative of Plains, obtain State Waivers from the OSFM. The entry of the preliminary injunction rested upon noncompliance of the OSFM to the required State Waivers.

By design, performance consistent with the Federal Consent Decree is performance permitted under the preliminary injunction. Correspondingly, there is no conflict between the Federal Consent Decree and the preliminary injunction. The conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree. To the extent that the Federal Consent Decree is binding on the parties, there is no preemption issue.

(D) DPA Order and the Federal Consent Decree

The parties have informed this court of the multiple actions and proceedings pending in the federal courts regarding the operation of the Las Flores Pipelines, including particularly efforts to modify the Federal Consent Decree. Nonetheless, in the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines. Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.

As quoted above, the DPA is concerned with allocation of resources and performance of contracts. This is backed by the immunity provision of section 4557. Two cases are instructive as to the scope of the DPA in the present context, *Hercules Inc. v. U.S.* (Fed. Cir. 1994) 24 F.3d 188 (*Hercules*), affirmed on other grounds (1996) 516 U.S. 417 [116 S.Ct. 981, 134 L.Ed.2d 47], and *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803 (*Vertac*).

In *Hercules*, plaintiff chemical manufacturers of Agent Orange (a defoliant used for military purposes during the Vietnam War) were involved in numerous tort actions filed by Vietnam veterans and their families alleging that the veterans' exposure to components in Agent Orange caused cancer and other health problems. (*Hercules*, *supra*, 24 F.3d at p. 191.) Following settlement of the tort actions, the plaintiffs brought an action against the United States in the Claims Court seeking indemnification for their respective contributions to the settlement. (*Id*. at p. 193.) The Claims Court held for the United States. (*Id*. at pp. 195-196.) Among other things, the Claims Court "rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA [now, 50 U.S.C. § 4557], because that section merely 'excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA.' [Citation.]" (*Id*. at p. 195.)

In affirming the judgment of the Claims Court, the Federal Circuit in *Hercules* stated:

"The language of section 101(a) [now, 50 U.S.C. § 4511(a)] makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled 'Priority in contracts and orders.' Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is 'for the purpose of assuring ... priority.' Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA

contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

“Once a contractor has been compelled to accept a national defense contract under section 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

“As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:
“ [‘]When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.[’]

“[Citations.] To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.
“Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination ‘against contracts to which priority is assigned ...,’ reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered ‘commercially impracticable’ by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. [Citation.] We also agree with the district court, [citation], that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. [Citation.]” (*Hercules*, *supra*, 24 F.3d at pp. 203–204.)
As explained in *Vertac*, back in 1967, the United States issued a DPA directive ordering a chemical company to accelerate its production and delivery of Agent Orange. (*Vertac*, *supra*, 46 F.3d at p. 807.) As a result, the chemical company devoted all of its efforts at its Jacksonville, Arkansas, facility to producing Agent Orange. (*Ibid*.) The production of Agent Orange produces hazardous waste, which the chemical company buried on-site. (*Ibid*.) Much later, the United States brought a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.) because of the disposal of waste at the Jacksonville facility. (*Vertac*, *supra*, at pp. 805-806.) Among other things, the District Court held as a matter of law that the chemical company was not entitled to immunity under the DPA. (*Id*. at p. 807.)
On appeal in *Vertac*, the chemical company argued that “the language of § 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude [the chemical company’s] CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of § 707 is not clear and unambiguous and that the interpretation advanced by [the chemical company] would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract.” (*Vertac*, *supra*, 46 F.3d at p. 812.)
The *Vertac* court agreed with *Hercules*, *supra*, that “ ‘the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA.’ [Citation.]” (*Vertac*, *supra*, 46 F.3d at p. 812.) The *Vertac* court thus held that the immunity of section 707 did not shield the chemical

company from liability it may have under CERCLA arising out if its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by section 101(a). (*Ibid.*)
In both *Hercules* and *Vertac*, the federal circuit courts held that the scope of immunity under current section 4557 only extends to the risk imposed by section 4511(a) in prioritizing contracts with the United States pursuant to a DPA order. Nothing in section 4511 or, by implication, in section 4557, permits a party subject to a DPA Order to violate other laws, especially including applicable other federal law. Moreover, the reasoning of *Hercules* and *Vertac* strongly implies that the DPA order, by itself, does not permit the violation of applicable state regulatory law—for example, no one suggests that Sable could steal materials or money to fulfill a DPA order without state law consequence under the section 4557 immunity.

There is now, albeit subject to pending proceedings, a binding federal judgment in the Federal Consent Decree which requires favorable action by the OSFM before Sable is permitted to restart the Las Flores Pipelines. As construed by the federal courts, a DPA Order does not by itself permit violation of other federal law to accomplish the goals of the DPA Order. Consequently, in the present procedural posture of the requirements binding on Sable, Sable continues to be obligated to the requirements of the Federal Consent Decree. The DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction.

(E) Mootness

Sable also argues that this matter, and the preliminary injunction in particular, is moot because Sable has voluntarily relinquished the State Waivers and the preliminary injunction is premised on the procedures involved with the State Waivers. This argument fails to persuade that the preliminary injunction should be dissolved for two reasons. First, Sable admittedly has not abandoned the project of restarting the Las Flores Pipelines. For the reasons explained above, under the Federal Consent Decree, Sable remains required to obtain approvals from the OSFM. In order to implement the restart project consistent with the Federal Consent Decree, the sufficiency of the OSFM's procedures remain at issue. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [absent abandonment of project, effective relief may still be awarded].) Sable's argument for mootness depends upon its argument that the OSFM can have no further involvement in the project. Under the current procedural posture of the project, the OSFM remains involved.

Second, in granting the preliminary injunction on a limited basis, the court partially agreed with Sable that much of the basis for petitioners' claims were premature because Sable remained engaged in obtaining authorization required under the Federal Consent Decree. Given the continuing requirements of the Federal Consent Decree and the voluntary relinquishment of the State Waivers by Sable, it is unclear that petitioners' other claims are now premature. Again, Sable's argument begins and ends with state law playing no further part in the project. Since the OSFM is bound by state law procedures, in the present circumstances, essential parts of state procedures are incorporated into the Federal Consent Decree. Sable has not persuasively shown that subsequent events make this matter moot and so warrant dissolution of the preliminary injunction.

(F) Conclusion

The court is mindful that there are many moving judicial and administrative parts relating to the restart of the Las Flores Pipelines. Sable has not persuaded the court that the DPA Order renders compliance with Federal Consent Decree unnecessary. The Federal Consent Decree requires approvals from the OSFM, which in turn must comply with state procedures in granting such approvals. Sable has not met its burden to show that the preliminary injunction should be dissolved or modified. Sable's motion will therefore be denied.

(3) Application for Order to Show Cause re Contempt

As discussed above, the court makes its position clear as to the current vitality of the preliminary injunction in light of recent events. Considering this position, the court is deeply concerned with noncompliance with the preliminary injunction. At the same time, the court is again mindful of the pendency of numerous other proceedings bearing on the Las Flores Pipelines. The court concludes that the most reasonable approach to addressing compliance with the injunction is to continue the hearing on the application for the order to show cause to allow the parties to take whatever steps they deem appropriate based upon this court's conclusions on the status of the preliminary injunction.

*Future Scheduled Hearings:*
May 22, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER

Minutes Prepared by:

Preston Frye, Deputy

# Exhibit 10

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY Gavin Newsom, Governor

**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

October 22, 2025

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT: STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A B**

Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM s review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled Immediate Repair Conditions and 180-Day Repair Conditions. Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth. Footnotes 7 and 9 further

clarify that remediation means a permanent repair method. The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.

Sincerely,

DANIEL BERLANT
State Fire Marshal

cc: James Hosler, OSFM, Assistant Deputy Director
Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
Joshua Cleaver, CAL FIRE, Staff Counsel

# Exhibit 11

EX-99.1 2 sablelasflores_121725.htm EX-99.1

U.S. Department
of Transportation

**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue SE
Washington, D.C. 20590

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY Digitally signed by LINDA GAIL DAUGHERTY Date: 2025.12.17 07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety

cc: James Hosler, Chief, Pipeline Safety Division, OSFM
Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 12

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
2/26/2026 2:34 PM
By: Terri Chavez , Deputy

Jeffrey D. Dintzer (SBN: 139056)
Garrett B. Stanton (SBN: 324775)
**ALSTON & BIRD, LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Tel: (213) 576-1000; Fax: (213) 576-1100
Jeffrey.Dintzer alston.com
Garrett.Stanton alston.com

Duncan Joseph Moore (SBN: 233955)
Benjamin J. Hanelin (SBN: 237595)
Natalie C. Rogers (SBN: 301254)
**PAUL HASTINGS LLP**
1999 Avenue of Stars, 27th Floor
Century City, CA 90067
Tel: (310) 620-5879; Fax: (310) 620-5899
djmoore paulhastings.com
benjaminhanelin paulhastings.com
natalierogers paulhastings.com

Trevor D. Large (SBN: 214886)
Victoria C. Diffenderfer (SBN: 350018)
**FAUVER LARGE ARCHBALD & SPRAY**
820 State Street, 4th Floor
Santa Barbara, CA 93101
Tel: (805) 966-7000; Fax: (805) 966-7227
tlarge flasllp.com
vdiffenderfer flasllp.com

Attorneys for Real Parties in Interest
SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10; inclusive,<br><br>Respondents/Defendants. | Case No.: 25CV02244<br>[Consolidated with 25CV02247]<br><br>**SECOND SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION**<br><br>Date: February 27, 2026<br>Time: 10:00 a.m.<br>Dept.: 4<br><br>Complaint Filed: April 15, 2025<br><br>[Assigned for Purposes to the Honorable Donna D. Geck, Dept. 4] |

SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,

Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a California non-profit corporation; GET OIL OUT , a California non-profit corporation; SANTA BARBARA COUNTY ACTION NETWORK, a California non-profit corporation; SIERRA CLUB, a national non-profit corporation; and SANTA BARBARA CHANNELKEEPER, a California non-profit corporation,

Petitioners/Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, an agency of the State of California; OFFICE OF THE STATE FIRE MARSHAL, an agency of the State of California; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 to 10; inclusive,

Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware Corporation, and PACIFIC PIPELINE COMPANY, a Delaware Corporation.

Real Parties in Interest.

Case No.: 25CV02247

# SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER

I, Jeffrey D. Dintzer, declare as follows:

1. I am an attorney duly licensed to practice law before all courts of the State of California and am a partner at Alston & Bird LLP, attorneys of record for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (hereinafter collectively referred to as "Sable"). I make this declaration in support of Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company's Motion for Reconsideration of Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and if called as a witness, could and would testify competently to them.

2. I am familiar with the case files for these matters. The files for these matters are kept at my shared direction in a secure electronic format at the offices of Alston & Bird LLP. Legal assistant Kim Niz and various associates maintain these files on a server at Alston & Bird.

3. In preparing this declaration, others at my direction retrieved the true and correct copy of the documents described below and prepared them for inclusion in my declaration.

4. On February 26, 2026, Sable sent a letter to Daniel Berlandt, State Fire Marshal, relinquishing, surrendering, and abandoning the State Waivers issued by the Office of the State Fire Marshal on December 17, 2024 with respect to Segments CA-324 and CA-325 of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325). A true and correct copy of Sable's February 26, 2026 letter is attached hereto as **Exhibit A**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 26th day of February, 2026, in Los Angeles, California.

By: [signature]
Jeffrey D. Dintzer

# EXHIBIT A

PAUL HASTINGS

1(310) 620-5779
djmoore@paulhastings.com

February 26, 2026

Daniel Berlant, State Fire Marshal

California Department of Forestry and Fire Protection
715 P Street
Sacramento, CA 94244
calfire.statefiremarshal@fire.ca.gov

Re: Sable – Relinquishment of State Waivers

Dear Fire Marshal Berlant:

As you know, our firm has represented Sable Offshore Corp. and Pacific Pipeline Company (collectively, Sable) in matters before the Office of the State Fire Marshal (OSFM) regarding Segments CA-324 (OSFM Line ID 0015) and CA-325 (OSFM Line ID 0001) of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325A/B). On behalf of Sable, I am writing to you with regard to the "State Waivers" issued by OSFM on December 17, 2024, with respect to Segments CA-324 and CA-325.

Although Sable has complied with the terms of the State Waivers, Sable has not exercised any rights or privileges under the State Waivers since they were issued. On December 17, 2025, the federal Pipeline & Hazardous Materials Safety Administration (PHMSA) notified Sable that it concurred in Sable's determination that the Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is an interstate pipeline facility under the Pipeline Safety Act, and that the Santa Ynez Pipeline System is therefore "subject to the regulatory oversight of PHMSA" rather than that of OSFM.[1] On December 23, 2025, PHMSA issued an emergency special permit with respect to Segments CA-324 and CA-325, which included conditions that are "substantially the same" as those included in OSFM's State Waivers, and reconfirmed that "PHMSA has exclusive pipeline safety regulatory authority" over Segments CA-324 and CA-325.[2] PHMSA has since confirmed again that the "California [OSFM] issued [the State W]aivers before PHMSA assumed regulatory jurisdiction," and because "States cannot regulate interstate pipelines … Sable may not rely on [OSFM's State W]aivers."[3]

Because Segments CA-324 and CA-325 are now subject to PHMSA's exclusive jurisdiction under the federal Pipeline Safety Act, Sable has determined it is appropriate to relinquish its rights under OSFM's previously issued State Waivers. Therefore, by this letter and effective immediately, Sable hereby relinquishes, surrenders and abandons the State Waivers.

//

[1] PHMSA, Letter to J. Caldwell Flores, "Determination of Interstate Classification" (Dec. 17, 2025).
[2] PHMSA, Docket No. PHMSA-2025-1502, Emergency Special Permit (Dec. 23, 2025).
[3] *Environmental Defense Center v. Pipeline & Hazardous Materials Safety Administration*, 9th Cir. Case No. 25-8059, Federal Respondents' Opposition to Emergency Stay Motion (Dec. 30, 2025), p. 18.

PAUL
HASTINGS

February 26, 2026
Page 2

Please do not hesitate to contact me with any questions.

Sincerely,

Duncan Joseph Moore
of PAUL HASTINGS LLP

CC:
James Hosler, Assistant Deputy Director, OSFM
Linda Gail Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA
Josh Cleaver, Staff Counsel, OSFM
J. Caldwell Flores, President, Sable Offshore Corp.
Anthony Duenner, General Counsel, Sable Offshore Corp.

LEGAL_US_W # 185921873.7

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On February 26, 2026, I served the document **SECOND SUPPLEMENTAL DECLARATION OF JEFFREY D. DINTZER IN SUPPORT OF REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION FOR RECONSIDERATION OF PRELIMINARY INJUNCTION** on the interested parties in this action addressed as follows: **See Attached Service List**

1. BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 26, 2026, at Los Angeles, California.

/s/ *Kim Niz*
Kim Niz

**SERVICE LIST**

| | |
|---|---|
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>**CENTER FOR BIOLOGICAL DIVERSITY**<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds biologicaldiversity.org<br>dpettit biologicaldiversity.org<br>tnimmer biologicaldiversity.org | *Attorneys for Petitioners: Center for Biological Diversity and Wishtoyo Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore paulhastings.com<br>benjaminhanelin paulhastings.com<br>natalierogers paulhastings.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD & SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge flasllp.com<br>vdiffenderfer flasllp.com | *Attorneys for Real Parties in Interest: Sable Offshore Corp. and Pacific Pipeline Company* |
| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>**ENVIRONMENTAL DEFENSE CENTER**<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop environmentaldefensecenter.org<br>jfrankel environmentaldefensecenter.org<br>trengifo environmentaldefensecenter.org | *Attorneys for Petitioners: Environmental Defense Center, a California non-profit corporation; Get Oil Out!, a California non-profit corporation, Santa Barbara County Action Network, a California non-profit corporation, Sierra Club, a national non-profit corporation, and Santa Barbara Channelkeeper, a California non-profit corporation* |

| | |
|---|---|
| Michael S. Dorsi, Esq.<br>**CALIFORNIA ATTORNEY GENERAL'S OFFICE**<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Tel.: (415) 510-3802<br>Michael.dorsi doj.ca.gov | *Attorneys for Respondents/Defendants: California Department of Forestry and Fire Protection, Office of the State Fire Marshal, Daniel Berlant (in his official capacity as State Fire Marshal)* |

# Exhibit 13

(Slip Opinion)

# Preemptive Effect of Defense Production Act Order on State Law

Presidential orders issued as an exercise of congressionally delegated authority or the President's constitutional powers have the force of federal law under the Supremacy Clause and may preempt state law.

An order issued pursuant to the Defense Production Act may preempt state laws expressly or by conflict.

An order issued pursuant to the Defense Production Act may displace sanctions for non-compliance with a contrary consent decree, even if that consent decree rests on federal-law claims.

March 3, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF ENERGY

Sable Offshore Corp. ("Sable") is the lessee and operator of the Santa Ynez Unit ("SYU"), an offshore oil and gas unit located in federal waters off the coast of California. Sable and the Department of the Interior are updating a previously approved Development and Production Plan, which would allow for continuous production on the SYU to address energy vulnerabilities on the West Coast. But, according to Sable, the State of California has impeded it from operating the SYU and transporting production through the Santa Ynez Pipeline System.

You have asked whether an order issued under the Defense Production Act of 1950 ("DPA" or "Act"), Pub. L. No. 81-774, 64 Stat. 798 (codified as amended at 50 U.S.C. § 4501 *et seq.*), to Sable by the President or his delegee would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure. We conclude that it would. An order issued as an exercise of congressionally delegated authority or the President's constitutional powers has the force of federal law under the Supremacy Clause and may preempt contrary state law. Because the DPA authorizes the President to order certain actions that may otherwise be prohibited by state law, an order issued pursuant to the DPA could preempt those laws expressly or by conflict. That is true regardless of the form of the President's order, although we refer in this memorandum to executive orders for simplicity. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive*

*Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order.").[1]

## I.

### A.

On January 20, 2025, President Trump declared a national emergency related to the Nation's energy supply and infrastructure. *See generally* Exec. Order No. 14156. The President determined that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* § 1. "These numerous problems," the President emphasized, "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs." *Id.*

The President directed the heads of executive departments and agencies to wield "any lawful emergency authorities available to them" to bolster the "production, transportation, refining, and generation of domestic energy resources." *Id.* § 2(a). "If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the

[1] President Obama delegated Title I authority under the DPA to the Secretary of Energy for all energy-related matters. *See* Exec. Order No. 13603 (2012). For convenience, we refer in this memorandum to determinations made, and orders given, by the President, even though that authority has been lawfully delegated to the Secretary. We note that an executive order issued by President Trump provides that if an agency seeks to invoke the DPA, it "shall submit recommendations for a course of action to the President." Exec. Order No. 14156 § 2(a) (2025). This language does not, however, impliedly limit the scope of the power delegated by the President to the Secretary. The provisions of each executive order are not "in irreconcilable conflict," nor is President Trump's order "clearly intended as a substitute" for President Obama's delegation. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (cleaned up). Instead, President Trump's order provides only that the Secretary should submit a recommendation to the President before wielding delegated authority. *See* Exec. Order No. 14156 § 2(a). The Secretary could, for instance, recommend that the Secretary himself—rather than the President—issue a DPA order. And nothing in President Trump's executive order requires the President's affirmative approval of a recommendation before the Secretary acts. *See generally id.*

President . . . ." *Id.* (internal citation omitted). The President also instructed agencies to expedite the completion of energy infrastructure, including by "facilitat[ing] the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

**B.**

The SYU—which Sable leases and operates—is a critical energy resource on the West Coast. Located in federal waters in the Pacific Ocean, it is the largest known offshore oilfield in the United States. *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1 (Dec. 12, 2025) ("Sable Letter").[2] It has an estimated 904 million barrels in place, and from 1981 to 2014, it produced more than 670 million barrels of oil. *Id.*

For most of the SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. *Id.* at 2. From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System. *Id.* This network of on- and offshore pipelines is known as the Santa Ynez Pipeline System. *Id.* Currently, Sable and the Department of the Interior are updating a previously approved Development and Production Plan to address West Coast energy vulnerabilities. *Id.* at 1–2.

But according to Sable, the State of California is impeding it from resuming transportation of SYU production through the Santa Ynez Pipeline System. Sable reports that "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations." *Id.* at 6.

---

[2] For purposes of this advice, we accept the veracity of the factual statements set forth in Sable's letter, although we are not presently in a position to verify their accuracy.

Sable has thus requested the Secretary of Energy ("Secretary") to make necessary findings under the DPA and issue an order "requiring Sable to operate the Santa Ynez Unit and the Santa Ynez Pipeline System to maximize domestic energy production." *Id.* at 9. In Sable's view, such an order would conflict with—and therefore preempt—California state law. *Id.* at 6.

## II.

Preemption doctrine derives from the constitutional hierarchy established by the Supremacy Clause. That clause provides that "the Laws of the United States," as well as the Constitution and treaties, "shall be the supreme Law of the Land," notwithstanding "any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. The Supremacy Clause thus enshrines two principles into our legal system: It places federal law above state law in the constitutional hierarchy, and it establishes a choice-of-law rule that federal law must prevail whenever it conflicts with state law. The Supreme Court has "identified three different types of preemption—conflict, express, and field—but all of them work in the same way." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (cleaned up). Federal law typically "imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* At times, federal law "might appear to operate directly on the States," such as in the form of an express preemption provision, but such provisions operate "just like any other federal law with preemptive effect" by conferring on private entities "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79.

We first explain that an executive order may preempt state law when the President is empowered by the Constitution or statute to regulate private parties or where state law would otherwise conflict with a lawful exercise of the President's official powers. We then describe the two primary ways in which executive orders might displace state law—expressly or by conflict.

**A.**

The Constitution vests the entire executive power in a single President, whose "duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024) (quoting *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020)). The President's authority to wield these powers "necessarily stems either from an act of Congress or from the Constitution itself." *Id.* (cleaned up) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Constitution that the President must defend, and the federal laws that he must execute, are "the supreme Law[s] of the Land." U.S. Const. art. VI, cl. 2; *see also id.* art. II, § 1, cl. 8; *id.* art. II, § 3. Of course, "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).

The power of executive agencies—literally, the Chief Executive's agents—to preempt state law is well understood. Congress may authorize executive agencies to promulgate regulations that "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (citation and internal quotation marks omitted). "This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." *Id.* at 295–96. Put simply, when agencies issue regulations implementing federal statutes, those regulations are fully clothed in "the Laws of the United States" for purposes of preemption and therefore can displace contrary state law. U.S. Const. art. VI, cl. 2. To be sure, an agency's power to preempt state law is not unlimited. "[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (cleaned up). But within the confines of delegated authority, executive preemption of state law is an unremarkable feature of our governmental structure.

This logic applies *a fortiori* to the President, who is the head of the Executive Branch and wields independent constitutional powers that agencies lack on their own. Regardless of whether the President derives his authority from statute or directly from the Constitution, he wields a piece

of federal sovereignty itself, so long as he acts within the bounds of his authority. States thus lack the power to impede the exercise of the President's official powers, as to do so would be to interfere with the United States itself. *See, e.g.*, *Tarble's Case*, 80 U.S. (13 Wall.) 397, 403–04 (1872) (holding that this rule applies "whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *see also In re Neagle*, 135 U.S. 1, 75 (1890) (holding that California murder law could not be applied to prosecute a federal officer "for an act which he was authorized to do by the law of the United States"). The Constitution's command that federal law prevails over contrary state law thus necessarily entails that valid presidential action preempts and displaces conflicting state law. *See In re Neagle*, 135 U.S. at 62 ("While [the federal government] is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."); *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) (concluding that executive agreements, which do not require congressional approval, "are fit to preempt state law, just as treaties are").

Presidential preemption is most likely to arise when "the President acts pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J., concurring). In such circumstances, the President's authority to regulate "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* That is, when Congress authorizes the President to act, the President may do so in a way that shunts aside conflicting state enactments, provided he acts within the scope of the congressional authorization or his independent constitutional authority.

Like regulations issued by agencies, executive orders authorized by the Constitution or a federal statute may preempt state law. As the Supreme Court has explained, executive orders "may create rights protected against inconsistent state laws through the Supremacy Clause," especially when such orders are issued pursuant to "congressional authorization." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 635–37 (Jackson, J., concurring)). Our Office, too, has long recognized an executive order "can of course have the force and effect of law," "particularly" if it "rests on specific statutory authority." Memorandum for Phyllis Coven, Deputy Associate Attorney General, Office of the

Associate Attorney General, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re:* Matter of Chu *and* Matter of Tsun at 17 n.15 (July 1, 1993). Thus, when an executive order is authorized by the Constitution or a federal statute (or both), "it can be enforced by the government against private parties and may preempt conflicting state law." Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 551 (2005) (footnotes omitted); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 171 (D.D.C. 2025).

Importantly, Congress need not mention preemption by name when authorizing the President to displace state law. Rather, Congress may authorize the President to preempt state law simply by conferring upon him regulatory power. *See, e.g.*, *Letter Carriers*, 418 U.S. at 273 n.5. When determining whether Congress has delegated such authority to the Executive Branch, courts simply "interpret the statute," "without any presumption one way or the other" about preemption. *FERC*, 535 U.S. at 18. "In other words, we must interpret the statute to determine whether Congress has given [the Executive Branch] the power to act," using ordinary principles of statutory interpretation. *Id.* As with any statute authorizing the Executive Branch to regulate pursuant to flexible statutory terms, courts must identify "the best reading of [the] statute" and "effectuate the will of Congress" as expressed by the text. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In sum, executive orders may preempt state law when the President's regulatory power stems from either congressional authorization or the Constitution itself.

**B.**

Executive orders, like statutes, may preempt state law in one of two ways: expressly or by implication.

Start with express preemption, which operates "through express language" in a presidential order or statute declaring certain state laws preempted. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015); *see, e.g.*, *Preemption of State and Local Requirements Under a PREP Act Declaration*, 45 Op. O.L.C. __, at *4–10 (Jan. 19, 2021). In some prior cases, the Court would begin its preemption analysis "with the assumption

that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," especially when Congress "legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up). Today, however, at least when a "statute contains an express pre-emption clause," the Court does "not invoke any presumption against preemption but instead focus[es] on the plain wording of the clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).[3] Of course, the existence of an express preemption clause "does not immediately end the inquiry" into a federal law's preemptive effect. *Altria Grp.*, 555 U.S. at 76. "[T]he question of the substance and scope of [the] displacement of state law still remains." *Id.* Determining the scope of an express preemption provision turns on "the plain wording of the clause." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation omitted).

Although express preemption clauses often "appear to operate directly on the States," their preemptive effect in truth operates by conferring on private parties "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478–79. Federal law regulating medical devices intended for human use, for example, expressly preempts state law by declaring that no state may establish "any requirement . . . which is different from, or in addition to, any requirement applicable under this chapter to the device." 21 U.S.C. § 360k(a). This provision appears to operate directly on states, but it actually confers on medical-device manufacturers a federal right to be free from requirements other than those imposed by the federal government.

Implied preemption operates in much the same way. "This mechanism is shown most clearly in cases involving 'conflict preemption.'" *Murphy*, 584 U.S. at 478. When federal law confers a right or imposes a restriction on regulated parties, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Thus, "when a regulated party cannot comply with both federal

[3] *See also, e.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). *But see AbbVie, Inc. v. Fitch*, 152 F.4th 635, 645 (5th Cir. 2025) (per curiam) (continuing to apply the presumption); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767–68 (9th Cir. 2025) (same).

and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 145 S. Ct. 1689, 1700 (2025); *see also Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019). The Supreme Court has found conflict preemption where, for example, it was impossible for a pharmaceutical company to "comply with both its state-law duty to strengthen the warnings" on the label for one of its drugs "and its federal-law duty not to alter" the label for that same drug. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

There are other forms of implied preemption, which we need not dwell on here. Field preemption, for instance, "occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). And obstacle preemption contemplates the displacement of state law "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation and internal quotation marks omitted). But we need not address those theories today; when an executive order expressly or by conflict preempts state law, resort to these other theories of implied preemption is unnecessary.

## III.

The President may expressly or by conflict preempt certain state laws by issuing an order under the DPA. We first situate the DPA within the broader context of national-defense laws, explaining why it authorizes the President to preempt state law. We then identify the particular provisions that would most likely allow the President to preempt state law in the circumstances presented here.

### A.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). "Recognizing this fact, the Framers listed 'providing for the common defence' as a motivating purpose for the Constitution," *Wayte v. United States*, 470 U.S. 598, 612 (1985) (cleaned up), conferring on the federal

government a "complete delegation of authority" to ensure the Nation's safety, *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2463 (2022). This power is not "limited to the 'context of an actual war.'" *Id.* at 2465 (citation omitted). It also includes the authority to act prophylactically—the government may act to secure the national defense well before the country's safety is in peril. *Cf. Dennis v. United States*, 341 U.S. 494, 509 (1951) ("Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited." (emphasis omitted)). Because national defense is vested exclusively in the federal government, "the structure of the Constitution prevents States from frustrating national objectives in this field." *Torres*, 142 S. Ct. at 2464. Even legitimate state interests generally must yield to the common defense of the Nation, for the Constitution "is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

In providing for the common defense, Congress and the President have "time and again, as exigencies arose," taken actions that have displaced ordinary state laws, such as those pertaining to property or torts. *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016). Following World War II, for example, the Renegotiation Act allowed the federal government "to recover excess profits" on wartime contracts—even with respect to contracts between two private parties rather than only those "made directly with the Government." *Lichter v. United States*, 334 U.S. 742, 788–89 (1948). The Court upheld "the right of the Government to recover excess profits on" such contracts, *id.* at 789, emphasizing the wartime exigencies that necessitated the legislation, *see id.* at 754–72. The Court subsequently sustained President Carter's decision to nullify attachments and liens on Iranian assets in the United States and to direct that those assets be transferred to Iran. *See Dames & Moore v. Regan*, 453 U.S. 654, 660, 674 (1981). In doing so, the Supreme Court emphasized that the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, 91 Stat. 1626, "delegate[d] broad authority to the President to act in times of national emergency with respect to property of a foreign country." 453 U.S. at 677. And because IEEPA authorized the actions taken, the Court upheld the nullification of the attachments and the transfer of the assets, traditional property rules notwithstanding. *Id.* at 674.

Modelled on "the First and Second War Powers Acts of 1941 and 1942, which gave the [E]xecutive [B]ranch broad authority to regulate industry during World War II," the DPA is yet another example of Congress delegating to the President powers to regulate domestic policy for the national defense. Alexandra G. Neenan, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767 [https://perma.cc/S6L9-UUJE]. The DPA differs from those earlier statutes, however, in one key respect: Although its predecessor statutes conferred sweeping authority upon the President during wartime, the DPA "is not an 'emergency' statute." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*"). Instead, it includes power to act prophylactically. Congress recognized that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." 50 U.S.C. § 4502(a)(1). The Act thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4). The President may use those authorities "whether or not an 'emergency' situation exists." *Energy Supply Interruption*, 6 Op. O.L.C. at 662.

The DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law. *Id.* (quoting H.R. Rep. No. 81-2759, at 4 (1950)). In general terms, section 4511 authorizes the President to control the distribution of materials, services, and facilities, and to require entities to prioritize the performance of some contracts over others, as "necessary or appropriate to promote the national defense" or "to maximize domestic energy supplies." 50 U.S.C. § 4511(a), (c). And because the President may regulate and direct private conduct when exercising such authority, he may also necessarily displace contrary state law.

And lest there be any doubt, the DPA makes explicit that orders issued pursuant to the Act displace state-law liability. It provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." *Id.* § 4557. Such immunity

from liability exists even when the related DPA rule, regulation, or order is subsequently "declared by judicial or other competent authority to be invalid." *Id.* Section 4557 is an express preemption provision, even though it does not appear to operate directly on state law. *See Murphy*, 584 U.S. at 478. "It confers on private entities . . . a federal right to engage in certain conduct"—conduct required by a DPA order—"subject only to certain (federal) constraints," not constraints imposed by state law. *Id.* at 478–79.

The provisions in section 4511 authorizing the President to issue regulatory (and thus preemptive) orders are united by a central principle: necessity. At a high level, section 4511(a) allows the President to require the prioritized performance of certain contracts or to allocate materials and other resources as he considers "necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(1)–(2). Section 4511(c) similarly allows the President to require the priority performance of certain contracts or allocate materials and resources "in order to maximize domestic energy supplies." *Id.* § 4511(c)(1). Ensuring the availability of such energy supplies, the DPA makes clear, is "necessary and appropriate" to secure "national defense preparedness." *Id.* § 4502(a)(5).

Necessity has long functioned as a defense to private liability under state law. When an otherwise tortious action—like trespass or conversion—is necessary to avoid "public disaster," the actor will not be held liable under tort law. *See* Restatement (Second) of Torts § 196 (1965) (trespass); *id.* § 262 (conversion); *see also id.* § 892D (describing the emergency doctrine). Necessity similarly excuses contractual nonperformance when supervening events make performance impracticable or frustrate the contract's purpose. *See* Restatement (Second) of Contracts § 261 (1981) (discharge by supervening impracticability); *id.* § 265 (discharge by supervening frustration). And force majeure clauses typically "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (citation omitted). Necessity even may excuse liability for criminal conduct: "Every American jurisdiction, without exception, has adopted the necessity defense in its criminal jurisprudence." Shaun P. Martin, *The Radical Necessity Defense*, 73 U. Cin. L. Rev. 1527, 1535 (2005).

The DPA operates on parallel logic to preempt state private law. When compliance with a presidential DPA order would otherwise violate state law—whether by causing tortious injury or breaching contractual obligations—the Act displaces that liability in the name of national defense. *See* 50 U.S.C. § 4557. Indeed, the DPA expressly contemplates reprioritizing contractual commitments for national-defense interests, notwithstanding that doing so may cause a party to breach its obligations under state contract law. *See id.* § 4511(a)(1), (c).

The DPA's displacement of state regulatory law follows from the same principle. State regulation often accomplishes *ex ante* what private law accomplishes *ex post*—the mitigation of social costs. *See* Susan Rose Ackerman, *Regulation and the Law of Torts*, 81 Am. Econ. Rev. 54, 54 (1991). The means are different, but the purpose is the same. For example, a state licensing regime and common-law negligence each address the risk of substandard professional conduct. Environmental regulations and common-law nuisance claims each address pollution and its harmful effects. *Cf.* Samuel Issacharoff, *Regulating After the Fact*, 56 DePaul L. Rev. 375, 380 (2007) ("The key is that both ex ante and ex post review are essential parts of the regulatory model—sometimes operating in tandem, sometimes as substitutes." (emphasis omitted)). The DPA contemplates the preemption of *ex ante* regulations much as it contemplates the preemption of *ex post* private-law remedies, all in the name of necessity. After all, although the interests protected by state regulation are doubtlessly important, "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte*, 470 U.S. at 611.

"Necessity" is not, of course, a constitutional prerequisite for Congress to confer on the President preemptive authority. But the Act functions as the Nation's necessity defense to state law. And under the DPA, the President possesses broad discretion to determine when to invoke that immunity, *see* 50 U.S.C. § 4511(a), (c), for it is the President who possesses the institutional competence to make such judgments on behalf of the Nation, *see id.* § 4502(a)(4); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (emphasizing the need to defer to the "evaluation of the facts by the Executive" in the national-security context).

Moreover, such a finding of necessity is likely immune from judicial review under the Administrative Procedure Act ("APA") and other statutes, even if the Secretary makes the determination by exercising delegated presidential power.[4] Under the APA, "agency action is not subject to judicial review to the extent that such action is committed to agency discretion by law." *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citation and internal quotation marks omitted). Review of an agency determination "is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191 (citation and internal quotation marks omitted). Section 4511(a) clearly commits action to the discretion of the President or his delegee, allowing the decisionmaker to allocate materials "to such extent as *he shall deem* necessary or appropriate." 50 U.S.C. § 4511(a)(2) (emphasis added); *see also id.* § 4511(a)(1). In *Webster v. Doe*, the Supreme Court construed similar language to preclude APA review. 486 U.S. 592 (1988). The provision at issue allowed "termination of [a Central Intelligence] Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600 (emphases in original). The Court concluded that this provision "foreclose[d] the application of any meaningful judicial standard of review." *Id.* So too here, especially given the national-security context, where the Executive Branch traditionally wields broad and often-unreviewable discretion. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 529–30 (1988); *Lee v. Garland*, 120 F.4th 880, 886 (D.C. Cir. 2024).

## B.

As we have emphasized, the DPA immunizes entities from liability "for damages or penalties" stemming from "any act or failure to act resulting directly or indirectly from compliance" with an order issued under the Act. 50 U.S.C. § 4557. Three provisions of 50 U.S.C. § 4511 authorize the President to direct that Sable resume production of the SYU and

---

[4] The APA does not apply to the President, although "the President's actions may still be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

operate the associated pipeline infrastructure. An order issued under one of these provisions could preempt state law either expressly or by conflict. We address these provisions in the order best suited to our analysis: We start with the President's allocation authority under section 4511(a)(2); we then discuss his prioritization authority under section 4511(a)(1); and we conclude with his energy-production authority under section 4511(c).

**1.**

We consider first the President's allocation authority under section 4511(a)(2). That provision authorizes the President "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The term "materials" encompasses "any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply," as well as "any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." *Id.* § 4552(13). The term "services" includes "any effort that is needed for or incidental to": (A) "the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item"; (B) "the construction of facilities"; (C) "the movement of individuals and property by all modes of civil transportation"; or (D) "other national defense programs and activities." *Id.* § 4552(16).[5] And the "term 'facilities' includes all types of buildings, structures, or other improvements to real property . . . , and services relating to the use of any such building, structure, or other improvement." *Id.* § 4552(8). In the light of these broad definitions, we have previously opined that this section could "be used to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." *Energy Supply Interruption*, 6 Op. O.L.C. at 665.

[5] Moreover, the phrase "industrial resources" as used in the Act means "materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base." 50 U.S.C. § 4552(12).

The President could expressly preempt California law through an order issued under this section. Section 4511(a)(2) authorizes the President to allocate materials, services, and facilities "in such manner" and "to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). This sweeping language allows the President to preempt contrary state law by ordering Sable to produce the recoverable oil located on the SYU and transport such production to the California refinery complex using the Santa Ynez Pipeline System. That conclusion follows directly from the capacious definitions of "materials," "services," and "facilities." *See id.* § 4552(8), (13), (16). The production and transportation of such oil—a "material"—is plainly a "service" within the meaning of the Act. *See id.* § 4552(13), (16). The Santa Ynez Pipeline System is, in our view, a facility within the meaning of the DPA, because it is an "improvement[] to real property," and operation of the pipeline system is a service "relating to the use" of that improvement. *Id.* § 4552(8). A DPA order could thus declare on its face that particular California environmental regulations, permitting requirements, or other restrictions are preempted with respect to Sable's production on the SYU and operation of the Santa Ynez Pipeline System. Indeed, if the President were to find that Sable being noncompliant with particular state laws is "necessary" to promote the national defense, *id.* § 4511(a)(2), he could instruct Sable to disregard state laws that would otherwise frustrate its obligations under the order.

One might suggest that the word "allocate" in section 4511(a)(2) allows the President only to *distribute* resources, not to compel their production. But that reading ignores critical statutory language. Section 4511(a)(2) authorizes the President to allocate not just materials but also "services"—which the Act defines to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." *Id.* § 4552(16). The President's power to allocate services thus includes the power to allocate productive capacity itself. Moreover, section 4511(a)(2) grants the President discretion to allocate services "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate," *id.* § 4511(a)(2), making clear that the President may determine how and to what degree to allocate productive capacity. That discretion necessarily entails the authority to compel production, not just to allocate materials that already exist. *See, e.g.*,

*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law); *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield." (cleaned up)). Indeed, an allocation order can "require[] a person to take or refrain from taking certain actions," including with respect to production of a resource. 15 C.F.R. § 700.33(b).

