**No. 26-5409**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

STATE OF CALIFORNIA, et al.,
*Plaintiffs-Appellants*,

v.

CHRIS WRIGHT, Secretary of the U.S. Department of Energy, in his official capacity, et al.
*Defendants-Appellees*.

---

# BRIEF FOR ARNAB DATTA, JOEL DODGE, SAMEERA FAZILI, AND PETER HARRELL AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS AND REVERSAL

---

*On Appeal from the United States District Court
for the Central District of California*
D.C. No. 2:26-cv-03396-SVW-SSC

WILLIAM J. COOPER
FELIPE CORREDOR
NATALIE S. CHA
**CONRAD | METLITZKY | KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Tel: (415) 343-7100
Fax: (415) 343-7101

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

IDENTITY & INTEREST OF *AMICI CURIAE* .................................................1

ARGUMENT ..................................................................................................3

I. The DPA's structure refutes the government's interpretation of Title I. ..................................................................................................5

II. The DPA's history reinforces that Title I cannot be used to compel new production. ............................................................11

A. The DPA's legislative history confirms that Title I was intended to manage distribution of existing resources. ............11

B. No other administration has invoked Title I to compel production. ..............................................................................14

1. Title I's prioritization powers have never been invoked to compel new production. ..............................14

2. Title I's allocation authority has never been invoked to compel new production. ..............................16

3. The government has instead used Title III of the DPA to expand industrial capacity when needed. ..........19

III. The government's proposed expansion of Title I could have dramatic consequences beyond this case. ..........................................22

CONCLUSION ............................................................................................23

CERTIFICATE OF COMPLIANCE ...............................................................25

# TABLE OF AUTHORITIES

## Cases

*Anthropic PBC v. U.S. Dep't of War*,
825 F.Supp.3d 1101 (N.D. Cal. 2026)........................................................23

*Bragdon v. Abbott*,
524 U.S. 624 (1998)............................................................................ 12, 13

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992)...................................................................................4

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)...................................................................................5

*Gallagher's Steak House, Inc. v. Bowles*,
142 F.2d 530 (2d Cir. 1944) ......................................................................12

*Glenn v. Tyson Foods, Inc.*,
40 F.4th 230 (5th Cir. 2022) ......................................................................19

*Gonzales v. Oregon*,
546 U.S. 243 (2006)...........................................................................7, 10

*Mackey v. Lanier Collection Agency & Serv., Inc.*
486 U.S. 825 (1988)...................................................................................9

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013)...................................................................................9

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993).................................................................................10

*Perkins v. Brown*,
53 F.Supp. 176 (S.D. Ga. 1943) ...............................................................12

*Russello v. United States*,
464 U.S. 16 (1983).....................................................................................7

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...................................................................................7

**Statutes & Rules**

50 U.S.C. § 4502 ........ 6, 10

50 U.S.C. §§ 4511–4518 ........ 6, 8

50 U.S.C. §§ 4531–4535 ........ 6, 9

Defense Production Act of 1950, Pub. L. No. 81-774, tit. II, § 201, 64 Stat. 798 (expired 1953). ........ 6, 7, 8

Fed. R. App. P. 29(a)(4)(E) ........ 1

Second War Powers Act, Pub. L. No. 77-507, tit. III, § 301, 56 Stat. 177–80 (1942) ........ 12

**Other Authorities**

Adam G. Levin, Cong. Research Serv., IN12540, *Trump Administration's Invocation of the Defense Production Act for Mineral Production* (2025) ........ 22

Adam G. Levin, Cong. Research Serv., TE10112, *Evaluating the Defense Production Act* (2025) ........ 21

Alexandra G. Neenan, Cong. Research Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* (2023) ........ 19

Alfred L. Scanlan, *Defense Production Act Extended and Amended*, 27 Notre Dame L. Rev. 185 (1952) ........ 6, 7

Cong. Research Serv., *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress*, R43767 (Oct. 6, 2023) ........ 11

Douglas I. Bell, U.S. Army Heritage & Educ. Ctr., *"A Little-Known Bill of Great National Significance": The Uses and Evolution of the Defense Production Act, 1950–2020* (2020) ........ *passim*

H.R. Rep. No. 81-2759 (1950) ........ 6, 13

Heidi M. Peters, *Afghanistan Evacuation: The Civil Reserve Air Fleet (CRAF) and the Defense Production Act (DPA)*, CRS INSIGHT

(Aug. 25, 2021),
https://www.congress.gov/crs_external_products/IN/PDF/
IN11731/IN11731.2.pdf ........................................................... 18, 19

