No. 26-5409

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,
*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE U.S DEPARTMENT OF ENERGY, ET AL.,
*Defendants-Appellees*,

and

SABLE OFFSHORE CORP., PACIFIC PIPELINE COMPANY,
*Intervenor-Defendants-Appellees*.

On Appeal from the United States District Court for the Central District of California, No. 2:26-cv-03396-SVW-SSC
The Honorable Stephen V. Wilson

# BRIEF OF *AMICI CURIAE* SENATOR SHELDON WHITEHOUSE AND OTHER MEMBERS OF CONGRESS IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

James P. Duffy
Patrick R. Jacobi
Peter A. Heisler
Daniel Alvarez
Alyssa-Dean Huie
RIDGELINE CENTER FOR LAW AND POLICY
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@ridgelinecenter.org

*Counsel for* Amici Curiae

## TABLE OF CONTENTS

TABLE OF CONTENTS .................... i

TABLE OF AUTHORITIES .................... iii

INTEREST OF *AMICI CURIAE* .................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................... 2

ARGUMENT .................... 4

I. National-Security and Emergency Assertions Do Not Waive Compliance With Statutory Prerequisites. .................... 4

II. Congress Developed the DPA Title I Statutory Prerequisites to Prevent Executive Branch Abuse by Requiring Specific Findings and Explanations. .................... 8

III. The District Court Erred by Relying on the Wright Order and Energy-Emergency Declaration Without Scrutinizing Whether DOE Satisfied DPA Title I Statutory Prerequisites and DOE's Own Regulations.... 12

IV. The Wright Order Identifies Neither a Military-Fuel Shortfall nor How Sable's Crude Oil Could Meet One and Ignores Basic Facts About Military-Fuel Supply. .................... 14

A. The Wright Order Ignores the Existing Military-Fuel Supply System, Which Includes Planning for Potential Supply Disruptions. .................... 15

B. The Wright Order Ignores That Sable Does Not Produce the Type of Refined Petroleum Products That the Military Purchases and Fails to Identify Any Connection Between Sable's Crude and a Military Contract. .................... 21

V. DOE Invoked National Defense and an Energy Emergency in the Wright Order as a Pretext to Effectuate the Administration's Policy Agenda and Rescue Sable From Financial Distress.................... 23

A. The Wright Order Reflects the Administration's Pattern of Pursuing Its Domestic Energy Agenda Favoring Fossil-Fuel Production and Reducing States' Authority Under the Guise of National Defense and Emergencies. .................... 23

B. The Circumstances Surrounding the Wright Order Point to Favoritism Toward Sable, Not National Defense. ....................... 27

CONCLUSION ........................................................................................... 32

CERTIFICATE OF COMPLIANCE ........................................................ 34

APPENDIX .............................................................................................. 35

# TABLE OF AUTHORITIES

## Cases

*Acorn Iron & Supply Co. v. Bethlehem Steel Co.*,
96 F. Supp. 481 (E.D. Pa. 1951)....................8

*Anthropic PBC v. Dep't of War*,
825 F. Supp. 3d 1101 (N.D. Cal. 2026) ....................6

*Anthropic PBC v. Dep't of War*,
No. 3:26-cv-01996-RFL, 2026 U.S. Dist. LEXIS 194178 (N.D. Cal. Aug. 27, 2026)....................4

*Cable News Network, Inc. v. Trump*,
No. 1:26-cv-03287-TJK, 2026 U.S. Dist. LEXIS 216809 (D.D.C. Sep. 24, 2026) ....................6

*Cal. Res. Corp. v. Pac. Pipeline Sys. LLC*,
No. C.26-08-012 (Cal. Pub. Utils. Comm'n filed Aug. 20, 2026)....................22

*D&F Afonso Realty Tr. v. Garvey*,
216 F.3d 1191 (D.C. Cir. 2000) ....................13

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................5, 24

*In re Klamath Irrigation Dist.*,
69 F.4th 934 (9th Cir. 2023)....................9

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) ....................4, 27

*Michigan v. Dep't of Energy*,
No. 25-1159, 2026 U.S. App. LEXIS 27898 (D.C. Cir. Sep. 11, 2026)....................26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ....................14

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026)....................6, 18

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024)....13

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025)....5

*Oregon v. Trump*,
165 F.4th 1158 (9th Cir. 2025)....6

*RENEW Ne. v. Dep't of the Interior*,
No. 25-cv-13961-DJC, 2026 U.S. Dist. LEXIS 87471 (D. Mass. Apr. 21, 2026)....13

*Roman Catholic Diocese v. Cuomo*,
592 U.S. 14 (2020)....5

*Trump v. Cook*,
146 S. Ct. 2234 (2026)....5, 23

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)....6

*Ziglar v. Abbasi*,
582 U.S. 120 (2017)....4

**Statutes**

10 U.S.C. § 111(a)....15

50 U.S.C. § 4502(a)(5)....2

50 U.S.C. § 4511....7

50 U.S.C. § 4511(a)....9

50 U.S.C. § 4511(b)....10

50 U.S.C. § 4511(c)(2)....11

**Administrative and Executive Materials**

DLA Energy, *Archived Fact Books* ....................................................................21

DLA Energy, *DLA Energy Commander Visits Indo-Pacific South, Emphasizes Support Capabilities for Sustained Warfighter Readiness* (Nov. 24, 2025)........17

DLA Energy, *DLA Energy's Pacific Pivot Begins in the Americas* (June 24, 2015)....................................................................19

DLA Energy, *Fiscal Year 2019 Fact Book*....................................................................19

DLA Energy, *Fiscal Year 2022 Fact Book*....................................................................19

DLA Energy, *Fiscal Year 2025 Fact Book*....................................................................15

DLA Energy, *Fueling the Military's Objectives: DLA Energy's Agile Contracting Powers Missions in the Western Hemisphere* (June 15, 2026) .................................................................... 17, 19

DLA Energy, *PLUTO Platform Enables DLA Energy's Proactive Approach to Fuel Management in the Americas* (Apr. 23, 2025)................ 16, 17

Exec. Order No. 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025)....................................................................12

**Other Authorities**

Br. of Energy Law Scholars *Amici Curiae* in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss, *Washington v. Trump*, No. 2:25-cv-00869 (W.D. Wash. May 13, 2026), ECF No. 92-1 ........................24

Cameron M. Keys, Cong. Rsch. Serv., IF11543, Defense Primer: The Defense Logistics Agency (2024)....................................................................16

Cameron M. Keys, Cong. Rsch. Serv., IF11479, Defense Primer: United States Transportation Command (2024)....................................................................16

