**No. 26-5409**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

STATE OF CALIFORNIA,
*Plaintiff-Appellant,*

v.

CHRIS WRIGHT, in his official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF ENERGY, ET AL.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court for the Central District of California, No. 2:26-cv-3396
The Honorable Steven V. Wilson, District Judge

---

# BRIEF OF *AMICUS CURIAE* THE SOFTWARE & INFORMATION INDUSTRY ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLANT

---

Matthew F. Ferraro
Sharmistha Das
William B. O'Reilly
CROWELL & MORING LLP
600 Fifth Street, NW
Washington, D.C. 20001
Phone: (202) 624-2500
Fax: (202) 628-5116
mferraro@crowell.com
sdas@crowell.com
woreilly@crowell.com
*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, the Software & Information Industry Association ("SIIA") respectfully submits the following Corporate Disclosure Statement:

SIIA is a trade association for those in the business of information. It has no parent company, it issues no stock, and no publicly held corporation owns a 10 percent or greater interest in it.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... i

IDENTITY AND INTEREST OF *AMICUS CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 5

I. The Government's Failure to Satisfy the DPA's Procedural and Substantive Prerequisites Imposes Significant Uncertainty on Industry. .......... 5

A. Members of the Technology Industry Rely on the DPA's Procedural Protections to Safeguard Their Investments. .......... 7

B. The Invocation of National Defense Should Rest on Clear Need and Narrow Tailoring, Both of Which Are Absent from the Wright Order .......... 12

II. Allowing the President to Compel Future Activity, Beyond Prioritizing or Allocating Existing Contracts, Imposes Unjustified Uncertainty on Industry. .......... 15

A. The President's Title I Authority Is Limited to Existing Supply and Does Not Authorize the President to Compel Future Activity. .......... 17

B. Permitting the President to Compel Economic Activity Would Upset the Settled Expectations of the Technology Community. .......... 20

CONCLUSION .......... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bark v. U.S. Forest Serv.*,
958 F.3d 865 (9th Cir. 2020) ... 14

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ... 8

*Crowley Tech. Mgmt., Inc. v. United States*,
123 Fed. Cl. 253 (2015) ... 14

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ... 14

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*,
532 F.2d 957 (5th Cir. 1976) ... 17

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) ... 16

*Nat'l Ass'n of Home Builders v. Norton*,
340 F.3d 835 (9th Cir. 2003) ... 8

*Sys. Dynamics Int'l, Inc. v. United States*,
167 Fed. Cl. 780 (2023) ... 14

*United States v. Jackson*,
187 F.4th 1198 (9th Cir. 2026), *petition for cert. filed* (U.S. Sep. 8, 2026) ... 20

*Woods v. Cloyd W. Miller Co.*,
333 U.S. 138 (1948) ... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ... 16

## Statutes

5 U.S.C. § 706(2)(A) .......... 14
50 U.S.C. § 4511 .......... 17
50 U.S.C. § 4511(a) .......... 7
50 U.S.C. § 4511(c)(2) .......... 7
50 U.S.C. § 4511(c)(2)(B) .......... 4
50 U.S.C. §§ 4531-35 .......... 19

## Regulations

10 C.F.R. Part 217 .......... 12
10 C.F.R. § 217.32 .......... 8
10 C.F.R. § 217.33 .......... 8
10 C.F.R. § 217.33(c) .......... 18
10 C.F.R. § 217.37-38 .......... 8
10 C.F.R. § 217.38(a) .......... 8, 12, 13
10 C.F.R. § 217.50-52 .......... 8
10 C.F.R. § 217.50(b) .......... 9
10 C.F.R. § 217.54 .......... 8, 13
10 C.F.R. § 217.55 .......... 8
15 C.F.R. § 700.13(c) .......... 18

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Software & Information Industry Association ("SIIA") is a global trade association representing nearly 400 firms involved in the business of information. Through its divisions, events, and advocacy, SIIA engages industry leaders and policymakers to ensure a vibrant information ecosystem: one that fosters creation, dissemination, and productive use. SIIA and its members work to proactively address issues and challenges that impact their industry segments with the goal of driving innovation and growth of the information economy. Its members provide data, content, and information that drives the global economy, informs financial networks, and connects learners and educators.

