# 26-5409

## United States Court of Appeals
## for the Ninth Circuit

STATE OF CALIFORNIA,

*Plaintiff-Appellant*,

v.

CHRIS WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; UNITED STATES DEPARTMENT OF ENERGY,

*Defendants-Appellees*,

SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY,

*Intervenor-Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California

**BRIEF FOR STATES OF NEW YORK, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW MEXICO, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, WASHINGTON, WISCONSIN, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT**

LETITIA JAMES
*Attorney General*
*State of New York*

28 Liberty Street
New York, New York 10005
(212) 416-8066

BARBARA D. UNDERWOOD
*Solicitor General*
MATTHEW W. GRIECO
*Senior Assistant Solicitor General*
SAMANTHA NEAL
*Assistant Solicitor General*
*of Counsel*

(*Additional counsel listed on signature pages.*)

Dated: October 9, 2026

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

INTRODUCTION AND INTEREST OF THE AMICI STATES .......... 1

ARGUMENT .......... 3

POINT I

THE DEFENSE PRODUCTION ACT (DPA) DOES NOT AUTHORIZE THE SWEEPING PREEMPTION THEORY PROPOSED BY THE FEDERAL GOVERNMENT .......... 3

A. The Office of Legal Counsel (OLC)'s Theory Contradicts the Text and Structure of the DPA .......... 5

1. The DPA contains no evidence of congressional intent to preempt state laws. .......... 6

2. The DPA does not delegate the authority OLC now claims. .......... 9

B. The OLC Theory Contradicts the History and Settled Understanding of the DPA. .......... 15

POINT II

OLC'S NEW INTERPRETATION OF THE DPA JEOPARDIZES THE AMICI STATES' AUTHORITY TO REGULATE IN AREAS TRADITIONALLY RESERVED TO THE STATES .......... 18

CONCLUSION .......... 23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) .......... 4

*Buljic v. Tyson Foods, Inc.*,
22 F.4th 730 (8th Cir. 2021) .......... 13

*CSX Transp., Inc. v. Easterwood*,
507 U.S. 658 (1993) .......... 4

*Empire Healthchoice Assur., Inc. v. McVeigh*,
547 U.S. 677 (2006) .......... 3

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 17

*Glenn v. Tyson Foods, Inc.*,
40 F.4th 233-34 (5th Cir. 2022) .......... 17

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) .......... 8

*Hencely v. Fluor Corp.*,
608 U.S. 31 (2026) .......... 3

*Hercules Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) .......... 5, 7, 10, 15

*Hillsborough Cnty. v. Automated Med. Laboratories, Inc.*,
471 U.S. 707 (1985) .......... 16

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 4

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) .......... 17

**Cases** **Page(s)**

*Mead Corp. v. Tilley*,
490 U.S. 714 (1989) ... 12

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ... 4, 16

*MRP Props. Co., LLC v. United States*,
72 F.4th 166 (6th Cir. 2023) ... 5

*New York v. United States*,
505 U.S. 144 (1992) ... 11

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025) ... 3

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) ... 4

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ... 4

*Rondeau v. Mosinee Paper Corp.*,
422 U.S. 49 (1975) ... 8

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ... 18

*United States v. Bulloch*,
165 F.4th 676 (2d Cir. 2026) ... 15

*United States v. Plains All Am. Pipeline L.P.*,
No. 2:20-cv-02415, 2026 WL 2432065
(C.D. Cal. Aug. 19, 2026) ... 21

*United States v. Vertac Chem. Corp.*,
46 F.3d 803 (8th Cir. 1995) ... 7, 11, 15

**Cases** **Page(s)**

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) .................... passim

*Wyeth v. Levine*,
555 U.S. 555 (2009) .................... passim

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .................... 16

**Federal Laws**

Defense Production Act of 1950,
ch. 932, 64 Stat. 798 .................... 11

Defense Production Act Reauthorization of 2009,
Pub. L. No. 111-67, 123 Stat. 2006 .................... 11

