Case No. 26-5409

**NOT SCHEDULED FOR ORAL ARGUMENT**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF CALIFORNIA,

*Plaintiff-Appellant*,

v.

CHRIS WRIGHT,
in his official capacity as Secretary of the U.S. Department of Energy, and the UNITED STATES DEPARTMENT OF ENERGY

*Defendants-Appellees*,

and

SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY,

*Intervenor Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:26-cv-03396-SVW-SSC
Hon. Stephen V. Wilson, District Judge

# BRIEF OF AMICI CURIAE ENVIRONMENTAL NGOs IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

Linda Krop
Margaret M. Hall
Jeremy M. Frankel
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
(805) 963-1622

*Counsel for Amici Environmental Defense Center, Get Oil Out!, Santa Barbara Channelkeeper, Santa Barbara County Action Network, and Sierra Club*

Julie Teel Simmonds
Talia Nimmer
Emily Jeffers
Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
(510) 844-7100

*Counsel for Amici Center for Biological Diversity and Wishtoyo Foundation*

*Additional counsel listed on inside cover*

Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340

Colin O'Brien
Earthjustice
1 Sansome Street, Suite 1700
San Francisco, CA 94104
(415) 217-2000

Alexandra Schluntz
Earthjustice
1125 17th Street #1010
Denver, CO 80202
(303) 996-9612

*Counsel for Amici Center for Biological Diversity and Environmental Defense Center*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1-1, amici Center for Biological Diversity, Environmental Defense Center, Get Oil Out!, Santa Barbara Channelkeeper, Santa Barbara County Action Network, Sierra Club, and Wishtoyo Foundation state that they are non-profit corporations, have no parent corporations, and no publicly held corporation owns 10% or more of their stock.

**Dated:** October 9, 2026

*s/Linda Krop*
Linda Krop

*s/Julie Teel Simmonds*
Julie Teel Simmonds

*s/Linnet Davis-Stermitz*
Linnet Davis-Stermitz

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT ..... ii

TABLE OF AUTHORITIES ..... iv

INTEREST OF AMICI CURIAE ..... 1

INTRODUCTION ..... 4

ARGUMENT ..... 5

I. The Defense Production Act Does Not Support the Department's Sweeping Assertion of Executive Power. ..... 5

A. The Department's Interpretation of the DPA Usurps State Law Without Regard to the High Bar for Preemption. ..... 7

B. The Department's Interpretation of the DPA Violates Key Constitutional Protections. ..... 10

C. The Department's Interpretation of the DPA Conflicts with Federal Law. ..... 12

II. The Secretary's Order Is Subject to Review Under the Administrative Procedure Act. ..... 15

A. The Secretary's Unlawful Order Cannot Escape APA Review. ..... 15

B. The Secretary's Action Is Not Committed to Agency Discretion by Law. ..... 20

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Pages(s)**

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) .......... 11

*ASSE Int'l, Inc. v. Kerry*,
803 F.3d 1059 (9th Cir. 2015) .......... 21, 22

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 15

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011) .......... 10

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 20, 23

*E. Air Lines, Inc. v. McDonnell Douglas Corp.*,
532 F.2d 957 (5th Cir. 1976) .......... 5

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) .......... 9

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 16

*Helgeson v. Bureau of Indian Affs.*,
153 F.3d 1000 (9th Cir. 1998) .......... 20

*Hercules Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) .......... 5

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
959 F.3d 1201 (9th Cir. 2020) .......... 10

*Jajati v. U.S. Customs & Border Prot.*,
102 F.4th 1011 (9th Cir. 2024) .......... 22, 23

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .......... 13

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) .......... 16–18

*Nevada v. Watkins*,
914 F.2d 1545 (9th Cir. 1990) ........................................ 17

*Newman v. Apfel*,
223 F.3d 937 (9th Cir. 2000) ........................................ 23

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) ........................................ 10

*Sable Offshore Corp. v. County of Santa Barbara*,
2026 WL 2058424 (C.D. Cal. July 14, 2026) ........................................ 5, 14

*United States v. Barraza-Lopez*,
659 F.3d 1216 (9th Cir. 2011) ........................................ 24

*United States. v. Vertac Chem. Corp.*,
46 F.3d 803 (8th Cir. 1995) ........................................ 12, 13

*Webster v. Doe*,
486 U.S. 592 (1988) ........................................ 20