Our reading is also consistent with the DPA's context and history. The Act was modeled on the War Powers Acts, which conferred on the President sweeping authority to regulate industry during wartime. *See* Neenan, *supra*, at 2. And a critical component of wartime authority is ensuring adequate productive capacity. The DPA supplies comparable authority but before the outbreak of any conflict. When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies," *id.* § 4502(a)(5). These congressional findings would mean little if the President could only shuffle existing inventory rather than direct facilities to produce energy.[6]

We emphasize that the precise preemptive scope of a presidential order would depend upon the language employed in relation to the obligations imposed by state law. We cannot opine on the preemptive reach of an order not yet drafted. Moreover, because "hypothetical or potential conflict is insufficient" to preempt state law by conflict, the wording

[6] The President's authority to compel production is even more pronounced under section 4511(c), which allows the President to use the allocation power "in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). We discuss section 4511(c) in greater detail below, but the word "allocate" must be "given more precise content by the neighboring words with which it is associated," *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (citation omitted), and "identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

of any DPA order will affect the scope of conflict preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).[7] According to Sable, "California agencies have deployed an array of state measures . . . to block pipeline operations," including "[enforcement of California] SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, [and] excessive delay in granting a long-term easement through a state park for an existing pipeline." Sable Letter at 6. If such state measures make it impossible for Sable immediately to resume production and distribution of oil located on the SYU, they would be displaced as a matter of conflict preemption if a presidential order directed Sable to resume production immediately. Such an order would "irreconcilably conflict" with the terms of California state law. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679 (cleaned up).

**2.**

The President's prioritization authority under section 4511(a)(1) also allows him to preempt state law. Section 4511(a)(1) authorizes the President "to require that performance under contracts or orders" that "he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). Recall that "[i]n executing a contract under the DPA, a contractor is not liable for actions taken to comply with" a presidential order issued pursuant to the Act. Neenan, *supra*, at 6. Moreover, the President can also "prioritize the performance of contracts between two private parties." *Id.*

The President could issue an order under section 4511(a)(1) to expressly preempt certain state laws that, in the President's judgment, would impair or delay prioritized contract performance. *See E. Air Lines, Inc. v.*

---

[7] The DPA immunizes entities from liability for any act "resulting directly *or indirectly* from compliance" with an order issued under the Act. 50 U.S.C. § 4557 (emphasis added). It is thus possible that a DPA order might preempt state law to the extent that an entity's compliance with that order would result—even indirectly—in a breach of state law. Section 4557's immunity for acts resulting indirectly from compliance with a DPA order suggests that Congress anticipated that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible. But it is not necessary for us in answering your question to decide whether the DPA in effect lowers the standard for conflict preemption, so we do not decide it here.

*McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976) ("Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."). The President could, for instance, instruct that Sable's contracts for oil production and transportation take priority over Sable's other contractual obligations and expressly preempt California environmental regulations insofar as they would impede that prioritized performance. By naming the preempted state laws on the face of the order, the President would eliminate any doubt about which legal requirements must give way to defense needs under the terms of the order.

An order issued under section 4511(a)(1) might also displace state contract law—which is often judge-made rather than statutory—by conflict. If the President requires that performance of certain contracts be prioritized over performance under any other contract or purchase order, state law rendering that prioritization impossible would be preempted. *Cf.* Memorandum for the Files, from Henry C. Whitaker, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Use of the Defense Production Act and the International Emergency Economic Powers Act to Regulate Industry During the Early Stages of the COVID-19 Pandemic* at 5–6 (Jan. 18, 2021). As we have explained, conflict preemption is a demanding standard; if Sable could prioritize the designated contracts while also complying with state law, state law would not necessarily be preempted. *But cf.* 50 U.S.C. § 4557 (shielding entities from liability for any act "resulting directly or indirectly from compliance" with a DPA order). But if state law would render Sable incapable of prioritizing the designated contracts, that state law would be displaced.

**3.**

Finally, section 4511(c) allows the President to preempt state law by wielding the allocation and prioritization powers "to maximize domestic energy supplies"—even in the absence of a national-defense finding. *See Energy Supply Interruption*, 6 Op. O.L.C. at 668 (citation omitted).[8]

[8] When updating our 1982 advice about the DPA in 2021, we wrote that "the powers granted in" section 4511 are "limited by" section 4511(b). Memorandum for Stuart F. Delery, Deputy Counsel to the President, Executive Office of the President, from Martin S. Lederman, Deputy Assistant Attorney General, Office of Legal

Section 4511(c) allows the President, upon making certain other findings, to "require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). The words "materials" and "services" have the same capacious meanings as described above. *See id.* § 4552(13), (16).

The preemption analysis under section 4511(c) parallels that of the two provisions described above. In a directive requiring Sable to resume production and distribution of oil from the SYU, the President could exempt Sable from compliance with particular state laws, especially if the President were to find that compliance with such laws would threaten the ability to "maximize domestic energy supplies." *Id.* § 4511(c)(1). At minimum, an executive order would displace conflicting California law under traditional conflict-preemption principles, with the scope of preemption turning on the order's specific terms.

## IV.

State law, we have been advised, is not currently the only impediment to Sable's ability to resume production and transportation of oil. A consent decree entered in *United States v. Plains All American Pipeline L.P.*, No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020), Dkt. 33 ("Consent Decree"), "currently vests authority over resumption of transportation through the onshore portions of the Santa Ynez Pipeline System with the California Office of the State Fire Marshal." Sable Letter at 9. We have been advised that Sable assumed by contract certain obligations under the Consent Decree.[*] Assuming for the sake of our analysis that provisions of the Consent Decree could be enforced against Sable, you have asked whether

Counsel, *Re: Preliminary Review of Possible Legal Authorities Related to the Cyberattack Targeting the Colonial Pipeline* at 10 (May 12, 2021). But section 4511(c)(1) applies "[n]otwithstanding any other provision of this chapter." 50 U.S.C. § 4511(c)(1). To the extent that our more recent advice inadvertently suggested that section 4511(b) would limit the President's authority under section 4511(c), we take this opportunity to disclaim that suggestion.

[*] Editor's note: As originally issued on March 3, 2026, this opinion mistakenly referred to Sable as a party to the Consent Decree. We have since confirmed that, although Sable assumed by contract certain obligations under the Consent Decree, it was not and is not party to the Consent Decree.

an executive order under the DPA would displace these provisions of the Consent Decree, even though there are both federal- and state-law claims at issue in that case. For three reasons, we think it would.

*First*, section 4557 would likely immunize Sable from needing to satisfy these provisions of the Consent Decree if acting to comply with a DPA order. The Consent Decree includes a "stipulated penalties" provision for violations of its requirements. *See* Consent Decree at 27. But section 4557 provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557. Thus, Sable would be immune from any penalties—including those imposed under the Consent Decree—for "any act or failure to act resulting directly or indirectly from compliance with" a DPA order. *Id.*

Section 4557 would also immunize Sable from liability for contempt under such circumstances. *See* Consent Decree at 39 (leaving "contempt" open as a sanction for violations). Civil contempt sanctions are "penalties designed to compel future compliance" with a consent decree. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025) ("Violation of a consent decree is enforceable by a citation for contempt."). Civil contempt sanctions can take the form of monetary fines or sentences of imprisonment. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–32 (1988). Monetary fines to compel future compliance with the Consent Decree here, of course, may not be imposed for any act or omission resulting from compliance with a DPA order. *See* 50 U.S.C. § 4557. So too for sentences of imprisonment imposed for the same reason. The word "penalty" meant "a punishment imposed or incurred for a violation of law or rule." *The American College Dictionary* 895 (1948 ed.); *see also Webster's New Collegiate Dictionary* 621 (2d ed. 1956) ("*Webster's*"); *The Oxford Universal Dictionary* 1462 (3d ed. 1955). Nor was the word "liable" limited to monetary liability. *See, e.g.*, *Webster's* at 484 ("Bound or obliged by law or submission to other forces; answerable"). And limiting the word "penalties" to only monetary fines would be incongruous with the rest of section 4557 and the DPA more broadly, which ensure that the President can displace impediments to productive capacity when necessary. Indeed,

it would be anomalous to think that section 4557 forbids the imposition of monetary fines but not the harsher penalty of imprisonment.

*Second*, a DPA order could constitute a force majeure under the Consent Decree. In particular, the Consent Decree defines a force majeure "as any event arising from causes beyond the control of Defendants . . . that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation." Consent Decree at 35. The issuance of a DPA order would likely constitute an "event" arising from causes beyond the control of Sable, and complying with the order might delay or prevent the performance of Sable's obligations under the Consent Decree.

*Third*, the issuance of a DPA order might also constitute changed circumstances sufficient to require modification of the Consent Decree. A consent decree "must" be modified if one of its obligations "has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And as we have explained, a DPA order has the force of federal law. If a DPA order requires Sable to take an action that is prohibited by the Consent Decree, the Consent Decree likely must be modified.

* * * * *

The DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law. An order issued under that authority could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree described above, including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*

# Exhibit 14

**Federal Register**

Vol. 91, No. 52

Wednesday, March 18, 2026

# Presidential Documents

**Title 3—**

**The President**

**Executive Order 14391 of March 13, 2026**

## Adjusting Certain Delegations Under the Defense Production Act

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* This order amends Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness). Executive Order 13603 delegates certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads. This order also clarifies section 2(a) of Executive Order 14156 of January 20, 2025 (Declaring a National Energy Emergency).

**Sec. 2**. *Amendment to Executive Order 13603.* Section 203 of Executive Order 13603 is hereby amended by striking the phrase ''Secretary of Commerce'' and inserting, in lieu thereof, ''Secretary of Commerce and the Secretary of Energy, each of whom may exercise such delegated authority independently of the other''.

**Sec. 3**. *Clarifying Section 2(a) of Executive Order 14156.* For the avoidance of doubt, an agency head need only recommend action to the President under section 2(a) of Executive Order 14156 when the authority to take the recommended action is vested in the President alone and has not been delegated. Section 2(a) of Executive Order 14156 does not require an agency head to make a recommendation to the President when the agency head has authority to take the action by virtue of a delegation pursuant to Executive Order 13603 or other Presidential delegation.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of Energy.



THE WHITE HOUSE,
*March 13, 2026.*

[FR Doc. 2026–05382
Filed 3–17–26; 11:15 am]
Billing code 6450–01–P

# Exhibit 15

An official website of the United States government Here's how you know

U.S. DEPARTMENT of ENERGY



# Secretary Wright Directs Sable Offshore to Restore the Santa Ynez Unit and Pipeline

U.S. Secretary of Energy Chris Wright today directed Sable Offshore Corp. to restore operations of the Santa Ynez Unit and Santa Ynez Pipeline System to address supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil.

Energy.gov

March 13, 2026

3 min

**WASHINGTON**—U.S. Secretary of Energy Chris Wright today directed Sable Offshore Corp. to restore operations of the Santa Ynez Unit and Santa Ynez Pipeline System to address supply disruption risks caused by California policies that have left the region and U.S. military forces

dependent on foreign oil. This action issued under authorities provided by the Defense Production Act and delegated through Executive Order, "National Defense Resources Preparedness," as amended by President Trump's Executive Order, "Adjusting Certain Delegations Under the Defense Production Act."

"The Trump Administration remains committed to putting all Americans and their energy security first," **Secretary Wright said**. "Unfortunately, some state leaders have not adhered to those same principles, with potentially disastrous consequences not just for their residents, but also our national security. Today's order will strengthen America's oil supply and restore a pipeline system vital to our national security and defense, ensuring that West Coast military installations have the reliable energy critical to military readiness."

Sable's facility can produce approximately 50,000 barrels of oil per day, a 15 percent increase to California's in-state oil production, that can replace nearly 1.5 million barrels of foreign crude each month.

California once supplied nearly 40 percent of U.S. oil production, but decades of radical state policies targeting reliable energy sources have driven a decline in domestic output while fuel demand remains among the highest in the nation. Today, more than 60 percent of the oil refined in California comes from overseas, with a significant share traveling through the Strait of Hormuz—presenting serious national security threats.

Unlike other regions of the country, California remains largely disconnected from interstate crude pipelines that move American oil to refineries across the United States. The action also prioritizes pipeline transportation capacity to ensure crude produced offshore California moves through the Las Flores Pipeline System to Pentland Station and into interstate pipelines, allowing American energy to reach domestic refineries more efficiently, while reducing California's reliance on foreign

oil vulnerable to geopolitical disruption.

Sable Offshore currently employs more than 100 workers and approximately 400 contractors in Santa Barbara County, and restoring operations is expected to create hundreds of additional American energy jobs while generating millions in local economic activity.

###

View Previous

Energy Department Announces $500 Million to Strengthen Domestic Critical Materials Processing and Manufacturing

March 13, 2026

View Next

Energy Department Initiates Strategic Petroleum Reserve Emergency Exchange to Stabilize Global Oil Supply

March 13, 2026

**Tags:**

PETROLEUM RESERVES

**Media Inquiries:**
(202) 586-4940 or
DOENews@hq.doe.gov

**Read more at the energy.gov Newsroom**

U.S. DEPARTMENT of ENERGY

**Committed to Restoring America's Energy Dominance.**

**Quick Links**

Leadership & Offices
Newsroom
Contact Us
Careers

**Resources**

Budget & Performance
Directives, Delegations, & Requirements
Freedom of Information Act (FOIA)
Inspector General
Privacy Program

**Federal Government**

USA.gov
The White House

**Follow Us**

# Exhibit 16

EX-99.1 2 a991ex-sypspressrelease.htm EX-99.1

**Exhibit 99.1**

# Sable Resumes Oil Flow as Ordered by the Federal DPA with Expected Gross Oil Rate of 50,000 Bbls/d and Expects First Sales by April 1, 2026

**Houston, TX** – Sable Offshore Corp. ("Sable," or the "Company") (NYSE: SOC) today announced that on March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit ("SYU") through the federally regulated and approved to operate Santa Ynez Pipeline System ("SYPS") from Las Flores Canyon ("LFC") to Pentland Station at the direction of the United States Secretary of Energy, Chris Wright.

On March 13, 2026, President of the United States, Donald J. Trump, signed an Executive Order to, among other things, delegate certain authorities under the Defense Production Act of 1950 ("DPA") to the United States Secretary of Energy. Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued an order to Sable invoking the DPA (the "DPA Order") to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS in order to address the energy scarcity and supply disruption risks caused by California policies that have left the region and U.S. military forces dependent on foreign oil. Sable immediately complied with this federal DPA Order and began shipping hydrocarbons from LFC to Pentland Station on March 14, 2026, with federal safety regulators present in observance.

As stated in the DPA Order, all federally produced barrels from the SYU must flow through the SYPS, up to the existing pipeline capacity of 200,000 Bbls/d. Sable completed its onshore anomaly repair program and hydrotested all segments of the SYPS consistent with applicable requirements as of May 2025.

Prior to resuming hydrocarbon transportation from LFC to Sable's sales point at Pentland Station, Sable had approximately 540,000 barrels of processed crude oil in storage at LFC, representing more than the line fill volume for the SYPS between LFC and Pentland Station. Sable is fully staffed and will continue to implement the conditions of the Emergency Special Permit previously issued by the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration.

Sable is currently producing hydrocarbons from its Platform Harmony at the SYU and our wells continue to perform as expected. Production ramp-up is anticipated to proceed with full production resumption at Platforms Harmony and Heritage this month, in March 2026, and Platform Hondo in June 2026. The Company plans to commence first sales by April 1, 2026 at an expected gross oil rate of 50,000 Bbls/d.

Also on March 13, 2026, Sable and Pacific Pipeline Company ("PPC") sued California Department of Parks and Recreation ("State Parks") in a lawsuit styled Sable Offshore Corp. and Pacific Pipeline Company, Plaintiffs v. Armando Quitero, in his official capacity as Director of the California Department of Parks and Recreation, Defendant, Case, No. 2:26-cv-02739 in the United States District Court for the Central District of California. The lawsuit requests declaratory relief to confirm Sable and PPC's rights (and their ability to fulfill their obligations) under the DPA Order. Subsequently, on March 14, 2026, State Parks sent a letter to Sable contesting Sable's rights under the DPA Order.

As previously stated, Sable is pursuing all financing options, including federal credit support. The Company plans to refinance its Senior Secured Term Loan, deploy its commodity hedging program, and evaluate shareholder return options shortly after commencing first sales.

"Sable Offshore is putting California consumers first by increasing domestic supply of crude oil into the California market by approximately 17% and we look forward to continuing to execute as so ordered by the Defense Production Act executed on March 13, 2026" said Jim Flores, Sable's Chairman and Chief Executive Officer. Flores continued, "We look forward to working closely with the Department of Energy in fully complying with the DPA and working with the Trump administration to take all necessary steps to deliver the energy necessary for the security and defense of the country."

**About Sable**

Sable Offshore Corp. is an independent oil and gas company, headquartered in Houston, Texas, focused on responsibly developing the Santa Ynez Unit in federal waters offshore California. The Sable team has extensive experience safely operating in California.

**Forward-Looking Statements**

The information in this press release include "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. When used in this press release, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "continue," "plan," "forecast," "predict," "potential," "future," "outlook," and "target," the negative of such terms and other similar expressions are intended to identify forward- looking statements, although not all forward-looking statements will contain such identifying words. These statements are based on the current beliefs and expectations of Sable's management and are subject to significant risks and uncertainties. Actual results may differ materially from those described in the forward-looking statements. Factors that could cause Sable's actual results to differ materially from those described in the forward-looking statements include: the ability to recommence full production of the SYU assets; our ability to recommence sales of oil, the cost and time required therefor, and production levels once recommenced; availability of future financing; our financial performance; global economic conditions and inflation; increased operating costs; lack of availability of drilling and production equipment, supplies, services and qualified personnel; geographical concentration of operations; environmental and weather risks; regulatory changes and uncertainties; litigation, complaints and/or adverse publicity; privacy and data protection laws, privacy or data breaches, or loss of data; our ability to comply with laws and regulations applicable to our business; and other one-time events and other factors that can be found in Sable's Annual Report on Form 10-K for the year ended December 31, 2025, which is filed with the Securities and Exchange Commission and are available on Sable's website (www.sableoffshore.com) and on the Securities and Exchange Commission's website (www.sec.gov). Except as required by applicable law, Sable undertakes no obligation to publicly release the result of any revisions to these forward-looking statements to reflect the impact of events or circumstances that may arise after the date of this press release.

**Disclaimers**

The Santa Ynez Unit restarted production in May 2025. Sable has not sold commercial quantities of hydrocarbons since the acquisition of the Santa Ynez Unit. The Santa Ynez Unit was shut in during June of 2015 when the only onshore pipeline transporting hydrocarbons produced from the Santa Ynez Unit to market ceased transportation.

**Contacts**

Investor Contact:
Harrison Breaud
Vice President, Finance & Investor Relations
IR@sableoffshore.com
713-579-8111

No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF ENERGY, *et al*.,
*Defendants-Appellants.*

**On Appeal from the United States District Court
for the Central District of California**
No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

**EXCERPTS OF RECORD – VOLUME 6 OF 6**

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
DEBORAH M. SMITH
*Acting Senior Assistant Attorney General*
JOSHUA A. KLEIN
*Supervising Deputy Solicitor General*
JEREMY BROWN
*Supervising Deputy Attorney General*

JANE REILLEY*
*Deputy Solicitor General*
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
KAVITA LESSER
*Deputy Attorneys General*
HALEY AMSTER
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Plaintiff-Appellant*

October 2, 2026

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

Case No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

Date: June 1, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

## TABLE OF CONTENTS

| | Page |
|---|---|
| Introduction | 1 |
| Statement of Facts | 3 |
| I. The Refugio Oil Spill and Resulting Consent Decree, and Sable's Acquisition of the Pipelines Subject to the Consent Decree's Terms | 3 |
| A. Sable's Initial Attempts To Restart the Pipelines | 5 |
| B. The DPA-Related Orders, and Sable's Restarting of Oil Flow | 5 |
| Legal Standard | 7 |
| Argument | 8 |
| I. California Is Likely To Succeed on the Merits. | 8 |
| A. The Wright Order Exceeds the DPA's Grant of Authority. | 8 |
| B. Defendants' Use of the Wright Order To Conscript State Land for Federal Use and Encourage Violations of Federal Court Orders Is Contrary to the DPA and Unconstitutional. | 12 |
| C. The Wright Order Violates the Department's Own Regulations. | 15 |
| D. The Wright Order Is Arbitrary and Capricious. | 17 |
| II. The Likelihood of Irreparable Harm and Equitable Factors Weigh in Favor of a Preliminary Injunction. | 18 |
| A. California Is Likely To Suffer Irreparable Harm. | 19 |
| B. The Public Interest and Balance of Equities Favor California. | 21 |
| Conclusion | 21 |

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott v. Perez*
585 U.S. 579 (2018) ........ 20

*Alabama v. U.S. Sec'y of Educ.*
2024 WL 3981994 (11th Cir. Aug. 22, 2024) ........ 20

*Ariz. Dream Act Coal. v. Brewer*
757 F.3d 1053 (9th Cir. 2014) ........ 21

*Biden v. Texas*
597 U.S. 785 (2022) ........ 8

*Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*
No. 2:26-cv-02946 (C.D. Cal., March 19, 2026) ........ 2, 14

*Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*
No. 26-cv-02946 (C.D. Cal. Apr. 23, 2026), Dkt. 38 ........ 1

*California v. PHMSA*
No. 26-508 (9th Cir.) ........ 5

*Coal. for Econ. Equity v. Wilson*
122 F.3d 718 (9th Cir. 1997) ........ 20

*Crowe & Dunlevy, P.C. v. Stidham*
640 F.3d 1140 (10th Cir. 2011) ........ 19

*Ctr. for Biological Diversity, et al., v. Cal. Dep't of Forestry & Fire Protection, et al.*
No. 25CV02244 (Santa Barbara Sup. Ct., July 29, 2025) ........ 2, 5

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*
532 F.2d 957 (5th Cir. 1976) ........ 8

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) ........ 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Envt'l Def. Ctr., et al. v. Pipeline & Hazardous Materials Safety Admin., et al.*
No. 25-8059 (9th Cir., Dec. 24, 2025) ... 2, 5

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994) ... 9, 11, 13

*Hercules Inc. v. United States*
516 U.S. 417 (1996) ... 13

*Immigrant Defs. L. Ctr. v. Noem*
145 F.4th 972 (9th Cir. 2025) ... 7, 8

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001) ... 20

*Kearney & Trecker Corp. v. United States*
231 Ct. Cl. 571 (1982) ... 10

*Kennedy v. Braidwood Mgmt., Inc.*
606 U.S. 748 (2025) ... 14

*Kentucky v. United States ex rel. Hagel*
759 F.3d 588 (6th Cir. 2014) ... 19

*League of Women Voters of United States v. Newby*
838 F.3d 1 (D.C. Cir. 2016) ... 21

*Maryland v. King*
567 U.S. 1301 (2012) ... 20

*Meinecke v. City of Seattle*
99 F.4th 514 (9th Cir. 2024) ... 7

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012) ... 7

*Miller v. French*
530 U.S. 327 (2000) ... 14

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983) .......... 17, 18

*Nat'l Ass'n of Home Builders v. Norton*
340 F.3d 835 (9th Cir. 2003) .......... 15

*Nat'l Med. Enter. v. Bowen*
851 F.2d 291 (9th Cir. 1988) .......... 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
886 F.3d 803 (9th Cir. 2018) .......... 19

*New York v. United States*
505 U.S. 144 (1992) .......... 14

*Newsom v. Trump*
811 F.Supp.3d 1086 (N.D. Cal. 2025) .......... 18

*NRDC v. U.S. Dep't of Interior*
113 F.3d 1121 (9th Cir. 1997) .......... 17

*Rodriguez v. Robbins*
715 F.3d 1127 (9th Cir. 2013) .......... 21

*Russello v. United States*
464 U.S. 16 (1983) .......... 12

*Sprietsma v. Mercury Marine*
537 U.S. 51 (2002) .......... 15

*Tennessee v. Dep't of Educ.*
104 F.4th 577 (6th Cir. 2024) .......... 20

*United States v. Plains All Am. Pipeline*
No. 2:20-cv-02415 (C.D. Cal., March 13, 2020) .......... 2, 4, 11, 13

*United States v. Vertac Chemical Corp.*
46 F.3d 803 (8th Cir. 1995) .......... 9, 13

## TABLE OF AUTHORITIES
## (continued)


Page

*United States v. Youssef*
547 F.3d 1090 (9th Cir. 2008) .......... 12

*Washington v. Trump*
145 F.4th 1013 (9th Cir. 2025) .......... 21

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .......... 7

*Wolford v. Lopez*
116 F.4th 959 (9th Cir. 2024) .......... 18

**STATUTES**

United States Code, Title 5
§ 551 .......... 8
§ 705 .......... 8
§ 706(2)(A) .......... 7, 8, 17
§ 706(2)(C) .......... 8

United States Code, Title 50
§ 4501 .......... 1
§ 4502(a)(3)(D) .......... 10
§ 4511(a) .......... 8
§ 4511(a)(1) .......... 9
§ 4511(a)(2) .......... 10
§ 4511(b) .......... 10, 11
§ 4511(c) .......... 8, 11
§ 4511(c)(2) .......... 11, 17, 18
§ 4533(b) .......... 12
§ 4557 .......... 13
§ 4558(j) .......... 12

California Public Resources Code
§ 5012 .......... 20

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Tenth Amendment .......... 14

# TABLE OF AUTHORITIES
## (continued)

Page

**OTHER AUTHORITIES**

Code of Federal Regulations, Title 10
§ 216.1 .......... 18
§ 216.4 .......... 17
§ 217.20 .......... 15, 16
§ 217.31(a) .......... 16
§ 217.31(b) .......... 16
§ 217.32 .......... 16
§ 217.32(b) .......... 16
§ 217.52 .......... 16
§ 217.54 .......... 16

Executive Order
13603 .......... 6
14156 .......... 18

## INTRODUCTION

According to the federal government, when an Executive Branch official signs an order under the Defense Production Act (DPA) directing a company to prioritize certain activities, the company may disregard any state regulations or court orders that stand in its way. That is not the law. The DPA allows the federal government to direct a company to prioritize fulfilling some contracts over others, and immunizes such companies from claims for breach of contract. But nothing in the DPA permits a federal official to order a company to act in defiance of generally applicable state laws—be they traffic laws, property laws, wage-and-hour laws, or safety and environmental regulations. This Court should preliminarily enjoin recent action by the federal government that rests on its gravely mistaken understanding of the DPA and restore California's authority to enforce critical health and safety regulations applicable to a pipeline carrying hazardous liquids.

Under the purported authority of Title I of the DPA, 50 U.S.C. § 4501 et seq., Secretary of Energy Chris Wright issued a Secretarial Order last month targeting an onshore crude oil pipeline that had been dormant since its failure resulted in the catastrophic Refugio Oil Spill in Santa Barbara County in 2015. *See Pipeline Capacity Prioritization and Allocation Order*, RJN, Exh. 1 [91 Fed. Reg. ___ (Mar. 13, 2026)] (the Wright Order). The Wright Order directs a private company, Sable Offshore Corporation, to "immediately prioritize and allocate pipeline transportation services for hydrocarbons." The federal government views this order as "directing the pipeline's owner to immediately resume the transport of oil through the pipeline."[1] So does Sable, which had written Secretary Wright to request the order as part of a broader campaign to short-circuit state environmental protection requirements. Sable relied on the order to immediately restart the flow of oil notwithstanding several State permits and approvals it had requested but not

[1] Statement of Interest of the United States, *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 26-cv-02946 (C.D. Cal. Apr. 23, 2026), Dkt. 38 at 1.

yet received. Sable's action violated a federal court's consent decree, California law, and the State's property rights in Gaviota State Park (which part of the pipeline traverses)—violations being litigated in other pending cases against Sable.[2]

But in issuing the Wright Order, Defendants themselves violated the DPA, related regulations, the Administrative Procedure Act (APA), and the Constitution. Those violations are the subject of this lawsuit against Secretary Wright and the Department of Energy, and of this motion for a stay of the Wright Order and a preliminary injunction prohibiting the Secretary (and anyone operating as his agent or working in concert) from relying on the Wright Order and DPA to authorize or compel Sable's operation of the pipelines without having received necessary state-law approvals and without satisfying the terms of court orders.

The State has a strong likelihood of success on the merits of its claims that the Wright Order is unlawful. Although the Wright Order purports to proceed under Sections 101(a) and (c) of the DPA, it exceeds the Secretary's authority under each. Under those provisions, the federal government may order a private actor to "prioritiz[e]" certain contracts over others and to honor a particular "allocat[ion]" of material and services among competing needs. As interpreted by the federal government, the Wright Order does neither—nor does it include the findings that Section 101(a) orders require under Section 101(b). The Wright Order is also unlawful because it violates the Secretary's own regulations governing DPA orders, which require specific prioritization procedures, categorizations, and findings that are absent here. Beyond that, the Secretary ignored important factors—including the many detrimental effects of preempting state law and ordering violations of court orders—rendering the order arbitrary and capricious. And if the DPA did

[2] *See, e.g.*, *United States v. Plains All Am. Pipeline*, No. 2:20-cv-02415 (C.D. Cal., March 13, 2020); *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.*, No. 2:26-cv-02946 (C.D. Cal., March 19, 2026); *Envt'l Def. Ctr., et al. v. Pipeline & Hazardous Materials Safety Admin., et al.*, No. 25-8059 (9th Cir., Dec. 24, 2025); *Ctr. for Biological Diversity, et al., v. Cal. Dep't of Forestry & Fire Protection, et al.*, No. 25CV02244 (Santa Barbara Sup. Ct., July 29, 2025).

allow a cabinet secretary to override state laws, state property rights, and court orders with the stroke of the Secretary's pen, it would be unconstitutional.

Given those violations of law, the equitable factors support a preliminary injunction and stay. The ongoing operation of the pipeline causes irreparable harm to California's sovereign and property interests, as well as to its environment and public safety—and the equities and public interest tilt strongly in favor of forcing the Secretary to respect statutory and constitutional limitations on executive action under the DPA.

## STATEMENT OF FACTS

Lines CA-324 and CA-325, which are located entirely onshore and within California, run along the Santa Barbara County coastline and inland to Kern County. *See* Consent Decree, RJN, Exh. 2 at 9-10, App. A. They transport treated petroleum products after they have been processed at the onshore Las Flores Canyon Processing Facility. *See* PHMSA Failure Investigation Report, RJN, Exh. 3 at 3. That facility receives a mix of crude oil and other hazardous liquids via separate undersea pipelines running to three drilling platforms off the Santa Barbara Coast, known as the Santa Ynez Unit. *See id.* at 4-5.

The undersea pipelines and onshore processing facility and pipelines, including Lines CA-324/325, are under the regulatory authority of several California agencies. *See infra* p. 20-21. Additionally, the undersea pipelines and Lines CA-324/325 cross land owned by the State of California, including tidelands, overseen by the California State Lands Commission, and Gaviota State Park, managed by the California Department of Parks and Recreation (State Parks). Bellman Decl., ¶ 3; CSLC Presentation, RJN, Exh. 4 at 1, 9.

### I. THE REFUGIO OIL SPILL AND RESULTING CONSENT DECREE, AND SABLE'S ACQUISITION OF THE PIPELINES SUBJECT TO THE CONSENT DECREE'S TERMS

In May 2015, Line CA-324 ruptured, releasing over 120,000 gallons of heavy crude oil along the Santa Barbara coast at Refugio State Beach. Final Damage

Assessment, RJN, Exh. 5 at 4. This catastrophic spill caused widespread damage to California's beaches and other natural resources and impeded commercial and recreational activities in coastal areas across Southern California. *Id.* Afterwards, Lines CA-324/325 were shut down by the companies who owned and operated the Pipelines at that time: Plains All American Pipeline, L.P. and Plains Pipeline, L.P. (together, Plains). An investigation conducted by the United States Department of Transportation's Pipeline and Hazardous Materials Safety Administration (PHMSA) concluded that the cause of failure was external corrosion that thinned the pipe wall to a level where it ruptured and released oil. PHMSA Failure Investigation Report, RJN, Exh. 3 at 3.

After the Refugio Oil Spill, the United States and various California state agencies filed suit against Plains over the harms from the oil spill. *United States, et al., v. Plains All Am. Pipeline*, *L.P., et al*., No. 2:20-cv-02415 (C.D. Cal.). Based on the parties' agreement, the matter was resolved by the Court's entry of a consent decree in October 2020. *See* Consent Decree Order (Oct. 14, 2020), RJN, Exh. 6.

The Consent Decree assigns sole authority to approve a restart plan for Lines CA-324/325 to California's Office of the State Fire Marshal (OSFM). Consent Decree, RJN, Exh. 2 at App. D. It also provides that Line CA-324 can only be restarted if Plains first receives a State Waiver from OSFM to use anti-corrosion measures that differ from federally required technology. *Id.*, App. B. The Consent Decree's requirements are "binding upon the Parties and any successors, assigns, as well as any other entities or persons otherwise bound by law to comply with this Consent Decree." *Id.* at ¶ 4.

In 2024, Sable acquired Lines CA-324/325, the offshore platforms, and the Las Flores Canyon Processing Facility. Assumption Agreement, RJN, Exh. 7 at Exh. E. In the acquisition of these lines, Sable agreed to be bound by the Consent Decree. *Id.*

/ / /

**A. Sable's Initial Attempts To Restart the Pipelines**

Shortly after acquiring the lines, Sable sought state permits and approvals necessary to restart transporting crude oil through the Pipelines for the first time in nearly a decade. The Santa Barbara County Superior Court issued a preliminary injunction enjoining Sable from restarting the Pipelines "until 10 court days following the filing and service of notice . . . that Sable has received all necessary approvals and permits . . . and that Sable intends to commence such restart." Order Re: Preliminary Injunction and Undertaking, *Ctr. for Biological Diversity, et al., v. Cal. Dep't of Forestry and Fire Prot., et al.*, No. 25CV02244 (Santa Barbara Sup. Ct., July 29, 2025), RJN, Exh. 8 at Exh. A; *see also* Minute Order (Apr. 17, 2026), RJN, Exh. 9 at 1. And in October 2025, OSFM responded to Sable's restart plan, by informing Sable that it had identified a requirement of the State Waivers that had not yet been met. OSFM Letter to Sable (Oct. 22, 2025), RJN, Exh. 10.

In response, Sable began a campaign to circumvent state regulators altogether. At Sable's urging, in December 2025, PHMSA issued an order redesignating Lines CA-324/325 as interstate pipelines subject to federal regulation—a reversal of its longstanding position that the Pipelines are intrastate pipelines that fall under OSFM's regulatory authority. *See* Federalization Order, RJN, Exh. 11.[3] In February 2026, Sable confirmed that it was abandoning its State Waivers based on PHMSA's Federalization Order. Second Supp. Decl. of Jeffrey D. Dintzer, RJN, Exh. 12 at ¶ 4.

**B. The DPA-Related Orders, and Sable's Restarting of Oil Flow**

While Sable was seeking to have PHMSA displace state regulation, it was also proceeding on another front. In December 2025, Sable requested that the U.S. Department of Energy (DOE) authorize Sable to restart Lines CA-324/325 by invoking the DPA. *See* Preemptive Effect of Defense Production Act Order on

[3] Challenges to that order are pending. *See California v. PHMSA*, No. 26-508 (9th Cir.); *Envt'l Def. Ctr. v. PHMSA*, No. 25-8059 (9th Cir.).

State Law, 50 Op. O.L.C. __, (Mar. 3, 2026) (OLC Slip Opinion, RJN, Exh. 13 at 3). DOE turned to the United States Department of Justice's Office of Legal Counsel (OLC) for an opinion that could justify a DPA order directing Sable to proceed in violation of the Consent Decree and state requirements. *Id.* at 1. In response, OLC opined that if the Secretary issued a DPA order to Sable, that order "could preempt state law either expressly or by conflict" and might "displace certain provisions of the Consent Decree . . . including those vesting authority over resumption of transportation [of oil through Lines CA-324/325] with [OSFM]." *Id.* at 22.

On March 13, 2026, President Trump issued an Executive Order titled *Adjusting Certain Delegations Under the Defense Production Act* (Delegations EO). RJN, Exh. 14. The Delegations EO amended the March 2012 Executive Order 13603, titled *National Defense Resources Preparedness*, by adding the Secretary of Energy to a list of Executive department and agency heads with DPA authority. *Id.*

DOE issued the Wright Order the same day, claiming authority pursuant to Sections 101(a) and (c) of the DPA, related regulations, and EO 13603. Wright Order, RJN, Exh. 1 at 1. The Wright Order instructs Sable to immediately (1) "prioritize and allocate pipeline transportation services" for oil produced at the Santa Ynez Unit; (2) "commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought," for oil transportation through Lines CA-324/325; and (3) "comply with this order" until otherwise directed by DOE. *Id.* at 3. The Wright Order mentions Sable's dissatisfaction with California laws and regulations, including the Consent Decree, "block[ing] pipeline operations." *Id.* at 2. However, the Wright Order did not include statutory findings required by sections 101(a) and (b) of the DPA, nor did it contain numerous elements required by the DOE regulations governing various types of DPA orders. *See infra* pp. 10-11, 15-18. DOE's press release

characterized the Wright Order as requiring Sable to immediately "Restore the Santa Ynez Unit and Pipeline." DOE Press Release (Mar. 13, 2026), RJN, Exh. 15.

On March 14—the day after the Wright Order—Sable began sending oil through the Pipelines. Sable Press Release (Mar. 16, 2026), RJN, Exh. 16. According to Sable, it had "immediately complied" with the Wright Order and restarted Lines CA-324/325 "at the direction of the United States Secretary of Energy." *Id.*

California filed this suit, contending that the Wright Order should be set aside under the APA and declared unconstitutional, and that Secretary Wright, DOE, and anyone acting in concert be enjoined from relying on the Wright Order to operate Lines CA-324/325.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The likelihood of success on the merits is the "most important factor in the preliminary injunction analysis" and is "all the more critical when a plaintiff alleges a constitutional violation and injury." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quotation marks omitted). That is because "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted).

Under the APA, "[a] reviewing court shall 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]'" *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 991 (9th Cir. 2025) (quoting 5 U.S.C. § 706(2)(A)). A court may, pending the conclusion of judicial review, issue a stay of

an agency action "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.* at 986 (quoting 5 U.S.C. § 705).

## ARGUMENT

### I. CALIFORNIA IS LIKELY TO SUCCEED ON THE MERITS.

California has a strong likelihood of showing that the Wright Order should be set aside under the APA and deemed unconstitutional.[4]

#### A. The Wright Order Exceeds the DPA's Grant of Authority.

The Wright Order claims authority under sections 101(a) and (c) of the DPA, 50 U.S.C. § 4511(a), (c). But it clearly exceeds the powers granted to the Secretary by those provisions. Congress envisioned these provisions as means by which orders for military or national security purposes would "gain[] precedence over civilian production," *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981 (5th Cir. 1976), by prioritizing certain contracts over other contracts. The Wright Order is interpreted by Defendants to do something quite different. It does not, for example, prioritize the production of oil over other activities Sable may want to pursue, nor does it prioritize sales of oil to some purchasers over others. Rather, as interpreted and applied by the federal government, it directs and authorizes Sable to operate its pipelines without regard to contrary law or court orders. Because nothing in the DPA grants the Executive that sweeping preemptive power, the Wright Order should be set aside. *See* 5 U.S.C. § 706(2)(A), (C) (court should set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations").