Jared T. Brown & Daniel H. Else, Cong. Research Serv., *The Defense Production Act of 1950, Before Passage of P.L. 113-172*, R43118 (Aug. 25, 2014)...........................................................................11

Luke A. Nicastro, Cong. Research Serv., TE10092, *Mission Critical: Restoring National Security as the Focus of Defense Production Act Reauthorization* (2024) .................................................... 21, 22

Matthew DeBord, *GM will make ventilators as the coronavirus pandemic rages and hospitals face unprecedented stress* (Mar. 20, 2020), https://www.businessinsider.com/gm-make-ventilators-coronavirus-pandemic-hospitals-face-stress-2020-3 .......................................................16

Peter H. Kaskell, *Production Under the Controlled Materials Plan*, 37 Cornell L. Rev. 573 (1952)................................................................ 17, 18

*Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __ (Mar. 3, 2026)...................................................................10

Press Release, *Gen. Motors Co., Strict Protocols in Place to Protect the Health of the GM Team Bldg. Ventec's Critical Care Ventilators in Kokomo* (Apr. 2, 2020), https://investor.gm.com/news-releases/news-release-details/strict-protocols-place-protect-health-gm-team-building-ventecs/..........................................................................16

S. Rep. No. 81-2251 (1950) ................................................................ 7, 10, 11, 13

U.S. Gov't Accountability Off., GAO-21-108, *Defense Production Act: Opportunities Exist to Increase Transparency and Identify Future Actions to Mitigate Medical Supply Chain Issues* (Nov. 2020), https://www.gao.gov/assets/gao-21-108.pdf ................................... 15, 16, 21

**Regulations**

3 C.F.R. § 339 ........................................................................................ 17

10 C.F.R. § 217.50 ..................................................................................... 17

16 Fed. Reg. 4127 (May 5, 1951) ............................................................ 17

16 Fed. Reg. 4128 (May 5, 1951) ............................................................ 18

90 Fed. Reg. 13,673 (Mar. 25, 2025) ........................................................ 22

91 Fed. Reg. 50,701 (Aug. 6, 2026) .......................................................... 19

CMP Reg. 1 ........................................................................................ 17, 18

## IDENTITY & INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are scholars, non-profit leaders, and former senior federal officials who have studied, written about, and helped administer the federal government's tools for industrial policy, supply-chain resilience, and economic security, including tools authorized by the Defense Production Act.[2] *Amici* support a robust and flexible interpretation of the DPA. But they share the view that Title I of the DPA does not authorize the government to compel new production, as the Wright Order at issue purports to do.

**Arnab Datta** is the Managing Director of Policy Implementation at Employ America and the Director of Policy Implementation at the Institute for Progress. At Employ America, he oversees policy and legal analysis across the organization's portfolio, including proposals for industrial finance and critical-minerals market resilience, and he previously served as its Senior Counsel. His published work has addressed issues including the government's use of DPA Title III financing. He previously served as a law clerk to the Senate Judiciary Committee and on a U.S.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) this brief was authored entirely by counsel for *amici* and not by counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from *amici* and their counsel, no other person contributed money to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

[2] *Amici* appear in their individual capacities, and their institutional affiliations are listed for identification only.

Senator's staff. His writing has appeared in publications including the *New York Times*, the *Financial Times*, and the *Washington Post*.

**Joel Dodge** is the Director of Industrial Policy and Economic Security at the Vanderbilt Policy Accelerator for Political Economy and Regulation at Vanderbilt Law School. He previously practiced and taught constitutional law, and practiced at a leading law firm. He has authored several reports on the Defense Production Act.

**Sameera Fazili** is a Senior Fellow at the Vanderbilt Policy Accelerator, with over two decades of experience in policy development and execution across the public, private, and nonprofit sectors. She has held multiple senior government roles, including serving as Deputy Assistant to the President and Deputy Director of the National Economic Council, where she worked on industrial policy and supply chains, led the White House Supply Chain Disruptions Task Force, and helped implement the CHIPS and Science Act, the Inflation Reduction Act, and the Infrastructure Investment and Jobs Act. She previously held economic policy roles in the White House and the Treasury Department and worked at the Federal Reserve Bank of Atlanta.

**Peter Harrell** is a Visiting Scholar at the Institute of International Economic Law at Georgetown University Law Center and a Senior Fellow at the Council on Foreign Relations. From 2021 to 2022, he served as Senior Director for International Economics at the National Security Council and National Economic Council, where

he led White House initiatives to secure supply chains for critical products. Earlier, he served in the U.S. State Department and as a reporter for *Congressional Quarterly*. Mr. Harrell has written and testified on the government's use of economic and emergency authorities, including the DPA.