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 31, 2026 at 7:11 AM ET) ....................................................................20

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 17, 2025 at 6:46 PM ET) ....................25

Erika Kranz, Env't & Energy L. Program at Harv. L. Sch., *One Year of Trump's "Energy Emergency" in Context and in Court* (Jan. 21, 2026) ....................13

Ian M. Stevenson, James Bikales & Scott Waldman, *White House Official's Move to Oil Company She Aided Raises Ethics Questions*, POLITICO (Aug. 21, 2026) ....................31

Jay Duffy & Jonas Monast, Ridgeline Ctr. for L. & Pol'y, *The Executive Power-Grab Playbook* (Sep. 2026) ....................25

Letter from Sen. Adam B. Schiff et al., Members of Cong., to Jim Flores, Chairman & CEO, Sable Offshore Corp. (May 27, 2026) ....................32

Letter from Sens. Adam B. Schiff & Alex Padilla & Rep. Salud Carbajal, to Brittany A. Kelm (Oct. 7, 2026) ....................31

Memorandum for Record from Sec'y of Def., *National Security Findings* (Mar. 13, 2026) ....................26

Nasdaq, *Sable Offshore Corp. Common Stock (SOC) Historical Quotes* ....................28

Peter J. Schaumberg, *Defense Production Act Section 101(c)*, 8 Denv. J. Int'l L. & Pol'y 307, 310 (1979) ....................11

Press Release, Sen. Adam B. Schiff, *Sen. Schiff Presses Sable Offshore After Sidestepping Lawmakers' Questions, Refusal of Transparency* (July 28, 2026) ....................32

*Remarks During Meeting with Executives of Oil and Gas Companies and an Exchange with Reporters*, 2026 Daily Comp. Pres. Docs. 12 (Jan. 9, 2026) ....................25

*Remarks in a Cabinet Meeting and an Exchange with Reporters*, 2026 Daily Comp. Pres. Docs. 208 (Mar. 26, 2026) ....................20

S. Rep. No. 81-2250 (1950) ....................9

S. Rep. No. 82-470 (1951) ....................10

S. Rep. No. 83-138 (1953) ....................10

Sable Offshore Corp., *Form 8-K* (Nov. 3, 2025) ....................28

Sable Offshore Corp., *Form 10-Q* (Aug. 12, 2025) ....................28

Sable Offshore Corp., *Q2 2026 Investor Presentation* (Aug. 10, 2026) ....................22

Sable Offshore Corp., *Schedule 14A* (Apr. 17, 2025) ....................28

Sable Offshore Corp., *Second Amendment to Senior Secured Term Loan Agreement* (Nov. 3, 2025) ....................28

Sam Koppelman & Till Daldrup, Hunterbrook Media, *Exclusive: Exxon Spinout Sable Leaked Key Info to Investors Including Golfer Phil Mickelson* (Oct. 31, 2025) ....................29

Suzanne Spaulding et al., LAWFARE, *The National Security Case for Judicial Review* (Feb. 7, 2026) ....................7

Tr. of Prelim. Inj. Hr'g, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), ECF No. 65 ....................26

U.S. Senate Comm. on Env't & Pub. Works, Democratic Staff, *The Billion Dollar Deal: How the Fossil Fuel Industry Bought the Trump Administration, Cashed In, and Left Americans to Pay the Price* (Sep. 2026) ....................27

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* include Members of Congress listed in the attached appendix. They have a strong institutional interest in preserving Congress's constitutional and legislative role in defining the scope of Executive Branch authority. Many represent California and/or serve on committees with jurisdiction over energy and the environment, as well as national security. *Amici Curiae* therefore have a particular interest in ensuring that the Executive Branch exercises its authority under the Defense Production Act of 1950 ("DPA") only when the statutory prerequisites are satisfied and within the bounds Congress prescribed.

*Amici Curiae* also include Paasha Mahdavi, an Associate Professor of Political Science and Affiliated Professor of Environmental Science & Management at the University of California, Santa Barbara, where he directs the Energy Governance and Political Economy Lab. His peer-reviewed research focuses on the political economy of the oil and gas industry. He has separately conducted research specific to Sable Offshore Corp. ("Sable"), including its production capacity and the impact of its operations on domestic energy markets.

---

[1] No person or entity other than *Amici Curiae* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Appellant consents to the filing of this brief. Appellees do not object to the filing of this brief within the applicable rules.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is not about national defense. It is about a heavily leveraged crude-oil company asking the President to transform the DPA from a statute designed to "assure the availability of domestic energy supplies for national defense needs," 50 U.S.C. § 4502(a)(5), into a corporate rescue operation for political allies—a rescue that advances the Administration's political preference for fossil-fuel development at the expense of all other concerns. The Department of Energy's ("DOE") March 13, 2026 order (the "Wright Order") rests on a national-defense justification but fails to identify a defense-based need to start flowing crude oil through Sable's pipelines. Instead, the Order invokes U.S. military presence and increased reliance on foreign crude in California without explaining why those general circumstances create a specific national-defense need for Sable's crude, much less how the crude would meet one.

The district court nevertheless treated those assertions as sufficient and denied California's request for a preliminary injunction. It recited DOE's conclusions, accepted them as "satisfy[ing] the requirements of Section 101," and deferred to DOE merely because its conclusions implicated "national security and foreign affairs." 1-ER-32–33. In doing so, the court failed to grapple with evidence that undermines DOE's asserted justification.

The district court skipped a critical step. Deference based on national-defense conclusions does not relieve a court of its duty to determine whether the Executive Branch has, in good faith, adequately established the statutory prerequisites that Congress imposed on national-defense invocations that unlock associated statutory authority. Here, the Wright Order comes nowhere close.

The broader record points instead to pretext: An Administration determined to expand fossil-fuel production intervened to rescue a favored political ally from financial ruin, ordering Sable to operate its pipelines and allowing it to bypass California protections that had kept the pipelines idle for nearly eleven years. The district court erred by accepting DOE's national-defense rationale at face value rather than assessing it against the statutory prerequisites, the record, and relevant publicly available information.

As explained below, national-security deference does not waive compliance with the DPA's statutory prerequisites, and many courts recently have scrutinized this Administration's national-security assertions carefully. The role of reviewing courts is even more pronounced for DPA Title I, where Congress developed the statutory prerequisites to prevent Executive Branch abuse by requiring specific findings and explanations. The district court's unexamined acceptance of—and deference to—DOE's general conclusions regarding irrelevant circumstances in

California's economy was error, as was the court's broad reliance on the Administration's purported declaration of an energy emergency.