*Amicus* submits this brief because the District Court ruled erroneously that the Secretary of Energy acted lawfully when he issued an order, pursuant to Title I of the Defense Production Act ("DPA"), to direct a private company to restart an oil pipeline network in order to

---

[1] No party or counsel for a party authored this brief in whole or in part, and no one other than *amicus*, its members, or its counsel funded the preparation or submission of this brief. All parties have consented to the filing of this brief.

accept *future* contracts. This holding represents an unprecedented and unbounded interpretation of the authority granted by Title I of the DPA. If affirmed, it would constitute an aggressive expansion of the Government's power into the private market and carry concrete and substantial consequences for *amicus*'s member companies and for the regular order upon which they rely when making business decisions and investments.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The DPA authorizes the President to take narrow, specific, and enumerated actions necessary to secure the country's national defense capabilities. Under Title I of the DPA, the President may require persons to accept, prioritize, and allocate contracts for materials and services needed to promote the national defense. Under Title III, the President may offer incentives and support to promote industrial expansion that will increase the production and supply of critical materials. And under Title VII, the President may take miscellaneous other actions to coordinate private industry's contributions to the

national defense without regard for constraints ordinarily applicable to the civilian economy, such as antitrust law.[2]

On March 3, 2026, the U.S. Department of Justice's Office of Legal Counsel ("OLC") issued an opinion that the President had the power under Title I of the DPA to order Sable Offshore Corp. and Pacific Pipeline Company ("Sable") to operate a network of oil pipelines, the Santa Ynez Pipeline System ("SYPS"), which had lain dormant for more than a decade as California imposed lawful restrictions to prohibit Sable from restarting it, including a consent decree signed by Sable's predecessor-in-interest to the SYPS. *See* Preemptive Effect of Defense Production Act Order on State Law, 50 Op. O.L.C. __ (Mar. 3, 2026) (the "OLC Opinion"). The OLC Opinion rejected the argument that the DPA's allocation authority "allows the President only to *distribute* resources, not to compel their production," and concluded that Title I of the DPA grants the president "the authority to compel production, not just to allocate materials that already exist." *Id.* at 16.

[2] The DPA, as originally enacted, contained seven titles, all subject to sunset provisions. Congress did not renew four of the seven; therefore, Titles I, III, and VII are the only ones still in effect.

On March 13, 2026, the Secretary of Energy, Chris Wright, signed a Pipeline Capacity Prioritization and Allocation Order (the "Wright Order"), invoking, as the President's delegee, Title I of the DPA to order Sable to operate the SYPS.

The Wright Order does not require Sable to deliver any particular amount of oil, nor does it identify any specific customer to receive it. Instead, the Wright Order directs Sable to breach its legal obligations—including its voluntarily-assumed obligations under the consent decree—by restarting the pipeline network in order to accept contracts *in the future*. But under the DPA's text and structure, Title I is not a blank check for the President to direct a private company's future business conduct.

To the contrary, Congress imposed specific procedural and substantive limitations on the President's authority to use the DPA to direct future economic activity. Procedurally, the law requires the President to make certain findings and determinations before exercising Title I authority, to ensure that authority is exercised in a manner genuinely necessary to the national defense. *See, e.g.*, 50 U.S.C. § 4511(c)(2)(B) (requiring a finding that the desired ends cannot be

accomplished by less disruptive means). Substantively, the DPA limits the President's authority to the prioritization and allocation of existing supply. The President cannot compel industrial expansion or demand private entities create future supply.

The Wright Order unlawfully disregards these limitations by making insufficiently supported and perfunctory findings as a pretext to interfere with Sable's private business decisions. If sanctioned by this Court, the unconstrained economic authority claimed under the Wright Order would harm American industry, chill business investment in innovation, and disrupt the deployment of new technologies.[3]

## ARGUMENT

### I. The Government's Failure to Satisfy the DPA's Procedural and Substantive Prerequisites Imposes Significant Uncertainty on Industry.