21 U.S.C. § 360k .................... 6

29 U.S.C.
§ 1144 .................... 6
§ 1144 .................... 8

33 U.S.C. § 1342 .................... 21

42 U.S.C.
§ 247d-6d .................... 6
§ 6926 .................... 21
§ 7410 .................... 21

50 U.S.C.
§ 4511 .................... 1, 5, 12-13, 15
§ 4531 .................... 11
§ 4557 .................... 7-8

44 C.F.R. § 333.33 .................... 13

**State Laws** **Page(s)**

Ariz. Rev. Stat.
tit 23, ch. 2 ... 19
§ 40-360.03 ... 19

Colo. Rev. Stat. § 24-65.1-501 ... 19

Conn. Gen. Stat. § 16-50g ... 19

D.C. Code § 8-101.05 et seq. ... 19

Del. Code tit. 7, § 6003 ... 19

Haw. Rev. Stat. § 269-7 et seq. ... 19

Ill. Admin. Code
tit. 35 § 602.105 ... 19
tit. 83, § 461.5 ... 19

Mass. Gen. Laws ch. 164, § 69T ... 19

Md. Code, Env't § 2-401 et seq. ... 19

Md. Code Lab. & Empl. § 5-104 ... 19

Me. Rev. Stat. tit. 35-A, § 2503 ... 19

Mich. Comp. Laws
§ 324.5505 ... 19
§ 408.1011 ... 19

Minn. Stat.
§ 182.653 ... 19
§ 216I.03 ... 19

N.M. Stat.
§ 50-9-5 ... 19
§ 61-33-6 et seq. ... 19

**State Laws** **Page(s)**


N.Y. Env't. Conserv. Law
§ 27-1103 .......... 19
§ 27-1105 .......... 19

N.Y. Lab. Law
§ 27-a .......... 19
§ 200 .......... 19

N.Y. Pub. Serv. Law
§ 66 .......... 19
§ 68 .......... 19

6 N.Y.C.R.R.
§ 373-2.14 .......... 21
§ 377.7 .......... 18-19

Or. Rev. Stat.
§ 469.310 .......... 19
§ 654.010 .......... 19

R.I. Gen. Laws
§ 23-20.10-1 et seq. .......... 19
§ 42-98-2 et seq. .......... 19

Va. Code
§ 40.1-51.1 .......... 19
§ 56-265.2 .......... 19

Vt. Stat.
tit. 21, § 201 .......... 19
tit. 30, § 248 .......... 19

Wash. Rev. Code
§ 49.17.060 .......... 19
§ 70A.15.2210 .......... 19

Wis. Stat. § 196.491 et seq. .......... 19

**Miscellaneous Authorities** **Page(s)**

Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026) .................14

Exec. Order No. 13909, 85 Fed. Reg. 16227 (Mar. 18, 2020) .................14

Exec. Order No. 13917, 85 Fed. Reg. 26313 (Apr. 28, 2020) ..................14

Determination No. 2022-13, 87 Fed. Reg. 31357 (May 18, 2022) ..........14

Exec. Order No. 14387, 91 Fed. Reg. 8703 (Feb. 18, 2026) .....................14

Preemptive Effect of Defense Production Act Order on State Law, 50 Op. O.L.C., slip op. (Mar. 3, 2026) .................................. passim

## INTRODUCTION AND INTEREST OF THE AMICI STATES

Amici are the States of New York, Arizona, Colorado, Connecticut, Delaware, Hawai‘i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Mexico, Oregon, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and the District of Columbia. The Amici States have a significant interest in preserving and enforcing state laws that protect the public health, safety, and welfare of their residents. That interest is particularly acute where, as here, an expansive assertion of federal authority under a novel interpretation of a federal statute threatens to preempt several categories of laws in areas of traditional state regulation without a clear congressional statement.

This appeal concerns the preemptive scope of the Defense Production Act (DPA), 50 U.S.C. § 4511. In conjunction with this case, the U.S. Department of Justice's Office of Legal Counsel (OLC) earlier this year announced a new and expansive theory of DPA preemption in an opinion provided to appellee, the Department of Energy. Under this theory, which was solicited to justify the Department's actions here, the President may compel the production of crude oil within the State of California while ignoring otherwise applicable state laws. In OLC's view, an executive order issued

under the DPA preempts *any* state law that poses any interference with that order, however slight. But adopting such an interpretation would disregard the longstanding presumption against preemption without a clear congressional statement and replace it with a presumption *of* preemption in any situation where the President finds a state law inconvenient and declares it to be an obstacle to federal interests under the DPA.