*Wyeth v. Levine*,
555 U.S. 555 (2009) ........................................ 9

**Statutes**

5 U.S.C. § 551(1) ........................................ 15–17

5 U.S.C. § 551(1)(G) ........................................ 17

5 U.S.C. § 701(a)(2) ........................................ 20

5 U.S.C. § 704 ........................................ 15

40 U.S.C. § 121(a) ........................................ 17

50 U.S.C. § 4511(a) ........................................ 21, 24

50 U.S.C. § 4511(a)(1) ........................................ 6

50 U.S.C. § 4511(a)(2) ........................................ 6

50 U.S.C. § 4511(b) ........................................ 20

50 U.S.C. § 4511(c) ........................................ 6, 24

50 U.S.C. § 4511(c)(2) ........................................ 20

50 U.S.C. § 4511(d) ........................................ 19, 20

50 U.S.C. § 4511(d)(1) ........................................ 6

50 U.S.C. § 4511(d)(2) .......................................................... 6, 13

50 U.S.C. § 4552(14) .......................................................... 24

50 U.S.C. § 4557 .......................................................... 19, 22

Pub. L. 83-95, 67 Stat. 129 (1953) .......................................................... 11

**Regulations**

15 C.F.R. pt. 700 (2026) .......................................................... 6

**Other Authorities**

*California wildfires prompt tougher rules for utilities*, Associated Press, Dec. 14, 2017, https://bit.ly/4ep8jRV .......................................................... 8

Michael H. Cecire & Heidi M. Peters, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* 2 (2020) .......................................................... 11

*Jackson Township Proposed Strip Mine Project*, Fox 8, Apr. 7, 2026, https://bit.ly/47Kwqqs .......................................................... 8

Will Parker, *Every Household in This Rural Town Receives $10,000 If a Data Center Gets Built*, Wall St. J., Sept. 27, 2026, https://bit.ly/4jLEtdU .......... 8

William Powell, *Policing Executive Teamwork: Rescuing the APA From Presidential Administration*, 85 Mo. L. Rev. 71 (2020) .......................................................... 18

## INTEREST OF AMICI CURIAE

Amici are environmental organizations with a deep interest in protecting the California coast and local communities from the risks and impacts of offshore and coastal oil and gas operations.[1] In 2015, one of the two pipelines at the center of this litigation caused a catastrophic oil spill at Refugio State Beach in Santa Barbara County. This pair of pipelines stretches 120 miles, passing through beaches and nearshore habitat along the Gaviota Coast, major groundwater basins, renowned parks and recreational areas, and a suburban neighborhood in Buellton, California. The 2015 spill affected approximately 150 miles of the California coast, harming wildlife and their habitats forcing the closure of fisheries and beaches, and costing local businesses hundreds of millions of dollars. Amici are concerned about the risks of another major oil spill from these pipelines. They not only seek to enforce environmental and safety laws pertaining to the pipelines, but they also seek to retain critical state regulatory oversight and protection of state lands, including Gaviota State Park and state tidelands.

[1] No counsel for a party authored this brief in whole or in part, and no such counsel, party, or other person or entity—other than amici and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

The Environmental Defense Center (EDC) is a non-profit law firm that defends nature and advances environmental justice on California's Central Coast through advocacy and legal action. EDC has long worked to protect the California coastline and marine environment from the risks of oil drilling and transportation.

Get Oil Out! formed in the wake of the Santa Barbara Oil Spill of 1969 to protect the Santa Barbara Channel and coastline from another devastating oil spill.

Santa Barbara County Action Network is a non-profit organization dedicated to promoting social and economic justice, preserving environmental and agricultural resources, and creating sustainable communities. That work includes efforts to protect Santa Barbara County's natural resources and community from risky oil and gas operations that do not comply with the law.

Sierra Club is a national organization dedicated to exploring, enjoying, and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives.

Santa Barbara Channelkeeper (SBCK) is a non-profit public benefit corporation with a mission of protecting and restoring the Santa Barbara

Channel and its watersheds through science-based advocacy, education, fieldwork, enforcement, and community engagement. SBCK and its members are committed to protecting the Santa Barbara Channel from pollution threats, such as coastal and offshore oil spills.

Center for Biological Diversity (CBD) is a nonprofit conservation organization dedicated to the recovery of endangered, threatened, and rare species and their habitats through science, policy, and law. CBD has worked for many years to protect imperiled plants and wildlife, open space, air and water quality, and the overall quality of life for people in the region where the pipelines at the center of this litigation are located.