**Section 101(a).** Section 101(a) is not a blank check for the Executive to do

[4] The Wright Order is a final agency action under 5 U.S.C. § 551, because it "'marks' the 'consummation' of the agency's decisionmaking process'" and purports to "result[] in 'rights and obligations being determined.'" *Biden v. Texas*, 597 U.S. 785, 788 (2022) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (alterations omitted)). Indeed, the federal government and Sable view the Wright Order as giving Sable the right and obligation to begin pumping oil through pipelines that were previously legally closed, and as displacing many of California's rights and Sable's obligations that would otherwise exist under court decrees and state and federal law.

whatever it wants. Instead, it serves a specific purpose. "The language of section 101(a) makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense." *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996). "Indeed, section 101 is titled 'Priority in contracts and orders.'" *Id.* It requires that that the contracts designated by the government be given "priority over the performance of any other contract or order." *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 806 (8th Cir. 1995).

Section 101(a)(1) allows the President or his delegee to "require that performance under contracts or orders . . . which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order," and "for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders." 50 U.S.C. § 4511(a)(1). The twice-repeated word "priority"—and the phrase "in preference to other contracts or orders"—makes plain what is meant: If an entity has multiple contracts or orders, section 101(a) allows the federal government to determine which should be fulfilled or accepted before others—for instance, by ordering Sable to fulfill orders for military suppliers before civilian suppliers. *See* Priority, Merriam-Webster, ("superiority in rank, position, or privilege" or "legal precedence in exercise of rights over the same subject matter").[5]

Thus, "in complying with DPA section 101(a) a contractor may have to *re-prioritize its outstanding contracts* in order to give the required preference to a compelled DPA contract." *Hercules*, 24 F.3d at 204. That is an important power,

[5] *See* Webster's New Collegiate Dictionary (7th ed. 1963) (same), https://tinyurl.com/ynfcmuuh; *see also* Preference, Merriam-Webster, https://www.merriam-webster.com/dictionary/preference ("priority in the right to demand and receive satisfaction of an obligation"); Webster's New Collegiate Dictionary (7th ed. 1963) (same), https://tinyurl.com/3ddbjpdd.

since the national defense may sometimes require prioritizing defense consumption above non-defense consumption, notwithstanding existing private contracts. *See, e.g.*, *Kearney & Trecker Corp. v. United States*, 231 Ct. Cl. 571, 573-574 (1982) (DPA order required manufacturer to divert product to defense use, making company miss existing customer's contractual delivery date). The Wright Order thus contains language requiring Sable to grant "priority" for transport of certain hydrocarbons over others. Wright Order, RJN, Exh. 1 at 3. But granting "priority" to one thing over another is not what DOE says the Wright Order does. Instead, DOE purports to order Sable, under the Wright Order, to transport oil when it otherwise would have fulfilled *no contracts at all* because of prohibitions under court orders and state law. Sable is "directed to accept and perform such contracts" not in priority to other contracts, but as an absolute matter. *Id.*

Section 101(a)(2) similarly states that the President or his delegee may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). That is a similar power to "*apportion* for a specific purpose or to particular persons or things," Allocate, Merriam-Webster, https://www.merriam-webster.com/dictionary/allocate (emphasis added)—that is, to "divide and share out according to a plan," Apportion, Merriam-Webster, https://www.merriam-webster.com/dictionary/apportion; *see also* 50 U.S.C. § 4502(a)(3)(D) (congressional policy recognizing that defense preparedness sometimes requires "the diversion of certain materials and facilities *from ordinary use* to national defense purposes" (emphasis added)). This too is a power to decide how available resources should be *divided* between multiple potential counterparties—something that the Wright Order does not do.

Orders issued under section 101(a) also require adherence to section 101(b), which governs the "use[]" of all "powers granted in [section 101]." *Id.* § 4511(b). Accordingly, section 101(a) cannot be used to "control the general distribution of

any material in the civilian market" unless the President (or his delegee) finds that (1) the material is "a scarce and critical material essential to the national defense" and (2) "the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." 50 U.S.C. § 4511(b). The Wright Order is an order to "control the general distribution in the civilian market," *id.*, because it directs Sable to transport crude oil through Lines CA-324/325 "to market on mainland California." Wright Order, RJN, Exh. 1 at 2. But the Wright Order does not contain the section 101(b) findings that Congress required. (The order states that certain "materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration." Wright Order, RJN, Exh. 1 at 3. But those are findings required to exercise authority under 101(c), 50 U.S.C. § 4511(c)(2), and do not substitute for section 101(b)'s required findings that the materials are "essential to the national defense," and that the "requirements of the national defense . . . cannot otherwise be met without creating a significant dislocation for the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship.") The Wright Order thus violates Congress's explicit command and is invalid under section 101(a).

**Section 101(c).** Section 101(c) allows the President or his delegee to "require the *allocation of*, or the *priority performance under contracts or orders* . . . relating to[] materials, equipment, and services in order to maximize domestic energy supplies" upon making certain required findings. 50 U.S.C. § 4511(c) (emphasis added). As with section 101(a), the key concepts are *priority* and *allocation*–which envision satisfying certain uses above others—not authorizing activity which otherwise would not be permitted at all. And *all* of "Section 101 is titled 'Priority in contracts and orders.'" *Hercules*, 24 F.3d at 203. For the same

reasons that the Wright Order is not a valid prioritization and allocation order under section 101(a), it is not a lawful order under section 101(c).

### B. Defendants' Use of the Wright Order To Conscript State Land for Federal Use and Encourage Violations of Federal Court Orders Is Contrary to the DPA and Unconstitutional.

Based on the OLC Opinion, DOE apparently contends that section 101 of the DPA authorizes federal agencies to issue orders that broadly preempt state laws and authorize violations of court orders. That is incorrect.

Another provision of the DPA contains express language preempting *antitrust* laws. 50 U.S.C. § 4558(j). But nothing in the DPA references preemption of state laws pertaining to safety, environmental protection, or property rights over state-owned (or any other) land. And Title III allows the government to use congressional funds to make loans and investments in several sectors (including energy) "without regard to the limitations of existing law." 50 U.S.C. § 4533(b). But section 101, in Title I, has no such language.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). This principle applies to provisions enacted together or provisions enacted separately but addressing related statutory schemes. *See United States v. Youssef*, 547 F.3d 1090, 1095 (9th Cir. 2008). The inclusion of preemptive language in some parts of the DPA but not this one is telling: Congress intended no general preemptive authority for DPA orders. At most, when the DPA is used to require companies to prioritize some contracts over others, that implies preemption of the state *contract* laws that would ordinarily govern *competing contractual claims*. But such a possibility is not at issue here: The Wright Order does not instruct Sable on how to choose among competing contracts, as explained above. Rather, DOE asserts that the Wright Order compels Sable to choose production activities over state laws and court orders that prohibit

those activities.

The limitless preemption asserted by DOE is not supported by the DPA's section 707, 50 U.S.C. § 4557. That provision states that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." But that immunity is tied to Congress's enactment of the DPA as a means to reprioritize competing contracts. "[T]he protection provided by DPA section 707 extends only to shield a contractor from *breach of contract* liability arising as a consequence of such re-prioritization," and goes no further. *Hercules*, 24 F.3d at 204 (emphasis added); *see Vertac*, 46 F.3d at 811-12 (similar). As *Hercules* explained, "the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed." *Id.* (collecting cases).

Although the March 2026 OLC opinion asserts that section 707 immunity preempts *all* state law that might frustrate performance under a DPA order, it fails to address the contrary holding in *Hercules*. OLC Slip Opinion, RJN, Exh. 13 at 11-12. And it marks a dramatic change from the federal government's longstanding disavowal of DPA interpretations that "would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *Vertac*, 46 F.3d at 812; *see also, e.g.*, *Hercules Inc. v. United States*, 516 U.S. 417, 430 n.14 (1996) (noting United States' position that § 707 "only bar[s] liability to customers whose orders are delayed or displaced on account of the priority accorded Government orders under § 101 of the DPA").

Nor can the DPA be reasonably read as authorizing the Executive Branch to flout federal judicial orders. Certainly nothing in the *text* of the DPA hints at such a

power. For Congress to grant such a power would be extraordinary—and for the Executive to exercise it would be unconstitutional. *See Miller v. French*, 530 U.S. 327, 343 (2000) ("Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch."). At most, Congress can alter the factors relevant to continuing relief, in ways that permit a party to request that *the court* modify an existing injunction. *See id.* at 331 (discussing provision under Prison Litigation Reform Act, under which a defendant's motion to terminate prospective relief operated as an automatic stay until the court made certain findings). Defendants, in contrast, believe that the Wright Order operates as a self-executing abridgment of this Court's consent decree, with no need to go to the Court at all. No statutory language even hints at such an intent, and courts "'must of course avoid' reading [a] statute 'in a manner that would render it clearly unconstitutional' when 'there is another reasonable interpretation available.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 776 (2025).

The doctrine of constitutional avoidance similarly counsels against Defendants' belief that the statute authorizes the Secretary to simply order Sable to trespass on state-owned land by using the pipelines to transit oil through the park when the relevant easement expired years ago. *See* Bellman Decl. ¶¶ 3-9. The California agency that owns Gaviota State Park has brought a trespass action against Sable in a separate case, which Sable removed to this Court. *Cal. Dep't of Parks & Recreation v. Sable Offshore Corp.,* No. 2:26-cv-02946 (C.D. Cal., March 19, 2026). For purposes of this challenge to the Wright Order itself, it suffices to note that the Constitution's structural federalism principles, as well as the Tenth Amendment, forbid Congress from commandeering state resources to federal ends. *See New York v. United States*, 505 U.S. 144, 175 (1992) (invalidating federal statute that offered States choice between accepting ownership of nuclear waste and regulating according to federal instructions). Even if there were congressional permission, it would be unconstitutional to deploy the DPA to force States to

dedicate state land to the federal government's ends. But there is no indication that Congress intended that unconstitutional result—and the serious constitutional concerns that would arise from such a reading weigh heavily in favor of rejecting it.

Finally, there is no "conflict preemption" here of the sort that occurs "'where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) (citation omitted). As described above, Congress's intent was to limit the commercial law principles that apply where there are competing contracts—not to create a state-law-free zone more broadly. And the first conflict to be resolved is the conflict between the Wright Order and the statutory requirements imposed by Congress, which respect rather than displace state law beyond questions of breach of contract. *See supra* pp. 8-11.

**C. The Wright Order Violates the Department's Own Regulations.**

The Wright Order is also invalid for failing to comply with DOE's own regulations. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) ("[h]aving chosen to promulgate the . . . Policy, the [agency] must follow that policy").

**Regulations Related to 101(a):** DOE's regulations pertaining to 101(a) describe various types of orders that the Secretary may issue under the DPA, including "allocation" orders and "rated" orders. 10 C.F.R. § 217.20. The regulations impose specific requirements on the content for each type of order. The Wright Order does not satisfy either set of requirements.

Allocation orders are defined as "official action[s] to control the distribution of materials, services, or facilities." *Id*. § 217.20. They must include "a detailed description of each required allocation action," "the specific start and end calendar dates for each required allocation action," a statement that it is an allocation order certified for national defense use, and a current copy of the regulations. 10 C.F.R.

§ 217.54. The Wright Order fails to meet these requirements because it does not contain a statement certifying that it is an allocation order, does not contain specific start and end dates, and does not contain "a detailed description of each required allocation action." And because the Wright Order seeks to "control the general distribution of a material in the civilian market," section 217.52 required the Secretary to submit to the President in writing the findings set forth in section 101(b)—which Defendants failed to do.

Rated orders are defined as a "prime contract, a subcontract, or a purchase order in support of an approved program issued in accordance with the provisions of this part." 10 C.F.R. § 217.20. A rated order must assign one of three priority levels: "DX" rated orders are prioritized over "DO" rated orders, which are prioritized over "unrated" orders. *Id.* § 217.31(a). Additionally, rated orders must include a program identification symbol denoting which currently approved program the order supports, the required delivery date for the order, and a statement that it is a rated order certified for national defense use. *Id.* §§ 217.31(b), 217.32. The words "immediately" or "as soon as possible" are insufficient to satisfy the regulation's requirement of a required delivery date. *Id.* § 217.32(b). The Wright Order does not meet these requirements because it does not assign a priority rating, and does not contain the program identification symbol, required delivery date, or statement that it is a rated order.

**Regulations related to 101(c):** These regulations require DOE to consider numerous factors related to a proposed energy project—including: (1) the quantity of energy involved, (2) the benefits of timely energy program furtherance or project completion, (3) socioeconomic impact, (4) the need for the end product for which the materials are allegedly required, (5) established national energy policies, (6) the availability and utility of substitute materials, and (7) the impact of the nonavailability of the specific materials on the furtherance or timely completion of the approved energy program or project—prior to issuing an order under section

101(c). 10 C.F.R. § 216.4. There is no indication that DOE considered any of the required factors.

Because the Wright Order fails to comply with DOE's regulations, it should be set aside. *See Nat'l Med. Enter. v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988) ("[a] regulation has the force of law; therefore, an agency's interpretation of a statute in a manner inconsistent with a regulation will not be enforced") (citing 5 U.S.C. § 706(2)(A)).

**D. The Wright Order Is Arbitrary and Capricious.**

The Wright Order should also be set aside as arbitrary and capricious. An agency action is "arbitrary and capricious" where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

As an exercise of power under section 101(c), the Wright Order must rest on findings that Sable's crude oil and pipelines are "scarce, critical, and essential (i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities," and that "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities" cannot otherwise be reasonably accomplished. 50 U.S.C. § 4511(c)(2).

The Wright Order recites those findings (unlike the findings required to invoke section 101(a), *see supra* pp. 10-11). But there is no evidence that Defendants in fact "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *NRDC v. U.S. Dep't of Interior*, 113 F.3d 1121, 1124 (9th Cir. 1997). For instance, the Wright Order does not explain how and why Sable's crude oil and pipelines specifically are "scarce,

critical, and essential," or why the order is necessary to reasonably accomplish "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities." 50 U.S.C. § 4511(c)(2). It also does not address the factors DOE is required to consider under its own regulations prior to issuing an order under 101(c). *See* 10 C.F.R. § 216.1. Finally, the Wright Order makes no reference to any consideration of actual data; it simply cites to the unsupported claims made in Executive Order 14156 and Sable's letter. Wright Order, RJN, Exh. 1 at 1-2. These are plainly not the types of sources Congress intended for consideration before exercising DPA power—ipse dixit from the President himself and a self-interested party.

Moreover, the Wright Order "entirely failed to consider" "important aspect[s] of the problem," as the APA requires. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It contains no examination of potential impacts on existing court orders, on the laws California has enacted under its sovereign power to protect its people and environment, or on California's rights as a landowner across whose property the oil would pass without an easement. *See infra* pp. 19-21. The availability of alternatives is also a relevant factor, under section 101(c)(2)'s requirement that "the maintenance [etc.] of energy supplies . . . cannot be accomplished without" a section 101(c) order. Yet the Wright Order's conclusory findings feature no analysis of alternatives.

## II. THE LIKELIHOOD OF IRREPARABLE HARM AND EQUITABLE FACTORS WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION.

The State faces irreparable harm, and the balance of equities and the public interest weigh in favor of immediate relief. *See Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024) (where the government is a party, the public interest and the balance of the equities factors "merge"); *Newsom v. Trump*, 811 F.Supp.3d 1086, 1115 (N.D. Cal. 2025) (merging public interest and balance of equities factors

where State sought preliminary injunction against federal government).

**A. California Is Likely To Suffer Irreparable Harm.**

DOE views the Wright Order as requiring Sable to immediately "[r]estore the Santa Ynez Unit and Pipeline," *see supra* p. 1, and absolutely immunizing Sable from liability for any ensuing harm. The previous, catastrophic rupture of that pipeline caused immense environmental and economic damage, leading to substantial damages payments and to the federal Consent Decree's imposition of important safety requirements as preconditions for reopening. *See* Consent Decree, RJN, Exh. 2 at 17-21, 23, App. B. Defendants, however, treat the Wright Order as directing Sable to send oil through the pipeline now, without those requirements being met. This constitutes irreparable harm—by violating the Constitution (*see supra* p. 12-15), and by forcing the State to bear the noncompliant pipeline's risks while immunizing Sable from the consequences, thus reducing Sable's incentive to invest in safe operations. *See, e.g., Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) ("[i]mposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury"); *Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014). It also subjects California to the risk of harm to species protected under the California Endangered Species Act. *See* Vance Decl., ¶¶ 3-12; *cf. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (irreparable harm for injunction under Endangered Species Act need not be based on "extinction-level threat").

Beyond that, "[i]ntangible injuries" may also establish irreparable harm. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). Under DOE's interpretation, the Wright Order divests the State of its regulatory authority. *Supra* pp. 19-21; DOE Press Release (Mar. 13, 2026), RJN, Exh. 15. The Wright Order explicitly noted Sable's dissatisfaction that California laws and regulations—as well as the federal judicial Consent Decree—had "block[ed]" use of its pipeline

for the time being, while Sable continued to pursue necessary state agency approvals. Wright Order, Exh. 1 at 2. Allowing the Wright Order to have effect during this litigation would cause irreparable harm by preventing the State from exercising its lawful jurisdiction and regulatory powers. *See, e.g.*, *Kansas v. United States*, 249 F.3d 1213, 1223-24 (10th Cir. 2001) (finding irreparable harm requirement met and upholding preliminary injunction, where federal government's designation of Indian Land was depriving Kansas of jurisdiction to enforce gaming limitations). That is because "[i]nvasions of state sovereignty ... likely cannot be economically quantified, and thus cannot be monetarily redressed, and as such constitute irreparable harm." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (internal quotation marks omitted) (finding irreparable harm requirement met and upholding preliminary injunction in challenge to federal government action where "the States with conflicting laws will be hampered in their ability to enforce their laws"); *Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994, at *7 (11th Cir. Aug. 22, 2024) (same); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury"); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

The state regulatory powers that DOE purports to displace effectuate essential protections for public health and the State's natural resources. They include the California Geologic Energy Management (CalGEM) Division's testing, inspection, and maintenance duties, Sharma Decl., ¶¶ 5-11, and the California Department of Fish and Wildlife's duties to protect threatened and endangered species, Vance Decl., ¶¶ 2-12, 15. Additionally, the Wright Order purports to displace State Parks's rights and obligations as a property owner. *See, e.g.*, Cal. Pub. Res. Code § 5012 (State Parks' duties prior to encumbering property); *id.* §

21002 (State Parks' obligations to conduct an environmental review so it can fully understand and plan for the impacts of granting Sable a 30-year easement to flow oil through Gaviota State Park, including any attendant maintenance).

**B. The Public Interest and Balance of Equities Favor California.**

When a plaintiff establishes a likelihood that a defendant's actions are unlawful, it has "established that both the public interest and the balance of the equities favor" preliminary injunctive relief. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). That is because it is neither equitable nor in the public interest for the government to violate federal law. *Id.* And the public has a strong "interest [in ensuring] that the laws enacted by their representatives are not imperiled by executive fiat." *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (internal quotation marks and citations omitted). In contrast, defendants "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), and there "is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

**CONCLUSION**

The Court should stay the Wright Order and preliminarily enjoin Defendants, and all those acting in concert with Defendants, from enforcing or relying on it.

Dated: May 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY M. BROWN
Supervising Deputy Attorney General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff State of California, certifies that this brief contains 6,982 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

Dated: May 1, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
REBECCA HUNTER
STACY LAU
MARY HALEY OUSLEY
BRIAN CALAVAN
Deputy Attorneys General

[signature]

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown doj.ca.gov
Alicia.Roessler doj.ca.gov
Rebecca.Hunter doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS RIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br>**DECLARATION OF DENA BELLMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

I, Dena Bellman, declare as follows:

1. I am currently employed as the District Superintendent of the Channel Coast District at the Department of Parks and Recreation ("State Parks"). I have held this position since 2023. I have personal knowledge of the facts stated in this

declaration and could, if called upon to do so, testify competently thereto. State Parks controls the State Park system and it owns and operates Gaviota State Park.

2. As District Superintendent of the Channel Coast District at State Parks, it is my understanding that State Parks is the sole fee owner of the land at Gaviota State Park.

3. I am informed and believe that Sable Offshore Corporation ("Sable") owns and operates Lines CA-324 and CA-325, two onshore oil and gas pipelines that transport hazardous liquids from a processing facility on the Santa Barbara Coast inland to Kern County. A four-mile segment of Line CA-325 ("CA-325") runs underground and through Gaviota State Park, which is owned and operated by State Parks. A true and correct copy of a State Parks document that includes as page 3 a topographic map depicting the segment of CA-325 that runs through the Park is attached hereto as **E hibit A**.

4. It is my understanding that Sable does not have a fee interest in any land at Gaviota State Park. Also, although CA-325 crosses Highway 101 near Gaviota State Beach, no portion of CA-325 under Gaviota State Park follows a public right-of-way.

5. On March 16, 2026, I reviewed a press release issued by Sable that same day, announcing that it had restarted oil production. I am informed and believe that Sable restarted the transportation of oil through CA-325, including through the segment that runs under Gaviota State Park.

6. On August 26, 1987, State Parks granted an easement to Celeron Pipeline Company of California ("Celeron") to "conduct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across" a portion of Gaviota State Park ("Celeron Easement"). A true and correct copy of the Celeron Easement is attached

hereto as **E hibit B**.[1] A true and correct copy of a drawing depicting the pipeline that was attached to the Celeron Easement is attached hereto as **E hibit C**. It is my understanding that the pipeline referenced in the Celeron Easement is the same CA-325 through which Sable is currently transporting oil. The Celeron Easement was for a term of thirty (30) years and expired on July 27, 2016.

7. I am informed and believe that Celeron is Sable's predecessor-in-interest. Neither Celeron nor Sable was granted a new easement, and Sable does not currently have an easement to transport oil under or across Gaviota State Park.

8. I am informed and believe that in 2015, CA-325 was owned and operated by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P. ("Plains"). I am also informed and believe that in or around 2022, Pacific Pipeline Company ("PPC") purchased Lines 901 and 903 from Plains, and that in or around 2024, Sable acquired PPC and its assets, including Lines 901 and 903, which had been renamed Lines CA-324 and CA-325, respectively. I am further informed and believe that between 2015 and approximately March 16, 2026, no oil was transported through CA-325.

9. Since 2016, State Parks has issued annual Right of Entry ("ROE") permits to Sable's predecessors-in-interest or companies affiliated with Sable that allow them to access Gaviota State Park in order to physically enter and perform minimal maintenance on CA-325 in its dormant status. Those permits are necessary because, as mentioned above, Sable does not have an easement that would otherwise allow it to access the Park.

10. Attached hereto as **E hibit D** is a true and correct copy of the annual ROE permit that State Parks issued to PPC on July 25, 2024, and that expired on July 26, 2025.

[1] The Celeron Easement was subsequently amended in 1996 to correct the legal description, as Sable's predecessor re-routed the pipeline during construction without State Parks' approval or knowledge until several years after construction. The amendment is included as part of Exhibit B attached hereto.

11. The most recent ROE permit ("Annual Permit") was issued by State Parks to PPC on July 25, 2025. A true and correct copy of the Annual Permit is attached hereto as **E hibit E**. The term of the Annual Permit began on July 27, 2025, and ends on July 26, 2026. The Annual Permit does not allow PPC or Sable to transport oil through that portion of CA-325 that passes through Gaviota State Park.

12. On March 14, 2026, State Parks issued a letter, expressing its formal denial of Sable's requested easement and demanding Sable remove CA-325 pursuant to State Parks' rights under the expired easement, providing a detailed rationale including recent property damage and physical harm caused as a result of Sable's anomaly digs and related activity. State Parks stated it was prepared to withdraw its letter if Sable confirmed in writing no later than 12PM Pacific Time on Monday, March 16, 2026, that it had not restarted the pipeline traveling through Gaviota State Park and that it would not restart the pipeline until and unless it obtained all required state approvals and a new easement from State Parks, or it obtained a final judicial decision that any state approvals or easements were not needed. Attached hereto as **E hibit F** is a true and correct copy of the letter State Parks issued to Sable on March 14, 2026. I am informed and believe that no response was received to that letter.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

13. To my knowledge, no one at State Parks asked Sable to remove CA-325 itself from Gaviota State Park prior to March 14, 2026, when State Parks sent Sable the above-referenced letter. Thus, it is my understanding that Sable had permission from State Parks to keep CA-325 and minimally maintain it in a dormant state at Gaviota State Park consistent with applicable ROE permits until the letter was issued and the right to keep CA-325 was revoked.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated: 4/28/2026

DocuSigned by:
Dena Bellman
1FD96B85B9674A1...

Dena Bellman
Declarant

# Exhibit A

**State of California – The Resources Agency**
**DEPARTMENT OF PARKS AND RECREATION**

# NOTICE OF EXEMPTION

**TO:** Office of Planning and Research
1400 Tenth Street
Sacramento, CA 95814

**FROM:** Department of Parks and Recreation
1416 Ninth Street
P.O. Box 942896
Sacramento, CA 94296-0001

**PROJECT TITLE:** Pacific Pipeline 2025 Anomaly Digs

**LOCATION:** Gaviota State Park

**COUNTY:** Santa Barbara

**DESCRIPTION OF THE NATURE AND PURPOSE OF PROJECT:** The project is located in Gaviota S.P. along an existing crude oil pipeline known as Line 325 (see **Exhibit A**). The project entails granting a right-of-entry to the Pacific Pipeline Company, which would allow permittee to excavate and repair eighteen (18) discrete pipeline anomaly sites. When the work on each site is completed, the surface will be restored. Work will be performed by Pacific Pipeline Company and/or its subcontractors.

**PUBLIC AGENCY APPROVING THE PROJECT:** California Department of Parks and Recreation

**NAME OF DIVISION OR DISTRICT CARRYING OUT THE PROJECT:** Channel Coast District

**EXEMPT STATUS:**
☒ Statutory Exemption (Section 15284)
☒ Categorical Exemption
*Classes:* 1, 2, 4, 5 *Sections:* 15301, 15302, 15304, 15305

**REASONS WHY PROJECT IS EXEMPT:**
- **Section 15284**: The project is less than eight miles in length; actual construction is not undertaken over a length of more than one-half mile at any one time; to State Parks' knowledge, the section of pipeline is not less than eight miles away from any section of pipeline that has been subject to this exemption in the past 12 months; the project is not solely for the purpose of excavating hazardous soil; the permittee's Integrated Contingency Plan results in notification of appropriate agencies to take action in the event of an emergency evacuation; project activities are undertaken within an existing right-of-way and the permit requires the right-of-way to be restored to its condition prior to the project; and the permit requires the permittee to comply with all conditions otherwise authorized by law.
- **Section 15301 (Class 1) Existing Facilities (d):** The project consists of restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety.
- **Section 15302 (Class 2) Replacement or Reconstruction (b):** Replacement of a commercial structure with a new structure of substantially the same size, purpose, and capacity.
- **Section 15304 (Class 4) Minor Alterations to Land (f):** The project consists of minor trenching and backfilling activities with planned surface restoration.
- **Section 15305 (Class 5) Minor Alterations in Land Use Limitations:** The project consists of minor alterations in land use limitations in areas with an average slope of less than 20%.

No potential for significant or cumulative impacts to the environment is anticipated in compliance with CEQA §15301, 15302, 15304, and 15305, as the project consists of repairs to an existing facility with no expansion of use. The footprint of the pipeline remains the same. All work shall be performed in

accordance with applicable environmental regulations and State Parks' stipulated requirements, conditions, and restrictions to avoid and/or minimize the potential for environmental impact. All work shall be monitored by qualified environmental and cultural staff.

**CONTACT:** Dena Bellman
Channel Coast District

**PHONE NO.:** (805) 331-3955
**EMAIL:** Dena.Bellman@parks.ca.gov

DocuSigned by:
Dena Bellman
1FD96B85B9674A1...

Dena Bellman
District Superintendent
Channel Coast District

5/9/2025
Date

**EXHIBIT A – Gaviota State Park Line 325A Topographic Map**

# EXHIBIT A




Legend
- Line CA-325A
- Gaviota State Park Assessor's Parcels

**Gaviota State Park**
**Line 325A - Topographic Map**
Pacific Pipeline Company
Santa Barbara County, California

Esri Community Maps Contributors, California State Parks, Esri, TomTom, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, Bureau of Land Management, EPA, NPS, US Census Bureau, USDA, USFWS, Copyright: © 2013 National Geographic Society, i-cubed, California State Parks, Esri, TomTom, Garmin, SafeGraph, FAO, METI/NASA, USGS, Bureau of Land Management, EPA, NPS, USFWS
USGS Topographic Map (Source: ArcGIS Online)

Scale: 1:15,360

SCS ENGINEERS

Santa Maria, CA | May 2025

0 0.15 0.3 Miles N

# Exhibit B

PIPELINE EASEMENT

CELERON PIPELINE COMPANY OF CALIFORNIA

GAVIOTA STATE PARK

STATE OF CALIFORNIA, acting by and through the Department of Parks and Recreation, hereinafter called "STATE", and pursuant to Public Resources Code Section 5012 and in accordance with Section 5400 et seq., grants to CELERON PIPELINE COMPANY OF CALIFORNIA, hereinafter called "COMPANY", an easement to construct, operate, maintain, and remove an underground pipeline together with its appurtenances for the transportation of hydrocarbon substances over, under, and across that portion of Gaviota State Park described in Exhibit "A", attached hereto and made a part hereof.

THIS EASEMENT IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS:

1. This easement is for a term of thirty (30) years, beginning July 28, 1986 and ending on July 27, 2016.

2. As consideration for the granting of this easement, COMPANY agrees to pay STATE $477,998.50, calculated as follows:

---

---

---

391-0…

1047899

DO NOT RECORD!

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

| | | | |
|---|---|---|---|
| Inland Area | 250 | 871.13 | 217,782.50 |
| | | | $377,998.50 |
| Mitigation of impacts to natural resources and public recreation use | | | 100,000.00 |
| TOTAL | | | $477,998.50 |

Mitigation of impacts to natural resources and public recreation use are based on the project described in the Environmental Impact Report and Environmental Impact Statement, dated January 1985 and filed under State Clearing House Number 83110902. Impacts above and beyond those within said Gaviota State Park will be the subject of additional compensation to State.

This payment shall be made in a single lump sum payment within 60 days of the date of this easement.

Discrepancies between pipeline lengths actually installed and calculated lengths will be paid for additionally or reimbursed from one party to the other within 90 days of the completion of the construction of the pipeline, using the formula set forth above.

3. COMPANY acknowledges that this easement is expressly limited to the lands described in said Exhibit "A", and use of other STATE owned land is not conferred or implied, excepting the access road described in Paragraph 13 14 herein.

---

3



301-0269

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

word "Grant" . ein shall not be construed as . ovenant against the existence of any thereof.

5. COMPANY, in the exercise of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.

6. (a) In the exercise of this easement, COMPANY shall conduct archeological work under provisions of Exhibit "B", attached hereto and made a part hereof.

(b) COMPANY agrees that construction monitors, as required under Santa Barbara County Final Development Plan C-1, will oversee all construction activities within said Park. Said Plan C-1 is attached hereto as Exhibit "C" and made a part hereof.

(c) COMPANY agrees that all areas disturbed during construction activities and during the term of this easement will be restored and revegetated as required under the approved Gaviota State Park Restoration and Revegetation Plan, attached hereto as Exhibit "D" and made a part hereof.

7. COMPANY hereby waives all claims and recourse against the State of California, its officers, agents, and employees for loss or damage to persons or property arising from, growing out of, or in any way connected with or incident to this easement. COMPANY agrees to indemnify, save harmless, and defend the State of California, its officers, agents, and employees against

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)



301-0263

the State of California, its officers, agents, and employees, arising out of or in any way connected with or incident to this easement, except those arising out of the sole negligence of STATE.

8. Upon any termination of this easement, COMPANY shall remove at the option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration.

9. It is mutually agreed that COMPANY, at its option, may extend the term of this easement for an additional period not to exceed ten (10) years, subject to the following provisions:

(a) COMPANY must give STATE, during year twenty-nine (29) of this easement, a written request for the extension of this easement. Said request shall set forth the length of the proposed extension.

(b) Consideration for said extension, payable by COMPANY in a lump sum prior to the expiration of the original term of this easement, shall be the fair market value of the property rights involved. If STATE and COMPANY fail to reach agreement as to said fair market value, the dispute shall be resolved under the provisions of paragraph 24 herein.

---

---

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

84 32915



SDI-0263

and B of this clause, and those terms and conditions changed by mutual consent of STATE and COMPANY, the terms and conditions of this easement shall remain in full force and effect.

10. COMPANY can at any time by providing thirty (30) days written notice to STATE of its intent to terminate this easement, do so.

11. In the event that COMPANY shall at any time be in default in respect to any liquidated monetary payment due hereunder STATE may at its option declare this easement forfeited and terminated, provided, however, before any forfeiture shall be declared hereunder, STATE shall cause to be given to COMPANY a written notice specifying the particulars wherein COMPANY is in default and demanding performance in accordance with the terms of this easement. If within thirty (30) days after such notice is given, COMPANY shall fully comply therewith, no forfeiture by reason of breach shall be declared hereunder; but, in the event of the failure of COMPANY to comply with such notice, STATE may then declare and effect a forfeiture by reason of the default therein specified.

COMPANY is prohibited from assigning, mortgaging, hypothecating, or transferring this easement or any interest therein without the prior written consent of STATE, which consent will not be unreasonably withheld.

12. In the event of a spill or leak of said pipeline contents into or over said Park, COMPANY shall immediately notify STATE'S Regional Director for ---

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV 8-72)

84 32915



301 0263

The name and company of the person reporting, an information telephone number that can be contacted for further information, the time and date of the spill, the location of the spill, the discharger, the substance spilled, the estimated quantity spilled, the cause of the spill, and the action taken. Thereafter, a written report shall be filed with the STATE identifying the source, cause, size of spill, and the action taken.

13. COMPANY shall during the herein term maintain in full force and effect, with respect to this easement, a policy or policies of public liability insurance in the amount of Five Hundred Thousand Dollars ($500,000) each occurrence for bodily injury and property damage combined ($500,000 combined single limit). The policy or policies shall be underwritten to the satisfaction of STATE, in a form satisfactory to STATE, and a complete and signed copy of a Certificate of Insurance thereof shall be submitted to STATE concurrently with the signed copy of this easement. Certificates of Insurance shall contain the following special endorsement:

> "The State of California, California State Park and Recreation Commission, Department of Parks and Recreation, their officers, employees, and agents, are hereby declared to be additional insureds under the terms of this policy, both as to the activities of the Company and as to the activities of the State, the State Park and Recreation Commission, the Department of Parks and Recreation, their officers, employees, and agents, as related to the activities contemplated in this easement."

3



301-0263

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

and vacation.

"The State of California is not liable for the payment of any premiums or assessments on this policy."

This cancellation provision shall not be construed in derogation of the duty of the COMPANY to furnish insurance during the entire term of the easement.

In the event COMPANY fails to keep in effect at all times insurance coverage as herein provided, STATE may, in addition to any other remedies it may have, terminate this easement and all privileges COMPANY may have hereunder.

14. The road to be used by COMPANY for ingress, egress, and access by COMPANY to this easement shall be reasonably designated and redesignated by STATE. COMPANY shall not call upon STATE, nor shall STATE have any responsibility to perform any maintenance work or to make any repairs or improvements on said road. If COMPANY feels more maintenance or repair work is needed than is actually performed by STATE, COMPANY may perform such repairs or maintenance at COMPANY'S own expense. COMPANY shall immediately repair any damage caused by COMPANY, or its invitees, to the road surface.

15. In its use of this easement, COMPANY shall comply with all STATE requirements, including, but not limited to, parking control and the uses

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

16. COMPANY shall coordinate all construction activities herein authorized within said Park with STATE'S Superintendent of the Gaviota District to assure the safety of said Park visitors and also to minimize the inconvenience to said Park visitors and possible detrimental effect on said Park operations or resources.

17. If STATE grants other pipeline easements within this easement, each such easement shall require that the grantee pay COMPANY'S cost for inspectors to protect COMPANY'S pipeline, require grantee to indemnify COMPANY, and to have a plan that gives time and dates for revegetation and cathodic protection in accordance with industry standards. STATE shall not be liable to COMPANY for failure to require said grantees to provide these protections unless COMPANY gives written notice to STATE, prior to such grant, of the provisions of this paragraph. Also, in no event shall STATE have any liability for failure to require these protections if the pipeline is installed pursuant to a court order in an action in eminent domain.

18. During construction, COMPANY shall provide or cause to be provided: (1) adequate signing for its work, including all of its excavations, within said Park warning the public of dangerous conditions, and (2) adequate lighting to warn against open excavations or other dangerous conditions created during said construction. All trenches and excavations for the pipeline or other construction work shall be made in such a manner as to permit the visiting public uninterrupted access across the route of said construction.

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)



301-0263

providing access throughout said Park for the visiting public.

20. No tree or plants outside this easement within said park shall be cut, injured, or disturbed as a result of the herein construction by COMPANY without prior approval of said Superintendent. Any tree or slash so cut or removed shall be disposed of in a manner satisfactory to STATE. Any trees or plants removed within said Park shall be replaced at no cost to STATE with trees and plants acceptable to STATE in accordance with provisions under Paragraph 6(c) above.

21. To secure the full and complete performance of COMPANY'S obligation hereunder to the good faith satisfaction of STATE, and until the termination herein provided, COMPANY shall furnish evidence for STATE of its financial net worth in excess of $10,000,000 or as an alternative, COMPANY may provide a bond in the amount of One Million Dollars ($1,000,000). Said bond shall be in the form shown on Exhibit "E", attached hereto and made a part hereof.

22. If, in the judgment of said Superintendent, the herein construction becomes hazardous to said Park or said Park visitors, the said Superintendent shall immediately request COMPANY to cease that specific construction task and COMPANY shall not proceed with that specific construction task until the hazardous problem is resolved in a manner acceptable to said Superintendent.

23. In the event of a rupture of the pipeline and consequent spill of pollutants within the said Park, COMPANY, at no cost to STATE, shall

3

20.. 0263

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

spill or pollutants. Upon approval by STATE and COMPANY of the monetary determination of loss, COMPANY shall submit said amount to STATE. If STATE and COMPANY fail to reach agreement, the dispute shall be resolved under provisions of paragraph 24 herein.

24. If a monetary dispute arises under paragraphs 9, 23, or 25 of this easement, it shall be resolved by two persons skilled in appraisal of the type of valuation sought by STATE. STATE shall appoint one appraiser and COMPANY the other appraiser. STATE and COMPANY shall be bound by the determination made by the two appraisers. If the two appraisers do not come to an agreement upon the appraised damages and/or values, a third appraiser shall be appointed by the first two appraisers so that a decision can be made by the majority.

25. In the event a spill of pollutants results in the permanent loss of usability of part or all of said Park, COMPANY, upon request by STATE, shall hire a professional real property appraiser acceptable to STATE for the purpose of determining fee value of the land no longer usable and the cost to replace said with land of equal value and utility. Upon review and approval of the appraisal by STATE and COMPANY, COMPANY will proceed to obtain land of equal value to provide STATE a dollar amount equal to the value of the land no longer usable. STATE and COMPANY will then exchange properties. If STATE and COMPANY cannot agree to the exchange, the dispute shall be resolved under provisions of paragraph 24 above.