## ARGUMENT

The Wright Order is an unprecedented extension of Title I of the DPA to compel new production. Acknowledging that the Santa Ynez Pipeline System had been dormant for ten years, *see* 4-ER-582, the government nonetheless ordered Sable to "immediately commence performance" under unspecified "contracts or orders for services . . . hereinafter entered into or sought, for hydrocarbon transportation capacity." 5-ER-780. The Wright Order pays lip service to the actual powers granted by Title I—to "prioritize" contracts and orders and to "allocate" materials, services, and facilities. *See id.* But it twists those powers beyond recognition by requiring that a private company "commence performance" of an entire category of contracts it was not performing, *id.*, and "restart[] the Pipeline" after it "sat idle" for a decade, 4-ER-582.

The government thus claims broad coercive power over private companies under the mantle of Title I (even though Sable requested the government's intervention here, *see* 5-ER-1023–1024). Sable was "directed" to undertake unspecified hydrocarbon contracts and "ordered to comply with this order immediately . . . until

Sable is directed otherwise." 5-ER-780. The order is not premised on Sable's cooperation nor limited by the extent of it. To the contrary, the government reads Title I as granting the President broad "power to compel production." 4-ER-589. If the district court's approval of that reading is affirmed, the Executive will have the power to compel private companies to make or transport anything they want.

The State of California explains why this authority to compel new production cannot be squared with the DPA's plain text. *See* Cal. Br. 21–23 (citing dictionaries and case law showing that "allocate" means "apportion" or "divide"); *id.* at 29–31 (explaining that "priority" and "preference" refer to *relative* position). That should be the end of the matter. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, . . . judicial inquiry is complete." (citation modified)). *Amici* write to explain in more detail why the DPA's structure and history lead to the same conclusion—that Title I does not grant the authority the Wright Order claims.

*First*, the DPA's structure cannot be squared with the district court's broad interpretation of Title I, which is titled "Priorities and Allocations." A different part of the DPA, Title III, expressly gives the President tools to promote the "Expansion of Productive Capacity and Supply." But those tools allow the government to *incentivize* such expansion through various financing and payment mechanisms. They do not include simply ordering new production. Still another part of the DPA,

Title II, *did* grant coercive powers that might support the authority the Wright Order claims—with procedural protections tailored to such drastic powers. But that grant expired over 70 years ago. These congressional choices expressed in the DPA's structure weigh heavily against the district court's boundless reading of Title I's text.

*Second*, Title I's history shows that it has been interpreted and used exclusively to prioritize and apportion existing capacity. Title I was based on a prior statute used primarily to carry out rationing programs. And in the first 75 years of its use, every administration to invoke Title I did so to prioritize or allocate existing capacity. It is unlikely that the far broader power the government now claims was lurking in Title I all that time.

*Finally*, the implications of the district court's interpretation counsel against affirmance. The radically expanded conception of Title I on which the Wright Order rests would permit the government to dragoon private production without any clear mandate from Congress and invite administrative capture and collusive "compulsion" designed to sidestep any number of legal obstacles.

## I. The DPA's structure refutes the government's interpretation of Title I.

Title I's prioritization and allocation provisions "must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). When Congress enacted the DPA, it did not give the President the generalized authority to issue any orders that would fulfill the

Act's purpose of ensuring "the ability of the domestic industrial base to supply materials and services for the national defense." 50 U.S.C. § 4502(a)(1). Congress instead enacted distinct titles, each giving the President a distinct category of powers.

Three are most relevant here. Title I allows the government to *reorder* existing production through prioritization and allocation. *See* 50 U.S.C. §§ 4511–4518. Title II—which expired in 1953—allowed the government to directly control productive capacity through *involuntary* means, *i.e.*, through requisition. *See* Defense Production Act of 1950, Pub. L. No. 81-774, tit. II, § 201, 64 Stat. 798, 799–800 (expired 1953). Title III allows the government to *expand* productive capacity through *voluntary* means, notably through grants, loans, and other financial investments. *See* 50 U.S.C. §§ 4531–4535. The government's reading of Title I collapses these categories into one.