On its face, the Wright Order fails to satisfy the DPA Title I prerequisites because it identifies no military-fuel need that flowing crude through Sable's pipelines would meet; it also fails to consider important aspects of the purported problem it seeks to address, especially the well-established procurement system for military-fuel needs and the fact that the military does not purchase unrefined crude oil. The broader record surrounding DOE's invocation of national defense to unlock DPA Title I authority instead reveals a pretextual effort to advance the Administration's domestic energy agenda and rescue Sable from financial distress. This Court should correct reverse the denial of California's motion for a preliminary injunction.

## ARGUMENT

### I. National-Security and Emergency Assertions Do Not Waive Compliance With Statutory Prerequisites.

"[N]ational-security concerns must not become a talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). Courts have reiterated that the "empty invocation of national security is not a blank check." *Anthropic PBC v. Dep't of War*, No. 3:26-cv-01996-RFL, 2026 U.S. Dist. LEXIS 194178, at *10–11 (N.D. Cal. Aug. 27, 2026). And the Supreme Court in *Learning Resources, Inc. v. Trump* invalidated "unbounded" tariffs that were based on

asserted emergency authority, emphasizing Congress's use of "demanding procedural prerequisites" and "careful constraints" when conferring the claimed tariff authority in other statutes. 607 U.S. 229, 244, 251 n.4 (2026). Deference to national-security or emergency assertions cannot license "wholesale judicial abdication." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 30 (2020) (Kavanaugh, J., concurring).

These principles play a vital role where Congress has conditioned delegated authority on statutory prerequisites. Even applying a deferential standard, this Court requires that prerequisite findings reflect good faith and "a colorable assessment of the facts and law within a range of honest judgment." *Newsom v. Trump*, 141 F.4th 1032, 1047–51 (9th Cir. 2025). And the mere notion of deference does not require courts to accept the Executive's stated justification at face value when the surrounding facts tell a different story. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (considering the "disconnect between the decision made and the explanation given" and explaining that courts are "not required to exhibit a naiveté from which ordinary citizens are free"). Indeed, the Supreme Court reiterated these principles this summer in reviewing presidential action, framing the threshold determination as whether the asserted factual predicate necessary to satisfy a statutory prerequisite "truly" existed or instead

supplied a "ready pretext" for accomplishing another objective. *Trump v. Cook*, 146 S. Ct. 2234, 2249 (2026).

Courts have regularly applied these principles in reviewing actions of this Administration, looking beyond asserted justifications where the record revealed inadequate factual support, contradictions, predetermined outcomes, or departures from ordinary procedures. *See, e.g.*, *Nat'l TPS All. v. Noem*, 166 F.4th 739, 771, 774 (9th Cir. 2026) (Mendoza, J., joined by Wardlaw, J., concurring) (concluding that "serious defects in the process" revealed the asserted rationale as "merely a pretext for [the Secretary's] true motives"), *reh'g denied*, 169 F.4th 796 (9th Cir. 2026), *overruled on other grounds by Mullin v. Doe*, 146 S. Ct. 2121 (2026); *Oregon v. Trump*, 165 F.4th 1158, 1186 (9th Cir. 2025) (relying on *Department of Commerce* in considering the President's statements surrounding deployment of the National Guard); *Cable News Network, Inc. v. Trump*, No. 1:26-cv-03287-TJK, 2026 U.S. Dist. LEXIS 216809, at *8–9 (D.D.C. Sep. 24, 2026) (recognizing that national security is a "weighty interest" warranting "highly deferential" review but finding that the record "lack[ed] factual support" for the government's asserted justification); *Anthropic PBC v. Dep't of War*, 825 F. Supp. 3d 1101, 1133 (N.D. Cal. 2026) (deeming asserted national-security rationale pretextual where contradictory evidence, procedural defects, and a "foreordained conclusion" showed that "the evidence tells a story that does not match the explanation");

*United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026) ("The Court is not required to accept pretextual, formalistic explanations untethered to the reality of what the government has said outside of the courtroom.").

Scrutiny for pretext is likewise appropriate here. For more than seventy years, Congress has required the Executive Branch to meet specific statutory prerequisites before DPA Title I authority may be exercised. DOE was thus well aware of the need to show its work to support required findings concerning, among other things, scarcity, criticality, essentiality to national defense, and whether the asserted need can otherwise be met, as the DPA is not a freestanding license to control the "normal distribution" of products "in the civilian market." 50 U.S.C. § 4511. Mere deference does not permit conclusory assertions to substitute for the required satisfaction of fact-specific statutory prerequisites that Congress enacted as guardrails against Executive overreach.

Nor do deference notions excuse less-searching judicial review. As a bipartisan group of former national security officials and judges recently explained: "Appropriate judicial review of executive claims of national security authorities is essential to ensuring that the nation remains governed by the rule of law." Suzanne Spaulding et al., LAWFARE, *The National Security Case for Judicial Review* (Feb. 20, 2026), https://perma.cc/ZHM6-PJQ7.

## II. Congress Developed the DPA Title I Statutory Prerequisites to Prevent Executive Branch Abuse by Requiring Specific Findings and Explanations.

The statutory prerequisites in DPA Title I are not mere formalities that can be satisfied by reciting statutory language and offering broad conclusions irrelevant to national-defense supply needs. They are safeguards that Congress deliberately built into Title I—and refined over decades—to reflect the balance between granting the Executive extraordinary national-defense authority and preserving the ordinary freedom of private industry "to sell or refuse to sell to any one for any or no reason." *Acorn Iron & Supply Co. v. Bethlehem Steel Co.*, 96 F. Supp. 481, 481–82 (E.D. Pa. 1951). Congress authorized intrusion on that freedom when national-defense needs require it but burdened the Executive Branch to satisfy Congress's prescribed statutory prerequisites as a means to circumscribe and limit this intrusion. The prerequisites therefore inform the boundaries of the authority that Congress delegated and are not simply boxes that can be checked in the name of deference. The legislative history bears this out.

Congress always viewed DPA Title I as conferring authority to harness economic activity for national defense—but with "minimum interference with

industry under our competitive system." S. Rep. No. 81-2250, at 13 (1950).[2] Congress designed DPA priority and allocation authority to manage existing, limited resources—for example, to "require the filling of a particular order in preference to another order," "stop or reduce the production of any item, in order to conserve the materials and manpower which would otherwise go into that item," or "channel materials to fill direct Government contracts, or subcontracts thereunder." *Id.*

Congress recognized from the outset the risk posed by allowing the Executive Branch to use Title I to intervene in private markets. It therefore limited that authority to circumstances that the President "deems necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a). Senators cautioned that Title I "should not be used to accomplish purposes, however meritorious, which bear no relation to national defense" and called for "careful attention" to ensure that exercises of Title I authority remain "so confined." S. Rep. No. 81-2250, at 13. Congress therefore envisioned judicial constraint of pretextual invocations of national defense as a means of accomplishing broader economic objectives and policy.