To prevent abuse of the DPA and needless disruption to the economy, Congress stipulated that the President may employ the DPA only after making specific findings and following established

[3] Because the Wright Order is procedurally and substantively infirm, the Court need not address whether a proper invocation of the DPA in other circumstances may preempt state law or displace federal court orders. *Amicus* takes no position on those questions.

procedures. Regulations with the force and effect of law formalize these prerequisites for each executive agency delegated DPA authority by the President.

California challenged the Wright Order's compliance with these procedural requirements because the Wright Order contained no indication that the Secretary actually evaluated the considerations required by statute and regulation, such as the quantities of oil or the duration of operation needed to satisfy the alleged national defense needs.

The District Court rejected California's argument, finding that the Wright Order "substantively complies" with these requirements. OP. at 33. That was error. In so doing, the District Court reduced what Congress intended to be meaningful procedural constraints on the President's exercise of authority into a rote check-the-box exercise. If allowed to stand, the District Court's interpretation would neuter the protective effect of those requirements, increasing business uncertainty by effectively permitting the President to intervene arbitrarily in the economy under the slim pretext of national defense.

### A. Members of the Technology Industry Rely on the DPA's Procedural Protections to Safeguard Their Investments.

Each of the authorities prescribed by the DPA requires the President to make certain findings and/or determinations prior to exercising the associated power.

For example, before prioritizing contracts or orders, the President must find it "necessary or appropriate to promote the national defense" that such contracts be issued on a priority basis to a recipient "capable" of performing the contract. *See* 50 U.S.C. § 4511(a). In the context of this case, where the stated purpose of the Wright Order is to "maximize domestic energy supplies," Wright Order at 1, the President must find that the "materials, services, and facilities" to be prioritized or allocated "are scarce, critical, and essential—(i) to maintain or expand exploration, production, refining, transportation; (ii) to conserve energy supplies; or (iii) to construct or maintain energy facilities[.]" 50 U.S.C. § 4511(c)(2). The President must also find that the desired end (*e.g.*, conserving energy supplies) "cannot reasonably be accomplished without exercising" the President's priority and allocation authority. *Id.*

Agency regulations formalize and supplement those procedural constraints. These substantive regulations, having been promulgated via notice-and-comment rulemaking, carry the force and effect of law. *See, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003). These regulations prescribe the conditions under which the Secretary of Energy may (and may not) issue orders prioritizing contracts or allocating materials, *see* 10 C.F.R. §§ 217.37-38, 217.50-52, the content such orders must contain, *see* 10 C.F.R. §§ 217.32, 217.54, and the circumstances under which a private person must accept or reject such orders, *see* 10 C.F.R. §§ 217.33, 217.55.

As a result of these cumulative requirements and legal protections, industry operates with, and relies upon, a settled understanding: While the Government may have occasional, legitimate need to divert supplies and services from the commercial marketplace to the national defense, such disruptions will be limited in frequency, short in duration, and confined to only what is genuinely necessary for the national defense. *See, e.g.*, 10 C.F.R. § 217.38(a) (prohibiting use of priority authority to obtain, *inter alia*, "[d]elivery on a date earlier than

needed," or "[a] greater quantity of the item or services than needed"), § 217.50(b) ("Allocation orders, when used, will be distributed equitably among the suppliers of the materials, services, or facilities being allocated and not require any person to relinquish a disproportionate share of the civilian market.").

This established lawful framework—and the robust Government decision-making process that it requires—allows companies to make business decisions regarding investment and resource allocation with confidence that the Government will not interfere with industry's expectations, absent a clear need and rigorous procedural protections. The Wright Order upsets this critical balance and vitiates these protections by transforming the DPA's procedural prerequisites into an exercise in pretext.

If the District Court order stands, the DPA's procedural safeguards will weaken. Much as a road without speedbumps invites more frequent speeding, a DPA process without meaningful procedural safeguards invites the Executive Branch to more frequently rely on this emergency authority to intervene in more industries across the American economy and in a broader set of circumstances increasingly

distant from core national defense, military preparedness, and emergency response needs.