OLC's newly announced interpretation of the DPA not only ignores the text, structure, and history of the DPA, but effectively immunizes entire areas of activity from liability within areas traditionally reserved to the States. Accordingly, the Amici States submit this brief to identify the legal errors in the OLC opinion while leaving it to the parties to address issues relating to the specific pipeline at issue in this case. In so doing, the Amici States have at least two significant interests at stake: (1) preserving the appropriate balance of authority between the States and federal government by confining the scope of preemption to that intended by Congress, and (2) safeguarding from preemption several categories of state laws in areas of traditional state concern—including those related to matters of public health, safety, environmental protection, property, and tort law.

# ARGUMENT

## POINT I

### THE DEFENSE PRODUCTION ACT (DPA) DOES NOT AUTHORIZE THE SWEEPING PREEMPTION THEORY PROPOSED BY THE FEDERAL GOVERNMENT

Preemption analysis starts from the principle that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767 (9th Cir. 2025). And evidence of preemptive purpose must be sought "in the text and structure of the statute at issue." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (quotation marks omitted); *Hencely v. Fluor Corp.*, 608 U.S. 31 (2026) ("[T]here is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." (quotation marks omitted)). For that reason, the Supreme Court has repeatedly rejected efforts to preempt state law either expressly or impliedly based on the invocation of "some brooding federal interest" untethered from statutory text. *Virginia Uranium*, 587 U.S. at 767.[1]

[1] *See also, e.g.*, *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 698 (2006) (Federal Employees Health Benefits Act, despite preemp-

(*continued on the next page*)

The federal government has now advanced a new and expansive theory of DPA preemption, set forth in an OLC opinion, that adopts the unprecedented view that § 4511 of the DPA preempts *any* state laws that impair or delay in any manner the operation of contracts prioritized by the President. *See* Preemptive Effect of Defense Production Act Order on State Law, 50 Op. O.L.C., slip op. at 18-19 (Mar. 3, 2026) ("OLC Op."). But the text, structure, and history of the DPA uniformly refute that interpretation.

---

tion clause, "does not purport to render inoperative *any and all* state laws that in some way bear on federal employee-benefit plans" (emphasis in original)); *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 643 (2022); *Kansas v. Garcia*, 589 U.S. 191, 203-04, 208-10 (2020); *Wyeth*, 555 U.S. at 565; *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444-50 (2005); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 500 (1996); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-05 (1983).

### A. The Office of Legal Counsel (OLC)'s Theory Contradicts the Text and Structure of the DPA.

OLC's preemption theory sweeps far more broadly than the text and structure of the DPA permit. To begin with, the DPA does not contain the requisite clear statement authorizing preemption of otherwise applicable state laws. OLC relies on a section titled "Priority in contracts and orders," which authorizes the President under limited conditions to "require" that contracts necessary to promote national defense be prioritized over other contracts, and to "allocate" those materials or services necessary to promote the national defense. 50 U.S.C. § 4511. That provision, by its terms, permits the President to prioritize contracts and distribute existing resources as required for national-defense purposes. *See Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996); *see also MRP Props. Co., LLC v. United States*, 72 F.4th 166, 172 (6th Cir. 2023) (Sutton, C.J.) (describing § 4511 as a provision that merely authorizes "orders directing manufacturers to prioritize production of key products"). It does not authorize the President to declare preempted all state laws which in any way burden federal defense contracts.