Wishtoyo Foundation (Wishtoyo) was founded in 1995 to preserve and protect Chumash culture and the culture of first nations peoples; to protect natural and cultural resources essential to Chumash lifeways and all people; and to educate and instill in youth environmental values, awareness, and stewardship. Wishtoyo has a longstanding record of protecting and restoring the coastal watersheds of Chumash homelands, the Santa Barbara Channel, and the Pacific Ocean.

## INTRODUCTION

A little over a decade ago, one of the pipelines at the center of this litigation ruptured catastrophically. Corroded as a result of its defective design, the pipeline released more than 120,000 gallons of oil into the surrounding environment, harming coastal and marine life irreparably. A long list of state and federal requirements bar the pipelines from restarting until or unless its safety can be assured. But with little interest in meeting those requirements, the pipelines' new owner, Sable Offshore Corp., asked the Department of Energy to supply a workaround. Astonishingly, the Department agreed.

The gambit called on the Secretary of Energy to invoke Title I of the Defense Production Act (DPA). By its plain language, that statute supplies the Executive Branch with narrow tools to require that businesses reprioritize contractual arrangements or reallocate services or resources from their ordinary uses. As the Department of Energy sees it, however, the DPA goes far further: It authorizes officials like him to "order" businesses like Sable to perform tasks they have no contracts to perform—and, indeed, are prohibited by state, federal, and even constitutional law from doing at all. And not only that, the Department claims that such a command is fully insulated from judicial review, no matter how unlawful it may be.

The district court embraced this bold theory, but both it and the Department were mistaken. The State's brief explains in detail why the statutory interpretation arguments they have embraced cannot be squared with the DPA's text. Opening Br. 20–31. Amici submit this brief to contribute two further points. *First*, amici highlight the stunning implications of the Department's account of the statute to underscore its departure from Congress's enacted text and the ordinary rules for disturbing state, federal, and constitutional protections. *Second*, amici explain why, under the basic principles of reviewability, the Department's overreach is subject to judicial review under the Administrative Procedure Act (APA).

## ARGUMENT

### I. The Defense Production Act Does Not Support the Department's Sweeping Assertion of Executive Power.

For three quarters of a century, courts, Executive Branch officials, and commentators alike have recognized that Title I of the Defense Production Act does what it says: "provide the President" with two discrete, "delegable authorities to influence domestic industry in the interest of national security." *Sable Offshore Corp. v. County of Santa Barbara*, 2026 WL 2058424, *12 (C.D. Cal. July 14, 2026); *see also, e.g.*, *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 981–82 (5th Cir. 1976); *Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994), *aff'd on other grounds*, 516 U.S. 417 (1996). The first of these is the

power to establish contractual "priority"—that is, to require a business to prioritize performing one of its contractual obligations in lieu of another. 50 U.S.C. § 4511(a)(1). The second is the power of "allocation"—that is, to control the distribution of materials, services, or facilities in the marketplace. *Id.* § 4511(a)(2). In 1975, Congress amended the statute to allow the President or his delegees to use these powers to expand domestic energy supplies, subject to several additional restrictions. *See id.* § 4511(c). With this basic vision in mind, the Executive Branch has, at Congress's direction, spent decades establishing an elaborate federal "priorities and allocations system," *id.* § 4511(d)(2), governed by specific "standards and procedures" set by each agency that wields DPA authority, *id.* § 4511(d)(1), that is followed every day by countless federal contractors and other entities, *see, e.g.*, 15 C.F.R. pt. 700 (2026).

But as today's Departments of Energy and Justice—and the court below—see it, the DPA did something different. *See* 5-ER-778–81 (Secretary's DPA order); 4-ER-591–94 (briefing below); 5-ER-1021–042 (Office of Legal Counsel opinion); 1-ER-35–39 (district court's reasoning). Under their interpretation, the DPA gave Executive Branch officials like the Secretary of Energy the power to direct a business to perform a task—here, restart a corroded and dangerous pipeline that catastrophically ruptured in 2015—without regard to whether that task involves "prioritizing" one of the business's competing contractual

obligations, or "allocating" resources from one part of the market to another. And if the recipient has no right to perform the task—if doing so conflicts with a wide assortment of state and federal laws, court orders, established property rights, or even the Constitution—no matter. By the pen of a single official, they say, the Executive Branch may direct favored industries or interests to bypass these constraints as inconvenient formalities. Even worse, the Department of Energy says that when Executive Branch agencies abuse this formidable power, there is nothing anyone can do to stop them. It claims those agencies' actions are unreviewable by the courts.