---

---

3

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)



301-0268

60 District Boulevard
Ba...rsfield, CA 93313

27. Notices to STATE shall be addressed to:

District Superintendent
Gaviota District
Department of Parks and Recreation
#10 Refugio Beach Road
Goleta, CA 93117

IN WITNESS WHEREOF, the parties hereto have executed this Grant of easement this ________day of ______________________________, 19___.

| CELERON PIPELINE COMPANY OF CALIFORNIA | STATE OF CALIFORNIA DEPT. OF PARKS AND RECREATION |
|---|---|
| By [signature] Ronald L. Hinn | [signature] |
| Title President | Chief Deputy Director |
| Date August 6, 1987 | 8-26-87 |

APPROVED:

DEPARTMENT OF GENERAL SERVICES

By [signature]
PAUL V. SAVONA, Chief
Office of Real Estate
and Design Services

Date: NOV 23 1987

57-0563

B-1132Q

Centerline description of a fifty (50) foot wide right of way in, through and across that certain parcel of land situated in the County of [illegible] Barbara, State of California more particularly referred to as "Gaviota State Park." Said land is depicted in Record of Survey Map recorded in Book 85, page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0° 25' East a distance of 152.7 feet from a 2" Iron Pipe with brass cap tagged L.S. 2602 and depicted as monument 40A on Record of Survey Map recorded in Book 85, Page 9, Sheets 1 to 5 inclusive.

1) THENCE North 71° 38' West for a distance of 547.9 feet;

2) THENCE North 65° 09' West for a distance of 46.0 feet;

3) THENCE North 54° 19' West for a distance of 40.0 feet;

4) THENCE North 43° 30' West for a distance of 40.0 feet;

5) THENCE North 32° 41' West for a distance of 105.5 feet;

6) THENCE North 22° 12' West for a distance of 40.0 feet;

7) THENCE North 11° 43' West for a distance of 575.3 feet;

8) THENCE North 19° 28' West for a distance of 40.0 feet;

9) THENCE North 27° 13' West for a distance of 116.5 feet;

10) THENCE North 36° 58' West for a distance of 40.0 feet;

11) THENCE North 46° 42' West for a distance of 40.0 feet;

12) THENCE North 56° 27' West for a distance of 33.5 feet;

13) THENCE North 68° 37' West for a distance of 40.0 feet;

14) THENCE North 80° 47' West for a distance of 40.0 feet;

15) THENCE South 87° 03' West for a distance of 45.8 feet;

16) THENCE South 78° 34' West for a distance of 40.0 feet;

17) THENCE South 70° 05' West for a distance of 40.0 feet;

18) THENCE South 61° 36' West for a distance of 75.5 feet;

19) THENCE South 72° 53' West for a distance of 40.0 feet;

21) THENCE North 85° 09' West for a distance of 40.0 feet;

22) THENCE North 74° 29' West for a distance of 40.0 feet;

23) THENCE North 63° 48' West for a distance of 208.8 feet to a point of curvature;

24) THENCE along a curve to the right with a radius of 44.5 feet and a central angle of 51° 30' for a distance of 40.0 feet;

25) THENCE North 12° 19' West for a distance of 808.0 feet to a point of curvature;

-1-

EXHIBIT-A

301-0263

28) THENCE South [illegible]° 20' West for a distance of 43.5 feet;

29) THENCE South 65° 13' West for a distance of 121.3 feet;

30) THENCE South 41° 19' West for a distance of 149.5 feet;

31) THENCE South 29° 36' West for a distance of 991.4 feet;

32) THENCE South 40° 41' West for a distance of 40.0 feet;

33) THENCE South 51° 46' West for a distance of 305.6 feet;

34) THENCE South 62° 01' West for a distance of 40.0 feet;

35) THENCE South 72° 16' West for a distance of 40.0 feet;

36) THENCE South 82° 32' West for a distance of 40.0 feet;

37) THENCE North 87° 13' West for a distance of 261.4 feet;

38) THENCE South 81° 05' West for a distance of 238.7 feet;

39) THENCE South 70° 18' West for a distance of 40.0 feet;

40) THENCE South 59° 32' West for a distance of 40.0 feet;

41) THENCE South 48° 45' West for a distance of 40.0 feet;

42) THENCE South 38° 00' West for a distance of 281.4 feet;

43) THENCE South 49° 01' West for a distance of 40.0 feet;

44) THENCE South 60° 03' West for a distance of 157.1 feet;

45) THENCE South 70° 33' West for a distance of 107.0 feet to a point of curvature;

46) THENCE along a curve to the right having a radius of 32.1 feet and a central angle of 71° 52' for a distance of 40.2 feet;

47) THENCE North 37° 35' West for a distance of 383.3 feet;

48) THENCE North 48° 49' West for a distance of 40.0 feet;

49) THENCE North 60° 14' West for a distance of 40.0 feet;

50) THENCE North 71° 33' West for a distance of 734.2 feet;

51) THENCE North 79° 07' West for a distance of 485.2 feet;

52) THENCE North 70° 38' West for a distance of 40.0 feet;

53) THENCE North 62° 08' West for a distance of 40.0 feet;

54) THENCE North 53° 38' West for a distance of 82.2 feet to the POINT OF TERMINATION in the West property line of the above described tract of land. Said POINT OF TERMINATION bears South 07° 36' East a distance of 2280.9 feet from a standard P&E bronze disc index number 3 as per Record of Survey mentioned above:

55) THENCE re-entering Gaviota State Park along the West property line. Said POINT OF BEGINNING bears South 07° 36' East a distance of 25.6 feet from a standard P&E bronze disc mentioned above. THENCE along a curve to the right having a radius of 35.3 feet and a central angle of 69° 02' for a distance of 42.5 feet;

3



EXHIBIT-A

301-0203

60) THENCE North [illegible] East for a distance of 218.[illegible] feet;

61) THENCE North 64° 21' East for a distance of 201.7 feet;

62) THENCE North 56° 54' East for a distance of 21.4 feet;

63) THENCE North 44° 55' East for a distance of 40.0 feet;

64) THENCE North 32° 57' East for a distance of 40.0 feet;

65) THENCE North 20° 58' East for a distance of 40.0 feet;

66) THENCE North 08° 59' East for a distance of 40.0 feet;

67) THENCE North 02° 59' West for a distance of 40.0 feet;

68) THENCE North 14° 58' West for a distance of 612.9 feet;

69) THENCE North 25° 52' West for a distance of 40.0 feet;

70) THENCE North 36° 46' West for a distance of 40.0 feet;

71) THENCE North 47° 39' West for a distance of 342.0 feet;

72) THENCE North 45° 52' West for a distance of 286.0 feet;

73) THENCE North 35° 30' West for a distance of 40.0 feet;

74) THENCE North 25° 08' West for a distance of 40.0 feet;

75) THENCE North 14° 47' West for a distance of 40.0 feet;

76) THENCE North 04° 25' West for a distance of 40.0 feet;

77) THENCE North 05° 57' East for a distance of 613.4 feet;

78) THENCE North 05° 51' West for a distance of 40.0 feet;

79) THENCE North 17° 39' West for a distance of 40.0 feet;

80) THENCE North 29° 27' West for a distance of 40.0 feet;

81) THENCE North 41° 14' West for a distance of 40.0 feet;

82) THENCE North 53° 02' West for a distance of 149.4 feet;

83) THENCE North 42° 33' West for a distance of 40.0 feet;

84) THENCE North 32° 04' West for a distance of 40.0 feet;

85) THENCE North 21° 35' West for a distance of 40.0 feet;

86) THENCE North 11° 06' West for a distance of 415.3 feet;

87) THENCE North 19° 10' West for a distance of 271.4 feet;

88) THENCE North 11° 59' West for a distance of 113.1 feet;



3

EXHIBIT A

301-0268

94) THENCE North [illegible]6° 49' East for a distance of 40.0 feet;

95) THENCE North 37° 09' East for a distance of 213.5 feet;

96) THENCE North 26° 49' East for a distance of 40.0 feet;

97) THENCE North 16° 28' East for a distance of 372.3 feet;

98) THENCE North 28° 03' East for a distance of 40.0 feet;

99) THENCE North 39° 39' East for a distance of 660.1 feet;

100) THENCE North 29° 57' East for a distance of 40.0 feet;

101) THENCE North 20° 16' East for a distance of 40.0 feet;

102) THENCE North 10° 34' East for a distance of 40.0 feet;

103) THENCE North 00° 52' East for a distance of 96.6 feet;

104) THENCE North 12° 24' East for a distance of 40.0 feet;

105) THENCE North 23° 56' East for a distance of 40.0 feet;

106) THENCE North 35° 28' East for a distance of 40.0 feet;

107) THENCE North 47° 00' East for a distance of 264.6 feet;

108) THENCE North 39° 36' East for a distance of 40.0 feet;

109) THENCE North 32° 12' Eat for a distance of 365.5 feet;

110) THENCE North 33° 15' East for a distance of 787.1 feet;

111) THENCE North 25° 53' East for a distance of 180.5 feet;

112) THENCE North 34° 22' East for a distance of 366.8 feet;

113) THENCE North 33° 21' East for a distance of 210.2 feet;

114) THENCE North 39° 14' East for a distance of 153.5 feet;

115) THENCE North 31° 35' East for a distance of 33.7 feet;

116) THENCE North 42° 25' East for a distance of 40.0 feet;

117) THENCE North 53° 15' East for a distance of 40.0 feet;

118) THENCE North 64° 05' East for a distance of 40.0 feet;

119) THENCE North 74° 55' East for a distance of 40.0 feet;

120) THENCE North 85° 45' East for a distance of 74.0 feet;

121) THENCE North 84° 50' East for a distance of 357.3 feet;

122) THENCE North 73° 09' East for a distance of 40.0 feet;

123) THENCE North 61° 28' East for a distance of 268.1 feet;



EXHIBIT-A

301-D268

129) THENCE North 56° [illegible]' East for a distance of 40.0 feet;

130) THENCE North 45° 13' East for a distance of 40.0 feet;

131) THENCE North 34° 12' East for a distance of 189.0 feet;

132) THENCE North 45° 19' East for a distance of 40.0 feet;

133) THENCE North 56° 25' East for a distance of 142.6 feet;

134) THENCE North 45° 49' East for a distance of 40.0 feet;

135) THENCE North 35° 12' East for a distance of 40.0 feet;

136) THENCE North 24° 36' East for a distance of 40.0 feet;

137) THENCE North 14° 00' East for a distance of 40.0 feet;

138) THENCE North 03° 23' East for a distance of 80.0 feet;

139) THENCE North 11° 40' East for a distance of 40.0 feet;

140) THENCE North 19° 57' East for a distance of 234.0 feet to the POINT OF TERMINATION in the Northerly property line of the above described tract of land. Said POINT OF TERMINATION bears North 68° 27' West a distance of 119.9 feet from Caltrans monument +00"A"/180.0 as shown on Caltrans Map for State Highway 1 Map P.M. 0.0-S81.

Said centerline contains 21,452.7 lineal feet or 1300.2 rods in length, more or less.

The bearings calculated to establish the location of the above centerline was obtained from monuments "Surprise" and "Orford."

EXHIBIT-A

3

[illegible]

ER-1111


EXHIBIT A
SANTA BARBARA COUNTY, CALIFORNIA
RANCHO NUESTRA SENORA DEL REFUGIO
RANCHO LAS CRUCES
RANCHO LAS CRUCES
RANCHO NUESTRA SENORA DEL REFUGIO
U.S.
HWY.
101
SOUTHERN PACIFIC RAILROAD
PACIFIC OCEAN
CELERON PIPELINE COMPANY OF CALIFORNIA
PL-1118-A
1 OF 2
301-0268

3

ALL AMERICAN PIPELINE COMPANY
5800 MING AVENUE, SUITE 300
BAKERSFIELD, CALIFORNIA 93309
ATT: RIGHT-OF-WAY DEPARTMENT

Kenneth A Pettit
Recorder
10:28am 27-Ju. -89 RO 5

When Recorded Mail To:

DOCUMENTARY TRANSFER TAX $ -0-
.......COMPUTED ON FULL VALUE OF PROPERTY CONVEYED
.......OR COMPUTED ON FULL VALUE LESS LIENS AND ENCUMBRANCES REMAINING AT TIME OF SALE.
All American Pipeline Co. By [signature]
Signature of Declarant or Agent determining tax. Firm Name

5

Space Above for Recorder's Use

AGREEMENT AND GRANT OF EASEMENT

Grantee: All American Pipeline Company ~~Celeron Pipeline Company of California~~ [initials]
TR89 100-E

Project: Underground Communication and Electrical Supply Systems

Park Unit: Gaviota State Park

THIS AGREEMENT made and entered into by and between the STATE OF CALIFORNIA, acting through the Department of Parks and Recreation, hereinafter called State, and ALL AMERICAN PIPELINE COMPANY ~~CELERON-PIPELINE-COMPANY-OF-CALIFORNIA~~, a Texas ~~Delaware~~ [initials] Corporation ~~Corporation~~, hereinafter called Grantee.

State pursuant to the provisions of Section 5012 of the Public Resources Code of the State of California, and for valuable consideration, receipt of which is hereby acknowledged, hereby grants unto Grantee, its successors and assigns forever, an easement for the use, construction, reconstruction, placement, replacement, repair, inspection, operation and maintenance of an underground communication and electrical supply systems consisting of underground conduits, cables, and vaults including aboveground enclosures, markers, and concrete pads and all incidental appurtenant fixtures and/or equipment in, under, across and along that certain real property conveyed to the State of California by deed recorded October 10, 1967, in

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)

85 34769

301-0207

1047903

California, and more particularly described as follows:

A strip of land 10 feet in width, lying 7 feet to the Westerly and 3 feet to the Easterly of the following described line:

Beginning at a point which bears North 20° 49' West, 1644.3 feet from a State Highway R.O.W. monument designated 05-SB-101 + 24.93/121 thence South 61° 14' East 13.3 feet; thence South 18° 40' East, 28.9 feet to point of termination on the North boundary of Celeron's existing East-West 50-foot wide pipeline easement recorded April 7, 1988 as Document No. 88-020459 Official Records, County of Santa Barbara.

PROVIDED, this Grant of Easement is subject to the following terms and conditions:

1. This Grant is subject to existing contracts, leases, licenses, easements, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.

2. Grantee waives all claims against State, its officers, agents, and employees, for loss or damage caused by, arising out of, or in any way connected with the exercise of this Easement, and Grantee agrees to save harmless, indemnify, and defend State, its officers, agents, and employees, from any and all loss, damage, or liability which may be suffered or incurred by State, its officers, agents, and employees caused by, arising out of, or in any way connected with exercise by Grantee of the rights hereby granted, except those arising out of the sole negligence of State.

---

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

85 34769

 30 - 2767

hereunder.

4. State expressly reserves the right to require Grantee, at the expense of Grantee, to remove and relocate all improvements placed by Grantee within the easement, upon determination by State that the same interfere with future development of State's property. Within 180 days after State's written notice and demand for removal and relocation of the improvements, Grantee shall remove and relocate the improvements to a feasible location on the property of State, as designated by State, and State shall furnish Grantee with a good and sufficient similar easement in such new location, on the same terms and conditions as herein stated, and Grantee thereupon shall reconvey to State the Easement herein provided.

5. This Easement shall terminate in the event Grantee fails for a continuous period of one (1) year to use the Easement for the purposes herein granted. Upon such termination, Grantee shall forthwith upon service of written demand, deliver to State a quitclaim deed, to its right, title, and interest hereunder, and shall, on State request, without cost to State, and within 90 days from written demand by State, remove all property placed by or for Grantee upon said property and restore said premises as nearly as possible to the same condition they were in prior to the execution of this Easement. In the event Grantee should fail to restore the premises in accordance with such request, State may do so at the risk of Grantee, and all costs of such removal and restoration shall be paid by Grantee upon demand.

---

COURT PAPER
STATE OF CALIFORNIA
STD 113 (REV 8-72)

85 34769

 301-0267

the ground around such excavation, and shall replace the earth so removed by it and restore the surface of the ground and any improvement thereon to as near the same condition as they were prior to such excavation as is practicable.

7. Grantee is further given the right of reasonable ingress to and egress from the Easement hereby granted, provided, however, that existing roads and trails shall be utilized for such purpose whenever reasonably possible and further provided that if such road or trail is not available, Grantee shall secure the consent of the State as to the route or routes to be followed for the purpose of such ingress and egress. Such right of ingress and egress shall at all times be exercised in a manner which will cause the least damage to the property of the State.

JUN 20 1989
Date

STATE OF CALIFORNIA
DEPARTMENT OF PARKS AND RECREATION

By [signature]

GRANTEE:
~~CELERON PIPELINE COMPANY OF CALIFORNIA~~ Union
ALL AMERICAN PIPELINE COMPANY

By [signature]

Y-16000

APPROVED
Department of General Services
By [signature]
Senior Land Agent
Office of Real Estate and Design Services

301-0267

COURT PAPER
STATE OF CALIFORNIA
STD. 113 (REV. 8-72)
85 34769

On this 26th day of June, in the year of 1989, before me, a Notary Public in and for the STATE OF CALIFORNIA, duly commissioned and sworn, personally appeared Henry R. Agonia, known to me to be the ___ DIRECTOR OF PARKS AND RECREATION OF THE STATE OF CALIFORNIA and acknowledged to me that (s)he executed the within instrument in the name of and on behalf of the STATE OF CALIFORNIA.

IN WITNESS WHEREOF, I have hereunder set my hand and affixed my official seal in said County, the day and year first above written.

Susan P. Harrington
Notary Public

OFFICIAL SEAL
SUSAN P. HARRINGTON
NOTARY PUBLIC CALIFORNIA
SACRAMENTO COUNTY
My Comm. Expires Sept 25, 1990

STATE OF CALIFORNIA )
) SS.
COUNTY OF Kern )

On June 9, 1989, before me, the undersigned, a Notary Public in and for said State, personally appeared **HARRY M. WEED**, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the **VICE PRESIDENT - OPERATIONS of ALL AMERICAN PIPELINE COMPANY**, a Texas corporation, the corporation that executed the within instrument, and acknowledged to me that such corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

WITNESS my hand and official seal.

Freda Dianna Bagby
Notary Public

OFFICIAL SEAL
FREDA DIANNA BAGBY
NOTARY PUBLIC - CALIFORNIA
KERN COUNTY
My comm. expires AUG 25, 1992

321-02-7

96-004247 4126-342

Recorded Official Records County of Santa Barbara Kenneth A Pettit Recorder 11:33am 26-Jan-96

| | |
|---|---|
| Rec Fee | 68.00 |
| AU2 | 2.00 |
| COP | 23.00 |
| CER | 2.00 |
| NCO | 66.00 |
| CR Crd | 161.00 |
| CARD | MM 22 |

**RECORDING REQUESTED BY**
**WHEN RECORDED MAIL TO:**
**ALL AMERICAN PIPELINE COMPANY**
**5500 MING AVENUE, SUITE 300**
**BAKERSFIELD, CALIFORNIA 93309**
**ATT: RIGHT-OF-WAY DEPARTMENT**

DOCUMENTARY TRANSFER TAX $ —0—
☐ Computed on full value of property conveyed, or
☐ Computed on full value less liens & encumbrances remaining thereon at time of sale.

Signature of declarant or agent determining tax - firm name

**SEPTEMBER 26, 1995**
**R/W 93050-OSB-023**
**GAVIOTA STATE PARK**
**COUNTY OF SANTA BARBARA**
**STATE OF CALIFORNIA**

## MEMORANDUM OF AMENDMENT TO PIPELINE EASEMENT

This Memorandum of Amendment to Pipeline Easement is made and entered into by and between the State of California, acting by and through the Department of Parks and Recreation ("**State**"), on the one hand, and All American Pipeline Company, successor by merger to Celeron Pipeline Company of California, ("**AAPL**"), on the other.

## RECITALS

WHEREAS, on or about August 6, 1987, a Pipeline Easement was made and entered into by and between **State** and **AAPL**, a memorandum of which said Pipeline Easement entitled Memorandum of Pipeline Easement, herein referred to as ("**Memorandum**"), was recorded April 7, 1988 as Document No. 88-020459 of the Official Records of Santa Barbara County, California, and;

WHEREAS, subsequent to the making of the **Memorandum**, the parties amended said Pipeline Easement, substituting Exhibit A-1 for Exhibit-A containing a centerline description and plat of the fifty foot (50') wide easement granted to **AAPL** to more specifically describe the location of the easement across and through Gaviota State Park property;

WHEREAS, it is the desire of the parties hereto to record this Memorandum of Amendment to Pipeline Easement to reflect the revised description of the fifty foot (50') wide easement as described in Exhibit A-1 of the Amendment of Pipeline Easement.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto do mutually agree as follows, to wit:

> The centerline description and plat contained in Exhibit A-1 attached hereto and incorporated herein is the legal description and location of the fifty foot (50') wide easement through the Gaviota State Park property which is covered by the Pipeline Easement, entered into on or about August 6, 1987, and the amendment thereto. Exhibit-A of said **Memorandum** and said Pipeline Easement and any reference thereto shall be deleted therefrom and said Exhibit A-1 is substituted therefor.

All terms, conditions and provisions of the Pipeline Easement, as amended, are incorporated herein by reference and shall remain in full force and effect.

This Memorandum of Amendment to Pipeline Easement and the Pipeline Easement, as amended, shall be read together as one document. To the extent that there may be any conflict or inconsistency between the unrecorded Pipeline Easement, as amended, and this Memorandum of Amendment to Pipeline Easement, the unrecorded Pipeline Easement, as amended, shall control.

In witness whereof, the parties hereto have executed this Memorandum of Amendment to Pipeline Easement as of the day and year indicated below by the signature of their duly authorized representatives.

DATED: 11/30, 1995

**STATE OF CALIFORNIA, DEPARTMENT OF PARKS AND RECREATION**

By: Donald W Murphy
**Donald W. Murphy, Director**

DATED: January 23, 19956

**ALL AMERICAN PIPELINE COMPANY, a Texas corporation**

By: Bruce K. Murchison
**Bruce K. Murchison, President**

1757.doc

STATE OF CALIFORNIA )
)
COUNTY OF KERN )

On January 23, 1996, ~~1995~~, before me Debbie S. Cardell, Notary Public, personally appeared **BRUCE K. MURCHISON, PRESIDENT**, of **ALL AMERICAN PIPELINE COMPANY,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

DEBBIE S. CARDELL
COMM. # 1056161
Notary Public — California
KERN COUNTY
My Comm. Expires MAY 7, 1999

[signature]
NOTARY PUBLIC

STATE OF CALIFORNIA )
)
COUNTY OF Sacramento )

On 8 January, 1995, before me Rebecca J. McGown, Notary Public, personally appeared **DONALD W. MURPHY, DIRECTOR,** of **CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,** personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

REBECCA J. MC GOWN
COMM. #1006175
NOTARY PUBLIC
SACRAMENTO COUNTY, CALIFORNIA
My Commission Expires September30, 1997

[signature]
NOTARY PUBLIC

STATE OF CALIFORNIA

0SB-023-SZ

Centerline description of a fifty (50') foot wide right-of-way in, through and across that certain parcel of land situated in the County of Santa Barbara, State of California more particularly referred to as "Gaviota State Park." Said land is depicted in Record of Survey Map, recorded in Book 85, Page 29, Sheets 1 to 5 inclusive, in the Office of the County Recorder of Santa Barbara County.

The limits of said centerline running parallel with and lying 25 feet either side of a centerline described as follows:

BEGINNING at a point in the East property line of the parcel referenced above. Said POINT OF BEGINNING bears North 0°24'51" East a distance of 154.93 feet from a 2" iron pipe with a brass cap tagged L.S. 2602 and depicted as index number 40A on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the County Recorder of Santa Barbara County.

1) THENCE, from said POINT OF BEGINNING North 71° 46' 31" West for a distance of 559.06 feet;
2) THENCE, North 66° 01' 16" West for a distance of 40.88 feet;
3) THENCE, North 51° 52' 50" West for a distance of 39.95 feet;
4) THENCE, North 41° 33' 53" West for a distance of 42.43 feet;
5) THENCE, North 30° 41' 54" West for a distance of 112.93 feet;
6) THENCE, North 19° 45' 18" West for a distance of 39.03 feet;
7) THENCE, North 11° 38' 46" West for a distance of 539.90 feet;
8) THENCE, North 13° 34' 45" West for a distance of 44.33 feet;
9) THENCE, North 26° 42' 46" West for a distance of 81.79 feet;
10) THENCE, North 26° 53' 47" West for a distance of 63.95 feet;
11) THENCE, North 36° 32' 47" West for a distance of 39.72 feet;
12) THENCE, North 54° 46' 50" West for a distance of 31.32 feet;
13) THENCE, North 67° 13' 49" West for a distance of 53.58 feet;
14) THENCE, North 72° 37' 51" West for a distance of 31.30 feet;
15) THENCE, North 79° 25' 18" West for a distance of 29.61 feet;

16) THENCE, North 86° 10' 12" West for a distance of 33.59 feet;
17) THENCE, South 84° 47' 57" West for a distance of 40.24 feet;
18) THENCE, South 69° 09' 40" West for a distance of 38.90 feet;
19) THENCE, South 59° 23' 22" West for a distance of 41.73 feet;
20) THENCE, South 62° 25' 23" West for a distance of 45.67 feet;
21) THENCE, South 75° 02' 42" West for a distance of 44.89 feet;
22) THENCE, South 83° 27' 42" West for a distance of 92.86 feet;
23) THENCE, South 84° 22' 03" West for a distance of 656.41 feet;
24) THENCE, South 84° 10' 55" West for a distance of 374.04 feet;
25) THENCE, South 85° 01' 08" West for a distance of 75.41 feet;
26) THENCE, South 89° 46' 18" West for a distance of 69.44 feet;
27) THENCE, North 70° 54' 45" West for a distance of 51.81 feet;
28) THENCE, North 64° 11' 39" West for a distance of 48.39 feet;
29) THENCE, North 62° 37' 30" West for a distance of 157.42 feet;
30) THENCE, North 41° 32' 31" West for a distance of 15.41 feet;
31) THENCE, North 13° 47' 08" West for a distance of 18.15 feet;
32) THENCE, North 12° 13' 05" West for a distance of 741.84 feet;
33) THENCE, North 36° 29' 21" West for a distance of 17.90 feet;
34) THENCE, North 63° 25' 05" West for a distance of 22.59 feet;
35) THENCE, North 65° 52' 37" West for a distance of 23.65 feet;
36) THENCE, North 86° 32' 11" West for a distance of 24.60 feet;
37) THENCE, South 69° 41' 56" West for a distance of 95.08 feet to a point in the Eastern right-of-way for State Highway 101. Said point bears North 19° 35' 06" West a distance of 805.01 feet from a State Highway angle point described as +00/121' on the Eastern right-of-way for State Highway 101. Said angle point is shown on State of California Department of Public Works drawing SB-101-46.5, Sheet 7 of 28.
38) THENCE, continuing South 69° 41' 56" West for a distance of 175.91 feet to a point in the Western right-of-way for State Highway 101. Said point bears North 19° 40' 36" West a distance of 502.66 feet from a State Highway angle point described as +00/54' on the Western right-of-way for State Highway 101. Said angle point is shown on State of California Department of Public Works drawing SB-101-46.5, Sheet 7 of 28.

39) THENCE, South 69° 41' 56" West for a distance of 109.97 feet;

40) THENCE, South 64° 30' 25" West for a distance of 54.07 feet;

41) THENCE, South 46° 32' 08" West for a distance of 90.02 feet;

42) THENCE, South 41° 09' 43" West for a distance of 74.01 feet;

43) THENCE, South 35° 30' 43" West for a distance of 53.14 feet;

44) THENCE, South 29° 47' 06" West for a distance of 775.30 feet;

45) THENCE, South 30° 30' 07" West for a distance of 185.42 feet;

46) THENCE, South 49° 31' 39" West for a distance of 85.95 feet;

47) THENCE, South 52° 18' 48" West for a distance of 205.04 feet;

48) THENCE, South 53° 43' 14" West for a distance of 44.79 feet;

49) THENCE, South 59° 04' 57" West for a distance of 41.23 feet;

50) THENCE, South 74° 07' 05" West for a distance of 42.08 feet;

51) THENCE, South 89° 42' 05" West for a distance of 44.94 feet;

52) THENCE, North 87° 15' 03" West for a distance of 224.68 feet;

53) THENCE, South 88° 01' 54" West for a distance of 45.09 feet;

54) THENCE, South 80° 38' 57" West for a distance of 235.82 feet;

55) THENCE, South 72° 00' 44" West for a distance of 40.47 feet;

56) THENCE, South 50° 17' 05" West for a distance of 44.07 feet;

57) THENCE, South 40° 26' 17" West for a distance of 91.96 feet;

58) THENCE, South 36° 43' 35" West for a distance of 142.61 feet;

59) THENCE, South 42° 48' 46" West for a distance of 54.02 feet;

60) THENCE, South 46° 45' 05" West for a distance of 62.46 feet;

61) THENCE, South 60° 18' 40" West for a distance of 46.92 feet;

62) THENCE, South 59° 53' 44" West for a distance of 32.62 feet;

63) THENCE, South 60° 07' 59" West for a distance of 47.52 feet;

64) THENCE, South 65° 17' 02" West for a distance of 31.64 feet;

65) THENCE, South 70° 32' 54" West for a distance of 83.25 feet;

66) THENCE, South 75° 47' 18" West for a distance of 22.00 feet;

67) THENCE, North 71° 55' 40" West for a distance of 17.95 feet;

68) THENCE, North 37° 42' 10" West for a distance of 297.01 feet;

69) THENCE, North 37° 59' 16" West for a distance of 51.49 feet;

70) THENCE, North 42° 03' 53" West for a distance of 20.85 feet;

71) THENCE, North 54° 04' 30" West for a distance of 42.79 feet;

72) THENCE, North 71° 01' 20" West for a distance of 636.85 feet;

73) THENCE, North 71° 51' 38" West for a distance of 53.12 feet;

74) THENCE, North 76° 45' 06" West for a distance of 93.87 feet;

75) THENCE, North 79° 02' 12" West for a distance of 380.69 feet;

76) THENCE, North 79° 26' 57" West for a distance of 65.46 feet;

77) THENCE, North 67° 59' 02" West for a distance of 85.73 feet;

78) THENCE, North 53° 34' 28" West for a distance of 83.03 to the POINT OF EXIT in the West property line of the above described tract of land. Said POINT OF EXIT bears South 07° 39' 18" East a distance of 2278.66 feet from a standard P&R bronze disk depicted as index number 3 on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the County Recorder of Santa Barbara County.

THENCE re-entering Gaviota State Park along the West property line. Said POINT OF RE-ENTRY bears South 07° 39' 18" East a distance of 23.84 feet from standard P&R bronze disk depicted as index number 3 on Record of Survey Map recorded in Book 85, Page 29 on Sheet 1 of 5 and further described on Sheet 4 of 5 in the Office of the Recorder of Santa Barbara County.

79) THENCE, North 41° 19' 12" East for a distance of 0.39 feet;

80) THENCE, North 22° 20' 38" East for a distance of 21.66 feet;

81) THENCE, North 22° 31' 52" West for a distance of 30.68 feet;

82) THENCE, North 27° 39' 40" West for a distance of 97.35 feet;

83) THENCE, North 26° 35' 06" West for a distance of 25.05 feet;

84) THENCE, North 10° 16' 17" East for a distance of 29.77 feet;

85) THENCE, North 41° 01' 27" East for a distance of 31.83 feet;

86) THENCE, North 55° 08' 54" East for a distance of 96.41 feet;

87) THENCE, North 55° 30' 31" East for a distance of 58.30 feet;

88) THENCE, North 57° 48' 50" East for a distance of 100.47 feet;

89) THENCE, North 58° 14' 25" East for a distance of 124.73 feet;

90) THENCE, North 58° 50' 09" East for a distance of 57.49 feet;

91) THENCE, North 62° 29' 33" East for a distance of 78.22 feet;

92) THENCE, North 63° 33' 16" East for a distance of 153.71 feet;

93) THENCE, North 58° 26' 55" East for a distance of 205.93 feet;

94) THENCE, North 64° 43' 52" East for a distance of 138.72 feet;

95) THENCE, North 64° 02' 35" East for a distance of 52.57 feet;

96) THENCE, North 64° 46' 08" East for a distance of 41.81 feet;

97) THENCE, North 53° 57' 37" East for a distance of 43.32 feet;

98) THENCE, North 36° 37' 58" East for a distance of 44.62 feet;

99) THENCE, North 22° 01' 34" East for a distance of 33.85 feet;

100) THENCE, North 12° 45' 49" East for a distance of 25.01 feet;

101) THENCE, North 4° 44' 59" East for a distance of 51.96 feet;

102) THENCE, North 11° 53' 42" West for a distance of 71.53 feet;

103) THENCE, North 14° 00' 26" West for a distance of 105.86 feet;

104) THENCE, North 13° 38' 52" West for a distance of 87.21 feet;

105) THENCE, North 13° 22' 59" West for a distance of 112.95 feet;

106) THENCE, North 16° 32' 23" West for a distance of 99.93 feet;

107) THENCE, North 17° 30' 21" West for a distance of 3.43 feet;

108) THENCE, North 14° 53' 47" West for a distance of 72.90 feet;

109) THENCE, North 17° 21' 18" West for a distance of 51.51 feet;

110) THENCE, North 18° 18' 23" West for a distance of 41.73 feet;

111) THENCE, North 21° 22' 16" West for a distance of 40.21 feet;

112) THENCE, North 29° 34' 32" West for a distance of 44.13 feet;

113) THENCE, North 36° 30' 22" West for a distance of 39.28 feet;

114) THENCE, North 45° 09' 01" West for a distance of 49.86 feet;

115) THENCE, North 48° 02' 46" West for a distance of 104.93 feet;

116) THENCE, North 46° 57' 01" West for a distance of 128.51 feet;

117) THENCE, North 45° 57' 45" West for a distance of 271.46 feet;

118) THENCE, North 44° 07' 00" West for a distance of 39.59 feet;

119) THENCE, North 34° 49' 04" West for a distance of 38.60 feet;

120) THENCE, North 18° 20' 18" West for a distance of 45.18 feet;

121) THENCE, North 4° 27' 42" West for a distance of 52.97 feet;

122) THENCE, North 6° 28' 32" East for a distance of 512.96 feet;

123) THENCE, North 6° 59' 05" East for a distance of 88.22 feet;

124) THENCE, North 6° 50' 30" East for a distance of 45.27 feet;

125) THENCE, North 4° 16' 55" West for a distance of 33.12 feet;

126) THENCE, North 17° 53' 09" West for a distance of 16.52 feet;

127) THENCE, North 28° 54' 53" West for a distance of 15.54 feet;

128) THENCE, North 38° 02' 45" West for a distance of 18.84 feet;

129) THENCE, North 45° 02' 54" West for a distance of 25.04 feet;

130) THENCE, North 52° 21' 14" West for a distance of 195.48 feet;

131) THENCE, North 51° 58' 28" West for a distance of 29.67 feet;

132) THENCE, North 35° 07' 42" West for a distance of 18.66 feet;

133) THENCE, North 21° 19' 25" West for a distance of 24.24 feet;

134) THENCE, North 12° 30' 01" West for a distance of 28.37 feet;

135) THENCE, North 11° 03' 54" West for a distance of 34.11 feet;

136) THENCE, North 10° 44' 57" West for a distance of 102.86 feet;

137) THENCE, North 11° 01' 53" West for a distance of 135.30 feet;

138) THENCE, North 10° 39' 33" West for a distance of 137.91 feet;

139) THENCE, North 18° 21' 28" West for a distance of 52.38 feet;

140) THENCE, North 18° 34' 30" West for a distance of 84.62 feet;

141) THENCE, North 18° 57' 14" West for a distance of 89.59 feet;

142) THENCE, North 18° 45' 23" West for a distance of 61.87 feet;

143) THENCE, North 10° 25' 56" West for a distance of 37.78 feet;

144) THENCE, North 13° 19' 34" West for a distance of 63.92 feet;

145) THENCE, North 20° 37' 59" West for a distance of 36.44 feet;

146) THENCE, North 24° 09' 47" West for a distance of 395.90 feet;

147) THENCE, North 24° 25' 34" West for a distance of 68.71 feet;

148) THENCE, North 17° 57' 30" West for a distance of 44.41 feet;

149) THENCE, North 12° 04' 41" West for a distance of 41.00 feet;

150) THENCE, North 5° 14' 59" West for a distance of 42.99 feet;

151) THENCE, North 4° 16' 52" East for a distance of 42.38 feet;

152) THENCE, North 9° 59' 24" East for a distance of 170.03 feet;

153) THENCE, North 10° 28' 26" East for a distance of 77.66 feet;

154) THENCE, North 13° 48' 46" East for a distance of 42.89 feet;

155) THENCE, North 20° 14' 29" East for a distance of 41.82 feet;

156) THENCE, North 25° 08' 23" East for a distance of 40.43 feet;

157) THENCE, North 30° 40' 03" East for a distance of 45.05 feet;

158) THENCE, North 36° 59' 39" East for a distance of 147.17 feet;
159) THENCE, North 35° 04' 06" East for a distance of 40.49 feet;
160) THENCE, North 23° 40' 36" East for a distance of 37.62 feet;
161) THENCE, North 16° 37' 43" East for a distance of 288.02 feet;
162) THENCE, North 20° 20' 19" East for a distance of 45.69 feet;
163) THENCE, North 24° 12' 35" East for a distance of 51.76 feet;
164) THENCE, North 28° 39' 33" East for a distance of 39.64 feet;
165) THENCE, North 37° 26' 37" East for a distance of 32.91 feet;
166) THENCE, North 39° 58' 38" East for a distance of 557.98 feet;
167) THENCE, North 36° 00' 37" East for a distance of 39.90 feet;
168) THENCE, North 28° 53' 01" East for a distance of 41.77 feet;
169) THENCE, North 19° 46' 53" East for a distance of 40.21 feet;
170) THENCE, North 13° 39' 38" East for a distance of 35.75 feet;
171) THENCE, North 3° 07' 48" East for a distance of 51.70 feet;
172) THENCE, North 0° 47' 39" East for a distance of 71.48 feet;
173) THENCE, North 13° 48' 46" East for a distance of 33.49 feet;
174) THENCE, North 24° 14' 56" East for a distance of 20.88 feet;
175) THENCE, North 39° 40' 01" East for a distance of 29.72 feet;
176) THENCE, North 45° 50' 18" East for a distance of 26.31 feet;
177) THENCE, North 47° 56' 23" East for a distance of 197.62 feet;
178) THENCE, North 44° 32' 33" East for a distance of 42.46 feet;
179) THENCE, North 42° 17' 35" East for a distance of 24.87 feet;
180) THENCE, North 38° 16' 06" East for a distance of 30.45 feet;
181) THENCE, North 32° 28' 19" East for a distance of 382.18 feet;
182) THENCE, North 33° 23' 25" East for a distance of 283.83 feet;
183) THENCE, North 33° 25' 42" East for a distance of 376.89 feet;
184) THENCE, North 31° 25' 08" East for a distance of 653.67 feet;
185) THENCE, North 33° 54' 45" East for a distance of 144.36 feet;
186) THENCE, South 89° 39' 48" East for a distance of 0.22 feet;
187) THENCE, North 34° 26' 20" East for a distance of 70.85 feet;
188) THENCE, North 37° 52' 29" East for a distance of 43.92 feet;
189) THENCE, North 42° 45' 48" East for a distance of 38.72 feet;
190) THENCE, North 37° 50' 22" East for a distance of 58.92 feet;

191) THENCE, North 31° 41' 18" East for a distance of 90.60 feet;

192) THENCE, North 45° 58' 50" East for a distance of 21.64 feet;

193) THENCE, North 57° 22' 06" East for a distance of 29.65 feet;

194) THENCE, North 82° 34' 03" East for a distance of 35.75 feet;

195) THENCE, North 84° 38' 52" East for a distance of 469.23 feet;

196) THENCE, North 68° 01' 29" East for a distance of 45.18 feet;

197) THENCE, North 61° 29' 57" East for a distance of 273.42 feet;

198) THENCE, North 79° 29' 29" East for a distance of 85.81 feet;

199) THENCE, North 89° 24' 26" East for a distance of 132.44 feet;

200) THENCE, South 86° 25' 22" East for a distance of 48.24 feet;

201) THENCE, South 77° 29' 49" East for a distance of 34.14 feet;

202) THENCE, South 72° 08' 48" East for a distance of 38.14 feet;

203) THENCE, North 83° 46' 08" East for a distance of 37.69 feet;

204) THENCE, North 55° 46' 08" East for a distance of 39.03 feet;

205) THENCE, North 34° 31' 01" East for a distance of 268.34 feet;

206) THENCE, North 40° 49' 03" East for a distance of 35.28 feet;

207) THENCE, North 55° 31' 12" East for a distance of 135.38 feet;

208) THENCE, North 56° 14' 40" East for a distance of 66.47 feet;

209) THENCE, North 48° 18' 15" East for a distance of 41.07 feet;

210) THENCE, North 22° 19' 57" East for a distance of 35.86 feet;

211) THENCE, North 10° 17' 19" East for a distance of 42.15 feet;

212) THENCE, North 4° 35' 14" East for a distance of 146.90 feet;

213) THENCE, North 18° 11' 40" East for a distance of 49.66 feet;

214) THENCE, North 20° 22' 15" East for a distance of 191.73 feet to the POINT OF TERMINATION in the North property line of the above described tract of land. Said POINT OF TERMINATION bears North 68° 27' 25" West a distance of 113.70 feet from a State Highway angle point in the South right-of-way line for State Highway 1. Said angle point is described as +00 "A" 185.00' and is shown on California State Highway, State of California, Department of Public Works, District 5 drawing number SB-1-R0.00/SB-101-R48.85.