a. Title II afforded the most "drastic" of these powers, and Congress treated it accordingly. H.R. Rep. No. 81-2759, at 3624 (1950); *see* Alfred L. Scanlan, *Defense Production Act Extended and Amended*, 27 Notre Dame L. Rev. 185, 196 (1952). That title—Section 201 of the original DPA—allowed the President to "requisition . . . property or the use thereof." Defense Production Act of 1950 § 201(a), 64 Stat. at 800. The statute had rigorous substantive and procedural protections. It "required that the national defense need must be immediate, not permitting delay or resort to other sources," and "based upon the condition that all other means

of obtaining the use of the property . . . had been exhausted." Scanlan, *supra*, at 196. It gave targeted companies the right to just compensation and to buy back the property at fair value when it was no longer needed. *See* 64 Stat. at 800. These protections mattered. When the Truman Administration asserted that such restrictions were too burdensome and tried to take over the Nation's steel mills without following them, the Supreme Court said no. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585–89 (1952) (holding unconstitutional the President's seizure of the steel mills where he conceded Title II's conditions were not met).

This Court should likewise decline to read Title I as conferring the same power without the same procedural safeguards. Title II, not Title I, contained the toolkit Congress gave the President to *compel production*: the Senate Report described Title II as "necessary in order to make it possible to put into use materials or facilities which, for one reason or another, the owners are unwilling to devote to the national defense." S. Rep. No. 81-2251, at 15 (1950). It would be "anomalous for Congress" to "painstakingly describe[]" limitations on the authority it grants an official, only to grant that same power without those limitations "by implication." *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006). Congress knew how to confer the power the government claims here—to compel private parties to expand productive capacity—and it did so expressly, in Title II. It did not do so in Title I, and that omission must be given effect. *See Russello v. United States*, 464 U.S. 16, 22–23

(1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The government's reading of Title I disregards that choice. It reads the power to "allocate" "services" under Title I, 50 U.S.C. § 4511(a), as one that "necessarily includes the power to compel production," 4-ER-589. The government describes the Wright Order the same way, treating the pipeline as a "facility" whose use it may direct, compelling Sable to restart a pipeline that "has sat idle since 2015." 4-ER-589; 4-ER-582. But if that power were included anywhere in the DPA, it was in Title II, which authorized the President to requisition "the use" of "facilities necessary for the manufacture, servicing, or operation of" supplies "needed for the national defense." Defense Production Act of 1950 § 201(a), 64 Stat. at 799. As the State of California's brief explains, the Wright Order also interferes with State property rights by effectively granting a new easement or immunizing trespass. Cal. Br. 40–43. Yet the government claims that power without the extraordinary findings, exhaustion requirement, or (constitutionally required) just compensation that Title II demanded.

The government's reading would also render Title II superfluous. Congress enacted Titles I and II together in the same Act. If Title I already conferred the power to compel private parties to expand productive capacity, Congress had no reason to

enact Title II, let alone to hedge it with the heightened findings and compensation requirements it so carefully prescribed. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

What's more, Title II was never used. Congress let it expire in 1953 and has never reenacted it. The government's reading of Title I would revive the very power that no President ever chose to use, and that Congress chose to withdraw—but without critical guardrails.

b. Congress did not leave the President without means to expand capacity. It retained Title III, which expressly equips the President to encourage the *voluntary* expansion of productive capacity through financial tools. *See* 50 U.S.C. §§ 4531–4535. Every one of these tools works by inducement—the government offers financial terms, and private parties decide whether to accept. *See, e.g.*, *id.* § 4531(a)(2) (loan guarantees), § 4532(a) (loans to private institutions), § 4533(a)(1)(A) (government purchases), § 4533(c)(2) (subsidies). And Congress retains oversight through the appropriations process. Having expressly specified how the President may expand productive capacity, through chosen incentives,

Congress is unlikely to have authorized compelled expansion implicitly, through vague language in a different title. *See Gonzales*, 546 U.S. at 262.

Title III's express means of expanding capacity likewise undermines the government's argument that, because the DPA's congressional findings refer to "the development of domestic productive capacity critical for ensuring the national defense," the President must have the power to compel private production. *See* 4-ER-589; *see also Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __, slip op. at 17 (Mar. 3, 2026) (citing 50 U.S.C. § 4502(a)(3)). The government reasons that these findings "would mean little" if the President could not direct facilities to produce. *Preemptive Effect of DPA Order*, slip op. at 17. But "vague notions of a statute's 'basic purpose'" are "inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993). The purposive findings that OLC cites identify a goal, not the means of reaching it. Congress supplied the means in Title III, which equips the President to develop productive capacity through financial inducements. *See infra* Section II.B.3. Those means are distinct from Title I's tools, which govern "the distribution of scarce supplies." S. Rep. No. 81-2251, at 16.