[2] The Court may take judicial notice of this and other publicly available documents cited herein *sua sponte*. *In re Klamath Irrigation Dist.*, 69 F.4th 934, 952 n.15 (9th Cir. 2023) (citations omitted).

Almost immediately, members of Congress grew concerned that this single constraint might not be enough to prevent abuse and began considering further limiting principles. In 1951, for example, Senators cautioned administering agencies to "be wary of the claims of those who exaggerate the needs and essentiality of their particular industries to obtain the benefits of allocations and priorities." S. Rep. No. 82-470, at 13 (1951). Claims of "essentiality" for a particular project must be weighed against the broader context of overall "supply, the availability of substitutes, [and] the place the material fills in the Nation's economy." *Id.* Congress thus cautioned against unexamined acceptance of claims of national-defense needs, recognizing that such needs often "can and should be filled in the ordinary course of business, without governmental intervention." *Id.*

In 1953, Congress adopted these and other limiting principles into the DPA. What is now Section 101(b) *bars* use of Title I authority to control the general distribution of material in the civilian market *unless* the President finds, among other things, that the material is "scarce and critical," "essential to the national defense," and that defense requirements cannot otherwise be met without "significant dislocation" causing "appreciable hardship." 50 U.S.C. § 4511(b). These prerequisites assure "that goods and materials will flow in the normal course of trade except in the case of exceptional and unusual circumstances." S. Rep. No. 83-138, at 15 (1953).

When Congress extended Title I to domestic-energy supplies in 1975, it carried that same scarcity-and-necessity framework forward. Congress required findings that the relevant materials, equipment, or services are "scarce, critical, and essential" and that the energy-related objective "cannot reasonably be accomplished without" a priority or allocation order. 50 U.S.C. § 4511(c)(2). In contemporaneous statements, DOE itself interpreted these statutory prerequisites to demand more than conclusory findings. According to an attorney in the DOE Office of General Counsel around the same time, satisfaction of the "critical and essential" prerequisites turned primarily on whether the requested items were on the "'critical path' of the energy project." Peter J. Schaumberg, *Defense Production Act Section 101(c)*, 8 Denv. J. Int'l L. & Pol'y 307, 310 (1979), https://tinyurl.com/2rz4x528. And meeting the "scarcity" prerequisite required a "demonstrat[ion] that there is a shortage of the necessary materials or equipment and that attempts to obtain them in normal commercial channels, even at a premium price, were unsuccessful." *Id.* at 310–11. Thus, even as Congress expanded Title I authority, DOE's legal staff understood the burden to demonstrate the statutory prerequisites with considerable specificity.

## III. The District Court Erred by Relying on the Wright Order and Energy-Emergency Declaration Without Scrutinizing Whether DOE Satisfied DPA Title I Statutory Prerequisites and DOE's Own Regulations.

DOE relies on vague national-defense justifications of questionable relevance for the Order but fails to articulate why Sable's crude-oil production and operation of lines CA-324 and CA-325 ("Pipelines") are "necessary" for national defense. *See* 2-ER-156–57, 166. The Order fails to identify any specific military need for crude oil or even explain how Sable's crude will be refined and ultimately distributed for military use. *See* 2-ER-153, 156–57, 166. Instead, DOE invokes generalities: California's gasoline prices, declining crude-oil production, reliance on imported crude, and limited pipeline infrastructure—without further explanation. 2-ER-156–57; 4-ER-636. Those generalized concerns neither connect Sable's operations to any specific national-defense need nor otherwise satisfy the DPA Title I statutory prerequisites.

The President's January 2025 declaration of a national "energy emergency," on which DOE expressly relies, also cannot fill that gap. *See* 4-ER-613–14, 618, 624, 631 (citing Exec. Order No. 14156, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8433 (Jan. 20, 2025)). DOE invokes the declaration's generalized claim of inadequate energy supply without explaining how Sable's crude would cure this purported emergency. 4-ER-613, 618, 630. As explained in detail in Part V.A, *infra*, the energy-emergency declaration itself is pretextual and merely

reflects a policy preference for fossil-fuel development, not any actual energy-supply emergency. *See generally* Erika Kranz, Env't & Energy L. Program at Harv. L. Sch., *One Year of Trump's "Energy Emergency" in Context and in Court* (Jan. 21, 2026), https://tinyurl.com/9pru5vrs. In any event, a presidential directive neither expands an agency's statutory authority nor excuses compliance with the Administrative Procedure Act. *See Nebraska v. Su*, 121 F.4th 1, 17 (9th Cir. 2024); *RENEW Ne. v. Dep't of the Interior*, No. 25-cv-13961-DJC, 2026 U.S. Dist. LEXIS 87471, at *64–65 (D. Mass. Apr. 21, 2026). The "emergency" declaration therefore cannot supplant DPA prerequisites or fill in missing connections between Sable's operations and "national defense."

The district court thus erred in relying on the President's energy-emergency declaration and the Wright Order to rubberstamp the Administration's unsupported conclusions, without any scrutiny of the purported national-defense rationale that DOE proffered. *See* 1-ER-31–32. In a particularly egregious example, the court excused DOE's failure to include the calendar end date required in its own regulation, 10 C.F.R. § 217.54, concluding that "[g]iven the uncertain duration of the energy emergency, it is hard to imagine more specificity would be possible," 1-ER-34. An agency cannot take an *"ipse dixit* approach" and fail to "link" evidence in the record to its conclusion—particularly where it "cavalierly brushes off" procedural prerequisites in its own regulations. *D&F Afonso Realty Tr. v. Garvey*,

216 F.3d 1191, 1196 (D.C. Cir. 2000). The district court's unexamined acceptance of DOE's conclusions was clear error.

## IV. The Wright Order Identifies Neither a Military-Fuel Shortfall nor How Sable's Crude Oil Could Meet One and Ignores Basic Facts About Military-Fuel Supply.

The materials offered in support of the Wright Order vaguely gesture at substantial U.S. military presence in California and the possibility that dependence on foreign oil could create general fuel-supply risks, 4-ER-622–23. The district court accepted those assertions, concluding that they supported a "clear and present national security interest" warranting deference to the Executive. 1-ER-16.