The DPA has an important function to address emergencies with emergency powers, but because it permits the Government to interfere in the private sector, it must be used sparingly and subject to appropriate guardrails consistent with the proper authorization of emergency powers. Without those guardrails, members of industry will come to question the stability of the commercial contracts on which they rely. The potential impacts of essentially unchecked DPA authority would recall the sort of "permanent" emergency Justice Jackson warned against nearly 80 years ago when he called for carefully scrutinizing the invocation of executive authorities that infringe on "the liberties of people" or "their property or economy" that only indirectly affect military conduct. *See Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 146-47 (1948) (Jackson, J., concurring). Indeed, permitting the Executive Branch to interfere with private contracts arbitrarily with rote, barebones justifications would permit the Government to pick winners and losers, potentially steering government work and even private property toward favored companies or punishing disfavored companies

by interfering with their businesses. The risks of more frequent DPA invocations destabilizing contracts will weigh on the technology industry, in particular, which relies on multi-year, multi-billion-dollar investments and complex supply chains for critical inputs. If industry cannot credibly expect to receive these inputs as contracted—and their agreements to be honored—investments will not merely be delayed but foregone entirely because of the uncertainty risk. As a result, the technological advantages upon which America's defense posture depends will be diluted.

There is no indication that Congress intended such far-reaching results when enacting the DPA, and executive agencies have historically disclaimed such authority when adopting regulations intended to limit interference with private contracts to only what is truly necessary to the national defense. Preserving that framework is critical to maintaining the dynamism and innovation of the American economy.

### B. The Invocation of National Defense Should Rest on Clear Need and Narrow Tailoring, Both of Which Are Absent from the Wright Order.

By rubber-stamping the Wright Order, the District Court upset the critical balance struck by the substantive limitations and procedural requirements of the DPA. The District Court mistakenly affirmed the Wright Order, which is boundless in terms of both quantity and duration, and, thus, contrary to the legal requirements that compel an exercise of Title I authority to be narrowly tailored to the Agency's actual requirements. *See* 10 C.F.R. § 217.38(a). Nor could the Wright Order be plausibly tailored to begin with, because the "national defense" needs cited as its basis—the nation's "insufficient energy production, transportation, refining, and generation," Wright Order at 1—are impermissibly generic, open-ended, and inscrutable.

Despite these deficiencies, the District Court affirmed the Wright Order by finding it "substantively" complied with applicable regulations. OP. at 33. Specifically, the District Court found "that the agency made all necessary findings" required by 10 C.F.R. Part 217. *See id.* at 32-33.

This analysis suffers from two independent deficiencies, each of which substantially undermines the protective purposes of the DPA's procedural requirements.

***First***, in finding the Agency made "all necessary findings," the District Court confined its analysis to the requirements of 10 C.F.R. § 217.54. *See* OP. at 32. But the Agency must address further considerations before it can lawfully issue such an order. In particular, the Agency must assess the means-end fit between a contemplated DPA order and the national defense requirements it will serve. *See, e.g.*, 10 C.F.R. § 217.38(a). Thus, the Agency must first identify a concrete and specific defense need as a predicate to explaining how the proposed order is necessary to satisfy it. Because there is no evidence that the Secretary ever made these determinations, the Wright Order fails to pass even the box-checking test applied by the District Court.

***Second***, the District Court's limitation of its review to only whether the Agency "made all necessary findings" is incomplete, because review under the Administrative Procedure Act ("APA") also requires scrutiny of whether those findings were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). To survive such scrutiny, the Agency's findings must be supported by "substantial evidence." *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025) (citing *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020)). This requirement is so even in the context of national security determinations, which are not exempt from judicial review even if entitled to deference. *See, e.g.*, *Sys. Dynamics Int'l, Inc. v. United States*, 167 Fed. Cl. 780, 797 (2023) ("the Court should not 'blindly accede' to assertions of national security") (quoting *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 266 (2015)).