### 1. The DPA contains no evidence of congressional intent to preempt state laws.

Unlike other federal statutes that have been found to preempt generally applicable state laws, the DPA conspicuously lacks an express preemption clause. The omission of such a clause is significant because Congress has repeatedly included such provisions when it wishes to preempt all state laws. *See, e.g.*, 29 U.S.C. § 1144(a) (ERISA) (its provisions "shall supersede any and all State laws" relating to certain employee benefit plans); 42 U.S.C. § 247d-6d(b)(8)(A) (PREP Act) (no State "may establish, enforce, or continue in effect . . . any provision of law or legal requirement that is different from, or is in conflict with" federal requirements); 21 U.S.C. § 360k(a)(1) (FDCA) (no State "may establish or continue in effect . . . any requirement . . . which is different from, or in addition to" federal requirements).

If Congress believed the States' traditional police powers and other laws posed an obstacle to DPA objectives, it surely would have enacted an express preemption provision at some point along the statute's seventy-six-year history. *See Wyeth*, 555 U.S. at 574. Congress's silence on the issue, coupled with its awareness of the historical backdrop of state tort and regulatory law, is "powerful evidence" against a finding of preemp-

tion, either express or implied. *See id.* at 575; *Virginia Uranium*, 587 U.S. at 765, 778 (evidence of express or implied preemptive purpose must be tethered to congressional intent as expressed in the statute).

OLC wrongly claims, *see* OLC Op. at 11-12, that § 4557, an immunity provision, should be treated as an express preemption clause. That provision provides that "[n]o person shall be held liable for damages or penalties" based on compliance with a DPA order that is later found to be invalid. 50 U.S.C. § 4557. By its terms, § 4557 is limited to the DPA's focus—contracts—and merely shields contractors from liability under non-DPA contracts for performing a DPA-related contract. For that reason, courts have held that § 4557 provides protection that "is analogous to that provided under the common-law doctrine of impossibility of performance" and "extends no further" than the risk of having to breach private contracts to give priority to a rated order. *Hercules Inc.*, 24 F.3d at 204; *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995). And it is telling that the only purported textual support for OLC's theory of express preemption derives from a narrow disclaimer of financial liability. Where the government strains to stretch such a modest provision to preempt all state laws, it is plain that the statute does not support the authority claimed.

Moreover, the immunity provision is titled "Liability for compliance *with invalid regulations*," 50 U.S.C. § 4557 (emphasis added), and excuses contractors only from liability for damages or penalties based on compliance with a DPA order that is later found "by judicial or other competent authority to be invalid," *id.* In other words, the provision excuses contractors from retroactive liability for complying with a DPA order that is judicially vacated. But the provision, by its terms, confers no preemptive power on DPA orders that are, as here, still in effect. *Contra, e.g.*, 29 U.S.C. § 1144(a) (ERISA "shall supersede *any and all* State laws" (emphasis added)). And in any event, excusing an actor from liability from damages or penalties is not the same as authorizing them to act. *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).

Additionally, § 4557 confers immunity only from "damages or penalties" for breaching non-DPA-related contract obligations. Section 4557 contains no exemption from regulation enforced via equitable remedies such as injunctions (which California seeks here), which are not damages or penalties as those terms are ordinarily understood. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) (equitable remedies are not punitive, but preventative).

And if OLC's understanding of § 4557 were correct, it would follow that a DPA order continues to preempt a state regulatory regime even after the DPA order itself were held invalid. In other words, a DPA order would forever oust state regulation under the OLC's theory, even if it turned out that the federal government lacked regulatory authority too. Here, for example, even if this Court were to conclude that the DPA order was unlawful, OLC's interpretation would say that the California pipeline could continue operating and the State would be powerless to halt it. Congress cannot have intended to create a complete regulatory void if the federal government used the DPA improperly. "[T]he possibility that both state and federal authorities would be left unable to regulate . . . seems more than a little unlikely." *Virginia Uranium*, 587 U.S. at 771.

**2. The DPA does not delegate the authority OLC now claims.**

OLC not only fails to identify preemptive language in the DPA but also is wrong about the authority the DPA *does* delegate. OLC's assertion that Congress "need not mention preemption by name" when authorizing the President to displace state law, OLC Op. at 7, overlooks whether Congress has actually delegated that authority to the President in the

first instance, *see Wyeth*, 555 U.S. at 577 (agencies have "no special authority to pronounce on pre-emption absent delegation by Congress"). Indeed, the OLC opinion itself admits that a federal agency may preempt state law only when the agency is "'acting within the scope of its congresssionally delegated authority.'" *See* OLC Op. at 5 (citing *New York v. FERC*, 535 U.S. 1, 18 (2002)).