If accepted, that view would have astonishing implications for federalism, property rights, and the separation of powers. And it would do so notwithstanding the high barriers that normally apply before a court will set aside those principles. This Court should reject the Department's invitation to ignore them here. Instead, as the State has urged, it should enforce the DPA's text as it was written.

### A. The Department's Interpretation of the DPA Usurps State Law Without Regard to the High Bar for Preemption.

Starting with federalism, if a DPA order can exempt a recipient wholesale from "the enforcement of conflicting state or local laws," as the district court reasoned (1-ER-35), Executive Branch officials can follow a simple formula to override any state laws they dislike. First, identify a task that cannot be

performed without violating the disfavored state law. Then, issue an order requiring that the recipient "immediately prioritize" its performance, or "allocate" the recipient's resources to doing so. 5-ER-780.

Consider a few examples. Disapprove of regulations that restrict where flammable energy infrastructure may be constructed? *See California wildfires prompt tougher rules for utilities*, Associated Press, Dec. 14, 2017, https://bit.ly/4ep8jRV. Order operators to "immediately prioritize" constructing those facilities or supplying their services anyway, and watch inconvenient limits melt away. Frustrated with a township's opposition to a hyperscale data center that fuels artificial intelligence tools the military might want? *See* Will Parker, *Every Household in This Rural Town Receives $10,000 If a Data Center Gets Built*, Wall St. J., Sept. 27, 2026, https://bit.ly/4jLEtdU. Order the developer to "allocate" those services all the same. Dislike zoning rules barring the construction of a strip mine in a quiet residential area? *See Jackson Township Proposed Strip Mine Project*, Fox 8, Apr. 7, 2026, https://bit.ly/47Kwqqs. Order landowners to "allocate" their parcels to developing the mine anyway.

As this case shows, demanding speed can do still further damage. Even where it is technically possible for industry to comply with state law before performing its ordered task—for instance, by completing a state-mandated safety

check or replacing a broken part needed to safely reopen a facility—federal officials can, by the Department's logic, nullify those requirements by requiring that businesses act more quickly than state law allows.

And as the examples in the State's opening brief (at 26–29) illustrate, that is only the beginning. So long as they articulate a national security or energy supply imperative purportedly justifying their action, unscrupulous officials might even find ways to skirt state criminal laws. Corrupt officials might reward their friends. Oblivious officials might accidentally override state laws they were not even aware existed.

Normally, it is not easy for federal agencies to declare open season on state regulations. That is especially true when—as in this case and the hypotheticals supplied above—no party has asserted that the proposed federal action *expressly* preempts state law, and the Department instead resorts to theories of implied preemption.

Implied preemption comes in several forms, and each is difficult to prove. Impossibility preemption, for instance, is a "demanding defense," *Wyeth v. Levine*, 555 U.S. 555, 573 (2009), that requires demonstrating that "compliance with both federal and state [law] is a physical impossibility" presenting an "inevitable collision" between federal and state law, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). And theories of implied purposes-and-

objectives preemption are even more tightly policed: A "high threshold must be met if a state law is to be preempted" merely "for conflicting with the purposes" of a federal law. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (quotation omitted). "[P]urported legislative intentions unmoored from any statutory text" cannot, on their own, displace state laws and regulations. *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). Litigants must identify "the text of a law" that does so. *Id.* And when the federal actor supposedly doing the preempting is an agency official acting on his own whim, courts scrutinize those actions closely. "The Supremacy Clause gives priority to the Laws of the United States, not the priorities and preferences of federal officers." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quotations omitted).

The Department's preemption roadmap is at odds with these safeguards. By its logic, all an Executive Branch official needs to preempt vast swaths of state law is a broad delegation of power and an urgent exhortation. That is not how the DPA is written, and it is not how preemption works.