Said centerline contains 21,682.58 lineal feet or 1314.10 rods in length.

The bearings calculated to establish the location of the above centerline were obtained from U.S.C. & G.S. monuments "TANK" and "SURPRISE" and monument 40A as shown on the Record of Survey Maps indicated above.

| | | | |
|---|---|---|---|
| 1 | N 71° 46' 31" W, 559.06' | 56 | S 50° 17' 05" W, 44.07' |
| 2 | N 66° 01' 16" W, 40.88' | 57 | S 40° 26' 17" W, 91.96' |
| 3 | N 51° 52' 50" W, 39.95' | 58 | S 36° 43' 35" W, 142.61' |
| 4 | N 41° 33' 53" W, 42.43' | 59 | S 42° 48' 46" W, 54.02' |
| 5 | N 30° 41' 54" W, 112.93' | 60 | S 46° 45' 05" W, 62.46' |
| 6 | N 19° 45' 18" W, 39.03' | 61 | S 60° 18' 40" W, 46.92' |
| 7 | N 11° 38' 46" W, 539.90' | 62 | S 59° 53' 44" W, 32.62' |
| 8 | N 13° 34' 45" W, 44.33' | 63 | S 60° 07' 59" W, 47.52' |
| 9 | N 26° 42' 46" W, 81.79' | 64 | S 65° 17' 02" W, 31.64' |
| 10 | N 26° 53' 47" W, 63.95' | 65 | S 70° 32' 54" W, 83.25' |
| 11 | N 36° 32' 47" W, 39.72' | 66 | S 75° 47' 18" W, 22.00' |
| 12 | N 54° 46' 50" W, 31.32' | 67 | N 71° 55' 40" W, 17.95' |
| 13 | N 67° 13' 49" W, 53.58' | 68 | N 37° 42' 10" W, 297.01' |
| 14 | N 72° 37' 51" W, 31.30' | 69 | N 37° 59' 16" W, 51.49' |
| 15 | N 79° 25' 18" W, 29.61' | 70 | N 42° 03' 53" W, 20.85' |
| 16 | N 86° 10' 12" W, 33.59' | 71 | N 54° 04' 30" W, 42.79' |
| 17 | S 84° 47' 57" W, 40.24' | 72 | N 71° 01' 20" W, 636.85' |
| 18 | S 69° 09' 40" W, 38.90' | 73 | N 71° 51' 38" W, 53.12' |
| 19 | S 59° 23' 22" W, 41.73' | 74 | N 76° 45' 06" W, 93.87' |
| 20 | S 62° 25' 23" W, 45.67' | 75 | N 79° 02' 12" W, 380.69' |
| 21 | S 75° 02' 42" W, 44.89' | 76 | N 79° 26' 57" W, 65.46' |
| 22 | S 83° 27' 42" W, 92.86' | 77 | N 67° 59' 02" W, 85.73' |
| 23 | S 84° 22' 03" W, 656.41' | 78 | N 53° 34' 28" W, 83.03' |
| 24 | S 84° 10' 55" W, 374.04' | 79 | N 41° 19' 12" E, 0.39' |
| 25 | S 85° 01' 08" W, 75.41' | 80 | N 22° 20' 38" E, 21.66' |
| 26 | S 89° 46' 18" W, 69.44' | 81 | N 22° 31' 52" W, 30.68' |
| 27 | N 70° 54' 45" W, 51.81' | 82 | N 27° 39' 40" W, 97.35' |
| 28 | N 64° 11' 39" W, 48.39' | 83 | N 26° 35' 06" W, 25.05' |
| 29 | N 62° 37' 30" W, 157.42' | 84 | N 10° 16' 17" E, 29.77' |
| 30 | N 41° 32' 31" W, 15.41' | 85 | N 41° 01' 27" E, 31.83' |
| 31 | N 13° 47' 08" W, 18.15' | 86 | N 55° 08' 54" E, 96.41' |
| 32 | N 12° 13' 05" W, 741.84' | 87 | N 55° 30' 31" E, 58.30' |
| 33 | N 36° 29' 21" W, 17.90' | 88 | N 57° 48' 50" E, 100.47' |
| 34 | N 63° 25' 05" W, 22.59' | 89 | N 58° 14' 25" E, 124.73' |
| 35 | N 65° 52' 37" W, 23.65' | 90 | N 58° 50' 09" E, 57.49' |
| 36 | N 86° 32' 11" W, 24.60' | 91 | N 62° 29' 33" E, 78.22' |
| 37 | S 69° 41' 56" W, 95.08' | 92 | N 63° 33' 16" E, 153.71' |
| 38 | S 69° 41' 56" W, 175.91' | 93 | N 58° 26' 55" E, 205.93' |
| 39 | S 69° 41' 56" W, 109.97' | 94 | N 64° 43' 52" E, 138.72' |
| 40 | S 64° 30' 25" W, 54.07' | 95 | N 64° 02' 35" E, 52.57' |
| 41 | S 46° 32' 08" W, 90.02' | 96 | N 64° 46' 08" E, 41.81' |
| 42 | S 41° 09' 43" W, 74.01' | 97 | N 53° 57' 37" E, 43.32' |
| 43 | S 35° 30' 43" W, 53.14' | 98 | N 36° 37' 58" E, 44.62' |
| 44 | S 29° 47' 06" W, 775.30' | 99 | N 22° 01' 34" E, 33.85' |
| 45 | S 30° 30' 07" W, 185.42' | 100 | N 12° 45' 49" E, 25.01' |
| 46 | S 49° 31' 39" W, 85.95' | 101 | N 04° 44' 59" E, 51.96' |
| 47 | S 52° 18' 48" W, 205.04' | 102 | N 11° 53' 42" W, 71.53' |
| 48 | S 53° 43' 14" W, 44.79' | 103 | N 14° 00' 26" W, 105.86' |
| 49 | S 59° 04' 57" W, 41.23' | 104 | N 13° 38' 52" W, 87.21' |
| 50 | S 74° 07' 05" W, 42.08' | 105 | N 13° 22' 59" W, 112.95' |
| 51 | S 89° 42' 05" W, 44.94' | 106 | N 16° 32' 23" W, 99.93' |
| 52 | N 87° 15' 03" W, 224.68' | 107 | N 17° 30' 21" W, 3.43' |
| 53 | S 88° 01' 54" W, 45.09' | 108 | N 14° 53' 47" W, 72.90' |
| 54 | S 80° 38' 57" W, 235.82' | 109 | N 17° 21' 18" W, 51.51' |
| 55 | S 72° 00' 44" W, 40.47' | 110 | N 18° 18' 23" W, 41.73' |


SANT
RANC
U.S. HIGHWAY

# NTA BARBARA COUNTY, CALIFORNIA

CHO NUESTRA SENORA DEL REFUGIO
RANCHO LAS CRUCES



CHEVRON U.S.A., INC.

OSB-019.00-PN






| | |
|---|---|
| 111 | N 21° 22' 16" W, 40.21' |
| 112 | N 29° 34' 32" W, 44.13' |
| 113 | N 36° 30' 22" W, 39.28' |
| 114 | N 45° 09' 01" W, 49.86' |
| 115 | N 48° 02' 46" W, 104.93' |
| 116 | N 46° 57' 01" W, 128.51' |
| 117 | N 45° 57' 45" W, 271.46' |
| 118 | N 44° 07' 00" W, 39.59' |
| 119 | N 34° 49' 04" W, 38.60' |
| 120 | N 18° 20' 18" W, 45.18' |
| 121 | N 04° 27' 42" W, 52.97' |
| 122 | N 06° 28' 32" E, 512.96' |
| 123 | N 06° 59' 05" E, 88.22' |
| 124 | N 06° 50' 30" E, 45.27' |
| 125 | N 04° 16' 55" W, 33.12' |
| 126 | N 17° 53' 09" W, 16.52' |
| 127 | N 28° 54' 53" W, 15.54' |
| 128 | N 38° 02' 45" W, 18.84' |
| 129 | N 45° 02' 54" W, 25.04' |
| 130 | N 52° 21' 14" W, 195.48' |
| 131 | N 51° 58' 28" W, 29.67' |
| 132 | N 35° 07' 42" W, 18.66' |
| 133 | N 21° 19' 25" W, 24.24' |
| 134 | N 12° 30' 01" W, 28.37' |
| 135 | N 11° 03' 54" W, 34.11' |
| 136 | N 10° 44' 57" W, 102.86' |
| 137 | N 11° 01' 53" W, 135.30' |
| 138 | N 10° 39' 33" W, 137.91' |
| 139 | N 18° 21' 28" W, 52.38' |
| 140 | N 18° 34' 30" W, 84.62' |
| 141 | N 18° 57' 14" W, 89.59' |
| 142 | N 18° 45' 23" W, 61.87' |
| 143 | N 10° 25' 56" W, 37.78' |
| 144 | N 13° 19' 34" W, 63.92' |
| 145 | N 20° 37' 59" W, 36.44' |
| 146 | N 24° 09' 47" W, 395.90' |
| 147 | N 24° 25' 34" W, 68.71' |
| 148 | N 17° 57' 30" W, 44.41' |
| 149 | N 12° 04' 41" W, 41.00' |
| 150 | N 05° 14' 59" W, 42.99' |
| 151 | N 04° 16' 52" E, 42.38' |
| 152 | N 09° 59' 24" E, 170.03' |
| 153 | N 10° 28' 26" E, 77.66' |
| 154 | N 13° 48' 46" E, 42.89' |
| 155 | N 20° 14' 29" E, 41.82' |
| 156 | N 25° 08' 23" E, 40.43' |
| 157 | N 30° 40' 03" E, 45.05' |
| 158 | N 36° 59' 39" E, 147.17' |
| 159 | N 35° 04' 06" E, 40.49' |
| 160 | N 23° 40' 36" E, 37.62' |
| 161 | N 16° 37' 43" E, 288.02' |
| 162 | N 20° 20' 19" E, 45.69' |
| 163 | N 24° 12' 35" E, 51.76' |
| 164 | N 28° 39' 33" E, 39.64' |
| 165 | N 37° 26' 37" E, 32.91' |
| 166 | N 39° 58' 38" E, 557.98' |
| 167 | N 36° 00' 37" E, 39.90' |
| 168 | N 28° 53' 01" E, 41.77' |
| 169 | N 19° 46' 53" E, 40.21' |
| 170 | N 13° 39' 38" E, 35.75' |
| 171 | N 03° 07' 48" E, 51.70' |
| 172 | N 00° 47' 39" E, 71.48' |
| 173 | N 13° 48' 46" E, 33.49' |
| 174 | N 24° 14' 56" E, 20.88' |
| 175 | N 39° 40' 01" E, 29.72' |
| 176 | N 45° 50' 18" E, 26.31' |
| 177 | N 47° 56' 23" E, 197.62' |


OSB-023.03-HZ
STATE HWY. 1
RIGHT-OF-WAY
LLOYDS BANK OF CALIFORNIA
TRUSTEE FOR LOUISE HANSON
OSB-034.00-PN
213
214
212
211
210
205
209
208
207
206
199
198
197
196
195
194
193
192
191
190
STATE HWY. 1
RIGHT-OF-WAY
N68°27'25"W
113.70'
ANGLE POINT
+00"A"
185.00'
N 375,059.48
E 1,327,948.84
214
N


RANCHO LAS CRUCES
RANCHO NUESTRA SENORA DEL REFUGIO
25'
25'
RIGHT-OF-WAY
CL EASEMENT
12.98'
PROPERTY LINE
RIGHT-OF-WAY
CL EASEMENT
RANCHO LAS CRUCES
RANCHO SAN JULIAN
P&R BRONZE DISK
N 369,987.14
E 1,323,866.33
S85°41'47"E
264.80'(CALC)


S69°41'56"W 175.91'
S69°41'56"W 109.97'
ANGLE POINT
N 363,978.51
E 1,328,422.30
STATE OF CALIFORNIA
(GAVIOTA STATE PARK)
OSB-023.00-SZ
PAUL A. MITCHELL
OSB-025.00-PN
S07°39'18"E
23.84'
P&R BRONZE DISK
N 365,701.25
E 1,324,140.94


U.S. HIGHWAY 101
OSB-023.01-HZ
U.S. HWY. 101 RIGHT-OF-WAY
CL EASEMENT
MGIC EQUITIES CORP.
OSB-024.00-PN
ELL
-PN
P&R BRONZE DISK
N 365,701.25
E 1,324,140.94
S07°39'18"E
2278.66'
NOTES:
1. THI
THR
COU
PAR
LANI
BOO
OF T
2. A 5C
SURV
3. PROP
HARO
IN THI
1992.
EXHIBIT A-1
SHEET 1 of 1
PIPELINE
AS-BUILT 30" PIPELINE
OF GAVIOTA
DRAWN BY: R.H.W.
DATE: 2-18-87
SCALE: 1"=600'



| | |
|---|---|
| 178 | [illegible] 32' 33" E, 42.46' |
| 179 | N 42° 17' 35" E, 24.87' |
| 180 | N 38° 16' 06" E, 30.45' |
| 181 | N 32° 28' 19" E, 382.18' |
| 182 | N 33° 23' 25" E, 283.83' |
| 183 | N 33° 25' 42" E, 376.89' |
| 184 | N 31° 25' 08" E, 653.67' |
| 185 | N 33° 54' 45" E, 144.36' |
| 186 | S 89° 39' 48" E, 0.22' |
| 187 | N 34° 26' 20" E, 70.85' |
| 188 | N 37° 52' 29" E, 43.92' |
| 189 | N 42° 45' 48" E, 38.72' |
| 190 | N 37° 50' 22" E, 58.92' |
| 191 | N 31° 41' 18" E, 90.60' |
| 192 | N 45° 58' 50" E, 21.64' |
| 193 | N 57° 22' 06" E, 29.65' |
| 194 | N 82° 34' 03" E, 35.75' |
| 195 | N 84° 38' 52" E, 469.23' |
| 196 | N 68° 01' 29" E, 45.18' |
| 197 | N 61° 29' 57" E, 273.42' |
| 198 | N 79° 29' 29" E, 85.81' |
| 199 | N 89° 24' 26" E, 132.44' |
| 200 | S 86° 25' 22" E, 48.24' |
| 201 | S 77° 29' 49" E, 34.14' |
| 202 | S 72° 08' 48" E, 38.14' |
| 203 | N 83° 46' 08" E, 37.69' |
| 204 | N 55° 46' 08" E, 39.03' |
| 205 | N 34° 31' 01" E, 268.34' |
| 206 | N 40° 49' 03" E, 35.28' |
| 207 | N 55° 31' 12" E, 135.38' |
| 208 | N 56° 14' 40" E, 66.47' |
| 209 | N 48° 18' 15" E, 41.07' |
| 210 | N 22° 19' 57" E, 35.86' |
| 211 | N 10° 17' 19" E, 42.15' |
| 212 | N 04° 35' 14" E, 146.90' |
| 213 | N 18° 11' 40" E, 49.66' |
| 214 | N 20° 22' 15" E, 191.73' |

TRACT: OSB–023.00–SZ
GAVIOTA STATE PARK
FEET: 21,682.58'
RODS: 1,314.10

TRACT: OSB–023.01–HZ
U.S. HIGHWAY 101
FEET: 175.91'
RODS: 10.66

NOTES:
1. THIS CENTERLINE DESCRIBES A 50' WIDE RIGHT–OF–WAY IN, THROUGH AND ACROSS A PARCEL OF LAND SITUATED IN THE COUNTY OF SANTA BARBARA, STATE OF CALIFORNIA MORE PARTICULARY REFERED TO AS "GAVIOTA STATE PARK." SAID LAND IS DEPICTED IN RECORD OF SURVEY MAP, RECORDED IN BOOK 85, PAGE 29, SHEETS 1 TO 5 INCLUSIVE, IN THE OFFICE OF THE COUNTY RECORDER OF SANTA BARBARA COUNTY.
2. A 50' PERMANENT RIGHT–OF–WAY (25' ON EACH SIDE OF THE SURVEYED LINE) EXISTS.
3. PROPERTY SURVEY FOR GAVIOTA STATE PARK WAS DONE BY HAROLD D. HARDIN, L.S. 3555, A LICENSED LAND SURVEYOR IN THE STATE OF CALIFORNIA DURING DEC. 1991 THRU FEB. 1992.

2278.66

| NO. | DATE | REVISION | BY |
|---|---|---|---|
| 1 | 10–9–95 | AS–BUILT & DRAWN IN AUTOCAD | J.D.R. |

**ALL AMERICAN PIPELINE COMPANY**

AS-BUILT 30" PIPELINE CROSSING PROPERTY OF GAVIOTA STATE PARK

| DRAWN BY: | DATE: | APPROVED BY: | DATE: |
|---|---|---|---|
| R.H.W. | 2–18–87 | C.R.C. | 2–18–87 |
| SCALE: 1"=600' | | DWG NO: PL–1119A | |

# EXHIBIT A-1

SHEET 1 of 1

# Exhibit C

EXHIBIT B


SANTA BARBARA COUNTY , CALIFORNIA
RANCHO NUESTRA SENORA DEL REFUGIO
RANCHO LAS CRUCES
XXXXXXA
CHEVRON U.S.A., INC.
RANCHO NUESTRA SENORA DEL REFUGIO
RANCHO LAS CRUCES
U.S. HWY. 101
STATE HWY. 1
SOUTHERN PACIFIC RAILROAD
PACIFIC OCEAN
RANCHO LAS CRUCES
RANCHO SAN JULIAN
PAUL A. MITCHELL
MGC EQUITIES CORP.
CELERON PIPELINE COMPANY OF CALIFORNIA
AS-BUILT 30" PIPELINE CROSSING PROPERTY OF GAVIOTA STATE PARK
RHW
2-18-87
CRC
2-18-87
1" = 1200'
PL-1119-A
1 OF 2
TRACT : OSB-023-SZ
FEET : 21,452.7
RODS : 1,300.2
NOTES:

# Exhibit D

| **RIGHT OF ENTRY PERMIT** | Agency: Department of Parks and Recreation<br>Project: **Pacific Pipeline 2024-25**<br>Gaviota State Park |
|---|---|

This Right of Entry Permit (Permit) is made and entered into this 16th day of July 2024, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Pacific Pipeline Company,** hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota State Park (S.P.), in the County of Santa Barbara, State of California; and
- **Whereas**, Permittee has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325.**
- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota S.P. for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved, and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2).** The environmental document is attached hereto as Exhibit "A" and the original easement is attached hereto as Exhibit "D" are both herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

DS DB

DS SL

DS KS

## TERMS AND CONDITIONS

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:** By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A and Exhibit D for the purpose of **pipeline maintenance and access for existing Line 325 that is currently subject to closure orders** (the Project), **and detailed below:**

   a) **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
   b) **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.**
   c) **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required by State.**
   d) **In the event of an oil spill of pipeline contents onto State land, Permittee shall immediately notify State's District Superintendent or authorized representative. Information to be reported includes but is not limited to location, volume of oil spilled, cause, time of spill, name and callback number of person reporting, and action taken so far. Thereafter, a written report will be filed with the State the summary of all details of the spill event.**
   e) **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads for Permittee's use. Permittee shall be**

**responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent. If Permittee damages any road it shall immediately repair the damage in accordance with State standards.**

f) **In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.**

g) **Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.**

h) **No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.**

2. **Permit Subject to Laws and Regulatory Agency Permits:** This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

   Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.

3. **Term of Permit:** This Permit shall only be for the period beginning on **July 27, 2024**, and ending on, **July 26, 2025** or as may be reasonably extended by written mutual agreement of the Parties.

4. **Consideration:** Permittee agrees to pay State the sum of **$ 42,154.42** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5. **Permit Subject to Existing Claims:** This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6. **Waiver of Claims and Indemnity:** Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted. Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7. **Contractors:** Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder. Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein. Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see "20. Default" paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8. **Insurance Requirements:** As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

   **General Provisions Applying to All Policies**

   A. **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

B. **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

C. **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

D. **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

E. **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management. If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

F. **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

G. **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

H. **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR). The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

I. **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

J. **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State. This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract. Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence. Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

9. **Reservation of Rights:** State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

10. **Access Limits and Conditions:** Access to the Property shall be limited to the access designated by State.

- **Access to Gaviota State Park shall be for access to and maintenance of existing Line 325 pipeline as outlined in the original environmental document, the original easement and amendment. See Exhibits A and D.**
- **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not covered by this Right of Entry.**

**11. Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least forty-eight (48) hours prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property. Permittee shall also notify the State contact[s] listed below in writing at least forty-eight (48) hours prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

DS DB

**STATE:**

Contact: Katharine Wilson
District Planning Chief
Katharine.Wilson@Parks.Ca.Gov

District: Channel Coast
Address: 911 San Pedro Street
Ventura, CA

Telephone: (805) 804-2060

DS

**PERMITTEE'S CONTACT:**

Contact: Stephen T. Laperouse
Vice President Land
slaperouse@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
Houston, Texas 77002

Telephone: (337) 316-3034

DS SL

**12. Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

**13. Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone. Permittee shall remove such fencing within two (2) days after the completion of work. Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

**14. Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work. State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site. Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring. During excavation, the State archaeological monitor may observe and report to the State on all excavation activities. State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee. The specific protocol, guidelines and channels of communication outlined by the California Native

American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed. Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days. Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

**15. Restoration of Property:** Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first. This obligation shall survive the expiration or termination of this Permit.

**16. Right to Halt Work:** The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

**17. Use Restrictions:** The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park. Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

**18. State's Right to Enter:** At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

Permittee shall not interfere with State's right to enter.

**19. Protection of Property:** Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

(a) Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

(b) Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

(c) Permittee shall not cut, prune or remove any vegetation upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(d) Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(e) Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as herein permitted, or subsequently approved in writing by the District Superintendent.

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

**20. Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

**21. State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

**22. Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

**23. Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

**24. Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

**25. Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

**26. Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

**27. Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

**28. Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

**29. Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: DocuSigned by: Dena Bellman 1FD96B85B9874A1...

Date: 7/25/2024

Name: **Dena Bellman**
Title: District Superintendent
Channel Coast District

**PACIFIC PIPELINE COMPANY**

Signature: DocuSigned by: [signature] 7FE2F35928C04E0...

Date: 7/25/2024

Name: **J. Caldwell Flores**
Title: President

# Exhibit E

# RIGHT OF ENTRY PERMIT

Agency: Department of Parks and Recreation

Project: **Pacific Pipeline 2025-26**
Gaviota State Park

This Right of Entry Permit (Permit) is made and entered into this 27 day of July 2025, between the State of California, acting by and through its Department of Parks and Recreation, hereinafter called State, and **Pacific Pipeline Company,** hereinafter called Permittee; State and Permittee may hereinafter be referred to as a Party, or collectively the Parties.

## RECITALS

- **Whereas**, the State owns, operates, and maintains the State Park known as Gaviota State Park (S.P.), in the County of Santa Barbara, State of California; and
- **Whereas**, Permittee has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's **pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders** (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart.**
- **Whereas**, the State desires to accommodate Permittee's application for permission to enter Gaviota S.P. for purposes of the Project, as provided herein and as, and to the extent, such Project has been previously described, permitted, approved, and conditioned by Permittee's original environmental document entitled **Celeron/All American and Getty Pipeline (CEQA SCH #1983110902-2).** The environmental document is attached hereto as Exhibit "A" and the original easement is attached hereto as Exhibit "D" are both herein incorporated by reference. This Permit shall further be limited as the Project may be conditioned by any other regulatory agency having jurisdiction, if applicable.

## TERMS AND CONDITIONS

Now therefore, the State by this Permit hereby grants to the Permittee permission to enter upon State's property, conditioned upon the agreement of the Parties that this Permit does not create or vest in Permittee any interest in the real property herein described or depicted, that the Permit is revocable and non-transferable, and that the Permit is further subject to the following terms and conditions:

1. **Project Description:** By this Permit, the State hereby grants to the Permittee permission to enter onto those lands depicted Gaviota SP and/or described on Exhibit "B" (the Property), attached hereto and herein incorporated by this reference, solely for the purpose of the Project, the limits of which are described in Exhibit A and Exhibit D for the purpose of **pipeline maintenance and access for existing Line 325 that is currently subject to closure orders** (the Project), **and detailed below:**

   a) **This permit is subject to all valid contracts, leases, licenses, encumbrances, and claims which may affect said property, and the use of the word "Grant" herein shall not be construed as a covenant against the existence of any thereof.**
   b) **Permittee, in the exercises of the privileges herein granted, shall at all times be in compliance with all applicable laws, rules, and regulations.**
   c) **Permittee agrees that all areas disturbed due to Project activities during the term of the permit will be restored and revegetated as required by State.**
   .
   d) **Any roads to be used by Permittee for ingress, egress, and access by the Permittee to the pipeline shall be reasonably designated and redesignated by State prior to Permittee's use. State shall not have any responsibility to perform maintenance or make repairs or improvements to the roads for Permittee's use. Permittee shall be**

**responsible for any desired improvements to the roads. Any improvement project shall conform to State standards and be subject to the approval of the State Parks District Superintendent. If Permittee damages any road it shall immediately repair the damage in accordance with State standards.**

e) **In its use of this permit, Permittee shall comply with all State requirements, including, but not limited to, parking control and the uses contemplated herein. Employee camping by Permittee in said park shall not be permitted.**

f) **Permittee shall coordinate all maintenance activities herein authorized within said park with State's District Superintendent or designee to assure the safety of park visitors and possible detrimental effects on park operations or resources.**

g) **No trees, plants, rocks, animals, or soils outside the pipeline footprint shall be cut or injured or disturbed by or on behalf of Permittee.**

2. **Permit Subject to Laws and Regulatory Agency Permits:** This Permit is expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations. Permittee shall, at Permittee's sole cost and expense, comply with the Project Description, and requirements and mitigations contained in the Environmental Document.

   Prior to commencement of any work, Permittee shall obtain all such legally required permits or approvals and submit to the State full and complete copies of all permits and approvals, including documentation related to or referenced in such permits and approvals, along with the corresponding agency contact and telephone numbers, and related California Environmental Quality Act (CEQA) and/or National Environmental Policy Act (NEPA) documentation as applicable.

DS DB

3. **Term of Permit:** This Permit shall only be for the period beginning on **July 27, 2025**, and ending on, **July 26, 2026** or as may be reasonably extended by written mutual agreement of the Parties.

4. **Consideration:** Permittee agrees to pay State the sum of **$ 48,046.85** as consideration for the rights granted by this Permit. Please refer to Exhibit "C" for calculation of fee.

5. **Permit Subject to Existing Claims:** This Permit is subject to existing contracts, permits, licenses, encumbrances, and claims which may affect the Property.

6. **Waiver of Claims and Indemnity:** Permittee waives all claims against State, its officers, agents and/or employees, for loss, injury, death, or damage caused by, arising out of, or in any way connected with the condition or use of the Property, the issuance, exercise, use or implementation of this Permit, and/or the rights herein granted. Permittee further agrees to protect, save, hold harmless, indemnify and defend State, its officers, agents and/or employees from any and all loss, damage, claims, demands, costs and liability which may be suffered or incurred by State, its officers, agents and/or employees from any cause whatsoever, arising out of, or in any way connected with this Permit, exercise by Permittee of the rights herein granted, Permittee's use of the Property and/or the Project for which this Permit is granted, except those arising out of the sole active negligence or willful misconduct of State. Permittee will further cause such indemnification and waiver of claims in favor of State to be inserted in each contract that Permittee executes for the provision of services in connection with the Project for which this Permit is granted.

7. **Contractors:** Permittee shall incorporate the terms, conditions and requirements contained herein when contracting out all or any portion of the work permitted hereunder. Permittee shall be responsible for ensuring contractor/subcontractor compliance with the terms and conditions contained herein. Failure of Permittee's contractors to abide by State's terms and conditions shall constitute default by Permittee (see "20. Default" paragraph below) allowing State to terminate this Permit and seek all legal remedies.

8. **Insurance Requirements:** As a condition of this Permit and in connection with Permittee's indemnification and waiver of claims contained herein, Permittee shall maintain, and cause its contractors to maintain, a policy or policies of insurance as follows:

   **General Provisions Applying to All Policies**

   A. **Coverage Term** – Coverage needs to be in force for the complete term of the contract. If insurance expires during the term of the contract, a new certificate must be received by the State at least ten (10) days prior to the expiration of this insurance. Any new insurance must still comply with the original terms of the contract.

**B.** **Policy Cancellation or Termination & Notice of Non-Renewal** – Contractor is responsible to notify the State within five business days before the effective date of any cancellation, non-renewal, or material change that affects required insurance coverage. In the event Contractor fails to keep in effect at all times the specified insurance coverage, the State may, in addition to any other remedies it may have, terminate this Contract upon the occurrence of such event, subject to the provisions of this Contract.

**C.** **Deductible** – Contractor is responsible for any deductible or self-insured retention contained within their insurance program.

**D.** **Primary Clause** – Any required insurance contained in this contract shall be primary, and not excess or contributory, to any other insurance carried by the State.

**E.** **Insurance Carrier Required Rating** – All insurance companies must carry a rating acceptable to the Office of Risk and Insurance Management. If the Contractor is self-insured for a portion or all of its insurance, review of financial information including a letter of credit may be required.

**F.** **Endorsements** – Any required endorsements requested by the State must be physically attached to all requested certificates of insurance and not substituted by referring to such coverage on the certificate of insurance.

**G.** **Inadequate Insurance** – Inadequate or lack of insurance does not negate the contractor obligations under the contract.

**H.** **Satisfying an SIR** - All insurance required by this contract must allow the State to pay and/or act as the contractor's agent in satisfying any self-insured retention (SIR). The choice to pay and/or act as the contractor's agent in satisfying any SIR is at the State's discretion.

**I.** **Available Coverages/Limits** - All coverage and limits available to the contractor shall also be available and applicable to the State.

**J.** **Subcontractors** - In the case of Contractor utilization of subcontractors to complete the contracted scope of work, contractor shall include all subcontractors as insureds under Contractor and insurance or supply evidence of insurance to The State equal to policies, coverages and limits required of Contractor.

**COMMERCIAL GENERAL LIABILITY**:
Commercial General Liability Insurance covering bodily injury and property damage in a form and with coverage that are satisfactory to the State. This insurance shall include personal and advertising injury liability, products and completed operations, and liability assumed under an insured contract. Coverage shall be written on an occurrence basis in an amount of not less than $1,000,000 per occurrence. Annual aggregate limit shall not be less than $2,000,000. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**AUTOMOBILE LIABILITY INSURANCE**:
Automobile Liability Insurance covering all owned, non-owned, and hired vehicles with a combined single limit of not less than $1,000,000 for bodily injury and property damage. **The State of California, its officers, agents, and employees are to be covered as additional insureds with respect to liability arising out of work or operations.**

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY**:
Workers' Compensation insurance as required by the State of California, with Statutory Limits, and Employer's Liability Insurance with limit of no less than $1,000,000 per accident for bodily injury or disease. **The Workers' Compensation policy shall be endorsed with a waiver of subrogation in favor of the State of California.**

**9.** **Reservation of Rights:** State reserves the right to use the Property in any manner, provided such use does not unreasonably interfere with Permittee's rights herein.

**10.** **Access Limits and Conditions:** Access to the Property shall be limited to the access designated by State.

- **Access to Gaviota State Park shall be for access to and maintenance of existing Line 325 pipeline as outlined in the original environmental document, the original easement and amendment. See Exhibits A and D.**
- **Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not covered by this Right of Entry.**

11. **Notice of Work:** Any required notices to State shall be sent to the State authorities in charge of Gaviota State Park named below. At least two full business days (which do not include state holidays) prior to any entry upon the Property for any of the purposes hereinabove set forth, Permittee shall provide the State contact[s] named below with written notice of Permittee's intent to enter the Property. Permittee shall also notify the State contact[s] listed below in writing at least two full business days (which do not include state holidays) prior to any change in the Project schedule or cessation or completion of work. Should State personnel need to contact Permittee, State shall notify Permittee's contact person listed below:

**STATE:**

Contact: Katharine Wilson
District Planning Chief
Katharine.Wilson@Parks.Ca.Gov

District: Channel Coast
Address: 911 San Pedro Street
Ventura, CA

Telephone: (805) 804-2060

**PERMITTEE'S CONTACT:**

Contact: Stephen T. Laperouse
Vice President Land
slaperouse@sableoffshore.com

Address: 845 Texas Avenue, Suite 2920
Houston, Texas 77002

Telephone: (337) 316-3034

12. **Limits of Work:** In no event shall this Permit authorize work in excess or contrary to the terms and conditions of any regulatory agency permit or approval. Under no circumstances, whether or not authorized by any regulatory agency, other permit or any person or entity other than State, shall work exceed that which is authorized by this Permit.

13. **Public Safety:** Permittee shall erect orange plastic temporary construction fencing and appropriate signage prior to commencement of work to prevent public access to the construction zone. Permittee shall remove such fencing within two (2) days after the completion of work. Permittee shall take, and shall cause its contractors or subcontractors to take, any and all necessary and reasonable steps to protect the public from harm in connection with the Project or implementation of this Permit.

14. **Compliance with Project Requirements, Monitoring and Mitigation Measures (if applicable):** Resource monitoring and mitigation measures identified by environmental document shall be completed in accordance with and to the satisfaction of the District Superintendent or designee.

Permittee's activities conducted under this Permit shall comply with all State and Federal environmental laws, including, but not limited to, the Endangered Species Act, CEQA, and Section 5024 of the Public Resources Code.

Any of Permittee's archaeological consultants working within the boundaries of the Property shall obtain a permit from the California State Parks Archaeology, History & Museums Division prior to commencing any archaeological or cultural investigations of the Property.

Permittee shall immediately advise State's contact person if any new site conditions are found during the course of permitted work. State will advise Permittee if any new historical resources (including archaeological sites), special status species, threatened/endangered species protocols, or other resource issues are identified within the Project site. Permittee shall abide by District Superintendent or designee's instructions to protect the resource(s) during the permitted work or risk revocation of the Permit.

Permittee shall make all excavation activities on the Property available to the State Archaeologist for observation and monitoring. During excavation, the State archaeological monitor may observe and report to the State on all excavation activities. State archaeological monitor shall be empowered to stop any construction activities as necessary to protect significant cultural resources from being disturbed.

In the event that previously unknown cultural resources, including, but not limited to, dark soil containing shell, bone, flaked stone, groundstone, or deposits of historic trash are encountered during Project construction by anyone, work will be suspended at that specific location, and the Permittee's work will be redirected to other tasks, until after a State-qualified archaeologist has evaluated the find and implemented appropriate treatment measures and disposition of artifacts, as appropriate, in compliance with all applicable laws and department resource directives.

If human remains are discovered during the Project, work will be immediately suspended at that specific location and the District Superintendent or designee shall be notified by Permittee. The specific protocol, guidelines and channels of communication outlined by the California Native

American Heritage Commission (NAHC), and/or contained in Health and Safety Code Section 7050.5 and Public Resources Code Sections 5097.9 et seq., will be followed. Those statutes will guide the potential Native American involvement in the event of discovery of human remains.

Permittee shall provide a written work schedule to State so that the State archaeological monitor can arrange to be on site on the necessary days. Permittee shall provide reasonable advance notice of and invite the District Superintendent or designee to any preconstruction meetings with the prime contractor or subcontractors.

15. **Restoration of Property:** Permittee shall complete the restoration, repair, and revegetation of the Property in consultation with, and to the satisfaction of, the State Environmental Scientist within one (1) year after completion of the Project or the expiration or termination of this Permit, whichever comes first. This obligation shall survive the expiration or termination of this Permit.

16. **Right to Halt Work:** The State reserves the right to halt work and demand mitigation measures at any time, with or without prior notice to Permittee, in the event the State determines that any provision contained herein has been violated, or in the event that cessation of work is necessary to prevent, avoid, mitigate or remediate any threat to the health and safety of the public or state park personnel, or to the natural or cultural resources of the state park.

17. **Use Restrictions:** The use of the Property by Permittee, including its guests, invitees, employees, contractors and agents, shall be restricted to the daytime hours between sunrise and sunset on a day-by-day basis, unless otherwise approved in advance in writing by State. No person shall use or occupy the Property overnight.

    Activities on the Property shall be conducted only in a manner which will not interfere with the orderly operation of the state park. Permittee shall not engage in any disorderly conduct and shall not maintain, possess, store or allow any contraband on the Property. Contraband includes, but is not limited to: any illegal alcoholic beverages, drugs, firearms, explosives and weapons.

    Roads and trails where motorized vehicles are normally prohibited may be used for vehicle access by Permittee, its employees, agents or contractors for patrol, maintenance or repair purposes only, and only to the extent specified by State, and shall be otherwise subject to all other conditions and/or restrictions of this Permit and any applicable laws, state park regulations and state park policies.

    Permittee shall not use or allow the Property to be used, either in whole or in part, for any purpose other than as set forth in this Permit, without the prior written consent of the State.

18. **State's Right to Enter:** At all times during the term of this Permit and any extension thereof, there shall be and is hereby expressly reserved to State and to any of its agencies, contractors, agents, employees, representatives, invitees or licensees, the right at any and all times, and any and all places, to temporarily enter upon said Property to survey, inspect, or perform any other lawful State purposes.

    Permittee shall not interfere with State's right to enter.

19. **Protection of Property:** Permittee shall protect the Property, including all improvements and all natural and cultural features thereon, at all times at Permittee's sole cost and expense, and Permittee shall strictly adhere to the following restrictions:

    (a) Permittee shall not place or dump garbage, trash or refuse anywhere upon or within the Property, except in self-contained trash receptacles that are maintained to State's satisfaction by Permittee.