Read as a whole, the DPA leaves no room for the government's interpretation that Title I grants the power to compel new production. Instead, "Title I authorities help ensure that the government has *priority access to goods that are already being*

*produced* by domestic industries," while Title III "help[s] create a sufficient supply of these essential goods in the interest of national defense." Cong. Research Serv., *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress*, R43767 (Oct. 6, 2023), at 10–11.

## II. The DPA's history reinforces that Title I cannot be used to compel new production.

Title I has always been understood and used to prioritize or allocate existing industrial capacity—until the Wright Order, which departs from that settled understanding to mandate the restarting of long-dormant private capacity for whatever hydrocarbon business may come.

### A. The DPA's legislative history confirms that Title I was intended to manage distribution of existing resources.

Congress fashioned Title I's prioritization and allocation powers to be "the same as those contained in title III of the Second War Powers Act," which had given the President a set of authorities to regulate industry during World War II. S. Rep. No. 81-2251, at 12; *see* Jared T. Brown & Daniel H. Else, Cong. Research Serv., *The Defense Production Act of 1950, Before Passage of P.L. 113-172*, R43118 (Aug. 25, 2014) ["2014 CRS Report"], at 1 (noting that the "DPA was inspired by the First and Second War Powers Acts of 1941 and 1942," which had lapsed at the end of World War II).

In turn, the Second War Powers Act's prioritization and allocation powers

related to managing the prioritization of contracts and the distribution of existing capacity. *See* Second War Powers Act, Pub. L. No. 77-507, tit. III, § 301, 56 Stat. 177–80. As to prioritization, that statute enabled the government to negotiate contracts or order that "shall, in the discretion of the President, take priority over all deliveries for private account or for export." *Id.* at 177–78.

As to allocation, the statute provided:

> Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may *allocate* such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense.

56 Stat. 178.[3] Courts construed that use of "allocate" as meaning "*the power to distribute, to assign, to allot*." *Gallagher's Steak House, Inc. v. Bowles*, 142 F.2d 530, 534 (2d Cir. 1944) (upholding rationing of food items as an allocation of material); *see also, e.g.*, *Perkins v. Brown*, 53 F.Supp. 176, 179 (S.D. Ga. 1943) (referring to "allocation, or rationing as it is more commonly called"). Congress's "repetition of the same language" in Title I indicates "the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998). The legislative history expressly confirms that Congress intended the "same breadth of interpretation" under the new statute. S. Rep. No. 81-2251, at 12.

[3] Unless otherwise noted, emphasis in quotations is added.

Other aspects of Title I's legislative history reinforce this interpretation. *See also* Cal. Br. 23, 25, 31 (citing additional evidence from legislative history). Congressional discussion focused on the *relative* prioritization and apportionment of limited resources to ensure the government's national defense needs would be met, often by reducing the resources available for ordinary civilian use. *See, e.g.*, S. Rep. No. 81-2251, at 13–14 (explaining that the President might "require the filling of a particular order" or "class of orders" in "preference to" others; to reduce or prohibit uses of scarce materials to "make the most effective use of that material"; to "restrict the output of an industry, to divert that industry from one type of product or another" and to "allocate" economic resources); H.R. Rep. No. 81-2759, at 3623–24 (similar). The Senate Committee on Banking and Currency cited the need "to deprive the utility industry of copper in order to increase the copper available for the munitions industry" in a judicious manner, as exemplifying the need for Title I's priorities and allocations powers. S. Rep. No. 81-2251, at 14. The House Committee on Banking and Currency likewise contemplated Title I being used to regulate "steel and other metals in short supply" and "to make certain the supply is distributed in accordance with our needs." H.R. Rep. No. 81-2759, at 3624; *see also id.* at 3624–25 (describing need to distribute limited supply of steel, tin, copper, and aluminum to accommodate expected increase in military and stockpile programs due to Korean War). The legislative history does not cite any examples whereby the government

would use Title I to compel new capacity.

### B. No other administration has invoked Title I to compel production.

Seven decades of practice confirm what the DPA's text, structure, and legislative history make clear: whenever prior administrations have invoked Title I's prioritization or allocations authority, they have used it to manage existing production, not to compel new capacity. And when the government has sought to expand capacity, it has turned instead to Title III's voluntary inducements.