But the factual premise on which that deference rested does not withstand scrutiny. Neither the Wright Order nor its supporting materials identify any military installation lacking fuel, military-fuel contract that cannot be filled, inadequate supply of refined fuel for military purposes, or other concrete military-fuel shortfall. And DOE's materials never explain how transporting Sable's crude oil through the Pipelines would address even an unspecified defense need. The national-security rationale DOE offered to fulfill the statutory prerequisites—and on which the district court relied—lacks any demonstrated connection to the action DOE took.

Moreover, DOE ignored two "important aspect[s] of the" purported emergency it claims to address. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). First, the Wright Order fails to account for the fact that the Department of Defense[3] has an established system for identifying, procuring, and delivering the U.S. military's fuel requirements, including where supply may be temporarily inadequate. Second, Sable does not produce the type of refined products that the military purchases, and the Wright Order identifies no supply-chain mechanism that would ensure that Sable's crude is ultimately used by the military.

### A. The Wright Order Ignores the Existing Military-Fuel Supply System, Which Includes Planning for Potential Supply Disruptions.

DLA Energy, a component of the Defense Logistics Agency ("DLA") in the Department of Defense, occupies the center of the military-fuel system. It procures and manages the military's supply of refined petroleum products, principally jet fuel, diesel, and gasoline. DLA Energy, *Fiscal Year 2025 Fact Book* 4, https://perma.cc/FCA2-SYWB. In 2025 alone, DLA Energy managed 903 petroleum contracts serving more than 4,000 locations. *Id.* at 4, 10. DLA, in turn, operates within a broader military-logistics network. It reports through the Department of Defense's acquisition-and-sustainment structure and works

[3] This brief uses the title "Department of Defense" as opposed to "Department of War" because the Department of Defense is established by statute, and any formal name change would require congressional approval. *See* 10 U.S.C. § 111(a).

alongside the U.S. Transportation Command ("USTRANSCOM"), the unified military command responsible for globally integrated transportation and distribution. *See* Cameron M. Keys, Cong. Rsch. Serv., IF11543, Defense Primer: The Defense Logistics Agency 1 (2024); Cameron M. Keys, Cong. Rsch. Serv., IF11479, Defense Primer: United States Transportation Command 1 (2024). Related commands, including Military Sealift Command, provide additional logistics and transportation capacity. *See* Keys, IF11479, Defense Primer: United States Transportation Command, *supra*, at 1–2. Together, these institutions identify military-fuel requirements, procure finished petroleum products, monitor inventories and supply-chain risks, and coordinate the storage and transportation necessary to deliver fuel where the military needs it.

DLA Energy also employs specific mechanisms for identifying and responding to supply risks before they impair operations. Since October 2024, DLA Energy has operated the Petroleum Logistics Utilization Tool and Optimization ("PLUTO") to centralize global energy data for supply-chain visibility, risk forecasting, and inventory management. DLA Energy, *PLUTO Platform Enables DLA Energy's Proactive Approach to Fuel Management* (Apr. 23, 2025), https://perma.cc/8E6D-QG7T. PLUTO provides a nearly real-time view

of energy operations across more than 600 Defense Fuel Supply Points[4] and nearly two billion gallons of bulk fuel products, allowing DLA Energy to forecast needs, identify risks, and optimize its global fuel-supply chain. *Id.* It can also simulate potential disruptions and model alternative supply chains in response to natural disasters, geopolitical instability, or transportation disruptions. *Id.* When military-fuel needs change unexpectedly, DLA Energy can also supplement longer-term procurement arrangements with "spot purchases" from the commercial market and draw on a broader network of suppliers. *See* DLA Energy, *Fueling the Military's Objectives: DLA Energy's Agile Contracting Powers Missions in the Western Hemisphere* (June 15, 2026), https://perma.cc/373R-SJBH.

The Wright Order utterly ignores this established system. It lacks any mention of DLA Energy, USTRANSCOM, or any other defense-related entity responsible for military-fuel supply or logistics. It fails to even suggest the existence of any DLA contract that suppliers cannot fulfill, military installation experiencing or anticipating a fuel shortage, inadequate inventory, or transportation or logistical bottleneck. Nor does the Order identify a fuel-supply risk detected

---

[4] Defense Fuel Supply Points are strategically positioned fuel-storage and distribution facilities that meet the military's energy demands. *See* DLA Energy, *DLA Energy Commander Visits Indo-Pacific South, Emphasizes Support Capabilities for Sustained Warfighter Readiness* (Nov. 24, 2025), https://perma.cc/QJ4W-SZ74.

through PLUTO or other military-logistics system, much less any request from the military for additional petroleum supply. The Wright Order's departure from established mechanisms for identifying and responding to military-fuel risks demonstrates a lack of reasoned decisionmaking. *See Nat'l TPS All.*, 166 F.4th at 771, 774 (Mendoza, J., joined by Wardlaw, J., concurring) (highlighting departures from normal practice and deficiencies in agency process in evaluating an asserted rationale). Rather than beginning with a military-fuel shortfall identified via established systems, procedures, and tools and then employing the DPA to meet it, the Order begins with Sable and simply assumes that putting Sable's crude oil into the stream of commerce will somehow advance national defense based on vague notions of supply and demand. In light of the military's well-established fuel-supply systems, DOE's approach is simply not credible.

The military's experience during the Pipelines' lengthy shutdown underscores DOE's failure to connect the purported supply shortfall to any logical expectation of what should be evident in military-fuel supply documents. The Pipelines remained out of service for nearly eleven years following the 2015 Refugio oil spill. In June 2015—the same month the Pipelines went offline—DLA Energy published a detailed account of its West Coast fuel strategy for the military's expanding Pacific focus. It described modernized fuel infrastructure and an expanding network of commercial suppliers supporting military installations

throughout the West. DLA Energy, *DLA Energy's Pacific Pivot Begins in the Americas* (June 24, 2015), https://perma.cc/844T-2HG2. It did not identify the loss of Sable's crude as a threat to military-fuel supply. Over the following decade, DLA Energy continued to describe West Coast and Pacific fuel security in terms of commercial partnerships, storage, transportation, supplier diversification, and logistics—not operation of the Pipelines. *See generally, e.g.*, DLA Energy, *Fiscal Year 2019 Fact Book*, https://perma.cc/Z4JT-TJHP; DLA Energy, *Fiscal Year 2022 Fact Book*, https://perma.cc/W77P-MSEX. The Wright Order invents the operation of Sable's Pipelines as a cure for a purported military-fuel shortfall out of whole cloth.