By engaging in a superficial and incomplete review of the Wright Order, the District Court endorsed a vision of the DPA that would afford the President and his delegees virtually unfettered authority over the national economy under the pretext of "national defense"—an outcome with deleterious implications for the American business environment. The text and structure of the DPA show that Congress did not intend to give the President such authority. Because the District Court did not review the Wright Order under the appropriate APA standard, its judgment should be reversed.

## II. Allowing the President to Compel Future Activity, Beyond Prioritizing or Allocating Existing Contracts, Imposes Unjustified Uncertainty on Industry.

The rule of law is the foundation of the U.S. economy. It supports everything from robust capital markets that finance innovation to the managerial decisions that translate those inventions into goods and services that Americans use throughout the country. The rule of law's stability and predictability enables investors, executives, and managers to make intelligent and informed decisions. That stability and predictability are especially important in the technology sector led by *amicus* and its members, where industry bets on unproven technologies with the expectation of significant social benefits on those that succeed.

As a result of this risk taking, the United States has become the world's leader in technological innovation, including in technologies such as artificial intelligence that the Administration believes "will usher in a new golden age of human flourishing, economic competitiveness, and national security for the American people."[4] To "win" this AI race, which is a core Administration goal, the industry

[4] *See, e.g.*, The White House, *Winning the Race: America's AI Action Plan* 1 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf.

must rely in great measure on private capital, which can only be deployed in stable and predictable business environments. Private capital will be less willing to invest if there is a substantial risk that the products industry seeks to build will be superseded by the improperly compelled production of military goods.

A core feature of the rule of law is that where the President acts—whether independently or through his subordinates—he does so only when authorized by a statute or the Constitution. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."). And the more extraordinary the power asserted, the clearer that grant of authority must be. *See, e.g.*, *Learning Res., Inc. v. Trump*, 607 U.S. 229, 242 (2026) (plurality opinion) ("We have long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers.") (internal quotation marks and citation omitted).

Here, the Wright Order explicitly invokes Title I of the DPA as the putative authority upon which it relies. *See* Wright Order at 5. Yet the Wright Order attempts an extraordinary expansion of the authority

claimed under that provision, which has only ever been used to prioritize and allocate ***existing*** supply—not to compel future production.

Interpreting the DPA to allow the President to compel future expansions of productive capacity would upend the settled expectations underpinning the American economy. Because the text and the structure of the DPA do not support such an interpretation, the Wright Order is *ultra vires.* The Court should reverse the District Court's order on that basis, as well.

### A. The President's Title I Authority Is Limited to Existing Supply and Does Not Authorize the President to Compel Future Activity.

Title I of the DPA confers on the President the power only to (1) prioritize contracts, including the acceptance thereof, and (2) allocate materials, services, and facilities, as he may deem necessary or appropriate to promote the national defense. *See* 50 U.S.C. § 4511. The purpose of these authorities is to resolve "conflicts between already scheduled commercial production" and urgent defense requirements by giving the latter precedence when needed. *See E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981 (5th Cir. 1976). In short,

Title I of the DPA assumes that the materials, services, or facilities to be prioritized or allocated are already produced in the civilian economy. Therefore, it merely gives the President authority to direct the distribution of those pre-existing materials, services, or facilities.

The power to prioritize or allocate existing supply does not include an implied power to compel new capacity where it does not exist. The Executive Branch has long recognized that its authority under Title I is limited to the capacities already available in the commercial marketplace. In the regulations implementing Title I, the Government disclaimed the authority to compel acceptance of orders for "an item not supplied" in the commercial market, or that do not "meet regularly established terms of sale or payment." *See* 10 C.F.R. § 217.33(c); *see also* 15 C.F.R. § 700.13(c) (same).

Thus, even if, as the OLC Opinion asserts, the "President's power to allocate services thus includes the power to allocate productive capacity itself," OLC Opinion at 16, that power is nevertheless constrained by the productive capacity ***currently in existence***. The President's Title I authority cannot be used to coerce industry into creating new capacity by opening new factories, entering new lines of

business, or otherwise providing goods or services not already in production.