And here, § 4511 only delegates authority regarding contracts necessary to promote the national defense. *See Hercules Inc.*, 24 F.3d at 203. Assuming that the DPA's authorization for the President to reprioritize certain contracts impliedly displaces some state *contract* law—where, for example, prioritizing a DPA contract would require a party to break a third-party contract otherwise enforceable under state law—OLC takes a radical and unsupported leap when it argues that "the same principle" leads to "displacement of state regulatory law." OLC Op. at 13. To the contrary, the statute nowhere contains the "clear and manifest" statement required to displace *all* such law, particularly in areas traditionally regulated by the States. *Wyeth*, 555 U.S. at 565 (quotation marks omitted) (noting presumption against preemption in areas of traditional state concern). And as the federal government had long argued prior to the

2026 OLC opinion, the DPA does not permit "the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." *Vertac Chem. Corp.*, 46 F.3d at 812.

The DPA's structure independently confirms that § 4511 grants the President power only to prioritize and distribute existing resources, and not the additional power to compel new production of resources notwithstanding state laws. Section 4511 is located within Title I of the DPA, which covers only "[p]riorities and allocations." Defense Production Act of 1950, ch. 932, § 101, 64 Stat. 798, 799. Congress separately addressed the *expansion* of productive capacity in Title III of the DPA (titled "Expansion of productive capacity and supply"), which includes provisions specifically directed towards facilitating new production through loans and other financial incentives. *See* Defense Production Act Reauthorization of 2009, Pub. L. No. 111-67, sec. 7, § 301 et seq., 123 Stat. 2006, 2006; 50 U.S.C. § 4531 et seq. The use of financial incentives to incentivize production—rather than *compelling* production at the stroke of a pen—guards against anticommandeering concerns that would otherwise be implicated under OLC's position. *See New York v. United States*, 505 U.S. 144, 174-75 (1992) (Tenth Amendment bars federal government from commanding

state resources to federal ends). The express distinction Congress drew between the "allocation" of resources in Title I and the express "expansion" of "productive capacity" in Title III reinforces that Congress did not understand the former to authorize the Executive to compel the production of resources, let alone in contravention of state law. And it undermines OLC's unsupported assertion that the President's power to "allocate services" necessarily includes "the power to allocate productive capacity itself." OLC Op. at 16.

OLC's expansive characterization of the statutory term "allocation" (*see* OLC Op. at 16) is thus misguided. The statute refers to "allocation" as the "distribution of any supplies of materials, services, and facilities in the marketplace." *See* 50 U.S.C. § 4511(c)(2). The use of the term "allocation" rather than "production" implies distribution of existing resources, not production of new resources. *Cf. Mead Corp. v. Tilley*, 490 U.S. 714, 722-23 (1989) (statutory term "allocate" describes a mechanism for distributing existing resources, not a source of new entitlements); *cf. Virginia Uranium*, 587 U.S. at 771 (Congress does not "hide elephants" in statutory "mouseholes" (citing *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001))). And as the statute's implementing regulations make

clear, "allocation" in the contracting context takes on a specialized meaning—"allocation orders" are only those that require a contractor to (1) "set-aside" existing resources in reserve; (2) stop or reduce production or use of certain resources, or divert such resources; or (3) specify the maximum amount of resources that may be used. *See, e.g.*, 44 C.F.R. § 333.33. Crucially, allocation orders merely authorize redistribution or redirection of existing resources, not the production of new resources. *See id.*

The express conditions Congress attached in § 4511(b) separately confirm that the statute was not intended as a general grant of authority to control civilian resource production, and certainly does not provide broad preemptive authority to do so. That provision makes clear that any such authority may not be invoked unless a finding is made that (1) such material is "scarce and critical material essential to the national defense," and (2) national defense objectives "cannot otherwise be met without creating significant dislocation of the normal distribution of such material in the civilian market." *See* 50 U.S.C. § 4511(b); *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 736 n.3 (8th Cir. 2021) (to exercise DPA authority pursuant to § 4511(a), the President "must" first make requisite § 4511(b) findings). But nowhere in the Executive Order does the President actually

make such a finding, *see* Exec. Order No. 14391, 91 Fed. Reg. 13199 (Mar. 13, 2026), and the OLC analysis ignores the requirement that the President make such findings.