### B. The Department's Interpretation of the DPA Violates Key Constitutional Protections.

The Department's capacious reading of the DPA reaches beyond state statutes and regulations to place state property rights and constitutional protections in the crosshairs too. By the Department's admission, nothing in its

account of the DPA prevents Executive Branch officials from ordering that state property be devoted to some new, preferred use. Here, it's depriving California of its discretionary authority to grant an easement over land in a coastal State park—and, for that matter, to prosecute trespass onto State lands. But why stop there? If agency officials are not constrained by existing property rights, they could just as easily design their orders to requisition huge swaths of state land.[2] Timber interests could be required to "allocate" their timber-harvesting services to prized state legacy forests. Mining interests could be ordered to "prioritize" extracting the valuable mineral resources housed on state land. And so on.

Here, as with preemption, courts ordinarily tread carefully. Basic principles of constitutional avoidance militate against allowing separation of powers conflicts or interference with property rights. Among other things, those principles insist that when Congress wants to "alter the balance between federal and state power and the power of the Government over private property," it must "enact exceedingly clear language." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (quotation omitted).

---

[2] And they could do so notwithstanding the fact that Congress once included requisition authorities in the DPA—and long ago allowed those provisions to lapse. *See* Opening Br. at 5, 42; Michael H. Cecire & Heidi M. Peters, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* 2 & n.9 (2020) (discussing Pub. L. 83-95, 67 Stat. 129, 131 § 11(a) (1953)).

The Department does not even attempt to make that showing here. As the State explains, the Department's arguments conflict with the clear language Congress *did* enact, which leaves no room for federal officials to requisition state (or private) property.

### C. The Department's Interpretation of the DPA Conflicts with Federal Law.

The Department of Energy's position also seems to give agency officials a veto over conflicting *federal* law. Numerous federal statutes—from the Endangered Species Act (ESA) to the Coastal Zone Management Act—restrict the operation of Sable's pipelines. For example, the ESA requires that federal agencies ensure their actions do not jeopardize listed species and establishes an important consultation process with federal wildlife agencies to examine impacts and develop alternatives to the action if warranted. But as the Department sees it, the DPA gives it the power to sweep those requirements aside. The Secretary can work an end-run around them merely by requiring that Sable prioritize a pipeline restart.

So interpreted, the DPA could imperil thousands of similar legislative enactments. Suppose an agency official wishes to secure speedy "production and delivery of Agent Orange"—a brutally toxic herbicide—without having to comply with the detailed laws that restrict the use or disposal of such chemicals, *see United States v. Vertac Chem. Corp.*, 46 F.3d 803, 807 (8th Cir. 1995), or that

protect workers from exposure to their dangers. As the Department sees it, it can craft a DPA order that exempts its industry partners from any of those requirements, creating the "absurd result of allowing a government contractor"—or, apparently, any private party—"to violate the laws with impunity, so long as it is performing a rated contract" or otherwise acting under DPA direction. *Id.* at 812; *see also id.* at 812–13 (rejecting a similarly expansive interpretation of the DPA).

Here yet again, agency officials do not ordinarily wield such expansive powers. Courts do not lightly conclude that Congress has impliedly replaced one enactment with another. Indeed, the usual rule is that courts "will not infer a statutory repeal" unless the legislature's intention is "'clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (citation omitted).

The DPA does not even hint at such an objective. It gives the President and his delegees clear, delineated authorities, and it tells them how those authorities may be exercised: to shift market behavior, not to override federal enactments.

* * *

If the abuses described above sound far afield from the "priorities and allocations system" Title I erected, 50 U.S.C. § 4511(d)(2), that's because they

are. The DPA wasn't written as a roving get-out-of-jail-free card for anyone who can persuade the Executive Branch that its business interests will somehow support national defense or increase the energy supply. As California has explained (at 4–7, 20–31), and as decades of agency practice reflect, when Congress enacted the DPA, Congress did what it said it was doing. It gave the Executive Branch "market vehicles" to prioritize certain federal objectives and to allocate businesses' services and resources to projects the Executive Branch favors rather than ones it doesn't. *Sable Offshore*, 2026 WL 2058424, at *11. It did not at the same time empower Executive Branch officials to disregard any enactment or regulation that interferes with their objectives.

Congress could have crafted the DPA's prioritization and allocation power to override each of these background principles. But nowhere in the statute's text, history, or long-running agency practice is there any indication that that's what it had in mind. Rather, as the State explains (at 23–25), where Congress wished to authorize the conduct the Department attempted here—to bring about new production or to requisition private property to its own ends—it said so. This Court should reject the Department's invitation to ignore those clear demonstrations of congressional intent.