    (b) Permittee shall not commit or create, or suffer to be committed or created, any waste, hazardous condition or nuisance in, on, under, above or adjacent to the Property.

    (c) Permittee shall not cut, prune or remove any vegetation upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (d) Permittee shall not disturb, move or remove any rocks or boulders upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

    (e) Permittee shall not grade or regrade, or alter in any way, the ground surface of the Property, except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(f) Permittee shall not bait, poison, trap, hunt, pursue, catch, kill or engage in any other activity which results in the taking, maiming or injury of wildlife upon the Property, except as specifically identified in the Project description and herein permitted or subsequently approved in writing by the District Superintendent.

(g) Permittee shall not use, create, store, possess or dispose of hazardous substances (as defined in the California Hazardous Substances Act) on the Property except as specifically identified in the Project description and herein permitted, or subsequently approved in writing by the District Superintendent.

(h) Permittee shall exercise due diligence to protect the Property against damage or destruction by fire, vandalism and any other causes.

**20. Default:** In the event of a default or breach by Permittee of any of the terms or conditions set forth in this Permit, State may at any time thereafter, without limiting State in the exercise of any right of remedy at law or in equity which State may have by reason of such default or breach:

(a) Maintain this Permit in full force and effect and recover the consideration, if any, and other monetary charges as they become due, without terminating Permittee's right to use of the Property, regardless of whether Permittee has abandoned the Property; or

(b) Immediately terminate this Permit upon giving written notice to Permittee, whereupon Permittee shall immediately surrender possession of the Property to State and remove all of Permittee's equipment and other personal property from the Property. In such event, State shall be entitled to recover from Permittee all damages incurred or suffered by State by reason of Permittee's default, including, but not limited to, the following:

(i) any amount necessary to compensate State for all the detriment proximately caused by Permittee's failure to perform its obligations under this Permit, including, but not limited to, compensation for the cost of restoration, repair and revegetation of the Property, which shall be done at State's sole discretion and compensation for the detriment which in the ordinary course of events would be likely to result from the default; plus

(ii) at State's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

**21. State's Right to Cure Permittee's Default:** At any time after Permittee is in default or in material breach of this Permit, State may, but shall not be required to, cure such default or breach at Permittee's cost. If State at any time, by reason of such default or breach, pays any sum or does any act that requires the payment of any sum, the sum paid by State shall be due immediately from Permittee to State at the time the sum is paid. The sum due from Permittee to State shall bear the maximum interest allowed by California law from the date the sum was paid by State until the date on which Permittee reimburses State.

**22. Revocation of Permit:** The State shall have the absolute right to revoke this Permit for any reason upon ten (10) days written notice to Permittee. Written notice to Permittee may be accomplished by electronic or facsimile transmission, and the notice period set forth in this paragraph shall begin on the date of the electronic or facsimile transmission, or, if sent by mail, on the date of delivery. If Permittee is in breach of the Permit or owes money to the State pursuant to this Permit, any prepaid monies paid by Permittee to State shall be held and applied by the State as an offset toward damages and/or amounts owed. Nothing stated herein shall limit the State's exercise of its legal and equitable remedies.

**23. Recovery of Legal Fees:** In any action brought to enforce or interpret any provisions of this Permit or to restrain the breach of any agreement contained herein, or for the recovery of possession of the Property, or to protect any rights given to the State against Permittee, and in any actions or proceedings under Title 11 of the United States Code, if the State shall prevail in such action on trial or appeal, the Permittee shall pay to the State such amount in attorney's fees in said action as the court shall determine to be reasonable, which shall be fixed by the court as part of the costs of said action.

**24. Voluntary Execution and Independence of Counsel:** By their respective signatures below, each Party hereto affirms that they have read and understood this Permit and have received independent counsel and advice from their attorneys with respect to the advisability of executing this Permit.

**25. Reliance on Investigations:** Permittee declares that it has made such investigation of the facts pertaining to this Permit, the Property and all the matters pertaining thereto as it deems necessary, and on that basis accepts the terms and conditions contained in this Permit. Permittee

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

**26.** **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

**27.** **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

**28.** **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

**29.** **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: ______________________________

Date: ______________________________

Name: **Dena Bellman**
Title: District Superintendent
Channel Coast District

**PACIFIC PIPELINE COMPANY**

Signature: ______________________________

Date: July 25, 2025

Name: **J. Caldwell Flores**
Title: President

acknowledges that State has made, and makes, no representations or warranties as to the condition of the Property, and Permittee expressly agrees to accept the Property in its as-is condition for use as herein permitted.

26. **Entire Agreement:** The Parties further declare and represent that no inducement, promise or agreement not herein expressed has been made to them and this Permit contains the entire agreement of the Parties, and that the terms of this agreement are contractual and not a mere recital.

27. **Warranty of Authority:** The undersigned represents that they have the authority to, and do, bind the person or entity on whose behalf and for whom they are signing this Permit and the attendant documents provided for herein, and this Permit and said additional documents are, accordingly, binding on said person or entity.

28. **Assignment:** This Permit shall not be assigned, mortgaged, hypothecated, or transferred by Permittee, whether voluntarily or involuntarily or by operation of law, nor shall Permittee let, sublet or grant any license or permit with respect to the use and occupancy of the Property or any portion thereof, without the prior written consent of State.

29. **Choice of Law:** This Permit will be governed and construed by the laws of the State of California.

**STATE OF CALIFORNIA**
Department of Parks and Recreation

Signature: Dena Bellman

Date: 7/25/2025

Name: **Dena Bellman**
Title: District Superintendent
Channel Coast District

**PACIFIC PIPELINE COMPANY**

Signature: ______________________

Date: ______________________

Name: **J. Caldwell Flores**
Title: President

# Exhibit F

**State of California • Natural Resources Agency** **Gavin Newsom,** ***Governor***

**DEPARTMENT OF PARKS AND RECREATION** **Armando M. Quintero,** ***Director***
**Legal Office • Post Office Box 924896 • Sacramento, CA 94296-000**

March 14, 2026

***Sent via Electronic Mail Only***
***slaperouse@sableoffshore.com***

Stephen T. Laperouse
Vice President Land
Sable Offshore
845 Texas Avenue, Suite 2920
Houston, TX 77002

Dear Mr. Laperouse:

This letter is to notify Sable Offshore and Pacific Pipeline Company ("Sable") that California Department of Parks and Recreation ("State Parks") is denying Sable's easement request, and demanding Sable immediately remove the pipeline according to section 8 of the Expired Easement.

Section 8 of the temporary pipeline easement granted to Sable's predecessor, Celeron Pipeline Company, which expired in 2016 ("Expired Easement"), attached hereto, authorizes State Parks to demand Sable to remove the pipeline and restore the property to its original condition after the end of the term. This letter demands immediate removal of the pipeline on State Parks' property pursuant to section 8 of the Expired Easement. State Parks has determined that due to Sable's excessive drain on state resources and incompatibility of their project with the park unit, State Parks will not be granting Sable an easement to continue to use Gaviota State Park for its oil pipeline operations. Additionally, although, State Parks has discussed the possibility of an easement with Sable, all prior permissions and discussions have been premised on the requirement that Sable comply with all applicable state laws and obtain all applicable state approvals, and Sable has now indicated that it has begun or imminently intends to begin restarting operations without adhering to those requirements or obtaining permission to use the State of California's land.

Consequently, State Parks is immediately ceasing any easement negotiations and related CEQA process.

If Sable does not formally respond within 10 days with plans for removal of the pipeline segment within Gaviota State Park, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim. State Parks is prepared to withdraw this letter, however, if Sable confirms in writing to State Parks no later than 12 PM Pacific Time on Monday, March

16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed.

*Background*

State Parks stewards Gaviota State Park, which consists of 2,712 acres of oak woodland and chaparral backcountry, beach and campground property, and natural sulfur hot springs in varied ecologically diverse habitats. It also contains significant known archeological, tribal, and historic resources, including the Las Cruces Adobe.

In 1986, Sable's predecessor received a 30-year pipeline easement from State Parks. Sable's pipeline runs four miles through Gaviota State Park, but has been offline since the May 2015 Refugio oil spill. The federal pipeline safety oversight agency determined the cause of the spill was in part the result of "ineffective protection against external corrosion of the pipeline." (Plains Pipeline, LP – Failure Investigation Report, Santa Barbara County, California Crude Oil Release – May 19, 2015, PHMSA (May 2016).) As a result of the spill, various state and federal agencies entered into a Consent Decree with Sable's predecessor as a settlement to a lawsuit containing a variety of claims. State Parks, as a resource trustee, is party to that Consent Decree which requires, among other things, that Sable comply with existing laws in its effort to restart its pipeline.[1]

Sable's 30-year easement for its pipeline expired in 2016, after the Refugio spill. Section 5 of the Expired Easement required Sable, "in the exercise of the privileges [therein] granted, [to] at all times be in compliance with all applicable laws, rules, and regulations." Section 8 of the Expired Easement stated that "[u]pon termination of this easement, COMPANY shall remove at option of STATE all improvements for which this easement is issued and shall restore and revegetate said easement in a manner satisfactory to STATE. In the event COMPANY fails to do so, STATE at its option may do so, and COMPANY agrees and warrants that upon receipt of written demand from STATE, COMPANY will pay to STATE the cost incurred by STATE for said removal and restoration."

---

[1] Section 78 of the Consent Decree states: "This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws, or regulations. Defendants are responsible for achieving and maintaining full compliance with all applicable federal, state, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, and permits, except as set forth herein. The United States and the State Agencies do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, OPA, Pipeline Safety Laws, or any other provisions of federal, state, or local laws, regulations, or permits."

Since 2016, State Parks has issued successive year-long right of entry permits in order to permit Sable (or its predecessors) access to the offline pipeline for general maintenance and monitoring. These permits have always been "expressly conditioned upon Permittee's obtaining any and all regulatory permits or approvals required by the relevant regulatory agencies for the Project and Permittee's use of the Property, and upon Permittee's compliance with all applicable municipal, state and federal laws, rules and regulations, including all State Park regulations." (Annual ROE, § 2.)

For years, State Parks understood Sable would ultimately abandon the current pipeline and replace and potentially realign the pipeline if it were to resume operations, and thus limited the ROE to those actions and access needs necessary for closure of the pipeline. Thus, the Annual ROE does not and cannot authorize operations. The second recital of the current Annual ROE states (omitting emphasis):

> Whereas, Permittee [Sable] has applied to State for permission to access Gaviota S.P. for purposes of carrying out Permittee's pipeline maintenance and access for existing Line 325 (formerly known as Line 903) that is currently subject to closure orders (the Project). This Permit is needed because the original easement facilitating Permittee's access to Line 325 in Gaviota S.P. has expired. Activities related to any new or future projects, including restarting Line 325 or constructing a new pipeline, are not included in the Project and are not covered by this Right of Entry. Instead, the parties are negotiating separate agreements regarding Permittee's activities with respect to restarting Line 325, including any preliminary work required by any regulatory oversight agencies to be completed prior to restart."

*Sable's Lack of Cooperation with State Parks, Violations of Past Permits, and Illegal Acts Damaging State Land*

Over the course of Sable and State Parks' negotiations, Sable has resisted every step of the process rather than working with State Parks. In July 2024, State Parks explained that Sable needed an easement in order to restart, and that a Right of Entry Permit for the anomaly digs would only be appropriate if the easement was near execution.

Instead of working with State Parks, Sable pushed for an immediate Right of Entry Permit, arguing there was no time for easement negotiations, despite the fact that State Parks had initiated the discussion about easement negotiations in July 2024. No law or contract required State Parks to continue working with Sable, or affiliated entities Exxon or Plains Pipeline, yet in order to provide physical access to the existing offline pipeline on public property, State Parks continued to offer a Right of Entry Permit so that Sable could have physical access to the property. State Parks did this with the

understanding that if the pipeline company ever continued operations, it would need to construct a new pipeline. The Consent Decree is clear that it does not waive any other requirements (see footnote 1), including legal authorization from State Parks to use and access the pipeline.

State Parks retains its usual discretion whether to grant an easement. Under Public Resources Code section 5012, State Parks may, but is not required to, grant an easement for pipeline purposes. Under State Parks' policy, encumbrances that do little or nothing to contribute toward State Parks' mission are presumed to be inappropriate, and State Parks is required to carefully analyze impacts before the encumbrance is approved by the State Parks Director. (State Parks' Department Operations Manual ("DOM"), § 2103.2.) Those requests that do little or nothing to contribute toward State Parks' mission must have no feasible offsite alternatives. Sable has stated that it has an offsite alternative. (https://sableoffshore.com/news/news-details/2025/Sable-Offshore-Corp--Announces-Alternative-Offtake-Strategy/default.aspx.)

Additionally, because Sable has requested a 30-year easement, State Parks has to be particularly careful in its analysis of whether and how to grant an easement that will impact this environmentally and culturally sensitive public land for decades. State Parks has informed Sable that under its policy "careful consideration must be given to impacts that may occur over the life of the encumbrance, including the burden and effect of ongoing maintenance or other intrusions." (DOM, § 2103.2.) In response, Sable has not provided sufficient information and follow State Parks' process and has shown time and again that it is not interested in complying with State Parks' process and will only be a burden and a liability to State Parks for the next three decades if it receives the right to operate within Gaviota State Park.

State Parks has always been clear that the annual Right of Entry Permit described above did not cover the extensive work involved with the anomaly digs. However, in February 2025, Sable elected to re-interpret the then-existing annual Right of Entry Permit and trespassed on State Parks' property, resulting in damage to natural resources. While Sable ceased work upon State Parks' demands, it showed that it is not a partner of the State and that obtaining full compensation and mitigation from Sable without litigation or other expensive, time consuming negotiations, is highly unlikely. Yet, State Parks cooperated with Sable's request and on May 8, 2025, State Parks issued a Right of Entry Permit for Sable's 18 anomaly digs ("Anomaly Dig ROE").

The Anomaly Dig ROE included restoration requirements which Sable has yet to perform, including restoration of a road that they demolished that provides access to an elementary school. Once the anomaly digs were complete[2], it became clear that Sable

[2] While the anomaly digs themselves were complete, Sable still has not finished completing the work required under the Anomaly Dig Right of Entry Permit, as noted above, including reconstruction of the

needed a much wider footprint for its easement area than they had proposed in their easement request.

On May 22, 2025, State Parks and Sable met to discuss the requirements for the easement request. State Parks informed Sable that restart is not authorized without an easement in place. While the basis for this is basic real property law rather than laws specific to state property, State Parks has had to continually explain to Sable why Sable needs a land right in order to operate on property it does not own, and that a license or permit to access property is not a land right and does not govern continuing operations. State Parks has been clear and consistent on this basic real property principle since the beginning of negotiations.

As a result of (1) Sable's consistent reluctance to work with State Parks' process, (2) Sable's illegal destruction of public property, (3) State Parks' statutory obligation to "administer, protect, develop, and interpret the property under its jurisdiction for the use and enjoyment of the public," (Public Resources Code § 5003), (4) State Parks' general policy against granting encumbrances that do not directly serve that mission, and (5) Sable's indications that it has begun or imminently intends to begin restarting operations without securing all required state approvals or a new easement, State Parks is denying Sable's easement request.

As stated above, if State Parks does not receive a plan for removal of the pipeline within 10 days of the date of this letter, or if Sable does not confirm in writing to State Parks no later than 12 PM Pacific Time on Monday, March 16, 2026, that it has not restarted Line 325 traveling through Gaviota State Park and that it will not restart that pipeline until and unless it obtains all required state approvals and a new easement from State Parks or obtains a final judicial decision (inclusive of appeals) that any state approvals or easements are not needed, State Parks will pursue legal action to defend the State's property rights, and State Parks reserves the right to take all appropriate legal action in the interim.

Sincerely,

DocuSigned by:
Tara E. Lynch
F610A257FA1247D...

Tara E. Lynch
Chief Counsel

---

damaged road that provides access to a local elementary school, and revegetation of the anomaly dig area. Sable has claimed that the anomaly dig footprint is revegetated, but in fact it came back with invasives, which can be expected where the footprint was not reseeded with State Parks-approved native mix as required by the Right of Entry Permit.

Enclosures
1. Annual ROE
2. Expired Easement

Cc:

Anthony Duenner, Sable Offshore General Counsel
Lee Alcock, Sable Offshore Assistant General Counsel
Dena Bellman, Channel Coast District Superintendent, State Parks
Katharine Wilson, Channel Coast District Planning Chief, State Parks
Emma Siverson, Senior Staff Counsel, State Parks

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown doj.ca.gov
Alicia.Roessler doj.ca.gov
Rebecca.Hunter.Beck doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,** *Plaintiff,* **v.** **CHRIS RIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,** *Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br>**DECLARATION OF JULIE ANCE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**<br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilsom<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

I, Julie Vance, declare as follows:

1. I am currently employed as the Regional Manager of the Central Region of the California Department of Fish and Wildlife ("CDFW"). I have held this position since 2015. I have personal knowledge of the facts stated in this declaration and could, if called upon to do so, testify competently thereto.

2. CDFW is the California state agency that implements and enforces California Fish and Game Code section 2050 et seq., known as the California Endangered Species Act ("CESA"), section 1600 et seq., relating to streambed alterations, and other provisions in the California Fish and Game Code.

3. The purpose of CESA is to conserve and protect plant and animal species at risk of extinction. Plant and animal species may be designated threatened or endangered under CESA after a formal two-step listing process by the California Fish and Game Commission ("Commission"). Such species are first designated by the Commission as a candidate species during the pendency of the listing process if CDFW finds, based on review of the listing petition, that the listing of a species as threatened or endangered may be warranted. Designation as a candidate species affords a species the same protection as a formally listed endangered or threatened species. After further scientific analysis and public proceedings, the Commission then determines whether listing is warranted, concluding the listing process.

4. No person may take or attempt to take the species, or any part or product of the species, without authorization from CDFW. Under CESA, "take" means hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill. (Cal. Fish & Game Code § 86 (West 2026).)

5. Under California Fish and Game Code section 2081, subdivision (b), CDFW may authorize the incidental take of a species listed under CESA as endangered, threatened, or candidate if: 1) such taking is incidental to, and not the purpose of, carrying out an otherwise lawful activity; 2) the permittee implements species-specific minimization and avoidance measures; and 3) the permittee fully mitigates the impacts of the activity. CDFW regulations similarly allow CDFW to authorize take of plants listed as rare pursuant to the Native Plant Protection Act. (Cal. Fish & Game Code § 1900 et seq.) These authorizations are commonly referred to as incidental take permits ("ITPs").

6. The California Fish and Game Code includes some species that are fully protected. (*See* Cal. Fish & Game Code §§ 3511, 4700, 5050, 5515.) Unlike species listed under CESA as endangered, threatened, or candidate, with narrow exceptions not relevant here, CDFW may not authorize take of a fully protected species; take is completely prohibited.

7. CDFW is divided into six land-based regional offices. The Central Region of CDFW includes San Luis Obispo and Kern counties. The South Coast Region of CDFW includes Santa Barbara County. The Los Flores Pipelines (CA-324 and CA-325) traverse all three counties.

8. Species listed under CESA as endangered, threatened, or candidate in proximity to the portion of the Pipelines that traverse San Luis Obispo and Kern counties include: California jewel flower (*Caulanthus californicus)*; Crotch's bumblebee (*Bombus crotchii*); Nelson's antelope squirrel (*Ammospermophilus nelsoni*); giant kangaroo rat (*Dipodomys ingens*); Tipton kangaroo rat (*D. nitratoides nitratoides*); and San Joaquin kit fox (*Vulpes macrotis mutica*). This list is based on an ITP Application that Plains Pipeline, L.P. ("Plains Pipeline") submitted to CDFW's Central Region office in August 2020 for a project that would have fully replaced the Pipeline within the same footprint.

9. On October 8, 2020, CDFW sent a letter to Plains Pipeline, informing Plains Pipeline that its ITP Application was incomplete. CDFW received a revised ITP Application from Plains Pipeline on November 9, 2020. On December 9, 2020, CDFW sent another letter to Plains Pipeline, informing Plains Pipeline that its revised ITP Application was incomplete. Ultimately, the project never moved forward.

10. Western burrowing owl (*Athene cunicularia hypugaea*); Blunt-nosed leopard lizard and California condor (*Gymnogyps californianus*) are also known to occur in proximity to the portion of the Pipeline that traverses San Luis Obispo and Kern counties. Western burrowing owl was listed as a candidate species under

CESA in October 2024 and Blunt-nosed lizard and California condor are both fully protected species. This information is based on data in the California Natural Diversity Database ("CNDDB").

11. The CNDDB is an extensive database of CESA-listed and other sensitive species. The CNDDB is populated by records through voluntary submissions of species detections. As a result, species may be present in locations not depicted in the CNDDB where there is suitable habitat features capable of supporting species. In other words, a lack of an occurrence record in the CNDDB does not mean a species is not present in a certain location.

12. The CNDBB indicates the following species occur in proximity to the portion of the Pipeline that traverses Santa Barbara County: unarmored threespine stickleback (*Gasterosteus aculeatus williamsoni*); southern California steelhead (*Oncorhynchus mykiss*); California red-legged frog (*Rana draytonii*); and California newt (*Taricha torosa*).

13. California Fish and Game Code sections 1602 and 1603 require an entity to submit a written notification to CDFW before conducting any work that will substantially obstruct or divert the natural flow of or substantially alter the bed, channel, or bank of a river, stream, and obtain a permit, known as a lake or streambed alteration agreement ("LSAA") from CDFW. An LSAA will be needed if CDFW determines the work could substantially adversely affect an existing fish or wildlife resource.

14. The Pipeline crosses a number of streams along its route through Santa Barbara, San Luis Obispo, and Kern counties.

/ /

/ /

/ /

/ /

/ /

15. Depending on the type of maintenance, repair, or other work to the Pipeline that will need to be completed, an ITP or LSAA from CDFW might be required before the work may begin.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated: 4/27/2026

Julie Vance
Declarant

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown doj.ca.gov
Alicia.Roessler doj.ca.gov
Rebecca.Hunter doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS RIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

Case No. 2:26-cv-3396-SVW-SSCx

**DECLARATION OF ROHIT SHARMA IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS**

Date: June 1, 2026
Time: 1:30 p.m.
Courtroom: 10A, 10th Floor
Judge: Hon. Stephen V. Wilson
Trial Date: Not Set
Action Filed: March 31, 2026

I, Rohit Sharma, declare as follows:

1. I am currently employed as the Chief Deputy of Operations with the California Department of Conservation, California Geologic Energy Management Division ("CalGEM"). I have held this position since July 2023. Previously, from

2021 to July 2023, I was the Acting Chief Deputy of Operations for CalGEM. I have personal knowledge of the facts stated in this declaration and could, if called upon to do so, testify competently thereto.

2. In my capacity as Chief Deputy of Operations for CalGEM, I am familiar with CalGEM's oversight of oil and gas operations within California, including the permitting of oil and gas wells, review and evaluation of underground injection control projects, regulation of production facilities, and inspection of oil and gas operations.

3. CalGEM's mission is to regulate California's oil, gas, and geothermal industries with a focus on public health, safety, and environmental protection through science and sound engineering, supporting the state's energy needs and climate commitments.

4. I am informed and believe that Sable Offshore Corporation ("Sable") owns and operates the Las Flores Canyon oil and gas processing facility ("Las Flores Canyon Facility") on the Santa Barbara Coast, and Lines CA-324 and CA-325, two onshore oil and gas pipelines that transport processed oil from the Las Flores Canyon Facility inland to Kern County.

5. The Las Flores Canyon Facility is subject to requirements under, *inter alia*, California Public Resources Code sections 3106, 3224, and 3270, and implementing regulations, California Code of Regulations ("C.C.R."), title 14, section 1712 *et seq*. These requirements include: conducting tests or inspections that the State Oil and Gas Supervisor, acting through CalGEM, has deemed necessary to establish reliability of the Facility's pipeline system, 14 C.C.R. § 1774.1(c); pressure testing before returning to service pipelines that have leaked and released a certain amount of fluids, and submitting test results to CalGEM within seven days of the test, 14 C.C.R. § 1774.1(d); modifying the design or construction of newly installed pipelines, and/or conducting additional testing and maintenance of such pipelines, at CalGEM's request, 14 C.C.R. § 1774; and

maintaining production facilities in good condition and in a manner that prevents leakage or corrosion and safeguards life, health, property, and natural resources, 14 C.C.R. § 1777(a).

6. CalGEM inspectors conduct regular environmental lease inspections of oil and gas wells and production facilities, such as Sable's Las Flores Canyon Facility. The purpose of environmental lease inspections is to allow CalGEM to monitor the health and safety of wells and facilities, and the facility operator's compliance with the California statutes and regulations that CalGEM enforces. These inspections typically focus on wells, settings, active and out-of-service tanks, vessels, pipelines, and sumps. While conducting an environmental lease inspection, CalGEM inspectors make observations and take photographs and videos, may employ the use of gas monitors and forward-looking infrared cameras and, if necessary, may use drones.

7. Environmental lease inspections are generally conducted at least once a year. The frequency of inspections depends on several different factors, such as whether the wells or production facilities are in a sensitive area and/or health protection zone, the operator's history of compliance, and incident occurrence. Additionally, CalGEM may require follow-up inspections to ensure that violations or concerns raised in previous inspections have been addressed, or to complete the inspection if the scope of the previous inspection was limited.

8. Access to oil and gas facilities to perform inspections is critical to CalGEM's mission and regulatory role to identify and properly address violations of statutory and regulatory requirements and prevent harm to life, health, property, and natural resources.

9. The following are examples of regulatory violations that, if present, would be identified and addressed during a CalGEM inspection, and the potential threats to safety and the environment if the violations are not addressed:

a. Failure to properly dispose of oilfield waste and refuse could result in a spill or leak, potentially releasing contaminants into storm drains, contaminating soil, groundwater, and/or drinking water, and causing a public nuisance. 14 C.C.R. § 1775(a).

b. Failure to maintain production facilities in good condition and in a manner that prevents leakage or corrosion in accordance with 14 C.C.R. § 1777(a) increases threats to public safety and the environment. Gas leaks at certain concentration levels create ignition risks and can also release greenhouse gases into the atmosphere. Fluid leaks can result in the release of contaminants into storm drains, the contamination of soil, groundwater, and/or drinking water, and cause a public nuisance. A standing pool of hydrocarbon fluid can present a fire hazard. Equipment submerged in fluid can corrode over time, making it inoperable and prone to leaks.

c. Failure to maintain adequate secondary containment in accordance with 14 C.C.R. § 1773.1 poses a threat of contamination to the surrounding areas in the event of a spill.

10. The oil and gas production facilities at the Las Flores Canyon Facility include an Oil Treating Plant and Cogeneration Facility, Stripping Gas Treatment Plant, and Pacific Offshore Pipeline Company Gas Treatment Facility, consisting of hundreds of structures and other units such as oil sludge thickener tanks, equalization tanks, vacuum flash drums, aeration basins, vessels, pipelines, and secondary containment, all of which CalGEM needs to be able to inspect on at least an annual basis.

/ /

/ /

/ /

/ /

11. If Sable denies access to CalGEM inspectors on the basis of the Wright Order, it would impede CalGEM's ability to ensure compliance with oil and gas production facility requirements and to prevent damage to life, health, property, and natural resources.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated: 4/28/2026

DocuSigned by:
Rohit Sharma
4F498F38AE3B48A...

Rohit Sharma
Declarant

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
STACY LAU (SBN 254507)
MARY HALEY OUSLEY (SBN 332711)
BRIAN CALAVAN (SBN 347724)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Alicia.Roessler@doj.ca.gov
Rebecca.Hunter@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **STATE OF CALIFORNIA,**<br>*Plaintiff,*<br>**v.**<br>**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**<br>*Defendants.* | Case No. 2:26-cv-3396-SVW-SSCx<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY**<br><br>Date: June 1, 2026<br>Time: 1:30 p.m.<br>Courtroom: 10A, 10th Floor<br>Judge: Hon. Stephen V. Wilson<br>Trial Date: Not Set<br>Action Filed: March 31, 2026 |

**[PROPOSED] ORDER**

This matter came before the Court on the Motion for a Preliminary Injunction and Stay ("Motion") filed by the State of California ("California"). The Court, having considered California's Motion, the documents filed therewith, and all other matters properly before it, hereby **GRANTS** the Motion.

In support of this Order, the Court makes the following findings: California has demonstrated (i) a likelihood of success on the merits of its claims; (ii) a likelihood of irreparable harm in the absence of preliminary relief; and (iii) that the balance of equities tips in its favor and that a preliminary injunction and stay are in the public interest.

Accordingly, the Court hereby **ORDERS** as follows:

1. Pursuant to 5 U.S.C. § 705, Defendant Secretary of Energy Chris Wright's March 13, 2026, order entitled "Pipeline Capacity Prioritization and Allocation Order" (the "Wright Order") is hereby **STAYED** and preliminarily set aside.

2. Defendants Secretary of Energy Chris Wright and the Department of Energy (collectively, "Defendants"), and its employees and agents and persons acting with the Department of Energy or on its behalf, are hereby **ENJOINED** from implementing, invoking, or enforcing the Wright Order to authorize or compel the flow of crude oil through Lines CA-324/325 without Sable having received necessary state-law approvals and without satisfying the terms of other court orders.

3. Defendants must immediately take every step necessary to effectuate this Order, including notifying any affected parties that the Wright Order has been set aside.

4. A security bond pursuant to Federal Rules of Civil Procedure 65(c) is not necessary under these circumstances and the Court exercises its discretion not to require one.

/ /

5. This stay and preliminary injunction shall remain in full force and effect pending resolution of this case on the merits or until further order of the Court, whichever occurs first.

**IT IS SO ORDERED.**

Dated: ___________________

_____________________________
Hon. Stephen V. Wilson
United States District Court Judge

ROB BONTA
Attorney General of California
DENNIS L. BECK, JR. (SBN 179492)
Supervising Deputy Attorney General
REBECCA HUNTER (SBN 356311)
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814-2951
Telephone: (916) 210-7801
Fax: (916) 327-2319
E-mail: Dennis.Beck@doj.ca.gov
Rebecca.Hunter.Beck@doj.ca.gov
ALICIA ROESSLER (SBN 219623)
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6767
Fax: (213) 897-2638
E-mail: Alicia.Roessler@doj.ca.gov
*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff,*

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants.*

Case No. 2:26-cv-3396

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE AND OTHER RELIEF**

**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF (L.R. 83-11)**

**(Defense Production Act, 50 U.S.C. § 4501 et seq.; Administrative Procedure Act, 5 U.S.C. §§ 701–706; Violation of U.S. Constitution Separation of Powers and 10th Amendment; Declaratory Relief)**

## INTRODUCTION

1. In a breathtaking power grab, the federal Executive Branch has asserted that, with the stroke of a Cabinet Secretary's pen on an order under the Defense Production Act, the federal government may preempt and supersede all state laws governing hazardous oil pipelines, California's sovereign property rights, and any order of a state or federal court, in an effort to extract as much petroleum as it can from the coastal waters off of California. This stunning usurpation of California's police powers, and the powers of the state and federal courts, should be struck down swiftly and certainly.

2. Onshore oil pipelines that run along the Santa Barbara, California, coast and inland to Kern County, California, were shut down in 2015 following a catastrophic rupture that spilled over 120,000 gallons of oil onto Refugio State Beach and into the ocean. In recent years, the pipeline operator has made repairs to the pipeline and sought to restart the pipelines, which fall within the jurisdiction of at least eight state agencies with regulatory authority over the pipelines and related facilities, or whose property the pipelines cross. The subset of those agencies that must grant affirmative approval for the pipelines to restart have been carefully examining the pipeline operator's requests, consistent with the specific safety and legal requirements under their respective statutes. Some approvals have been granted conditionally, while some remain under review pending the pipeline operator's submission of additional information or completion of legally required steps.

3. The pipeline operator was unhappy with the speed of those approvals, however—not because they were taking longer than other similarly complex and environmentally sensitive reviews, but because the pipeline operator was severely undercapitalized and desperate to begin generating revenue. Accordingly, the pipeline operator asked Defendant United States Secretary of Energy Chris Wright to order it to restart the pipelines under the Defense Production Act (DPA).

Secretary Wright issued that order on March 13, 2026. *See* Secretarial Order entitled *Pipeline Capacity Prioritization and Allocation Order* (the Wright Order). 91 Fed Reg. ___ (March 13, 2026). The pipeline operator then relied on the Wright Order, and a contemporaneous opinion from the U.S. Department of Justice's Office of Legal Counsel, to argue that any state laws or existing court orders standing in the way of restart could be ignored and set aside. The very next day, on March 14, 2026, the pipeline operator restarted pumping oil through pipelines despite an outstanding preliminary injunction in state court, despite not having necessary permits from either the state or the federal government for pipeline operation, despite still not having approval from several state agencies, and despite not having a current or valid easement to keep or utilize the segment of its pipeline crossing California state property.

4. By way of this action, the State of California seeks declaratory relief and a permanent injunctive relief under the United States Constitution and the Administrative Procedure Act (APA) and vacatur under the APA with respect to the Wright Order.

5. The Wright Order directs the pipeline operator to immediately "prioritize and allocate" transportation of hydrocarbon services, i.e., crude oil, produced at three offshore platforms in the Outer Continental Shelf (OCS) known as the Santa Ynez Unit. The crude oil extracted from the Santa Ynez Unit is transported through an undersea pipeline (the Offshore Pipeline), which Offshore Pipelines are partly on lands leased from the California State Lands Commission, into a production facility onshore where it is treated and separated into distinct petroleum products, and then enters a different intrastate onshore pipeline system and travels, including in part through Gaviota State Park, approximately 120 miles to an inland distribution station (Lines CA-324/325). The Wright Order also directs the pipeline operator to "immediately commence performance" under contracts for oil production and transportation from the Santa Ynez Unit through the Offshore Pipeline, processing

facility, and Lines CA-324/325, and to prioritize contracts regarding such oil over other contracts the company may have.

6. Defendant Secretary Wright claims that his order is authorized by the DPA. Defendants assert that Title I of the DPA "authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense" with respect to energy production. Defendants cite the *Declaring a National Energy Emergency* Executive Order (Executive Order 14156) and generally claim that greenlighting the oil production and transportation from the Santa Ynez Unit through the Offshore Pipeline, processing facility, and Lines CA-324/325 is "necessary and appropriate to promote the national defense," and "maximize[s] domestic energy supplies" where those supplies are "scarce."

7. A legal opinion issued by the U.S. Department of Justice's Office of Legal Counsel 10 days before the Wright Order opined that an order signed by a Cabinet Secretary under the DPA fully preempts contrary state law, as well as existing contrary federal and state court orders. As a result, the Wright Order purports to authorize activity that is illegal or unauthorized under both state law, and federal law, and barred by existing court orders, by directing and compelling that lawless action from a privately owned oil company desperate for a shortcut to restarting its oil production from the OCS through Lines CA-324/325 that have been shut down since the disastrous 2015 oil spill. Nothing in the DPA authorizes this usurpation of a State's sovereign property rights and police powers or the authority of the courts to enforce their own orders, and the federal Executive Branch's self-serving legal opinion to the contrary lacks merit.

8. The facts do not justify this overreach either. Restarting the flow of oil through Lines CA-324/325 does not fix any of these purported problems. Defendants' national defense and national energy emergency justifications are patently unreasoned. To the contrary, the offshore platforms have a maximum

expected gross oil rate of 50,000 barrels per day, contributing a fraction of a percent to the domestic energy market. Although international conflict has driven up oil prices globally by reducing oil exports from the Middle East, there is no actual *shortage* of crude oil in the United States; the incremental oil production the Wright Order directs would thus neither address a shortage (because there is none) nor lower the cost of crude oil in the United States (because this miniscule incremental production would not have an impact on the global price of oil). And even if there were any marginal benefit to the "national defense," it would be vastly outweighed by the environmental and safety risks, as well as the unlawful and unconstitutional displacement of the State's police powers and the intrusion upon the State's sovereign property rights.

9. Indeed, without this Court's intervention, the Wright Order would permit the federal government to order and authorize the restart of unpermitted and noncompliant infrastructure for oil and gas production and transportation in the State of California. Defendants improperly use the DPA to authorize sweeping preemption of state and federal regulatory frameworks governing oil and gas production and transportation, coastal management, environmental protections, property interests, and more. Such broad preemption is patently unauthorized by the DPA, and the Wright Order amounts to an unprecedented and historic grant of power to an oil corporation. If allowed to stand, the Wright Order would displace California's broad and comprehensive state environmental, pipeline safety, coastal management, sovereign property rights, and common law frameworks. Unlawfully bypassing any and all state requirements is an affront to the sovereignty of California and its right to manage its property and exercise its police powers within its own borders.

10. Not only does the Wright Order seek to preempt California law, but it also seeks to authorize the pipeline operator to directly violate at least two separate court orders—one from a state superior court and one from another federal court—

requiring the operator to meet certain conditions before it can restart operating the pipelines. This violation of the Constitutional separation of powers between the Executive and Judicial branches is yet another attempt by the current federal administration to undermine the rule of law and to eviscerate a co-equal branch of the federal government.

11. To prevent these harms to Plaintiff, this Court should declare that the Wright Order is unlawful under the APA and violates the United States Constitution. For these and other reasons discussed below, the Wright Order should be declared unlawful and vacated.

## JURISDICTION AND VENUE

12. This action arises under the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; the Defense Production Act, 50 U.S.C. §§ 4501 et. seq.; and federal regulations implementing the Defense Production Act. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because this is a civil action in which Defendants are agencies of the United States or officers of such an agency; the California Attorney General and the State of California have offices at 300 South Spring Street, Los Angeles, California, and therefore reside in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### Plaintiff

14. Plaintiff the State of California is a sovereign State of the United States. Attorney General Bonta is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of this State. Cal. Const.,

art. V, § 13; Cal. Gov't Code §§ 12510-11. The State of California administers its laws through various Executive Branch agencies and independent commissions of the State, including the Department of Forestry and Fire Protection's Office of the State Fire Marshal, the Department of Conservation's Geologic Energy Management Division, the California Coastal Commission, the State Lands Commission, the Department of Parks and Recreation, the State and Regional Water Resources Control Boards, the Department of Fish and Wildlife and that department's Office of Spill Prevention and Response.

**Defendants**

15. Defendant Chris Wright is the Secretary of the United States Department of Energy (DOE), and that agency's highest-ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 42 U.S.C. § 7131.

16. Defendant United States Department of Energy is a cabinet agency within the Executive Branch of the United States government. 42 U.S.C. § 7131.

## ALLEGATIONS

### I. Congress Enacted the DPA to Respond to Legitimate Needs for Goods and Services in Times of Emergency.

17. Congress enacted the DPA, 50 U.S.C. §§ 4501 *et seq.*, to provide the President, and Executive Branch officials by delegation, with authority to shape military preparedness and provide necessary industrial supplies for the national defense.