#### 1. Title I's prioritization powers have never been invoked to compel new production.

Every prior administration that invoked Title I's *prioritization* authority used it to reorder or divert existing production—never to compel new production. For instance, during the Korean War, the Office of Defense Mobilization used Title I to divert steel from civilian to defense use, just as Congress had anticipated. *See* Douglas I. Bell, U.S. Army Heritage & Educ. Ctr., *"A Little-Known Bill of Great National Significance": The Uses and Evolution of the Defense Production Act, 1950–2020*, at 12 (2020) [hereinafter "Bell Report"]. The government did the same during the Vietnam War, using Title I "to prioritize defense orders . . . for a broad range of items, including oil, copper, steel, and chemicals." *Id.* at 20.

When the 1973 oil embargo cut off half of the Defense Department's oil supply, the President used Title I to divert *existing* domestic oil production to the military, requiring producers, "regardless of existing delivery contracts, to furnish

the oil specified by the military." *Id.* at 22. The following year, the government used the DPA to advance construction of the Trans-Alaska Pipeline—not by ordering anyone to build the pipeline, but by ensuring that the project would receive "first priority on high-demand materials." *Id.* at 22–23. And after Chrysler won the contract for the M1 Abrams tank in the late 1970s, the President assigned the program the highest ("DX") priority rating, "requiring Chrysler to ensure tank production received first priority." *Id.* at 21–22.

Recent uses have followed the same pattern. After Congress extended the DPA's priorities system to critical infrastructure in 2003, the Federal Emergency Management Agency often used Title I authority "to buy goods and services already in production and to compel companies to fill FEMA orders first"—after Superstorm Sandy in New Jersey, after the 2017 hurricanes in Texas and Florida, and after Hurricane Katrina in New Orleans. *Id.* at 29. During the COVID-19 pandemic, the government used Title I to direct 3M, an existing N95 respirator producer, to prioritize domestic orders. *See* U.S. Gov't Accountability Off., GAO-21-108, *Defense Production Act: Opportunities Exist to Increase Transparency and Identify Future Actions to Mitigate Medical Supply Chain Issues*, at 33 tbl. 4 (Nov. 2020), https://www.gao.gov/assets/gao-21-108.pdf ["GAO Report"]. The President also used Title I to place priority ratings on ventilator contracts with existing

manufacturers, including General Motors. *Id.* [4]

In each instance, the government moved existing orders to the front of the line or redirected goods already being made. Never did it order a private party to create, restart, or otherwise expand capacity—until the Wright Order.

#### 2. Title I's allocation authority has never been invoked to compel new production.

The government's invocation of Title I's *allocation* authority is also without precedent. In every prior instance in which the government has invoked allocation authority—beginning with the Korean War—it has been to manage the apportionment of existing resources for the national defense. Never has it been invoked to expand production of resources in the first instance.

Consistent with the statutory structure and legislative history outlined above in Sections I and II, the first executive order implementing the DPA—President

[4] The government has suggested that a 2020 Title I order directed General Motors ("GM") to prioritize contracts not yet formed. *See* 4-ER-588; 2-ER-194. But GM was already working on production of ventilators prior to the order. *See* Press Release, *Gen. Motors Co., Strict Protocols in Place to Protect the Health of the GM Team Bldg. Ventec's Critical Care Ventilators in Kokomo* (Apr. 2, 2020), https://investor.gm.com/news-releases/news-release-details/strict-protocols-place-protect-health-gm-team-building-ventecs/ (outlining timeline of production); *see also* Matthew DeBord, *GM will make ventilators as the coronavirus pandemic rages and hospitals face unprecedented stress* (Mar. 20, 2020), https://www.businessinsider.com/gm-make-ventilators-coronavirus-pandemic-hospitals-face-stress-2020-3. Moreover, GM provided existing factory floor space to ventilator makers Ventec Life Systems and Airon, which were already producing—it did not start a new production line. *See* Bell Report at 30.

Truman's Executive Order 10,161—expressly contemplated that departments to whom the President delegated authority under the DPA shall "exercise [their] priorities and allocations powers in such manner as will in [their] judgment promote adequate supplies and their *proper distribution*." Exec. Order No. 10,161, 3 C.F.R. § 339 (1949–1953). Regulations under the DPA likewise interpreted Title I's allocation authority as pertaining to apportionment, requiring that allocation orders "be *distributed equitably among* the suppliers of the materials, services, or facilities being allocated and not require any person to relinquish a *disproportionate share of the civilian market*." 10 C.F.R. § 217.50.