Recent events illustrate how the military's established system responds when fuel supply is actually disrupted, further impugning DOE's claims. Amid the 2026 conflict in the Strait of Hormuz, DLA Energy has addressed military-petroleum needs through mechanisms designed to modify or create finished-fuel contracts, conduct spot purchases, restore storage capacity, and make use of commercial tankers carrying refined petroleum products like diesel and jet fuel. *See* DLA Energy, *Fueling the Military's Objectives*, *supra*. These mechanisms respond to identified military needs for refined or otherwise-directly-usable fuel and employ the military's existing procurement and logistics infrastructure to obtain and

deliver it. In other words, the Department of Defense's response to the disruption in the Strait of Hormuz did not rely on Sable's crude at all.

The Administration's contemporaneous statements reinforce that disconnect. Shortly after the Order issued, President Trump asserted: "The amazing thing is we don't need the Hormuz Strait. We don't need it. We don't need it at all. We don't—we have so much oil. Our country is not affected by this."[5] Five days later, responding to concerns that foreign countries could not obtain jet fuel because of the disruption, President Trump advised them to "buy from the U.S., we have plenty."[6] The Administration's contemporaneous assessments are difficult to reconcile with DOE's unexplained premise that Sable's comparatively small volume of crude was necessary to meet national-defense requirements. The Department of Defense's actual response to the conflict-driven disruption further undermines that premise.

---

[5] Remarks in a Cabinet Meeting and an Exchange with Reporters, 2026 Daily Comp. Pres. Docs. 208 (Mar. 26, 2026).

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 31, 2026, at 7:11 AM EDT), https://perma.cc/B4H7-T3E9.

### B. The Wright Order Ignores That Sable Does Not Produce the Type of Refined Petroleum Products That the Military Purchases and Fails to Identify Any Connection Between Sable's Crude and a Military Contract.

The Wright Order disconnects from the established military fuel-procurement system in another fundamental respect: Sable does not produce military-ready fuel. Sable produces *crude oil*; it does not produce jet fuel, diesel, gasoline, or any other refined petroleum product purchased and used by the military. Indeed, the military does not purchase crude oil at all.[7] For Sable's crude to become a product that DLA Energy *could* purchase, the crude must first enter the commercial market, be transported to a refinery, be refined into usable petroleum products, and ultimately enter the military's procurement and distribution system. Yet the Order fails to identify any refinery that will process Sable's crude for military use, resulting refined product destined for DLA Energy, DLA Energy contract that Sable-derived fuel will fulfill, or mechanism ensuring that any fuel derived from Sable's crude will ever reach a military installation or even the domestic market.

Events following the restart of Sable's Pipelines in March 2026 further demonstrate that its crude is not even improving general supply, let alone fulfilling

[7] DLA Energy Fact Books from 2008 through 2024, which report petroleum purchases by product category, reflect no purchases of crude oil. *See* DLA Energy, *Archived Fact Books*, https://www.dla.mil/Energy/About/Library/.

a specific military shortfall. In response to Sable's crude flow, California refiners *displaced* previously scheduled crude-oil cargoes to accommodate Sable's unexpected supply. Sable Offshore Corp., *Q2 2026 Investor Presentation* 11 (Aug. 10, 2026), https://tinyurl.com/t7fnhxvb. Refiners then *limited* Sable's throughput, imposed price deductions based on sulfur content, and negotiated additional marketing arrangements. *Id.* at 4, 11–12. And a major California crude producer has filed a complaint with the California Public Utilities Commission alleging that the unexpected start of Sable's Pipelines displaced longstanding California-produced crude from local pipelines, making it more difficult and costly to transport that crude oil to the California market. Complaint, *Cal. Res. Corp. v. Pac. Pipeline Sys. LLC.*, No. C.26-08-012 (Cal. Pub. Utils. Comm'n filed Aug. 20, 2026), https://perma.cc/TN97-JBYN. Sable's crude was thus displacing other local crude and exacerbating the difficulties of getting crude to the California market—not filling an unmet supply need, let alone any purported national-defense shortfall.

The Wright Order therefore fails to establish the necessary supply-chain connection to support its asserted national-defense need. It identifies neither an unmet military-fuel need that Sable's crude will satisfy nor any mechanism by which that crude will enter the military-fuel system. Further, if an actual military-fuel shortage existed, DPA Title I provides tools that fit naturally within the established procurement system—for example, requiring priority performance of

contracts supplying refined-fuel products ready for military use or allocating scarce, otherwise unavailable materials essential to producing, storing, or delivering such products. The Wright Order does neither. Instead, it gives preferential treatment to a particular, long-dormant upstream crude pipeline operator to begin flowing product without identifying any plausible connection to defense needs. Deference does not require this Court to overlook that gap. *See Cook*, 146 S. Ct. at 2249 ("Our review is deferential, but we are not required to exhibit a naiveté from which ordinary citizens are free." (citation omitted)).

## V. DOE Invoked National Defense and an Energy Emergency in the Wright Order as a Pretext to Effectuate the Administration's Policy Agenda and Rescue Sable From Financial Distress.

### A. The Wright Order Reflects the Administration's Pattern of Pursuing Its Domestic Energy Agenda Favoring Fossil-Fuel Production and Reducing States' Authority Under the Guise of National Defense and Emergencies.

DOE's failure to connect Sable's crude oil and Pipelines to any national-defense need reveals the Wright Order for what it is: a ham-handed effort to advance this Administration's domestic policy agenda and override California's authority to protect its citizens and natural resources. DOE even blames "idiosyncratic California state policies" for purported fuel vulnerabilities, attributes high gasoline prices in part to California's environmental programs, and suggests vague " consumer savings for the public" that might result from restarting Sable's Pipelines. 4-ER-623, 625, 637–38, 640. Setting aside inaccuracies in DOE's

conclusions, these statements are consistent with the broader record, which demonstrates the Administration's pattern of pursuing its fossil-fuel agenda at the expense of all other concerns, especially state authority.