This limitation on the scope of Title I is confirmed by Title III of the DPA, which provides distinct authorities for the expansion of productive capacity and supply. *See* 50 U.S.C. §§ 4531-35. Unlike the priority and allocation authorities of Title I, which are coercive, Title III does not include any compulsory power. Instead, Title III authorizes the President to provide incentives and assistance in the form of loans, guarantees, purchase commitments, and other support, but industry's acceptance thereof is strictly voluntary. *See id.* Thus, if the President determines that the existing industrial base lacks sufficient capacity to support critical defense needs, the law empowers him only to encourage capacity expansion pursuant to the authority of Title III. He may not compel such expansion as a predicate to fulfilling hypothetical future orders under Title I.

To hold otherwise would in practical effect render Title III of the DPA almost entirely superfluous. If the President could simply order industry to expand capacity in order to fulfill anticipated future needs, there would be no need for him to offer incentives towards that end. *See*

*United States v. Jackson*, 187 F.4th 1198, 1208 (9th Cir. 2026), *petition for cert. filed* (U.S. Sep. 8, 2026). As a result, the Government's reading of Title I is inconsistent with both the text and structure of the DPA. This Court should reject it.

### B. Permitting the President to Compel Economic Activity Would Upset the Settled Expectations of the Technology Community.

The President's authority under Title I of the DPA is limited to existing supply generated by the industrial base's current capacity, and it cannot be used to compel new capacity by executive fiat. Allowing the President simply to compel new productive capacity by directing private industry to enter new markets, manufacture new products, or perform new services would overturn the settled expectations that inform business decisions throughout the technology industry.

Here, Sable's predecessor-in-interest made a business decision to discontinue operation of the SYPS. Now, more than a decade later, the Secretary of Energy seeks to use Title I of the DPA to force a reversal of that decision by directing Sable to reopen the pipelines to expand oil production capacity in the United States. While Sable may welcome this particular intrusion into its business, *see* Appellant's Opening Brief at

12-14, neither the Wright Order nor the DPA is predicated on such consent. Instead, the Government claims an authority to meddle in the most foundational decisions of private industry, without providing adequate process, even over a firm's objections. That authority is untenable.

Under the Government's interpretation of Title I, the President may order private parties to cease or commence manufacturing operations, allocate capital from one business line to another, design or sell products, or enter or refrain from entering certain markets. For example, despite industry concerns over cybersecurity and safety impacts, the Government might seek to compel AI companies to deploy AI models publicly without regard to potential risks or, alternatively, prevent one or more disfavored AI companies from doing business, on the grounds that their models pose unreasonable risks; direct companies to produce, share with the Government, or purge the data sets on which AI is trained; order firms to build data centers on private land, irrespective of property owners' views, local laws, and companies' business preferences; or steer the direction of semiconductors towards some companies and away from others. And by compelling business to

invest in his preferred products, the President may starve firms of the capital needed to invest in projects essential to future growth and innovation, both directly (by forcing them to re-allocate capital between business lines) and indirectly (by discouraging business investment and shrinking the pool of capital available).

These are all choices our free-market system rightly reserves for private-sector companies to make on their own. The Government's overly expansive assertion of the President's narrow powers should not be permitted to upturn the foundations of our Nation's competitive marketplace, which, for 250 years, has delivered the technological developments that make the Nation's business environment the envy of the world.

## CONCLUSION

*Amicus* respectfully urges the Court to reverse the District Court's order with instructions to grant California's motion to enjoin the Wright Order.

Respectfully submitted,

October 9, 2026

/s/ Mathew F. Ferraro
Matthew F. Ferraro
Sharmistha Das
William B. O'Reilly

CROWELL & MORING LLP
600 Fifth Street, NW
Washington, D.C. 20001
Phone: (202) 624-2500
Fax: (202) 628-5116
mferraro@crowell.com
sdas@crowell.com
woreilly@crowell.com
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 29(a)(5) because, excluding the portions exempted by Rule 32(f), this brief contains 3,982 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook.

s/ Matthew F. Ferraro
Matthew F. Ferraro