Past presidential orders provide numerous examples of explicit findings that the requisite § 4511(b) findings were made. *See, e.g.*, Exec. Order No. 13909, 85 Fed. Reg. 16227 (Mar. 18, 2020) ("[H]ealth and medical resources needed to respond to the spread of COVID-19 . . . meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b))."[2] But any such finding is conspicuously absent from the Executive Order and DPA order at issue in this case. Not only do the limiting conditions in § 4511(b) undermine OLC's theory that the provision has broad preemptive sweep, *see* OLC Op. at 17-19, but OLC's failure to make the requisite statutory

---

[2] *See also, e.g.*, Exec. Order No. 14387, 91 Fed. Reg. 8703, 8704 (Feb. 18, 2026) ("Promoting the National Defense by Ensuring an Adequate Supply of Elemental Phosphorus and Glyphosate-Based Herbicides"); Determination No. 2022-13, 87 Fed. Reg. 31357 (May 18, 2022) ("Delegating Authority Under the Defense Production Act To Ensure an Adequate Supply of Infant Formula"); Exec. Order No. 13917, 85 Fed. Reg. 26313 (Apr. 28, 2020) ("Delegating Authority Under the Defense Production Act With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19").

findings plainly defeats any claim that the DPA order at issue here preempts contrary state law.

### B. The OLC Theory Contradicts the History and Settled Understanding of the DPA.

Although the text and structure of the DPA alone foreclose OLC's novel preemption theory, *see Virginia Uranium*, 587 U.S. at 778, the history and long-settled understanding of the DPA reinforce this conclusion. Congress passed the DPA during the Korean War in an effort to "maintain a large production of military goods while seeking also to meet the long-denied and increasing needs of the Nation's civil economy." *United States v. Bulloch*, 165 F.4th 676, 678-79 (2d Cir. 2026) (quotation marks omitted). To that end, the Act authorizes the President to require that preference be given to government contracts as necessary to promote the national defense. *See* 50 U.S.C. § 4511; *see also Hercules Inc.*, 24 F.3d at 203. See *supra* at 5-6. But nothing in the Act's history or application suggests that Congress understood the DPA to delegate to the President a power to allow federal contractors to freely violate state laws. *See Vertac Chem. Corp.*, 46 F.3d at 812. Instead, the Supreme Court has long insisted that the President remain within the bounds of the authority specifically

conferred by the DPA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-86 (1952) (DPA does not authorize the President to seize steel mills for national defense purposes).

The historical backdrop of States' regulatory authority, both before and after the DPA's adoption, confirms that Congress did not understand that regulatory authority to conflict with the DPA's purposes. Rather, as California rightly points out, the reasonable presumption is "that Congress intended compliance with the DPA to be undertaken *safely*—in conformance with state regulations designed to protect workers and the public." Appellant's Br. at 39. Applying this presumption against preemption, courts have repeatedly refused to preempt state laws in areas that are, as here, traditionally occupied by the States. *See Wyeth*, 555 U.S. at 565, 573-75; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Hillsborough Cnty. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 719 (1985). And in any event, the OLC opinion lacks support for any notion that federal requirements cannot be reconciled with longstanding state health, safety, and environmental regulations. To the contrary, the OLC opinion suggests that compliance with federal requirements and state law is possible. *See* OLC Op. at 19.

Crucially, neither Congress nor any court has endorsed the sweeping theory of DPA preemption OLC advances here. And courts should be skeptical of reading extraordinary powers into a statute's general language. Just as the statutory term "regulate" does not include the sweeping power to impose tariffs, *see Learning Resources, Inc. v. Trump*, 607 U.S. 229, 248-49 (2026), the term "allocate" connotes changes to the distribution of resources, not transformational power to compel energy production, and in contravention of state law. And it is telling that in the Act's seventy-six-year history, no President has invoked the Act in the manner that the OLC opinion would now authorize. *See Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 505-06 (2010).