## II. The Secretary's Order Is Subject to Review Under the Administrative Procedure Act.

Nor is the Secretary's order immune from judicial scrutiny under the APA, as the Department and Sable argued below.[3] The order is final action by the Secretary of Energy, who is an "agency" by the APA's plain terms, whether or not he discharges powers delegated to him by the President. And his decision is not committed to discretion by law.

### A. The Secretary's Unlawful Order Cannot Escape APA Review.

For starters, the Secretary's order is plainly reviewable under the APA. The APA applies to any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. As an "authority of the government of the United States," albeit one "within" another agency, the Secretary of Energy is an agency. *Id.* § 551(1). And the order at issue here has all the hallmarks of finality. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). By its own telling, it constitutes the consummation of a series of "findings and determinations" by the agency. *See* 5-ER-780. And it purports to direct a third party to undertake immediate obligations. *See id*. The Department of Energy

[3] That is to say nothing of the State's additional causes of action, which supply further bases to review the Secretary's actions. *See* 2-ER-167–70 (State's amended complaint). For purposes of this brief, amici focus on the key reasons why the State's APA claims are reviewable.

and Sable have not contested any of these points. But before the district court, they claimed that the Secretary's order is, in fact, a *presidential* order to which the APA cannot apply. That argument "defies fundamental principles of administrative law" and is foreclosed by this Court's decision in *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024).

The Department's argument starts with the Supreme Court's decision in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), where the Court held that presidential actions are not reviewable under the APA because the President does not meet the APA's definition of an "agency." *Id.* at 796–801. Even though the text of the APA does not exclude the President from that definition, *see* 5 U.S.C. § 551(1), the Court in *Franklin* viewed him as occupying a "unique constitutional position," 505 U.S. at 800. Accordingly, it was unwilling to treat him as an agency under the APA absent an express statement to that effect. *Id.* at 801. The Secretary of Energy, of course, holds no "unique constitutional position." But, the Department's argument goes, so long as he is acting pursuant to delegated presidential authority, he, too, is exempt from the APA.

The Department's attempt to extend *Franklin*'s rule, however, cannot be reconciled with the APA's statutory text and decades of caselaw. *Franklin*'s rule

stems from textual silence and the President's "unique" position.[4] But the Secretary does not occupy a "unique" position like the President's, and the APA is not silent as to whether the Secretary of the Energy is an agency. *See* 5 U.S.C. § 551(1). Accordingly, case after case has treated him as such. *See, e.g.*, *Nevada v. Watkins*, 914 F.2d 1545, 1563 (9th Cir. 1990). To accept the Department's view, then, this Court would have to write a new exception into the APA, under which an Executive Branch official can be an "authority of the Government" only some of the time. There is no basis to do so.

So it is of little surprise that, when confronted with a similar argument two years ago, this Court rejected it. In *Nebraska v. Su*, the Department of Labor argued that it was entitled to the *Franklin* presumption when it took steps to implement a presidential directive issued under authority delegated in the first instance to the President. 121 F.4th at 7 (citing 40 U.S.C. § 121(a)); *see id.* at 15–16. But as this Court explained, "as a textual matter," every final action "taken

[4] As this Court has observed, *see Su*, 121 F.4th at 15 & n.8, *Franklin*'s reasoning is difficult to square with Congress's drafting choices. When Congress wanted to exclude an "authority of the government" from the APA's definition of agency, it said so. *See* 5 U.S.C. § 551(1)(A)–(H) (exempting, among others, Congress). It even expressly excluded *some* forms of military authority—those "exercised in the field in time of war or occupied territory." *Id.* § 551(1)(G). This Court, of course, is bound by *Franklin*. But as it emphasized in *Su*, the Court should not needlessly expand precedent that rests on dubious foundations. 121 F.4th at 15 n.8.

by an agency" is subject to judicial review—even if that action is implementing a presidential order. *Id.* at 15–16. With good reason: The contrary view "would shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen," thereby evading "APA-mandated accountability." *Id.*

Try as it might, the Department of Energy cannot distinguish this caselaw. Before the district court, it suggested that *Su* merely preserved APA review for agency actions that implement executive orders, and had nothing to say about the President's delegation of his own constitutional or statutory authority. But that argument does not account for *Su*'s interpretation of the APA's text. Nor does it explain why an agency is less of an "agency," as the APA defines that term, when it performs a task the President has ordered it to perform than when it exercises delegated presidential power. And it certainly does not explain why Congress would have reached that compromise, allowing the agencies it otherwise wished to subject to APA-mandated accountability to evade "public involvement, transparency, and deliberation" on their own whim. *Id.*