18. The DPA authorizes the Executive to employ three tools to carry out its purpose. Title I of the DPA provides for the "allocation and prioritization" of government contracts for strategic and critical goods. Title II allows the Executive to utilize financial incentives to expand capacity. Title VII authorizes the Executive

to enter into voluntary agreements with private industry. (Other titles of the DPA have since expired and are no longer in effect.)[1]

19. The cornerstone provision of the DPA is Title I, which authorizes the President to require industry to prioritize and give preference to federal contracts or orders and to allocate materials, services and facilities which he deems necessary for national defense.[2] Additionally, the President may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."[3]

20. "National defense" is broadly defined to encompass "programs for military and energy production or construction, military or critical infrastructure assistance to any foreign nation, homeland security, stockpiling, space, and any directly related activity," as well as "emergency preparedness activities conducted pursuant to title VI of The Robert T. Stafford Disaster Relief and Emergency Assistance Act and critical infrastructure protection and restoration."[4]

21. Historically, the DPA has primarily been invoked for military contracts for goods and services and to react to a global crisis, such as the COVID-19 pandemic. The Executive has used the DPA to direct industry to prioritize the fulfillment of government contracts for specific goods it deemed critical and strategic, such as meat production[5] and medical supplies in response to COVID-19, and for the Department of Defense to "allocate" civilian aircraft for potential use by the government during a national defense emergency.[6]

---

[1] 50 U.S.C. §§ 4501 et seq.
[2] 50 U.S.C. § 4511.
[3] 50 U.S.C. § 4511(a)(2).
[4] 50 U.S.C. § 4552 (14).
[5] Exec. Order No. 13917, 85 Fed. Reg. 26,313, 26,313 (Apr. 28, 2020).
[6] The allocation authority supports the Civil Reserve Air Fleet (CRAF) program, which was created initially in 1951, and is now managed by the U.S. Department of Transportation. https://www.congress.gov/crs-product/R43767#fn23

22. The DPA confers a distinct grant of authority specifically directed at contracts and allocation orders for energy production. It provides that "[n]otwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies" upon making certain statutory findings.[7] Critically, this authority may not be invoked unless the President finds that the relevant materials, services, and facilities are "scarce, critical, and essential" to maintaining or expanding energy exploration, production, refining, or transportation, and that these objectives "cannot reasonably be accomplished without exercising" this authority.[8] These are required threshold findings of fact, not merely discretionary recitals.

23. The DPA contains no provision indicating that it displaces judicial power or state power preserved by the Constitution or Congress in other statutes, coastal management, environmental protections, property interests, and more.

24. Finally, the DPA contains a sunset provision that requires Congress to periodically reauthorize it to retain effect. Notably, in 2009, Congress did not reauthorize the provision that allowed the President to use the DPA to requisition private property.

## II. Faulty Maintenance of Line CA-324 Resulted in One of the Largest Oil Spills in California History and Extensive Damage to the State, and Authorizing its Unlawful Restart by an Irresponsible Company Is a Dangerous Usurpation of California's Sovereign Property and Police Powers.

25. The Wright Order directs a pipeline operator, Sable Offshore Corporation (Sable), to restart production and transportation of oil and gas through pipelines that were shut down since a devastating oil spill in 2015. By way of background, the Wright Order pertains to several processes and pieces of infrastructure. Crude oil

[7] 50 U.S.C. § 4511(c)(1).
[8] 50 U.S.C. § 4511(c)(2).

and other hazardous liquids are produced at three offshore drilling platforms off the Santa Barbara Coast (the Santa Ynez Unit) and transported by undersea pipelines—including through pipelines on lands leased from the California State Lands Commission—to a processing facility immediately onshore, called the Las Flores Canyon Processing Facility. There, the liquids and natural gas are separated and treated, and the processed oil product is then placed into different Lines CA-324/325 that span more than 120 miles—including a portion of which is currently trespassing through Gaviota State Park—from the Santa Barbara County coast inland to Kern County, California, for storage and ultimately distribution. The Santa Ynez Unit, the Las Flores Canyon Processing Facility, and the Offshore and Lines CA-324/325 first came online between 1970 and the mid-1990s.




26. On May 19, 2015, Line CA-324 (then known as Line 901) ruptured, releasing over 120,000 gallons of heavy crude oil into the environment along the Santa Barbara coast at Refugio State Beach, which came to be known as the

Refugio Oil Spill. The spill coated seven miles of shoreline with crude oil and tar balls and damaged beaches more than 100 miles down the coast.

27. Investigations determined that Lines CA-324/325's system designed to prevent corrosion used a defective design that could not be remediated. The investigation report determined that the cause of the rupture was external corrosion of the pipeline wall at the point of failure.

28. The Refugio Oil Spill caused widespread damage to California's natural resources, lands, and livelihoods. The spill oiled the Pacific Ocean and the coastal zone from Refugio Beach to as far south as Manhattan Beach in Los Angeles County.

29. The spill adversely impacted natural resources under the trusteeship of the State of California, including marine mammals and fish, kelp and eelgrass, and it degraded marine and coastal habitats. It harmed migratory marine mammals and birds that spend a portion of their lifecycle within the waters of the Channel Islands National Marine Sanctuary. The California Department of Fish and Wildlife had to close commercial and recreational fishing. The spill also impeded shoreline and offshore recreation and boating at Channel Islands National Park and marred and closed Santa Barbara's beaches to public use and enjoyment.

30. Lines CA-324/325 were taken out of operation after the spill, and state and federal regulators, as mentioned, investigated the failure. Around that time, in 2016, the Pipeline and Hazardous Materials Safety Administration (PHMSA) determined that Lines CA-324/325 were *intra*state pipelines, and that the State of California had authority to regulate and impose safety standards pursuant to the Pipeline Safety Act.[9] In 2016, regulatory authority over the Pipelines was then transferred from PHMSA to the California Department of Forestry and Fire Protection, Office of the State Fire Marshal (OSFM).

---

[9] See 49 U.S.C. § 60105.

31. On May 12, 2020, the United States, California state regulatory agencies, and the University of California filed a civil action against then-owner and operator, Plains All American Pipeline Company (Plains), for causing the Refugio Oil Spill. *U.S. v. Plains All American Pipeline*, Case No. 2:20-cv-02415 (March 13, 2020).

32. State and federal agencies engaged in efforts that culminated in an agreed-upon Consent Decree, filed in 2020 in the Central District of California, which required that the operator pay over $60 million in damages and penalties, and which prescribed terms for any future restart of the pipelines. The Court (Hon. Philip S. Gutierrez) signed the Consent Decree on October 14, 2020, which is a judgment binding all parties.

33. Plains was also found guilty of a felony and eight misdemeanors for failing to properly maintain these pipelines.

34. The United States and California designated OSFM as the agency that is responsible for oversight of the Lines CA-324/325, consistent with PHMSA's confirmation of OSFM jurisdiction in 2016.

35. The Consent Decree requires that, prior to restarting Line 901 [now Line CA-324], Plains shall apply for a State Waiver [i.e., state approval to use anti-corrosion measures that differ from the federally required technology, cathodic protection] from OSFM. The Consent Decree also assigned OSFM the power to approve a restart plan and provided procedures for its modification and termination, as well as for the Court's retention of jurisdiction to enforce compliance with its terms. In its acquisition of Lines CA-324/325, Sable agreed to be bound by the Consent Decree.

36. For more than ten years, Lines CA-324/325 remained idle until March 14, 2026, when Sable restarted Lines CA-324/325 based on the Wright Order.

37. Since Sable acquired the Pipelines in 2024, it has consistently demonstrated that it is willing to cut corners and disregard legal compliance in its crusade to return to production to dig itself out of a financial hole.

38. In February 2024, Sable acquired the Santa Ynez Unit, Las Flores Canyon Processing Facility, and Lines CA-324/325 from ExxonMobil for a total of $625 million dollars, financed almost entirely by a $622 million loan from ExxonMobil.

39. Sable was and remains undercapitalized. As a condition of the acquisition, if Sable did not restart production by January 1, 2026, ExxonMobil had the right of reversion. The maturity date was extended to March 31, 2027, but with a higher interest rate, pursuant to the Second Amendment to Senior Secured Term Loan Agreement.

40. Sable's precarious financial position dictated that it prioritize restarting the pipelines quickly, above all else. Shortly after the acquisition, Sable began its venture to restart oil production at the Santa Ynez Unit, transport crude oil through Lines CA-324/325, and sell the oil commercially. In order to do so Sable ultimately opted to attempt to repair and augment the pipelines instead of replacing them. Sable's crews began working on Lines CA-324/325 despite not having received several requisite permits or approvals.

41. By Plaintiff's knowledge and information, there are several active lawsuits to date related to the pipeline work and potential restart. Since early 2025, several state and local entities have issued administrative notices of violation and brought enforcement actions, and actions seeking other forms of relief, against Sable, alleging the company failed to comply with certain requirements of the state framework in performing pipeline maintenance and potential restart, including

obtaining applicable property rights.[10] Sable, including its wholly owned subsidiaries, sued California regulators and local authorities for, *inter alia*, attempting to implement State law and taking enforcement action regarding Sable's legal violations.[11] Nonprofits have sued challenging OSFM's issuance of State Waivers for alternative anti-corrosion technology for Lines CA-324/325.[12]

---

[10] *See Sable Offshore Corp. et al. v. California Coastal Commission*, Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025) (Coastal Commission cross complained against Sable to enforce administrative orders, including fines for unpermitted repair work in the coastal zone); *The People of the State of California v. Sable Offshore Corp.,* Case No. 25-000333 (Santa Barbara Sup. Ct., Sep. 16, 2025) (Santa Barbara County District Attorney brought criminal charges alleging intentional violations of the California Water Code and Fish and Game Code related to the unpermitted repair work); *People of the State of California ex rel. California Regional Water Quality Control Board, Central Coast Region v. Sable Offshore Corp*., Case No. 25CV06285 (Santa Barbara Sup. Ct., Oct. 3, 2025) (alleging violations of the California Water Code involving failure to comply with an investigative order; failure to report waste discharges; and discharge of waste into "waters of the state" without permits); (*Cal. Dep't of Parks and Recreation v. Sable Offshore Corp., et al.*, Case No. 26CV01759 (Santa Barbara Super. Ct., Mar. 17, 2026) (State Parks alleged trespass by Sable relating to use of the pipeline, including to transport oil through Gaviota State Park without a valid property interest) (removed Mar. 19, 2026 into federal district court as *Cal. Dep't of Parks and Recreation v. Sable Offshore Corp., et al*., C.D.Cal. 2:26-cv-02946).

[11] *See Sable Offshore Corp. et al. v. California Coastal Commission,* Case No. 25CV00974 (Santa Barbara Sup. Ct., Feb. 18, 2025) (challenging the Coastal Commission's jurisdiction to enforce an administrative penalty); *Pacific Pipeline Co. v. State of California*, Case No. 1:26-cv-01486 (E.D. Cal, Sep. 29, 2025); *Sable Offshore Corp. v. Quintero,* Case No. 2:26-cv-02739 (C.D. Cal., March 13, 2026) (seeking declaratory relief related to issue of obtaining easement within Gaviota State Parks); *Sable Offshore Corp. v. CalGEM, et al.,* Case No. 26WM000036 (Sacramento Sup. Ct., February 17, 2026) (challenging CalGEM's bond requirement for production facilities under Public Resources Code section 3205.8 and applicability of SB 1137).

[12] *Environmental Defense Center et al v. California Dep't of Forestry and Fire Protection, Office of the State Fire Marshal et al.,* Case No. 25CV02247 (Santa Barbara Sup. Ct, Apr. 15, 2025) and *Center for Biological Diversity et al v. California Dep't of Forestry and Fire Protection, Office of the State Fire Marshal et al*., Case No. 25CV02244 (Santa Barbara Sup. Ct, Apr. 15, 2025).

42. Importantly, the Santa Barbara County Superior Court issued a preliminary injunction on July 29, 2025, which enjoined Sable from restarting the Pipelines until 10 court days following the filing and service of notice by or on behalf of Sable that Sable has received all necessary approvals and permits for restarting the Pipelines, and that Sable intends to commence such restart. As of the date of this Complaint, that preliminary injunction remains in place—which Sable is now in violation of—despite Sable twice attempting to dissolve it. Nonprofits have also sued the United States Bureau of Oceanic Energy Management and Bureau of Safety and Environmental Enforcement regarding federal leases for the Santa Ynez Unit.[13]

43. On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. On October 22, 2025, OSFM informed Sable that the State Waivers required Sable to, before any restart, repair metal loss anomalies detected during in-line inspections and declined to approve the restart plan at that time.

44. Rather than coming into compliance with the State Waiver requirements, on November 26, 2025, Sable instead petitioned PHMSA to reverse its position that the pipelines are subject to State jurisdiction—which position was memorialized in the Consent Decree—and step in and unilaterally assume jurisdiction over the Pipelines. Sable's letter to PHMSA "notif[ied]" the agency of *Sable's* determination that the pipelines were interstate— a determination that PHMSA must make, and one counter to PHMSA's longstanding determination —and asked that PHMSA assume exclusive authority over the pipelines by redesignating them as interstate under the Pipeline Safety Act, 49 U.S.C. § 60100 et seq.

45. On December 17, 2025, PHMSA adopted Sable's determination. The agency, in violation of the Consent Decree, issued an order redesignating the

---

[13] *Center for Biological Diversity et al. v. Doug Burgum et al.,* Case No. 2:25-cv-02840, (C.D. Cal, Apr. 2, 2025); *Center for Biological Diversity et al v. Debra Haaland et al*., Case No. 2:24-cv-05459 (C.D. Cal, June 27, 2024).

Pipelines as *inter*state, purporting to strip OSFM of its authority to regulate the *intra*state pipelines, and declaring the Pipelines under PHMSA's "exclusive regulatory authority" (Federalization Order).

46. On December 22, 2025, PHMSA issued a one-page letter approving Sable's Restart Plan for the Pipelines.

47. On December 23, 2025, PHMSA issued an Emergency Special Permit to Sable, waiving compliance from certain requirements related to remediation of corrosion in the pipeline wall. PHMSA also stated that the granting of the Emergency Special Permit was necessary to address the energy emergency declared in Executive Order 14156, *Declaring a National Energy Emergency*. 90 Fed. Reg. 8433 (Jan. 20, 2025).

48. On January 23, 2026, California filed a petition for review in the Ninth Circuit Court of Appeals challenging PHMSA's Federalization Order, PHMSA's approval of the restart plan, and the emergency special permit.[14]

49. On February 26, 2026, Sable announced that it was abandoning its State Waivers, which are required by the Consent Decree before the Pipelines could be restarted, citing PHMSA's Federalization Order as the basis.

50. Sable's restart of the Pipelines, absent the requisite permits and compliance with state and federal law, is an affront not only to California's police powers, but also the proper and safe regulation of the Pipelines and is alarming given the history of the Pipelines. Furthermore, Sable's loan indebtedness and pressure to restart before its assets revert to ExxonMobil, give the company an incentive to prioritize its own financial solvency over the safety and compliance of its project. Sable's desire to circumvent the law is not only borne out by its actions, but plainly evidenced by two letters requesting that federal regulators, first PHMSA

[14] *State of Calif. v. PHMSA et al.*, No. 25-508, consolidated with *Env'tl Def. Ctr. v. PHMSA*, No. 25-8059 (9th Cir.).

and now DOE, help the company restart in circumvention of California's laws and rights and at least two court orders. Defendants' unprecedented act of government assistance to a single struggling oil company endangers the health and safety of California's residents and the environment.

### III. The Wright Order was Issued at Sable's Request to Restart the Pipelines by Bypassing State and Federal Law, Including Two Judicial Orders.

51. On December 12, 2025, Sable sent a letter to DOE requesting that it act under the DPA to authorize and order the restart of the Pipelines.[15]

52. On March 3, 2026, the U.S. Department of Justice's Office of Legal Counsel issued an opinion entitled *Preemptive Effect of Defense Production Act Order on State Law* (OLC Opinion). 50 Op. O.L.C. __ (Mar. 3, 2026). At DOE's request, the OLC Opinion addressed whether an order issued under the DPA to Sable by the President or his delegee "would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure."[16] The OLC Opinion concluded that an "order issued under [the DPA] could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree . . . including those vesting authority over resumption of transportation [of oil through the Pipelines] with [OSFM]."[17]

53. Shortly thereafter, on March 13, 2026, President Trump issued an Executive Order (EO) titled, *Adjusting Certain Delegations Under the Defense Production Act*.[18] The EO amended previous Executive Order 13603 (National

---

[15] 50 Op. O.L.C __ (March 3, 2026) Slip Op. at 3, citing to a Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act at 1 (Dec. 12, 2025).

[16] *Id.* at 1.

[17] *Id.* at 22.

[18] https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-underthe-defense-production-act/

Defense Resources Preparedness) of March 2012, which delegates certain authorities of the President under the DPA to specified Executive department and agency heads, by adding the Secretary of Energy.

54. That same day, the Wright Order was issued pursuant to Title I of the DPA.[19] Specifically, the Wright Order directs Sable to:

> . . . [I]mmediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities at Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.
>
> . . . [I]mmediately commence performance under current contracts or orders for services, including contracts or order hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal;
>
> . . . .
>
> . . . [C]omply with this order immediately and to maintain that compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.[20]

55. The Wright Order restates Sable's claims that "the State of California is impeding it from resuming transportation of Santa Ynez Unit production through the SYPS" and that "California agencies have deployed an array of state measures—including [California Senate Bill No. 237 (2025), setting stricter conditions on restart of pipelines that have been idle, inactive or out of service for five years or more], the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through

[19] DPA § 4511; The Order was issued pursuant to the delegation of authority conferred on the Secretary by Executive Order 13603.

[20] Wright Order at 3.

a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[21]

56. On March 14, 2026, one day after the Wright Order was issued, Sable restarted the Pipelines, in direct violation of the Consent Decree - which it is bound by - the preliminary injunction in the Santa Barbara County Superior Court, and all state and federal laws governing the restart. The restart also constitutes an intentional trespass across state owned property through Gaviota State Park.

57. Sable immediately issued a press release and announced it "immediately complied" with the DPA Order and restarted pumping through the CA Lines 324/325 "*at the direction of the United States Secretary of Energy, Chris Wright*."[22]

58. The DOE issued a press release and several statements confirming that Secretary Wright issued an order under the DPA directing Sable to immediately "restore the Santa Ynez Unit and Pipeline."

59. On March 17, 2026, Sable sent a letter to the U.S. Department of Justice and the California Department of Justice, also stating it had "complied with Order" and restarted the Pipelines, and that it was no longer going to abide by the Consent Decree.[23]

**IV. Secretary Wright Orders the Immediate Restart of the Pipelines in Direct Contravention of the DPA and its Regulations.**

60. Secretary Wright issued the Wright Order pursuant to the DPA's Title I prioritization and allocation authority that permits orders that compel the

---

[21] *Id*. at 2.

[22] https://sableoffshore.com/news/news-details/2026/Sable-Resumes-Oil-Flow-as-Ordered-by-the-Federal-DPA-with-Expected-Gross-Oil-Rate-of-50000-Bblsd-and-Expects-First-Sales-by-April-1-2026/default.aspx (emphasis added).

[23] Letter from Anthony C. Duenner, Executive Vice President, General Counsel and Secretary, Sable Offshore Corp., March 17, 2026.

performance of government contracts with industry necessary to promote the national defense with respect to energy.[24]

61. This authority gives the Secretary the power to require industry contractors to perform some orders before others or to allocate already-available resources to some orders before others.[25]

62. Notably, the DPA's Title I regulations establish a "Department of Energy Priorities and Allocations Program" specifically for regulating the prioritization and allocation of government contracts with industry.[26]

63. These Title I contracts are called "requirements contract," "basic ordering agreement," "prime vendor contract," or "similar procurement document . . ."[27]

64. The DPA regulations assign levels of priority to contracts based on a rating system that rates a contract as "DO" or "DX" or "unrated."[28] DX rated orders are prioritized over DO orders, and DO orders are prioritized over unrated orders.

65. Any contracting decisions made under this system must be made with a "strong preference" for small businesses, especially those in economically depressed areas.[29] Sable is not a small business.

66. Notably, the DPA's Title I regulations require that these contracts include a specific delivery date. The word "immediately," as used in the Wright Order to authorize the restart, does not constitute a delivery date as required.[30]

67. However, the Wright Order does not say, and no public information indicates, that Sable holds a Title I government contract or that Sable is required to

[24] DPA § 4511 A.
[25] 50 U.S.C. § 4511(a), (c).
[26] 10 C.F.R. § 217.3.
[27] 10 C.F.R. § 217.32
[28] 10 C.F.R. § 217.31
[29] 10 C.F.R. § 216
[30] 10 C.F.R. § 217.32

sell its crude to the government in a Title 1 contract. The Wright Order also fails to state where, or to whom, Sable will sell the crude oil it produces.

68. It is simply inexplicable and unclear how the Secretary purports to utilize the DPA's Title I authority to direct the wholesale and "immediate" restart of the pipelines in the absence of any required Title I contracts, orders, or allocations.

69. The Secretary's use of the DPA's Title I authority to order the immediate restart of the pipelines out of the context of ordering the performance of a government contract or allocation order is incongruent with the statute and regulations that support the DPA's Title I power and amounts to an unprecedented abuse of power by the Secretary, and the order is contrary to law and arbitrary and capricious.

70. Even if Sable applied for or obtained a Title I government contract to supply its oil to the government, the Wright Order is still invalid because it fails to meet the threshold findings requirements of Title I.

71. The DPA only authorizes the Secretary to require priority performance of contracts or allocation orders for domestic energy if two key findings are made.

72. First, he must find that the covered "materials, services, and facilities are *scarce, critical, and essential*—(i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities[.]" (Emphasis added.)

73. Second, he must determine that the "maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities *cannot reasonably be accomplished* without exercising the authority specified in paragraph (1) of this subsection."[31] (Emphasis added.)

[31] DPA § 4511(c).

74. The law governing agency actions requires that these findings must be more than mere declarations, but rather, supported by sound reasoning that supports the choice made.

75. The Wright Order declares that the offshore Santa Ynez Unit oil field is a "critical energy resource on the West Coast" and the largest offshore oilfield, but fails to provide necessary information to support this determination, fails to make the required findings, and fails to consider all aspects of the problem with restarting the pipelines.

76. For example, there is no information provided that describes the quantity or quality of oil or the cost of extraction on the environment or community. Nor is there an identification of other energy sources or a comparison to other possible energy sources that might provide more energy independence with fewer impacts, such as a renewable energy source. The Secretary failed to explain why the DOE chose to favor Sable's oil project above all others.

77. The Order also fails to discuss the impact of another oil spill on California's economy.

78. The impacts of the 2015 oil spill—which caused hundreds of millions of dollars of damage to California's natural resources and economy—coupled with the ongoing safety issues, are another vital piece of the problems surrounding Sable's restart that were ignored in the Wright Order.

79. The Wright Order also does not attempt to articulate why the pipelines, in particular, are critical to the national defense. The Wright Order also does not allege that Sable is part of a national energy program or a national defense program.

80. The Wright Order cites the *Declaring a National Energy Emergency* Executive Order (Executive Order 14156), which is currently being challenged in federal court.[32]

---

[32] *State of Washington, et al. v. Donald Trump, et al.*, Case No. 2:25-cv-00869 (U.S.D.C. Western Dist. of WA).

81. The United States already produces significantly more oil and gas than it uses. It is the world's largest exporter of liquified natural gas and exports millions of barrels a day of crude oil. It has been a net energy exporter since 2019, when President Trump declared the nation energy independent.[33]

82. The Wright Order also fails to provide any rational basis that connects how ordering Sable to "require acceptance and prioritize performance" of "contracts" or "allocations" would promote the national defense with respect to energy.

83. The Secretary fails to rationally explain why the Wright Order only favors Sable, nor does it provide any credible information to support the restart of Sable's pipeline in a manner that is "immediate" and circumvents state and federal law, as well as existing court orders.

**V. The Wright Order Impermissibly Tries to Displace a Robust, Coordinated Apparatus of State Law and Attempts to Usurp State Agency Jurisdiction.**

84. In the three-page Wright Order, Secretary Wright gave Sable a convenient escape from compliance with state pipeline regulation and environmental, and land use laws that it, in multiple instances to date, has failed to comply with. This attempts to make inapplicable the comprehensive state regulatory framework governing the restart. Secretary Wright's use of the DPA to

[33] U.S. Energy Information Admin., In-Brief Analysis: The United States was the world's largest liquified natural gas exporter in 2023 (Apr. 1, 2024). Available at https://www.eia.gov/todayinenergy/detail.php?id=61683.

U.S. Energy Information Admin., U.S. Exports of Crude Oil (Jan. 31, 2025), Available at https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrexus1&f=a.

U.S. Energy Information Admin., U.S. Energy Facts Explained (July 15, 2024), Available at https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php; U.S. Energy Independence Set New Record In 2023

broadly authorize preemption of state law in the Wright Order is contrived, in direct conflict with the statute, and without lawful and reasoned explanation.

85. The California regulatory framework governing the restart vests authority in eight different state agency regulators, who play crucial and interrelated roles in regulating the Pipelines restart. The state scheme is critical for California's safety.

86. A variety of state laws apply to the restart. First, two California state laws and regulations govern pipeline safety and oil spill response.

87. The Elder California Pipeline Safety Act of 1981, Cal. Gov. Code § 51010 et seq., applies to public safety, risk reduction, and spill prevention of hazardous liquid pipelines within California. OSFM implements the law. California Senate Bill 237, which took effect January 1, 2026, amended the Elder California Pipeline Safety Act to require spike hydrostatic testing for any oil pipeline that has been idle, inactive, or out of service for five years or more.

88. The Lempert-Keene-Seastrand Act of 1990, Cal. Gov. Code section §§ 8574.1 et seq., applies to oil spill prevention, preparedness and response. The Office of Spill Prevention and Response, within the California Department of Fish and Wildlife, implements the law.

89. Second, California state laws and regulations govern the restart's impacts to water quality.

90. The Porter-Cologne Water Quality Control Act of 1969, Cal. Wat. Code, § 13000 et seq., applies to the discharge of waste, stormwater, and land disturbances that could occur during pipeline repair or construction. The California State and Regional Water Quality Control Boards implement the law.

91. Third, California state laws and regulations govern the restart's impacts to wildlife and habitats.

92. The California Endangered Species Act of 1984, Cal. Fish & Game Code, § 2050 et seq., applies to the management and protection of listed species. And section 1602 of the California Fish and Game Code requires a lake or

streambed alteration permit if the pipeline's onshore activities may substantially adversely impact fish and wildlife. The California Department of Fish and Wildlife implements these laws.

93. Fourth, California state laws and regulations govern activity and development in the coastal zone. The California Coastal Act of 1976, Public Resources Code §§ 30000 et seq., regulates development in the "coastal zone."[34]

94. California Senate Bill 237 10 C.F.R. § 217.31 amended the California Coastal Act clarifying that the repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more and is located in the coastal zone, such as the Pipelines, requires a new coastal development permit governed by the requirements of California Public Resources Code section 30262. Cal. Pub. Res. Code § 30262(b)(2). The California Coastal Commission implements these laws.

95. Fifth, California state laws and regulations apply to certain oil and gas production facilities, including the Las Flores Canyon Processing Facility.

96. Section 3106 of the California Public Resources Code ensures that operators carry out oil and gas production, operation, and decommissioning of "production" facilities in a manner that prevents damage to the health and safety of California's citizens, or damage to the environment and natural resources. The California Department of Conservation, Geologic Energy Management Division (CalGEM) implements the law.

97. Furthermore, the pipelines cross state land and are subject to state property law. The State's lands are administered and managed by several state agencies.

98. The California State Lands Commission issues and manages leases for existing oil and gas operations in State waters. The California State Lands Commission currently holds two of Sable's undersea pipelines leases, one for oil

[34] Cal. Pub. Res. Code, § 30103.

and one for natural gas, that together connect the Santa Ynez Unit offshore platforms to the Santa Ynez Pipeline System and onshore Las Flores Canyon Facilities and Onshore Pipelines.

99. California Department of Parks and Recreation (State Parks) may grant easements for oil or gas pipelines on property that it owns.[35] Because the onshore pipelines cross approximately four miles of Gaviota State Park, which is owned by State Parks, Sable must obtain an easement from State Parks to run its oil across state land.

100. Sable does not currently have any easement rights or other property rights that allow it to transport oil through Gaviota State Park.

101. In 1987, State Parks granted an easement to Sable's predecessor-in-interest, Celeron Pipeline Company of California, to transport hydrocarbon substances through the segment of Line CA-325 (then Line 903) that crossed Gaviota State Park. This easement was for a term of 30 years. It began on July 28, 1986, and expired on July 27, 2016.

102. Since 2016, State Parks has issued annual Right of Entry (ROE) permits to Sable's predecessors-in-interest or companies affiliated with Sable that have allowed them to access Gaviota State Park in order to perform maintenance on the then-dormant Line CA-325.

103. The ROE permits are not easements. Sable does not currently have any easement rights or other property rights that would allow it to transport oil through Gaviota State Park. The ROEs are necessary because Sable does not have an easement that would otherwise allow it to access the Park.

104. To the extent the Wright Order directs Sable to trespass on state land by operating without an easement, the Order infringes on state property rights and is unconstitutional.

[35] Cal. Pub. Res. Code § 5012.

105. In the days following Sable's March 14, 2026 restart announcement, State Parks, the State Lands Commission and the California Coastal Commission issued letters to Sable seeking confirmation from that company that it would adhere to state law obligations. State Parks received no responses to its letter.

106. Through these state agencies, the State of California carefully exercises its police powers to protect the public health and welfare as required by the Legislature of the State of California through its duly enacted laws. The DPA does not authorize the Secretary to issue an order that preempts California's laws.

**VI. Defendants Impermissibly Wield Executive Power to Abrogate Federal Law and Judicial Orders.**

107. The Wright Order, if allowed to stand, purports to subvert a vast array of long-standing federal laws, a federal judicial Consent Decree, and at least one state preliminary injunction that put conditions on any restart of the Pipelines. The DPA contains no provision that allows it to direct Sable to circumvent federal law, the Consent Decree that arose from the devastating Refugio Oil Spill and pipeline safety problems from the Pipelines, or the state court's preliminary injunction. While actions to enforce the Consent Decree and preliminary injunction are pending in the courts that issued those orders—and thus the State does not ask this Court to enforce those orders itself against nonparty Sable—the Wright Order's suggestion that it could upend those judicial orders is infirm and should be invalidated.

108. In addition to California's regulatory framework governing the safe and secure production of oil from Sable's pipelines, there are several federal statutes that are not preempted by the DPA, such as the Pipeline Safety Act, the Submerged Lands Act, and the Coastal Zone Management Act.

109. Furthermore, the Consent Decree and preliminary injunction are judicial orders that Sable must comply with, and the Wright Order cannot modify or abridge them.

110. Sable has not met the conditions for restart. The DPA does not authorize the Secretary to use a Title I DPA Order to sidestep Judicial Orders and require Sable to restart "immediately" in violation of the Consent Decree and preliminary injunction.

**VII. Defendants' Actions Harm California.**

111. Without this Court's intervention, the Wright Order voids state laws and infringes on state property rights, resulting in harms to California.

112. The Wright Order is an affront to, and usurpation of, the traditional police powers delegated to the states, in that it seeks to override any and all California laws that stand in the way of the restart of the Pipelines. The Wright Order also tramples over California's property rights to the extent it purports to allow Sable to operate Line CA-325 through a state park without an easement—or the safety and environmental conditions the Department of Parks and Recreation previously imposed under a now-expired easement—and to operate the Offshore Pipeline through leases from the California State Lands Commission without abiding by lease terms, including those mandating compliance with all other state laws.

113. Without cathodic protection or the safe alternative required by the State Waivers, there is also increased risk of oil spills in pipelines.

114. Spills resulting from restarting the pipelines under a handcuffed state regulatory framework would have serious environmental impacts across multiple categories, including water quality safety, coastal protection, and species protection.

115. Given the devastating impact of the Refugio Oil Spill and Sable's numerous pipeline safety violations, Sable's unlawful restart poses significant risks to California's economy, natural resources, and communities' health, safety, and welfare.

## CAUSES OF ACTION

### COUNT I
### Violations of Administrative Procedure Act, § 706(2)(B)-(C) Contrary to Law, In Excess of Statutory Authority

116. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

117. An agency may not take any action that exceeds the scope of its statutory authority or violates federal law.

118. The Wright Order is an agency action subject to the APA. 5 U.S.C. § 551.

119. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B) – (C).

120. Defendants may only exercise authority conferred by statute.

121. Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not amount to deference—rather, "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at 392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 109) (2015) (Scalia, J., concurring in judgment)).

122. Defendants have no authority under the DPA to immunize Sable from compliance with state and federal laws and Court Orders, including the Consent Decree and preliminary injunction. There is no express nor implied authority in the DPA to preempt all relevant state and federal laws governing the restart. If allowed to stand, this illegal assertion of authority to displace a broad regulatory framework could have wide-ranging applications and extend beyond judicially enforceable limits.

123. In addition, to the extent the Wright Order purports to preempt Plaintiff's right to own, manage, and dispose of its own land in Gaviota State Park, Defendants have no authority for such preemption absent a clear congressional judgment. See, e.g., *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993). Defendants unlawfully claim power beyond what Congress intended when it enacted the DPA.

124. The Wright Order is contrary to requirements for contract prioritizations and allocation orders codified in the statute and regulations, which specifically apply to government contracts and government contractors, conditions that are not applicable here.

125. The Wright Order is contrary to Title I's required specificity in description of contract prioritizations and allocations. The Wright Order lacks specificity as to any Title I contracts, orders, or allocations that Sable must enter into. The Wright Order fails to state where, or to whom, Sable will sell its crude from the pipelines.

126. The Wright Order does not meet the regulatory requirements of an allocation order because it continues in perpetuity, without a start and end date, fails to include a detailed description of the required allocation actions, and does not comply with other details required by 10 C.F.R. § 217.

127. Even if the Wright Order otherwise complied with the DPA, it would not have the sweeping preemptive scope that Defendants claim. Nothing in the DPA purports to preempt all state laws and regulations that affect or apply to contracts governed by the DPA.

128. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants lack legal authority under the DPA and its implementing regulations in enacting the Wright Order, and, in so doing, acted contrary to law and in violation of the APA.

129. Plaintiff is also entitled vacatur of the Wright Order pursuant to 5 U.S.C. § 706.

**COUNT II**
**Violation of Administrative Procedure Act 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious**

130. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

131. Defendants are included as "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Wright Order is agency action subject to review under the APA.

132. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

133. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of

the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

134. The Wright Order provides no reasoned basis and fails to explain why and how the restart of oil production and transportation from the Santa Ynez Unit through the Offshore and Lines CA-324/325 is necessary to "promote the national defense" and address purported domestic energy shortages. Relatedly, the national defense rationale is pretextual, not a valid justification.

135. The Wright Order failed to consider important aspects of the problem, such as the fact that immediately restarting transportation of crude oil through the pipelines would violate state and federal law and Court Orders.

136. Further, the Wright Order contains no reasoning as to the impact it would have, if allowed to stand, on California's state regulatory framework.

137. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Wright Order violates the APA because it is arbitrary and capricious.

138. Plaintiff is also entitled to vacatur of the Wright Order pursuant to 5 U.S.C. § 706.

**COUNT III**
**Violation of the U.S. Constitution**
**Separation of Powers**

139. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

140. Article III, Section 1 of the United States Constitution vests the judicial Power of the United States in federal courts. U.S. Const., art. III, Sec. 1.

141. It is the constitutional role of the judiciary to control, by Article III judges, the interpretation, declaration, and application of federal law. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 76–81 (1982).

142. The Constitution identifies specific roles for the Executive in the lawmaking process, via the Recommendation Clause and the Presentment Clause, which creates the President's veto power; outside these roles, the Executive Branch has no authority to change the law to suit the President's policy. U.S. Const. art. II, § 3; *id*. § 7, cl. 2; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

143. Congress cannot vest review of Article III court decisions in Executive Branch officials, and, by extension, the legislative and Executive Branches cannot unilaterally override judicial determinations. Separation of powers principles protect judicial independence by ensuring that once a court renders a decision, it cannot be subject to Executive revision or nullification.

144. Congress also possesses the power to legislate. Article I, Section 1 of the U.S. Constitution states "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives. U.S. Const., art. I, § 1.

145. The Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Executive has no power "to enact, to amend or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

146. With the Wright Order, Defendants attempt to usurp the judiciary's authority to modify or reverse judicial judgments in direct violation of the separation of powers. The Executive Branch's attempt to overrule the careful judgements of the Judicial branch by ordering Sable to restart is in direct contravention of the Consent Decree and the preliminary injunction, both judicial orders. Because the Consent Decree is an exercise of this court's Article III power, only an Article III court can modify or retract it.

147. Defendants violated constitutional separation of powers constraints because, through the Wright Order, Defendants claim to have overridden Congress's considered judgments by attempting to broadly preempt state law, when the text of the DPA does not empower Defendants to do so.

148. Further, Defendants impermissibly attempt to substitute the President's policy priorities for the will of Congress in enacting the DPA.

149. Plaintiff is aggrieved persons suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702.

150. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Wright Order violates the constitutional principles of separation of powers doctrine and impermissibly arrogates to the Executive Branch power that is reserved to the Judicial branch.

**COUNT IV**
**Violation of the Tenth Amendment to the U.S. Constitution**
**Sovereign Interests**

151. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

152. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend X.

153. Each state as a sovereign has reserved power to own, manage, and dispose of its property, including state parkland.

154. To the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Order infringes upon California's sovereign power to own, manage, and dispose of its property.

155. Defendants have no authority under the DPA to infringe upon or preempt California's sovereign power to own, manage, and dispose of its property. A state's power to own, manage, and dispose of its property is not subject to preemption absent a clear congressional judgment. *See, e.g., Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218 (1993); *Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1079 (9th Cir. 2017).

156. And the federal government has no constitutional power to commandeer state property for federal ends in violation of the Tenth Amendment, including by compelling the state to give a private company free use of that property in potential violation of the State's own constitutional prohibition on gifting public funds or things of value to private parties (Cal. Const., Art. XVI, section 6).

157. If Congress intends to override a state's right to own, manage, and dispose of its own property, it must speak clearly as to such intention, which it has not done in the DPA.

158. Plaintiff is an aggrieved person suffering a legal wrong or adversely affected by Defendants' conduct under 5 U.S.C. § 702.

159. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that, to the extent the Wright Order directs Sable to trespass on state land in Gaviota State Park by operating even without an easement, or to force California to grant Sable an easement or other property right to transport oil through Gaviota State Park, the Wright Order violates the Tenth Amendment to the U.S. Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

1. Issue a judicial declaration that the Wright Order is unconstitutional and/or unlawful because it violates the APA and the U.S. Constitution;
2. Vacate the Wright Order pursuant to 5 U.S.C. § 706;

3. Enjoin Defendants from invoking the Wright Order to authorize or compel operation of the Santa Ynez Unit and the pipelines, and from allowing anyone operating as Defendants' agents or working in concert with them to rely on or invoke the Wright Order to operate the Santa Ynez Unit and the pipelines without having received necessary state-law approvals and without satisfying the terms of court orders;
4. Grant other such relief as this Court may deem proper.

Dated: March 30, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
DENNIS L. BECK, JR.
Supervising Deputy Attorney General
REBECCA HUNTER
Deputy Attorney General

ALICIA ROESSLER
Deputy Attorney General
*Attorneys for Plaintiff State of California*

ROB BONTA
Attorney General of California
JEREMY BROWN (SBN 269159)
Supervising Deputy Attorney General
ALICIA ROESSLER (SBN 219623)
REBECCA HUNTER (SBN 356311)
BRIAN CALAVAN (SBN 347724)
KAVITA LESSER (SBN 233655)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1256
Telephone: (213) 269-6605
Fax: (213) 897-2638
E-mail: Jeremy.Brown@doj.ca.gov
Kavita.Lesser@doj.ca.gov

*Attorneys for Plaintiff*
*State of California*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**STATE OF CALIFORNIA,**

*Plaintiff*,

**v.**

**CHRIS WRIGHT,** in his official capacity as Secretary of the U.S. Department of Energy; **UNITED STATES DEPARTMENT OF ENERGY,**

*Defendants*,

and

**SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY**,

*Intervenor-Defendants*.