Over 70 years of executive implementation have hewed to the same commonsense understanding. The most extensive use of the DPA's allocation authority took place during the Korean War, when the government used it to revive a World War II–era program known as the Controlled Materials Plan ("CMP"). *See* CMP Reg. 1, 16 Fed. Reg. 4127–33 (May 5, 1951). The Korean War version of the CMP established an allotment system for three controlled materials—steel, copper, and aluminum. *See generally* Peter H. Kaskell, *Production Under the Controlled Materials Plan*, 37 Cornell L. Rev. 573, 583–620 (1952). Depending on the importance to national defense of the products made out of controlled materials, those products would be classified as either "class A"—products with a special military purpose, such as artillery pieces or fighter planes—or "class B"—off-the-shelf

products with military and non-military applications, such as automobiles, nuts and bolts, and the like. *See id.* at 586–87. Allotments under the CMP addressed the entire supply chain for class A products, ensuring that controlled materials would be directed to the most critical applications. Class B products were subject to a simpler system of allotment to producers with established manufacturing operations. *See id.* at 588–89, 592–93; CMP Reg. 1, § 3(c), 16 Fed. Reg. 4128; CMP Reg. 1, § 5, 16 Fed. Reg. 4128. The CMP thus invoked the government's Title I allocation authority to manage the distribution of existing, but supply-constrained, resources.

Other noteworthy examples of the government invoking its Title I allocation authority occurred as part of the Civil Reserve Air Fleet ("CRAF") program. Heidi M. Peters, *Afghanistan Evacuation: The Civil Reserve Air Fleet (CRAF) and the Defense Production Act (DPA)*, CRS INSIGHT (Aug. 25, 2021), https://www.congress.gov/crs_external_products/IN/PDF/IN11731/IN11731.2.pdf. CRAF makes Title I allocation authority "available to respond to national defense needs or other contingencies" requiring emergency airlift capability, pursuant to which civilian aircraft belonging to participating U.S. civil air carriers can be allocated to military uses "where DOD cannot meet airlift requirements." *Id.* at 1. Although CRAF was first established in 1951, Title I authority has been invoked as part of the CRAF program in three instances when the government activated that program: to support Gulf War operations from August 1990 to May 1991, to support

the Iraq War from February 2002 to June 2003, and to support the Afghanistan evacuation in August 2021. *See id.* at 2.

In short, Title I allocation authority has been seldom invoked, especially since the end of the Cold War, and it has only ever been used to manage the distribution of existing resources. *See* Alexandra G. Neenan, Cong. Research Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* 6 & n.33 (2023) (noting that allocation authority was not invoked between end of Cold War and the COVID-19 pandemic); *see also, e.g.*, 91 Fed. Reg. 50,701 (Aug. 6, 2026) (Bureau of Industry & Security announcing a temporary final rule requiring sellers of lithium battery and tungsten waste and scrap to allocate 100 percent of their monthly sales to domestic buyers).[5]

### 3. The government has instead used Title III of the DPA to expand industrial capacity when needed.

When the government has wanted to expand productive capacity through the DPA, it has turned to Title III's voluntary inducements—not to compulsion under Title I. From the Korean War through the mid-1970s, Title III financed more than 1,700 federally backed loans totaling more than $4 billion. *See* Bell Report at 11. In

[5] Contrary to the government's assertion below that the Secretary of Agriculture used Title I allocation authority to order meat and poultry processing plants to remain in operation during the COVID-19 pandemic, such authority was never actually used, much less upheld. *See Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 233–34, 236 (5th Cir. 2022).

the 1950s, DPA funds built new aluminum plants in Illinois, California, and Tennessee, *id.* at 17, and encouraged the mining of strategic metals, drawing almost 3,000 applications to the Department of the Interior in 1955 alone, *id.* at 16. During the Vietnam War, DPA funds paid for a new building and updated equipment at a plant to expand its production of jewel bearings for missile guidance systems and other precision instruments. *Id.* at 20.

Later administrations followed the same voluntary approach as new needs emerged. After the 1979 Iranian Revolution, the government funded synthetic-fuels research under the DPA and the Energy Security Act of 1980, in exchange for the right to purchase the bulk of any new production for the military. Bell Report at 23. The Reagan Administration likewise funded the development of composite materials, fiber optics, and microelectronics, *id.*, and in the 1990s, Title III funds advanced radiation-hardened electronics and lightweight metal-matrix composites for aerospace use, *id.* at 27. In the 2010s, the Navy's "Great Green Fleet" initiative drew $210 million in DPA funds to support biofuel manufacturers. *Id.* at 28.

So too during the pandemic. In April and May 2020, the government awarded $75.5 million to Puritan Medical Products to expand testing-swab manufacturing, $133 million in Title III funds to 3M, O&M Halyard, and Honeywell to expand domestic N95 mask production, and another $126 million to 3M. GAO Report at 34 tbl. 5; Bell Report at 30–31, 34. The government's treatment of 3M is especially

instructive: it used Title I to direct 3M, an existing N95 producer, to prioritize domestic orders, *see supra* Section II.B.1, but it used Title III funding to *expand* 3M's N95 capacity.

Nor was pandemic-era Title III spending limited to medical supplies. In June 2020, the Defense Department announced $135 million in Title III actions to sustain and expand the defense industrial base, including contracts with Bethel Industries to expand body-armor manufacturing capacity and with Spirit AeroSystems to expand production of advanced tooling and composite fabrication. Bell Report at 31. A week later, it announced further Title III awards, including to shipbuilder Austal USA to "maintain, protect, and expand critical domestic shipbuilding" capacity. *Id.* And in 2021, the government again used Title III to expand domestic vaccine production capacity and shore up medical supply chains. *See* Adam G. Levin, Cong. Research Serv., TE10112, *Evaluating the Defense Production Act* (2025).

In 2022, to expand production of artillery, missiles, and strategic materials, the Biden Administration used Title III to enter into voluntary contracts and purchase commitments with operating defense contractors, and Congress appropriated $500 million for DPA purposes. *See* Luke A. Nicastro, Cong. Research Serv., TE10092, *Mission Critical: Restoring National Security as the Focus of Defense Production Act Reauthorization* (2024). In March 2025, President Trump's Executive Order 14,241 invoked Title III to finance domestic mining and processing of critical

minerals through loans and purchase commitments. *See* Exec. Order No. 14,241, 90 Fed. Reg. 13,673 (Mar. 25, 2025); Adam G. Levin, Cong. Research Serv., IN12540, *Trump Administration's Invocation of the Defense Production Act for Mineral Production* (2025).

Across seven decades and administrations of both parties, the pattern holds: Title III expands capacity, and Title I manages the capacity that already exists. Until the Wright Order, no Title I order had ever directed a private entity to "commence" new production.

## III. The government's proposed expansion of Title I could have dramatic consequences beyond this case.

Expanding Title I to compelled production is not just unprecedented. It would also open the door to myriad expansive future uses of the DPA that were not contemplated by Congress.

*First*, government authority to compel production under Title I would constitute a sweeping new power to dictate firm-level production decisions. For example, the President could invoke Title I to compel fossil fuel companies to "prioritize" production of clean energy over oil and gas production by engaging in the former but not the latter. Or use Title I to compel AI companies to produce models they consider unsafe. Indeed, the Secretary of War recently threatened to do just that by "invok[ing] the Defense Production Act to designate Anthropic as essential to national security and thus compel Anthropic to provide its services

without the restrictions" on mass surveillance and lethal autonomous warfare on which Anthropic had insisted. *Anthropic PBC v. U.S. Dep't of War*, 825 F.Supp.3d 1101, 1113–14 (N.D. Cal. 2026).

*Second*, expanded Title I authority would allow for collusive "compelled" production to get around legal and other procedural impediments that the firm being "compelled" otherwise faces. The President might, for instance, invoke Title I to insulate data centers from state and local moratoria or regulation on their construction. So too could the President cite Title I to push through clean energy projects without regard for state and local permitting rules. Again, this risk is not theoretical. That is what happened here, where Sable requested that the federal government use the DPA to let it restart the Pipeline and get around various legal impediments. This Court should think twice before encouraging more companies to lobby the Executive Branch for an end-run around whatever legal obstacles they happen to face.

## CONCLUSION

The order on appeal misconstrues the DPA and would allow a radical expansion of prioritization and allocation authority under Title I. This Court should reverse.

Dated: October 8, 2026

Respectfully submitted,

*/s/ William J. Cooper*

WILLIAM J. COOPER
FELIPE CORREDOR
NATALIE S. CHA
**CONRAD|METLITZKY|KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Tel: (415) 343-7100
Fax: (415) 343-7101

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(G) and 32(g)(1) and Circuit Rule 32-1, I certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style require-ments of FRAP 32(a)(6) because the brief was pre-pared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word.

I further certify that this brief complies with FRAP 29(a)(5) because it contains 5,584 words, excluding the parts of the brief exempted by FRAP 32(f).

Dated: October 8, 2026

Respectfully submitted,

*/s/ William J. Cooper*

WILLIAM J. COOPER
FELIPE CORREDOR
NATALIE S. CHA
**CONRAD|METLITZKY|KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Tel: (415) 343-7100
Fax: (415) 343-7101

Counsel for *Amici Curiae*