The Wright Order's heavy reliance on the President's energy-emergency declaration provides ample evidence of this pattern. *See* 4-ER-613–14, 618, 624, 631. The declaration reflects an attempt to favor certain energy providers over others, not an attempt to solve an energy-supply problem, even excluding wind and solar from its definition of "energy resources." *See generally* Br. of Energy Law Scholars *Amici Curiae* in Supp. of Pl.'s Resp. to Defs.' Mot. to Dismiss, *Washington v. Trump*, No. 2:25-cv-00869-JNW (W.D. Wash. May 13, 2025), ECF No. 92-1, https://tinyurl.com/57c5m627. As it invokes inadequate domestic energy supply and high prices as grounds for the emergency declaration, the Administration has halted utility-scale wind projects, restricted renewable-energy permitting, and terminated energy projects—actions that are shrinking supply and raising prices—while continuing to approve energy exports after DOE concluded in an order that domestic energy markets were "sufficiently robust to make supplies available to exporters and other market participants." *Id.* at 5 (citation omitted). These contradictions demonstrate that the asserted emergency serves the Administration's preferred energy mix rather than responding genuinely to any purported energy shortage. *See Dep't of Com.*, 588 U.S. at 785 (warning that courts

should not disregard a "disconnect between the decision made and the explanation given"). President Trump has publicly reiterated these preferences. *See* Donald J. Trump (@realDonaldTrump), Truth Social, *I am authorizing my Administration to immediately begin producing Energy with BEAUTIFUL, CLEAN COAL.* (Mar. 17, 2025, at 6:46 PM ET), https://tinyurl.com/3y72tcf2; Remarks During Meeting with Executives of Oil and Gas Companies and an Exchange with Reporters, 2026 Daily Comp. Pres. Docs. 12, (Jan. 9, 2026) ("My goal is to not let any windmill be built.").

If there were any remaining doubt of the Administration's true intentions in the Wright Order, the broader public record extinguishes it. Time and again, the Administration has invoked national security or emergency authority to favor fossil-fuel development, restrict competing energy sources, and supersede state primacy on these issues. *See generally* Jay Duffy & Jonas Monast, Ridgeline Ctr. for L. & Pol'y, *The Executive Power-Grab Playbook* (Sep. 2026), https://perma.cc/L7DY-CL84. For example, the Administration has invoked national-security or emergency authority to halt permitted offshore-wind projects, exempt decades of Gulf oil-and-gas activity from longstanding endangered-species protections, exempt dozens of coal plants from pollution-control requirements, and prevent planned retirements of uneconomic coal plants. *Id.* at 2. Like the Wright Order, the Gulf exemption failed to identify any existing military-fuel shortage,

instead deeming the exemption "necessary for national security," including a never-before-heard need to eliminate even the purported risk that mere litigation *challenges* might prevent agencies from "maximiz[ing] the Gulf's oil and gas production." Memorandum for Record from Sec'y of Def., *National Security Findings* ¶¶ 93–100 (Mar. 13, 2026) (attached to letter from Defense Sec'y Pete Hegseth to Sec'y of Interior Doug Burgum), https://perma.cc/5E69-95DT.

Courts reviewing these actions have rejected the asserted pretextual rationales. For example, in a case reviewing the Administration's attempt to halt wind projects, the district court concluded that the government's "failure to explain or apply [its] reasoning suggests that the stated national security reason may have been pretextual." Tr. of Prelim. Inj. Hr'g 44:8–:10, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999-RCL (D.D.C. Jan. 12, 2026), ECF No. 65, https://tinyurl.com/mts5yuhu. Similarly, in *Michigan v. Department of Energy*, the D.C. Circuit vacated DOE's Federal Power Act Section 202(c) order keeping a retiring coal plant open, rejecting DOE's "sweeping conception" of its emergency authority. No. 25-1159, 2026 U.S. App. LEXIS 27898, at *7, 35–38, 49–53 (D.C. Cir. Sep. 11, 2026). The court emphasized that the Energy Secretary's authority to determine whether an emergency exists "does not grant a boundless license to ignore the statutory text" and concluded that DOE had failed to explain how its action aligned with the statutory text. *Id.* at *35, 50.

As in those cases, here Congress did not authorize the Executive Branch to manufacture an emergency to expand federal statutory authority in service of advancing its preferred domestic energy policy. This Court should not allow DOE to use general notions of national-defense or emergency authority as "'a ready pretext for usurpation' of congressional power" and state authority. *Learning Resources*, 607 U.S. at 247 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring)).

### B. The Circumstances Surrounding the Wright Order Point to Favoritism Toward Sable, Not National Defense.

Sable's conduct leading up to the Wright Order further belies the asserted national-defense justification. Far from addressing a sudden defense need for flowing crude through Sable's Pipelines after more than a decade of inactivity, the Order oversteps DPA authority to help yet another fossil-fuel ally in desperate need of a financial bailout. *See generally* U.S. Senate Comm. on Env't & Pub. Works, Democratic Staff, *The Billion Dollar Deal: How the Fossil Fuel Industry Bought the Trump Administration, Cashed In, and Left Americans to Pay the Price* (Sep. 2026) (documenting the fossil-fuel industry's financial support for President Trump and subsequent Administration actions benefiting the industry), https://perma.cc/367E-QQYK.

Sable acquired the Pipelines and associated offshore crude-extraction assets in 2024 under an agreement that included a $622-million loan from seller Exxon,

which put Sable under enormous pressure to restart production. 2-ER-145. By late 2025, with maturing debt on the horizon and still no way to bring crude oil to market, Sable had to restructure its debt even as it lacked any means of generating revenue. Sable Offshore Corp., *Form 10-Q* 8, 19, 41 (Aug. 12, 2025), https://perma.cc/2F6L-QSD7. The restructured debt's terms—an interest rate jumping from ten percent to fifteen percent, a liquidity covenant requiring the company to keep $25 million available in cash, and a requirement to raise an additional $225 million from equity investors—revealed Sable's dire financial straits.[8] Financial markets responded immediately, cutting Sable's stock price in half as the terms became public.[9] Given Sable CEO Jim Flores' publicly reported ownership stake in the company, this drop personally cost him over $122 million dollars in market value.[10]

---

[8] Sable Offshore Corp., *Second Amendment to Senior Secured Term Loan Agreement* (Oct. 31, 2025), https://perma.cc/T7HT-K44M; Sable Offshore Corp., *Form 8-K* (Nov. 3, 2025), https://perma.cc/L8AY-AH9K.

[9] Sable's stock closed at $12.83 on October 30, 2025 (the day before the deal was signed), and $5.90 on November 4, 2025 (the day after it was announced in a public filing), a drop of $6.93 per share. The volume of shares traded also jumped significantly from around four million on October 30, 2025, to over ten million each trading day through November 4, 2025, likely demonstrating that news of the adjusted financing terms was leaking to markets ahead of the public announcement. *See* Nasdaq, *Sable Offshore Corp. Common Stock (SOC) Historical Quotes*, https://perma.cc/Q8UU-Q9U4.

[10] In April 2025, Sable reported that Jim Flores beneficially owned 17,670,120 shares of the company. Sable Offshore Corp., *Schedule 14A* 19 (Apr. 17, 2025), https://tinyurl.com/y3tbjzap. With a drop of $6.93 per share between October 30,

Around the same time, Sable sought federal intervention to restart the Pipelines. CEO Flores reportedly disclosed to select investors his plan to take advantage of Administration connections to obtain a federal order allowing Sable to bypass California's safety requirements and environmental protections. *See generally* Sam Koppelman & Till Daldrup, Hunterbrook Media, *Exclusive: Exxon Spinout Sable Leaked Key Info to Investors Including Golfer Phil Mickelson* (Oct. 31, 2025), https://perma.cc/K94L-99WW. Flores claimed connections with Energy Secretary Wright and to have reached "DJT" through an intermediary during which Flores proposed painting President Trump's name on Sable's offshore platforms—an idea he said the President "liked . . . in gold." *Id.* Sable formalized its plan on December 12, 2025, with a letter to DOE requesting a DPA order directing operation of the Pipelines. 2-ER-149.

The Administration soon provided the relief Sable sought. On March 3, 2026, the Department of Justice's Office of Legal Counsel issued an opinion concluding that a DPA order would preempt California laws and the federal consent decree preventing Sable from operating the Pipelines. *Id.* at 150. Ten days later, President Trump delegated the relevant DPA authority to Secretary Wright;

2025, and November 4, 2025, the estimated loss in value of his beneficially owned shares is over $122 million. Additionally, the same filing shows his son, Sable's President J. Caldwell Flores, beneficially owning 1,438,042 shares, making his estimated loss during the same period just under $10 million.

that same day, Wright ordered Sable to operate the Pipelines. *Id.* at 150–51. Sable began transporting oil the next day. *Id.* at 151. California's request for a preliminary injunction ensued, and in its denial, the district court concluded that restarting the Pipelines "violated the express provisions of the Consent Decree, without justification," 1-ER-28, yet gave Sable and DOE a free pass going forward: "Now that the pipeline has been successfully restarted, any pre-restart requirements [incorporated into the Consent Decree] are moot," 1-ER-21.

The Wright Order's procedural deficiencies and irregularities line up with the time pressure associated with Sable's debt. DOE issued the Order without: (1) consulting the Department of Commerce (as DOE's regulations require), the Department of Defense, or DLA Energy; (2) specifying regulatorily required start-and-end dates; or (3) meeting other prerequisites of its own regulations. 2-ER-139–41 (listing regulatory prerequisites), 2-ER-154 (noting failure to comply with 10 C.F.R. § 217.54). Undertaking all these procedures would have slowed Sable's ability to begin generating revenue from operating the Pipelines, exacerbating Sable's already dire financial position.

The Wright Order's divergence from DPA Title I's regulatory procedures, historical use, and Congress's understanding of the authority further undermines DOE's national-defense rationale. If DOE had identified an actual national-defense shortfall, it could have employed well-established DPA prioritization tools to

address the shortfall directly. Instead, the Order overrides California protections that do not impede the overall flow of crude oil in the State while singling out one producer for favorable treatment. Nothing about the asserted national-defense need explains that choice. The evident emergency was instead Sable's own: it needed immediate federal intervention to begin generating revenue in its attempt to stave off financial crisis.

The unusually close relationship between the Administration and Sable continued after the Order. Brittany Kelm, a senior White House energy adviser, worked extensively to secure Sable's restart and received public credit for having "unlocked production in California." Ian M. Stevenson, James Bikales & Scott Waldman, *White House Official's Move to Oil Company She Aided Raises Ethics Questions*, POLITICO (Aug. 21, 2026), https://tinyurl.com/48jejn9f. Kelm then left the White House to lead Sable's Washington, DC policy office. That transition prompted a congressional inquiry seeking records concerning Kelm's work on Sable during her White House tenure, the timing of her employment negotiations with Sable, and her compliance with federal ethics requirements. *See* Letter from Sens. Adam B. Schiff & Alex Padilla & Rep. Salud Carbajal to Brittany A. Kelm 1–3 (Oct. 7, 2026), https://perma.cc/26A2-4WWB.

The entire sequence leading up to the Wright Order also prompted a separate congressional investigation into Sable. Members conducting that oversight

concluded that "the Trump Administration is willing to circumvent state laws to benefit industry partners and preferred energy sources, and [that Sable is] a willing partner in its efforts." Letter from Sen. Adam B. Schiff et al., Members of Cong., to Jim Flores, Chairman & CEO, Sable Offshore Corp. 3 (May 27, 2026), https://perma.cc/CU3X-VPNP. Sable has since declined to provide the information Congress requested, prompting Senator Schiff to renew the request. Press Release, Sen. Adam B. Schiff, *Sen. Schiff Presses Sable Offshore After Sidestepping Lawmakers' Questions, Refusal of Transparency* (July 28, 2026), https://perma.cc/LPK2-AFGZ.

These circumstances, alongside DOE's other failures, support the conclusion that "national defense" supplied an invented, pretextual justification for the outcome Sable and the Administration sought—and was not the reason DOE deployed the DPA. This Court should not be taken in by such an obviously pretextual assertion. It should accordingly reject the Executive Branch's attempt to unlock DPA Title I authority.

## CONCLUSION

For the foregoing reasons and those presented in the Opening Brief of Plaintiff-Appellant, Doc. 18.1, the Court should reverse the district court's denial of Plaintiff's motion for preliminary injunction.

Dated: October 9, 2026

Respectfully submitted,

*s/ Patrick R. Jacobi*
James P. Duffy
Patrick R. Jacobi
Peter A. Heisler
Daniel Alvarez
Alyssa-Dean Huie
RIDGELINE CENTER FOR LAW AND POLICY
712 H Street NE, Suite 90006
Washington, DC 20002
(703) 405-8950
patrick.jacobi@ridgelinecenter.org

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number 26-5409**

I am the attorney or self-represented party.

**This brief contains 6,879 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature: *s/Patrick R. Jacobi* Date: October 9, 2026

## APPENDIX

LIST OF AMICI CURIAE
**Members of Congress**

Sen. Sheldon Whitehouse
*Rhode Island*

Sen. Alex Padilla
*California*

Sen. Adam Schiff
*California*

Sen. Tammy Duckworth
*Illinois*

Rep. Salud Carbajal
*California – 24*

Rep. Zoe Lofgren
*California – 18*

Rep. Ted Lieu
*California – 36*

Rep. Nanette Díaz Barragán
*California – 44*

Rep. John Garamendi
*California – 8*

Rep. Robert Garcia
*California – 42*

Rep. Laura Friedman
*California – 30*

Rep. Mike Levin
*California – 49*

Rep. Dave Min
*California – 47*

Rep. Jimmy Panetta
*California – 19*

Rep. Brad Sherman
*California – 32*

Rep. Mike Thompson
*California – 4*