The examples that OLC offers for presidential authority to compel new production via the power to allocate resources, *see* OLC Op. at 17, are a handful of COVID-era district court cases involving meat production. But as the Fifth Circuit later recognized, the federal government never actually issued a DPA order to any meatpacking company; rather, the federal government indicated that it was *considering* a DPA order but never issued one. *See Glenn v. Tyson Foods, Inc.*, 40 F.4th 233-34 (5th Cir. 2022); *see also id.* at 237 (federal government "merely encouraged Tyson

to stay open" and "the letter was not an order"). OLC thus fails to identify in its opinion any actual instance in which a president or agency has used a DPA order to set aside state laws.

## POINT II

### OLC'S NEW INTERPRETATION OF THE DPA JEOPARDIZES THE AMICI STATES' AUTHORITY TO REGULATE IN AREAS TRADITIONALLY RESERVED TO THE STATES

Accepting the OLC's sweeping theory of preemption here not only defies the text, structure, and history of the DPA, but could strip States of their constitutional authority to enforce state laws in a variety of areas—including, inter alia, property law, environmental law, tort law, and zoning law. *See Virginia Uranium*, 587 U.S. at 770-71. That result would violate the principle that the States are "vested with the responsibility of protecting the health, safety, and welfare" of their citizens and have "great latitude" when carrying out that responsibility. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007).

For example, New York law requires certain utilities and infrastructure projects (such as those operating near sensitive areas like schools or hospitals) to secure operating permits, satisfy annual reporting requirements, and comply with safety certifications. *See* 6 N.Y.C.R.R.

§ 377.7; N.Y. Env't. Conserv. Law §§ 27-1103, 27-1105; N.Y. Pub. Serv. Law §§ 66, 68.[3] But under OLC's new preemption theory, any time a President wanted to compel new energy production near a school—even in a manner deemed hazardous under state law—the relevant state law could give way, notwithstanding the risks to public health and safety. And if a state regulator deemed a facility unsafe because its equipment presented an imminent danger to employees, *see* N.Y. Lab. Law § 27-a, OLC's theory could render the State powerless to enforce that law, or to enforce the requirement that an employer take measures so as to "provide reasonable and adequate protection to the lives, health and safety of all persons employed therein," *see id.* § 200.[4] In sum, under OLC's reasoning, *see*

---

[3] The Amici States have similar requirements. *See, e.g.*, Ariz. Rev. Stat. § 40-360.03; Colo. Rev. Stat. § 24-65.1-501; Conn. Gen. Stat. § 16-50g; Del. Code tit. 7, § 6003; D.C. Code § 8-101.05 et seq.; Haw. Rev. Stat. § 269-7 et seq.; Ill. Admin. Code tit. 35 § 602.105; *id.* tit. 83, § 461.5; Me. Rev. Stat. tit. 35-A, § 2503; Md. Code, Env't § 2-401 et seq.; Mass. Gen. Laws ch. 164, § 69T; Mich. Comp. Laws § 324.5505; Minn. Stat. § 216I.03; N.M. Stat. § 61-33-6 et seq.; Or. Rev. Stat. § 469.310; R.I. Gen. Laws § 42-98-2 et seq.; Vt. Stat. tit. 30, § 248; Va. Code § 56-265.2; Wash. Rev. Code § 70A.15.2210; Wis. Stat. § 196.491 et seq.

[4] *See also, e.g.*, Ariz. Rev. Stat. tit 23, ch. 2; Md. Code Lab. & Empl. § 5-104; Mich. Comp. Laws § 408.1011; Minn. Stat. § 182.653; N.M. Stat. § 50-9-5; Or. Rev. Stat. § 654.010; 23 R.I. Gen. Laws § 23-20.10-1 et seq.; Va. Code § 40.1-51.1; Vt. Stat. tit. 21, § 201; Wash. Rev. Code § 49.17.060.

OLC Op. at 9, the President could simply preempt state laws by issuing a DPA order, subject only to his own discretion—even if the burden of complying with those state laws while prioritizing federal contracts would be modest.

OLC's theory would likely apply with equal force to state property and tort law. If a DPA-authorized pipeline facility operated on private property without an easement, a private landowner could be without recourse to sue. If equipment failure resulted in grievous injuries, facility workers and other third-party victims could be unable to avail themselves of negligence or wrongful death causes of action on the theory that such interfere with the pipeline's ability to operate. And if the facility emitted ash and coal contaminants onto the property of a private homeowner, any nuisance or trespass claim brought by the landowner under state law could be categorically preempted. The same is true with respect to state environmental laws. If a facility was found to violate a state regulation prohibiting certain facilities from operating over public drinking water

wells, *see* 6 N.Y.C.R.R. § 373-2.14(b)(3), a DPA order could—on the OLC's theory—preempt that law and resume the facility's operations.[5]

These risks are not hypothetical. In 2015, the owner and operator of the pipeline at issue here entered into a consent decree with the State of California after a corroded pipeline ruptured and spilled over 120,000 gallons of crude oil along California's coastline. *See United States v. Plains All Am. Pipeline L.P.*, No. 2:20-cv-02415, 2026 WL 2432065, at *1 (C.D. Cal. Aug. 19, 2026). The pipeline was shut down on the ground that it violated, inter alia, several state laws regulating water pollution and pipeline safety. *See id. at* *11-13. Under OLC's theory here, a DPA order could compel the owner of the pipeline to restart the transportation of

---

[5] Broad DPA preemption could also threaten state laws that Congress expressly authorized States to adopt. For example, federal environmental statutes authorize States to develop and administer programs that satisfy federal requirements for acceptable levels of air, water, and hazardous waste pollution. *See, e.g.*, Clean Air Act, 42 U.S.C. § 7410 (requiring state implementation plans for emissions reduction), Clean Water Act, 33 U.S.C. § 1342(b) (authorizing state-administered pollutant discharge programs), Resource Conservation and Recovery Act, 42 U.S.C. § 6926 (authorizing state-administered hazardous waste programs). Consistent with that delegation, most States have enacted regulatory schemes to administer those federal programs. But under OLC's preemption theory, a DPA order could potentially displace those regulatory schemes, notwithstanding that such were expressly authorized by Congress.

crude oil, notwithstanding the fact that it has neither conformed to the requirements of the consent decree nor otherwise complied with the State's health and safety requirements.

*   *   *

Adopting OLC's interpretation of the DPA would upset the careful balance between federal and state regulatory authority in areas of traditional state concern. To endorse this view would transform the DPA into an instrument that authorizes preemption of *any* state law that poses a hypothetical impediment to presidential priorities. If that use of the DPA is permissible, scores of state laws that safeguard the health, safety, and welfare of state residents are only one presidential order away from being erased despite the absence of any congressional intent to bestow such a power. OLC's theory has no basis in the DPA's text, structure, or history, and it ignores the longstanding presumption against preemption without a clear congressional statement. This Court should reject it.

## CONCLUSION

This Court should reverse the denial of the preliminary injunction.

Dated: New York, New York
October 9, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*

By: /s/ *Samantha Neal*
SAMANTHA NEAL
Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-8066

BARBARA D. UNDERWOOD
*Solicitor General*
MATTHEW W. GRIECO
*Senior Assistant Solicitor General*
SAMANTHA NEAL
*Assistant Solicitor General*
*of Counsel*

*(Counsel listing continues on next page.)*

KRISTIN K. MAYES
*Attorney General*
*State of Arizona*
2005 N. Central Avenue
Phoenix, AZ 85004

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway 10th Fl.
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, N.W., Ste. 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 S. LaSalle Street
Chicago, IL 60603

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
445 Minnesota St., Ste. 600
St. Paul, MN 55101

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 S. Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JAY JONES
*Attorney General*
*Commonwealth of Virginia*
202 N. Ninth Street
Richmond, VA 23219

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5409

I am the attorney or self-represented party.

**This brief contains** 4,590 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ____.
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Samantha Neal **Date** October 9, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*