Such a rule also makes no sense on its own terms. Among other things, it would be at odds with our nation's history. Historically, Congress "delegated all administrative authority to the President in name," and the President delegated his power further as he saw fit. William Powell, *Policing Executive*

*Teamwork: Rescuing the APA From Presidential Administration*, 85 Mo. L. Rev. 71, 89–91, 127 (2020). There is no reason to think that Congress conceived of every administrative action taken pursuant to these delegations as presidential power not subject to ordinary judicial review.

And it makes particularly little sense as applied to a statute like the DPA. Even if *presidential* DPA orders were unreviewable, the statute expressly envisions that the President will delegate his powers to agencies like the Secretary, whom Congress then tasks with establishing all the ordinary trappings of standardized agency practice. *See, e.g.*, 50 U.S.C. § 4511(d). Further statutory language makes it unlikely that Congress intended to insulate any DPA orders from review. As California has explained (at 54), the DPA expressly contemplates that orders issued under the statute will be subject to judicial review by immunizing acts that result from a business or individual's compliance with a DPA order notwithstanding that the order is "thereafter . . . declared by judicial or other competent authority to be invalid." 50 U.S.C. § 4557. To be declared invalid by judicial order, a DPA order must be reviewable.

Bottom line: The Department of Energy's attempt to evade the APA defies the principles on which that statute was based and this Court's precedents interpreting them. This Court should reject it.

### B. The Secretary's Action Is Not Committed to Agency Discretion by Law.

To the extent the Department contends that DPA orders are unreviewable because they are "committed to agency discretion by law," *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. § 701(a)(2)), it is just as mistaken. The Supreme Court reads that exception to APA review "quite narrowly," *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotation omitted), consistent with the "strong presumption" that Congress intends administrative action to be reviewable, *Helgeson v. Bureau of Indian Affs.*, 153 F.3d 1000, 1003 (9th Cir. 1998) (quotation omitted). It is not enough that an action be discretionary; after all, the APA itself "command[s] that courts set aside agency action that is an abuse of discretion." *Dep't of Com.*, 588 U.S. at 772. Rather, the Supreme Court has restricted use of the exception to those "rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge" the agency's action. *Id.* (quotation omitted). Title I of the DPA is not such a statute.

Indeed, Title I contains detailed statutory requirements well-suited to judicial enforcement. Several provisions explicitly enumerate findings the President or his delegee is required to make before issuing a DPA order. *See, e.g.*, 50 U.S.C. § 4511(b) (requiring, among others, findings that a material is "a scarce and critical material essential to the national defense"); *id.* § 4511(c)(2)

(restricting use of authority absent detailed findings). Others require agencies delegated power under the statute to establish standards, procedures, and consistent policies to enforce the section. *Id.* § 4511(d). It is difficult to understand why Congress would have bothered to articulate these detailed requirements if they were mere formalities whose absence or insufficiency could not be enforced. And this Court has expressly held that, even if a statute "grants an agency 'unfettered discretion,'" the agency's decision may nonetheless be reviewed for failure to comply with its own regulations. *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1069 (9th Cir. 2015) (quotation omitted). That is to say nothing of the State's further challenges to whether the Secretary's order is, as a matter of statutory interpretation, a "prioritization" or "allocation" order at all. *See* 50 U.S.C. § 4511(a); Opening Br. at 21–31.

Perhaps for these reasons, the Department's reviewability concerns before the district court stopped short of insisting that *all* of the Secretary's actions under the DPA are too discretionary to be subject to judicial review. It focused on two: the Secretary's determination that his order was necessary to promote the national defense under Section 4511(a), and his determination that the order was necessary to maximize domestic energy supplies under Section 4511(c). Leaning heavily on the national security context—which it insists

applies equally to both determinations—the Department has urged that neither may be subject to judicial scrutiny. It is mistaken.

Starting with Section 4511(a), as an initial matter, the Department's premise that the Secretary's determination is unreviewable because it involved national defense is mistaken. As this Court explained in *ASSE International*, whether judicial review may interfere with national defense or foreign policy objectives is a context-specific question that depends on the statute and program in question. 803 F.3d at 1070. And here, the detailed criteria Congress included in Section 4511(b) and (d)—together with the other statutory clues that Congress intended DPA reviewability, *see* 50 U.S.C. § 4557—strongly suggest that it did not see scrutiny of Executive Branch determinations as unduly disruptive. Those criteria also supply law to apply in such a challenge.

Moreover, notwithstanding the Executive Branch's national security prerogatives, "judicial review under the APA concerns not only the particular outcome the agency reaches, but also the process in which the agency engages and the reasoning the agency articulates when it reaches that outcome." *Jajati v. U.S. Customs & Border Prot.*, 102 F.4th 1011, 1017 (9th Cir. 2024). So even when an agency "reaches an outcome that could conceivably fall within its broad discretion," a court may well retain "jurisdiction under the APA" to

consider whether the agency relied on matters outside its discretion. *Id.* Here, the State has identified at least two.

First, the requirement that agencies offer "genuine justifications for important decisions" supplies a legal standard by which to scrutinize whether the Secretary's national security justifications are "contrived," "pretextual," or "incongruent" with the record. *Dep't of Com.*, 588 U.S. at 756, 783, 785; *see* 2-ER-165–66 (State's allegations to this effect). "The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds." *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000); *see also Jajati*, 102 F.4th at 1017 (collecting cases).

Second, "the general requirements of reasoned agency decisionmaking" provide standards by which courts can examine whether the Department's order was arbitrary and capricious. *Jajati*, 102 F.4th at 1017 (quotation omitted). That includes the State's allegations that the Secretary supplied no rational basis to explain why, or how, his command to Sable was necessary to promote the national defense and that the Secretary failed to consider important aspects of the problem, including the likelihood of catastrophic impacts on the State's economy and natural resources, and its disturbance of the State's regulatory framework. *See* 2-ER-166.

The Department's position on Section 4511(c) fails for these same reasons and one more. The Department has suggested that Section 4511(c) is only "nominally" about domestic energy supplies, but in fact concerns discretionary national defense judgments. 2-ER-76. That position is utterly at odds with Congress's choice to treat the two topics as distinct concerns governed by distinct rules. *Compare* 50 U.S.C. § 4511(a) (DPA orders for national defense), *with id.* § 4511(c) (DPA orders, subject to additional requirements, concerning energy supplies). While the topics may be linked—for instance, as relates to *federal* "programs for . . . energy production," *id.* § 4552(14)—this Court generally presumes that Congress enacts separate subsections for a reason. *See, e.g.*, *United States v. Barraza-Lopez*, 659 F.3d 1216, 1220 (9th Cir. 2011). Here, there is an obvious one: Congress wanted additional safeguards before empowering the President to interfere in the market for reasons other than urgent national defense prerogatives.

In sum, neither the Department's invocation of national security concerns, nor its commitment to its energy agenda, renders courts powerless to review its actions.

## CONCLUSION

This Court should reverse the district court's denial of California's motion for a preliminary injunction.

**Dated:** October 9, 2026

_s/Linda Krop_
Linda Krop
Margaret M. Hall
Jeremy M. Frankel
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
(805) 963-1622
lkrop@environmentaldefensecenter.org
mhall@environmentaldefensecenter.org
jfrankel@environmentaldefensecenter.org

*Counsel for Amici Environmental Defense Center, Get Oil Out!, Santa Barbara Channelkeeper, Santa Barbara County Action Network, and Sierra Club*

_s/Julie Teel Simmonds_
Julie Teel Simmonds
Talia Nimmer
Emily Jeffers
Center for Biological Diversity
2100 Franklin Street, Suite 375
Oakland, CA 94612
(510) 844-7100
jteelsimmonds@biologicaldiversity.org
ejeffers@biologicaldiversity.org
tnimmer@biologicaldiversity.org

*Counsel for Amici Center for Biological Diversity and Wishtoyo Foundation*

_s/Linnet Davis-Stermitz_
Linnet Davis-Stermitz
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
ldavisstermitz@earthjustice.org

Alexandra Schluntz
Earthjustice
1125 17th Street #1010
Denver, CO 80202
(303) 996-9612
aschluntz@earthjustice.org

Colin O'Brien
Earthjustice
1 Sansome Street, Suite 1700
San Francisco, CA 94104
(415) 217-2000
cobrien@earthjustice.org

*Counsel for Amici Center for Biological Diversity and Environmental Defense Center*