No. 2:26-cv-3396-SVW-SSCx

**PLAINTIFF'S NOTICE OF PRELIMINARY INJUNCTION APPEAL**

**NOTICE IS HEREBY GIVEN** that Plaintiff State of California in the above-captioned case hereby appeals to the United States Court of Appeals for the Ninth Circuit from this Court's Order Denying Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants filed and entered on the docket in this action on August 19, 2026 (ECF 82). A copy of said order is attached hereto as Exhibit 1.

Date: August 20, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
JEREMY BROWN
Supervising Deputy Attorneys General
ALICIA ROESSLER
REBECCA HUNTER
BRIAN CALAVAN
Deputy Attorneys General

*<u>/s Kavita Lesser</u>*
Kavita Lesser
Deputy Attorney General
*Attorneys for Appellant State of California*

ACCO,(SSCx),APPEAL,DISCOVERY,MANADR,RELATED-G

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:26-cv-03396-SVW-SSC

State Of California v. Chris Wright, et al.
Assigned to: Judge Stephen V. Wilson
Referred to: Magistrate Judge Stephanie S. Christensen
Related Case: 2:20-cv-02415-SVW-SSC
Case in other court: 9th CCA, 26-05409
Cause: 05:551 Administrative Procedure Act

Date Filed: 03/30/2026
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**State Of California** represented by

**Alicia Irene Roessler**
California Dept of Justice, Office of Attorney General
300 S. Spring Street Suite 1702
Los Angeles, CA 90013
213-269-6767
Fax: 213-897-2638
Email: alicia.roessler@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Calavan**
California Department of Justice
1515 Clay Street, 20th Floor
Oakland, CA 94612
510-879-1981
Fax: 510-622-2270
Email: brian.calavan@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Dennis L Beck , Jr**
CAAG - Office of Attorney General
Public Rights Division, Environment Section
1300 I Street Suite 125
Sacramento, CA 95814
916-210-7801
Fax: 916-327-2319
Email: Dennis.Beck@doj.ca.gov
*TERMINATED: 04/24/2026*

**Kavita Lesser**
CAAG - Office of the Attorney General
California Department of Justice
300 South Spring Suite 1702

Los Angeles, CA 90013
213-269-6605
Fax: 213-897-2638
Email: kavita.lesser@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Mary Haley Ousley**
Office of the Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
510-879-3957
Fax: 510-622-2270
Email: maryhaley.ousley@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Michael Stephen Dorsi**
California Attorney General's Office
455 Golden Gate Avenue Suite 11000
San Francisco, CA 94102
415-510-3802
Fax: 415-703-5480
Email: Michael.Dorsi@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Rebecca Hunter**
California Department of Justice
Office of the Attorney General
1300 I St, Ste 1530
Sacramento, CA 95814
916-210-7754
Email: Rebecca.Hunter@doj.ca.gov
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Environmental Defense Center** represented by

**Margaret Morgan Hall**
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
805-963-1622
Fax: 805-962-3152
Email:
mhall@environmentaldefensecenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Linda Krop**
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
805-963-1622
Email:

lkrop@EnvironmentalDefenseCenter.org
*ATTORNEY TO BE NOTICED*

**Movant**

**Sen. Sheldon Whitehouse**
Hart Senate Office Bldg
Room 530
Washington, DC 20510
202-224-2921

represented by **Cara Ann Horowitz**
UCLA School of Law
Environmental Law Clinic
405 Hilgard Ave
P O Box 951476
Los Angeles, CA 90095-1476
310-206-4033
Email: horowitz@law.ucla.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Patrick Duffy**
Ridgeline Center for Law and Policy
712 H Street NE, Suite 90006
Washington, DC 20002
802-233-7967
Email: jay.duffy@ridgelinecenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**Sable Offshore Corp.**

represented by **Nicholas McDaniel**
Babst, Calland, Clements and Zomnir PC
505 Ninth St., NW, Suite 602
Suite 602
Washington, DC 20004
202-853-3458
Email: nmcdaniel@babstcalland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Stebbins Bina**
Latham and Watkins LLP
10250 Constellation Boulevard Suite 1100
Los Angeles, CA 90067
424-653-5500
Fax: 424-653-5501
Email: jessica.stebbinsbina@lw.com
*ATTORNEY TO BE NOTICED*

**Intervenor Plaintiff**

**Pacific Pipeline Company**

represented by **Nicholas McDaniel**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Jessica Stebbins Bina**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Chris Wright**
*in his official capacity as Secretary of the U.S. Department of Energy*

represented by

**Ian Swenson**
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-532-5139
Fax: 202-514-0557
Email: ian.swenson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Riley Walters**
Cooper and Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
202-220-9637
Email: rwalters@cooperkirk.com
*TERMINATED: 07/21/2026*

**Stefan J Bachman**
DOJ-Enrd
7611 Ben Franklin Station
Washington, DC 20044
202-598-9566
Email: stefan.bachman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Energy**

represented by

**Ian Swenson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Riley Walters**
(See above for address)
*TERMINATED: 07/21/2026*

**Stefan J Bachman**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2026 | | FILING FEE PAID for new civil case. Receipt No. ACACDC-41866804 for $405 filing fee. (Roessler, Alicia) (Entered: 03/30/2026) |

| | | |
|---|---|---|
| 03/31/2026 | 1 | COMPLAINT with filing fee previously paid ($405 paid on 03/30/2026, receipt number ACACDC-41866804), filed by Plaintiff State Of California. (Attorney Dennis L Beck, Jr added to party State Of California(pty:pla))(Beck, Dennis) (Entered: 03/31/2026) |
| 03/31/2026 | 2 | CIVIL COVER SHEET filed by Plaintiff State Of California. (Beck, Dennis) (Entered: 03/31/2026) |
| 03/31/2026 | 3 | NOTICE of Related Case(s) filed by Plaintiff State Of California. Related Case(s): No. 2:26-cv-02946-WLH-MAA; 2:26-cv-02739-AB-PVCx; 2:20-cv-02415-SVW-SSC; 2:25-cv-04165-DMG-AGR (Beck, Dennis) (Entered: 03/31/2026) |
| 03/31/2026 | 4 | [Request for Clerk to Issue Summons on Complaint] Filed as Request for Clerk to Issue Subpoena filed by Plaintiff State Of California. (Beck, Dennis) Modified on 4/6/2026 (car). (Entered: 03/31/2026) |
| 03/31/2026 | 5 | Notice Notice to the Clerk of Action Seeking Statewide or Nationwide Relief filed by Plaintiff State Of California. (Beck, Dennis) (Entered: 03/31/2026) |
| 04/06/2026 | 6 | NOTICE OF ASSIGNMENT to District Judge Anne Hwang and Magistrate Judge Brianna Fuller Mircheff. (car) (Entered: 04/06/2026) |
| 04/06/2026 | 7 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 04/06/2026) |
| 04/06/2026 | 8 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (car) (Entered: 04/06/2026) |
| 04/06/2026 | 9 | 60 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendants United States Department of Energy, Chris Wright, United States Attorneys Office. (car) (Entered: 04/06/2026) |
| 04/08/2026 | 10 | PROOF OF SERVICE Executed by Plaintiff State Of California, upon Defendant All Defendants. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to Civil Process Clerk. Executed upon the Attorney Generals Office of the United States by delivering a copy to Assistant Attorney General for Administration. Executed upon the officer agency or corporation by delivering a copy to U.S. Department of Energy. Service was executed in compliance with Federal Rules of Civil Procedure. Due diligence declaration NOT attached. Registered or certified mail return receipt NOT attached. (Roessler, Alicia) (Entered: 04/08/2026) |
| 04/15/2026 | 11 | NOTICE OF APPEARANCE of California Attorney General Office Mary Haley Ousley on behalf of Plaintiff State Of California. (Attorney Mary Haley Ousley added to party State Of California(pty:pla))(Ousley, Mary) (Entered: 04/15/2026) |
| 04/15/2026 | 12 | NOTICE of Appearance filed by attorney Riley Walters on behalf of Defendants United States Department of Energy, Chris Wright (Attorney Riley Walters added to party United States Department of Energy(pty:dft), Attorney Riley Walters added to party Chris Wright(pty:dft))(Walters, Riley) (Entered: 04/15/2026) |
| 04/15/2026 | 13 | NOTICE of Related Case(s) filed by Defendants United States Department of Energy, Chris Wright. Related Case(s): 2:20-cv-02415, 2:26-cv-02739, 2:26-cv-02946 (Walters, Riley) (Entered: 04/15/2026) |
| 04/23/2026 | 14 | ORDER RE TRANSFER PURSUANT to this Court's General Order in the Matter of Assignment of Cases and Duties to the District Judges. Related Case- filed. Related Case No: 2:20-cv-02415-SVW-SSCx. Case transferred from Judge Anne Hwang and Magistrate Judge Brianna Fuller Mircheff to Judge Stephen V. Wilson and Magistrate Judge Stephanie S. Christensen for all further proceedings. The case number will now reflect the initials of |

| | | |
|---|---|---|
| | | the transferee Judge 2:26-cv-03396-SVW-SSCx. Signed by Judge Stephen V. Wilson. (lh) (Entered: 04/23/2026) |
| 04/24/2026 | 15 | Notice of Appearance or Withdrawal of Counsel: for attorney Dennis L Beck, Jr counsel for Plaintiff State Of California. Dennis L. Beck, Jr. is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiff State of California. (Beck, Dennis) (Entered: 04/24/2026) |
| 05/01/2026 | 16 | NOTICE OF MOTION AND MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS filed by Plaintiff State Of California. Motion set for hearing on 6/1/2026 at 01:30 PM before Judge Stephen V. Wilson. (Attachments: # 1 REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS, # 2 Memorandum OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS, # 3 Declaration OF DENA BELLMAN IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS, # 4 Declaration OF JULIE VANCE IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS, # 5 Declaration OF ROHIT SHARMA IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS, # 6 Proposed Order) (Roessler, Alicia) (Entered: 05/01/2026) |
| 05/05/2026 | 17 | EX PARTE APPLICATION to Continue Hearing / Opposition Deadline from June 1, 2026 / May 11, 2026 to June 22, 2026 / June 1, 2026 filed by Defendants United States Department of Energy, Chris Wright. (Attachments: # 1 Declaration of Riley Walters, # 2 Proposed Order) (Walters, Riley) (Entered: 05/05/2026) |
| 05/05/2026 | 18 | NEW CASE ORDER upon filing of the complaint by Judge Stephen V. Wilson. (dta) (Entered: 05/05/2026) |
| 05/05/2026 | 19 | ORDER SETTING INITIAL STATUS CONFERENCE for 6/1/2026 at 1:30 PM before Judge Stephen V. Wilson. (dta) (Entered: 05/05/2026) |
| 05/05/2026 | 20 | ORDER by Judge Stephen V. Wilson. DENIED BY ORDER OF THE COURT.; denying 17 EX PARTE APPLICATION to Continue Hearing. (aco) (Entered: 05/05/2026) |
| 05/07/2026 | 21 | NOTICE OF MOTION AND MOTION to Intervene filed by Proposed Intervenor Plaintiff Environmental Defense Center. Motion set for hearing on 6/8/2026 at 01:30 PM before Judge Stephen V. Wilson. (Attachments: # 1 Declaration of Linda Krop, # 2 Declaration of Julie Teel Simmonds, # 3 Declaration of Margaret Hall, # 4 Declaration of Alex Katz, # 5 Declaration of Brady Bradshaw, # 6 Declaration of Maureen Ellenberger, # 7 Declaration of Ken Hough, # 8 Declaration of Mike Lyons, # 9 Declaration of Ted Morton, # 10 Declaration of Tevin Schmitt, # 11 Notice of Interested Parties, # 12 Proposed Order Granting Motion to Intervene, # 13 Proposed Complaint) (Attorney Margaret Morgan Hall added to party Environmental Defense Center(pty:bkmov)) (Hall, Margaret) (Entered: 05/07/2026) |
| 05/08/2026 | 22 | Notice of Appearance or Withdrawal of Counsel: for attorney Brian Calavan counsel for Plaintiff State Of California. Adding Brian Calavan as counsel of record for State of California for the reason indicated in the G-123 Notice. Filed by plaintiff State of California. (Attorney Brian Calavan added to party State Of California(pty:pla))(Calavan, Brian) (Entered: 05/08/2026) |
| 05/11/2026 | 23 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS 16 filed by Defendants United States Department of Energy, Chris Wright. (Attachments: # 1 Exhibit |

| | | |
|---|---|---|
| | | A (Declaration of Ashley Nunes), # 2 Exhibit B (Declaration of Dustin Hubbard))(Walters, Riley) (Entered: 05/11/2026) |
| 05/11/2026 | 24 | NOTICE OF MOTION AND MOTION to Intervene *(UNOPPOSED)* Sable Offshore Corp., Pacific Pipeline Company. Motion set for hearing on 6/8/2026 at 01:30 AM before Judge Stephen V. Wilson. (Attachments: # 1 Declaration of J. Caldwell Flores in Support of Motion to Intervene and Proposed Opposition to Plaintiff's Motion for Preliminary Injunction and Stay, # 2 Declaration of Jessica Stebbins Bina in Support of Motion to Intervene, # 3 Proposed Order Granting Motion to Intervene, # 4 Proposed Opposition to Plaintiff's Motion for Preliminary Injunction and Stay, # 5 Proposed Evidentiary Objections to Evidence Submitted in Support of Plaintiff's Motion for Preliminary Injunction and Stay, # 6 Declaration of Steve Rusch in Support of Proposed Opposition to Plaintiff's Motion for Preliminary Injunction and Stay, # 7 Proposed Order Denying Plaintiff's Motion for Preliminary Injunction and Stay) (Attorney Jessica Stebbins Bina added to party Sable Offshore Corp. (pty:intvd), Attorney Jessica Stebbins Bina added to party Pacific Pipeline Company(pty:intvd)) (Stebbins Bina, Jessica) (Entered: 05/11/2026) |
| 05/11/2026 | 25 | NOTICE of Interested Parties filed by Proposed Intervenor Defendants Pacific Pipeline Company, Sable Offshore Corp., (Stebbins Bina, Jessica) (Entered: 05/11/2026) |
| 05/13/2026 | 26 | NOTICE of Appearance filed by attorney Margaret Morgan Hall on behalf of Movant Environmental Defense Center (Hall, Margaret) (Entered: 05/13/2026) |
| 05/18/2026 | 27 | REPLY filed by Plaintiff State Of California to MEMORANDUM in Opposition to Motion, 23 (Attachments: # 1 Certificate of Service)(Roessler, Alicia) (Entered: 05/18/2026) |
| 05/20/2026 | 28 | ORDER GRANTING SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANY'S MOTION TO INTERVENE by Judge Stephen V. Wilson. Having considered Sable Offshore Corp. and Pacific Pipeline Company's unopposed Motion to Intervene as defendants pursuant to Federal Rule of Civil Procedure 24(a)(2), the Motion to Intervene is GRANTED. IT IS HEREBY ORDERED THAT: Sable Offshore Corp. and Pacific Pipeline Company are granted intervention as of right for all purposes in this action. Sable Offshore Corp. and Pacific Pipeline Company's Proposed Opposition to Plaintiff's Motion for Preliminary Injunction and Stay Against All Defendants, and the exhibits thereto, is filed as of today. Sable Offshore Corp. and Pacific Pipeline Company shall file their responsive pleadings under Rule 24(c) on the same date as Defendants' deadline for responding to Plaintiff's Complaint or three days after intervention is granted, whichever is later.; granting 24 MOTION to Intervene. (aco) (Entered: 05/20/2026) |
| 05/22/2026 | 29 | APPLICATION of Non-Resident Attorney Nicholas McDaniel to Appear Pro Hac Vice on behalf of Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp. (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-42352033) filed by Intervenor - Defendants Pacific Pipeline Company, Sable Offshore Corp.. (Attachments: # 1 Proposed Order) (Stebbins Bina, Jessica) (Entered: 05/22/2026) |
| 05/26/2026 | 30 | ORDER by Judge Stephen V. Wilson: granting 29 Non-Resident Attorney Nicholas McDaniel APPLICATION to Appear Pro Hac Vice on behalf of Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp., designating Jessica Stebbins Bina as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY(aus) (Entered: 05/26/2026) |
| 05/27/2026 | 31 | (IN CHAMBERS) ORDER AND SCHEDULING NOTICE by Judge Stephen V. Wilson: The Court, on its own motion, hereby CONTINUES the Status Conference and MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS from June 1, 2026, to June 8, 2026, at 01:30 PM before Judge Stephen V. Wilson. SO ORDERED. |

| | | |
|---|---|---|
| | | THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dta) TEXT ONLY ENTRY (Entered: 05/27/2026) |
| 05/27/2026 | 32 | REPLY *TO INTERVENORS SABLE OFFSHORE CORP. AND PACIFIC PIPELINE COMPANYS OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND STAY* filed by Plaintiff State Of California. (Attachments: # 1 Supplement PLAINTIFFS OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF INTERVENORS OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND STAY, # 2 Supplement PLAINTIFFS RESPONSES TO INTERVENORS OBJECTIONS TO EVIDENCE SUBMITTED IN SUPPORT OF PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND STAY AGAINST ALL DEFENDANTS) (Calavan, Brian) (Entered: 05/27/2026) |
| 05/28/2026 | 33 | (IN CHAMBERS) ORDER by Judge Stephen V. Wilson: The Court DENIES the MOTION to Intervene 21 . SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dta) TEXT ONLY ENTRY (Entered: 05/28/2026) |
| 05/29/2026 | 34 | Joint STIPULATION Extending Time to Answer the complaint as to United States Department of Energy answer now due 7/8/2026; Chris Wright answer now due 7/8/2026, re Complaint (Attorney Civil Case Opening) 1 filed by Defendants United States Department of Energy; Chris Wright.(Walters, Riley) (Entered: 05/29/2026) |
| 06/01/2026 | 35 | PLAINTIFFS REQUEST FOR REMOTE APPEARANCE BY OBSERVING ATTORNEYS; DECLARATION OF BRIAN CALAVAN re NOTICE OF MOTION AND MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS 16 filed by Plaintiff State Of California. (Attachments: # 1 Proposed Order)(Calavan, Brian) (Entered: 06/01/2026) |
| 06/01/2026 | 36 | RESPONSE filed by Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp. *- Response to Plaintiff's Objections to Evidence Submitted in Support of Intervenors' Opposition to Motion for Preliminary Injunction (32-1)* (Stebbins Bina, Jessica) (Entered: 06/01/2026) |
| 06/02/2026 | 37 | ORDER by Judge Stephen V. Wilson. DENIED BY ORDER OF THE COURT. RE: PLAINTIFFS REQUEST FOR REMOTE APPEARANCE BY OBSERVING ATTORNEYS 35 . (aco) (Entered: 06/02/2026) |
| 06/03/2026 | 38 | Joint STIPULATION for Extension of Time to File Opposition to Motion(s) to Dismiss; Reply iso Motion(s) to Dismiss filed by Plaintiff State Of California. (Attachments: # 1 Proposed Order)(Calavan, Brian) (Entered: 06/03/2026) |
| 06/05/2026 | 39 | NOTICE of Appearance filed by attorney Michael Stephen Dorsi on behalf of Plaintiff State Of California (Attorney Michael Stephen Dorsi added to party State Of California(pty:pla))(Dorsi, Michael) (Entered: 06/05/2026) |
| 06/08/2026 | 40 | TRANSCRIPT ORDER as to Plaintiff State Of California for Court Smart (CS). Court will contact Michael S. Dorsi at Michael.Dorsi@doj.ca.gov with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Dorsi, Michael) (Entered: 06/08/2026) |
| 06/08/2026 | 41 | TRANSCRIPT ORDER as to Defendants United States Department of Energy, Chris Wright for Court Smart (CS). (Walters, Riley) (Entered: 06/08/2026) |
| 06/08/2026 | 42 | TRANSCRIPT ORDER as to Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp. for Court Smart (CS). Court will contact Karin Sanders at karin.sanders@lw.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Stebbins Bina, Jessica) (Entered: 06/08/2026) |

| | | |
|---|---|---|
| 06/08/2026 | 50 | MINUTES OF NEW CASE STATUS CONFERENCE; MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS filed by Plaintiff 16 held before Judge Stephen V. Wilson. Case called. For the reasons stated on the record, the Court ORDERS the parties to file supplemental briefs, not to exceed 25 pages, within 10 days of this hearing and Reply briefs, not to exceed 14 pages, 7 days after that deadline. As explained by the Court, the briefs should address the issues discussed at the hearing. As discussed, each of the two submitted briefs and the two submitted Reply briefs shall be filed jointly by all parties with aligned interests in the case. Identical copies of these briefs shall be filed, on the same timeline, in the related case: 2:20-cv-02415-SVW-SSC. Court Recorder: c/s 6-8-2026. (aco) (Entered: 06/10/2026) |
| 06/09/2026 | 43 | TRANSCRIPT ORDER as to Interested Party for Court Smart (CS). Court will contact Michael R. Gordon at mgordon@washingtonanalysis.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 06/09/2026) |
| 06/09/2026 | 44 | TRANSCRIPT ORDER as to Interested Party for Court Smart (CS). Court will contact Eva Dorrough at edorrough@cov.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 06/09/2026) |
| 06/09/2026 | 45 | TRANSCRIPT ORDER as to Interested Party for Court Smart (CS). Court will contact Andrew Nicholls at anicholls@airdberlis.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 06/09/2026) |
| 06/09/2026 | 46 | TRANSCRIPT ORDER as to Interested Party for Court Smart (CS). Court will contact John Davenport at davenport@jrco.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 06/09/2026) |
| 06/10/2026 | 47 | TRANSCRIPT for proceedings held on 6/8/26 2:06 P.M..Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC, phone number 361-949-2988. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/1/2026. Redacted Transcript Deadline set for 7/13/2026. Release of Transcript Restriction set for 9/8/2026. (dag) (Entered: 06/10/2026) |
| 06/10/2026 | 48 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/8/26 2:06 P.M. re Transcript 47 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY.(dag) TEXT ONLY ENTRY (Entered: 06/10/2026) |
| 06/10/2026 | 49 | TRANSCRIPT ORDER as to Interested Party for Court Smart (CS). Court will contact Cody Akins at cakins@sidley.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (cr) (Entered: 06/10/2026) |
| 06/10/2026 | 51 | TRANSCRIPT ORDER for Court Smart (CS). Court will contact Sarah Ben-Ezer at sarah@whitefortcapital.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (aa) (Entered: 06/11/2026) |
| 06/15/2026 | 52 | TRANSCRIPT ORDER as to Party of Interest for Court Smart (CS). Court will contact JOSHUA STEPHEN JOHNSON at JOSHJOHNSON@VELAW.COM with further |

| | | |
|---|---|---|
| | | instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (jvc) (Entered: 06/15/2026) |
| 06/15/2026 | 53 | NOTICE OF CLERICAL ERROR: Due to clerical error Re: Transcript (CV),, 47 (siv) (Entered: 06/15/2026) |
| 06/15/2026 | 54 | FIRST AMENDED TRANSCRIPT for proceedings held on 6/8/2026, 2:06 p.m.. Electronic Court Recorder: Exceptional Reporting Services, Inc., phone number 361 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/6/2026. Redacted Transcript Deadline set for 7/16/2026. Release of Transcript Restriction set for 9/14/2026. (siv) Modified on 6/16/2026 (cr). (Entered: 06/15/2026) |
| 06/15/2026 | 55 | NOTICE OF FILING TRANSCRIPT filed for proceedings 6/8/2026, 2:06 p.m. re Transcript 54 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (siv) TEXT ONLY ENTRY (Entered: 06/15/2026) |
| 06/16/2026 | 56 | TRANSCRIPT ORDER as to Party of Interest for Court Smart (CS). Court will contact NICO VAN AELSTYN at NVANAELSTYN@SHEPPARD.COM with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (jvc) (Entered: 06/16/2026) |
| 06/16/2026 | 57 | ORDER REGARDING BRIEFING SCHEDULE FOR DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTION(S) TO DISMISS PLAINTIFF'S COMPLAINT by Judge Stephen V. Wilson. Defendants Secretary of Energy Chris Wright and the U.S. Department of Energy and Intervenor-Defendants Sable Offshore Corp. and Pacific Pipeline Company shall file and serve any responsive motions, including a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b), by June 29, 2026. (SEE DOCUMENT FOR FURTHER DETAILS) (chk) (Entered: 06/16/2026) |
| 06/16/2026 | 58 | SECOND AMENDED TRANSCRIPT for proceedings held on 06/08/2026 at 2:06 PM. Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 7/7/2026. Redacted Transcript Deadline set for 7/17/2026. Release of Transcript Restriction set for 9/14/2026. (cr) (Entered: 06/16/2026) |
| 06/16/2026 | 59 | NOTICE OF FILING SECOND AMENDED TRANSCRIPT filed for proceedings 06/08/2026 at 2:06 PM re Transcript 58 . THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cr) TEXT ONLY ENTRY (Entered: 06/16/2026) |
| 06/17/2026 | 60 | NOTICE of Appearance filed by attorney Kavita Paul Lesser on behalf of Plaintiff State Of California (Attorney Kavita Paul Lesser added to party State Of California(pty:pla)) (Lesser, Kavita) (Entered: 06/17/2026) |
| 06/18/2026 | 61 | Notice of Appearance or Withdrawal of Counsel: for attorney Stefan J Bachman counsel for Defendants United States Department of Energy, Chris Wright. Adding Stefan J. Bachman as counsel of record for Chris Wright, in his official capacity as Secretary of Energy, and U.S. Department of Energy for the reason indicated in the G-123 Notice. Filed by Defendant United States of America. (Attorney Stefan J Bachman added to party United States Department of Energy(pty:dft), Attorney Stefan J Bachman added to party Chris Wright(pty:dft))(Bachman, Stefan) (Entered: 06/18/2026) |

| | | |
|---|---|---|
| 06/18/2026 | 62 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS 16 filed by Plaintiff State Of California. (Roessler, Alicia) (Entered: 06/18/2026) |
| 06/18/2026 | 63 | JOINT POST-HEARING BRIEF re NOTICE OF MOTION AND MOTION for Preliminary Injunction re AND STAY AGAINST ALL DEFENDANTS 16 filed by Defendants United States Department of Energy, Chris Wright. (Bachman, Stefan) (Entered: 06/18/2026) |
| 06/25/2026 | 64 | REPLY filed by Defendants United States Department of Energy, Chris Wright to Supplement(Motion related) 62 (Bachman, Stefan) (Entered: 06/25/2026) |
| 06/25/2026 | 65 | REPLY to Supplement (Motion Related) 63 filed by Plaintiff State Of California. (Lesser, Kavita) (Entered: 06/25/2026) |
| 06/29/2026 | 66 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendants United States Department of Energy, Chris Wright. Motion set for hearing on 9/14/2026 at 01:30 PM before Judge Stephen V. Wilson. (Attachments: # 1 Memorandum of Points and Authorities in Support of Motion to Dismiss, # 2 Proposed Order, # 3 Declaration of Riley W. Walters) (Walters, Riley) (Entered: 06/29/2026) |
| 06/29/2026 | 67 | JOINDER in NOTICE OF MOTION AND MOTION to Dismiss Case 66 filed by Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp.. (Attachments: # 1 Declaration of J. Stebbins Bina)(Stebbins Bina, Jessica) (Entered: 06/29/2026) |
| 07/10/2026 | 68 | NOTICE of Appearance filed by attorney Ian Swenson on behalf of Defendants United States Department of Energy, Chris Wright (Attorney Ian Swenson added to party United States Department of Energy(pty:dft), Attorney Ian Swenson added to party Chris Wright(pty:dft))(Swenson, Ian) (Entered: 07/10/2026) |
| 07/13/2026 | 69 | Plaintiff's Response to Defendants' Motion to Dismiss; Notice of Election to File Amended Complaint Pursuant to Rule 15(a)(1)(B) re NOTICE OF MOTION AND MOTION to Dismiss Case 66 filed by Plaintiff State Of California. (Roessler, Alicia) (Entered: 07/13/2026) |
| 07/17/2026 | 70 | NOTICE of Entry of RULING filed by Plaintiff State Of California. (Roessler, Alicia) (Entered: 07/17/2026) |
| 07/20/2026 | 71 | RESPONSE filed by Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp. to Notice of Entry of Decision or Ruling by a Judge of this Court 70 (Stebbins Bina, Jessica) (Entered: 07/20/2026) |
| 07/20/2026 | 72 | FIRST AMENDED COMPLAINT against Defendants All Defendants amending Complaint (Attorney Civil Case Opening) 1 , filed by Plaintiff State Of California(Roessler, Alicia) (Entered: 07/20/2026) |
| 07/21/2026 | 73 | Notice of Appearance or Withdrawal of Counsel: for attorney Riley Walters counsel for Defendants United States Department of Energy, Chris Wright. Riley W. Walters is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Defendants Chris Wright, in his official capacity as Secretary of Energy; United States Department of Energy. (Walters, Riley) (Entered: 07/21/2026) |
| 07/27/2026 | 74 | STIPULATION for Extension of Time to File Motion(s) to Dismiss the Amended Complaint filed by Defendants United States Department of Energy, Chris Wright. (Attachments: # 1 Proposed Order)(Swenson, Ian) (Entered: 07/27/2026) |
| 07/28/2026 | 75 | (IN CHAMBERS) ORDER DEEMING DEFENDANT'S MOTION TO DISMISS AS MOOT (Dkt. No. 66 ) by Judge Stephen V. Wilson: In light of the First Amended Complaint (Dkt. No. 72 ), Defendant's Motion to Dismiss is DENIED as MOOT, and the |

| | | |
|---|---|---|
| | | hearing scheduled for 9/14/2026, is hereby VACATED. SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dta) TEXT ONLY ENTRY (Entered: 07/28/2026) |
| 07/28/2026 | 76 | RESPONSE filed by Defendants United States Department of Energy, Chris Wrightto Notice of Entry of Decision or Ruling by a Judge of this Court 70 (Bachman, Stefan) (Entered: 07/28/2026) |
| 07/30/2026 | 77 | NOTICE OF MOTION AND MOTION for Leave to file Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction filed by Plaintiff State Of California. Motion set for hearing on 9/14/2026 at 01:30 PM before Judge Stephen V. Wilson. (Attachments: # 1 Declaration of Kavita Lesser in Support of Motion for Leave, # 2 Proposed Order Granting Motion for Leave, # 3 Memorandum Plaintiff's Proposed Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction) (Lesser, Kavita) (Entered: 07/30/2026) |
| 07/30/2026 | 78 | ORDER REGARDING BRIEFING SCHEDULE FOR DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTION(S) TO DISMISS PLAINTIFF'S AMENDED COMPLAINT 74 by Judge Stephen V. Wilson. Having considered the Joint Stipulation Regarding the Briefing Schedule for Defendants' and Intervenor-Defendants' Motion(s) To Dismiss Plaintiff's Amended Complaint, which Defendants Secretary of Energy Chris Wright and the U.S. Department of Energy filed in the above-caption matter on July 27, 2026, the Court enters the following order. Defendants and Intervenor-Defendants shall file any responsive motion(s), including a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b), by August 21, 2026. The hearing on the above referenced motion(s) shall be set for September 28, 2026, at 1:30 p.m., in Courtroom 10A. (See document for further details). (aco) (Entered: 07/31/2026) |
| 08/10/2026 | 79 | in Opposition re: NOTICE OF MOTION AND MOTION for Leave to file Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction 77 filed by Defendants United States Department of Energy, Chris Wright. (Swenson, Ian) (Entered: 08/10/2026) |
| 08/10/2026 | 80 | OPPOSITION to NOTICE OF MOTION AND MOTION for Leave to file Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction 77 filed by Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp.. (McDaniel, Nicholas) (Entered: 08/10/2026) |
| 08/17/2026 | 81 | REPLY in support of NOTICE OF MOTION AND MOTION for Leave to file Supplemental Brief in Support of Plaintiff's Pending Motion for Preliminary Injunction 77 filed by Plaintiff State Of California. (Lesser, Kavita) (Entered: 08/17/2026) |
| 08/19/2026 | 82 | ORDER GRANTING MOTION TO MODIFY THE CONSENT DECREE IN US V. PLAINS 49 , GRANTING IN PART MOTION TO ENFORCE THE CONSENT DECREE 55 , AND ADDRESSING PENDING MOTIONS IN RELATED PIPELINE ACTIONS: (1) DENYING A MOTION FOR PRELIMINARY INJUNCTION IN CALIFORNIA V. WRIGHT 16 , (2) DENYING A MOTION TO DISMISS IN SABLE V. QUINTERO 27 , AND (3) GRANTING A MOTION TO REMAND IN BIOLOGICAL DIVERSITY V. CALIFORNIA 46 by Judge Stephen V. Wilson. For the foregoing reasons, and in the manner described, supra: the motion to modify the consent decree in US v. Plains is GRANTED; the motion to enforce the Consent Decree in US v. Plains is GRANTED IN PART; the motion for preliminary injunction in Wright is DENIED; the motion to dismiss in Quintero is DENIED. Judgment in Quintero is DECLARED, and the case is closed; and the motion for remand in Biodiversity is GRANTED. Accordingly, the Court hereby: (1) MODIFIES the Consent Decree in US v. Plains to terminate the ongoing requirements for Plains, substitute PHMSA for OSFM, and incorporate by reference the requirements of the State Waivers, including the substance of some California state law; (2) ENFORCES the |

| | | |
|---|---|---|
| | | Consent Decree by imposing on Sable a penalty of $1.449 million; (3) DECLARES that the Defense Production Act, through Secretary Wright's allocation order, bars California's Department of Parks and Recreation from bringing legal action to prevent Sable from complying with the DPA Order by operating the Onshore Pipeline; and (4) REMANDS Biodiversity to Santa Barbara Superior Court. (See document for further details).; denying 16 MOTION for Preliminary Injunction. (aco) (Entered: 08/19/2026) |
| 08/20/2026 | 83 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiff State Of California. Appeal of Order on Motion for Preliminary Injunction,,,,,, 82 . (Appeal Fee - $605 Fee Paid, Receipt No. ACACDC-43112344.) (Attachments: # 1 Exhibit Order Denying Preliminary Injunction Motion)(Lesser, Kavita) (Entered: 08/20/2026) |
| 08/20/2026 | 84 | REPRESENTATION STATEMENT re Notice of Appeal to 9th Circuit Court of Appeals, 83 . (Lesser, Kavita) (Entered: 08/20/2026) |
| 08/21/2026 | 85 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendants United States Department of Energy, Chris Wright. Motion set for hearing on 9/28/2026 at 01:30 PM before Judge Stephen V. Wilson. (Attachments: # 1 Memorandum, # 2 Proposed Order) (Swenson, Ian) (Entered: 08/21/2026) |
| 08/21/2026 | 86 | JOINDER in NOTICE OF MOTION AND MOTION to Dismiss Case 85 filed by Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp.. (McDaniel, Nicholas) (Entered: 08/21/2026) |
| 08/21/2026 | 87 | TRANSCRIPT ORDER as to Plaintiff State Of California for Court Smart (CS). (Attachments: # 1 Proof of Service)(Hunter, Rebecca) (Entered: 08/21/2026) |
| 08/21/2026 | 88 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 26-5409 assigned to Notice of Appeal to 9th Circuit Court of Appeals, 83 as to Plaintiff State Of California. (iv) (Entered: 08/22/2026) |
| 08/24/2026 | 89 | (IN CHAMBERS) ORDER by Judge Stephen V. Wilson: The Court DENIES the MOTION for Leave to file Supplemental Brief 77 AS MOOT. SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dta) TEXT ONLY ENTRY (Entered: 08/24/2026) |
| 09/04/2026 | 90 | NOTICE OF MOTION AND MOTION to File Amicus Brief *In Support of Plaintiff's Opposition to Motion to Dismiss* filed by Movant - Amicus Sheldon Whitehouse. (Attachments: # 1 Memorandum, # 2 Proposed Order) (Attorney Cara Ann Horowitz added to party Sheldon Whitehouse(pty:mov)) (Horowitz, Cara) (Entered: 09/04/2026) |
| 09/04/2026 | 91 | Notice of Appearance or Withdrawal of Counsel: for attorney Cara Ann Horowitz counsel for Movant Sheldon Whitehouse. Adding Cara Horowitz as counsel of record for Senator Sheldon Whitehouse et al.; and Paasha Mahdavi for the reason indicated in the G-123 Notice. Filed by Movant - Amicus Senator Sheldon Whitehouse et al.; and Paasha Mahdavi. (Horowitz, Cara) (Entered: 09/04/2026) |
| 09/04/2026 | 92 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss Case 85 *Plaintiffs Opposition to Defendants Motion to Dismiss* filed by Plaintiff State Of California. (Roessler, Alicia) (Entered: 09/04/2026) |
| 09/09/2026 | 93 | APPLICATION of Non-Resident Attorney James P. Duffy to Appear Pro Hac Vice on behalf of Movant Sheldon Whitehouse (Pro Hac Vice Fee - $450 Fee Paid, Receipt No. ACACDC-43268704) filed by Applicant Sheldon Whitehouse. (Attachments: # 1 Proposed Order) (Horowitz, Cara) (Entered: 09/09/2026) |
| 09/10/2026 | 94 | (IN CHAMBERS) ORDER by Judge Stephen V. Wilson: The Motion to File Amicus Brief In Support of Plaintiff's Opposition to Motion to Dismiss 90 is DENIED, because the matter has been adequately briefed not only in this motion but in prior motions. SO |

| | | |
|---|---|---|
| | | ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (dta) TEXT ONLY ENTRY (Entered: 09/10/2026) |
| 09/10/2026 | 95 | ORDER by Judge Stephen V. Wilson: granting 93 Non-Resident Attorney James P. Duffy APPLICATION to Appear Pro Hac Vice on behalf of Movant Sheldon Whitehouse, designating Cara Horowitz as local counsel. THERE IS NO PDF ASSOCIATED WITH THIS ENTRY(aus) (Entered: 09/10/2026) |
| 09/11/2026 | 96 | REPLY in Support of NOTICE OF MOTION AND MOTION to Dismiss Case 85 filed by Defendants United States Department of Energy, Chris Wright. (Swenson, Ian) (Entered: 09/11/2026) |
| 09/11/2026 | 97 | REPLY in support NOTICE OF MOTION AND MOTION to Dismiss Case 85 filed by Intervenor Plaintiffs Pacific Pipeline Company, Sable Offshore Corp.. (Stebbins Bina, Jessica) (Entered: 09/11/2026) |
| 09/15/2026 | 98 | STIPULATION to Waive oral argument NOTICE OF MOTION AND MOTION to Dismiss Case 85 , Joinder (Motion Related) 86 filed by Plaintiff State Of California. (Attachments: # 1 Proposed Order)(Lesser, Kavita) (Entered: 09/15/2026) |
| 09/17/2026 | 99 | ORDER RE: JOINT STIPULATION ARGUMENT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT 98 by Judge Stephen V. Wilson, the Court enters the following order. Pursuant to Local Rule 7-15, oral argument on Defendants' Notice of Motion and Motion to Dismiss Plaintiff's First Amended Complaint (ECF 85) and Intervenor-Defendants' Notice of Joinder and Brief in Support of Defendants' Motion to Dismiss (ECF 86) is waived. The Motion is taken under submission, the hearing is VACATED. (es) (Entered: 09/17/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/29/2026 19:05:47 | | | |
| **PACER Login:** | haleyamster | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:26-cv-03396-SVW-SSC End date: 9/29/2026 |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |